In re:                                              Case No. 9:10-bk-03846-ALP
                                                    Chapter 11
FIDDLER'S CREEK, LLC, *et al.* [1]

      Debtors.
_____/

## DECLARATION OF ANTHONY DINARDO IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

## I.   INTRODUCTION.

1.      My name is Anthony DiNardo and I am the Chief Financial Officer of the Debtors. Concurrently with the filing of this affidavit, the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on February 23, 2010 (the "Petition Date"). An organizational chart of the corporate structure encompassing each of the Debtors is attached hereto as ***Exhibit A.***

2.      The Debtors' corporate headquarters are located at 8156 Fiddler's Creek Parkway, Naples, Florida 34114.

3.      I make this affidavit on personal knowledge in my capacity as Chief Financial Officer of the Debtors. The statements set forth below are true to the best of my knowledge, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.      I submit this affidavit in support of the Debtors' Chapter 11 petitions (the "Chapter

---

[1] The Debtors seeking joint administration are: (i) Fiddler's Creek, LLC; (ii) 951 Land Holdings, LLC; (iii) 951 Land Holdings, Ltd.; (iv) DY Associates, LLC; (v) DY Land Associates, Ltd.; (vi) FC Beach, LLC; (vii) FC Beach, Ltd.; (viii) FC Golf, LLC; (ix) FC Golf, Ltd.; (x) FC Hotel, LLC; (xi) FC Hotel, Ltd.; (xii) FC Marina, LLC; (xiii) FC Resort, LLC; (xiv) FC Resort, Ltd.; (xv) Fiddler's Creek Management, Inc.; (xvi) GBFC Development, LLC; (xvii) GBFC Development, Ltd.; (xviii) GBFC Marina, Ltd.; (xix) Gulf Bay Hospitality Company, LLC; (xx) Gulf Bay Hospitality, Ltd.; (xxi) Gulf Bay Hotel Company, LLC; (xxii) Gulf Bay Hotel Company, Ltd.; (xxiii) DY Land Holdings II, LLC;

11 Cases") and first-day motions being filed contemporaneously herewith in the above-captioned Chapter 11 Cases. Any capitalized terms not expressly defined herein shall have the meaning ascribed to them in the relevant first-day motion. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, and information supplied to me by other members of the Debtors' management and advisors.

5.      In order to assist the Court and creditors in understanding the corporate structure of the Debtors and the relief sought by the Debtors in these cases, I have organized this affidavit in four (4) parts as follows:  Part I consists of the Introduction.  Part II describes the Debtors' business, history and capital structure.  Part III describes the events and circumstances precipitating the filing of the Chapter 11 petitions.  Part IV describes the Chapter 11 Cases and sets forth the relevant facts in support of the Debtors' various first-day applications and motions filed concurrently herewith.

## II.    DESCRIPTION OF THE DEBTORS' BUSINESS, HISTORY AND CAPITAL STRUCTURE.

### A.    Corporate History and Structure

6.      Each of the Debtors in these Chapter 11 Cases owns, operates and/or is otherwise affiliated with the fully integrated, premier master planned residential community known as "Fiddler's Creek" in southwestern Florida.  Fiddler's Creek is located in Collier County, Florida, approximately 12 miles southeast of the City of Naples and six miles north of Marco Island. The Fiddler's Creek development is comprised of nearly 4,000 zoned acres of prime land in Naples, Florida, and is planned for and capable of accommodating up to 6,000 residences upon projected

---

build-out, which is estimated to be completed in 2020. Fiddler's Creek has been approved and vested by the State of Florida as a Development of Regional Impact.

7.      Beginning in 1993, the Debtors, together with Tomen America, Inc., as its partner in certain of the Debtors, began assembling the various properties that today comprise Fiddler's Creek. The property underlying Fiddler's Creek was accumulated by the Debtors from 1993 through 1996. Specifically, the first acquisition consisted of approximately 1,300 acres that would become Fiddler's Creek, a master-planned community. The second acquisition increased the community's size to its current 3,931 acres. Fiddler's Creek as it sits today represents the culmination of years of planning, negotiations, settlements and assemblage efforts by the Debtors and the Debtors' team of professionals.

8.      In 1998, Fiddler's Creek sold its first home. Since then, Fiddler's Creek has developed, sold and constructed in excess of 1,650 homes in the development. As a result, Fiddler's Creek is home to over 4,300 full and part time residents.

**B.      Fiddler's Creek Community.**

9.      Fiddler's Creek contains five distinctive neighborhoods known as: Fiddler's Creek, Veneta, Aviamar, Marsh Cove and Meadow Run, all as depicted more clearly on the Master Site Plan attached hereto as ***Exhibit B***. Within each of these neighborhoods are several unique villages of varying housing products offering a wide range of price points including but not limited to, custom built luxury homes, single family homes, coach homes, villa homes and attached-villa residences. In total, there are 1,782 fully constructed and existing homes, including single family homes, coach homes and carriage homes in different communities within Fiddler's Creek. In addition, there is completed infrastructure for an additional platted 840 units of both single family

homesites and multifamily units within a variety of villages.

10.    In addition, there is over 33 acres of prime commercial property that is "infrastructure ready," with approximately 23 acres situated along State Road 951 (Collier Blvd.) and approximately 9 acres situated along US 41 (Tamiami Trail).  The total commercial square footage for buildout is approximately 300,000 square feet.

11.    In addition to the above saleable inventory of homes and developed lots, Fiddler's Creek contains approximately 2,100 acres of undeveloped land fully entitled for approximately 3,329 additional residential units and amenities.  This includes approximately 1,300 acres of the undeveloped land approved for future amenity development, including two golf courses, clubhouses, expanded tennis facilities, lakes, preserves and more.  Less than one-third of Fiddler's Creek will be developed for residential use, while the remainder of the land is dedicated primarily to nature preserves, lakes, parks, golf courses and recreational areas.

C.    **Fiddler's Creek Amenities.**

12.    Fiddler's Creek contains substantial operating amenities which are enjoyed by the homeowners.  The Club & Spa at Fiddler's Creek, which is a 54,000 square-foot resort style clubhouse with state-of- the-art fitness facility, lighted tennis courts, full menu spa services, resort style multi-pool swimming complex, casual and formal dining venues and a meeting and activity center.  The Club & Spa offers casual dining through its al fresco grille known as the *Gator Grille.* The Club & Spa also has offers formal fine dining through its restaurant known as *Caxambas.*

13.    Additionally, homeowners have the opportunity to join The Golf Club at Fiddler's Creek, with its first golf course named "The Creek Course," designed by the acclaimed golf course architect, Arthur Hills.  The Creek Course has been nationally recognized by Golf Week magazine as one of the Top 100 Best Residential Golf Courses for each of years 2005 through 2009.  Fiddler's

Creek has also been recognized by Travel & Leisure magazine as one of America's Top 100 Golf Communities for two consecutive years. The second course, The Preserve Course, is currently being designed by the award winning team of Hurdzan/Frye.

14.     Fiddler's Creek homeowners also have the option to join The Tarpon Club, which offers members beach privileges, dinning, spa services (as well as other resort amenities) at Marco Beach Ocean Resort, located on nearby Marco Island. There are also facilities available at the Tarpon Club Marina, located on the Isles of Capri, with direct access to the Gulf of Mexico, for wet and dry slip boat storage and a planned clubhouse with casual and fine dinning venues with views of Johnson Bay. In addition, the Tarpon Club has a dry boat storage facility that is designed to accommodate up to 150 boats ranging in size up to 35 feet, and is currently finalizing permit rights for 52 wet slips which will accommodate larger boats.

15.     With respect to their development on Marco Island, during the early 1990's certain of the Debtors purchased one of the last parcels of undeveloped beachfront property on Marco Island and began construction of a condominium and beachfront property known as the Marco Beach Ocean Resort (the "MBOR"), which opened in December 2001. The MBOR is comprised of 103 all suite luxury hotel/condominium units, a restaurant *Sale e Pepe*, which features northern Italian cuisine, a spa and fitness center, shops and other superb amenities, resulting in its being the recipient of AAA's Four-Diamond Award, as well as the Mobil Four-Star Award. Today, one of the Debtors, FC Beach, Ltd., continues to own 13 hotel condominium units at the MBOR. Another of the Debtors, Gulf Bay Hospitality, Ltd., operates the restaurant, *Sale e Pepe*, and manages the banquet facilities in the MBOR Beach Pavilion. Lastly, another of the Debtors, Gulf Bay Hotel Company, Ltd., manages the hotel operations at the MBOR for a management fee.

16.     The Beach Pavilion is a Tuscan styled building located at the MBOR that houses the

*Sale e Pepe* restaurant, the lounge, banquet and ballroom facilities, the beachside bar, and changing facilities available to Tarpon Club members.

**D.     The Debtors' Senior Management.**

17.     The Debtors' senior management team and their professional experience are as follows:

a.     **Aubrey J. Ferrao, President, Chief Executive Officer and founder of Fiddler's Creek.**  Mr. Ferrao came to the United States in 1973 from India at the age of nineteen after receiving a Bachelor of Arts degree from St. Stephens College at the University of Delhi.  Mr. Ferrao arrived in Florida in 1976 and began his 26 year real estate development career.  Prior to developing Fiddler's Creek, in 1986, Mr. Ferrao founded a group of companies known as the Gulf Bay Group of Companies ("Gulf Bay").  Gulf Bay is one of the largest privately owned development companies in Florida, with its headquarters in Naples, Florida.  Mr. Ferrao has grown Gulf Bay into a vertically integrated, multi-faceted real estate development company with capabilities that include planning, development, real estate construction, marketing and sales, operations and management.  Gulf Bay has accumulated vast knowledge and experience in successfully developing this large multi-faceted, highly amenitized community. Since its founding, Gulf Bay has enjoyed a stellar reputation for integrity, service and top-quality construction that has always delivered the very best to its customers.  To that end, Gulf Bay has developed various successful luxury high-rise projects in the Pelican Bay and Park Shore areas of Naples, which include, among others, the development and construction of high rise towers and garden condominium developments consisting of St. Tropez, St. Maarten, St. Thomas, St. Lucia, St. Lucia Gardens, St. Simone, St. Nicole, St. Raphael, St. Marissa, St. Kitts, St. Vincents, Cap Farrat, Cannes, St. Pierre, St. Laurent, Crown Colony at Pelican Bay, Waterpark Place at Pelican Bay and The Brittany.

b.     **Anthony DiNardo, Chief Financial Officer.**  I hold a Bachelor of Arts degree in Economics from New York University and a Masters in Business Administration and Accounting from the New York University Graduate School of Business. Additionally, I maintain a professional status as a Certified Public Accountant; state licensed Real Estate Broker and Mortgage Broker and a BOMI certified Real Property Administrator.  Prior to working with the Debtors, I held a position as Vice-President of Finance with the Arvida Corporation of Florida, Real Estate Division as well as a position at Helmsley Spear, Inc., in New York, N.Y.  I have over 30 years experience in real estate development.

c.     **Joseph Livio Parisi, In-House Corporate Counsel.**  Mr. Parisi holds a Bachelor of Science in Engineering from the United States Merchant Marine Academy, a Masters of Technology degree in Construction Contract Administration from Arizona State

University, and a Juris Doctor degree from Nova Southeastern University. Mr. Parisi was admitted to the Florida Bar in 1993 and prior to working with the Debtors, was a litigation attorney in the Ft. Lauderdale office of Ruden, McClosky, Smith, Schuster & Russell, P.A., where he practiced primarily in the areas of real estate and construction litigation for contractors and developers.

d. **Mark. P. Strain, Vice President of Planning.** Mr. Strain holds a Bachelor of Science degree in Business Administration from International College with undergraduate courses at the University of California, Irvine. Mr. Strain maintains state general contractor licenses in both California and Florida. Mr. Strain is responsible for all planning functions as well as infrastructure and horizontal development for the Debtors with specific area of responsibility on the Fiddler's Creek Development of Regional Impact ("DRI"). Prior to his involvement with the Debtors, Mr. Strain completed a 313 acre community in north Collier County and operated Excel Construction and Development Corporation, for which he held the position of President for 13 years. Mr. Strain's involvement in real estate development provides over 26 years of experience to the Debtors.

**E.    The Debtors' Prepetition Secured Lenders**

18.    As set forth in the First Day Declaration, the Debtors have the following eight (8) separate prepetition secured creditors: (i) AmSouth n/k/a Regions Bank (ii) Fifth Third Bank (iii) Textron Financial Corporation; (iv) Orion Bank n/k/a Iberia Bank; (v) KeyBank National Association; (vi) Mellon United National Bank; (vii) Tomen America, Inc. ("Tomen"); and (viii) Florida Financial Investments, Inc. (collectively the "Prepetition Secured Lenders"). As set forth below, each of the Prepetition Secured Lenders asserts a mortgage lien on certain property included in Fiddler's Creek and owned by one or more of the Debtors. The mortgage liens asserted by the Prepetition Secured Lenders do not overlap, as each Prepetition Secured Lender financed a separate parcel of land and improvements, if any, thereon contained within the overall Fiddler's Creek development. As such, no one Prepetition Secured Lender asserts a lien on all of the assets and property comprising Fiddler's Creek.

    **i.    AmSouth Bank, n/k/a Regions Bank.**

19.     On March 14, 2006, GBFC Development, Ltd., ("GBFC") executed and delivered to Regions Bank ("Regions") a certain First Consolidated Revolving Construction Mortgage Note in the principal amount of Fifty Million And No/100 Dollars ($50,000,000.00), which note consolidated and renewed the indebtedness evidenced by that certain Sixth Renewal Revolving Construction Mortgage Note, dated March 2, 2006, in the original principal amount of Thirty Million And No/100 Dollars ($30,000,000.00) and that Future Advance Note Future Advance Revolving Construction Mortgage Note, dated March 14, 2006, in the original principal amount of Twenty Million And No/100 Dollars ($20,000,000.00) (collectively referred to as the "Regions Note"). The Regions Note is guaranteed by Fiddler's Creek, LLC. Regions asserts that the Regions Note is secured by a certain Mortgage, Security Agreement and Assignment of Rents, dated November 2, 2001, encompassing certain real property and improvements known as (i) Parcel #1: tracts 60, 62, and 64 of Fiddler's Creek, Phase 5, Aviamar Unit One (Marengo and Serena); (2) Parcel #2: lots 1-26 of Fiddler's Creek, Phase 5, Aviamar Unit One (Millbrook-Phase 1); and (3) Parcel J (Callista) (collectively, the "Regions Collateral"). The outstanding balance owed to Regions on the Regions Note as of the Petition Date was $43,895,045.00. The Debtors assert that the Regions Collateral has a current aggregate market value equal to $60,680,000.00.

**ii.     Fifth Third Bank.**

20.     On May 4, 2006, GBP Development, Ltd. ("GBP") executed and delivered a certain revolving promissory note to Fifth Third Bank ("Fifth Third") in the principal amount of Twenty Three Million And No/100 Dollars ($23,000,000.00) (the "Fifth Third Note"). The Fifth Third Note is guaranteed by GB Peninsula, Ltd.  Fifth Third asserts that the Fifth Third Note is secured by a Mortgage and Security Agreement, dated May 4, 2006, in the real property and improvements

known as *Chiasso* and *Menaggio* in the Veneta subdivision of Fiddler's Creek and all buildings, structures and improvements associated with the real property (the "Fifth Third Collateral"). The outstanding balance owed to Fifth Third on the Fifth Third Note as of the Petition Date was Fifteen Million Three Hundred Thirty-Nine Thousand Eight Hundred Twenty-One And 21/100 Dollars ($15,339,821.21). The Debtors assert that the Fifth Third Collateral has a current market value equal to $6,600,000.00 with respect to finished lots and $12,000,000.00 with respect to completed housing units for an aggregate market value of $18,600,000.00.

      **iii.**      **KeyBank, National Association.**

      21.      On October 31, 2007, 951 Land Holdings, Ltd. ("951 Land") executed and delivered to Key Bank, National Association ("Key Bank") a certain Development Loan Agreement and promissory note whereby KeyBank agreed to make a secured loan available to 951 Land in the maximum aggregate amount not to exceed the sum of Twenty-One Million And No/100 Dollars ($21,000,000.00) in order to finance the development and construction of the initial phase of "Marsh Cove" in Fiddler's Creek Community (the "KeyBank Note"). The KeyBank Note is guaranteed by Fiddler's Creek, LLC. KeyBank asserts that the KeyBank Note is secured by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated October 31, 2007, encompassing certain vacant land consisting of 4 non-contiguous parcels totaling 52.10 acres (the "KeyBank Collateral"). The outstanding balance of the KeyBank Note as of the Petition Date was $6,610,330.00. The Debtors assert that the KeyBank Collateral has a current aggregate market value equal to $10,770,000.00.

      **iv.**      **Textron Financial Corporation.**

      22.      On November 14, 2008, FC Golf, Ltd. ("FC Golf") executed and delivered to Textron Financial Corporation ("Textron") a certain Second Amended and Restated Promissory Note in the

original principal amount of Eight Million Nine Hundred Fifty-Four Thousand Eight Hundred Seventy And 45/100 Dollars ($8,954,870.45) (the "Textron Note"). The Textron Note is guaranteed by Fiddler's Creek, LLC. Textron asserts that the Textron Note is secured by (i) Mortgage Security Agreement and Fixture Filing, dated as of December 11, 2002, as modified by that certain Note and Mortgage Modification Agreement, dated as of August 4, 2006, and that certain Notice of Future Advance, Note and Mortgage Modification Agreement, dated as of November 14, 2008, encompassing, among other things, (i) the golf course within Fiddler's Creek known as the "Creek Course," as well as a certain parcel of property presently used as a temporary driving range for the Creek Course, and (ii) all of FC Golf's right, title, and interest, as lessee, in the leases entered into by and between FC Golf and the Fiddler's Creek Foundation, Inc. for space located at the Club & Spa related to the Creek Course (the "Textron Collateral"). The outstanding balance owed to Textron on the Textron Note as of the Petition Date was $9,036,666.00. The Debtors assert that the Textron Collateral has a current aggregate market value equal to $18,400,000.00.

v.      **Orion Bank, n/k/a Iberia Bank - Tarpon Club Loan.**

23.      On or about March 31, 2004, each of GBFC Marina Ltd., FC Marina, LLC, FC Hotel, Ltd, FC Hotel, LLC, FC Resort Ltd., FC Resort, LLC, Gulf Bay Hotel Debtors, Ltd., Gulf Bay Hospitality, Ltd., Gulf Bay Hospitality Debtors, LLC, (collectively, the "Orion Borrowers") executed and delivered to Orion Bank a promissory note in the principal amount of Eighteen Million And No/100 Dollars ($18,000,000.00) (the "First Orion Note"). On May 31, 2006, the Orion Borrowers executed and delivered a Notice of Future Advance and Extension of Payment Agreement and promissory note for an additional loan in the original principal amount of Eight Million And No/100 Dollars ($8,000,000.00) for a total amount owing of Twenty Six Million And No/100 Dollars ($26,000,000.00) (collectively with the First Orion Note, the "Orion Note"). Orion

Bank was recently taken over by the Federal Deposit Insurance Corporation, who in turn sold its assets to Iberia Bank. Orion Bank, n/k/a Iberia Bank asserts that the Orion Note is secured by that certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated March 31, 2004 encompassing certain (i) condominium commercial units located at the Marco Beach Ocean Resort; (ii) Lots 455-496 and 567-576 of Isles of Capri Business section according to Plat Book 3, Page 52 of the Public Records of Collier County, Florida (Marina and excess land); and (iii) certain land leases related to boat slips at the Tarpon Club (the "Orion Collateral"). The outstanding balance owed to Orion on the Orion Note as of the Petition Date was $18,124,462.00. The Debtors assert that the Orion Collateral has a current aggregate market value equal to $20,640,000.00.

   **vi.**  **Florida Financial Investments, Inc.**

   24.  On December 15, 2008, DY Land Associates, Ltd. ("DY Land") executed and delivered a certain promissory note to Florida Financial Investments, Inc., ("FFI") in the principal amount of Five Million And No/100 Dollars ($5,000,000.00) ("FFI Note"). Through several subsequent advances thereunder, DY Land borrowed up to a total of Nine Million Five Hundred Thousand And No/100 Dollars ($9,500,000.00) in respect of the FFI Note. FFI asserts that the FFI Note is secured by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated December 15, 2008, and various spreader agreements encompassing certain undeveloped vacant land consisting of 717.87 acres designated for development of 1,134 residential units (the "FFI Collateral"). The outstanding principal balance owed to FFI on the FFI Note as of the Petition Date was $9,500,000.00). The Debtors assert that the FFI Collateral has a current aggregate market value equal to $49,100,000.00.

   **vii.**  **Tomen America, Inc. – Loan #1.**

   25.  On May 18, 2008, each of FC Commercial LLC and FC Parcel 73, LLC

executed and delivered that certain promissory note in the principal amount of Eighteen Million Six Hundred Thousand And No/100 Dollars ($18,600,000.00) ("Tomen 1 Note") to Tomen America, Inc. ("Tomen"). The Tomen 1 Note is guaranteed by each of Fiddler's Creek, LLC, Fiddler's Creek Management, Inc., FC Beach, Ltd., GBFC Development, Ltd., DY Land Associates, Ltd, 951 Land Holdings, Ltd., GBFC Marina, Ltd., FC Hotel, Ltd., FC Resort, Ltd., Gulf Bay Hotel Debtors, Ltd., and Gulf Bay Hospitality, Ltd. (collectively, the "Tomen Guarantors"). Tomen asserts that the Tomen 1 Note is secured by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of May 16, 2008, encompassing certain vacant residential land known as Parcel 73, certain vacant commercial land located on SR 41 and certain vacant commercial land property located on SR 951 (the "Tomen 1 Collateral"). The outstanding balance owed to Tomen on the Tomen 1 Note as of the Petition Date was $19,061,771.00. The Debtors assert that the Tomen 1 Collateral has a current aggregate market value equal to $26,040,000.00.

      **viii.**    **Tomen America, Inc. - Loan #2**

     26.     On May 16, 2008, DY Land Holdings II, LLC ("DY Land") executed and delivered a certain promissory note in the principal amount of Thirty Million And No/100 Dollars ($30,000,000.00) ("Tomen 2 Note") to Tomen. The Tomen 2 Note is guaranteed by the Tomen Guarantors. Tomen asserts that the Tomen 2 Note is secured by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of May 16, 2008, encompassing certain vacant land consisting of 1,055.78 acres designated for development of 1,500 residential units known as Parcel 2 (the "Tomen 2 Collateral"). The outstanding balance owed to Tomen on the Tomen 2 Note as of the Petition Date was $32,393,868.00. The Debtors assert that the Tomen 2 Collateral has a current aggregate market value equal to $64,000,000.00.

### ix. Mellon United National Bank.

27. On December 22, 2004, 951 Land executed and delivered a certain promissory note to Mellon United National Bank ("Mellon") in the principal amount of Six Million And No/100 Dollars ($6,000,000.00) (the "Mellon Note"). The Mellon Note is guaranteed by Fiddler's Creek, LLC. Mellon asserts that the Mellon Note is secured by a certain Mortgage and Security Agreement of even date encompassing certain real property known as the "Fiddler's Creek Administrative Office Building" and the "Sales Center" located at 8156 and 8152 Fiddler's Creek Parkway, Naples, Florida, together with all tangible and intangible property relating thereto (the "Mellon Collateral"). The outstanding balance owed to Mellon on the Mellon Note as of the Petition Date was $5,853,962.00. The Debtors assert that the Mellon Collateral has a current aggregate market value equal to $6,000,000.00.



Fiddler's Creek® Master Site Plan
Naples, Florida

**F. Community Development District ("CDD") Special Assessments.**

28.     In addition to the secured bank loans referenced herein, certain of the Debtors are responsible for Community Development District ("CDD") special assessments with respect to certain sections of Fiddler's Creek community.  There are two Community Development Districts encompassing Fiddler's Creek, which are commonly referred to as the "Fiddler's Creek CDD #1" ("CDD #1") and "Fiddler's Creek CDD #2" ("CDD #2").

29.     The Fiddler's Creek Community Development Districts were organized as local, special purpose government entities authorized by Chapter 190 of the Florida Statutes, as amended,

provide an alternative method of planning, acquiring, operating, financing and maintaining community-wide improvements in planned communities.

30.     The Fiddler's Creek Community Development Districts are organized similar to other local governments in Florida, in that their governing body is composed of a five-member board known as the Board of Supervisors (the "Board").  The Board establishes the policy of the CDD in accordance with Florida law.  The Board, through review of advertised Requests for Qualifications, ranks and selects a District Engineer to perform the engineering needs of the CDD.  The District Manager and the District Attorney administer the operations of the CDD and implement the Board's policies and contracts.

31.     Each CDD is funded and is currently operating and maintaining community infrastructure in Fiddler's Creek, including water management, street lighting, landscaping, access control, roadway, irrigation, and park and recreation services. The CDD complements the responsibilities of the community homeowner's associations and the Debtors.

**i.      Fiddler's Creek CDD #1**

32.     The Fiddler's Creek CDD #1 was established August 13, 1996, and encompasses an area of approximately 1,389.77 acres within the Fiddler's Creek Development of Regional Impact ("DRI") to provide the necessary infrastructure for the community.  CDD #1 was developed in several phases as follows:

- Phase 1 : Constructed during 1996-1999 included infrastructure elements such as general planning (soft costs), roadways, utilities, earthwork and clearing, street lighting, landscaping, security, wetland mitigation, off-site improvements and contingencies.

- Phase 2:  Commenced in 1999,  included earthwork and clearing regarding property adjoining the first golf course of the Project.

- Phase 3: Completed in 2002, included road and infrastructure systems to move the project both further to the east and north.

- Phase 4: Involved (i) site work associated with the large commercial parcel along Collier Boulevard (State Road 951); (ii) installation of the Marsh Cove Boulevard extension to connect with the future Golf Clubhouse; (iii) site development of new residential parcels within Marsh Cove and the conversion of the temporary driving range parcel, known as Parcel 6, outside the Marsh Cove area.

33.     In order to finance the construction of improvements to the property located in the Fiddler's Creel CDD #1, the Fiddler's Creek CDD#1 issued a certain series of thirty (30) year bonds to various investors.  Under Florida law, Fiddler's Creek CDD#1 has the right to specially assess the real estate within its boundaries to generally enable it to repay the bond debt over a period of thirty (30) years and to generate funds necessary for the continued maintenance of such improvements.  As of December 31, 2009, the total outstanding amount of the bonds issued by Fiddler's Creek CDD #1 equaled $34,974,843.  Also, as of December 31, 2009, the total amount of unpaid assessments due by the Debtors in respect of the property encompassing Fiddler's Creek CDD#1 was $3,858,191.

**ii.     Fiddler's Creek CDD #2**

34.     The Fiddler's Creek CDD #2 was established in November 19, 2002, and encompasses an area of approximately 998.79 acres within the Fiddler's Creek DRI.  CDD #2 added land to the north and northeast of the original project boundaries and was developed in several phases as follows:

- Phase 1: Commenced in 2003, and now completed, created extensive new residential land, primarily for multi-family residences. The work includes typical soft costs, earthwork, water management, roadwork and utilities necessary to provide services within this new are.

- Phase 2:  Commenced in 2005 and completed in 2007, followed Phase 1 work and completed the residential parcels within the Veneta community, including the water management and infrastructure.

- Phase 3:  Included completion of remaining area of the Aviamar community

16

and also created a portion of the necessary water management areas adjacent to the second golf course. This final phase will also include the creation of part of the community water management facilities, and developer related soft costs for each work and soil management.

  o    Phase 4: This final phase is expected to commence sometime in the future to coincide with the creation of the second golf course, and will include roadways and completion of water management areas.

35.    In order to finance the construction of improvements to the property located in the Fiddler's Creek CDD #2, the Fiddler's Creek CDD#2 issued a certain series of thirty (30) year bonds to various investors. Under Florida law, Fiddler's Creek CDD#2 has the right to specially assess the real estate within its boundaries to generally enable it to repay the bond debt over a period of thirty (30) years and to generate funds necessary for the continued maintenance of such improvements. As of December 31, 2009, the total outstanding amount of the bonds issued by Fiddler's Creek CDD #2 equaled $71,809,786. Also, as of December 31, 2009, the total amount of unpaid assessments due by the Debtors in respect of the property encompassing Fiddler's Creek CDD#2 was $3,470,653.

## III.    EVENTS PRECIPITATING CHAPTER 11 FILINGS.

### A.    Adverse Market Conditions

36.    The homebuilding industry in the United States has experienced a significant downturn in the demand for new homes and an oversupply of new and existing homes available for sale. The negative impact of these events and trends was worsened by the turmoil in the mortgage and credit markets in late 2008 and continued through 2009, adversely impacting the Debtors' continued access to needed financing.

37.    Developers and homebuilders throughout the United States have reported the negative impact of the current conditions in the industry. The downtown has been particularly steep

in Florida where excess supply of new homes has led to downward pricing pressure for residential homes as well as improved and unimproved land and softening in the pace of home sales. The poor financial performance of the real estate industry during this past year has by no means been limited to the homebuilding sector but affected all financial areas of our national economy.

38.     Unlike other homebuilders who purchased land at the peak of the economic boom, the land comprising Fiddler's Creek community was acquired between 1992 and 1996. The Debtors' management team carefully developed and marketed the project successfully by requiring purchasers to pay thirty percent (30%) deposits on the purchases of new homes or lots. The Debtors' financial difficulties were not cause by mismanagement but by the failure of its financial partner, the failed agreements of future financing by its lenders, as well as the financial credit crunch that affected all sectors of the economy in 2008. These financial difficulties were highlighted when certain of the Debtors' lenders experienced financial difficulties themselves, which prevented them from providing additional loans to and/or restructuring existing loans with the Debtors.

39.     In early February 2008, the Debtors, and other borrowing entities, negotiated the terms of a loan in the amount of Seventy-Five Million and No/100 Dollars ($75,000,000.00) ("2008 Loan") with Textron Financial Corporation ("Textron"). On or about May 15, 2008, in reliance upon Textron's representations that it would fund the 2008 Loan, the Debtors executed a term sheet and caused a deposit to be paid. Thereafter, Textron began postponing finalizing the 2008 Loan for several months. Finally, in December 2008, despite its representations that all of the conditions for the 2008 Loan had been met or satisfied, Textron announced that it would not make the 2008 Loan.

40.     The Debtors' management team also approached Regions Bank and Fifth Third Bank and requested an extension and renewal of the Construction Loan which matured in early 2009.

Operating on parallel tracks, the Debtor's management team also retained the services of a mortgage broker to seek alternative sources of financing for the project. However, despite the valiant efforts made by the Debtors' management team to restructure or seek additional working capital from its various lenders ( Textron, Regions and Fifth Third) and other financing sources, the downturn in the world financial markets locked up any ability to borrow monies from banks and/or other financial institutions.

41. In 2007, the real estate assets of Fiddler's Creek had a discounted value of Seven Hundred Million Dollars And No/100 ($700,000,000.00). As of the Petition Date, Fiddler's Creek declared the total bulk sale discounted values of its real estate assets to be approximately Three Hundred and Twelve Million Dollars ($312,000,000) and mortgage debt of One Hundred and Sixty Million Dollars ($160,000,000.00), excluding CDD debt, which clearly illustrates how the real estate assets of Fiddler's Creek have been adversely impacted by the downturn in the real estate sector, the complete lack of liquidity in the financial markets and the overall economy.

42. A significant reason for the Debtors' need to seek additional sources of financing for the project is the failure and refusal of purchasers under contract to close on units that were constructed pursuant to written agreements. In 2008, the Debtors were ready to close on homes sales of condominium units in the village of "*Callista*" community, however, as a result of the downtown in the economy and real estate markets, a majority of these purchasers failed and refused to close on their units, resulting in a loss of Forty-Two Million and No/100 Dollars ($42,000,000.00) in expected revenue. Despite aggressively cutting costs and expenses, the Debtors expended the remainder of their cash reserves by December 2008.

   **B.     The Debtors Cost Saving Initiatives and Efforts-**

43. In light of the sharp industry downturn, the Debtors in late 2007 began to take action

19

to maximize revenues and minimize cash outflows. As part of these initiatives, the Debtors took steps to reduce general and administrative expenses and to streamline their operations and increase efficiencies. The cost reduction efforts included, among other things, (i) reducing the workforce at all levels, (ii) eliminating certain contracts and indirect costs, and (iii) revising the marketing and advertising budget.

44.     As part of the cash savings measures, the Debtors analyzed each community based on profit and sales absorption goals that took into account current market factors such as the oversupply of homes available for sale, less demand, decreased consumer confidence, and tighter mortgage loan underwriting. The Debtors took steps to reduce inventory, limit development of new product and overall development activities, and reduced the number of homes under construction.

45.     For accounting and tax purposes, the Debtors operate on a fiscal year that ends on December 31st of each year. For the fiscal year ended December 31, 2009, the Debtors, on a consolidated basis, generated sales of approximately Fifteen Million Seven Hundred Thirty-Eight Thousand and No/100 Dollars ($15,738,000.00) and reported net loss of approximately Forty-Three Million Nine Hundred Sixty-three and No/100 Dollars ($43,963,000.00).

**C.     The Tomen America, Inc. Settlement and Other Litigation**

**i.     The Tomen Litigation.**

46.     Even before the downturn in the market conditions in 2007, the Debtors were negatively impacted by the protracted litigation with Tomen America, Inc., a subsidiary of Tomen Corporation (Japan's seventh largest trading company) ("Tomen America").

47.     Tomen was a joint venture partner of Gulf Bay for over nineteen (19) years in various very successful luxury residential properties developed along a one and a half mile stretch of Gulf front property in the community of Pelican Bay in Naples, Florida. During this time, Tomen

America on behalf of its Japanese parent, Tomen Corporation ("Tomen Japan"), had served as the funding partner, providing the principal source of equity and debt financing for these projects, as well as Fiddler's Creek.

48.     In early 2000, however, the relationship between the parties began to change when Tomen America's parent corporation, Tomen Japan (Tomen America and Tomen Japan sometimes referred to as Tomen), experienced a financial crisis at home, in part, from bad investment decisions in Japanese real estate market.   To stave off bankruptcy, Tomen Japan reached an accommodation with its creditors that included billions of dollars in debt forgiveness and issuance of additional Tomen Japan shares to creditors.  In return for that accommodation, Tomen Japan ceded *de facto* control over its operations to its largest shareholder, Tokai Bank, and Toyota Tsusho Corporation ("Toyota"), a large trading company affiliated with Toyota Motor Corporation.  (Tokai Bank has now merged with the The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU")).  Toyota and BTMU forced Tomen Japan to embark on a major new plan calling for divestiture of all real estate investments throughout the world.   Toyota assumed formal control over Tomen Japan pursuant to a merger in April 2006.

49.     On March 8, 2007, Gulf Bay and Parcel J Joint Venture filed an action against Tomen, BTMU, and Toyota styled: *Gulf Bay Land Investments, Inc., and Parcel J Joint Venture v. Toyota Tsusho Corporation, Tomen American, Inc., Parcel J01 Development, Inc., and The Bank of Tokyo-Mitsubishi UFJ, Ltd., Case No. 07-684-CA* in the Circuit Court of the 20th Judicial Circuit In and For Collier County, Florida ("Tomen State Court Action") for breach of contract, fiduciary duty, and express and implied covenants of good faith and fair dealing, promissory estoppel, tortious interference, and civil conspiracy.

50.     After protracted litigation, Gulf Bay agreed to settle the Tomen State Court Action

pursuant to a Binding Memorandum of Understanding ("BMU") dated January 26, 2008.

### ii.    Textron Foreclosure Action

51.    On November 10, 2009, Textron commenced an action against FC Golf, Ltd., and Fiddler's Creek styled: *FC Golf, Ltd., Fiddler's Creek, LLC., Fiddler's Creek Foundation, Inc. and John Does as Tenants-in-Possession* (collectively the "Debtor Defendants") Case No. 09-9775-CA pending in the Circuit Court of the Twentieth Judicial Circuit In and For Collier County, Florida ("Textron State Court Action"), and seeking to foreclose Textron's mortgage and security interest under Textron's Note and Mortgage.

52.    On January 11, 2010, the Debtor Defendants filed their Verified Answer, Affirmative Defenses and Counterclaim to the Verified Complaint. Pursuant to the Counterclaim, the Debtor Defendants seek damages against Textron for negligent misrepresentations and promissory estoppel, for among other things, justifiable reliance on Textron's misrepresentations causing Twenty-five Thousand and No/100 Dollars ( $25,000.00) to be paid to Textron to obtain the 2008 Loan and forego alternative financing opportunities available to them.

53.    On November 20, 2009, a *Motion for Issuance of Order to Show Cause* ("OSC") was filed by Textron. By mutual agreement the parties continued the hearing on the OSC to February 22, 2010 at 1:30 pm. The Textron State Court Action and OSC hearing have been stayed by virtue of the bankruptcy filing.

### iii.    Fifth Third Foreclosure Action

54.    On December 9, 2009, Fifth Third commenced a foreclosure action against *GBP Development, Ltd., GB Peninsula, Ltd., Sunnymede Properties, LP; Menaggio Condominium Association, Inc., Varenna Condominium Association, Inc., and Fiddler's Creek Foundation, Inc. (collectively the "Debtor Defendants")* Case No. 09-10583-CA in the Circuit Court of the Twentieth

Judicial Circuit In and For Collier County, Florida ("Fifth Third State Court Action") seeking to foreclose its security interests under the Fifth Third Note and Mortgage.

55.     Since the initial filing, the Debtor Defendants have filed various motions against Fifth Third concerning the improper inclusion of certain Defendants and property in its action for foreclosure. Recognizing and ultimately agreeing with the Debtor Defendants that the legal description attached to its Notice of *Lis Pendens* and Complaint was defective, Fifth Third agreed to drop Defendants, *Sunnymede Properties, L.P.* and the *Varenna Condominium Association, Inc*., from the foreclosure action and file an Amended Complaint.

56.     On February 11, 2010, the Debtor Defendants filed and served their Answer and Affirmative Defenses to the Amended Complaint, and a Counterclaim.   In the Counterclaim, the Debtor Defendants seek damages against Fifth Third for negligent misrepresentations, promissory estoppels, breach of oral agreement and breach of contract based on, among other things, the prior oral and written representations made by or on behalf of Fifth Third to the Debtor Defendants in connection with the extension of the Fifth Third Loan in exchange for payment of certain construction loans on two properties located in Fiddler's Creek (the *Mulberry Row* and *Isla Del Sol* Construction Loans and the *Varenna* Construction Loan) totaling approximately Four Million Five Hundred Thousand and No/100 Dollars ($4,500,000.00).

57.     In September 2008, relying on Fifth Third's agreement and representation to extend the Fifth Third Note, certain of the Debtor Defendants caused the *Mulberry Row* and *Isla Del Sol* and *Varenna* Construction loans to be paid off.   Notwithstanding the foregoing, Fifth Third failed to provide the extension of the Fifth Third Loan.   Although, representatives of Fifth Third continued to assure the Debtor Defendants that the loan would be renewed pursuant to its original terms, the terms sheet that was ultimately delivered to the Debtor Defendants included substantially different

terms and conditions which the Debtor Defendants rejected.

58.     The Amended Complaint and the Debtor Defendants' Answer, Affirmative Defenses and Counterclaim are pending and stayed by the bankruptcy filing.

### iv.     Regions Bank Foreclosure Action.

59.     On or about January 28, 2010, Regions commenced a foreclosure action against *GBFC Development, Ltd., 9541 Land Holdings, Ltd., Fiddler's Creek, LLC and Mark Woodward and Edward K. Cheffy as Trustees of The Aubrey Ferrao (Fiddler's Creek) 1999 Trust, (collectively the "Debtor Defendants") Case No. 10-649-CA* in the Circuit Court of the Twentieth Judicial Circuit In and For Collier County Florida seeking to foreclose its security interests under the Regions Note and Mortgage

60.     On February 11, 2010, the Debtor Defendants filed and served their Answer and Affirmative Defenses to the Complaint, and a Counterclaim.   In the Counterclaim, the Debtor Defendants seek damages against Regions for fraudulent inducement, negligent misrepresentations, promissory estoppel, breach of oral agreement and breach of contract based on Regions oral and written representations that it would extend the Regions Loan pursuant to its original terms. As the maturity date approached, Regions attempted to modify the loan terms and requested that the Debtor Defendants' principal personally guarantee the loans, which had never been given (nor requested) in the past.   The Debtor Defendants continued to make all loan payments through the maturity date in reliance on the loan extension.  However, just prior to the loan's maturity date, Regions advised the Debtor Defendants that the loan would not be extended.

61.     The Complaint and Debtor Defendants' Answer, Affirmative Defenses and Counterclaim are pending and stayed by the bankruptcy filing.

### v.     Other Pending Litigation

24

62.     The Debtors are also a party to certain various other suits filed during the past two (2) years for contract rescission and/or specific performance which are more fully described in ***Exhibit "C".***

63.     As a result of the dramatic events in the real estate and financial markets that have transpired during course of the past year, the Debtors were not able to negotiate a restructuring of their debt with the existing mortgage lenders. This situation, coupled with national and local declines in pricing and sale of new homes caused Fiddler's Creek to seek protection in order to restructure its debt under the provisions of the Chapter 11 Bankruptcy Code.

**vi.     Debtor-In-Possession Loan from Gulf Bay Capital, Inc. - $25 million.**

64.     As set forth below in more detail, the Debtors have been able to obtain a debtor-in-possession loan[2] in the amount of Twenty-Five Million and No/100 Dollars ($25,000,000.00) from Gulf Bay Capital, Inc., ("Gulf Bay" or "DIP Lender"), an affiliate of Mr. Ferrao, in order to finance these Chapter 11 Cases and enable the Debtors to operate in the ordinary course of business throughout these bankruptcy proceedings, including to cover all of the community's overhead expenses during the reorganization. As a result, the Debtors expect to continue through this reorganization – staffed by its full complement of current employees – to deliver extraordinary lifestyle experiences, operating and maintaining the Golf Club, Tarpon Club and other facilities and amenities with consistent high standards of excellence and customer service. The Debtors further expect to continue to sell and deliver homes without interruption. Customer satisfaction will remain the Debtors' top priority. With the new loan facility, Fiddler's Creek will be able to ensure the continued normal business operations of one of the best resort communities in the country.

**IV.     THE CHAPTER 11 CASES AND FIRST DAY MOTIONS**

65.     As of the Petition Date, the Debtors declared assets with a value of Three Hundred and Twelve Million and No/100 Dollars ($312,000,000.00) and mortgage debt of One Hundred Sixty Million and No/100 Dollars ($160,000,000.00), not including CDD total assessments. Chapter 11 provides the most efficient and timely process for the Debtors to restructure their debt and bring their capital structure in line with today's market realities.

66.     The Debtors each continue in the possession of their properties and the management of the business as debtors-in-possession pursuant to Sections 1107 and 1008 of the Bankruptcy Code. In order to enable the Debtors to operate effectively and avoid the adverse effects of the Chapter 11 filings, the Debtors have filed various types of "first-day" applications and motions (collectively, the "First Day Pleadings") with the Court seeking relief intended to allow the Debtors to effectively transition into chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates. Unless this "first day" relief is granted, I believe the Debtors' business operations will suffer devastating effects with respect to its customers, homeowners and suppliers, who will refuse to continue to do business with the Debtors.

67.     I am generally familiar with the contents of each First Day Pleading (including the exhibits thereto) described in further detail herein, and based upon that general familiarity and information provided to me by other members of the Debtors' management team and my colleagues who report to me or provide information to me in the ordinary course of the Debtors' business, I believe that the relief sought in each First Day Pleading is necessary: (a) to enable the Debtors to operate in Chapter 11 with minimal disruption or loss of productivity and value; (b) to achieve a successful reorganization of the Debtors; and (c) to prevent immediate and irreparable harm to the Debtors' businesses taken as a whole. Contemporaneously with the filing of this Declaration, the

---

[2] The credit facility is described in greater detail in Section IV (E) of this Declaration.

Debtors have filed the following First Day Pleadings in connection with these cases:

**A.** ***Emergency* Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion").**

68.     As discussed herein above, the Debtors in these Chapter 11 Cases include Fiddler's Creek, LLC and GB Peninsula, Ltd. and 26 of their direct and indirect subsidiaries.   Each of the Debtors directly or indirectly shares one or more parent or subsidiary entities with each of the other Debtors.  The Debtors operate as an integrated business with common ownership, and share key financial and operational systems.

69.     The Debtors seek orders directing the joint administration of their Chapter 11 Cases for procedural purposes only, including the filing of any disclosure statement and plans of reorganization and other contested matters.   The issues that will be addressed in these bankruptcy cases will be related, therefore, the joint administration of these cases will obviate the need for duplicative notices, motions, applications and hearings thereby saving considerable time and expense for the Debtors and their estates.

70.     The joint administration of these Chapter 11 Cases, to the best of my knowledge, will not give rise to any conflict of interest among the Debtors' estates. Nor will joint administration adversely affect the Debtors' respective creditors because this motion requests only administrative, not substantive, consolidation of the estates. Thus, I believe individual creditors' rights should not be harmed by the relief requested; by contrast, non-debtor parties in interest will benefit from the cost reductions associated with the joint administration of these cases.

71.     Moreover, the joint administration of these cases shall, among other things: (i) preserve judicial resources and consistency of rulings that may impact on the Debtors and creditors of the estates; and (iii) avoid duplicity of pleadings, motions and other court papers filed during the

proceedings.

**B.** *Emergency* **Motion for Entry of an Order Authorizing the Debtors to File a Consolidated Case Management Summary (the "CMS Motion").**

72.     I have reviewed Administrative Order FLMB-2009-1, which states that each individual Debtor is generally required to file with the Court a completed Chapter 11 CMS within the earlier of three (3) business days following the petition date or one (1) business day prior to the date of the first scheduled hearing.

73.     Given the number of Debtors in these cases, the complex and interlinked relationships among the Debtors and the fact that the Debtors intend to file their statements of financial affairs, and schedules of assets and liabilities very soon after the Petition Date, the Debtors believe it would be more efficient to file one consolidated CMS.

74.     Allowing the Debtors to file a consolidated CMS would relieve the Debtors of substantial expense of time, money and effort.  Moreover, a consolidated CMS should not prejudice the Debtors' creditors or other parties in interest because much of the information contained in the CMS is duplicative for many of the Debtors and the filing of a consolidated CMS will prove more efficient in providing disclosure of key information regarding the Debtors.

**C.** *Emergency* **Motion by Debtors' To (I) Set Claims Bar Dates, and (II) For Approval Of Form And Manner Of Notice Of Commencement Of Cases And Bar Dates And For Filing Proofs Of Claim (the "Claims Bar Motion")**

75.     The Debtors seek approval of the form and notice of commencement of these Chapter 11 Cases and respective bar dates for the submission of proofs of claims. The Debtors believe that given the size and complexity of these Chapter 11 Cases, the form and notice they are proposing will help ensure that as many creditors and parties in interest as possible receive notice of the filing of these Chapter 11 Cases and the bar dates by which they must assert claims against the Debtors.

76.     The Debtors propose to provide notice of the commencement of these Chapter 11 Cases and the respective bar dates upon entry of an Order granting the Claims Bar Motion so as to afford creditors, equity security holders and parties in interest more than ample time to assert Proof of Claims.  The Debtors believe that adoption of the procedures proposed in the Claims Bar Motion, and the service of those procedures, is in the best interest of the creditors and parties in interest and will allow each of the Debtors' constituents the ability to participate in these Chapter 11 Cases to the extent they are so inclined.

**D.      *Emergency* Motion For Authority To (A) Prepare, A Consolidated Matrix Of Creditors In Lieu Of Individual Matrices, (B) File The Consolidated Matrix In Each Debtor's Case (C) File A Consolidated List Of The Debtors' 20 Largest Unsecured Creditors (the "Consolidated Matrix Motion")**

77.     The Debtors have a number of common creditors and entities to which notice of certain proceedings and events in these Chapter 11 Cases must be provided and who will need to be included in the Debtors' creditor matrix.   Requiring the Debtors to prepare and file individual creditor matrices would be an extremely burdensome task and require each Debtor to parse through individual lists to identify their individual creditors and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.   Additionally, this process will increase the overall costs of administration and risks associated with preparing and filing separate matrices for each Debtor in the format required by the Clerk's Instructions.

78.     After consulting with the proposed advisors to the Debtors' estates, I believe that preparing a  single consolidated list of the 20 largest unsecured creditors in these Chapter 11 Cases in the format or formats proposed in the Consolidated Matrix Motion as currently maintained by the Debtors in the ordinary course of their business will be sufficient to permit the proper notices, claims

and balloting to be provided to all applicable parties.

**E.** ***Emergency*** **Motion for Entry of Interim and Final Orders Pursuant to Sections 361, 363, 364(C) and (D) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure Authorizing (A) Debtors In Possession to Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating to the Foregoing, (D) Modifying the Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use of Cash Collateral and Granting Adequate Protection Thereof, (G) Scheduling a Final Hearing, and (H) Prescribing Form and Manner of Notice with Respect Thereto (the "DIP Motion")**

79.     Well in advance of the Petition Date, the Debtors, with the assistance of their financial advisors, assessed the financing needs of the companies and explored various financing alternatives. Beginning in March 2008, the Debtors solicited numerous proposals for financing, including debtor in possession financing, from various institutions. These efforts culminated in extended discussions with multiple institutions, and ultimately, a firm proposal from Gulf Bay Capital, Inc., (the "DIP Lender").  After carefully considering the proposal submitted by DIP Lender, evaluating the terms and costs associated with the proposal, I believe that the proposal by DIP Lender provides the most advantageous and flexible terms to the Debtors' estates. Accordingly, Fiddler's Creek and GB Peninsula, Ltd., negotiated and reached an agreement to enter into, subject to approval of the Court,  senior secured term loan credit facility in the aggregate amount  of  Twenty-Five Million and No/100 Dollars ($25,000,000.00) (the "Credit Facility") subject to the terms and conditions set forth in the Commitment Letter dated February 23, 2010 (the "Commitment Letter") attached as *Exhibit A* to the DIP Motion, together with all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of the DIP Lender in connection therewith, including, without limitation, a loan and security agreement, guaranty agreements, notes, mortgages, deeds of trust, Uniform Commercial Code ("UCC") financing statements, and all other related agreements, documents, and instruments executed and/or delivered

in connection therewith or related thereto (collectively, as each may be amended, restated, modified or supplemented and in effect from time to time, the "DIP Loan Documents").

80.     The DIP Lender has agreed to provide one or more initial advances in an amount not to exceed Four Million and No/100 Dollars ($4,000,000.00)(the "Initial Advance") consistent with the initial 13-week budget, attached as *Exhibit B* to the DIP Motion, for the period of time between the filing of the Bankruptcy Cases and the hearing on the Final Order to sustain the Debtors' business operations during the next thirteen weeks.   In exchange for the DIP Loan, the DIP Lender has requested, pursuant to the terms of the Commitment Letter, that it  receive first priority priming liens on and security interest in all of the Debtors Collateral (as defined in the Commitment Letter), subject only to the carve-out described in the DIP Motion, and all other protections specifically set forth in the Commitment Letter and proposed Interim Order.

81.     Upon entry of the Final Order by the Bankruptcy Court, additional advances (the "Subsequent Advances"), together with the Initial Advance, may be made from time to time thereafter in accordance with the 18 Month Budget attached to the Commitment Letter as and the terms and conditions of the Credit Facility.    The Initial Advance and all indebtedness and obligations proposed under the Commitment Letter will be secured by a Bankruptcy Court-ordered Interim Order providing for first priority liens and first priority senior security interests in all unencumbered tangible and intangible assets, proceeds, cash collateral or any other property of the Debtors whatsoever, whether now existing or hereinafter created (excluding Avoidance Actions), payment guarantees from each Guarantor; and collateral assignment of all material leases, contracts, licenses and permits (all of the foregoing being referred to as the "Unencumbered Collateral") and senior priming liens on all Collateral of the Debtors and Guarantors.

82.     The Subsequent Advances (together with the Initial Advance upon entry of the Final

Order, the Loan Advances) and all indebtedness and obligations under the Loan associated with the Initial Advance and the Subsequent Advances will be secured by a Bankruptcy Court-ordered Final Order providing for first priority priming liens and first priority senior security interests in all Unencumbered Collateral and all encumbered tangible and intangible assets, proceeds and cash collateral or any other property of the Debtors whatsoever, whether now existing or hereinafter created (excluding Avoidance Actions), payment guarantees from each Guarantor; and collateral assignment of all material leases, contracts, licenses and permits (all of the foregoing, together with the Unencumbered Collateral, being referred to as the "Collateral").

83.     Both the Unencumbered Collateral and the Collateral shall have no permitted encumbrances senior or equal to the DIP Lenders' liens and security interests except for unpaid real estate taxes, assessments due to the Community Development Districts encompassing the Collateral, and those matters commonly included as exceptions to title insurance policies in Southwest Florida that may be specifically agreed to in writing by DIP Lender in its sole discretion ("Permitted Liens"). Permitted Liens shall also include the Replacement Liens as defined below, provided that all such Replacement Liens shall be subordinate to the DIP Lender and DIP Lender's liens.  The final loan documentation will include provisions that provide for the granting of replacement liens (the "Replacement Liens") subordinate to those of the DIP Lender to be provided to Regions and Fifth Third who have the collateral securing their respective prepetition allowed secured claims sold during the Chapter 11 Cases by the Debtors and the proceeds from which are not paid to such prepetition secured lenders in accordance with their prepetition loan documents. The DIP Lender agrees that all such Replacement Liens may be subordinate to its senior priming liens on remaining real estate assets of the Debtors.

The final loan documentation for the DIP Loan shall provide that the DIP Lender agrees that

it will not foreclose on real property described in the Waterfall in accordance with the Commitment Letter unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in Waterfall. This provision shall not restrict the Lender from foreclosing on any Unencumbered Collateral or Collateral not specifically described in the below list, nor restrict the Lender from exercising other rights or enforcing other remedies at any time.

84.     In order to satisfy the requirements of section 364(c) and (d) of the Bankruptcy Code in respect of the DIP Loan and the proposed grant of senior secured priming liens to the DIP Lender on all assets and property of the Debtors, the Debtors understand that adequate protection is required to be provided to the prepetition secured lenders in respect of their interests in such assets and property.

85.     With respect to the Interim Order and the Final Order, the Debtors assert that each prepetition secured lender has a range of equity cushion in its individual piece of collateral securing their respective prepetition mortgage loan. The Debtors intend to present expert appraisal testimony to the Court in respect of such equity cushion in connection with the interim and final hearings on this Motion. As will be presented to the Court, the aggregate value of the Debtors' real property and improvements is approximately Three Hundred and Twelve Million and No/100 Dollars ($312,000,000.00). The total amount of secured mortgage debt asserted by the Prepetition Secured Lenders in respect of such real property and improvements is approximately One Hundred and Sixty Million and No/100 Dollars ($160,000,000.00). More importantly, with respect to each prepetition secured lender, the collateral supporting each such prepetition secured lender's asserted mortgage lien exceeds the amount of its mortgage, in most cases by millions of dollars. Therefore, the Debtors assert that each prepetition secured lender has an equity cushion that provides adequate protection to

33

each prepetition secured lender.

86.     As set forth in more detail in the DIP Motion, the Debtors assert that Fiddler's Creek has substantially more intrinsic value when viewed as a whole than when broken down into individual, separate pieces.  Therefore, the Debtors assert that maintaining the overall integrated operations of Fiddler's Creek through the blanket DIP Loan provides adequate protection to the prepetition secured lenders.  The DIP Loan provided by the DIP Lender encompasses the entirety of Fiddler's Creek so that the intrinsic value is maintained and preserved for the benefit of all creditors and parties in interest.

87.     The proceeds from the DIP Loan will be used during the period covered by the Interim Order and the Final Order in a manner consistent with the terms and conditions of the DIP Loan Documents, and in accordance with the Budget, to pay for, among other things, (i) the maintenance of, and warranty work associated with, the assets and properties owned by the Debtors, which serve as collateral to one or more of the Prepetition Secured Lenders, (ii) the insurance of the assets and properties owned by the Debtors, which serve as collateral to one or more of the Prepetition Secured Lenders, (iii) the working capital needs of the Debtors, and (iv) the payroll and overhead associated with operating Fiddler's Creek.

88.     In addition, with respect to the period covered by the Final Order, the DIP Loan will also pay for, among other things, (i) the taxes and CDD assessments accrued post petition with respect to the assets and properties owned by the Debtor which serve as collateral to one or more of the prepetition secured lenders, and (ii) the post petition interest accrued at the contract rate to the prepetition secured lenders.

89.     The Commitment Letter provides for the DIP Lender to marshal  the collateral securing the DIP Loan so that such collateral is liquidated and sold in a certain order of priority.

Specifically, the DIP Lender has agreed that if it decides to exercise its rights and remedies with respect to the collateral securing the DIP Loan upon the occurrence of an event of a default as defined under the DIP Loan Documents that remains uncured by the Debtors, then the DIP Lender will use commercially reasonable efforts to foreclose and realize upon such collateral in the order of priority described in the DIP Motion (the "Waterfall").

90.     Based on the values set forth in the Waterfall, the Debtors assert that the prepetition secured lenders are fully and adequately protected in respect of their asserted pre-petition liens on the collateral securing their various loan obligations in the event that the DIP Lender asserts an event of default under the DIP Loan Documents and exercises its rights and remedies with respect to foreclosing on the various pieces of collateral securing the DIP Loan.  Of particular importance is the fact that the first three categories of collateral securing the DIP Loan contained in the Waterfall have an aggregate market value in an amount in excess of Thirty-Seven Million and No/100 Dollars ($37,000,000).

91.     With respect to both the Interim Order and the Final Order, there is a range of equity over and above the collateral securing the asserted liens of the prepetition secured lenders such that it is only a remote possibility that the DIP Lender will be required to recover on the DIP Loan from the Debtors' assets allegedly securing the liens of the prepetition secured lenders.  Moreover, each such prepetition secured lender has an equity cushion in its own collateral package that provides additional adequate protection of their interest in respect of the granting of the DIP Loan and the priming liens proposed.

92.     Moreover, certain of the prepetition secured lenders assert mortgage liens solely on the amenities located within Fiddler's Creek that provide various services enjoyed by the homeowners within Fiddler's Creek.  Specifically, Textron provided the financing for the Creek

Course and a parcel of property located near the golf course and presently used for a temporary driving range. Orion Bank n/k/a Iberia Bank provided the financing for the Tarpon Club and the Marco Beach Ocean Resort. Moreover, Mellon Bank provided the financing for the construction of each of the Fiddler's Creek Administrative Office Building and the Sales Center. It is important to note for purposes of these Chapter 11 Cases and for purposes of the DIP Motion that the Debtors do not intend to sell any of the amenities that service Fiddler's Creek, whether it is the Creek Course, Tarpon Club, the Marco Beach Ocean Resort, the Fiddler's Creek Administrative Office Building and/or the Sales Center. As a result, and other than in connection with an event of default under the terms of the DIP Loan Documents, these assets will not be sold to repay the DIP Loan. Notwithstanding, the DIP Lender requires that such assets in fact serve as collateral for the DIP Loan given the intrinsic and integrated value that they provide to the success of the Fiddler's Creek development.

93. In this case, several of the prepetition secured lenders assert mortgage liens against undeveloped land located within Fiddler's Creek. Specifically, KeyBank asserts a mortgage lien on the KeyBank Collateral, which consists of approximately 52 acres of undeveloped land without any infrastructure in place. The Debtors do not intend to develop any of the KeyBank Collateral during the Chapter 11 Cases and as such have no plans to sell any of the KeyBank Collateral to repay the DIP Loan.

94. In addition, FFI asserts a mortgage lien on the FFI Collateral, which is approximately 717 acres of undeveloped land without any infrastructure in place. The Debtors do not intend to develop such land during the Chapter 11 Cases and as such have no plans to sell any of the collateral securing the FFI loans to repay the DIP Loan.

95. Likewise, Tomen asserts a mortgage lien on the Tomen 1 Collateral and the Tomen 2

Collateral, which property is slated and zoned for future commercial and residential purposes. The Debtors do not intend to develop the Tomen 1 Collateral or the Tomen 2 Collateral during the Chapter 11 Cases and as such have no plans to sell any of the collateral securing the Tomen loans to repay the DIP Loan.

96.     Each of Regions Bank and Fifth Third Bank, however, assert mortgage liens on the Regions Collateral and the Fifth Third Collateral, respectively, which consists of property within Fiddler's Creek that is either constructed with existing housing units or fully developed and platted lots with completed infrastructure ready for the construction of homes. During the Chapter 11 Cases, the Debtors intend to market and sell the Regions Collateral and/or the Fifth Third Collateral. The net proceeds from such sales will be used to repay the DIP Loan pursuant to the terms of the DIP Loan Documents. Notwithstanding such intention, the Debtors do not intend to sell any of the Regions Collateral or the Fifth Third Collateral during the period covered by the Interim Order. Rather, in the event that the Debtors enter into a contract for the purchase and sale of any such home or lot during the period covered by the Interim Order, then the Debtors shall file a separate motion with the Court at such time seeking authority to sell such home or lot pursuant to Section 363 of the Bankruptcy Code free and clear of any and all liens, claims and encumbrances. It is important to note, however, that Regions Bank and Fifth Third are the primary beneficiaries of the DIP Loan because, as set forth in the Budget with respect to the Initial Advance, in excess of 71% of the costs associated with the administration and protection of the collateral securing the loans of the prepetition secured lenders goes directly to the collateral securing the loans of Regions and Fifth Third.

97.     Based upon the foregoing, there is and will be no basis or need to provide any of the prepetition secured lenders with replacement liens during the period covered by the Interim Order in

order to protect them from the proceeds from the sale of their collateral being used to repay the DIP Loan.

98.    As it relates to the Final Order only, the Debtors propose to provide Regions and Fifth Third with replacement liens in certain Unencumbered Property owned by the Debtors to adequately protect Regions and Fifth Third in the event that the Debtors sell certain portions of the Regions Collateral and/or Fifth Third Collateral from and after the entry of the Final Order. Such replacement liens will be junior only to the liens of the DIP Lender and will be structured to provide Regions and Fifth Third with replacement liens that compensate them for the sale of the Regions Collateral or Fifth Third Collateral, the net proceeds from which will be used to repay the DIP Loan.

### i.    The Debtors' Post Petition Financing Needs

99.    The Debtors represent that the entry of the Interim Order is in the best interests of the Debtors, their creditors and their estates and that an immediate and critical need exists for the Debtors to borrow monies under the DIP Loan and to use the Cash Collateral of certain of the prepetition secured lenders in order to, among other things, continue the orderly operation of their businesses and avoid an immediate shutdown of operations; (i) meet their obligations for payroll, necessary ordinary course expenditures, (ii) pay for warranty repairs to existing inventory and other operating expenses; (iii) make payments authorized under other Orders entered by this Court; (iv) obtain needed goods and services; (v) retain homeowner, customer, supplier and employee confidence by demonstrating that they have the financial ability to maintain normal operations; (vi) create an environment where prospective homebuyers will have a level of confidence and comfort that they can purchase and/or construct a home in Fiddler's Creek, and (vii) maintain adequate cash resources customary and necessary for companies of this size and in the industry in which they operate, thereby avoiding immediate and irreparable harm to the Debtors' estates. In essence, the

Debtors seek to preserve and maintain the going concern value of the Debtors' estates.

100.     Subject to entry of the Interim Order, the Debtors represent that: (i) while the Debtors have substantial equity in their assets, such equity is not liquid or available to pay the on-going obligations of the Debtors' estates, (ii) the cash generated by the Debtors' operations will be insufficient to meet the cash requirements to operate their businesses, requiring additional cash infusions from a lending source; and (iii) the prepetition secured lenders have not consented to the use by the Debtors of their respective collateral, including Cash Collateral on terms acceptable to the Debtors.

101.     The DIP Lender agrees to provide the DIP Loan to the Debtors' to enable the Debtors' to fund their obligations, including for working capital, on the following terms: (i) the DIP Lender must receive first priority priming liens on and security interests in all of the Debtors Collateral (as defined in the Commitment Letter), subject only to the carve-out (as defined in the DIP Motion), and (iii) the Debtors' use of the proceeds of the DIP Loan must comply with the Budget attached as *Exhibit B* to the DIP Motion , and (iv) the DIP Lender receives all of the other protections more specifically set forth in the Interim Order and the Commitment Letter.

102.     The Debtors are unable to obtain credit or borrow money from the DIP Lender without the Debtors granting to the DIP Lender (i) a first priority lien and security interest, pursuant to section 364(c)(2) of the Bankruptcy Code, on all tangible and intangible assets and property of the Debtors that are unencumbered by liens, (ii) a first priority lien and security interest, pursuant to section 364(c)(3) of the Bankruptcy Code, on all tangible and intangible assets and property of the Debtors that are encumbered only by Permitted Liens, which liens and security interests would be junior only to such Permitted Liens, and (iii) a super-priority priming first lien, pursuant to section 364(d) of the Bankruptcy Code, in all other tangible and intangible assets, personal and real property

of the Debtors, whether now owned or hereafter acquired, subject only to Permitted Liens, and senior to the Liens held by the prepetition secured lenders and (iv) the DIP Super-priority Claim, all as provided for in the Interim Order. For the avoidance of doubt, the Collateral securing the DIP Loan shall exclude any and all causes of action arising under sections 544, 546, 547, 548 and 550 of the Bankruptcy Code (the "Avoidance Actions"). In addition, the terms and conditions of the DIP Loan are substantially more beneficial to the Debtors than any other proposed priming DIP Loan that the Debtors were attempting to obtain prior to the filing of these Chapter 11 Cases.

103.    The DIP Lender has indicated a willingness to consent and agree to the Debtors entering into the financing arrangements contemplated by the Commitment Letter and the Interim Order, and the DIP Lender is willing to provide the additional financing contemplated thereby, upon approval of the terms and subject to the conditions set forth in the Commitment Letter and a finding by the Court that the DIP Loan is essential to the Debtors' estates and is being provided in good faith, and that the DIP Lenders' security interests, liens, claims, super-priority claims and other protections requested will not be affected by any subsequent renewal or modification of the Interim Order or any other order, as provided in Section 364(e) of the Bankruptcy Code, as more particularly set forth in the Interim Order.

104.    The relief requested in the DIP Motion is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their property.    It is in the best interest of Debtors' estates to be allowed to borrow under the terms proposed and contemplated by the Commitment Letter. .

105.    The Debtors believe that the terms and conditions of the DIP Loan, including those which provide for the payment of interest to the DIP Lender at the time, and in the manner provided under the Commitment Letter, are fair, reasonable, and the best available under the circumstances.

The Debtors note that there is no commitment fee being charged by the DIP Lender, nor is there any unused line fee, exit fee or similar fees being charged by the DIP Lender.

106.     The Commitment Letter and the Interim Order were negotiated in good faith and at arms-length between the Debtors, on the one hand, and the DIP Lender, on the other. Credit to be extended under the DIP Loan will be extended in good faith, in consequence of which the DIP Lender is entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code.

107.     For the above reasons, the Debtors have determined, in the exercise of their sound business judgment, that the Debtors require approval of  the DIP Loan in an amount equal to Twenty-Five Million and No/100 Dollars  ($25,000,000.00), with an initial advance in an amount up to Four Million and No/100 Dollars ($4,000,000.00) for the period covered by the Interim Order.

108.     The Debtors were unable to obtain post-petition financing in the form of unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under Sections 364(a) and 364(b) of the Bankruptcy Code, or, on a timely basis, secured credit pursuant to Section 364(c) of the Bankruptcy Code on terms and conditions more favorable to the Debtors' estates than those offered by the DIP Lender, as evidenced by the Commitment Letter.

109.     The Debtors recognize that the DIP Lender is an affiliate of Mr. Ferrao, who is an insider of the Debtors as that term is defined in the Bankruptcy Code.  However, I have been advised that there is no prohibition in the Bankruptcy Code for an insider to make a debtor-in-possession loan to a debtor as long as the provisions of section 364 of the Bankruptcy Code are otherwise complied with, especially in a situation as exists in these Chapter 11 Cases wherein the Debtors, despite all best efforts over a several month period, were unable to obtain financing on terms more favorable than the terms provided for in the DIP Loan.  The Debtors assert that they have and are

able to comply with the terms and provisions of section 364 of the Bankruptcy Code in connection with the DIP Loan.

### ii. Use of Cash Collateral of Textron and Orion.

110.     In addition to the proceeds from the DIP Loan proposed to be borrowed, certain of the Debtors also require the use of the cash generated from the operation of the Textron Collateral (namely the Creek Course) and the cash generated from the operation of the Orion Collateral (namely the Tarpon Club and the restaurant facilities at the Marco Beach Ocean Resort).  I have been advised that the cash or cash equivalents, funds or proceeds of or derived from certain of the Textron Collateral and the Orion Collateral allegedly securing the obligations of the respective Debtors to each of Textron and Orion respectively, under the Textron Note and the Orion Note, respectively, may constitute cash collateral within the meaning of Section 363 of the Bankruptcy Code (the "Cash Collateral") and are, therefore, entitled to adequate protection of and to the extent of their interests  in the Cash Collateral from any diminution resulting from the DIP Loan or the use, sale or lease of the Cash Collateral.

111.     FC Golf,  with respect to the Cash Collateral of Textron, and the Orion Borrowers, with respect to the Cash Collateral of Orion, are seeking in the DIP Motion the authority to the use the Cash Collateral of Textron and Orion, respectively, in accordance with the Budget.   Such Debtors  also seek a final hearing on the continued use of Cash Collateral at the same time as the hearing on the Final Order related to the DIP Loan.

112.     In connection with the proposed use of Cash Collateral each of FC Golf and the Orion Borrowers have agreed, subject to approval of this Court, that (i) the Cash Collateral generated from the operations of the Textron Collateral shall be segregated from the proceeds of the DIP Loan and the cash generated by any other aspects of the Debtors' operations, and used solely to fund the

operating expenses, in accordance with the Budget, related to the Textron Collateral; (ii) the Cash Collateral generated from the operations of the Orion Collateral shall be segregated from the proceeds of the DIP Loan and the cash generated by any other aspects of the Debtors' operations, and used solely to fund the operating expenses, in accordance with the Budget, related to the Orion Collateral; (iii) each of Textron and Orion, shall have, *nunc pro tunc* as of the commencement of these Chapter 11 Cases, a replacement lien pursuant to Section §361(2) of the Bankruptcy Code on and in all property of FC Golf, with respect to Textron and the Orion Borrowers, with respect to Orion, acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the property of FC Golf and the Orion Borrowers securing the prepetition obligations owed to Textron and Orion respectively (the "Cash Collateral Replacement Liens"), provided however, that in all events, such Cash Collateral Replacement Liens shall be junior and subordinate to the liens granted pursuant to the DIP Motion, in the Commitment Letter, and in the Interim Order to the DIP Lender in respect of the DIP Loan.

113.    Even though the Debtors have agreed not to use the Textron Cash Collateral for any purposes other than to fund the operations of the Textron Collateral, the Debtors believe that they will still need to borrow under the DIP Loan to cover certain cash flow shortfalls in the Textron Collateral during the period covered by the Interim Order.

114.    The Debtors agree that neither Textron nor Orion shall have or be granted a Cash Collateral Replacement Lien on or against any Avoidance Actions or on or against the proceeds of the Avoidance Actions.

115.    In the event that diminution occurs in the value of Cash Collateral of either Textron and/or Orion from and after the Petition Date as a result of the use thereof by FC Golf or the Orion Borrowers respectively, in an amount in excess of the value of the Cash Collateral Replacement

Lens granted herein, then each of Textron and Orion shall have the right to assert an administrative expense claim under section 507(b) of the Bankruptcy Code with priority over all other administrative expense claims, subject in all events to the Carve Out and the DIP Super-Priority Claim.

**F.** ***Emergency*** **Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services (the "Utilities Motion")**

116.     The Debtors receive utility services from various utility companies for water, sewer service, electricity, gas, telephone service, internet service, cable service and waste management. These utility services are provided by approximately six utilities (collectively, the "Utility Providers"), including those listed on *Exhibit "A"* annexed to the Utilities Motion (the "Utility Service List").

117.     On average, the Debtors spend approximately Forty-Five Thousand and Two Hundred Seventeen and No/100 Dollars ($45,217.00) each month on utility costs. As of the Petition Date, I believe that the Debtors are substantially current on utility payments. The Debtors propose to provide a deposit equal to 2 weeks of utility service, calculated as a historical average over the past 6 months, to any Utility Provider who requests such deposit in writing (the "Adequate Assurance Deposit"), provided that such requesting Utility Provider does not already hold a deposit equal to or greater than 2 weeks of utility services, and provided further that such Utility Provider is not currently paid in advance for its services. As a condition of requesting and accepting an Adequate Assurance Deposit, the requesting Utility Provider shall be deemed to have stipulated that the Adequate Assurance Deposit constitutes adequate assurance of future payment to such Utility Provider within the meaning of Section 366 of the Bankruptcy Code, and shall further be deemed to have waived any right to seek additional adequate assurance during the course of the Chapter 11

cases.

118.    The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers.

119.    The Utility Providers service the Debtors' corporate headquarters, sales centers and job sites. Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and successful reorganization. Any interruption of utility services, even if briefly, would disrupt the Debtors' ability to continue selling and building homes and servicing their customers, thereby negatively impacting customer relationships, revenues and profits. Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, the value of creditor recoveries. Therefore, it is critical that utility services continue uninterrupted during these Chapter 11 Cases.

     **G.    Professional Retention and Compensation Motions**

     **(i)    Application for Entry of an Order Authorizing the Employment and Retention of Paul J. Battista and Genovese, Joblove & Battista, P.A. as Attorneys for the Debtors and Debtors In Possession *Nunc Pro Tunc* to the Petition Date (the "GJB Retention Application")**

120.    The Debtors seek to retain Paul J. Battista, and the law firm of Genovese, Joblove & Battista, P.A., ("GJB") as their attorneys because GJB has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.

121.    GJB has expended significant time and resources working with the Debtors to prepare for this bankruptcy filing and has become extremely familiar with the Debtors' business operations and legal obligations to various creditor constituencies. The Debtors believe that the continued

45

representation by their pre-petition restructuring counsel, GJB, is critical to the Debtors' efforts to restructure their business because GJB has extensive experience and expertise in complex commercial reorganization cases and is thereby very familiar with the Debtors' business, legal and financial affairs

122.    GJB is not owed any fees and costs as of the Petition Date and is not otherwise a creditor of the Debtors.

**(ii)    Application for Entry of an Order Authorizing the Employment and Retention of Woodward, Pires & Lombardo, P.A., as Special Corporate Counsel for the Debtors and Debtors In Possession *Nunc Pro Tunc* to the Petition Date (the "WPL Retention Application")**

123.    The Debtors seek to retain Mark J. Woodward and the law firm of Woodward, Pires & Lombardo, P.A. ("WPL") as the Debtors' special corporate counsel in these Chapter 11 Cases.

124.    The law firm of WPL has represented the Debtors for many years as general corporate counsel, rendering legal advice and related professional services in three general areas: (i) general corporate work, including contract review, general advice to officers and directors, preparation of Board of Director and Shareholder Minutes and Consent Actions without a meeting, creating subsidiaries and qualifying entities to do business in various jurisdictions and researching and advising on various business regulations; (ii) general real estate, title, and related transactional work; and (iii) general operational work, including bond and CDD issues.  The continuing services of WPL are necessary to enable the Debtors to effectively and efficiently deal with their corporate and real estate issues and to maximize value in connection therewith.

**(iii)    Application for Entry of an Order Authorizing the Employment and Retention of Soneet R. Kapila and Kapila & Company, as Financial Consultants and Accountants for the Debtors and Debtors In Possession *Nunc Pro Tunc* to the Petition Date (the "Kapila & Co.  Retention Application")**

125.     Prior to the commencement of these Chapter 11 Cases, the Debtors sought the

services of Kapila & Co. principally with respect to financial and accounting advice regarding restructuring matters in general, and the preparation for and potential commencement and prosecution of the Chapter 11 Cases for the Debtors. The Debtors believe that the continued representation by their pre-petition restructuring accountants and financial advisors, Kapila & Co., is critical to the Debtors' efforts to restructure their business because Kapila & Co. has extensive experience and expertise in complex commercial reorganization cases and is thereby very familiar with the Debtors' business and financial affairs. Accordingly, Kapila & Co. is well-suited to guide the Debtors through the Chapter 11 process.

126. Kapila & Co. is not owed any fees and costs as of the Petition Date and is not otherwise a creditor of the Debtors.

> **H.** **Motion For Entry Of An Order Authorizing The Retention And Compensation Of Certain Professionals In The Ordinary Course Of Business *Nunc Pro Tunc* To The Petition Date (the "OCP Motion")**

127. The Debtors employ various attorneys, accountants, engineers and other professionals in the ordinary course of their business (each, an "OCP" and, collectively, the "OCPs"). The OCPs provide services to the Debtors in a variety of matters unrelated to these Chapter 11 Cases, including (i) insurance coordination and consultation (ii) tax accounting and auditing; (iii) building and environmental engineering and consultation and (iv) various non-bankruptcy related legal matters, including collections, title work and bond/CDD matters. A list of the Debtors' current OCPs is annexed as *Exhibit B* to the OCP Motion.

128. Although some of the OCPs have professional degrees and certifications, they provide services to the Debtors that are integral to the day-to-day operation of the Debtors' businesses and which do not relate directly to or materially affect the administration of these Chapter

11 Cases.

129.    The Debtors submit that the continued employment and compensation of the OCPs is in the best interests of their estates, creditors and other parties in interest. Although the Debtors anticipate that the OCPs will wish to continue to represent the Debtors on an ongoing basis, some may not be in a position to do so if the Debtors cannot pay them on a regular basis. Without the background knowledge, expertise and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors undoubtedly will incur additional and unnecessary expenses in educating replacement professionals about the Debtors' business and financial operations.

130.    The Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business. Moreover, in light of the number of OCPs and the significant costs associated with the preparation of employment applications for professionals who will receive relatively modest fees, the Debtors submit that it would be impractical, inefficient and extremely costly for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP.

131.    Although some of the OCPs may hold relatively small unsecured claims against the Debtors in connection with services rendered to the Debtors pre-petition, the Debtors do not believe that any of the OCPs have an interest materially adverse to the Debtors, their creditors, or other parties in interest.

132.    Further, the Debtors submit that immediate approval of the relief requested in the OCP Motion will not prejudice any of the parties in these Chapter 11 Cases.  Pursuant to the Compensation Procedures proposed in the OCP Motion, each of the OCPs is required to submit a

Declaration of Disinterestedness within twenty (20) days of the entry of the order granting such relief. All parties-in-interest then have an additional ten (10) days to object to the retention of OCP in these cases.

I.    **Motion For An Administrative Order Pursuant To Sections 105(a) And 331 Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of Professionals (the "Interim Compensation Motion").**

133.    The Debtors seek approval of an interim order approving procedures for the compensation and reimbursement of expenses to court-approved professionals (the "Professionals") on a monthly basis. I am advised by counsel that such an order will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees and expenses incurred in these Chapter 11 Cases more effectively and is comparable to those established in other complex Chapter 11 Cases in this and other districts.

134.    In summary, the requested monthly compensation procedure would require all professionals retained and approved by the Court to present counsel for the Debtors, counsel for the Official Committee of Unsecured Creditors, if one is established, and the United States Trustee a detailed statement of services rendered and expenses incurred for the prior month. If no objection is filed, the Debtor would be authorized to promptly pay eighty percent (80%) of the amount of fees incurred for the month, with a twenty percent (20%) hold back and one hundred percent (100%) payout of the out-of-pocket expenses for the month. These payments would be subject to the Court's subsequent approval as part of the standard interim fee application process. These procedures will help ensure the continued services of professionals rending critical services to the Debtors and will help spread out the payments to professionals.

135.    This concludes my declaration.

Dated this <u>24th</u> day of February, 2010.

<u>*/s/ Anthony DiNardo*</u>
Anthony DiNardo

# FIDDLER'S CREEK STRUCTURE



# GB Peninsula and GBP Development Chart



# Fiddler's Creek® Master Site Plan

## Naples, Florida

**Entities**

- FC Commercial, LLC
- DY Land II, LLC
- 951 Land Holding Ltd.
- GBP Development
- 951 Land Holding Ltd.
- GBFC Development Ltd.
- FC Golf Ltd.
- Parcel 73, LLC
- GB Peninsula, Ltd
- DY Land, Ltd.

*The Golf Courses*

- THE CREEK COURSE AT FIDDLER'S CREEK.
- THE PRESERVE COURSE AT FIDDLER'S CREEK.
- THE ROOKERY AT MARCO GOLF CLUB
- THE MARSH COURSE AT FIDDLER'S CREEK.

**Conceptual Master Site Plan**

MEADOW RUN

MARSH COVE

FIDDLER'S CREEK

AVIAMAR

VENETA

STATE-OWNED CONSERVATION AREA

## EXHIBIT "C"
## Summary of Pending Litigation

| ENITIY NAME | | CASE NAME | CASE NUMBER; COURT | TYPE OF ACTION |
|---|---|---|---|---|
| **GB PENINSULA, LTD.** | | | | |
| GB Peninsula, Ltd. | 002 | Fifth Third Bank, an Ohio banking Corp. vs. GBP Development, Ltd.; GB Peninsula, Ltd.; Sunnymede Properties, LP; Menaggio Condominium Association, Inc.; Varenna Condominium Association, Inc.; Fiddler's Creek Foundation, Inc. | Case No. 09-10583-CA | Foreclosure Action / Counterclaim filed |
| **GBP DEVELOPMENT, LTD.** | | | | |
| GBP Development, Ltd. GBP Development LLC | 003 | Mark Chaikin vs. GBP Development, Ltd. GBP Development, LLC. Gulf Bay Homes, Ltd. Gulf Bay Homes, Inc. 951 Land Holdings, Ltd. 951 Land Holdings, LLC Gulf Bay 100, Ltd. Gulf Bay 100, Inc. | Case No. 09-0441-CA; 20th Judicial Circuit, Collier County, Florida | Contract Rescission; and other damages |
| GBP Development, Ltd. | 004 | Daniel Sussman and Peter Ferrara vs. GBP Development, Ltd. Fiddler's Creek Realty, Inc. | Case No. 05-1585-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission |
| GBP Development, Ltd. | 005 | Daniel Sussman and Roberta Sussman vs. GBP Development, Ltd. | Case No. 07-1358-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission |
| GBP Development, Ltd. | ## | GBP Development, Ltd., GBP Development, LLC, 951 Land Holdings, Ltd., 951 Land Holdings, LLC, and FC Golf, Ltd. vs. Glenn Vician; Dawn Vician; Richard Lohmeyer; Kristi Lohmeyer; Robert Stochel; Hoffman & Stochel; Bowman, Heintz, Boscia & Vician, P.C.; Thomas Chase; | Case No. 10-724-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Settlement Agreement, Breach of Covenant of Good Faith and Fair Dealing, Defamation, Tortuous Interference, and Declaratory Relief |

| | | | | |
|---|---|---|---|---|
| | | and Thomas C. Chase, P.A., | | |
| GBP Development, Ltd. | 002 | Fifth Third Bank, an Ohio banking Corp. vs. GBP Development, Ltd.; GB Peninsula, Ltd.; Sunnymede Properties, LP; Menaggio Condominium Association, Inc.; Varenna Condominium Association, Inc.; Fiddler's Creek Foundation, Inc. | Case No. 09-10583-CA | Foreclosure Action / Counterclaim filed |

**951 LAND HOLDINGS, LTD.**

| | | | | |
|---|---|---|---|---|
| 951 Land Holdings, Ltd. 951 Land Holdings, LLC Gulf Bay 100, Ltd. Gulf Bay 100, Inc. | 003 | Mark Chaikin vs. GBP Development, Ltd. GBP Development, LLC. Gulf Bay Homes, Ltd. Gulf Bay Homes, Inc. 951 Land Holdings, Ltd. 951 Land Holdings, LLC Gulf Bay 100, Ltd. Gulf Bay 100, Inc. | Case No. 09-0441-CA; 20th Judicial Circuit, Collier County, Florida | Contract Rescission; and other damages |
| 951 Land Holdings, Ltd., 951 Land Holdings, LLC | ## | GBP Development, Ltd., GBP Development, LLC, 951 Land Holdings, Ltd., 951 Land Holdings, LLC, and FC Golf, Ltd. vs. Glenn Vician; Dawn Vician; Richard Lohmeyer; Kristi Lohmeyer; Robert Stochel; Hoffman & Stochel; Bowman, Heintz, Boscia & Vician, P.C.; Thomas Chase; and Thomas C. Chase, P.A., | Case No. 10-724-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Settlement Agreement, Breach of Covenant of Good Faith and Fair Dealing, Defamation, Tortuous Interference, and Declaratory Relief |
| 951 Land Holdings, Ltd. | | Regions Bank, and Alabama banking corporation, vs. GBFC Development, Ltd., 951 Land Holdings, Ltd., Fiddler's Creek, LLC and Mark Woodward and Edward Cheffy as Trustees of The Aubrey J. Ferrao (Fiddler's Creek) 1999 Trust. | Case No. 10-649-CA; 20th Judicial Circuit, Collier County, Florida | Foreclosure Action / Counterclaim filed |

**FIDDLER'S CREEK, LLC**

| | | | | |
|---|---|---|---|---|
| Fiddler's Creek, LLC | 007 | Textron Financial Corp. vs. FC Golf, Ltd., Fiddler's Creek, LLC, Fiddler's Creek Foundation, Inc., John Does as tenants in possession | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Foreclose Action / Counterclaim filed |

| | | | | |
|---|---|---|---|---|
| Fiddler's Creek, LLC | ## | Fiddler's Creek, LLC vs. Cushman Wakefield, Inc. and Cushman Wakefield Sonnenblick Goldman | Case No. 10-272-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Contract; B/ Fiduciary Duty; B/Good Faith and Fair Dealing; Tortuous Interference, etc. |
| Fiddler's Creek, LLC | | Regions Bank, and Alabama banking corporation, vs. GBFC Development, Ltd., 951 Land Holdings, Ltd., Fiddler's Creek, LLC and Mark Woodward and Edward Cheffy as Trustees of The Aubrey J. Ferrao (Fiddler's Creek) 1999 Trust. | Case No. 10-649-CA; 20th Judicial Circuit, Collier County, Florida | Foreclosure Action / Counterclaim filed |

**FC GOLF, LTD.**

| | | | | |
|---|---|---|---|---|
| FC Golf, Ltd. | ## | GBP Development, Ltd., GBP Development, LLC, 951 Land Holdings, Ltd., 951 Land Holdings, LLC, and FC Golf, Ltd. vs. Glenn Vician; Dawn Vician; Richard Lohmeyer; Kristi Lohmeyer; Robert Stochel; Hoffman & Stochel; Bowman, Heintz, Boscia & Vician, P.C.; Thomas Chase; and Thomas C. Chase, P.A., | Case No. 10-724-CA; 20th Judicial Circuit, Collier County, Florida | Breach of Settlement Agreement, Breach of Covenant of Good Faith and Fair Dealing, Defamation, Tortuous Interference, and Declaratory Relief |
| FC Golf, Ltd. | 007 | Textron Financial Corp. vs. FC Golf, Ltd., Fiddler's Creek, LLC, Fiddler's Creek Foundation, Inc., John Does as tenants in possession | Case No. 09-9775-CA; 20th Judicial Circuit, Collier County, Florida | Foreclose Action / Counterclaim filed |

**FIDDLER'S CREEK MANAGEMENT, INC**. (LLC)
(currently being represented by Foundation insurance company counsel)

| | | | | |
|---|---|---|---|---|
| Fiddler's Creek Mgt, Inc. | 008 | Sally and Gerald Bergmoser vs. Fiddler's Creek Foundation, Inc. d/b/a The Club and Spa at Fiddler's Creek and Fiddler's Creek Management, LLC | Case No. 09-4388-CA; 20th Judicial Circuit, Collier County, Florida | Damages (being defended by Foundation insurance counsel) |

**GBFC DEVELOPMENT, LTD.**

| | | | | |
|---|---|---|---|---|
| GBFC Development, Ltd. | | Regions Bank, and Alabama banking corporation, | Case No. 10-649-CA; 20th Judicial Circuit, | Foreclosure Action |

| | | | | |
|---|---|---|---|---|
| | | vs.<br>GBFC Development, Ltd., 951 Land Holdings, Ltd., Fiddler's Creek, LLC and Mark Woodward and Edward Cheffy as Trustees of The Aubrey J. Ferrao (Fiddler's Creek) 1999 Trust. | Collier County, Florida | / Counterclaim filed |
| GBFC Development, Ltd. | 010 | Thomas and Sandra Gollinger vs.<br>GBFC Development, Ltd. | Case No. 08-6226-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 011 | GBFC Development, Ltd. vs.<br>Frederick Smith | Case No. 08-9676-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 012 | Ellen Spear v<br>GBFC Development, Ltd. | Case No. 07-2193-CA [Marengo] ; 20th Judicial Circuit, Collier County, Florida | Contract rescission/ Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 013 | GBFC Development, Ltd. vs.<br>Leonard Bubri | Case No. 09-2148-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 014 | GBFC Development, Ltd. Vs.<br>Dennis Bauries and Brian Cramer | Case No. 08-3953-CA [Marengo]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 015 | GBFC Development, Ltd. vs.<br>Thomas and Kelly Armstrong | Case No. 09-3528-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 016 | GBFC Development, Ltd. vs.<br>Steen, Eric | Case No. 09-3453-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / **DEFAULT JUDGMENT ENTERED** |
| GBFC Development, Ltd. | 017 | GBFC Development, Ltd. vs.<br>David and Jane Moreton | Case No. 08-9678-CA [Service accepted by the Foreign] [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 018 | GBFC Development, Ltd. vs.<br>Michael and Susan Lofstedt | Case No. 08-9184-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 019 | GBFC Development, Ltd. vs.<br>Michael Tierney | Case No. 08-8396-CA [Awaiting Service – Foreign National] | Specific Performance / Counterclaim for Contract Rescission |

| | | | | |
|---|---|---|---|---|
| | | and Melvin Christiansen | [Callista]; 20th Judicial Circuit, Collier County, Florida | |
| GBFC Development, Ltd. | 020 | GBFC Development, Ltd. v. Michelle Kearney Andrew Kearney | Case No. 09-0848-CA [Awaiting Service – Foreign National] [Callista 12-104]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 021 | GBFC Development, Ltd. v. Michelle Kearney Andrew Kearney | Case No. 09-0847-CA [Awaiting Service – Foreign National] [Callista 12-204]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 022 | Matthew Butler vs. GBFC Development, Ltd. | Case No. 07-2486-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 023 | Robert and Charlene Edwards vs. GBFC Development, Ltd. | Case No. 07-2458-CA [Serena]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 024 | Brian and Jody Boland vs. GBFC Development, Ltd.<br><br>GBFC Development, Ltd. vs. Brian and Jody Boland | Case No. 08-7795-CA [Callista]; 20th Judicial Circuit, Collier County, Florida<br><br>Case No. 08-8395-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Specific Performance<br><br>Specific Performance |
| GBFC Development, Ltd. | 025 | GBFC Development, Ltd. vs. Jay and Myra Browne | Case No. 08-9677-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance / Counterclaim for Contract Rescission |
| GBFC Development, Ltd. | 026 | Matthew Butler vs. GBFC Development, Ltd. | Case No. 07-2485-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Contract Rescission / Counterclaim for Specific Performance |
| GBFC Development, Ltd. | 027 | GBFC Development, Ltd. vs. Mark and Kimberly Woolley | Case No. 09-3529-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |
| GBFC Development, Ltd. | 028 | GBFC Development, Ltd. vs. Brannigan, Jane R. | Case No. 09-2149-CA [Callista]; 20th Judicial Circuit, Collier County, Florida | Specific Performance |