# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| **In re:** | **Chapter 11** |
| | |
| **FIDDLER'S CREEK, LLC.** | **Case No. 9:10-bk-03846-ALP** |
| 951 LAND HOLDINGS, LLC | Case No. 9:10-bk-03852-ALP |
| DY ASSOCIATES, LLC | Case No. 9:10-bk-03856-ALP |
| GBFC DEVELOPMENT, LLC | Case No. 9:10-bk-03864-ALP |
| FC MARINA, LLC | Case No. 9:10-bk-03872-ALP |
| FC BEACH, LLC | Case No. 9:10-bk-03873-ALP |
| FC GOLF, LLC | Case No. 9:10-bk-03875-ALP |
| DY LAND HOLDINGS II, LLC | Case No. 9:10-bk-03878-ALP |
| FC PARCEL 73, LLC | Case No. 9:10-bk-03881-ALP |
| FC COMMERCIAL, LLC | Case No. 9:10-bk-03888-ALP |
| FC HOTEL, LLC | Case No. 9:10-bk-03886-ALP |
| FC RESORT, LLC | Case No. 9:10-bk-03896-ALP |
| GULF BAY HOSPITALITY COMPANY, LLC | Case No. 9:10-bk-03898-ALP |
| GULF BAY HOTEL COMPANY, LLC | Case No. 9:10-bk-03905-ALP |
| GBP DEVELOPMENT, LLC | Case No. 9:10-bk-03908-ALP |
| GB PENINSULA, LTD. | Case No. 9:10-bk-03909-ALP |
| 951 LAND HOLDINGS, LTD. | Case No. 9:10-bk-03911-ALP |
| DY LAND ASSOCIATES, LTD. | Case No. 9:10-bk-03918-ALP |
| GBFC DEVELOPMENT, LTD. | Case No. 9:10-bk-03920-ALP |
| GBFC MARINA, LTD. | Case No. 9:10-bk-03928-ALP |
| FC BEACH, LTD. | Case No. 9:10-bk-03934-ALP |
| FC GOLF, LTD. | Case No. 9:10-bk-03937-ALP |
| FC HOTEL, LTD. | Case No. 9:10-bk-03938-ALP |
| FC RESORT, LTD. | Case No. 9:10-bk-03947-ALP |
| GULF BAY HOSPITALITY, LTD. | Case No. 9:10-bk-03949-ALP |
| GULF BAY HOTEL COMPANY, LTD. | Case No. 9:10-bk-03950-ALP |
| GBP DEVELOPMENT, LTD. | Case No. 9:10-bk-03952-ALP |
| FIDDLER'S CREEK MANAGEMENT, INC. | Case No. 9:10-bk-03954-ALP |
| | |
| | **(Jointly Administered under** |
| **Debtors.** | **Case No. 9:10-bk-03846-ALP)** |
| _____/ | |

# APPLICATION OF DEBTORS-IN-POSSESSION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 327(A) AND 328(A) OF THE BANKRUPTCY CODE AUTHORIZING THE EMPLOYMENT AND RETENTION OF MOELIS & COMPANY LLC AS FINANCIAL ADVISOR AND INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE

Fiddler's Creek, LLC ("Fiddler's Creek") and twenty-seven (27) of its subsidiaries and affiliates (collectively, the "Debtors" or the "Company")[1], by and through their undersigned counsel, respectfully request the entry of an order pursuant to Sections 327(a) and 328(a) of Title 11 of the United States Code (hereinafter the "Bankruptcy Code"), Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure, and Rule 2016-1 of the Local Rules for the United States Bankruptcy Court for the Middle District of Florida (the "Local Rules") authorizing the employment and retention of Moelis & Company LLC ("Moelis") as their financial advisor and investment banker *nunc pro tunc* to the Petition Date in accordance with the terms and conditions set forth in that certain engagement letter dated as of March  23, 2010, by and between the Debtors and Moelis, (the "Engagement Letter" or "Agreement"), a copy of which is annexed hereto as ***Exhibit A*** and is incorporated by reference herein.   In support of this Application, the Debtors rely upon the *Declaration of Mark S. Hootnick* attached hereto as ***Exhibit B*** (the "Hootnick Declaration") and the *Declaration of Anthony DiNardo in Support of First Day Pleadings* (the "First Day Declaration")[D.E.#29].   In further support of this Application, the Debtors respectfully represent as follows:

**BACKGROUND**

**A.**     **The Chapter 11 Filing**

1.     On February 23, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").   The Debtors continue to operate their businesses and manage their properties as

---

[1]     The Debtors in these jointly administered proceedings  are: (i) Fiddler's Creek, LLC; (ii) 951 Land Holdings, LLC; (iii) 951 Land Holdings, Ltd.; (iv) DY Associates, LLC; (v) DY Land Associates, Ltd.; (vi) FC Beach, LLC; (vii) FC Beach, Ltd.; (viii) FC Golf, LLC; (ix) FC Golf, Ltd.; (x) FC Hotel, LLC; (xi) FC Hotel, Ltd.; (xii) FC Marina, LLC; (xiii) FC Resort, LLC; (xiv) FC Resort, Ltd.; (xv) Fiddler's Creek Management, Inc.; (xvi) GBFC Development, LLC; (xvii) GBFC Development, Ltd.; (xviii) GBFC Marina, Ltd.; (xix) Gulf Bay Hospitality Company, LLC; (xx) Gulf Bay Hospitality, Ltd.; (xxi) Gulf Bay Hotel Company, LLC; (xxii) Gulf Bay Hotel Company, Ltd.; (xxiii) DY Land Holdings II, LLC; (xxiv) FC Commercial, LLC; (xxv) FC Parcel 73, LLC; (xxvi) GB Peninsula, Ltd., (xxvii) GBP Development, Ltd. and (xxviii) GBP Development, LLC .

debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On March 8, 2010, the Court entered an Order Granting Debtor's Emergency Motion for Order Directing Joint Administration of Chapter 11 Cases and jointly administering the cases under Case No. 9:10-bk-03846-ALP as the designated lead case.

3. No trustee, examiner or committee of unsecured creditors has been appointed.

4. On March 15, 2010, the United States Trustee's Office filed a Notice of Appointment of Homeowners' Committee [D.E. #72].

5. For further information on the Debtors' capital structure, business and operations, the Debtors refer to the First Day Declaration filed contemporaneously herewith.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2). The statutory and legal predicates for the relief sought herein are sections 327(a) and 328(a) of the Bankruptcy Code, Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure, and Rule 2016-1 of the Local Rules.

## RELIEF REQUESTED

7. By this Application, the Debtors seek to employ and retain Moelis as their financial advisor and investment banker under sections 327 and 328 of the Bankruptcy Code because of Moelis' recognized expertise and extensive experience in providing high quality financial advisory and investment banking services to debtors and creditors in chapter 11 cases and out-of-court restructurings.

8. The Debtors seek to engage Moelis to provide general investment banking and financial advice in connection with the Debtors' attempts to complete a strategic restructuring,

reorganization, recapitalization and/or sale of all or a significant portion of the Debtors' outstanding indebtedness.

<strong><u>Moelis' Qualifications</u></strong>

9.       Moelis is a financial advisory and investment banking firm focused on providing investment banking services, financial advice and transaction execution on behalf of its clients.

10.      Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and Securities Investor Protection Corporation.  Moelis was founded in 2007 and is a wholly-owned subsidiary of Moelis & Company Holdings LLC.  Moelis provides a broad range of corporate advisory services to its clients, including, without limitation, services pertaining to: (i) general financial advice, (ii) mergers, acquisitions, and divestitures, (iii) corporate restructurings, (iv) special committee assignments, and (v) capital raising.  Moelis and its senior professionals have extensive experience in providing advisory services to real estate companies in reorganizing and restructuring of distressed debt, both out-of-court and in chapter 11 proceedings.

11.      Moelis' business reorganization professionals have served as financial and strategic advisors to various parties (including debtors) in numerous Chapter 11 cases, including, among others: *In re Neenah Enterprises, Inc.*, Case No. 10-10360 (Bankr. D. Del. Feb. 2, 2010); *In re Atrium Companies, Inc.*, Case No. 10-10150 (Bankr. D. Del. Jan. 20, 2010); *In re Simmons Bedding Co.*, Case No. 09-14037 (Bankr. D. Del. Nov. 16, 2009); *In re Reader's Digest Ass'n Inc.*, Case No. 09-23529 (Bankr. S.D.N.Y. Aug. 24, 2009); *In re NV Broadcasting LLC*, Case No. 09-12473 (Bankr. D. Del. Jul. 13, 2009); *In re Fontainebleau Las Vegas Holdings LLC*, Case No. 09-21481 (Bankr. S.D. Fla. Jun. 9, 2009); *In re ION Media Networks Inc.*, Case No. 09-13125 (Bankr. S.D.N.Y. May 19, 2009); *In re J.G. Wentworth LLC*, Case No. 09-11731

(Bankr. D. Del. May 19, 2009); *In re Source Interlink Cos.*, Case No. 09-11424 (Bankr. D. Del. Apr. 27, 2009); *In re Dayton Superior Corp.*, Case No. 09-11351 (Bankr. D. Del. Apr. 19, 2009); *In re Idearc Inc.*, Case No. 09-31828 (Bankr. N.D. Tex. Mar. 31, 2009); *In re Aleris International Inc.*, Case No. 09-10478 (Bankr. D. Del. Feb. 12, 2009); *In re Muzak Holdings LLC*, Case No. 09-10422 (Bankr. D. Del. Feb. 10, 2009); *In re Hartmarx Corp.*, Case No. 09-02046 (Bankr. N.D. Ill. Jan. 23, 2009); *In re Lyondell Chemical Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 6, 2009); *In re Tribune Co.*, Case No. 08-13141 (Bankr. D. Del. Dec. 8, 2008); *In re Pilgrim's Pride Corp.*, Case No. 08-45664 (Bankr. N.D. Tex. Dec. 1, 2008); *In re Motor Coach Industries International Inc.*, Case No. 08-12136 (Bankr. D. Del. Sep. 15, 2008); *In re Greektown Holdings LLC*, Case No. 08-53106 (Bankr. E.D. Mich. May 29, 2008); *In re Pappas Telecasting Inc.*, Case No. 08-10916 (Bankr. D. Del. May 10, 2008); *In re Tropicana Entertainment LLC*, Case No. 08-10856 (Bankr. D. Del. May 5, 2008); *In re Tousa Inc.*, Case No. 08-10928 (Bankr. S.D. Fla. Jan. 29, 2008); *In re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y. Oct. 8, 2005).

12.     The resources, capabilities, and experience of Moelis in advising the Debtors are crucial to the Debtors' successful restructuring.   An experienced financial advisory and investment banking firm such as Moelis fulfills a critical need that complements the services offered by the Debtors' other restructuring professionals.   Primarily, Moelis will assist in the evaluation of strategic alternatives and render financial advisory services to the Debtors in connection with their ongoing restructuring efforts.   For these reasons, the Debtors require the services of a capable and experienced financial advisory firm and investment bank such as Moelis.

## Services to Be Provided

13.     Subject to further order of the Court and consistent with the Engagement Letter,

Moelis proposes to render the following financial advisory and investment banking services as necessary and requested by the Debtors:[2]

(a) undertake, in consultation with members of management of the Company, a comprehensive business and financial analysis of the Company;

(b) to the extent Moelis deems necessary, appropriate and feasible, or as the Company may request, review and analyze the Company's assets and its operating and financial strategies;

(c) review and analyze the business plans and financial projections prepared by the Company including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

(d) evaluate the Company's debt capacity and assist in the determination of an appropriate capital structure for the Company;

(e) as deemed desirable by the Company, identify, initiate, review, negotiate, and evaluate any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof), and, if directed, develop and evaluate alternative proposals for a Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

(f) solicit and evaluate indications of interest and proposals regarding any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) from current or potential lenders, equity investors, Acquirers or strategic partners;

(g) assist the Company in developing strategies to effectuate any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof), including financing alternatives;

(h) advise and assist the Company in the course of its negotiation of any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) and participate in such negotiations, as requested;

(i) determine and evaluate the risks and benefits of considering, initiating and consummating any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

(j) determine values or ranges of values (as appropriate) for the Company and any securities that the Company offers or proposes to offer in connection with a Capital Transaction;

---

[2] To the extent that this Application and the terms of the Engagement Letter are inconsistent, the terms of the Engagement Letter shall control.

(k)    in coordination with the Company, prepare and implement a marketing plan and, working with management and based upon information provided by the Company, prepare one or more memoranda describing assets, properties or businesses to be sold in any Sale Transaction (each, a "<u>Selling Memo</u>");

(l)    working with the Company's management and based upon information provided by the Company, prepare one or more memoranda describing the Company and its businesses for use in any potential Capital Transaction (each, an "<u>Information Memo</u>");

(m)    contact potential Acquirers or investors that we and the Company have agreed may be appropriate, and in rendering such services, we may meet with representatives of such Acquirers or investors and provide such representatives with the Selling Memo or Information Memo and such additional information about the Company's assets, properties or businesses as may be appropriate and acceptable to the Company, subject to customary business confidentiality agreements in form and substance approved by the Company;

(n)    assist the Company in the development, preparation and distribution of selected information, documents and other materials to create interest in and to consummate any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

(o)    assist the Company in valuing its assets or business, provided that any real estate or fixed asset appraisals will be undertaken by outside appraises, separately retained and compensated by the Company;

(p)    be available at the Company's request to meet with management, board of directors, creditor groups, equity holders, any official committees appointed in the Bankruptcy Case, or other parties to discuss any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

(q)    if requested by the Company, participate in hearings before the Bankruptcy Court and provide relevant testimony; and

(r)    such other financial advisory and investment banking services as may be agreed upon by Moelis and the Company, and that is within the scope of this engagement.

## **Professional Compensation**

14.    Moelis intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the Debtors' chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, guidelines established by the Office of the United States

Trustee for the Middle District of Florida (the "U.S. Trustee Guidelines"), and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement Letter (the "Fee Structure"). Specifically, the Debtors are seeking Court approval of the Fee Structure at this time pursuant to section 328 of the Bankruptcy Code.

15.     In summary, the Fee Structure provides for the following compensation:[3]

(a) The payment of the fees set forth below shall be subject to the rules and procedures of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and applicable Local Rules and guidelines of the U.S. Trustee's Office:

(i)     **Monthly Fee**.  During the term of the Engagement Letter as provided therein, a cash fee of $125,000 per month (the "Monthly Fee"). The first Monthly Fee shall be paid within three (3) business days after the entry of an order of the Bankruptcy Court approving the Engagement Letter or, if the Bankruptcy Court enters an order in respect of the payment of interim compensation to professionals employed in the Bankruptcy Case, then in compliance with such order (the "Interim Compensation Order").  All subsequent Monthly Fees shall be paid in advance prior to each monthly anniversary of the Engagement Letter or, if applicable, in accordance with the Interim Compensation Order.  Whether or not a Restructuring Transaction, Sale Transaction or Capital Transaction has taken place or will take place, we shall earn and be paid the Monthly Fee every month during the term of the Engagement Letter, provided that such Monthly Fee shall be credited against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee as follows:

a.      With regard to the first six (6) months of the Engagement Letter, the Monthly Fee, shall not be credited against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee;

b.      With regard to the second six (6) months of the Engagement Letter, an amount equal to fifty percent (50%) of the Monthly Fees actually paid to Moelis shall be credited once against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee earned by Moelis pursuant to the Engagement Letter; and

c.      With regard to every month after the first year anniversary during the term of the Engagement Letter, an amount equal to 100% of the Monthly Fees actually paid to Moelis shall be credited once against any Restructuring Fee, Capital Transaction Fee and/or Sale

---

[3] For a more detailed description of the fee structure, please see the Engagement Letter, which is attached hereto as <u>Exhibit A</u>.

Transaction Fee earned by Moelis pursuant to the Engagement Letter.

(ii)     **Restructuring Fee**.  In addition to the foregoing Monthly Fees, the Company shall pay Moelis a cash fee (the "Restructuring Fee") of 1.00% of the principal amount of any indebtedness and accrued interest thereon restructured in any Restructuring Transaction subject to a minimum aggregate Restructuring Fee of $1,000,000 (the "Minimum Restructuring Fee").  The Restructuring Fee shall be paid immediately upon the consummation of a Restructuring Transaction.  It is expressly understood and agreed that a separate Restructuring Fee shall be payable in respect of each Restructuring Transaction in the event that more than one Restructuring Transaction shall occur, provided, however, that the Minimum Restructuring Fee shall not apply separately to each Restructuring Transaction, but shall be based upon the aggregate of all Restructuring Transactions.

(iii)     **Capital Transaction Fee**.  In addition to the foregoing Monthly Fee and Restructuring Fee, the Company shall pay Moelis a cash fee (the "Capital Transaction Fee"), in an amount equal to (i) 1.00% of the aggregate amount of new debt raised in a Capital Transaction in the form of secured debt, (ii) 1.75% of the aggregate amount of new debt raised in a Capital Transaction in the form of senior unsecured debt, (iii) 2.25% of the aggregate amount of new debt raised in a Capital Transaction in the form of subordinated debt, (iv) 2.50% of the aggregate amount of new debt raised in a Capital Transaction in the form of convertible debt, (v) 4.00% of the aggregate amount or face value of new capital raised in a Capital Transaction in the form of preferred equity, including preferred equity-linked securities, options, warrants or other rights to acquire preferred equity interests of the Company, and (vi) 5.00% of the aggregate amount or face value of new capital raised in a Capital Transaction in the form of common equity, including, options, warrants or other rights to acquire common equity interests of the Company.  The Capital Transaction Fee shall be paid immediately upon the closing and funding of each Capital Transaction.  It is expressly understood and agreed that a separate Capital Transaction Fee shall be payable in respect of each Capital Transaction in the event that more than one Capital Transaction shall occur.  In the event that a Capital Transaction is consummated by the Company with Lone Star U.S. Acquisition, LLC or its affiliates (collectively, "Lone Star") in an amount equal to or in excess of $90,000,000, then the Capital Transaction Fee that will be due to Moelis shall be reduced by $250,000.00.

(iv)     Sale Transaction Fee.  In addition to the foregoing Monthly Fee, the Restructuring Fee and the Capital Transaction Fee, the Company shall pay to Moelis a cash fee (the "Sale Transaction Fee") which will be equal to the greater of (a) $1,000,000 or (b) 1.00% of the Transaction Value up to $200,000,000, plus 0.75% of the Transaction Value between $200,000,000 and $500,000,000, plus 0.50% of the Transaction Value above $500,000,000.  For the purposes of calculating the Sale Transaction Fee, the term "Transaction Value" shall be defined as set forth in ***Annex A*** to the Engagement Letter.  The Sale Transaction Fee shall be paid immediately upon the closing of each Sale Transaction.  It is expressly understood and agreed that

a separate Sale Transaction Fee shall be payable in respect of each Sale Transaction in the event that more than one Sale Transaction shall occur.

(v) Limitation on Fees. In the event that the Company enters into a single transaction that constitutes more than one of a Restructuring Transaction, a Capital Transaction and/or a Sale Transaction (as such terms are defined herein), then Moelis shall not be entitled to multiple transaction fees for that single transaction. Instead, Moelis shall be paid a single transaction fee for each such transaction in an amount equal to the highest of the applicable transaction fees.

(b) Whether or not any Restructuring Transaction, Sale Transaction or Capital Transaction is consummated, and in addition to any fees payable to Moelis, the Debtors will reimburse Moelis, upon its written request, for all reasonable expenses incurred by Moelis in entering into the Engagement Letter and in connection with Moelis performing services pursuant to the Engagement Letter. These expenses generally include travel costs, document reproduction, telephone and facsimile charges, meals and other customary expenses for this type of transaction, including the reasonable fees, disbursements and other charges of Moelis' legal counsel. Moelis agrees to provide reasonable backup relating to such expenses to the extent requested by the Debtors and as may be required by the Bankruptcy Court.

16.    The Fee Structure is reasonable and is consistent with and typical of compensation arrangements entered into by Moelis and other comparable firms in connection with the rendering of similar services under similar circumstances. The Debtors believe that the Fee Structure is reasonable, market based, and designed to fairly compensate Moelis for its work and to cover fixed and routine overhead expenses.

17.    Additionally, the Fee Structure reflects the difficulty and challenging nature of Moelis' engagement. As such, Moelis' restructuring expertise, as well as its capital markets knowledge, financing skills, and mergers and acquisitions expertise, some or all of which may be required by the Debtors during the term of Moelis' engagement hereunder, were important factors in determining the Fee Structure. The Debtors believe that the ultimate benefit of Moelis' services hereunder cannot be measured by reference to the number of hours to be expended by Moelis' professionals in the performance of such services. Indeed, the Debtors and Moelis have agreed upon the Fee Structure anticipating that a substantial commitment of professional time

and effort will be required of Moelis and its professionals in connection with the chapter 11 cases and in light of the fact that (a) such commitment may foreclose other opportunities for Moelis and (b) the actual time and commitment required of Moelis and its professionals to perform its services under the Engagement Letter may vary substantially, thereby creating "peak load" issues for Moelis.

18.     Moelis will file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the guidelines established by the U.S. Trustee, and any applicable orders of this Court.

19.     The Debtors have been informed that Moelis' restructuring professionals will keep time records describing their activities in one hour increments as well as the identity of persons who performed such tasks. The Debtors also understand that Moelis will supplement this information with a list of the non-restructuring professionals who assist the restructuring department on this matter but who do not, as a matter of general practice, (and would not in these chapter 11 cases) keep time records. The Debtors intend for Moelis to receive payment of its fees on a fixed-rate and percentage basis, which is customary in the investment banking industry. The Debtors have been informed by Moelis that it is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys and does not keep time records on a "project category" basis. To the extent Moelis would be required to submit more detailed time records for its professionals by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the guidelines established by the U.S. Trustee or orders of this Court, the Debtors request that Moelis be permitted to submit summary time records kept in one hour increments in applications for payment of compensation, as described in the

*Declaration of Hootnick*. Accordingly, to the extent necessary, based on the foregoing, the Debtors respectfully seek waiver of the information requirements set forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and other applicable guidelines and orders of this Court.

20. The Debtors do not owe Moelis any fees for services performed or expenses incurred under the Engagement Letter prior to the Petition Date.

## **Indemnification**

21. Pursuant to the Engagement Letter, the Debtors have agreed to reimburse, indemnify and hold harmless Moelis and its divisions, affiliates, current or former directors, officers, partners, members, agents or employees of Moelis or any of its affiliates, or any person controlling Moelis or its affiliates, current or former directors, officers, partners, members, agents or employees (collectively, the "Indemnified Persons").[4]

22. The Debtors and Moelis believe that the reimbursement, indemnification and contribution provisions contained in the Engagement Letter are customary and reasonable for financial advisory and investment banking engagements, both out-of-court and in chapter 11 cases.

23. The Engagement Letter's reimbursement, indemnification and contribution provisions were negotiated by the Debtors and Moelis at arm's-length and in good faith. Further, the indemnification provisions, viewed in conjunction with the other terms of Moelis' proposed retention, are reasonable and in the best interests of the Debtors in light of the fact that the Debtors require Moelis' services to successfully reorganize. Accordingly, the Debtors request

---

[4] The Engagement Letter provides, in part, that the Debtors will reimburse such Indemnified Parties for their reasonable and customary legal and other expenses (including, without limitation, the costs and expenses incurred in connection with investigating, preparing for and responding to third-party subpoenas or enforcing the engagement) incurred in connection therewith as such expenses are incurred.

that the Court approve Moelis' retention, including the reimbursement, indemnification and contribution provisions contained in ***Annex B* of the Engagement Letter** and privacy statement contained in ***Annex C*** to the Engagement Letter.

## No Duplication of Services

24.     The Debtors intend that the services of Moelis will complement, and not duplicate, the services being rendered by other professionals retained in the chapter 11 cases, including those of Kapila & Company.  Moelis understands that the Debtors have retained and may retain additional professionals during the term of the engagement and will work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

## Moelis' Disinterestedness

25.     To the best of the Debtors' knowledge and except to the extent disclosed herein and in the *Hootnick Declaration*:  (a) Moelis is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and does not hold or represent an interest adverse to the Debtors' estates; and (b) has no connection to the Debtors, their creditors, or other parties in interest in the chapter 11 cases.  To the extent that Moelis discovers any new relevant facts or relationships bearing on the matters described herein during the period of Moelis' retention, Moelis will file promptly a supplemental declaration as required by Bankruptcy Rule 2014(a).

## Supporting Authority

26.     Section 327(a) of the Bankruptcy Code authorizes a debtor to employ professionals that "do not hold or represent an interest adverse to the estate, and that are disinterested persons."   11 U.S.C. § 327(a).   As discussed above, Moelis satisfies the disinterestedness standard of section 327(a) of the Bankruptcy Code.

27.     In addition, the Debtors seek approval of the Engagement Letter, including the indemnification provisions found in ***Annex B* of the Engagement Letter**, pursuant to section 328(a) of the Bankruptcy Code, which provides, in relevant part, that the debtors "with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be,  on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis .   Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a).

28.     Notably, section 328 of the Bankruptcy Code allows the Debtors to retain a professional on a fixed percentage fee basis or on a contingent fee basis such as the Fee Structure set forth in the Engagement Letter.  Indeed, similar fixed and contingency fee arrangements in other large chapter 11 cases have been routinely approved and implemented by courts around the country.  *See, e.g.*, *In re Tousa, Inc.,* Case No. 08-10928-BKC-JKO (Bankr. S.D.Fla. January 29, 2008); *In re Arch Aluminum & Glass Co., Inc.,* Case No. 09-36232-BKC-JKO (Bankr. S.D.Fla. November 25, 2009); *In re Atlas Worldwide Aviation Logistics, Inc.,* Case No. 04-10792-BKC-RAM (Bankr. S.D.Fla. January 30, 2004); *In re Land Resource, LLC.,* Case No. 08-bk-10159-ABB (Bankr. M.D.Fla. October 30, 2008); *In re Northwest Airlines Inc.*, Case No. 05-17930 (Bankr. S.D.N.Y. July 20, 2006); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. May 2, 2006); *In re Delphi Corp.*, Case No. 05-44481 (Bankr. S.D.N.Y. Nov. 30, 2005); *In re Tower Auto., Inc.*, Case No. 05-10578 (Bankr. S.D.N.Y. June 15, 2005); *In re Solutia, Inc.*, Case No.

03-17949 (Bankr. S.D.N.Y. May 26, 2004); *In re Parmalat U.S.A. Corp.*, Case No. 04-11139 (Bankr. S.D.N.Y. Apr. 22, 2004); *In re Adelphia Comm. Corp.*, Case No. 02-41729 (Bankr. S.D.N.Y. Dec. 12, 2003); *In re Worldcom, Inc.*, Case No. 02-13533 (Bankr. S.D.N.Y. Jan. 14, 2003).

29.     The Bankruptcy Code itself does not speak to the validity, or lack thereof, of indemnification or exculpation provisions. Under 11 U.S.C. § 328, however, the trustee or appointed committee may employ "a professional ... on any *reasonable* terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingency fee basis." (emphasis added). The question therefore is whether the indemnification and exculpation provisions are reasonable. *Murphy v. Weathers*, 2008 WL 4426080, 4 (M.D.Ga.,2008). It is well-settled that indemnification and exculpation provisions are not *per se* prohibited. *See In re Thermadyne Holdings Corp.,* 283 B.R. 789, 756 (B.A.P. 8th Cir.2002); *In re Friedman's, Inc.,* 356 B.R. 758, 762 (Bankr.S.D.Ga.2005). In fact, inclusion of such provisions are becoming commonplace for retention agreements and confirmation plans. *See United Artists Co.,* 315 F.3d at 229 (noting that, "indemnification of financial advisors against their own negligent conduct is becoming a common market occurrence."); *See also In re Enron Corp.,* 326 B.R. 497, 504 (S.D.N.Y.2005) (affirming bankruptcy courts order that confirmed plan with similar exculpation clause, in part, because it was "reasonable and customary and in the best interests of the estates."). The standard is whether the provisions are reasonable under the circumstances and in the best interests of the estate. *In re Thermdyne Holdings Corp.,* 283 B.R. at 756; *See also In re Metricom, Inc.,* 275 B.R. 364, 371 (Bankr.N.D.Cal.2002) ("the issue is whether particular terms are reasonable under given circumstances, and such a determination can only be made on a case by case basis.") *Murphy v.*

*Weathers*, 2008 WL 4426080, (M.D.Ga. 2008). *See also In re Pan American Hosp. Corp.*, 373 B.R. 773, 776 (Bankr..S.D.Fla.,2007) (allowing an indemnification provision for a financial and capital market advisor in Chapter 11 case); *In re Friedman's, Inc.,* 356 B.R. 758, 760-62 (Bankr.S.D.Ga.2005) (There is no *per se* prohibition against inclusion of indemnification or exculpation provisions in proposed Chapter 11 plan.).

30.     In the instant case, the Fee Structure is intended to reasonably compensate Moelis given the nature and scope of services to be provided pursuant to the Engagement Letter and is reflective of the market rate for an investment bank with Moelis' substantial experience.  Further, the Fee Structure is consistent with fee structures typically utilized by Moelis and other leading financial advisors and investment banks.  Accordingly, the Debtors believe that the Engagement Letter contains reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code.

31.     As set forth above, notwithstanding approval of the Engagement Letter under section 328 of the Bankruptcy Code, Moelis intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with the chapter 11 cases, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement Letter.

## Notice

32.     This Application and all attachments hereto shall be served via CM/ECF and/or E-Mail upon: (i) all parties listed on the Master Service List maintained by the Debtors, to the extent such party is registered to receive Notices of Electronic Filings via CM/ECF and/or the Debtors have an E-Mail address on file for such party; (ii) all parties upon whom service is

required pursuant to Rule 4001(c)(1)(C), to the extent not listed on the Master Service List; (iii) all parties who have filed Notices of Appearance pursuant to Local Rule 1007-2 and who is registered to receive Notices of Electronic Filings via CM/ECF; (iv) each Prepetition Secured Lender, and (v) any other party which the Court directs.

**No Prior Request**

33.     No prior application for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order pursuant to  Sections 327(a) and 328(a) of Title 11 of the United States Code and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure, authorizing the employment and retention of Moelis & Company LLC as their financial advisor and investment banker *nunc pro tunc* to the Petition Date in accordance with the terms and conditions set forth in the Engagement Letter dated as of March 23, 2010, by and between the Debtors and Moelis and such other relief as this Court deems just and proper.

Dated: March 31, 2010.

**[signature on next page]**

Respectfully Submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for Debtors-in-Possession
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By:    /s/ *Mariaelena Gayo-Guitian*
       Mariaelena Gayo-Guitian, Esq.
       Fla. Bar No.  0813818
       mguitian@gjb-law.com

       Paul J. Battista, Esq.
       Florida Bar No. 884162
       pbattista@gjb-law.com

       Heather L. Harmon, Esq.
       Florida Bar No. 013192
       hharmon@gjb-law.com

       Michael L. Schuster
       Florida Bar No. 57119
       mschuster@gjb-law.com

# EXHIBIT "A"

MOELIS & COMPANY

March 23, 2010

Fiddler's Creek, LLC
8156 Fiddler's Creek Parkway
Naples, FL 34114

Attention: Mr. Anthony DiNardo, Chief Financial Officer

Dear Mr. DiNardo:

We are pleased to confirm the arrangement (this "Agreement") under which Fiddler's Creek, LLC and its 27 affiliates and subsidiaries who are debtors and debtors in possession (collectively, the "Company" or "you") under Title 11 of the United States Code (the "Bankruptcy Code") pending in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), Case No. 10-bk-03846-ALP (the "Bankruptcy Case") has engaged Moelis & Company LLC ("Moelis," and, together with its affiliates and subsidiaries, "we", "our" or "us") to act as its exclusive financial advisor and investment banker in connection with a Restructuring Transaction, Sale Transaction or Capital Transaction as defined below.

As used herein, the term "Restructuring Transaction" shall mean and include any restructuring, reorganization, rescheduling, or recapitalization of all or any material portion of the Company's liabilities, however such result is achieved, including without limitation through any one or more of the following means, whether in one or a series of transactions: a plan of reorganization (a "Plan") confirmed in connection with any case or cases commenced by or against the Company, whether individually or on a consolidated basis in the Bankruptcy Case, exchange offer, consent solicitation, covenant relief, rescheduling of debt maturities, change in interest rates, settlement or forgiveness of debt, conversion of debt into equity, other amendments to the terms of the Company's debt instruments, issuance of new securities, raising of new debt or equity capital, sale or other transfer of equity, assets or other interests of the Company, provided, however, that a Restructuring Transaction shall not include (i) an abandonment or other transfer of collateral to any secured lender if Moelis does not provide any financial advisory or investment banking services to the Company in connection therewith, (ii) a restructuring of the debtor in possession loan from Gulf Bay Capital, Inc. to the Company, which is presently the subject of a motion before the Bankruptcy Court and an interim order of the Bankruptcy Court if Moelis does not provide any financial advisory or investment banking services to the Company in connection therewith, or (iii) a restructuring of the bond indebtedness related to the Community Development Districts encompassing the property owned by the Company if Moelis does not provide any financial advisory or investment banking services to the Company in connection therewith; provided, however, that Moelis shall obtain the Company's

prior consent before commencing any financial advisory or investment banking services in connection with (i), (ii) or (iii) above.

As used herein, the term "Sale Transaction" means (a) any merger, consolidation, reorganization or other business combination pursuant to which the business of the Company is combined with that of person, group of persons, partnership, corporation or other entity (including, without limitation, a secured creditor acquiring such assets through a credit bid) (an "Acquiror"); (b) the acquisition by an Acquiror, directly or indirectly, of all or any material portion of the capital stock of the Company, by way of negotiated purchase or by merger, reorganization, recapitalization or otherwise; or (c) the acquisition by an Acquiror, directly or indirectly, of all or a material portion of the assets, properties or businesses of the Company, by way of a direct or indirect purchase, exchange, joint venture or other means, including under section 363 of the Bankruptcy Code (including, without limitation, a secured creditor acquiring such assets through a credit bid); provided, however, the term "Sale Transaction" does not include the sale of lots, units, or residences offered and sold in the ordinary course of the Company's business.

As used herein, the term "Capital Transaction" means one or a series of transactions in which the Company raises or issues (whether effected pursuant to a chapter 11 plan (a "Plan") confirmed in connection with the Bankruptcy Case under the Bankruptcy Code (outside of the Bankruptcy Case, or otherwise) any (a) secured or unsecured debt (including, without limitation, any asset-backed debt, convertible debt, or debtor-in-possession financing in connection with a Bankruptcy Case (excluding the Gulf Bay DIP Loan)); (b) equity interests (including, without limitation, preferred stock or common stock) or equity-linked securities; (c) hybrid capital; or (d) options, warrants or other rights to acquire equity interests in the Company or any of its subsidiaries or affiliates, provided however that a Capital Transaction shall include the use of the proceeds from the Gulf Bay DIP Loan to pay any prepetition secured or unsecured debt of the Company.

1. As part of our engagement, we will perform the following services, as requested by you.

(a) undertake, in consultation with members of management of the Company, a comprehensive business and financial analysis of the Company;

(b) to the extent Moelis deems necessary, appropriate and feasible, or as the Company may request, review and analyze the Company's assets and its operating and financial strategies;

(c) review and analyze the business plans and financial projections prepared by the Company including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

(d) evaluate the Company's debt capacity and assist in the determination of an appropriate capital structure for the Company;

(e)    as deemed desirable by the Company, identify, initiate, review, negotiate, and evaluate any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof), and, if directed, develop and evaluate alternative proposals for a Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

(f)    solicit and evaluate indications of interest and proposals regarding any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) from current or potential lenders, equity investors, Acquirors or strategic partners;

(g)    assist the Company in developing strategies to effectuate any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof), including financing alternatives;

(h)    advise and assist the Company in the course of its negotiation of any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) and participate in such negotiations, as requested;

(i)    determine and evaluate the risks and benefits of considering, initiating and consummating any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

(j)    determine values or ranges of values (as appropriate) for the Company and any securities that the Company offers or proposes to offer in connection with a Capital Transaction;

(k)    in coordination with the Company, prepare and implement a marketing plan and, working with management and based upon information provided by the Company, prepare one or more memoranda describing assets, properties or businesses to be sold in any Sale Transaction (each, a "Selling Memo");

(l)    working with the Company's management and based upon information provided by the Company, prepare one or more memoranda describing the Company and its businesses for use in any potential Capital Transaction (each, an "Information Memo");

(m)    contact potential Acquirors or investors that we and the Company have agreed may be appropriate, and in rendering such services, we may meet with representatives of such Acquirors or investors and provide such representatives with the Selling Memo or Information Memo and such additional information about the Company's assets, properties or businesses as may be appropriate and acceptable to the Company, subject to customary business confidentiality agreements in form and substance approved by the Company;

(n)     assist the Company in the development, preparation and distribution of selected information, documents and other materials to create interest in and to consummate any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

(o)     assist the Company in valuing its assets or business, provided that any real estate or fixed asset appraisals will be undertaken by outside appraises, separately retained and compensated by the Company;

(p)     be available at your request to meet with your management, board of directors, creditor groups, equity holders, any official committees appointed in the Bankruptcy Case, or other parties to discuss any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

(q)     if requested by the Company, participate in hearings before the Bankruptcy Court and provide relevant testimony; and

(r)     such other financial advisory and investment banking services as may be agreed upon by Moelis and the Company, and that is within the scope of this engagement.

2. In connection with our engagement, the Company will furnish us with all information that we reasonably deem appropriate (collectively, the "Information") and will provide us with access to the officers, directors, employees, accountants, counsel and other representatives of the Company. To the best of the Company's knowledge, the Information to be furnished by or on behalf of the Company, when delivered, will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading. In addition, the Company agrees to promptly advise us of any material event or change in the business, affairs, condition (financial or otherwise) of the Company that occurs during the term of our engagement hereunder. The Company understands and agrees that we, in performing our services hereunder, will use and rely upon the Information as well as publicly available information regarding the Company, and that we do not assume responsibility for independent verification of any Information, whether publicly available or otherwise furnished to us, concerning the Company, including, without limitation, any financial information, forecasts or projections, considered by us in connection with the rendering of our services. Accordingly, we shall be entitled to assume and rely upon the accuracy and completeness of all Information and are not required to conduct a physical inspection of any of the properties or assets, or to prepare or obtain any independent evaluation or appraisal of any of the assets or liabilities, of the Company. With respect to any financial forecasts and projections made available to us by the Company and used by us in our analysis, we shall be entitled to assume that such forecasts and projections have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of the Company as to the matters covered thereby. In connection with the services described above, the Company authorizes us, as the Company's representative, to transmit any Selling Memo or Information Memo that the Company has had the opportunity to review and approve, in writing, to potential parties to a Sale Transaction or Capital Transaction. The Company hereby

acknowledges that all Information contained in any Selling Memo or Information Memo will be provided by or based upon Information provided by the Company or third parties, and that the Company will be solely responsible for the contents thereof.

3. (a) As compensation for our services hereunder, the Company agrees to pay us the following fees. The payment of these fees shall be subject to the rules and procedures of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and applicable local rules and guidelines of the Bankruptcy Court and any Bankruptcy Court orders:

       (i)     Monthly Fee. During the term of this Agreement as provided herein, a cash fee of $125,000 per month (the "Monthly Fee"). The first Monthly Fee shall be paid within three (3) business days after the entry of an order of the Bankruptcy Court approving this Agreement or, if the Bankruptcy Court enters an order in respect of the payment of interim compensation to professionals employed in the Bankruptcy Case, then in compliance with such order (the "Interim Compensation Order"). All subsequent Monthly Fees shall be paid in advance prior to each monthly anniversary of this Agreement or, if applicable, in accordance with the Interim Compensation Order. Whether or not a Restructuring Transaction, Sale Transaction or Capital Transaction has taken place or will take place, we shall earn and be paid the Monthly Fee every month during the term of this Agreement, provided that such Monthly Fee shall be credited against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee as follows:

       a.     With regard to the first six (6) months of this Agreement, the Monthly Fee, shall not be credited against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee;

       b.     With regard to the second six (6) months of this Agreement, an amount equal to fifty percent (50%) of the Monthly Fees actually paid to Moelis shall be credited once against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee earned by Moelis pursuant to this Agreement; and

       c.     With regard to every month after the first year anniversary during the term of this Agreement, an amount equal to 100% of the Monthly Fees actually paid to Moelis shall be credited once against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee earned by Moelis pursuant to this Agreement.

       (ii)     Restructuring Fee. In addition to the foregoing Monthly Fees, the Company shall pay Moelis a cash fee (the "Restructuring Fee") of 1.00% of the principal amount of any indebtedness and accrued interest thereon restructured in any Restructuring Transaction subject to a minimum aggregate Restructuring Fee of $1,000,000 (the "Minimum Restructuring Fee"). The Restructuring Fee shall be paid immediately upon the consummation of a Restructuring Transaction. It is expressly understood and agreed that a separate Restructuring Fee shall be payable in respect of each Restructuring Transaction in the event that more than one Restructuring

- 6 -

Transaction shall occur, provided, however, that the Minimum Restructuring Fee shall not apply separately to each Restructuring Transaction, but shall be based upon the aggregate of all Restructuring Transactions.

(iii)     Capital Transaction Fee.  In addition to the foregoing Monthly Fee and Restructuring Fee, the Company shall pay Moelis a cash fee (the "Capital Transaction Fee"), in an amount equal to (i) 1.00% of the aggregate amount of new debt raised in a Capital Transaction in the form of secured debt, (ii) 1.75% of the aggregate amount of new debt raised in a Capital Transaction in the form of senior unsecured debt, (iii) 2.25% of the aggregate amount of new debt raised in a Capital Transaction in the form of subordinated debt, (iv) 2.50% of the aggregate amount of new debt raised in a Capital Transaction in the form of convertible debt, (v) 4.00% of the aggregate amount or face value of new capital raised in a Capital Transaction in the form of preferred equity, including preferred equity-linked securities, options, warrants or other rights to acquire preferred equity interests of the Company, and (vi) 5.00% of the aggregate amount or face value of new capital raised in a Capital Transaction in the form of common equity, including, options, warrants or other rights to acquire common equity interests of the Company.  The Capital Transaction Fee shall be paid immediately upon the closing and funding of each Capital Transaction. It is expressly understood and agreed that a separate Capital Transaction Fee shall be payable in respect of each Capital Transaction in the event that more than one Capital Transaction shall occur.  In the event that a Capital Transaction is consummated by the Company with Lone Star U.S. Acquisition, LLC or its affiliates (collectively, "Lone Star") in an amount equal to or in excess of $90,000,000, then the Capital Transaction Fee that will be due to Moelis shall be reduced by $250,000.

(iv)     Sale Transaction Fee.  In addition to the foregoing Monthly Fee, the Restructuring Fee and the Capital Transaction Fee, the Company shall pay to Moelis a cash fee (the "Sale Transaction Fee") which will be equal to the greater of (a) $1,000,000 or (b) 1.00% of the Transaction Value up to $200,000,000, plus 0.75% of the Transaction Value between $200,000,000 and $500,000,000, plus 0.50% of the Transaction Value above $500,000,000.  For the purposes of calculating the Sale Transaction Fee, the term "Transaction Value" shall be defined as set forth in *Annex A*.  The Sale Transaction Fee shall be paid immediately upon the closing of each Sale Transaction.  It is expressly understood and agreed that a separate Sale Transaction Fee shall be payable in respect of each Sale Transaction in the event that more than one Sale Transaction shall occur.

(v)     Limitation on Fees.  In the event that the Company enters into a single transaction that constitutes more than one of a Restructuring Transaction, a Capital Transaction and/or a Sale Transaction (as such terms are defined herein), then Moelis shall not be entitled to multiple transaction fees for that single transaction.  Instead, Moelis shall be paid a single transaction fee for each such transaction in an amount equal to the highest of the applicable transaction fees.

(b) Whether or not any Restructuring Transaction, Sale Transaction or Capital Transaction is consummated, and in addition to any fees payable to us, the Company will reimburse us, upon our written request from time to time, for all reasonable expenses incurred by us in entering into this Agreement and in connection with our performing services pursuant to this Agreement. These expenses generally include travel costs, document reproduction, telephone and facsimile charges, meals, and other customary expenses for this type of transaction, including the reasonable fees, disbursements and other charges of our legal counsel. We agree to provide reasonable backup relating to such expenses to the extent requested by the Company and as may be required by the Bankruptcy Court.

(c) The Company's obligation to pay any fee, expense or indemnity set forth herein shall be subject to the approval of the Bankruptcy Court and upon such approval shall be absolute and unconditional, and shall not be subject to any reduction by way of setoff, recoupment or counterclaim.

(d) The parties acknowledge that a substantial professional commitment of time and effort will be required of Moelis and its professionals hereunder, and that such commitment may foreclose other opportunities for us. Moreover, the actual time and commitment required for the engagement may vary substantially. In light of the numerous issues that may arise in engagements such as this, Moelis' commitment to the time and effort necessary to address the issues that will arise in this engagement, the expertise and capabilities of Moelis that will be required in this engagement, and the market rate for professionals of Moelis' stature and reputation, the parties agree that the fee arrangement provided for herein is just and reasonable, fairly compensates Moelis, and provides the requisite certainty to the Company.

4.  (a) The Company shall use its reasonable best efforts to seek an interim and final order of the Bankruptcy Court authorizing the employment of Moelis as its investment banker pursuant to the terms of this Agreement (including, without limitation, the fee, expense, and indemnification provisions hereof) pursuant to, and subject to the standards of review set forth in, section 328(a) of the Bankruptcy Code (and not subject to the standards of review set forth in section 330 of the Bankruptcy Code), nunc pro tunc to the date first written above. The retention application and the proposed interim and final orders authorizing Moelis' retention must be acceptable to Moelis in its sole discretion. The Company shall pay all amounts then earned and payable pursuant to this Agreement in cash. In agreeing to seek Moelis' retention under section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Moelis' general restructuring experience and expertise, its knowledge of the capital markets and its restructuring capabilities will inure to the benefit of the Company, that the value to the Company of Moelis' services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the fees set forth in Section 3 herein are reasonable, regardless of the number of hours expended by Moelis' professionals in the performance of the services to be provided hereunder.

(b) Moelis shall have no obligation to provide services under this or any agreement, unless Moelis' retention under such agreement is approved by final non-appealable order of the Bankruptcy Court (acceptable to Moelis in its sole discretion, which order must also approve the

indemnification provisions in *Annex B* of this Agreement) under section 328(a) of the Bankruptcy Code, within 60 days following the filing of an application by the Company pursuant to the Bankruptcy Code requesting authorization to employ Moelis as provided herein. If the final non-appealable order authorizing the employment of Moelis is not obtained within such 60-day period, or such order is later reversed, vacated, stayed or set aside for any reason, Moelis may terminate this Agreement, and the Company shall be obligated to reimburse Moelis for all fees and expenses incurred prior to the date of termination, subject to the requirements of any applicable orders of the Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules, and applicable local rules, guidelines and Bankruptcy Court orders. Following entry of the interim order authorizing the retention of Moelis, the Company shall pay as promptly as possible all fees and expenses due pursuant to this Agreement, as approved by the Bankruptcy Court and in accordance with the terms of this Agreement, the Bankruptcy Code, the Bankruptcy Rules, and applicable local rules, guidelines and Bankruptcy Court orders, including the Interim Compensation Order.

(c) The Company agrees that Moelis' post-petition compensation as set forth herein and payments made pursuant to the expense reimbursements and indemnification provisions of this Agreement (including, without limitation, *Annex B* hereto) shall be entitled to the status as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, and the Company shall use its reasonable best efforts to cause such compensation to be included in and have the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more financing orders entered by the Bankruptcy Court. In the event the Company is not able to do so, then Moelis shall have the right to terminate this Agreement. The Company also agrees to assist Moelis in preparing, filing and serving all required fee statements, interim fee applications, and final fee application. The Company agrees to support Moelis' fee applications during any Bankruptcy Court hearing on such fee applications, so long as the fees and expenses sought by Moelis therein are consistent with this Agreement.

(d)    The terms of this Section 4 are solely for the benefit of Moelis, and may be waived, in whole or in part, only by Moelis.

5.    The Company understands that if we are asked to act for the Company in any additional capacity relating to this engagement but not specifically addressed in this Agreement, then such activities shall constitute separate engagements and the terms of any such additional engagements will be embodied in one or more separate written agreements, containing terms and conditions to be mutually agreed upon, including, without limitation, appropriate indemnification provisions. The indemnity provisions in *Annex B* referred to below shall apply to any such additional engagements, unless superseded by an indemnity provision set forth in a separate agreement applicable to any such additional engagements, and shall remain in full force and effect regardless of any completion, modification or termination of our engagement(s).

6. No advice or opinion rendered by us, whether formal or informal, may be disclosed, in whole or in part, or summarized, excerpted from or otherwise referred to without our prior written consent. In addition, we may not be otherwise referred to without our prior written consent, which shall not be unreasonably withheld. It is understood, however, that if we are

requested to render an opinion, the opinion may be included in its entirety (including all attachments thereto) in any communication by the Company or the Board of Directors to parties in interest in the Bankruptcy Cases, if any are filed; provided, however, that we have had the opportunity to review such communication prior to any filing with the Securities and Exchange Commission or prior to its dissemination to parties in interest in the Bankruptcy Cases, if any are filed. The Company acknowledges that we may, at our option and expense and after announcement of any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof), place announcements and advertisements or otherwise publicize such transaction and our role in it (which may include the reproduction of the Company's logo and a hyperlink to the Company's website) on our website and in such financial and other newspapers and journals as we may choose, stating that we have acted as exclusive financial advisor to the Company in connection with any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof). Furthermore, if requested by us, the Company shall include a mutually acceptable reference to us in any press release or other public announcement made by the Company regarding the matters described in this Agreement.

7. Since we will be acting on behalf of the Company in connection with our engagement hereunder, the Company and we agree to the indemnity provisions and other matters set forth in *Annex B*, which is incorporated by reference into this Agreement.

8. (a) Our engagement hereunder shall extend until the earliest of (i) the effective date of a chapter 11 plan of reorganization or liquidation confirmed in the Bankruptcy Cases, (ii) the conversion of the Bankruptcy Cases to chapter 7 of the Bankruptcy Code, (iii) appointment of a chapter 11 trustee or an examiner with expanded powers in the Bankruptcy Cases, (iv) dismissal of the Bankruptcy Cases, and (v) the consummation of the last Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof), as agreed upon by Moelis and the Company; provided, however, that our engagement may be (x) terminated earlier, with or without cause, either by us or by you upon 15 days' prior written notice thereof to the other party, (y) terminated earlier as provided elsewhere herein or (z) extended, in writing, by the Company and us. Notwithstanding the foregoing, in the event of any expiration or termination of our engagement hereunder, (i) we will continue to be entitled to payment by the Company (or its bankruptcy estates) of the unpaid fees up to and including the date of expiration or termination pursuant to Section 3 of this Agreement, and (ii) unreimbursed expenses incurred by us as a result of services rendered prior to the date of expiration or termination shall become immediately payable by the Company (or its bankruptcy estates) in full. The Company's obligation to indemnify us and certain related persons and entities as provided in *Annex B* referred to above and the provisions of Sections 4(c), 4(d), 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15 hereof, shall remain operative and in full force and effect regardless of any such termination or expiration.

(b) If, at any time prior to the expiration of 12 months following (i) the expiration of this Agreement, (ii) the termination of this Agreement by you other than "for cause" (as defined below) (iii) the termination of this Agreement by us "for cause" (as defined below), a Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) is consummated, or if the Company enters into an agreement regarding a Restructuring

- 10 -

Transaction, Sale Transaction or Capital Transaction (or any combination thereof) (which is subsequently consummated), then the Company (or its bankruptcy estates) shall pay us the appropriate fee specified in Section 3 above immediately upon the closing of such transaction. The term "for cause," in the case of a termination by you, shall mean any material breach of this Agreement by Moelis, which remains uncured after notice by you and a reasonable opportunity to cure. The term "for cause," in the case of a termination by Moelis, shall mean the failure of the Company to pay any amounts due to Moelis hereunder or any other material breach of this Agreement by the Company, which remains uncured after notice by Moelis and a reasonable opportunity to cure. Except as provided for in this paragraph 8(b), following the date of expiration or termination of this Agreement, Moelis shall not be entitled to a Restructuring Fee, Sale Transaction Fee or Capital Transaction Fee. The Company agrees not to object to our request for allowance of such fee by the Bankruptcy Court or any appellate court if Moelis is entitled to such fee under the terms of this Agreement.

9. We are a securities firm engaged in a number of merchant banking and investment banking activities. Information which is held elsewhere by us, but of which none of the individuals involved in providing services contemplated by this Agreement actually has (or without breach of internal procedures can properly obtain) knowledge, will not for any purpose be taken into account in determining our responsibilities to the Company under this Agreement. We will have no duty to disclose to the Company or any other party, or utilize for the Company's or any other party's benefit any nonpublic information acquired in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on our business.

10. The obligations of the Company hereunder shall be the joint and several obligations of only the entities comprising the Company. All aspects of the relationship created by this Agreement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein. All actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively by any New York state or federal court of competent jurisdiction sitting in the Borough of Manhattan in the City of New York to whose jurisdiction we and the Company hereby irrevocably submit. We and the Company hereby irrevocably waive any defense or objection to the New York forum designated above. Notwithstanding the previous two sentences, during the pendency of the Bankruptcy Case, any and all actions and proceedings arising out of or relating to this Agreement will be heard and determined by the Bankruptcy Court or any court having appellate jurisdiction over the Bankruptcy Court. If the Bankruptcy Court declines to assert jurisdiction over such proceedings or if the reference is withdrawn to the United States District Court, then such proceedings shall be heard and determined in any New York state or federal court of competent jurisdiction sitting in the Borough of Manhattan of the City of New York, to whose jurisdiction we and the Company hereby irrevocably submit. WE HEREBY AGREE, AND THE COMPANY HEREBY AGREES ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS SECURITY HOLDERS, TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF THE AGREEMENT OR OUR PERFORMANCE THEREUNDER.

11. This Agreement (including all Annexes hereto) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void, unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. This Agreement may not be amended or otherwise modified or waived except by an instrument in writing signed by both us and the Company. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement, and a facsimile or email of an original signature will be deemed an original. This Agreement shall be binding upon the Company and us and its and our respective successors and permitted assigns.

12. The Company acknowledges and agrees that Moelis has been retained to act solely as an advisor to the Company, and not as an agent of the Company or as an advisor of any other person or entity. The Company's engagement of Moelis is not intended to confer rights upon any person (including shareholders, employees or creditors of the Company) not a party hereto as against Moelis or its affiliates, or its directors, officers, principals, employees or agents, successors or assigns. Moelis shall act as an independent contractor and not in any other capacity under this Agreement, and any duties arising out of its engagement shall be owed solely to the Company.

13. We agree to keep confidential all Information provided to or received by us, and we will not (except as required by applicable law, regulation or legal or administrative process) without the Company's prior written consent, disclose any Information in any manner whatsoever; provided, however, that we understand that we may reveal the Information to our advisors, board of directors, partners, members, key personnel, representatives, affiliates, subsidiaries or agents (including their accountants and attorneys) (the "Affiliated Persons") (a) who need to know the Information in connection with the services Moelis is providing to the Company, (b) who are informed by us of the confidential nature of the Information, and (c) who agree to act in accordance with the terms of this Agreement. We shall exercise reasonable best efforts to cause the Affiliated Persons to observe the confidentiality terms of this Agreement.

14. In the event we are requested pursuant to, or required by, applicable law, regulation or legal or administrative process to disclose any of the Information, to the extent we are not prohibited from doing so, we will notify the Company promptly so that the Company may seek a protective order or other appropriate remedy or, in the Company's sole discretion, waive compliance with the terms of this paragraph and the foregoing paragraph. In the event that no such protective order or other remedy is obtained, or the Company waives compliance with the terms of this paragraph or the foregoing paragraph, in writing, then we will furnish only that portion of the Information which we are legally required to furnish, and we will exercise reasonable best efforts to obtain reliable assurance that confidential treatment will be afforded the Information. Additionally, we agree to provide a copy of the Information which is being disclosed, pursuant to the provisions of this paragraph, to the Company.

- 12 -

15.    Moelis and the Company expect to work closely together during the course of this engagement.    Moelis intends to use its best efforts to consult with the Company prior to contacting third parties regarding the Company, and to keep the Company informed of its progress and of its material communications with third parties about the Company, in accordance with Moelis' professional obligations to the Company as its client.

16.    We acknowledge and agree that we may not assign our obligations and rights under, and our consideration pursuant to, this Agreement to another registered broker-dealer without the prior written consent of the Company, which may be granted or withheld in the Company's sole discretion.    Please note the important privacy, business continuity and USA PATRIOT Act disclosures on *Annex C* hereof.

17.    Moelis and the Company agree that no broker has been used by either party in connection with this Agreement or the transactions described in this Agreement, except that Randall W. Byrnes may receive a fee from Moelis in connection therewith. Each party agrees to indemnify and hold the other harmless from any claims, losses or other damages, including reasonable attorneys' fees and expenses asserted by any person claiming entitlement to a brokerage or similar fee related to this Agreement.   For the avoidance of doubt, Moelis will indemnify and hold the Company harmless from any claims that may be asserted against the Company by Randall W. Byrnes in connection with any brokerage fee or "finder's fee" in connection with this Agreement.

*(Signature page follows)*

We are delighted to accept this engagement and look forward to working with you on this assignment. Please confirm that the foregoing is in accordance with your understanding by signing and returning to us the enclosed duplicate of this agreement. By affixing your signature hereto, you represent that you are a person authorized by the Company to enter into this agreement on its behalf.

Very truly yours,

MOELIS & COMPANY LLC

By: _____
Name: Alex Rubin
Title: Managing Director

Accepted and agreed to as of the date first written above:

FIDDLER'S CREEK, LLC
By:     GBFC II, L.P., a Delaware limited
        partnership, a member
By:     GBFC II, LLC, a Delaware limited
        liability company, its general partner
By:     Gulf Bay 100, Ltd., a Florida limited
        partnership, its sole member
By:     Gulf Bay 100, Inc., a Florida corporation,
        its general partner

By: _____
    Name: Anthony DiNardo
    Title: CFO, Secretary and not individually

## ANNEX A

"Transaction Value" shall equal the sum of (A) in the case of the sale, issuance or exchange of equity securities, the total consideration received or to be received for such securities (including amounts payable to holders of options, warrants and convertible securities and amounts held in escrow), plus payments made in installments, amounts payable in connection with the Transaction under consulting agreements, agreements not to compete or similar arrangements (including such payments to management), and contingent payments (whether or not related to future earnings or operations); (B) in the case of a sale or disposition of assets, the total consideration paid or received or to be paid or received for such assets (including amounts held in escrow and installment payments), plus contingent payments (whether or not related to future earnings or operations); and (C) (i) in the case of the sale, issuance or exchange of equity securities, the principal amount of all indebtedness for borrowed money as set forth on the most recent consolidated balance sheet (the "Balance Sheet") of the acquired company prior to the consummation of the Transaction (less the amount of cash and cash equivalents up to but not exceeding the total amount of indebtedness set forth on the Balance Sheet) and (ii) in the case of a sale or disposition of assets, the principal amount of all indebtedness for borrowed money as set forth on the Balance Sheet that the Acquirer assumes; and (D) the value implied in the Transaction of any equity or assets retained by the debt and security holders of the acquired company upon consummation of the Transaction. In the case of a recapitalization, all equity securities retained by security holders of the acquired company upon consummation of the Transaction will be deemed acquired in the Transaction.

In the case of a joint or collaborative venture, strategic alliance or similar transaction (a "Joint Venture"), Transaction Value shall equal (i) the aggregate value, as we and the Company mutually agree in good faith, of the proceeds, assets and other consideration all parties to the Joint Venture pay or contribute in connection with the Transaction, including, without limitation, cash, notes, securities, installment or contingent amounts, intellectual property, licenses, distribution agreements and other property; or (ii) in the event such Transaction does not involve the payment or contribution of consideration to a Joint Venture, such amount as we and the Company mutually agree in good faith.

The Company will pay any portion of the Transaction Fee attributable to contingent payments constituting Transaction Value upon consummation of the Transaction, based on the present value of such amounts, using a discount rate and probability of payment that you and we mutually agree.

For purposes of calculating the Transaction Value, equity securities constituting a part of the consideration payable in the Transaction that are traded on a national securities exchange shall be valued at the closing price thereof on the 30 trading days immediately prior to the closing of the Transaction. Any debt or other securities or other non-cash consideration shall be valued as the Company and we may mutually agree.

- A-1 -

## ANNEX B

In further consideration of the agreements contained in the engagement letter dated the date hereof (the "Engagement"), in the event that Moelis & Company LLC or any of its divisions, affiliates, current or former directors, officers, partners, members, agents or employees of Moelis or any of its affiliates, or any person controlling Moelis or its affiliates, current or former directors, officers, partners, members, agents or employees (collectively, "Indemnified Persons") becomes involved in any capacity in any action, claim, suit, investigation or proceeding, actual or threatened, brought by or against any person (including, without limitation, creditors of Fiddler's Creek, LLC (together with its subsidiaries and affiliates, the "Company"), stockholders of the Company, a receiver, a custodian, a trustee appointed in any case or cases under title 11 of the United States Code commenced by or against the Company or any of its subsidiaries or affiliates, whether individually or on a consolidated basis (a "Bankruptcy Case"), an official committee appointed in a Bankruptcy Case, or a litigation trust, liquidating trust or similar vehicle created in connection with a Bankruptcy Case (or a trustee of such trust or similar vehicle)), in connection with or as a result of the Engagement or any matter referred to in the Engagement, the Company will reimburse such Indemnified Person for its reasonable and customary legal expenses (including, without limitation, the costs and expenses incurred in connection with investigating, preparing for and responding to third-party subpoenas or enforcing the Engagement) incurred in connection therewith as such expenses are incurred. The Company will also indemnify and hold harmless any Indemnified Person from and against, and the Company agrees that no Indemnified Person shall have any liability to any party for, any losses, claims, liabilities, damages and expenses (including actions or proceedings in respect thereof) (collectively, "Losses") (A) related to or arising out of (i) the Company's or its agents' actions or failures to act (including statements or omissions made or information provided by the Company or its agents) or (ii) actions or failures to act by an Indemnified Person with the Company's or its agents' consent or in reliance on the Company's or its agents' actions or failures to act or (B) otherwise related to or arising out of the Engagement or our performance thereof, except that clause (B) shall not apply to any Losses that are finally determined by a court or arbitral tribunal of competent jurisdiction to have resulted primarily from the bad faith, willful misconduct or gross negligence of any Indemnified Person.

If such indemnification for any reason (other than such Indemnified Person's bad faith, willful misconduct or gross negligence as finally determined by a court or arbitral tribunal of competent jurisdiction to have primarily caused the Losses) is not available or is insufficient to hold an Indemnified Person harmless, the Company agrees to contribute to the Losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company, on the one hand, and by us, on the other hand, with respect to the Engagement or, if such allocation is determined by a court or arbitral tribunal of competent jurisdiction to be unavailable, in such proportion as is appropriate to reflect other equitable considerations, such as the relative fault of the Company on the one hand and of us on the other hand; provided, however, that to the extent permitted by applicable law, the Indemnified Persons shall not be responsible for amounts which, in the aggregate, are in excess of the amount of all fees actually received by us from the Company in connection with the engagement. Relative benefits to the Company, on the one hand, and us, on the other hand, with respect to the Engagement shall be

deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received or proposed to be received by the Company or its security holders, as the case may be, pursuant to the transaction(s), whether or not consummated, contemplated by the Engagement, bears to (ii) all fees actually received by us in connection with the Engagement.

The Company will not, without our prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination includes a release of each Indemnified Person from any liabilities arising out of such action, claim, suit, investigation or proceeding. The Company will not permit any such settlement, compromise, consent or termination to include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of an Indemnified Person, without such Indemnified Person's prior written consent. No Indemnified Person seeking indemnification, reimbursement or contribution under this agreement will, without the Company's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to herein.

Prior to entering into any agreement or arrangement with respect to, or effecting, any merger, statutory exchange or other business combination or proposed sale or exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth herein, the Company will notify us in writing thereof (if not previously so notified) and, if requested by us, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth herein, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and upon terms and conditions mutually satisfactory to the Company and us.

The Company's obligations hereunder shall be in addition to any rights that any Indemnified Person may have at common law or otherwise.

The Company acknowledges that in connection with the Engagement we are acting as an independent contractor and not in any other capacity, with duties owing solely to the Company. This agreement and any other agreements relating to the Engagement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein. All actions and proceedings arising out of or relating to this agreement shall be heard and determined by any New York State or federal court of competent jurisdiction sitting in the Borough of Manhattan in the City of New York to whose jurisdiction we and the Company irrevocably submit. Notwithstanding the foregoing, solely in the event a Bankruptcy Case is commenced with respect to the Company, all actions and proceedings arising out of or relating to this agreement shall be heard and determined by the Bankruptcy Court. If the Bankruptcy Court declines to assert jurisdiction over such proceedings or if the reference is withdrawn to the United States District Court, then such proceedings shall be heard and determined in any New York state or federal court of competent jurisdiction sitting in the

- B-2 -

Borough of Manhattan of the City of New York, to whose jurisdiction we and the Company hereby irrevocably submit. Solely for purposes of enforcing the Company's obligations hereunder, the Company consents to personal jurisdiction, service and venue in any court proceeding in which any claim subject to this agreement is brought by or against any Indemnified Person. WE HEREBY AGREE, AND THE COMPANY HEREBY AGREES, TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF THIS AGREEMENT.

The provisions of this *Annex B* shall apply to the Engagement referred to in the Engagement Letter dated the date hereof (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the Engagement. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

FIDDLER'S CREEK, LLC

By:    GBFC II, L.P., a Delaware limited
        partnership, a member

By:    GBFC II, LLC, a Delaware limited
        liability company, its general partner

By:    Gulf Bay 100, Ltd., a Florida limited
        partnership, its sole member

By:    Gulf Bay 100, Inc., a Florida corporation,
        its general partner

By: _____
    Name: Anthony DiNardo
    Title: CFO, Secretary and not individually

Accepted and agreed to as of the date hereof:

MOELIS & COMPANY LLC

By: _____
    Name: Alex Rubin
    Title: Managing Director

## ANNEX C

This *Annex C* is a part of and is incorporated into that certain engagement letter (the "Agreement") dated March 10, 2010 by and between Fiddler's Creek, LLC (together with its affiliates and subsidiaries, the "Company" or "you") and Moelis & Company LLC ("Moelis," and, together with its affiliates and subsidiaries, "we," "our" or "us").

## PRIVACY STATEMENT

One of the most important components of our relationship with you is the trust that you have placed in us to keep your nonpublic information private.

The information you provide to Moelis is used for the purposes of advising and guiding you regarding certain investment transactions. The employees of Moelis do not discuss client information with anyone outside the company unless specifically authorized to do so by you. Information we collect and record about you is kept strictly confidential. We maintain security procedures and standards designed to protect nonpublic information at all times.

With the exception of circumstances where we are required by law to disclose your nonpublic information, we do not share such information with any unaffiliated entity. In the event that we change this policy and determine that it is beneficial to share information with an unaffiliated third party, we will notify you beforehand and give you the opportunity to opt-out of such information sharing.

The confidentiality provisions of the Agreement will control the non-disclosure of confidential or private information, and other terms included therein.

## BUSINESS CONTINUITY DISCLOSURE

Moelis maintains a business continuity plan, which addresses interruptions to our normal course of business. This plan is reviewed annually and updated as necessary. Our disclosure statement is available on our website at www.moelis.com and is available in written form upon request.

The plan outlines the actions Moelis will take in the event of a single-building, citywide or regional business interruption, including the use of an office location not affected by the interruption, retrieval of off-site back up data, use of primary and alternate vendors for continued communication, notification of active clients to provide interim information and relocation of personnel to an unaffected site.

## USA PATRIOT ACT

In order to comply with the USA Patriot Act, Moelis must obtain, verify and record information that identifies each entity (or individual) that enters into a business relationship with Moelis. As a result, in addition to obtaining our client/customer's corporate name and address, Moelis may seek to obtain our client/customer's corporate tax identification number and certain other

- C-1 -

information. Moelis may also request relevant corporate resolutions and other identifying documents.

# EXHIBIT "B"

In re:

FIDDLER'S CREEK, LLC.
951 LAND HOLDINGS, LLC
DY ASSOCIATES, LLC
GBFC DEVELOPMENT, LLC
FC MARINA, LLC
FC BEACH, LLC
FC GOLF, LLC
DY LAND HOLDINGS II, LLC
FC PARCEL 73, LLC
FC COMMERCIAL, LLC
FC HOTEL, LLC
FC RESORT, LLC
GULF BAY HOSPITALITY COMPANY, LLC
GULF BAY HOTEL COMPANY, LLC
GBP DEVELOPMENT, LLC
GB PENINSULA, LTD.
951 LAND HOLDINGS, LTD.
DY LAND ASSOCIATES, LTD.
GBFC DEVELOPMENT, LTD.
GBFC MARINA, LTD.
FC BEACH, LTD.
FC GOLF, LTD.
FC HOTEL, LTD.
FC RESORT, LTD.
GULF BAY HOSPITALITY, LTD.
GULF BAY HOTEL COMPANY, LTD.
GBP DEVELOPMENT, LTD.
FIDDLER'S CREEK MANAGEMENT, INC.

Chapter 11

Case No. 9:10-bk-03846-ALP
Case No. 9:10-bk-03852-ALP
Case No. 9:10-bk-03856-ALP
Case No. 9:10-bk-03864-ALP
Case No. 9:10-bk-03872-ALP
Case No. 9:10-bk-03873-ALP
Case No. 9:10-bk-03875-ALP
Case No. 9:10-bk-03878-ALP
Case No. 9:10-bk-03881-ALP
Case No. 9:10-bk-03888-ALP
Case No. 9:10-bk-03886-ALP
Case No. 9:10-bk-03896-ALP
Case No. 9:10-bk-03898-ALP
Case No. 9:10-bk-03905-ALP
Case No. 9:10-bk-03908-ALP
Case No. 9:10-bk-03909-ALP
Case No. 9:10-bk-03911-ALP
Case No. 9:10-bk-03918-ALP
Case No. 9:10-bk-03920-ALP
Case No. 9:10-bk-03928-ALP
Case No. 9:10-bk-03934-ALP
Case No. 9:10-bk-03937-ALP
Case No. 9:10-bk-03938-ALP
Case No. 9:10-bk-03947-ALP
Case No. 9:10-bk-03949-ALP
Case No. 9:10-bk-03950-ALP
Case No. 9:10-bk-03952-ALP
Case No. 9:10-bk-03954-ALP

Debtors.

_____/

**(Jointly Administered under
Case No. 9:10-bk-03846-ALP)**

---

**DECLARATION OF MARK S. HOOTNICK IN SUPPORT OF
APPLICATION OF DEBTORS-IN-POSSESSION FOR ENTRY OF
AN ORDER PURSUANT TO SECTIONS 327(A) AND 328(A) OF THE
BANKRUPTCY CODE AUTHORIZING THE EMPLOYMENT AND
RETENTION OF MOELIS & COMPANY LLC AS FINANCIAL ADVISOR
AND INVESTMENT BANKER _NUNC PRO TUNC_ TO THE PETITION DATE**

I, Mark S. Hootnick, being duly sworn, hereby depose and say as follows:

1.      I am over the age of 18 and competent to testify.  I am a Managing Director of Moelis & Company LLC ("Moelis").  This declaration is submitted on behalf of Moelis in connection with the application ("Application") filed by Fiddler's Creek, LLC ("Fiddler's Creek") and twenty-seven (27) of its subsidiaries and affiliates (collectively, the "Debtors" or the "Company") for entry of an order authorizing the Debtors to retain and employ Moelis as their financial advisor and investment banker, *nunc pro tunc* to the Petition Date.[1]

2.      The facts set forth in this declaration are based upon my personal knowledge, upon information and belief, or upon client matter records kept in the ordinary course of business that were reviewed by me or other employees of Moelis under my supervision and direction. The procedures pursuant to which Moelis determined whether there were any connections between Moelis and interested parties in these cases is described below.

## QUALIFICATIONS OF MOELIS

3.      Moelis is an investment banking firm with its principal office located at 399 Park Avenue, 5th Floor, New York, New York 10022.  Moelis is a registered broker-dealer with the United States Securities and Exchange Commission and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.  Moelis was founded in 2007 and is a wholly-owned subsidiary of Moelis & Company Holdings LLC, a privately-owned company.  Moelis & Company Holdings LLC, together with its subsidiaries, has approximately 270 employees located in offices in New York, Los Angeles, Boston, Chicago, London, and Sydney.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application.

4.    Moelis provides a broad range of financial advice to its clients, including, with respect to: (a) corporate restructurings; (b) general corporate finance; (c) mergers, acquisitions and divestitures; (d) special committee assignments; and (e) capital raising.    Moelis and its professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in Chapter 11 proceedings.    Moelis' business reorganization professionals have served as financial and strategic advisors to various parties (including debtors) in numerous chapter 11 cases, including, among others:  In re Neenah Enterprises, Inc., Case No. 10-10360 (Bankr. D. Del. Feb. 2, 2010); In re Atrium Companies, Inc., Case No. 10-10150 (Bankr. D. Del. Jan. 20, 2010); In re Simmons Bedding Co., Case No. 09-14037 (Bankr. D. Del. Nov. 16, 2009); In re Reader's Digest Ass'n Inc., Case No. 09-23529 (Bankr. S.D.N.Y. Aug. 24, 2009); In re NV Broadcasting LLC, Case No. 09-12473 (Bankr. D. Del. Jul. 13, 2009); In re Fontainebleau Las Vegas Holdings LLC, Case No. 09-21481 (Bankr. S.D. Fla. Jun. 9, 2009); In re ION Media Networks Inc., Case No. 09-13125 (Bankr. S.D.N.Y. May 19, 2009); In re J.G. Wentworth LLC, Case No. 09-11731 (Bankr. D. Del. May 19, 2009); In re Source Interlink Cos., Case No. 09-11424 (Bankr. D. Del. Apr. 27, 2009); In re Dayton Superior Corp., Case No. 09-11351 (Bankr. D. Del. Apr. 19, 2009); In re Idearc Inc., Case No. 09-31828 (Bankr. N.D. Tex. Mar. 31, 2009); In re Aleris International Inc., Case No. 09-10478 (Bankr. D. Del. Feb. 12, 2009); In re Muzak Holdings LLC, Case No. 09-10422 (Bankr. D. Del. Feb. 10, 2009); In re Hartmarx Corp., Case No. 09-02046 (Bankr. N.D. Ill. Jan. 23, 2009); In re Lyondell Chemical Co., Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 6, 2009); In re Tribune Co., Case No. 08-13141 (Bankr. D. Del. Dec. 8, 2008); In re Pilgrim's Pride Corp., Case No. 08-45664 (Bankr. N.D. Tex. Dec. 1, 2008); In re Motor Coach Industries International Inc., Case No. 08-12136 (Bankr. D. Del. Sep. 15, 2008); In re Greektown Holdings LLC, Case No. 08-53106 (Bankr.

E.D. Mich. May 29, 2008); <u>In re Pappas Telecasting Inc.</u>, Case No. 08-10916 (Bankr. D. Del. May 10, 2008); <u>In re Tropicana Entertainment LLC</u>, Case No. 08-10856 (Bankr. D. Del. May 5, 2008); <u>In re Tousa Inc.</u>, Case No. 08-10928 (Bankr. S.D. Fla. Jan. 29, 2008); <u>In re Delphi Corp.</u>, Case No. 05-44481 (Bankr. S.D.N.Y. Oct. 8, 2005).

5.    I understand that the Debtors have selected Moelis as their financial advisor and investment banker based upon, among other things, (a) the Debtors' need to retain a skilled financial advisory firm to provide advice with respect to the Debtors' complex restructuring activities and (b) Moelis' extensive experience and excellent reputation in providing financial advisory and investment banking services in complex chapter 11 cases such as these.

## <u>SCOPE OF SERVICES</u>

6.    Subject to further order of the Court and consistent with that certain engagement letter dated as of March 23, 2010, by and between the Debtors and Moelis, (the "<u>Engagement Letter</u>" or "<u>Agreement</u>"), a copy of which is annexed to the Application as *Exhibit A* and is incorporated by reference herein, Moelis proposes to render the following financial advisory and investment banking services as necessary and requested by the Debtors:[2]

a)    undertake, in consultation with members of management of the Company, a comprehensive business and financial analysis of the Company;

b)    to the extent Moelis deems necessary, appropriate and feasible, or as the Company may request, review and analyze the Company's assets and its operating and financial strategies;

c)    review and analyze the business plans and financial projections prepared by the Company including, but not limited to, testing assumptions and comparing those assumptions to historical Company and industry trends;

---

[2] To the extent that this Application and the terms of the Engagement Letter are inconsistent, the terms of the Engagement Letter shall control.

d)    evaluate the Company's debt capacity and assist in the determination of an appropriate capital structure for the Company;

e)    as deemed desirable by the Company, identify, initiate, review, negotiate, and evaluate any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof), and, if directed, develop and evaluate alternative proposals for a Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

f)    solicit and evaluate indications of interest and proposals regarding any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) from current or potential lenders, equity investors, Acquirers or strategic partners;

g)    assist the Company in developing strategies to effectuate any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof), including financing alternatives;

h)    advise and assist the Company in the course of its negotiation of any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof) and participate in such negotiations, as requested;

i)    determine and evaluate the risks and benefits of considering, initiating and consummating any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

j)    determine values or ranges of values (as appropriate) for the Company and any securities that the Company offers or proposes to offer in connection with a Capital Transaction;

k)    in coordination with the Company, prepare and implement a marketing plan and, working with management and based upon information provided by the Company, prepare one or more memoranda describing assets, properties or businesses to be sold in any Sale Transaction (each, a "Selling Memo");

l)    working with the Company's management and based upon information provided by the Company, prepare one or more memoranda describing the Company and its businesses for use in any potential Capital Transaction (each, an "Information Memo");

m)    contact potential Acquirers or investors that we and the Company have agreed may be appropriate, and in rendering such services, we may meet with representatives of such Acquirers or investors and provide such representatives with the Selling Memo or Information Memo and such additional information about the Company's assets, properties or businesses as may be appropriate and acceptable to the Company, subject

to customary business confidentiality agreements in form and substance approved by the Company;

n)     assist the Company in the development, preparation and distribution of selected information, documents and other materials to create interest in and to consummate any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

o)     assist the Company in valuing its assets or business, provided that any real estate or fixed asset appraisals will be undertaken by outside appraises, separately retained and compensated by the Company;

p)     be available at the Company's request to meet with management, board of directors, creditor groups, equity holders, any official committees appointed in the Bankruptcy Case, or other parties to discuss any Restructuring Transaction, Sale Transaction or Capital Transaction (or any combination thereof);

q)     if requested by the Company, participate in hearings before the Bankruptcy Court and provide relevant testimony; and

r)     such other financial advisory and investment banking services as may be agreed upon by Moelis and the Company, and that is within the scope of this engagement.

## DISINTERESTEDNESS AND ELIGIBILITY

7.     In connection with its proposed retention by the Debtors in these cases, Moelis undertook to determine whether it had any conflicts or other relationships that might cause it not to be disinterested or to hold or represent an interest adverse to the Debtors. Specifically, Moelis obtained from the Debtors and/or their representatives the names of individuals and entities that may be parties in interest in the chapter 11 cases (the "Potential Parties in Interest") and such parties are listed on *Schedule A* attached hereto. Moelis then (a) researched its internal records and (b) issued a general inquiry to its officers to determine whether Moelis has any connections with the Debtors and any Potential Parties in Interest. To the extent that I have been able to ascertain, Moelis has not been retained within the last three years to represent any of the Potential Parties in Interest.

8.    Except as otherwise set forth herein, to the best of my knowledge, neither I, Moelis, nor any of its professionals:

   (a)    is a creditor, equity security holder or insider of the Debtors;

   (b)    is or has been within two years of the Petition Date, an officer, director or employee of the Debtors; or

   (c)    has any interest materially adverse to the interests of the Debtors' estates; or

   (d)    is related to any judge of this Court, the U.S. Trustee or the Assistant U.S. Trustee for this District.

9.    Moelis may have worked with, continue to work with, and/or have mutual clients with, certain accounting and law firms that are Potential Parties in Interest. As part of its diverse practices, Moelis appears in numerous cases and proceedings, and participates in transactions that involve many different professionals, including, but not limited to, attorneys, accountants, and financial consultants who are claimants and parties in interest in these chapter 11 cases. Further, Moelis has performed in the past, and may perform in the future, financial advisory services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of whom may be involved in these proceedings. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors in matters upon which Moelis is to be employed, and none are in connection with these chapter 11 cases.

10.    To the best of my knowledge, no employee of the Moelis engagement team serving the Debtors is a relative of, or has been connected with, any judge of the bankruptcy court for this District, the Office of the United States Trustee for the Middle District of Florida (the "U.S. Trustee") or any employee of the U.S. Trustee. However, Moelis has not reviewed the

7

relationship that the members of Moelis' engagement team serving the Debtors may have against a comprehensive list of employees within the U.S. Trustee's office.

11.    Moelis does not believe it is a "creditor" of any of the Debtors within the meaning of section 101(10) of the Bankruptcy Code. Further, and to the best of my knowledge, neither I nor any member of the Moelis' engagement team serving the Debtors is a holder of any of the Debtors' debt or equity securities. Based upon all of the foregoing, I believe Moelis is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code and does not hold or represent an interest adverse to the Debtors or their estates.

12.    Moelis & Company Holdings LLC's private equity business ("Moelis Capital Partners") holds investment positions in various entities, some of which may be parties in interest in these chapter 11 cases. To the best of my knowledge, Moelis Capital Partners does not hold any investment position that constitutes a conflict of interest that would disqualify Moelis from providing services described in the Engagement Letter. Furthermore, Moelis Capital Partners does not share any information relating to its investment activities with the Moelis professionals seeking retention in these chapter 11 cases, and the Moelis professionals providing services to the Debtors will not share confidential or otherwise non-public information they receive in the course of this engagement with Moelis Capital Partners. Accordingly, Moelis Capital Partners' investment activities do not constitute a conflict of interest that would disqualify Moelis from providing services described in the Engagement Letter.

13.    Despite the efforts described above to identify and disclose Moelis' relationships with parties in interest in these chapter 11 cases, Moelis is unable to state with certainty that every client relationship or other connection has been disclosed. Continued inquiry will be made

following the filing of the Application, on a periodic basis, with additional disclosures to this Court if necessary or otherwise appropriate.

## PROFESSIONAL COMPENSATION AND INDEMNIFICATION

14.     Moelis intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with these chapter 11 cases, subject to this Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, guidelines established by the Office of the United States Trustee (the "U.S. Trustee Guidelines"), and any other applicable procedures and orders of the Court and consistent with the proposed compensation set forth in the Engagement Letter (the "Fee Structure").

15.     In summary, the Fee Structure provides for the following compensation:[3]

(a) The payment of the fees set forth below shall be subject to the rules and procedures of the Bankruptcy Code, the Bankruptcy Rules and applicable Local Rules and U.S. Trustee Guidelines:

(i)     **Monthly Fee**.  During the term of the Engagement Letter as provided therein, a cash fee of $125,000 per month (the "Monthly Fee"). The first Monthly Fee shall be paid within three (3) business days after the entry of an order of the Bankruptcy Court approving the Engagement Letter or, if the Bankruptcy Court enters an order in respect of the payment of interim compensation to professionals employed in the Bankruptcy Case, then in compliance with such order (the "Interim Compensation Order"). All subsequent Monthly Fees shall be paid in advance prior to each monthly anniversary of the Engagement Letter or, if applicable, in accordance with the Interim Compensation Order. Whether or not a Restructuring Transaction, Sale Transaction or Capital Transaction has taken place or will take place, we shall earn and be paid the Monthly Fee every month during the term of the Engagement Letter, provided that such Monthly Fee shall be credited against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee as follows:

---

[3] For a more detailed description of the fee structure, please see the Engagement Letter.

a.     With regard to the first six (6) months of the Engagement Letter, the Monthly Fee, shall not be credited against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee;

b.     With regard to the second six (6) months of the Engagement Letter, an amount equal to fifty percent (50%) of the Monthly Fees actually paid to Moelis shall be credited once against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee earned by Moelis pursuant to the Engagement Letter; and

c.     With regard to every month after the first year anniversary during the term of the Engagement Letter, an amount equal to 100% of the Monthly Fees actually paid to Moelis shall be credited once against any Restructuring Fee, Capital Transaction Fee and/or Sale Transaction Fee earned by Moelis pursuant to the Engagement Letter.

(ii)     **Restructuring Fee**. In addition to the foregoing Monthly Fees, the Company shall pay Moelis a cash fee (the "Restructuring Fee") of 1.00% of the principal amount of any indebtedness and accrued interest thereon restructured in any Restructuring Transaction subject to a minimum aggregate Restructuring Fee of $1,000,000 (the "Minimum Restructuring Fee"). The Restructuring Fee shall be paid immediately upon the consummation of a Restructuring Transaction. It is expressly understood and agreed that a separate Restructuring Fee shall be payable in respect of each Restructuring Transaction in the event that more than one Restructuring Transaction shall occur, provided, however, that the Minimum Restructuring Fee shall not apply separately to each Restructuring Transaction, but shall be based upon the aggregate of all Restructuring Transactions.

(iii)     **Capital Transaction Fee**. In addition to the foregoing Monthly Fee and Restructuring Fee, the Company shall pay Moelis a cash fee (the "Capital Transaction Fee"), in an amount equal to (i) 1.00% of the aggregate amount of new debt raised in a Capital Transaction in the form of secured debt, (ii) 1.75% of the aggregate amount of new debt raised in a Capital Transaction in the form of senior unsecured debt, (iii) 2.25% of the aggregate amount of new debt raised in a Capital Transaction in the form of subordinated debt, (iv) 2.50% of the aggregate amount of new debt raised in a Capital Transaction in the form of convertible debt, (v) 4.00% of the aggregate amount or face value of new capital raised in a Capital Transaction in the form of preferred equity, including preferred equity-linked securities, options, warrants or other rights to acquire preferred equity interests of the Company, and (vi) 5.00% of the aggregate amount or face value of new capital raised in a Capital Transaction in the form of common equity, including, options, warrants or other rights to acquire common equity interests of the Company. The Capital Transaction Fee shall be paid immediately upon the closing and funding of each Capital Transaction. It is expressly understood and agreed that a separate Capital Transaction Fee shall be payable in respect of each Capital Transaction in the event that more than one Capital

Transaction shall occur. In the event that a Capital Transaction is consummated by the Company with Lone Star U.S. Acquisition, LLC or its affiliates (collectively, "Lone Star") in an amount equal to or in excess of $90,000,000, then the Capital Transaction Fee that will be due to Moelis shall be reduced by $250,000.00.

(iv) **Sale Transaction Fee**. In addition to the foregoing Monthly Fee, the Restructuring Fee and the Capital Transaction Fee, the Company shall pay to Moelis a cash fee (the "Sale Transaction Fee") which will be equal to the greater of (a) $1,000,000 or (b) 1.00% of the Transaction Value up to $200,000,000, plus 0.75% of the Transaction Value between $200,000,000 and $500,000,000, plus 0.50% of the Transaction Value above $500,000,000. For the purposes of calculating the Sale Transaction Fee, the term "Transaction Value" shall be defined as set forth in *Annex A* to the Engagement Letter. The Sale Transaction Fee shall be paid immediately upon the closing of each Sale Transaction. It is expressly understood and agreed that a separate Sale Transaction Fee shall be payable in respect of each Sale Transaction in the event that more than one Sale Transaction shall occur.

(v) **Limitation on Fees**. In the event that the Company enters into a single transaction that constitutes more than one of a Restructuring Transaction, a Capital Transaction and/or a Sale Transaction (as such terms are defined herein), then Moelis shall not be entitled to multiple transaction fees for that single transaction. Instead, Moelis shall be paid a single transaction fee for each such transaction in an amount equal to the highest of the applicable transaction fees.

16. The Debtors will also reimburse Moelis, upon its written request, for all reasonable expenses incurred by Moelis in entering into the Engagement Letter and in connection with Moelis performing services pursuant to the Engagement Letter. These expenses generally include travel costs, document reproduction, telephone and facsimile charges, meals and other customary expenses for this type of transaction, including the reasonable fees, disbursements and other charges of Moelis' legal counsel. Moelis agrees to provide reasonable backup relating to such expenses.

17. I believe that the Fee Structure is reasonable, market based, and designed to fairly compensate Moelis for its work and to cover fixed and routine overhead expenses. I also believe that the Fee Structure is consistent with and typical of compensation arrangements entered into

by Moelis and other comparable firms in connection with the rendering of similar services under similar circumstances.

18.     Additionally, I believe that the Fee Structure reflects the difficulty and challenging nature of Moelis' engagement.  As such, Moelis' restructuring expertise, as well as its restructuring expertise, capital markets knowledge, financing skills, and mergers and acquisitions expertise, some or all of which may be required by the Debtors during the term of Moelis' engagement hereunder, were important factors in determining the Fee Structure.  I believe that the ultimate benefit of Moelis' services hereunder cannot be measured by reference to the number of hours to be expended by Moelis' professionals in the performance of such services.  Indeed, the Debtors and Moelis have agreed upon the Fee Structure anticipating that a substantial commitment of professional time and effort will be required of Moelis and its professionals in connection with the chapter 11 cases and in light of the fact that (a) such commitment may foreclose other opportunities for Moelis and (b) the actual time and commitment required of Moelis and its professionals to perform its services under the Engagement Letter may vary substantially, thereby creating "peak load" issues for Moelis.

19.     Moelis will file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the U.S. Trustee Guidelines, and any applicable orders of this Court.

20.     Moelis proposes that its restructuring professionals would keep time records describing their activities in one hour increments as well as the identity of persons who performed such tasks.  Moelis will supplement this information with a list of the non-restructuring professionals who assist the restructuring department on this matter but who do not,

as a matter of general practice, (and would not in these chapter 11 cases) keep time records. Moelis intends to receive payment of its fees on a fixed-rate and percentage basis, which is customary in the investment banking industry. It is not the general practice of investment banking firms to keep detailed time records similar to those customarily kept by attorneys and Moelis does not keep time records on a "project category" basis.

21.     Moelis will maintain records (in summary format) of services rendered for the Debtors including summary descriptions of those services, the approximate time (in hourly increments) expended in providing those services and the individuals who provided those services. Additionally, Moelis will maintain detailed records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in these chapter 11 cases. Moelis will present such records as required by applicable orders of this Court.

## INDEMNIFICATION

22.     As is customary in the financial advisory industry, the Debtors have agreed to reimburse, indemnify and hold harmless Moelis and its divisions, affiliates, current or former directors, officers, partners, members, agents or employees of Moelis or any of its affiliates, or any person controlling Moelis or its affiliates, current or former directors, officers, partners, members, agents or employees (collectively, the "Indemnification Provisions"). I believe that the Indemnification Provisions are reasonable terms and conditions of Moelis' engagement and are comparable to those generally obtained by financial advisory firms of similar stature to Moelis. Moelis agreed upon the Indemnification Provisions with the Debtors at arm's-length and after good faith negotiation. I understand that other bankruptcy courts have approved indemnification, contribution and reimbursement provisions that are identical or similar to the

Indemnification Provisions, including in the cases listed in paragraph 4 above where Moelis served as the debtor's or official creditors' committee's financial advisor.

## MISCELLANEOUS

23.     Moelis intends for its services to complement, and not duplicate, the services being rendered by other professionals retained in the chapter 11 cases, including those of Kapila & Company.  Moelis understands that the Debtors have retained and may retain additional professionals during the term of the engagement and Moelis will work cooperatively with such professionals to integrate any respective work conducted by the professionals on behalf of the Debtors.

24.     The Debtors do not owe Moelis any fees for services performed or expenses incurred under the Engagement Letter prior to the Petition Date.  Moreover, Moelis has not received any payments from the Debtors during the ninety days prior to the Petition Date.

25.     As described in paragraph 17 of the Engagement Letter, Moelis might agree in the future to pay a "finder's fee" to Randall W. Byrnes in connection with the Debtors' engagement of Moelis.  To date, Moelis has not agreed to pay such a fee to Mr. Byrnes, nor has it agreed on the amount of a potential fee (if any fee were to be paid at all).  In the event Moelis enters into an agreement to pay such a fee to Mr. Byrnes, Moelis shall disclose the existence of such agreement and the amount of such fee to this Court.  Subject to the foregoing, Moelis has received no promises as to compensation in connection with these chapter 11 cases, other than as outlined in the Engagement Letter, and Moelis has no agreement with any other entity to share any compensation received with any person other than the principals and employees of Moelis.

NY\1631652.2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated this _31st_ day of March, 2010

By: _____

Mark S. Hootnick

# SCHEDULE A
## List of Interested Parties

## DEBTORS

**FIDDLER'S CREEK, LLC, *et al***
Attn: Tony DiNardo
8156 Fiddler's Creek Pkwy
Naples, FL 34114

## SECURED LENDERS

**Regions Bank**
Attn: Gloria Sloop
1900 5th Ave N, 12th FL
Birmingham , AL 35203

**Regions Bank**
4851 N Tamiami Trail
Naples, FL 34103

**Regions Bank**
Raymond Miller, Esq.
Gunster Yoakley
2 South Biscayne Boulevard, Suite 3400
Miami, FL 33131-1897

**Tomen America, Inc.**
Stuart A. Krause, Esq.
Zeichner Ellman & Krause
575 Lexington Ave
New York, NY 10022

**Tomen America, Inc.**
805 Third Avenue
New York, NY 10022

**IberiaBank**
2150 Goodlette Rd.
Naples, FL 34102

**Textron Financial Corporation**
c/o Mark Bloom, Esq.
Greenberg Traurig
1221 Brickell Ave
Miami, FL 33131

**Fifth Third Bank**
c/o Brian Giles, Esq.
Statman, Harris & Eyrich, LLC
3700 Carew Tower
441 Vine Street
Cincinnati, Ohio 45202

**Fifth Third Bank**
999 Vanderbuilt Beach Rd
Naples, FL 34108

**Mellon United, N.A.**
Commercial Loan Division
1111 Brickell Ave, 30th Floor
Miami, FL 33131

**Florida Financial Investments, Inc.**
8156 Fiddler's Creek Pkwy
Naples, FL 34114

**Florida Financial Investments, Inc.**
c/o Donald Kirk, Esq.
501 E. Kennedy Boulevard
Suite 1700
Tampa, Florida 33602

## DEBTOR-IN-POSSESSION LENDER

**Gulf Bay Capital, Inc.**
c/o Stephen R. Leslie, Esq.
110 East Madison Street
Suite 200
Tampa, Florida 33602-4700

**CONSOLIDATED TOP 20**
**UNSECURED CREDITORS**

**Aon Risk Services Inc Of NY**
Po Box 7247-7376
Philadelphia, PA
19170-7376

**Ash City USA**
PMB 816 60 Industrial Pkwy
Buffalo, NY 14227

**Avalon Risk Inc.**
240 Cedar Knolls Rd
Suite 308
Cedar Knolls, NJ 07927

**Bellagio Village Association**
5067 Tamiami Trail East
Naples, FL 34113

**Carriage Limousine LLC**
678 Bald Eagle Dr Ste #4
Marco Island, FL 34115

**Century Link**
Po Box 96064
Charlotte, NC 28296-0064

**Cranberry Crossing**
5067 Tamiami Trail East
Naples, FL 34114

**Evans Oil Company**
3170 S Horseshoe Dr
Po Box 856
Naples, FL 34106

**FBS Property Tax Abatement LLC**
200 S Biscayne Boulevard
Suite 2300
Miami, FL 33131

**Grand Western Brands Inc.**
Po Box 21046
Ft Lauderdale, FL 33335-1046

**Guymann Construction Of FL**
305 Sw 3rd St
Cape Coral, FL 33991-1961

**Jenner & Block LLP**
330 N Wabash Avenue
Chicago, IL 60611

**John Deere Landscapes**
Po Box 23994
Tampa, FL 33623-3994

**Lee County Port Authority**
11000 Term. Access Rd
#8671
Ft Myers, FL 33913-8899

**Sysco West Coast FL**
Po Box 1839
Palmetto, FL 34220

**Tampa Bay Trane**
902 N Himes
Tampa, FL 33609

**Textron Business Services Inc**
Dept At 40219
Atlanta, GA 31192-0219

**The Advocacy Group At**
**Tew Cardenas LLC**
215 South Monroe St Ste
702
Tallahassee, FL 32301

**Titleist/ Acushnet Company**
Po Box 532402
Charlotte, NC 28290-2402

**United Capital Funding Corp.**
Po Box 31246
Tampa, FL 33631-3246

## GOVERNMENTAL ENTITIES

**Collier County Tax Collector**
2800 N. Horseshoe Drive
Naples, FL 34104

**The City of Naples**
City Attorney
735 Eighth Street South, 2nd Floor
Naples, FL 34102

**Internal Revenue Service**
PO Box 21126
Philadelphia, PA 19114

**Internal Revenue Service**
**Special Procedures – Insolvency**
7850 SW 6th Court
Plantation, FL 33324

**Special Asst. U.S. Attorney**
2110 First Street, Suite 3-137
Ft Myers, FL 33901

**The Honorable Eric H. Holden, Jr.**
**Attorney General of the U.S.**
950 Pennsylvania Avenue, NW Room 4400
Washington, DC 20530-0001

**State of Florida**
**Department of Revenue**
c/o Frederick F. Rudzik
PO Box 6668
Tallahassee, FL 32314

**Securities and Exchange Commission**
**Branch of Reorganization**
3475 Lenox Road, N.E., #1000
Atlanta, GA 30326-1232

Trial Attorney
U.S. Department of Justice
Office of the U.S. Trustee, Region 21
501 E. Polk Street, Suite 1200
Tampa, Florida 33602
steven.wilkes@usdoj.gov

## NOTICE OF APPEARANCES

Robert A. Soreano
E-mail: soriano@gtlaw.com
Greenberg Traurig, P.A.
625 East Twiggs Street, Suite 100
Tampa, Florida 33602

Mark David Bloom
E-mail: bloomm@gtlaw.com
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131

Aaron P. Honaker
E-mail: honakera@gtlaw.com
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131

Jeffrey Gilbert
E-mail: gilbergj@gtlaw.com
Greenberg Traurig, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301

Andrew L. Much (Georgia Bar No. 527875)
E-mail: amuch@textronfinancial.com
Textron Financial Corporation
11575 Great Oaks Way, Suite 210
Alpharetta, GA 30022

Stephen R. Leslie, Esq
Stichter, Riedel, Blain & Prosser, P.A.
Attorneys for Gulf Bay Capital, Inc.
110 Madison Street - Suite 200
Tampa, Florida 33602
Email: sleslie@srbp.com

Mark D. Hildreth, Esquire
Attorney for Iberia Bank
Shumaker, Loop & Kendrick, LLP
PO Box 49948
Sarasota, FL 34230-6948

Michael P. Shuster, Esq. and
Jeffrey S. Kannensohn, Esq.
9132 Strada Place, 3rd Floor
Naples, Florida 34108-2683
mshuster@porterwright.com
jkannensohn@porterwright.com

Fortney Gross, Esq.
Counsel for Regions Bank
Gunster, Yoakley& Stewart, P.A.
777 South Flagler Drive, Suite 500E
West Palm Beach, FL 33401
Email: lgross@gunster.com

David M. Landis, Esq.
Jon E. Kane, Esq.
Counsel for Tomen America, Inc
Mateer & Harbert, P.A. &
225 E. Robinson Street, Suite 600
Post Office Box 2854
Orlando, Florida 32802-2854
Email: dlandis@mateerharbert.com
Email jkane@mateerharbert.com

Patricia A. Redmond, Esq.
predmond@stearnsweaver.com
Counsel for Aubrey Ferrao
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130

Glenn S. Vician, Esq.
8605 Broadway
Merrillville, Indiana 46410
Glennsvician2@bbbvonline.com

Douglas M. Gonzalez, Esq.
200 East Broward Blvd. St. 1900
Suie 1900
Fort Lauderdale, FL 33301
dgonzalez@wsh-law.com

Carla Barrow, Esq.
Attorney for CDD
200 East Broward Blvd. St. 1900
Suite 1900
Fort Lauderdale, FL 33301
cbaroow@wsh-law.com

John B. Hutton, Esq.
Counsel for US Bank National Asoc.
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, FL 33131
huttonj@gtlaw.com

Warren S. Bloom, Esq.
Amy E. Lowen, Esq.
GREENBERG TRAURIG, P.A.
450 S. Orange Avenue, Suite 650
Orlando, FL 32801
bloomw@gtlaw.com
lowena@gtlaw.com

Diane L. Jensen, Esq.
Local Counsel for Regions Bank
Pavese Law Firm
Post Office Drawer 1507
Ft. Myers, FL 33902

Jules S. Cohen, Esq.
Counsel for Colonnade Naples Land LLC
Akerman Senterfitt
POB 231
420 S. Orange Ave.
Suite 1200
Orlando, FL 32802-0231
jules.cohen@akerman.com

Edmund Whitson, Esq.
Counsel for Colonnade Naples Land LLC
Akerman Senterfitt
SunTrust Financial Center
401 E. Jackson St.
Suite 1700
Tampa, FL 33602-5250
Edmund.whitson@akerman.com

**<u>AD HOC HOMEOWNERS'</u>**
**<u>COMMITTEE</u>**

Phillip Brougham
pbrougham@earthlink.net

Al Love
alove@comcast.net

Dave Yates
dyates@comcast.net

Sandy Carinci
smcarinci@yahoo.com

Torben Christensen
flyfan@aol.com

Chairperson of  the Homeowners Committee
is Phillip Brougham
pbrougham@earthlink.net


Jordi Guso, Esq
Counsel for Ad Hoc Homeowners
Committee
200 South Biscayne Boulevard
Suite 1000
Miami, FL  33131
E-mail: JGuso@bergersingerman.com