UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

| | |
|---|---|
| **In re:** | **Chapter 11** |
| | |
| **FIDDLER'S CREEK, LLC** | **Case No. 9:10-bk-03846-ALP** |
| 951 LAND HOLDINGS, LLC | Case No. 9:10-bk-03852-ALP |
| DY ASSOCIATES, LLC | Case No. 9:10-bk-03856-ALP |
| GBFC DEVELOPMENT, LLC | Case No. 9:10-bk-03864-ALP |
| FC MARINA, LLC | Case No. 9:10-bk-03872-ALP |
| FC BEACH, LLC | Case No. 9:10-bk-03873-ALP |
| FC GOLF, LLC | Case No. 9:10-bk-03875-ALP |
| DY LAND HOLDINGS II, LLC | Case No. 9:10-bk-03878-ALP |
| FC PARCEL 73, LLC | Case No. 9:10-bk-03881-ALP |
| FC COMMERCIAL, LLC | Case No. 9:10-bk-03888-ALP |
| FC HOTEL, LLC | Case No. 9:10-bk-03886-ALP |
| FC RESORT, LLC | Case No. 9:10-bk-03896-ALP |
| GULF BAY HOSPITALITY COMPANY, LLC | Case No. 9:10-bk-03898-ALP |
| GULF BAY HOTEL COMPANY, LLC | Case No. 9:10-bk-03905-ALP |
| GBP DEVELOPMENT, LLC | Case No. 9:10-bk-03908-ALP |
| GB PENINSULA, LTD. | Case No. 9:10-bk-03909-ALP |
| 951 LAND HOLDINGS, LTD. | Case No. 9:10-bk-03911-ALP |
| DY LAND ASSOCIATES, LTD. | Case No. 9:10-bk-03918-ALP |
| GBFC DEVELOPMENT, LTD. | Case No. 9:10-bk-03920-ALP |
| GBFC MARINA, LTD. | Case No. 9:10-bk-03928-ALP |
| FC BEACH, LTD. | Case No. 9:10-bk-03934-ALP |
| FC GOLF, LTD. | Case No. 9:10-bk-03937-ALP |
| FC HOTEL, LTD. | Case No. 9:10-bk-03938-ALP |
| FC RESORT, LTD. | Case No. 9:10-bk-03947-ALP |
| GULF BAY HOSPITALITY, LTD. | Case No. 9:10-bk-03949-ALP |
| GULF BAY HOTEL COMPANY, LTD. | Case No. 9:10-bk-03950-ALP |
| GBP DEVELOPMENT, LTD. | Case No. 9:10-bk-03952-ALP |
| FIDDLER'S CREEK MANAGEMENT, INC. | Case No. 9:10-bk-03954-ALP |

**Debtors.**

**(Jointly Administered under**
Case No. 9:10-bk-03846 ALP)

_____/

**JOINT PLAN OF REORGANIZATION FOR DY LAND HOLDINGS II, LLC, FC COMMERCIAL, LLC AND FC PARCEL 73, LLC PURSUANT TO**
<u>**CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**</u>

GENOVESE JOBLOVE & BATTISTA, P.A.
Paul J. Battista, Esq.
Bart A. Houston, Esq.
Mariaelena Gayo-Guitian, Esq.
100 S.E. Second Street, 44TH Floor
Miami, Florida 33131
Telephone:    (305) 349-2300
Facsimile:    (305) 349-2310
Email:    pbattista@gjb-law.com
Email:    bhouston@gjb-law.com
Email:    mguitian@gjb-law.com
Counsel for Debtors and Debtors in Possession

Tampa, Florida
Dated as of December 3, 2010

# TABLE OF CONTENTS

ARTICLE 1    INTRODUCTION......................................................................................... 1

ARTICLE 2    DEFINED TERMS; RULES OF CONSTRUCTION......................................... 2
    2.1    Defined Terms............................................................................................ 2
    2.2    Rules of Construction. ............................................................................. 18

ARTICLE 3    TREATMENT OF ADMINISTRATIVE CLAIMS, UNITED STATES
              TRUSTEE FEES, PRIORITY TAX CLAIMS, AND DIP LENDER ALLOWED
              CLAIM....................................................................................................... 18
    3.1    Administrative Claims. ............................................................................ 18
    3.2    United States Trustee's Fees .................................................................... 19
    3.3    Priority Tax Claims. ................................................................................. 19
    3.4    DIP Lender Allowed Claim...................................................................... 19

ARTICLE 4    DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS ... 20
    4.1    Class 1:  Priority Claims. ......................................................................... 20
    4.2    Class 2:  Secured Real Estate Tax Claims. .............................................. 20
    4.3    Class 3: Secured CDD Claims. ................................................................ 21
    4.4    Class 4:  Secured Claims of Colonnade Naples Land, LLC ..................... 21
    4.5    Class 5:  Unsecured Convenience Claims. ............................................... 21
    4.6    Class 6:  Unsecured Claims (Unsecured Claims Not Otherwise Classified)..... 21
    4.7    Class 7:  Equity Interests. ........................................................................ 21

ARTICLE 5    TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS....... 21
    5.1    Unclassified Claims. ................................................................................ 21
    5.2    Class 1:  Priority Claims. ......................................................................... 21
    5.3    Class 2: Secured Real Estate Tax Claims – DY/FC Real Property. .................. 22
    5.4    Class 3:  Secured CDD Off Roll Bond Claims . ................................................. 22
    5.5    Class 4:  Secured Claims of Colonnade Naples Land, LLC. ............................. 22
    5.6    Class 5: Unsecured Convenience Claims ................................................. 22
    5.7    Class 6:  Unsecured Claims (Unsecured Claims Not Otherwise Classified)..... 23
    5.8    Class 7:  Equity Interests. ........................................................................ 23

ARTICLE 6    ACCEPTANCE OR REJECTION OF THE PLAN ......................................... 23
    6.1    Each Impaired Class Entitled to Vote Separately..................................... 23
    6.2    Acceptance by Impaired Classes. ............................................................ 23
    6.3    Presumed Acceptance of Plan by Unimpaired Classes............................ 24
    6.4    Impairment Controversies........................................................................ 24

ARTICLE 7    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
              LEASES ................................................................................................... 24
    7.1    Assumption or Rejection of Executory Contracts and Unexpired Leases......... 24
    7.2    Approval of Assumption or Rejection of Executory Contracts and Unexpired
              Leases....................................................................................................... 25
    7.3    Inclusiveness. ........................................................................................... 25
    7.4    Cure of Defaults. ..................................................................................... 25

| | 7.5 | Claims under Rejected Executory Contracts and Unexpired Leases................. 26 |
|---|---|---|
| | 7.6 | Insurance Policies. ........................................................................................... 26 |
| | 7.7 | Indemnification Rights. .................................................................................... 26 |

| ARTICLE 8 | | MEANS OF IMPLEMENTATION OF THE PLAN......................................... 26 |
|---|---|---|
| | 8.1 | General Overview of the Plan............................................................................ 26 |
| | 8.2 | Effective Date Actions. ..................................................................................... 27 |
| | 8.3 | Vesting of Property of DY/FC Estates in the Reorganized Debtor. ................... 27 |
| | 8.4 | Continued Corporate Existence. ........................................................................ 27 |
| | 8.5 | Corporate Action................................................................................................ 28 |
| | 8.6 | Managers and Members of the Reorganized Debtor........................................... 28 |
| | 8.7 | Section 1146 Exemption. ................................................................................... 28 |
| | 8.8 | Pursuit of Litigation Claims.............................................................................. 29 |
| | 8.9 | Prosecution and Settlement of Litigation Claims. ............................................. 30 |
| | 8.10 | Effectuating Documents; Further Transactions. ................................................ 30 |
| | 8.11 | Cancellation of Existing Loan Documents and Agreements. ............................. 31 |
| | 8.12 | Exit Financing.................................................................................................... 31 |
| | 8.13 | Exclusivity Period.............................................................................................. 31 |

| ARTICLE 9 | | PROVISIONS GOVERNING DISTRIBUTIONS ......................................... 31 |
|---|---|---|
| | 9.1 | Initial Distribution............................................................................................. 31 |
| | 9.2 | Determination of Claims.................................................................................... 32 |
| | 9.3 | Distributions....................................................................................................... 33 |
| | 9.4 | Unclaimed Distributions. ................................................................................... 33 |
| | 9.5 | Transfer of Claim. .............................................................................................. 34 |
| | 9.6 | One Distribution Per Holder. ............................................................................. 34 |
| | 9.7 | Effect of Pre-Confirmation Distributions. ......................................................... 34 |
| | 9.8 | No Interest on Claims. ........................................................................................ 34 |
| | 9.9 | Compliance with Tax Requirements. .................................................................. 34 |

| ARTICLE 10 | INTENTIONALLY OMITTED ........................................................................ 35 |
|---|---|

| ARTICLE 11 | | CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE .................................................................................. 35 |
|---|---|---|
| | 11.1 | Conditions Precedent to Confirmation of the Plan. ........................................... 35 |
| | 11.2 | Conditions Precedent to the Effective Date. ...................................................... 35 |
| | 11.3 | Notice of the Effective Date. ............................................................................. 36 |

| ARTICLE 12 | | DISCHARGE, EXCULPATION FROM LIABILITY, RELEASE, AND GENERAL INJUNCTION .................................................................................. 36 |
|---|---|---|
| | 12.1 | Discharge of Claims........................................................................................... 36 |
| | 12.2 | Exculpation from Liability................................................................................. 37 |
| | 12.3 | General Injunction. ............................................................................................ 37 |
| | 12.4 | Term of Certain Injunctions and Automatic Stay.............................................. 38 |
| | 12.5 | No Liability for Tax Claims. .............................................................................. 38 |
| | 12.6 | Regulatory or Enforcement Actions. ................................................................. 38 |

ARTICLE 13    RETENTION OF JURISDICTION .................................................................. 38
    13.1    General Retention. ................................................................................... 38
    13.2    Specific Purposes. ................................................................................... 39
    13.3    Closing of the Bankruptcy Cases. .......................................................... 41

ARTICLE 14    MODIFICATION OF PLAN AND CONFIRMATION OVER OBJECTIONS 41
    14.1    Modification of Plan. .............................................................................. 41
    14.2    Confirmation Over Objections................................................................ 42

ARTICLE 15    MISCELLANEOUS PROVISIONS ............................................................. 43
    15.1    No Admissions. ....................................................................................... 43
    15.2    Revocation or Withdrawal of the Plan. .................................................. 43
    15.3    Standard for Approval of the Bankruptcy Court. ................................... 43
    15.4    Further Assurances. ................................................................................. 43
    15.5    Headings. ................................................................................................. 43
    15.6    Notices. .................................................................................................... 43
    15.7    Governing Law......................................................................................... 44
    15.8    Limitation on Allowance. ....................................................................... 44
    15.9    Estimated Claims. ................................................................................... 44
    15.10   Consent to Jurisdiction............................................................................ 44
    15.11   Setoffs. .................................................................................................... 45
    15.12   Successors and Assigns............................................................................ 45
    15.13   Modification of Payment Terms. ............................................................ 45
    15.14   Entire Agreement. ................................................................................... 45
    15.15   Severability of Plan Provisions............................................................... 45
    15.16   Controlling Document. ............................................................................ 45
    15.17   Plan Supplement. .................................................................................... 46
    15.18   Computation of Time. ............................................................................. 46
    15.19   Substantial Consummation. .................................................................... 46

## INDEX TO EXHIBITS TO PLAN

Exhibit A    –    Exit Financing Commitment Letter

Exhibit B    –    Assumed Contracts

Exhibit C    –    Legal Description of Colonnade Collateral

# ARTICLE 1
# INTRODUCTION

DY Land Holdings II, LLC, FC Commercial, LLC and FC Parcel 73, LLC, as debtors and debtors in possession (collectively, the "DY/FC Debtors"), hereby propose the following joint plan of reorganization for the DY/FC Debtors, which Plan provides for the resolution of outstanding Claims against and Equity Interests in the DY/FC Debtors pursuant to the provisions of Chapter 11 of the Bankruptcy Code. The DY/FC Debtors, as proponents of the Plan, requests Confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code. Unless otherwise defined, capitalized terms used in the Plan shall have the meanings ascribed to such terms in Article 2.1 of the Plan.

In summary, but subject to the more specific details provided herein, the Plan provides for the reorganization of the DY/FC Debtors, the emergence of the DY/FC Debtors from the Bankruptcy Cases as the Reorganized Debtor and the treatment of Allowed Claims against the DY/FC Debtors and Allowed Equity Interests in the DY/FC Debtors as provided in the Plan. Although the DY/FC Estates are presently being jointly administered for procedural purposes with the Other Debtors, the DY/FC Debtors, the Other Debtors and their respective Estates have not been substantively consolidated.

In addition to the Plan of the DY/FC Debtors contained herein, the Other Debtors are filing the Other Plans as separate plans of reorganization contemporaneously herewith. The Other Debtors intend to pursue confirmation of the Other Plans simultaneously with this Plan. The Disclosure Statement being filed contemporaneously herewith is a joint consolidated disclosure statement applicable to the Plan of the DY/FC Debtors and the Other Plans filed by the Other Debtors.

Under Section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from the Holder of a Claim or Equity Interest until such time as the Disclosure Statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Equity Interests. The Disclosure Statement was approved by the Bankruptcy Court in the Disclosure Statement Approval Order, and has been distributed simultaneously with the Plan to all Holders of Claims and Equity Interests whose votes are being solicited. The Disclosure Statement contains, among other things, (a) a discussion of the Debtors' history, businesses, Property, and operations, (b) the Projections for the Reorganized Debtors' future operations, (c) a summary of significant events which have occurred to date in the Bankruptcy Cases and the Other Debtors' Bankruptcy Cases, (d) a summary of the means of implementing and funding the Plan, and (e) the procedures for voting on the Plan. No materials, other than the Plan and the accompanying Disclosure Statement, Disclosure Statement Approval Order and Ballot, have been approved by the DY/FC Debtors or the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DY/FC DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT, AND ANY EXHIBITS ATTACHED THERETO, IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications to the Plan set forth in the Plan, the DY/FC Debtors expressly reserve the right to alter, amend, modify, revoke or withdraw the Plan, one or more times, prior to the Effective Date of the Plan.

IN THE OPINION OF THE DY/FC DEBTORS, THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DY/FC DEBTORS. ACCORDINGLY, THE DY/FC DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF EQUITY INTERESTS, AND THE DY/FC DEBTORS RECOMMEND THAT CREDITORS AND HOLDERS OF EQUITY INTERESTS VOTE TO ACCEPT THE PLAN.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THE PLAN AND IN THE ACCOMPANYING DISCLOSURE STATEMENT CONCERNING THE HISTORY OF THE DEBTORS' BUSINESSES, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, THE PROJECTIONS FOR THE FUTURE OPERATIONS OF THE REORGANIZED DEBTORS, TRANSACTIONS TO WHICH THE DEBTORS WERE OR ARE PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTORS AND NOT TO ANY OTHER PARTY.

## ARTICLE 2
## DEFINED TERMS; RULES OF CONSTRUCTION

2.1 **Defined Terms**.

2.1.1 As used in the Plan, the following terms (which appear in the Plan as capitalized terms) shall have the meanings set forth below:

"**Administrative Claim**" means a Claim for (a) any cost or expense of administration allowed under Section 503(b) or 507(a)(2) of the Bankruptcy Code, to the extent the party claiming any such cost or expense files an application, motion, request or other Bankruptcy Court-approved pleading seeking such cost or expense in the Bankruptcy Cases on or before the applicable Administrative Claims Bar Date, including (i) any actual and necessary costs and expenses of preserving the DY/FC Estates or operating the businesses of the DY/FC Debtors (including wages, salaries, or commissions for services rendered) incurred on or after the Petition Date, (ii) any Postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the DY/FC Debtors in the ordinary course of their businesses, (iii) any Claim granted administrative priority status by a Final Order of the Bankruptcy Court, (iv) any Claim by for taxes (and for interest and/or penalties related to such taxes) due from the DY/FC Debtors for any Postpetition tax year or period under applicable law, and (v) compensation or reimbursement of expenses of Professionals awarded or allowed pursuant to an order of the Bankruptcy Court under Section 330(a) or 331 of the Bankruptcy Code (including any amounts held back pursuant to an order of the Bankruptcy Court); (b) any Superpriority Claim; (c) all fees and charges assessed against the DY/FC Estates under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930; and (d) any and all other costs or expenses of administration of the Bankruptcy Cases that are allowed by a Final Order of the Bankruptcy Court; provided, however, that, when used in the Plan, the term "Administrative Claim" shall not include the DIP Lender Allowed Claim, any Priority Tax

Claim, any Cure Claim, any Environmental Claim, any Disallowed Claim, or, unless otherwise expressly provided in the Plan, any of the Claims in Classes 1 through 6. In no event shall any Claim set out in a Proof of Claim or any application, motion, request or other Bankruptcy Court approved pleading be deemed to be an Allowed Administrative Claim without further order of the Bankruptcy Court.

**"Administrative Claim Bar Date(s)"** means the date(s) established by one or more orders of the Bankruptcy Court as the deadline for the filing by any Creditor or other party in interest of an application, motion, request or other Bankruptcy Court-approved pleading for allowance of any Administrative Claim, including as established in the Disclosure Statement Approval Order; provided, however, that (a) unless otherwise ordered by the Bankruptcy Court, the Administrative Claim Bar Date for the filing by any Professional of an application for any Administrative Claim not yet filed as of the date of the Plan shall be no later than fourteen (14) days after the date of entry of the Disclosure Statement Approval Order, (b) to the extent the Bankruptcy Court has entered an order establishing a different and specific deadline for a Creditor or other party in interest to file an Administrative Claim, the date set forth in such order shall be deemed to be the Administrative Claim Bar Date as to such Creditor or other party in interest, and (c) the Administrative Claim Bar Date shall not apply to liabilities incurred in the ordinary course of business after the Administrative Claims Bar Date but before the Effective Date. Any Holder of an alleged Administrative Claim (including a Holder of a Claim for Postpetition federal, state or local taxes) that does not file an application, motion, request or other Bankruptcy Court-approved pleading by the applicable Administrative Claim Bar Date shall be forever barred, estopped and enjoined from ever asserting such Administrative Claim against the DY/FC Debtors, the DY/FC Estates, the Reorganized Debtor, or any of their respective Property, and such Holder shall not be entitled to participate in any Distribution under the Plan on account of any such alleged Administrative Claim.

**"Affiliate"** means any Person that is an "affiliate" within the meaning of Section 101(2) of the Bankruptcy Code.

**"Allowed Amount"** means the dollar amount in which a Claim is allowed.

**"Allowed Claim"** means a Claim or that portion of a Claim which is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed with the Clerk's Office on or before the Bar Date or the Governmental Unit Bar Date, as applicable, or, by order of the Bankruptcy Court, was not required to be so filed or was deemed timely filed, or (b) as to which no Proof of Claim was filed with the Clerk's Office on or before the Bar Date or the Governmental Unit Bar Date, as applicable, but which has been or hereafter is listed by the DY/FC Debtors in the Schedules as liquidated in amount and not disputed or contingent, and, in the case of subparagraph (a) and (b) above, as to which either (i) no objection to the allowance of such Claim has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, or (ii) any objection as to the allowance of such Claim has been settled or withdrawn or has been overruled by a Final Order. "Allowed Claim" shall also include a Claim that is allowed under the Plan or by the Bankruptcy Court in a Final Order. "Allowed," when used as an adjective herein (such as Allowed Administrative Claim, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, and Allowed Unsecured Claim), has a corresponding meaning.

**"Allowed Class ... Claim"** means an Allowed Claim in the particular Class described.

**"Allowed Equity Interest"** means any Equity Interest which either (i) is not a Disputed Equity Interest or (ii) has been Allowed by a Final Order of the Bankruptcy Court.

**"Assumed Contracts"** has the meaning ascribed to such term in Article 7 of the Plan.

**"Ballot"** means the ballot, the form of which has been approved by the Bankruptcy Court, accompanying the Disclosure Statement provided to each Holder of a Claim entitled to vote to accept or reject this Plan.

**"Bankruptcy Cases"** means the chapter 11 Bankruptcy Cases of DY Land Holdings II, LLC, FC Commercial, LLC and FC Parcel 73, LLC pending in the Bankruptcy Court under Case Nos. 9:10-bk-03878-ALP, 9:10-bk-03888-ALP and 9:10-bk-03881-ALP respectively.

**"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the Petition Date, together with all amendments and modifications thereto.

**"Bankruptcy Counsel"** means Genovese Joblove & Battista, P.A.

**"Bankruptcy Court"** means the United States Bankruptcy Court for the Middle District of Florida, Ft. Myers Division, or, as the context requires, any other court of competent jurisdiction exercising jurisdiction over the Bankruptcy Cases.

**"Bankruptcy Rules"** means (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under Section 2075 of title 28 of the United States Code, (b) the Federal Rules of Civil Procedure, as amended and promulgated under Section 2072 of title 28 of the United States Code, (c) the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, and (d) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto to the extent applicable to these Bankruptcy Cases or proceedings herein, as the case may be.

**"Bar Date"** means August 31, 2010, the date set by the Bankruptcy Court as the last day for filing a Proof of Claim against the DY/FC Debtors, excluding (a) a Prepetition Claim of a Governmental Unit, for which a Proof of Claim must be filed with the Bankruptcy Court by the Governmental Unit Bar Date, (b) a Prepetition Claim of a Golf Club Member, which Bar Date is November 17, 2010; (c) an Administrative Claim, for which a request for payment of an Administrative Claim must be filed with the Bankruptcy Court by the Administrative Claim Bar Date, (d) a Claim for which a bar date may have been otherwise established by a Final Order of the Bankruptcy Court, for which a Proof of Claim must be filed with the Bankruptcy Court by the date set forth in such Final Order, and (e) a Claim with respect to an executory contract or unexpired lease that is assumed or rejected pursuant to the Plan (as to which the bar date shall be as set forth in

Article 7 of the Plan) or a Final Order of the Bankruptcy Court (as to which the bar date shall be as set forth in such Final Order).

**"Bonds"** means those certain special assessment revenue bonds or special assessment refunding bonds, in differing series, issued by the applicable CDD pursuant to the Bond Documents.

**"Bond Documents"** means the Prepetition trust indenture and related bond documents entered into by the applicable CDD and the Indenture Trustee related to the issuance by the applicable CDD of the Bonds in respect of and related to the DY/FC Real Property.

**"Business Day"** means any day other than (a) a Saturday, (b) a Sunday, (c) a "legal holiday" (as "legal holiday" is defined in Bankruptcy Rule 9006(a)), or (d) a day on which commercial banks in Tampa, Florida are required or authorized to close by law.

**"Cash"** means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a Distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from the Reorganized Debtor drawn on a domestic bank.

**"CDD"** means, as applicable, either Fiddler's Creek Community Development District I or Fiddler's Creek Community Development District II, each of which is a local unit of a special purpose government entity authorized, established and governed by and pursuant to Chapter 190 of the Florida Statutes that has the authority to impose non-ad valorem special assessments on certain property located within its boundaries.

**"CDD Claims"** means, collectively, the CDD Off Roll Bond Claims and the CDD Off Roll O&M Claims.

**"CDD Off Roll Bond Claims"** means the Claims of the applicable CDD against the DY/FC Debtors related to non-ad valorem special assessments imposed by the applicable CDD against the DY/FC Real Property related to the payment of principal and interest/debt service owed by the CDD to the Indenture Trustee in connection with the Bonds issued by the applicable CDD for the benefit of the DY/FC Real Property that are billed and collected directly by the applicable CDD from the DY/FC Debtors, and are not subject to collection by and through the Collier County Tax Collector in connection with annual real estate tax bills issued by the Collier County Tax Collector.

**"Claim"** has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

**"Class"** means a category of Claims or Equity Interests classified together as described in Article 3 of the Plan.

**"Clerk"** means the Clerk of the Bankruptcy Court.

**"Clerk's Office"** means the Office of the Clerk of the Bankruptcy Court located at the Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, 5th Floor, Tampa, Florida 33602.

**"Collateral"** means Property in which the DY/FC Estates has (or had) an interest and that secures (or secured), in whole or part, whether by agreement, statute, or judicial decree, the payment of a Claim.

**"Colonnade"** means Colonnade Naples Land, LLC, a Delaware limited liability company, as assignee of the Claims and Liens of Tomen America, Inc.

**"Colonnade Collateral"** means that certain Property of the DY/FC Debtors which is encumbered by a Prepetition Lien in favor of Colonnade, which Property consists of the DY/FC real Property.  The Colonnade Collateral is more particularly described on Exhibit C attached hereto.

**"Committee"** means the Official Unsecured Creditors' Committee appointed by the United States Trustee in the Bankruptcy Cases pursuant to Section 1102 of the Bankruptcy Code on April 12, 2010 pursuant to an Amended Notice of Appointment of Homeowners' Committee and Notice of Change of Designation From Homeowners' Committee to Official Unsecured Creditors' Committee [C.P. #132], as the membership of such Committee may hereafter be further amended or modified by the United States Trustee.

**"Confirmation"** or **"Confirmation of the Plan"** means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

**"Confirmation Date"** means the date on which the Confirmation Order is entered on the Docket by the Clerk pursuant to Bankruptcy Rule 5003(a).

**"Confirmation Hearing"** means the hearing which will be held before the Bankruptcy Court to consider Confirmation of the Plan and related matters pursuant to Section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time. The date and the time of commencement of the Confirmation Hearing is set forth in the Disclosure Statement Approval Order.

**"Confirmation Order"** means the order of the Bankruptcy Court in the Bankruptcy Cases confirming the Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code, which order shall be in form and substance acceptable to the Exit Financing Lender, as such order may be amended, modified or supplemented with the consent of the Exit Financing Lender.

**"Convenience Class Election"** means the irrevocable election by a Holder of an Unsecured Claim having a face amount greater than $25,000 to have such Unsecured Claim reduced to $25,000 and treated as an Unsecured Convenience Claim under the Plan. The election must be made by the Holder on the Ballot and filed with the Bankruptcy Court on or before the Voting Deadline.

**"Creditor"** means the Holder of a Claim, within the meaning of Section 101(10) of the Bankruptcy Code, including Secured Creditors, Unsecured Creditors, and Creditors with Administrative Claims, Priority Tax Claims, Priority Claims, Cure Claims, and Environmental Claims.

**"Cure Claim"** means any Claim of any nature whatsoever, including any Claim for any cure payment, cost or other amount, if any, due and owing by the DY/FC Debtors pursuant to Section 365(b) of the Bankruptcy Code or otherwise and any Claim for a default (monetary or non-monetary), arising from, relating to or in connection with the assumption by the DY/FC Debtors of any Assumed Contract (provided such Claim is filed with the Bankruptcy Court by the Cure Claim Submission Deadline). In no event shall any Claim set out in a Proof of Claim be deemed to be a Cure Claim.

**"Cure Claim Submission Deadline"** means, and shall occur on the same day as, the Voting Deadline.

**"Debt"** has the meaning ascribed to such term in Section 101(12) of the Bankruptcy Code.

**"Debtors"** means, collectively, (i) Fiddler's Creek, LLC; (ii) 951 Land Holdings, LLC; (iii) 951 Land Holdings, Ltd.; (iv) DY Associates, LLC; (v) DY Land Associates, Ltd.; (vi) FC Beach, LLC; (vii) FC Beach, Ltd.; (viii) FC Golf, LLC; (ix) FC Golf, Ltd.; (x) FC Hotel, LLC; (xi) FC Hotel, Ltd.; (xii) FC Marina, LLC; (xiii) FC Resort, LLC; (xiv) FC Resort, Ltd.; (xv) Fiddler's Creek Management, Inc.; (xvi) GBFC Development, LLC; (xvii) GBFC Development, Ltd.; (xviii) GBFC Marina, Ltd.; (xix) Gulf Bay Hospitality Company, LLC; (xx) Gulf Bay Hospitality, Ltd.; (xxi) Gulf Bay Hotel Company, LLC; (xxii) Gulf Bay Hotel Company, Ltd.; (xxiii) DY Land Holdings II, LLC; (xxiv) FC Commercial, LLC; (xxv) FC Parcel 73, LLC; (xxvi) GB Peninsula, Ltd., (xxvii) GBP Development, Ltd. and (xxviii) GBP Development, LLC.

**"Debtors in Possession"** means, collectively, the DY/FC Debtors and the Other Debtors, as the context may require, as debtors in possession in the Bankruptcy Cases and the Other Debtors' Bankruptcy Cases.

**"DIP Advances"** means the aggregate outstanding Postpetition advances extended to the Debtors by the DIP Lender pursuant to the DIP Loan Documents and in accordance with and subject to the terms and conditions of the DIP Financing Orders. As of the date of the Plan, the DIP Advances totaled $4,750,441 (excluding accrued and unpaid interest).

**"DIP Financing Orders"** means, collectively, (I) with respect to the DIP Lender, (i) that certain Interim Order Granting Motion Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto, dated March 10, 2010 (C.P. #73) (the "First Interim Order"), (ii) that certain Second Interim Order Granting Motion Pursuant To

Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto, dated April 30, 2010 (C.P.# 184) (the "Second Interim Order"), (iii) that certain Third Interim Order Granting Motion Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto, dated July 26, 2010 (C.P.# 310)(the "Third Interim Order"), and (iv) that certain Fourth Interim Order Granting Motion Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto, dated October 7, 2010 (C.P. # 416), and (II) with respect to the Textron DIP Loan, that certain Final Order Granting Supplement Relating to FC Golf, Ltd. and Textron Financial Corporation (Textron) to Emergency Motion For Entry Of Interim And Final Orders Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, dated September 28, 2010 [C.P. #393].

**"DIP Lender"** means Gulf Bay Capital, Inc., a Florida corporation, in its capacity as lender under the DIP Loan Documents.

**"DIP Lender Allowed Claim"** means the Allowed Claim of the DIP Lender in an amount equal to the outstanding DIP Advances (plus accrued and unpaid interest and other charges) as of the Effective Date as determined by the terms and provisions of the DIP Loan Documents and the DIP Financing Orders related to the DIP Lender.

**"DIP Loan"** means that certain loan from the DIP Lender to the Debtors approved by the Bankruptcy Court pursuant to the DIP Financing Orders related to the DIP Lender and the DIP Loan Documents.

**"DIP Loan Documents"** means all of the documents evidencing the DIP Loan, including those filed with the Bankruptcy Court pursuant to a Notice of Filing, dated April 23, 2010 (C.P.#157), and all other documents executed in connection therewith, as any such document has been amended, modified or supplemented thereafter in accordance with its terms.

**"Disallowed Claim"** means any Claim which has been disallowed by an order of the Bankruptcy Court, which order has not been stayed pending appeal.

**"Disclosure Statement"** means that certain Joint Disclosure Statement for Plans of Reorganization of Fiddler's Creek, LLC, 951 Land Holdings, LLC, 951 Land Holdings, Ltd., DY Associates, LLC, DY Land Associates, Ltd., FC Beach, LLC, FC Beach, Ltd., FC Golf, LLC, FC Golf, Ltd., FC Hotel, LLC, FC Hotel, Ltd., FC Marina, LLC, FC Resort, LLC, FC Resort, Ltd., Fiddler's Creek Management, Inc., GBFC Development, LLC, GBFC Development, Ltd., GBFC Marina, Ltd., Gulf Bay Hospitality Company, LLC, Gulf Bay Hospitality, Ltd., Gulf Bay Hotel Company, LLC, Gulf Bay Hotel Company, Ltd., DY Land Holdings II, LLC, FC Commercial, LLC, FC Parcel 73, LLC, GB Peninsula, Ltd., GBP Development, Ltd. and GBP Development, LLC under Chapter 11 of Title 11, United States Code, dated as of December 3, 2010, including all Exhibits attached thereto, as submitted and filed by the Debtors pursuant to Section 1125 of the Bankruptcy Code and approved by the Bankruptcy Court in the Disclosure Statement Approval Order, which Disclosure Statement (and all Exhibits thereto) shall be in form and substance acceptable to the Exit Financing Lender, and as such Disclosure Statement may be amended, supplemented, modified or amended and restated from time to time, with the consent of the Exit Financing Lender.

**"Disclosure Statement Approval Order"** shall mean that certain order of the Bankruptcy Court, dated _____, 2011 (C.P. ____) approving, among other things, the Disclosure Statement as containing adequate information pursuant to Section 1125 of the Bankruptcy Code, and setting various deadlines in connection with Confirmation of the Plan, which order shall be in form and substance acceptable to the Exit Financing Lender.

**"Disputed Claim"** means any Claim or portion thereof (other than a Disallowed Claim) that is not an Allowed Claim and (a) as to which a Proof of Claim has been filed with the Clerk's Office or is deemed filed under applicable law or order of the Bankruptcy Court, or (b) which has been scheduled in the Schedules, and, in the case of subparagraph (a) and (b) above, as to which an objection has been or may be timely filed or deemed filed under the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court and any such objection has not been (i) withdrawn, (ii) overruled by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court.  In addition to the foregoing, a Disputed Claim shall also mean a Claim that is not an Allowed Claim, whether or not an objection has been or may be timely filed, if (a) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, (b) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim scheduled in the Schedules, (c) any corresponding Claim has been scheduled in the Schedules as disputed, contingent or unliquidated, (d) no corresponding Claim has been scheduled in the Schedules, or (e) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof.  To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the amount subject to objection.  To the extent that the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, such Claim shall be a Disputed Claim only to the extent of the amount specified in the Proof of Claim which is in excess of the amount of the Claim as scheduled. "Disputed," when used as an adjective herein (such as Disputed Administrative Claim, Disputed Priority Tax Claim, Disputed Priority Claim, Disputed Secured Claim, and Disputed Unsecured Claim), has a corresponding meaning.

**"Disputed Equity Interest"** means any Equity Interest as to which an objection has been or may be timely filed or deemed filed under the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court and any such objection has not been (i) withdrawn, (ii) overruled by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court.

**"Distribution"** means a distribution of Cash or Property, as the context requires, to a Creditor on account of an Allowed Claim pursuant to the terms of the Plan, including the Initial Distribution.

**"Distribution Date"** means the date or dates under the Plan when Cash or Property is required to be distributed to the Holders of Allowed Claims in accordance with the Plan, including the Initial Distribution.

**"Docket"** means the docket or dockets in the Bankruptcy Cases maintained by the Clerk.

**"DY/FC Debtors"** means, collectively, DY Land Holdings II, LLC, FC Commercial, LLC and FC Parcel 73, LLC, as a debtor and debtors in possession under Case Nos. 9:10-bk-03878-ALP, 9:10-bk-03888-ALP and 9:10-bk-03881-ALP, respectively.

**"DY/FC Estates"** means the Estates of the DY/FC Debtors.

**"DY/FC Real Property"** means the Property of the DY/FC Debtors that consists of the following real property: (i) 1,055 acres of undeveloped real property owned by DY Land Holdings II, LLC, (ii) undeveloped real property owned by FC Commercial, LLC, which is zoned commercial and located at 8225 Fiddler's Creek Parkway, Naples FL and 14020 East Tamiami Trail, Naples, FL, and (iii) undeveloped real property owned by FC Parcel 73, LLC and indentified as Parcel 73 within the Fiddler's Creek PUD and located in the southeast quadrant of U.S. 41 and C.R. 951, Naples, FL.

**"Effective Date"** means, and shall occur on, the first Business Day after which all of the conditions precedent to the occurrence of the Effective Date contained in Article 11 of the Plan have been satisfied or waived pursuant to and in accordance with Article 11.2 of this Plan.

**"Effective Date Notice"** has the meaning ascribed to such term in Article 11 of the Plan.

**"Entity"** has the meaning ascribed to such term in Section 101(15) of the Bankruptcy Code.

**"Environmental Claim"** means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity) against the DY/FC Debtors, their predecessors, successors or assigns, or Affiliates, or their present or former officers, directors or employees, arising out of, or related to, any Environmental Laws, including any Claim or demand: (a) to restrict or enjoin, or recover

damages, costs or expenses to remedy, any release, environmental pollution, contamination or nuisance or to require the DY/FC Debtors to remedy or to reimburse, pay or incur costs to remedy any release, environmental pollution, contamination or nuisance, (b) to remedy, reimburse, compensate or pay any damage, penalty, fine or forfeiture for, or to restrict or enjoin, any violation of or alleged violation of any Environmental Laws, (c) to pay any contractual claim with respect to any Environmental Laws, or (d) to pay or reimburse any Person or Entity for personal injury (including worker's compensation, sickness, disease or death), tangible or intangible property damage or natural resource damage arising out of, or relating to, any release, environmental pollution, contamination or nuisance, whether or not contemplated in subparagraphs (a) through (c) above, or whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury or damage giving rise to such Claim or demand was diagnosable, undiagnosable, detectable or undetectable before the Confirmation of the Plan or before the Final Decree Date.  Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Environmental Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the Bankruptcy Code.

"**Environmental Laws**" means all federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree, or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). As used in the Plan, the term "Environmental Laws" shall  include (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, et seq., (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, et seq., (c) the Clean Air Act, 42 U.S.C. §§ 7401, et seq., (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, et seq., (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq., (f) the Oil Pollution Act of 1990 (OPA 90), (g) the Hazardous Materials Transportation Authorization Act of 1994, 49 U.S.C. §§ 5101, et seq., (h) the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136, et seq., (i) the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, et seq., (j) the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq., (k) the Occupational Safety and Health Act, 29 U.S.C. §§ 651, et seq., (l) the Safe Drinking Water Act, 42 U.S.C. §§ 300(f), et seq., (m) all other statutes or laws issued or promulgated by any Governmental Unit, as they may be amended from time to time, relating to environmental contamination or pollution, air pollution, water pollution, noise control and/or the handling, transportation, discharge, existence, release, disposal or recovery of on-site or off-site hazardous, toxic or dangerous wastes, substances, chemicals or materials (including petroleum), including any transfer of ownership notification or approval statutes, and (n) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

"**Equity Interests**" means the ownership interests in the DY/FC Debtors held by Fiddler's Creek, LLC.

"**Estates**" means, collectively, the estates created for the DY/FC Debtors and/or the Other Debtors, as the context may require, by Section 541 of the Bankruptcy Code upon the commencement of the Bankruptcy Cases and the Other Debtors' Bankruptcy Cases, respectively.

"**Estimation Hearing**" means a hearing for the estimation of Claims under Section 502(c) of the Bankruptcy Code.

"**Exculpated Parties**" has the meaning ascribed to such term in Article 12 of the Plan.

"**Exhibit**" means an exhibit annexed to the Plan or to the Disclosure Statement, as the context requires.

"**Exit Financing**" has the meaning ascribed to such term in Article 8 of the Plan.

"**Exit Financing Commitment Letter**" means that certain commitment letter from the Exit Financing Lender to the Debtors attached hereto as Exhibit A, pursuant to the terms of which the Exit Financing Lender has agreed to make the Exit Financing available to the Debtors and the Reorganized Debtors.

"**Exit Financing Documents**" shall mean those certain loan and security documents evidencing and securing the Exit Financing, and as more particularly set forth in the Plan Supplement and which documents shall be in form and substance acceptable to the Exit Financing Lender.

"**Exit Financing Lender**" shall mean Mount Kellett Capital Management LP or one or more funds or accounts to be designated by it.

"**Final Decree**" means the final decree for each of the Bankruptcy Cases entered by the Bankruptcy Court pursuant to Bankruptcy Rule 3022.

"**Final Decree Date**" means the date on which the Final Decree, obtained after a hearing on notice to such Persons and Entities as the Bankruptcy Court may direct, is entered on the Docket.

"**Final Order**" means an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and: (i) as to which the time to appeal or seek reconsideration or rehearing thereof or file a petition for certiorari has expired; (ii) in the event of a motion for reconsideration or rehearing or petition for certiorari is filed, such motion or petition shall have been denied by an order or judgment of the Bankruptcy Court or other applicable court; or (iii) in the event of an appeal is filed and pending, a stay pending appeal has not been entered; provided, however that with respect to an order or judgment of the Bankruptcy Court allowing or disallowing a Claim, such order or judgment shall have become final and non-appealable; and provided further, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil

Procedure, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

**"Golf Club Member"** means an active or resigned member of the Golf Club at Fiddler's Creek, which is owned and operated by FC Golf, Ltd.

**"Governmental Unit"** has the meaning ascribed to such term in Section 101(27) of the Bankruptcy Code.

**"Governmental Unit Bar Date"** means August 23, 2010, the date established by Section 502(a)(9) of the Bankruptcy Code as the last day for a Governmental Unit to file a Proof of Claim against the DY/FC Debtors in the Bankruptcy Cases.

**"Holder"** means (a) as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, or (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as such is reflected on the Schedules or the books and records of the DY/FC Debtors or as otherwise determined by order of the Bankruptcy Court, or (iii) if the owner or holder of such Claim has assigned or transferred the Claim to a third party and the DY/FC Debtors or Reorganized Debtor, as the case may be, have received sufficient written evidence of such assignment or transfer, the assignee or transferee; and (b) as to any Equity Interest, the record owner or holder of such Equity Interest as of the Effective Date.

**"Impaired"** refers to any Claim or Equity Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

**"Indemnification Rights"** means any obligations or rights of the DY/FC Debtors to indemnify, reimburse, advance, or contribute to the losses, liabilities or expenses of an Indemnitee pursuant to such DY/FC Debtors' articles or certificate of incorporation, articles of organization, bylaws, operating agreement, partnership documents, or policy of providing indemnification, applicable law, or a specific agreement in respect of any claims, demands, suits, causes of action or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of such DY/FC Debtors.

**"Indemnitee"** means all present and former directors, officers, members, managers, partners, employees, agents or representatives of the DY/FC Debtors who are entitled to assert Indemnification Rights.

**"Indenture Trustee"** means U.S. Bank National Association, as the successor indenture trustee with regard to the Bonds issued by the applicable CDD under the Bond Documents.

**"Initial Distribution"** has the meaning ascribed to such term in Article 9 of the Plan.

**"Liabilities"** means any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated

or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to the DY/FC Debtors or any predecessor thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence taking place prior to the Effective Date in any way relating to the DY/FC Debtors or any predecessor thereof, any Property of the DY/FC Debtors, the businesses or operations of the DY/FC Debtors, the Bankruptcy Cases, or the Plan, including any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness based in whole or in part upon any Claim of or relating to successor liability, transferee liability, or other similar theory; provided, however, that, when used in the Plan, the term "Liabilities" shall not include any obligations of the Reorganized Debtor expressly set forth in the Plan or the Plan Documents.

**"Lien"** means, with respect to any Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

**"Litigation Claims"** means any and all claims, choses in action, causes of action suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively, in law, equity or otherwise, which are owned or held by, or have accrued to, the DY/FC Debtors, whether arising before or after the Petition Date, including, without limitation, those which are: (i) property of the DY/FC Estates under and pursuant to Section 541 of the Bankruptcy Code; (ii) for subrogation and contribution; (iii) for turnover; (iv) for avoidable transfers and preferences under and pursuant to Sections 542 through 550 and 553 of the Bankruptcy Code and applicable state law; (v) to determine the extent, validity and priority of liens and encumbrances; (vi) for surcharge under Section 506(c) of the Bankruptcy Code; (vii) for subordination under Section 510 of the Bankruptcy Code; (viii) related to federal or state securities laws; (ix) direct or derivative claims or causes of action of any type or kind; (x) for professional malpractice against professionals employed by the DY/FC Debtors; (xi) under and pursuant to any policies of insurance maintained by the DY/FC Debtors; (xii) for collection on accounts, accounts receivables, loans, notes receivables or other rights to payment; (xiii) for the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Section 505 of the Bankruptcy Code; (xiv) which arise under or as a result of any section of the Bankruptcy Code, including Section 362; (xv) or may be available to the DY/FC Debtors against any third party(ies) under any legal or equitable theory, whether or not specifically identified or described herein or in the Disclosure Statement and (xvi) to the extent not otherwise set forth above, as described in the Disclosure Statement.

**"Local Rules"** means the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

**"Other Debtors"** means the Debtors other than the DY/FC Debtors.

**"Other Debtors' Bankruptcy Cases"** means, collectively, the jointly administered cases of the Other Debtors currently pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, which cases were commenced on the Petition Date and presently bear the Case Nos. set forth in the above caption.

**"Other Plans"** means those certain plan(s) of reorganization proposed by the Other Debtors in the Other Debtors' Bankruptcy Cases, respectively.

**"Other Reorganized Debtors"** means the Other Debtors as reorganized under the applicable Other Plans.

**"Person"** means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

**"Petition Date"** means February 23, 2010, the date on which the DY/FC Debtors commenced the Bankruptcy Cases by filing their voluntary petitions under Chapter 11 of the Bankruptcy Code.

**"Plan"** means this Plan of Reorganization of GB Peninsula, Ltd. proposed under Chapter 11 of Title 11, United States Code dated as of December 3, 2010, and all Exhibits to the Plan, including, without limitation, those Exhibits that are or will be contained in the Plan Supplement, which Plan (and all such Exhibits thereto) shall be in form and substance acceptable to the Exit Financing Lender, as the same may be amended, supplemented, modified or amended and restated from time to time in accordance with the provisions of the Plan and the Bankruptcy Code with the consent of the Exit Financing Lender.

**"Plan Documents"** means all documents that aid in effectuating the Plan, including, without limitation, the Exit Financing Documents, which documents (as may be amended, modified or supplemented from time to time) shall be in form and substance acceptable to the Exit Financing Lender.

**"Plan Solicitation Package"** means, collectively, the Disclosure Statement, the Plan, the Disclosure Statement Approval Order, and the Ballot, which Plan Solicitation Package shall be in form and substance acceptable to the Exit Financing Lender..

**"Plan Supplement"** means the compendium of documents comprised of the Plan Documents (to the extent not already on file with the Bankruptcy Court), which shall be filed with the Bankruptcy Court in accordance with Article 15 of the Plan, which Plan Supplement (as may be amended, modified or supplemented from time to time) shall be in form and substance acceptable to the Exit Financing Lender.

**"Postpetition"** means arising or accruing on or after the Petition Date and before the Effective Date.

**"Prepetition"** means arising or accruing prior to the Petition Date.

**"Priority Claim"** means a Claim that is entitled to a priority in payment pursuant to Sections 507(a)(4), (5) and (7) of the Bankruptcy Code and that is not an Administrative Claim, a Priority Tax Claim, a Secured Claim, a Secured Real Estate Tax Claim or an Unsecured Claim.

**"Priority Tax Claim"** means a Claim of a Governmental Unit that is entitled to a priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code and that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Secured Real Estate Tax Claim or an Unsecured Claim.

**"Professional"** means any professional employed in the Bankruptcy Cases pursuant to an order of the Bankruptcy Court, pursuant to Section 327 or 1103 of the Bankruptcy Code.

**"Projections"** means the cash flow projections for the Reorganized Debtor and the Other Reorganized Debtors from the Effective Date through 2016, a copy of which is attached as Exhibit 1 to the Disclosure Statement.

**"Proof of Claim"** means a proof of claim filed with the Bankruptcy Court with respect to a Claim against one or more of the DY/FC Debtors pursuant to Bankruptcy Rule 3001, 3002 or 3003.

**"Property"** means any property or asset of any kind, whether real, personal or mixed, tangible or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

**"Reorganized Debtor"** means, collectively, DY Land Holdings II, LLC, FC Commercial, LLC and FC Parcel 73, LLC on and after the Effective Date as reorganized pursuant to the terms of the Plan, including any successor thereto by merger, consolidation or otherwise.

**"Reorganized Debtors"** means, collectively, the Reorganized Debtor and the Other Reorganized Debtors.

**"Schedules"** means, collectively, Schedules A, B, C, D, E, F, G, and H filed by the DY/FC Debtors in the Bankruptcy Cases pursuant to Bankruptcy Rule 1007, as any of such Schedules has been or may hereafter be amended or supplemented from time to time.

**"Secured Claim"** means any Claim of a Creditor that is (a) secured in whole or in part, as of the Petition Date, by a Lien (i) on Collateral and (ii) which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code, but, with respect to both (a) and (b) above, only to the extent of the value of such Creditor's interest in the Estates' interest in such Collateral or the amount subject to setoff, as the case may be. Except as otherwise provided in the Plan, if the value of a Creditor's interest in the Estates' interest in such Collateral or the amount subject to setoff is less than the amount of the Allowed Claim, then such deficiency shall constitute an Unsecured Claim.

**"Secured Creditor"** means any Creditor holding a Secured Claim.

"**Secured Real Estate Tax Claim**" means a Secured Claim for Prepetition real estate taxes on the DY/FC Real Property, including for tax years 2008, 2009 and 2010.

"**Superpriority Claim**" means any Claim created by a Final Order of the Bankruptcy Court providing for a priority senior to that provided in Section 507(a)(1) of the Bankruptcy Code, including any such Claims granted under Section 364(c)(1) of the Bankruptcy Code.

"**Textron DIP Loan**" means that certain loan from Textron Financial Corporation to FC Golf, Ltd. approved by the Bankruptcy Court pursuant to the DIP Financing Orders applicable to Textron Financial Corporation in the maximum principal amount of $2,500,000.

"**Unimpaired**" refers to a Claim that is not Impaired.

"**United States**" means the United States of America.

"**United States Trustee**" means the Office of the United States Trustee for the Middle District of Florida.

"**Unsecured Claim**" means any Claim which is not a DIP Lender Allowed Claim, an Administrative Claim, Priority Tax Claim, Priority Claim, Secured Real Estate Tax Claim, Secured Claim, or a Cure Claim, including (a) any Claim arising from the rejection of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (b) except as otherwise provided in the Plan, any portion of a Claim to the extent the value of the Creditor's interest in the Estates' interest in the Collateral securing such Claim is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code, (c) any Claim arising from the provision of goods or services to the DY/FC Debtors prior to the Petition Date, and (d) any Claim designated as an Unsecured Claim elsewhere in the Plan.

"**Unsecured Convenience Claim**" means an Unsecured Claim (a) in an amount less than or equal to $25,000, or (b) in an amount greater than $25,000 and as to which the Holder of such Claim has agreed to reduce the amount of its Claim to $25,000 by making the Convenience Class Opt-In Election.

"**Unsecured Creditor**" means any Creditor holding an Unsecured Claim.

"**Voting Deadline**" means the last day to submit a Ballot accepting or rejecting the Plan as fixed by the Disclosure Statement Approval Order.

"**Voting Instructions**" means the instructions for voting on the Plan contained in the applicable section of the Disclosure Statement and in the Ballot, as the case may be.

2.1.2   Any capitalized term used in the Plan that is not defined in the Plan but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or in the Bankruptcy Rules, as the case may be (with the Bankruptcy Code or the Bankruptcy Rules, as the case may be, controlling in the case of a conflict or ambiguity).

2.2     **Rules of Construction.**

For purposes of the Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented; (d) if the Plan's description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references in the Plan to Articles and Exhibits are references to Articles and Exhibits of or to the Plan; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular Article or section or subsection of the Plan; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Plan shall be deemed incorporated herein by any such reference and made a part hereof for all purposes; (i) any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; and (j) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 2.2.

## ARTICLE 3
## TREATMENT OF ADMINISTRATIVE CLAIMS, UNITED STATES TRUSTEE FEES, PRIORITY TAX CLAIMS, AND DIP LENDER ALLOWED CLAIM

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, United States Trustee Fees, Priority Tax Claims, and the DIP Lender Allowed Claim have not been classified in the Plan.  The treatment accorded to Administrative Claims, United States Trustee Fees, Priority Tax Claims, and the DIP Lender Allowed Claim is set forth below in this Article 3.

3.1     **Administrative Claims.**

3.1.1    Except as otherwise provided in Articles 3.1.2 below, each Holder of an Allowed Administrative Claim (including Allowed Administrative Claims of Professionals) shall be paid (a) an amount, in Cash, by the Reorganized Debtor equal to the Allowed Amount of its Administrative Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, on the later of (i) the Effective Date, or as soon thereafter as reasonably practicable, or (ii) as soon as practicable after the date of a Final Order Allowing such Administrative Claim, (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Claim and the DY/FC Debtors or the Reorganized Debtor, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

3.1.2    All Allowed Administrative Claims with respect to liabilities incurred by the DY/FC Debtors in the ordinary course of business during the Bankruptcy Cases shall be paid by Reorganized Debtor (a) in the ordinary course of business in accordance with contract terms, (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative

Claim and the DY/FC Debtors or the Reorganized Debtor, as the case may be, with the consent of the Exit Financing Lender, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

3.2    **United States Trustee's Fees**

All unpaid fees and charges assessed against the DY/FC Debtors under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930, for any calendar quarter ending prior to the Effective Date shall be paid to the United States Trustee by the Reorganized Debtor by no later than thirty (30) days following the Effective Date. At the time of such payment, the Reorganized Debtor shall provide to the United States Trustee an affidavit indicating the disbursements made by the DY/FC Debtors for the relevant periods, if requested by the United States Trustee. Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6), with respect to the Bankruptcy Cases shall be paid by Reorganized Debtor, until the earlier of (i) the closing of the Bankruptcy Cases by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to another chapter under the Bankruptcy Code. Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6). At the time of each such payment, the Reorganized Debtor shall provide to the United States Trustee an affidavit indicating the disbursements for the relevant period, if requested by the United States Trustee.

3.3    **Priority Tax Claims.**

Each Holder of an Allowed Priority Tax Claim shall receive from Reorganized Debtor, on account of such Allowed Priority Tax Claim, regular installment payments in Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code commencing on the later of (i) the Effecitve Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Tax Claim. Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Tax Claim and the DY/FC Debtors or the Reorganized Debtor, as the case may be, with the consent of the Exit Financing Lender. The Reorganized Debtor shall have the right to prepay such Allowed Priority Tax Claims at any time, in whole or in part, without penalty or premium.

3.4    **DIP Lender Allowed Claim.**

3.4.1    Pursuant to the DIP Financing Orders, the Bankruptcy Court has approved interim advances by the DIP Lender to the Debtors in an amount equal to $7,300,422, which advances are secured, except as set forth in the DIP Financing Oeders, by a first priority, priming Lien in favor of the DIP Lender on substantially all of the Property of the DY/FC Debtors, with the exception of that portion of the Colonnade Collateral that is comprised of 1,055 acres of undeveloped land as described on Exhibit C attached hereto.

3.4.2    Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the DIP Lender is entitled to receive on the Effective Date, in full and final satisfaction, settlement, release, extinguishment,

and discharge of the DIP Lender's Allowed Claim, Cash equal to the amount of the DIP Lender's Allowed Claim. Notwithstanding, the DY/FC Debtors and the Other Debtors propose that the treatment afforded the DIP Lender Allowed Claim herein and in the Other Plans results in the DIP Lender Allowed Claim being deemed satisfied in full on the Effective Date in accordance with and pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code.

3.4.3 With respect to the DY/FC Debtors, on the Effective Date, the DIP Lender shall receive, at the option of the DIP Lender to be exercised on or prior to the Confirmation Date, either one or a combination of the following: (i) Cash, when combined with the treatment of the DIP Lender Allowed Secured Claim under and pursuant to this Plan and/or the Other Plans, of a value equal to the full amount of the DIP Lender Allowed Claims, (ii) all right, title and interest of the DY/FC Debtors in, to and under some or all of the Property, including the DY/FC Real Property but excluding the DY/FC Real Property owned by DY Land Holdings II, LLC, securing the DIP Lender Allowed Claim, which treatment shall be effected by the DY/FC Debtors transferring all such right, title and interest to the DIP Lender, or its assigns, on the Effective Date, subject in all events to any and all Liens for Allowed Claims (as restructured pursuant to the Plan) on such Property, including the DY/FC Real Property, senior to the Liens of the DIP Lender, which Allowed Claims shall be assumed on a non-recourse basis by the DIP Lender or its successors and assigns; or (iii) such other treatment as may be agreed to between the DIP Lender and the DY/FC Debtors on or before the Effective Date with the consent of the Exit Financing Lender. Such treatment shall be in full and final satisfaction, settlement, release, extinguishment and discharge of the DIP Lender's Allowed Claim and all Liens granted in connection therewith. As of the Effective Date, without any further action by any party, the Liens on the Property of the DY/FC Debtors that secure the DIP Loan shall be deemed to be extinguished, satisfied and released. To the extent that any Liens to secure the DIP Loan have been filed or recorded publicly, if requested by Reorganized Debtor, the DIP Lender shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens of record, but in all events subject to the treatment of such Liens as provided herein.

## ARTICLE 4
## DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests. A Claim or Equity Interest (a) is classified in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and (b) is classified in a different Class to the extent the Claim or Equity Interest qualifies within the description of that different Class. Unless otherwise expressly stated, the Classes of Claims set forth below include Claims against each of the DY/FC Debtors that qualify within the description of that Class. For purposes of the Plan, the Claims and Equity Interests are classified as follows:

4.1 **Class 1: Priority Claims.**

Class 1 consists of all Priority Claims.

4.2 **Class 2: Secured Real Estate Tax Claims.**

Class 2 consists of the Secured Real Estate Tax Claims in respect of the DY/FC Real Property.

4.3     **Class 3: Secured CDD Claims.**

Class 3 consists of the Secured CDD Off Roll Bond Claims.

4.4     **Class 4:  Secured Claims of Colonnade Naples Land, LLC**

Class 4 consists of the Secured Claims of Colonnade Nalples Land, LLC

4.5     **Class 5:  Unsecured Convenience Claims.**

Class 5 consists of all Unsecured Convenience Claims

4.6     **Class 6:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

Class 6 consists of all Unsecured Claims not otherwise classified in the Plan.

4.7     **Class 7:  Equity Interests.**

Class 7 consists of all Equity Interests.

## ARTICLE 5
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

Claims and Equity Interests shall be treated under the Plan in the manner set forth in this Article 5.  Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

5.1     **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth in Article 3 of the Plan.

5.2     **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim..  Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the DY/FC Debtors or Reorganized Debtor, as

the case may be with the consent of the Exit Financing Lender. Class 1 is Unimpaired by the Plan. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

### 5.3 **Class 2: Secured Real Estate Tax Claims – DY/FC Real Property.**

5.3.1    Class 2 consists of the Secured Real Estate Tax Claims against the DY/FC Real Property.  On the Effective Date, the legal, equitable and contractual rights of each Holder of an Allowed Secured Real Estate Tax Claim encumbering the DY/FC Real Property shall be left unaltered.  Class 2 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Secured Claim in Class 2 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

### 5.4 **Class 3:  Secured CDD Off Roll Bond Claims .**

Class 3 consists of the Secured CDD Off Roll Bond Claims.  As of the Effective Date, the legal, equitable and contractual rights of each Holder of an Allowed  Secured CDD Off Roll Bond Claim encumbering the DY/FC Real Property shall be left unaltered.  Class 3 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Secured Claim in Class 3 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

### 5.5 **Class 4:  Secured Claims of Colonnade Naples Land, LLC.**

Class 4 consists of the Secured Claims of Colonnade Naples Land, LLC.   The Class 4 Secured Claims of Colonnade Naples Land, LLC shall be satisfied: (i) from and by the DY/FC Debtors transferring all of their right, title and interest in, to and under the Colonnade Collateral securing the respective Allowed Class 4 Secured Claim to Colonnade Naples Land, LLC in full and final satisfaction, release and discharge of the Allowed Claims of Colonnade, including the Allowed Class 4 Secured Claim in accordance with Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, subject in all events to those Liens securing the DIP Lender Allowed Claim and any other Liens senior in priority to the Liens in favor of Colonnade on the Colonnade Collateral, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the Holder of such Allowed Claim and the DY/FC Debtors or Reorganized Debtor, with the consent of the Exit Financing Lender.  Such satisfaction shall occur on the later of the Effective Date or the date the Class 4 Secured Claim of Colonnade is Allowed by a Final Order.  Class 4 is Impaired.  As a result, the Holder of an Allowed Class 4 Secured Claim is entitled to vote to accept or reject the Plan.

### 5.6 **Class 5: Unsecured Convenience Claims**

5.6.1    Class 5 consists of all Unsecured Convenience Claims.  Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 5.  Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 6 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 5 under the Plan

by making the Convenience Class Opt-In Election. The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

5.6.2    Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

5.6.3 Class 4 is Impaired by the Plan. Each Holder of an Allowed Unsecured Convenience Claim in Class 4 is entitled to vote to accept or reject the Plan.

5.7    **Class 6:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

5.7.1    Class 6 consists of all Unsecured Claims not otherwise classified in the Plan.

5.7.2    Under the Plan, each Holder of an Allowed Unsecured Claim in Class 6 shall receive, an amount in Cash equal to five(5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter.  Class 6 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 6 is entitled to vote to accept or reject the Plan.

5.8    **Class 7:  Equity Interests.**

Class 7 consists of all Equity Interests.  On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered.  Class 7 is Unimpaired. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 7 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan

**ARTICLE 6**
**ACCEPTANCE OR REJECTION OF THE PLAN**

6.1    **Each Impaired Class Entitled to Vote Separately.**

Except as otherwise provided in Article 6.4, the Holders of Claims or Equity Interests in each Impaired Class of Claims or Impaired Class of Equity Interests shall be entitled to vote separately to accept or reject the Plan.

6.2    **Acceptance by Impaired Classes.**

6.2.1    Classes  4, 5 and 6 are Impaired under the Plan, and Holders of Claims in such Classes are entitled to vote to accept or reject the Plan.  Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the

Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.

6.3    **Presumed Acceptance of Plan by Unimpaired Classes.**

Classes 1, 2, 3 and 7 are Unimpaired under the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code, such Class and the Holders of Claims in such Class are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote on the Plan. Accordingly, votes of Holders of Claims in Classes 1, 2, 3, and 7 are not being solicited by the DY/FC Debtors. Except as otherwise expressly provided in the Plan, nothing contained herein or otherwise shall affect the rights and legal and equitable claims or defenses of the DY/FC Debtors or Reorganized Debtor in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

6.4    **Impairment Controversies.**

If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity Interest or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.

## ARTICLE 7
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1    **Assumption or Rejection of Executory Contracts and Unexpired Leases.**

Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that currently exist between the DY/FC Debtors and another Person or Entity listed on Exhibit B attached hereto shall be assumed by the DY/FC Debtors as of the Effective Date (collectively, the "Assumed Contracts"); provided, however, that the DY/FC Debtors reserve the right, on or prior to the Confirmation Date, (with the consent of the Exit Financing Lender) to amend Exhibit B to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be assumed (if added) or rejected (if deleted). The DY/FC Debtors shall provide notice of any amendments to Exhibit B to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Exhibit B shall not constitute an admission by the DY/FC Debtors that such document is an executory contract or an unexpired lease or that any of the DY/FC Debtors has any liability thereunder. Any executory contract or unexpired lease that exists between any of the DY/FC Debtors and another Person or Entity and that is not listed on Exhibit B attached to the Plan shall be deemed rejected by the applicable DY/FC Debtor as of the Confirmation Date (collectively, the "Rejected Contracts"), unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume such executory contract or unexpired lease. For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of any of the DY/FC

Debtors shall be deemed to be executory contracts and Assumed Contracts (even if not listed on Exhibit B), and (ii) except as provided in Article 7.7, all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed by any of the DY/FC Debtors for the benefit of a third party shall be deemed to be executory contracts and Rejected Contracts.

7.2     **Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.**

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 7.1 hereof, and (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 7.1 hereof.  The assumption by any of the DY/FC Debtors of an Assumed Contract shall be binding upon any and all parties to such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable by Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

7.3     **Inclusiveness.**

Unless otherwise specified on Exhibit B, each executory contract and unexpired lease listed or to be listed on Exhibit B shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Exhibit B.

7.4     **Cure of Defaults.**

Any lessor or other party to an Assumed Contract (except those lessors or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under Article 7.1, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date.  Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the DY/FC Debtors or Reorganized Debtor or the Property of any of them.  The Reorganized Debtor shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim.  Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than the date which is six (6) months after the Effective Date, the Reorganized Debtor shall cure any and all undisputed Cure Claims.  All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the DY/FC Debtors' liability with respect thereto or as may otherwise be agreed to by the parties with the consent of the Exit Financing Lender.  As of the date of the Plan and as set forth on Exhibit B, the DY/FC Debtors does not believe there will be any Cure Claims.

7.5     **Claims under Rejected Executory Contracts and Unexpired Leases.**

7.5.1    Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the DY/FC Debtors or Reorganized Debtor or the Property of any of them.  With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date.  The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

7.5.2    All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 6.  Any such Claims that become Disputed Claims shall be Disputed Claims in Class 6 for purposes of administration of Distributions under the Plan to Holders of Allowed Unsecured Claims in Class 6.

7.6     **Insurance Policies.**

All of the DY/FC Debtors' insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Litigation Claim that either of the DY/FC Debtors or Reorganized Debtor may hold against any Person or Entity, including the insurers under any of the DY/FC Debtors' insurance policies.

7.7     **Indemnification Rights.**

All Claims for Indemnification Rights against the DY/FC Debtors by an Indemnitee for defense and indemnification shall be reinstated against Reorganized Debtor and rendered Unimpaired to the extent that such Indemnitee is entitled to defense or indemnification under applicable law, agreement or past policy of the DY/FC Debtors.

## ARTICLE 8
## MEANS OF IMPLEMENTATION OF THE PLAN

8.1     **General Overview of the Plan.**

The Plan provides for the continued operation of the Property of the DY/FC Estates by and through the Reorganized Debtor in accordance with the Plan.  On the Effective Date of the Plan and except as expressly provided in the Plan, the Property of the DY/FC Estates (excluding the Colonnade Collateral) will vest in the Reorganized Debtor, and the Reorganized Debtor will thereafter manage such Property and implement the terms of the Plan, including making

26

Distributions of Cash and Property to Holders of Allowed Claims, as applicable, all as set forth in the Plan.

The Plan provides for Cash payments to Holders of Allowed Claims in certain instances and for the transfer of Property to certain Holders of Allowed Secured Claims as the indubitable equivalent of such Allowed Secured Claims, all as more particularly described in Articles 3 and 5 of the Plan.

The Plan shall be implemented on the Effective Date, and the primary source of the funds necessary to implement the Plan initially will be the Cash of the Reorganized Debtor and the funds available to the Reorganized Debtor from the Exit Financing. At the present time, the DY/FC Debtors believes that Reorganized Debtor will have sufficient funds as of the Effective Date to pay in full the expected payments required under the Plan, including to the Holders of Allowed Administrative Claims (including Allowed Administrative Claims of Professionals) and Allowed Priority Claims. Cash payments to be made under the Plan after the Effective Date to the Holders of Allowed Unsecured Claims and Allowed Unsecured Convenience Claims will be derived from the operations of Reorganized Debtor and/or from the Exit Financing, including as shown in the Projections.

8.2    **Effective Date Actions.**

8.2.1    Subject to the approval of the Bankruptcy Court and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date contained in Article 11.2 of the Plan, on or as of the Effective Date, the Plan shall be implemented, and the Reorganized Debtor shall carry out all other obligations and responsibilities required under the Plan, including the execution and delivery of all documentation contemplated by the Plan and the Plan Documents.

8.3    **Vesting of Property of DY/FC Estates in the Reorganized Debtor.**

On the Effective Date, and except as otherwise expressly provided in the Plan or the Exit Financing Documents, all Property of the DY/FC Estates (including the Litigation Claims but excluding the Colonnade Collateral) shall vest in the applicable Reorganized Debtor free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature except the Permitted Liens, and the Confirmation Order shall so provide. As of the Effective Date, the Reorganized Debtor may operate its businesses and use, acquire, and dispose of its Property, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. All privileges with respect to the Property of any of the DY/FC Estates, including the attorney/client privilege, to which the DY/FC Debtors is entitled shall automatically vest in, and may be asserted by or waived on behalf of, the applicable Reorganized Debtor.

8.4    **Continued Corporate Existence.**

8.4.1    As of the Effective Date, the DY/FC Debtors shall each continue after the Effective Date to exist as a separate limited liability companies, with all of the powers of a limited liability company under the Florida Limited Liability Company Act (as amended or supplemented), without

prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date.

8.5 **Corporate Action.**

All matters provided for under the Plan involving the corporate structure of the DY/FC Debtors or the Reorganized Debtor, or any corporate action to be taken by or required of the DY/FC Debtors or the Reorganized Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the partners, members or managers of the DY/FC Debtors or the Reorganized Debtor.

8.6 **Managers and Members of the Reorganized Debtor.**

8.6.1    Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the partners, managers and members of the DY/FC Debtors, as the case may be, immediately prior to the Effective Date shall be deemed to be the partners, managers and members of the Reorganized Debtor without any further action by any party.  Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the DY/FC Debtors have disclosed, in the Disclosure Statement, the identity and affiliation of any individuals proposed to serve as the initial partners, managers and members of the Reorganized Debtor.

8.6.2.    On and after the Effective Date, the operations of the Reorganized Debtor shall continue to be the responsibility of its partners, managers and members, or as set forth in the applicable existing organizational or operational documents of the DY/FC Debtors .  The partners, managers and members of the Reorganized Debtor shall serve from and after the Effective Date.

8.6.3    From and after the Confirmation Date, the partners, managers and members, as applicable, of the DY/FC Debtors and the Reorganized Debtor, as the case may be, shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order.

8.6.4    To the extent that, as of the Effective Date, the DY/FC Debtors has in place employment, indemnification and other agreements with its partners,  managers, members and employees who will continue in such capacities after the Effective Date, such agreements shall remain in place after the Effective Date, and the Reorganized Debtor will continue to honor such agreements.  Such agreements may include equity, bonus and other incentive plans in which partners, managers, members and other employees of the Reorganized Debtor may be eligible to participate.

8.7 **Section 1146 Exemption.**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any security, or the making, delivery or recording of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the vesting, re-vesting, transfer or sale of any Property of, by or in the DY/FC Debtors or their Estates or Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing,

shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, by the Confirmation Order, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

8.8    **Pursuit of Litigation Claims.**

8.8.1    On the Effective Date, the Litigation Claims shall be vested in the Reorganized Debtor. The Reorganized Debtor will have the right, in its sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Litigation Claims without seeking any approval from the Bankruptcy Court except as provided in Article 8.9. The DY/FC Debtors are currently not in a position to express an opinion on the merits of any of the Litigation Claims or on the recoverability of any amounts as a result of any such Litigation Claims. For purposes of providing notice, the DY/FC Debtors state that any party in interest that engaged in business or other transactions with the DY/FC Debtors Prepetition or that received payments from the DY/FC Debtors Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. The Reorganized Debtor will fund the costs and expenses (including legal fees) to pursue the Litigation Claims.

8.8.2    No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Litigation Claim. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Litigation Claim. ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY LITIGATION CLAIM OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF REORGANIZED DEBTOR. Creditors are advised that legal rights, claims and rights of action the DY/FC Debtors may have against them, if they exist, are retained under the Plan for prosecution unless a specific order of the Bankruptcy Court authorizes the DY/FC Debtors to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the DY/FC Debtors or Reorganized Debtor do not possess or do not intend to prosecute a particular claim or Litigation Claim if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the DY/FC Debtors, whether now known or unknown, for the benefit of Reorganized Debtor. A Litigation Claim shall not, under any circumstances, be waived as a result of the failure of the DY/FC Debtors to describe such Litigation Claim with specificity in the Plan or in the Disclosure Statement; nor shall the Reorganized Debtor, as a result of such failure, be estopped or precluded under any theory from pursuing any such Litigation Claim. Nothing in the Plan operates as a release of any Litigation Claim.

8.8.3    The DY/FC Debtors does not presently know the full extent of the Litigation Claims and, for purposes of voting on the Plan, all Creditors are advised that Reorganized Debtor will have substantially the same rights that a Chapter 7 trustee would have with respect to the Litigation

Claims. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Litigation Claim against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Litigation Claim following Confirmation of the Plan.

8.8.4 At this time, the DY/FC Debtors believe the Litigation Claims consist primarily of (i) avoidance actions relating to preferential transfers and possible fraudulent transfers under various provisions of the Bankruptcy Code against various trade Creditors and other Prepetition Creditors, and (ii) claims against Tomen America, Inc., and its assignee, Colonnade Naples Land, LLC (collectively, "Tomen"), to avoid as a fraudulent transfer under Section 548 of the Bankruptcy Code and applicable state law the obligations and liens of the DY/FC Debtors to Tomen related to the Class 4 Secured Claims of Colonnade. A more detailed description of the Litigation Claims is set forth in the Disclosure Statement.

8.8.5 The DY/FC Debtors and Reorganized Debtor reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

8.8.6 The DY/FC Estates shall remain open, even if the Bankruptcy Cases shall have been closed, as to any and all Litigation Claims until such time as the Litigation Claims have been fully administered and the recoveries therefrom have been received by Reorganized Debtor.

## 8.9    **Prosecution and Settlement of Litigation Claims.**

The Reorganized Debtor (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Litigation Claim which the DY/FC Debtors had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Litigation Claim. From and after the Effective Date, Reorganized Debtor shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Litigation Claim or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Litigation Claim or objection to a Claim originally asserted in a face amount equal to or less than $100,000.00, then the Reorganized Debtor may settle, with the consent of the Exit Financing Lender, the Litigation Claim or objection to Claim and execute necessary documents, including a stipulation of settlement or release; and (ii) if the resulting settlement involves a Litigation Claim or objection to a Claim originally asserted in a face amount exceeding $100,000.00, then Reorganized Debtor shall be authorized and empowered to settle such Litigation Claim or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019.

## 8.10    **Effectuating Documents; Further Transactions.**

Prior to the Effective Date, each partner, member and manager, or other officer, of the DY/FC Debtors (and, on and after the Effective Date, each partner, member and manager, or other

officer, of Reorganized Debtor) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents, including the Exit Financing Documents, and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

8.11    **Cancellation of Existing Loan Documents and Agreements.**

On the Effective Date, except as otherwise expressly provided in the Plan, (a) all notes, bonds, indentures, debentures or other instruments or documents evidencing or creating any indebtedness or obligations of the DY/FC Debtors with respect to Claims in Classes 1 through 6 shall be deemed cancelled, and (b) the obligations of the DY/FC Debtors under any such notes, bonds, indentures, debentures or other instruments or documents evidencing or creating any indebtedness or obligations of the DY/FC Debtors with respect thereto shall be discharged.

8.12    **Exit Financing.**

On or as soon as reasonably practicable following the Effective Date, the Reorganized Debtors will consummate a new senior secured term loan credit facility with the Exit Financing Lender in the amount of $30,000,000 and in accordance with the terms of the Exit Financing Documents (the "Exit Financing").  The Reorganized Debtors shall be permitted to utilize the proceeds of the Exit Financing to (i) to fund the obligations of the DY/FC Debtors and the Reorganized Debtors under the Plan and the Other Plans to confirm and consummate the Plan and the Other Plans, including the payment of all Allowed Administrative Claims and Priority Claims, and (ii) as additional working capital to conduct its operations following the Effective Date and to fund, to the extent necessary, the Distributions to Holders of Allowed Claims under the Plan and the Other Plans on or after the Effective Date, all in accordance with the Exit Financing Documents. The material terms of the Exit Financing are set forth in the Exit Financing Commitment Letter, a copy of which is annexed hereto as Exhibit A.

8.13    **Exclusivity Period.**

The DY/FC Debtors will retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

8.14    **Dissolution of the Committee**.

On the Effective Date of the Plan, the Committee shall be deemed dissolved and the members of the Committee and the Professionals employed by the Committee shall be deemed to have been released and discharged from any and all rights, duties and responsibilities arising out of or related to the Bankruptcy Cases.

**ARTICLE 9**
**PROVISIONS GOVERNING DISTRIBUTIONS**

9.1    **Initial Distribution.**

As soon as reasonably practicable (as determined by the Reorganized Debtor with the consent of the Exit Financing Lender) after the Effective Date, the Reorganized Debtor shall make the Distributions required under the Plan to Holders of Allowed Administrative Claims (including Allowed Administrative Claims of Professionals), Allowed Priority Claims and the DIP Lender Allowed Claim in accordance with the Plan (collectively, the "Initial Distribution"). Thereafter, the Reorganized Debtor shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of the Plan.

9.2    **Determination of Claims.**

9.2.1    From and after the Effective Date, the Reorganized Debtor shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims, all with the consent of the Exit Financing Lender. Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than ninety (90) days following the Effective Date (unless such period is extended by the Bankruptcy Court upon motion of the DY/FC Debtors or the Reorganized Debtor), and the Confirmation Order shall contain appropriate language to that effect. Objections to Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) ninety (90) days following the Effective Date or (b) the date sixty (60) days after the Reorganized Debtor receives actual notice of the filing of such Claim.

9.2.2    Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the DY/FC Debtors or the Reorganized Debtor, as the case may be, effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Cases on behalf of the Holder of a Claim.

9.2.3    Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Cases, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. The DY/FC Debtors or the Reorganized Debtor may, at any time, with the consent of the Exit Financing Lender, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the DY/FC Debtors or the Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the DY/FC Debtors or the Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. The determination of Claims in Estimation Hearings shall be binding for purposes of

establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

9.3     **Distributions.**

9.3.1    Notwithstanding any provision herein to the contrary, no Distribution shall be made to the Holder of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim. At such time that such Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim shall receive the Distribution to which such Holder is then entitled under the Plan.

9.3.2    Notwithstanding any provision herein to the contrary, if, on any applicable Distribution Date, the Holder of a Claim is subject to a proceeding against it by the Reorganized Debtor under Section 502(d) of the Bankruptcy Code, then the Reorganized Debtor (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding.

9.3.3    Distributions to a Holder of an Allowed Claim shall be made at the address of such Holder set forth in the Schedules or on the books and records of the DY/FC Debtors or the Reorganized Debtor at the time of the Distribution, unless the Reorganized Debtor has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules. The Reorganized Debtor shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided herein.

9.4     **Unclaimed Distributions.**

9.4.1    If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then the Reorganized Debtor shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

9.4.2    If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to the Reorganized Debtor due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to the Reorganized Debtor as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

9.4.3    Any unclaimed Distribution as described above sent by the Reorganized Debtor shall become the property of Reorganized Debtor.

9.5    **Transfer of Claim.**

In the event that the Holder of any Claim shall transfer such Claim on and after the Effective Date, such Holder shall immediately advise the Reorganized Debtor in writing of such transfer and provide sufficient written evidence, in the Reorganized Debtor's reasonable discretion, of such transfer.  The Reorganized Debtor shall be entitled to assume that no transfer of any Claim has been made by any Holder unless and until the Reorganized Debtor shall have received written notice to the contrary.  Each transferee of any Claim shall take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given or other action taken hereunder and, except as otherwise expressly provided in such notice, the Reorganized Debtor shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

9.6    **One Distribution Per Holder.**

If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distribution hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

9.7    **Effect of Pre-Confirmation Distributions.**

Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the DY/FC Debtors or the Reorganized Debtor to such Holder under the Plan.

9.8    **No Interest on Claims.**

Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition interest or the payment of Postpetition interest, penalties, or late charges on account of such Allowed Claim for any purpose.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Disputed Claim becomes an Allowed Claim.

9.9    **Compliance with Tax Requirements.**

In connection with the Plan, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax

obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

# ARTICLE 10

# INTENTIONALLY OMITTED

# ARTICLE 11
## CONDITIONS PRECEDENT TO CONFIRMATION
## OF THE PLAN AND THE EFFECTIVE DATE

11.1 **Conditions Precedent to Confirmation of the Plan.**

The following are conditions precedent to Confirmation of the Plan, each of which may be waived by the DY/FC Debtors with the consent of the Exit Financing Lender:

11.1.1 The Bankruptcy Court shall have entered the Disclosure Statement Approval Order.

11.1.2 The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

11.1.3 The Bankruptcy Court shall have entered a confirmation order confirming the Other Plans in the Other Debtors' Bankruptcy Cases in form and substance acceptable to the DY/FC Debtors and the Exit Financing Lender.

11.2 **Conditions Precedent to the Effective Date.**

The Plan shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the DY/FC Debtors with the consent of the Exit Financing Lender:

11.2.1 The Confirmation Order shall be a Final Order.

11.2.2 The confirmation order(s) entered in the Other Debtors' Bankruptcy Cases in respect of the Other Plans shall, in form and substance acceptable to the Exit Financing Lender, be Final Order(s) and all of the conditions precedent to the effective date in the Other Plans shall have been satisfied or waived.

11.2.3 All conditions precedent to the closing of the Exit Financing shall have been satisfied or waived in accordance with the terms thereof.

11.2.4    Each Plan Document shall be in form and substance acceptable to the DY/FC Debtors and the Exit Financing Lender.

## 11.3    **Notice of the Effective Date.**

Promptly following the satisfaction or waiver of all of the conditions set forth in Article 11.2, the DY/FC Debtors shall file a notice (the "Effective Date Notice") with the Bankruptcy Court designating the Effective Date.

**ARTICLE 12**
**DISCHARGE, EXCULPATION FROM LIABILITY, RELEASE,**
**AND GENERAL INJUNCTION**

## 12.1    **Discharge of Claims.**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the DY/FC Debtors and the DY/FC Estates and the Reorganized Debtor from any and all Debts, Liabilities or Claims of any nature whatsoever against the DY/FC Debtors that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date.  Except as otherwise expressly provided in the Plan or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective Date, the DY/FC Debtors and their Estates and the Reorganized Debtor, and their respective successors or assigns, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan.  As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of Claims or Equity Interests, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the DY/FC Debtors or the DY/FC Estates or the Reorganized Debtor, or any of their respective successors and assigns, or the assets or Property of any of them, any other or further Claims, Debts, rights, causes of action, remedies, Liabilities or Equity Interests based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementation of the Plan, and the Confirmation Order shall contain appropriate injunctive language to that effect.  In accordance with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities against the DY/FC Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, to the fullest extent permitted by applicable law, and such discharge shall void any judgment obtained against the DY/FC Debtors, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, Debt or Equity Interest.  Notwithstanding the foregoing, Reorganized Debtor shall remain obligated to make payments and Distributions to Holders of Allowed Claims as required pursuant to the Plan.

12.2    **Exculpation from Liability.**

The DY/FC Debtors and their respective partners, members and managers, the Professionals for the DY/FC Debtors (acting in such capacity), the Committee and its members, the Professionals for the Committee (acting in such capacity), the DIP Lender and the Exit Financing Lender (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, any Plan Document, the Exit Financing, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Cases, in each case for the period on and after the Petition Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. The rights granted under this Article 12.2 are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article 12.2 shall not release any of the Litigation Claims.

12.3    **General Injunction.**

Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, Liability or Equity Interest that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, Liabilities, or Equity Interests, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents: (a) commencing or continuing in any manner any action or other proceeding against the DY/FC Debtors or the Reorganized Debtor or their respective Property; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the DY/FC Debtors, or the Reorganized Debtor, or their respective Property; (c) creating, perfecting or enforcing any Lien or encumbrance against the DY/FC Debtors, or the Reorganized Debtor, or their respective Property; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the DY/FC Debtors or the Reorganized Debtor; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the DY/FC Debtors or the Reorganized Debtor under the Plan and the Plan Documents and the other documents executed in connection therewith. The DY/FC Debtors and the Reorganized Debtor shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article 12.3 shall not release any of the Litigation Claims.

12.4    **Term of Certain Injunctions and Automatic Stay.**

12.4.1        All injunctions or automatic stays for the benefit of the DY/FC Debtors pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Cases, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

12.4.2        With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the DY/FC Debtors' liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the DY/FC Debtors affirmatively elect to have the DY/FC Debtors' liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the DY/FC Debtors affirmatively to have the automatic stay lifted and to have the DY/FC Debtors' liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtors as provided herein.

12.5    **No Liability for Tax Claims.**

Unless a taxing Governmental Unit has asserted a Claim against the DY/FC Debtors before the Governmental Unit Bar Date or Administrative Claim Bar Date established therefor, no Claim of such Governmental Unit shall be Allowed against the DY/FC Debtors, the Reorganized Debtor or their respective members, managers or other officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the DY/FC Debtors, any of its Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

12.6    **Regulatory or Enforcement Actions.**

Nothing in this Plan shall restrict any federal government regulatory agency from pursuing any regulatory or police enforcement action against the DY/FC Debtors, the Reorganized Debtor, or their respective successors or assigns, but only to the extent not prohibited by the automatic stay of Section 362 of the Bankruptcy Code or discharged or enjoined pursuant to Section 524 or 1141(d) of the Bankruptcy Code.


**ARTICLE 13**
**RETENTION OF JURISDICTION**


13.1    **General Retention.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and except as expressly provided in the Confirmation Order as it shall have become a Final Order, or the Plan Documents (including, without limitation, the Exit Financing Documents), until the Bankruptcy Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of and over the Bankruptcy Cases that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

13.2    **Specific Purposes.**

In addition to the general retention of jurisdiction set forth in Article 13.1, after Confirmation of the Plan and until the Bankruptcy Cases are closed, and except as expressly provided in the Confirmation Order as it shall have become a Final Order, or the Plan Documents (including, without limitation, the Exit Financing Documents), the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases for the following specific purposes.

13.2.1    to allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any application for an Administrative Claim, and to determine any and all objections to the allowance or priority of Claims or Equity Interests;

13.2.2    to determine any and all cases, controversies, suits or disputes arising under or relating to the Bankruptcy Cases, the Plan or the Confirmation Order (including regarding the effect of any exculpation, discharge, limitation of liability, or injunction provisions provided for herein or affected hereby and regarding whether the conditions precedent to the consummation and/or Effective Date of the Plan have been satisfied);

13.2.3    to determine any and all applications for allowance of compensation of Professionals and reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code arising out of or relating to the Bankruptcy Cases; provided, however, that this retention of jurisdiction shall not require prior Bankruptcy Court approval of the payment of fees and reimbursement of expenses of Professionals incurred after the Effective Date unless an objection to such fees and expenses has been made by Reorganized Debtor;

13.2.4    to determine any and all motions pending as of the date of the Confirmation Hearing (including pursuant to the Plan) for the rejection, assumption, or assignment of executory contracts or unexpired leases to which the DY/FC Debtors are a party or with respect to which the DY/FC Debtors may be liable, and to determine the allowance of any Claims resulting from the rejection thereof or any Cure Claims;

13.2.5    to determine any and all motions, applications, adversary proceedings, contested or litigated matters, Litigation Claims, and any other matters involving the DY/FC Debtors or Reorganized Debtor commenced in connection with, or arising during, the Bankruptcy Cases and pending on the Effective Date, including approval of proposed settlements thereof;

13.2.6    to enforce, interpret and administer the terms and provisions of the Plan and the Plan Documents, provided, however, that the Bankruptcy Court shall not retain jurisdiction to enforce, interpret or administer the terms and provisions of the Exit Financing Documents;

13.2.7 to modify any provisions of the Plan to the fullest extent permitted by the Bankruptcy Code and the Bankruptcy Rules;

13.2.8 to consider and act on the compromise and settlement of any Claim against or Equity Interest in the DY/FC Debtors or the DY/FC Estates;

13.2.9 to assure the performance by Reorganized Debtor of its obligations under the Plan;

13.2.10 to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Disclosure Statement, the Plan, the Plan Documents, the Confirmation Order, or any exhibits or schedules to the foregoing, as may be necessary or appropriate to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

13.2.11 to resolve any disputes concerning any release or exculpation of, or limitation of liability as to, a non-debtor (including any Professional) hereunder or the injunction against acts, employment of process or actions against such non-debtor (including any Professional) arising hereunder;

13.2.12 to enforce all orders, judgments, injunctions and rulings entered in connection with the Bankruptcy Cases;

13.2.13 to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Plan Documents (other than the Exit Financing Documents);

13.2.14 to review and approve any sale or transfer of assets or Property by the DY/FC Debtors or the Reorganized Debtor, including prior to or after the date of the Plan, and to determine all questions and disputes regarding such sales or transfers;

13.2.15 to determine all questions and disputes regarding title to the assets or Property of the DY/FC Debtors, the DY/FC Estates or the Reorganized Debtor;

13.2.16 to determine any and all matters, disputes and proceedings relating to the Litigation Claims, whether arising before or after the Effective Date;

13.2.17 to determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the DY/FC Debtors arising on or prior to the Effective Date or arising on account of transactions contemplated by the Plan;

13.2.18 to resolve any determinations which may be requested by the DY/FC Debtors or Reorganized Debtor of any unpaid or potential tax liability or any matters relating thereto under

Sections 505 and 1146 of the Bankruptcy Code, including tax liability or such related matters for any taxable year or portion thereof ending on or before the Effective Date;

13.2.19    to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

13.2.20    to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

13.2.21    to determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or the Plan Documents;

13.2.22    to enter such orders as are necessary to implement and enforce the injunctions described herein;

13.2.23    to enforce the obligations of any purchaser of any Property of the DY/FC Debtors;

13.2.24    to determine such other matters and for such other purposes as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; and

13.2.25    to enter an order concluding and terminating the Bankruptcy Cases.

## 13.3    **Closing of the Bankruptcy Cases**.

In addition to the retention of jurisdiction set forth in Articles 13.1 and 13.2, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases to enter an order reopening the Bankruptcy Cases after they have been closed.

## ARTICLE 14
## MODIFICATION OF PLAN AND CONFIRMATION OVER OBJECTIONS

## 14.1    **Modification of Plan**.

14.1.1    The DY/FC Debtors may, with the consent of the Exit Financing Lender, modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement meet applicable Bankruptcy Code and Bankruptcy Rules requirements.

14.1.2    After the entry of the Confirmation Order, the DY/FC Debtors (prior to the Effective Date) or Reorganized Debtor (on and after the Effective Date) may, with the consent of the Exit Financing Lender, modify the Plan or the other Plan Documents to remedy any defect or omission herein, or to reconcile any inconsistencies between the Plan or such other Plan Documents and the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan,

provided that (a) the DY/FC Debtors or Reorganized Debtor (as the case may be) obtain Bankruptcy Court approval for such modification, after notice and a hearing, and (b) such modification does not materially adversely affect the interests, rights, or treatment of any Class of Claims or Equity Interests under the Plan.

14.1.3    After the entry of the Confirmation Order and before the Effective Date of the Plan, the DY/FC Debtors (prior to the Effective Date) or Reorganized Debtor (on or after the Effective Date) may, with the consent of the Exit Financing Lender, modify the Plan or the other Plan Documents in a way that materially adversely affects the interests, rights, or treatment of a Class of Claims or Equity Interests, provided that (a) the Plan and such other Plan Documents, as modified, meet applicable Bankruptcy Code requirements, (b) the DY/FC Debtors or Reorganized Debtor (as the case may be) obtain Bankruptcy Court approval for such modification, after notice, including to the Class of Claims or Equity Interests materially adversely affected and a hearing, (c) such modification is accepted by (i) at least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims actually voting in each Class of Claims adversely affected by such modification or (ii) at least two-thirds in amount of Allowed Equity Interests actually voting in each Class of Equity Interests adversely affected by such modification, and (d) the DY/FC Debtors or Reorganized Debtor (as the case may be) comply with Section 1125 of the Bankruptcy Code with respect to the Plan or such other Plan Documents, as modified.

14.1.4    Notwithstanding anything to the contrary contained in this Article 14.1 or elsewhere in the Plan, the Plan may not be altered, amended or modified without the written consent of the DY/FC Debtors (prior to the Effective Date) or Reorganized Debtor (on and after the Effective Date).

## 14.2    **Confirmation Over Objections.**

In the event any Impaired Class of Claims or Equity Interests votes against the Plan, and the Plan is not revoked or withdrawn in accordance with Article 15.2, the DY/FC Debtors hereby request, and shall be allowed, with the consent of the Exit Financing Lender, to modify the terms of the Plan or the other Plan Documents to effect a "cramdown" on such dissenting Class by (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2)(B) of the Bankruptcy Code, (b) deleting distributions to all Classes at or below the level of the objecting Class, or reallocating such distributions, until such impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code, or (c) otherwise allowed under applicable law, including to propose a "new value" plan. The DY/FC Debtors may, with the Exit Financing Lender, make such modifications or amendments to the Plan or the other Plan Documents and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice prior to the Confirmation Hearing. No such modifications shall require any resolicitation of acceptances as to the Plan by any Class of Claims or Equity Interests unless the Bankruptcy Court shall require otherwise. Notwithstanding any provision of the Plan to the contrary, the DY/FC Debtors reserve any and all rights they may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

# ARTICLE 15
# MISCELLANEOUS PROVISIONS

## 15.1    No Admissions.

The Plan provides for the resolution, settlement and compromise of Claims against and Equity Interests in the DY/FC Debtors.  Nothing herein shall be construed to be an admission of any fact or otherwise binding upon the DY/FC Debtors in any manner prior to the Effective Date.

## 15.2    Revocation or Withdrawal of the Plan.

The DY/FC Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the DY/FC Debtors revoke or withdraw the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void in all respects and nothing contained in the Plan shall be deemed to (a) constitute a waiver or release of any Claims against, or Equity Interests in, the DY/FC Debtors or any other Person, or (b) prejudice in any manner the rights of the DY/FC Debtors or any other Person in any further proceedings involving the DY/FC Debtors.

## 15.3    Standard for Approval of the Bankruptcy Court.

In the event any of the matters described herein are brought for approval before the Bankruptcy Court, then any such approval shall mean the entry of an order by the Bankruptcy Court approving the matter using the standards for approval of similar matters by a Chapter 11 debtor in possession.

## 15.4    Further Assurances.

Each of the DY/FC Debtors and Reorganized Debtor agree, and are hereby authorized, to execute and deliver any and all papers, documents, contracts, agreements and instruments which may be reasonably necessary to carry out and implement the terms and conditions of the Plan.

## 15.5    Headings.

The headings and table of contents used in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose or in any manner affect the construction of the provisions of the Plan.

## 15.6    Notices.

All notices, requests or other communications in connection with, or required to be served by, the Plan shall be in writing and shall be sent by United States first class mail, postage prepaid, or by overnight delivery by a recognized courier service, and addressed as follows: (i) if to the 951 Debtors or Reorganized Debtor, 8156 Fiddler's Creek Parkway, Naples, Florida 34114, with a copy to Paul J. Battista, Esq., Genovese Joblove & Battista, P.A., 100 S.E. Second Street, 44th Floor, Miami, Florida 33131, (ii) if to the Committee, c/o Jordi Guso, Esq., Berger Singerman, P.A., 200 S. Biscayne Blvd., 10th Floor, Miami, Florida 33131, and (iii) if to the Exit Financing Lender, 625 Fifth Avenue, 18th Floor, New York, NY 10022 with a copy to Lawrence V. Gelber, Esq., Schulte Roth &

Zabel, LLP, 919 Third Avenue, New York, New York 10022. Copies of all notices under the Plan to any party shall be given to each of the parties listed above contemporaneously with the giving of such notice. Any of the parties listed above may change the person or address to whom or to which notices are to be given hereunder by filing a written instrument to that effect with the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Plan, no notice shall be required hereunder to the Committee if it is no longer in existence.

15.7    **Governing Law.**

Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or where the Plan or Plan Documents (including, without limitation, the Exit Financing Documents) or the provision of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan or other Plan Documents provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflicts of law thereof.

15.8    **Limitation on Allowance.**

No attorneys' fees, punitive damages, penalties, exemplary damages, or interest shall be paid with respect to any Claim or Equity Interest except as otherwise expressly provided in the Plan or as Allowed by a Final Order of the Bankruptcy Court.

15.9    **Estimated Claims.**

To the extent any Claim is estimated for any purpose other than for voting on the Plan, then in no event shall such Claim be Allowed in an amount greater than the estimated amount.

15.10   **Consent to Jurisdiction.**

Upon any default under the Plan, the DY/FC Debtors and Reorganized Debtor consent to the jurisdiction of the Bankruptcy Court and agree that the Bankruptcy Court shall be the preferred forum for all proceedings relating to any such default,except to the extent expressly provided in the Plan Documents (including, without limitation, Exit Financing Documents).

Subject to the limitations contained in Article 13 with respect to the Exit Financing Lender and the Exit Financing Documents, by accepting any Distribution under or in connection with the Plan, by filing any Proof of Claim, by filing any Administrative Claim or Cure Claim, by voting on the Plan, by reason of being served with notice of the filing of the Bankruptcy Cases or the Confirmation Hearing, or by entering an appearance in the Bankruptcy Cases, Creditors, Holders of Equity Interests and other parties in interest, including foreign Creditors and foreign parties in interest, have consented, and shall be deemed to have expressly consented, to the jurisdiction of the Bankruptcy Court for all purposes with respect to any and all matters relating to, arising under or in connection with the DY/FC Debtors, the Plan or the Bankruptcy Cases, including the matters and purposes set forth in Article 13 of the Plan. The Bankruptcy Court shall maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in Article 13 of the Plan.

15.11 **Setoffs.**

Subject to the limitations provided in Section 553 of the Bankruptcy Code, Reorganized Debtor may, but shall not be required to, set off against any Claim and any Distribution to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the DY/FC Debtors or the Reorganized Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized Debtor of any such claim that the DY/FC Debtors or the Reorganized Debtor may have against the Holder of such Claim.

15.12 **Successors and Assigns.**

The rights, benefits, duties and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

15.13 **Modification of Payment Terms.**

The Reorganized Debtor reserves the right to modify the treatment of any Allowed Claim, as provided in Section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date, upon the consent of the Holder of such Allowed Claim.

15.14 **Entire Agreement.**

The Plan and the Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Person or Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter thereof, other than as expressly provided for therein or as may hereafter be agreed to by such Person or Entity in writing.

15.15 **Severability of Plan Provisions.**

If, prior to Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the DY/FC Debtors (with the consent of the Exit Financing Lender) shall have the power to alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term or provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

15.16 **Controlling Document.**

To the extent the Confirmation Order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtors or Reorganized Debtor and any third party, unless otherwise expressly provided in the Plan or the Confirmation Order, the Confirmation Order and the Plan shall control over the Disclosure Statement and any such agreement. The Confirmation Order (and any other Final Orders of the Bankruptcy Court) shall be construed together and consistent with the terms of the Plan; provided, however, to the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control over the Plan.

15.17 **Plan Supplement.**

The Plan Supplement shall be filed with the Bankruptcy Court at least ten (10) days prior to the Voting Deadline; provided, however, that the DY/FC Debtors, with the consent of the Exit Financing Lender, may amend the Plan Supplement through and including the Confirmation Date. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected at the Clerk's Office during normal business hours, may be obtained from the Bankruptcy Court's copying service upon the payment of the appropriate charges, or may be obtained from Bankruptcy Counsel.

15.18 **Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

15.19 **Substantial Consummation.**

The Plan shall be deemed to be substantially consummated within the meaning of Section 1101 of the Bankruptcy Code upon commencement by Reorganized Debtor of the Initial Distribution described in Article 9.1 of the Plan.

Dated as of December 3, 2010      Respectfully submitted,

**DY LAND HOLDINGS II, LLC**

By:    Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of DY Land Holdings II, LLC

        By:    GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

        By:    _____
                Aubrey J. Ferrao, as chief executive officer and not individually

**FC COMMERCIAL, LLC**

By:    Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Commercial, LLC

    By:    GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

    By:    GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

    By:    /s/ Aubrey J. Ferrao_____
                 Aubrey J. Ferrao, as chief executive officer and not individually


**FC PARCEL 73, LLC**

By:    Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Parcel 73, LLC

    By:    GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

    By:    GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

    By:    /s/ Aubrey J. Ferrao_____
                 Aubrey J. Ferrao, as chief executive officer and not individually

/s/ Paul J. Battista

Paul J. Battista (Florida Bar No. 884162)
Bart A. Houston (Florida Bar No. 623636)
Mariaelena Gayo-Guitian (Florida Bar No. 813818)
GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. Second Street, 44th Floor
Miami, Florida 33131
Telephone:      (305) 349-2300
Facsimile:      (305) 349-2310
Email: pbattista@gjb-law.com
Email: bhouston@gjb-law.com
Email: mguitian@gjb-law.com
Counsel for Debtors and Debtors in Possession

49

**EXHIBIT A**

**Exit Financing Commitment Letter**

**Mount Kellett Capital Management LP**
**623 Fifth Avenue, 18th Floor**
**New York, NY 10022**

December 3, 2010

Fiddler's Creek, LLC
8156 Fiddler's Creek Parkway
Naples, FL 34114

Attention: Anthony DiNardo

Re:     **$30,000,000 Exit Credit Facilities Commitment Letter**

Ladies and Gentlemen:

You have advised Mount Kellett Capital Management LP on behalf of one or more funds or accounts to be designated by it ("us," "we" or "Mount Kellett") that Fiddler's Creek, LLC, a Delaware limited liability company, and certain of its subsidiaries and affiliates (collectively, "you" or the "Debtors"),[1] are operating as debtors-in-possession under voluntary cases (collectively, the "Chapter 11 Cases") commenced in the U.S. Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"). You have further advised us that you expect the Debtors will be reorganized pursuant to one or more plans or joint plans of reorganization to be proposed by the Debtors in their respective Chapter 11 Cases, which plans or joint plans, as may be amended, modified or supplemented from time to time, shall be in form and substance acceptable to Mount Kellett in its sole and absolute discretion (collectively, the "Plans").

We are pleased to provide this commitment to provide financing on the terms and conditions set forth herein and in the Summary of Terms and Conditions attached hereto as Annex I (the "Exit Term Sheet") in connection with the $30,000,000 senior secured term loan credit facilities (the "Exit Facilities"). The proceeds of the Exit Facilities will be used for the purposes specified in the Term Sheet.

You acknowledge that neither this letter nor the Exit Term Sheet (together, this "Commitment Letter") purports to summarize all the terms, conditions, covenants, representations, warranties and other provisions that would be contained in definitive documentation for the Exit Facilities (the "Exit Facilities Documentation"). All matters whether or not specified in this Commitment Letter are subject to (and Mount Kellett's commitment is conditioned upon) mutual agreement of the parties and execution and delivery of the Exit Facilities Documentation, as set forth herein. All capitalized terms used and not defined herein have the meanings ascribed to them in the Exit Term Sheet.

*Conditions*

---

[1] The Debtors are listed in Appendix A to Annex I of this Commitment Letter (Exit Term Sheet).

The commitment by Mount Kellett to provide the Exit Facilities is subject to, in addition to the other conditions set forth in the Exit Term Sheet and the Exit Facilities Documentation,

      (a)     completion by Mount Kellett, and its satisfaction in all respects with the results, of legal, business, operational and financial diligence in respect of the Debtors and its affiliates;

      (b)     receipt by Mount Kellett, of a proposed annual business plan in respect of the Debtors, as reorganized, that is in form and substance acceptable to Mount Kellett in its sole discretion;

      (c)     receipt by Mount Kellett of the forms of Plans proposed to be filed by Debtors, which Plans, as they may be amended, modified or supplemented from time to time, shall be in form and substance acceptable to Mount Kellett in its sole discretion, and which shall provide for, among other things: (i) full and final discharge and satisfaction of all prepetition indebtedness, other than prepetition indebtedness as may be reinstated or refinanced with the prior consent of Mount Kellett, and other claims against the Debtors, (ii) the termination, release and discharge of all liens and security interests securing any such indebtedness, other than liens and security interests in respect of any Undischarged Prepetition Collateral, as may be set forth in such Plans; and (iii) full and final discharge and satisfaction of all indebtedness arising under the DIP Credit Facility, including the termination, release and discharge of all liens and security interests arising thereunder.

      (d)     satisfaction of Mount Kellett that, from and after the date hereof, there will not have occurred any change, development, circumstance or event that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the condition (financial or otherwise), business, results of operations, assets, liabilities, or prospects of the Debtors or their affiliates;

      (e)     approval by the Bankruptcy Court of entry into, and execution of, this Commitment Letter (including, without limitation, the provisions for fee and expense payment) by Debtors; and

      (f)     the negotiation, execution and delivery of Exit Facilities Documentation consistent with the terms and conditions set forth herein (including the Exit Term Sheet), in form and substance reasonably satisfactory to Borrowers and Mount Kellett.

If at any time Mount Kellett determines in its discretion that any condition set forth in this Commitment Letter (including, without limitation, the Exit Term Sheet) will not be fulfilled, then Mount Kellett may terminate this Commitment Letter by giving notice thereof to you.

*Exclusivity*

During the effectiveness of this Commitment Letter, you hereby agree to work exclusively with Mount Kellett to accomplish the Exit Facilities on substantially the terms and conditions set forth herein, and agree that you will not, directly or indirectly (a) engage in any discussions with another lender or funding source regarding an alternative financing to the Exit Facilities, (b) provide any deposit to any other lender or funding source in connection with an alternative financing to the Exit Facilities, (c) solicit or accept a proposal or commitment from another lender or funding source in connection with an alternative financing to the Exit Facilities, or (d) otherwise permit or encourage another person to solicit a financing proposal or conduct due diligence in connection with an alternative financing to the Exit Facilities.

*Confidentiality*

You agree that this Commitment Letter (including the Exit Term Sheet) is for your confidential use only and that neither its existence, nor the terms hereof, will be disclosed by you to any person other than to your respective officers, directors, employees, accountants, attorneys, and other advisors, and then only on a "*need-to-know*" basis in connection with the transactions contemplated hereby and on a confidential basis. The foregoing notwithstanding, following your acceptance of this letter in accordance herewith, you may (a) disclose this Commitment Letter to the Bankruptcy Court, any official committees appointed in the Chapter 11 Cases, the U.S. Trustee appointed in the Chapter 11 Cases, and such other parties in interest as may be necessary to obtain approval by the Bankruptcy Court of the Exit Facilities, including attaching the Commitment Letter to the Plans when filed with the Bankruptcy Court, (b) file a copy of this Commitment Letter in any other public record in which it is required by law to be filed, and (c) may make such other public disclosures of the terms and conditions hereto as you are required by law, in the reasonable opinion of your counsel, to make.

*Information*

In issuing this Commitment Letter, we are relying on the accuracy of the information furnished by you or on your behalf, without independent verification thereof. You represent and warrant to us that, to the best of your knowledge, (a) all written information concerning you and your Debtor and non-Debtor affiliates (the "Information") that has been, or is hereafter, made available by you or on your behalf (other than projections of future financial performance) is, or when delivered shall be, when considered as a whole, complete and correct in all material respects and does not, and shall not when delivered, contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements have been made, and (b) to the extent that any such Information contains projections, such projections were prepared in good faith on the basis of (i) assumptions that are believed by you to be reasonable at the time such projections were prepared, and (ii) information believed by you to have been accurate based upon the information available to you at the time such projections were prepared. You agree that if, at any time prior to the Closing Date, you become aware that any of the foregoing representations or warranties is incorrect, then you will promptly supplement the Information so that such representation or warranty is correct.

*Fees and Expenses*

As consideration for Mount Kellet's commitment hereunder, you agree to pay, or cause to be paid, to Mount Kellett a commitment fee in an amount equal to 2.0% of the Commitments (the "Commitment Fee"), which shall be due and payable on the Closing Date. The Commitment Fee will be deemed to be fully earned on and subject to the occurrence of the Closing Date and will not be subject to reduction by way of set-off or counterclaim.

In addition, you agree to pay, or cause to be paid, all other fees and reasonable out-of-pocket costs and expenses of Mount Kellett (including, without limitation, fees and disbursements of Schulte Roth & Zabel LLP and local bankruptcy counsel, consultant and advisor costs and expenses, filing and recording fees, costs and expenses of due diligence, transportation, duplication, messenger, collateral reviews, appraisals, valuations, audits and field examinations) incurred by or on behalf of Mount Kellett in connection with (a) the preparation, negotiation, execution, and delivery of this Commitment Letter (including the Exit Term Sheet), and any and all Exit Facilities Documentation, and (b) the enforcement of any of Mount Kellett's rights and remedies under this Commitment Letter and the Exit Facilities Documentation, in either case regardless of whether the transactions contemplated hereunder or thereunder are consummated.

*Indemnification*

You agree to indemnify and hold harmless Mount Kellett, each of our affiliates, and each of our and their respective officers, directors, employees, agents, advisors, attorneys, and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities, and expenses (including, without limitation, fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party, in each case, arising out of or in connection with or relating to this Commitment Letter, the Exit Facilities Documentation, or any of the transactions contemplated hereby or thereby, or any use made or proposed to be made with the proceeds of the Exit Facilities, and whether or not the transactions contemplated hereunder or under the Exit Facilities Documentation are consummated, except to the extent such claim, damage, loss, liability, or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

You further agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to you or your respective affiliates for or in connection with the transactions contemplated hereunder or under the Exit Facilities Documentation, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. In no event, however, shall any Indemnified Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.

*Governing Law, etc.*

This Commitment Letter shall be governed by, and construed in accordance with, the law of the State of New York. You and we hereby consent to the exclusive jurisdiction and

venue of the federal and/or state courts located in the Borough of Manhattan in the City of New York, New York; provided that during the period prior to the Closing Date, each of the parties hereto submits to the jurisdiction of the Bankruptcy Court solely with respect to the matters addressed herein. Notwithstanding anything to the contrary in the foregoing, following the Closing Date, the governing law and forum provisions set forth in the Exit Facilities Documentation (as executed and delivered) shall prevail.

### *Waiver of Jury Trial*

You and we hereby irrevocably waive all right to trial by jury in any suit, action, proceeding, claim or counterclaim (whether based on contract, tort, or otherwise) arising out of or relating to this Commitment Letter or the transactions contemplated hereby.

### *Patriot Act*

You are hereby notified that, pursuant to the requirements of the USA PATRIOT Act (the "Patriot Act"), you are required to obtain, verify and record information that identifies each Borrower, which information includes names, addresses, tax identification numbers and other information that will allow us to identify each Borrower in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective for Mount Kellett.

### *Miscellaneous*

This Commitment Letter sets forth the entire agreement between the parties with respect to the matters addressed herein, supersedes all prior communications, written or oral, with respect hereto, and may not be amended or modified except in a writing signed by all parties. This Commitment Letter may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same letter. Delivery of an executed counterpart of a signature page to this letter by facsimile or other electronic transmission shall be as effective as delivery of a originally executed counterpart of this letter.

The provisions under the "Confidentiality," "Information," "Fees and Expenses," "Indemnification," "Governing Law," "Waiver of Jury Trial" and "Miscellaneous" headings herein shall (i) survive any termination or expiration of this Commitment Letter, and (ii) remain in full force and effect regardless of whether the Exit Facilities Documentation is executed and delivered; provided that to the extent of any inconsistency between any provision herein and any provision in the Exit Facilities Documentation, as executed and delivered, the provision in the Exit Facilities Documentation shall prevail and supersede the provision herein.

This Commitment Letter is (a) not assignable by you without our prior written consent (and any purported assignment without such consent shall be null and void and of no force and effect), (b) intended solely for the benefit of the parties hereto and the Indemnified Parties, and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Indemnified Parties to the extent expressly set forth herein.

This Commitment Letter may not be amended or waived except by an instrument in writing signed by each party hereto.

*[Remainder of page left intentionally blank]*

Unless otherwise agreed to in writing by us, this Commitment Letter shall expire at 11:59 p.m. (New York time) on December 3, 2010, unless prior thereto we have received a copy of this Commitment Letter signed by each party. In the event that the Closing Date does not occur by the Outside Date (to be acceptable to Lender in its sole discretion), our commitment to provide the Exit Facilities shall automatically expire on such date. If you elect to deliver this letter by facsimile or other electronic means, please arrange for the executed original to follow by next-day courier.

Very truly yours,

**MOUNT KELLETT CAPITAL
MANAGEMENT LP**

**By: Mount Kellett Capital Partners GP LLC, its
general partner**

By: _____
Name: Mark McGoldrick
Title: Managing Partner

**AGREED AND ACCEPTED**

This 3rd day of December, 2010

**GBP DEVELOPMENT, LTD.**

By: GBP Development, LLC, a Florida limited liability company, as sole general partner of GBP Development, Ltd.

By: GB Peninsula, Ltd., a Florida limited partnership, as a member of GBP Development, LLC and limited partner of GBP Development, Ltd.

By: GBPeninsula, Inc., a Florida corporation, as sole general partner of GB Peninsula, Ltd..

By: _____
Aubrey J. Ferrao, as chief executive officer and not individually

**GBP DEVELOPMENT, LLC**

By: GB Peninsula, Ltd., a Florida limited partnership, as a member of GBP Development, LLC and limited partner of GBP Development, Ltd.

By: GB Peninsula, Inc., a Florida corporation, as sole general partner of GB Peninsula, Ltd..

By: _____
Aubrey J. Ferrao, as chief executive officer and not individually

**GBFC DEVELOPMENT, LTD.**

By:    GBFC Development, LLC, a Delaware limited
liability company, as sole general partner of GBFC
Development, Ltd.

By:    Fiddler's Creek, LLC, a Delaware limited liability
company, as authorized manager and sole member
of GBFC Development, LLC

        By:    GBFC II, L.P., a Delaware limited
partnership, as manager and member of
Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability
company, as sole general partner of GBFC
II, L.P.

        By:    _____
Aubrey J. Ferrao, as chief executive officer
and not individually

**GBFC DEVELOPMENT, LLC**

By:    Fiddler's Creek, LLC, a Delaware limited liability
company, as authorized manager and sole member
of GBFC Development, LLC

        By:    GBFC II, L.P., a Delaware limited
partnership, as manager and member of
Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability
company, as sole general partner of GBFC
II, L.P.

        By:    _____
Aubrey J. Ferrao, as chief executive officer
and not individually

**GB PENINSULA, LTD**

By: GB Peninsula, Inc., as sole general partner of GB Peninsula, Ltd.

By: _____
Aubrey J. Ferrao, as president and not individually

**GBFC MARINA, LTD.**

By: FC Marina, LLC, a Delaware limited liability company, as sole general partner of GBFC Marina, Ltd.

By: Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Marina, LLC and limited partner of GBFC Marina, Ltd.

　　By: GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

　　By: GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

　　By: _____
Aubrey J. Ferrao, as chief executive officer and not individually

**FC MARINA, LLC**

By:    Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Marina, LLC

        By:    GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

        By:    _____
                Aubrey J. Ferrao, as chief executive officer and not individually


**FC RESORT, LTD.**

By:    FC Resort, LLC, a Delaware limited liability company, as sole general partner of FC Resort, Ltd.

By:    Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Resort, LLC and limited partner of FC Resort, Ltd.

        By:    GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

        By:    _____
                Aubrey J. Ferrao, as chief executive officer and not individually

**FC RESORT, LLC**

By:     Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Resort, LLC

    By:     GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

    By:     GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

    By:     _____
        Aubrey J. Ferrao, as chief executive officer and not individually

**FC HOTEL, LTD.**

By:     FC Hotel, LLC, a Delaware limited liability company, as sole general partner of FC Hotel, Ltd.

By:     Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Hotel, LLC and limited partner of FC Hotel, Ltd.

    By:     GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

    By:     GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

    By:     _____
        Aubrey J. Ferrao, as chief executive officer and not individually

**FC HOTEL, LLC**

By:     Fiddler's Creek, LLC, a Delaware limited liability
company, as authorized manager and sole member
of FC Hotel, LLC

> By:     GBFC II, L.P., a Delaware limited
> partnership, as manager and member of
> Fiddler's Creek, LLC
>
> By:     GBFC II, LLC, a Delaware limited liability
> company, as sole general partner of GBFC
> II, L.P.
>
> By:     _____
> Aubrey J. Ferrao, as chief executive officer
> and not individually

**GULF BAY HOTEL COMPANY, LTD.**

By:     Gulf Bay Hotel Company, LLC, a Delaware limited
liability company, as sole general partner of Gulf
Bay Hotel Company , Ltd.

By:     Fiddler's Creek, LLC, a Delaware limited liability
company, as authorized manager and sole member
of Gulf Bay Hotel Company, LLC and limited
partner of Gulf Bay Hotel Company, Ltd.

> By:     GBFC II, L.P., a Delaware limited
> partnership, as manager and member of
> Fiddler's Creek, LLC
>
> By:     GBFC II, LLC, a Delaware limited liability
> company, as sole general partner of GBFC
> II, L.P.
>
> By:     _____
> Aubrey J. Ferrao, as chief executive officer
> and not individually

**GULF BAY HOTEL COMPANY, LLC**

By: Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of Gulf Bay Hotel Company, LLC

    By: GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

    By: GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

    By: _____
    Aubrey J. Ferrao, as chief executive officer and not individually

**GULF BAY HOSPITALITY, LTD.**

By: Gulf Bay Hospitality Company, LLC, a Delaware limited liability company, as sole general partner of Gulf Bay Hospitality , Ltd.

By: Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of Gulf Bay Hospitality Company, LLC and limited partner of Gulf Bay Hospitality, Ltd.

    By: GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

    By: GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

    By: _____
    Aubrey J. Ferrao, as chief executive officer and not individually

**GULF BAY HOSPITALITY COMPANY, LLC**

By:    Fiddler's Creek, LLC, a Delaware limited liability
company, as authorized manager and sole member
of Gulf Bay Hospitality Company, LLC

        By:    GBFC II, L.P., a Delaware limited
partnership, as manager and member of
Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability
company, as sole general partner of GBFC
II, L.P.

        By:    _____
Aubrey J. Ferrao, as chief executive officer
and not individually

**FIDDLER'S CREEK MANAGEMENT, INC.**

By:    _____
Aubrey J. Ferrao, as chief executive officer and not
individually

**FIDDLER'S CREEK, LLC**

        By:    GBFC II, L.P., a Delaware limited
partnership, as manager and member of
Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability
company, as sole general partner of GBFC
II, L.P.

        By:    _____
Aubrey J. Ferrao, as chief executive officer
and not individually

**FC GOLF, LTD.**

By: FC Golf, LLC, a Delaware limited liability company, as sole general partner of FC Golf, Ltd.

By: Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Golf, LLC

    By: GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

    By: GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

    By: _____
    Aubrey J. Ferrao, as chief executive officer and not individually

**FC GOLF, LLC**

By: Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Golf, LLC

    By: GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

    By: GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

    By: _____
    Aubrey J. Ferrao, as chief executive officer and not individually

**DY LAND HOLDINGS II, LLC**

By:    Fiddler's Creek, LLC, a Delaware limited liability
company, as authorized manager and sole member
of DY Land Holdings II, LLC

        By:    GBFC II, L.P., a Delaware limited
partnership, as manager and member of
Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability
company, as sole general partner of GBFC
II, L.P.

        By:    _____
Aubrey J. Ferrao, as chief executive officer
and not individually


**FC COMMERCIAL, LLC**

By:    Fiddler's Creek, LLC, a Delaware limited liability
company, as authorized manager and sole member
of FC Commercial, LLC

        By:    GBFC II, L.P., a Delaware limited
partnership, as manager and member of
Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability
company, as sole general partner of GBFC
II, L.P.

        By:    _____
Aubrey J. Ferrao, as chief executive officer
and not individually

**FC PARCEL 73, LLC**

By:     Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Parcel 73, LLC

      By:     GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

      By:     GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

      By:     _____
              Aubrey J. Ferrao, as chief executive officer and not individually


**DY LAND ASSOCIATES, LTD**

By:     DY Associates, LLC, a Florida limited liability company, as sole general partner of DY Land Associates, Ltd.

By:     Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of DY Associates, LLC

      By:     GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

      By:     GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

      By:     _____
              Aubrey J. Ferrao, as chief executive officer and not individually

**DY ASSOCIATES, LLC**

By: Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of DY Associates, LLC

    By: GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

    By: GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

    By: _____
Aubrey J. Ferrao, as chief executive officer and not individually

**951 LAND HOLDINGS, LTD**

By: 951 Land Holdings, LLC, a Delaware limited liability company, as sole general partner of 951 Land Holdings, Ltd.

By: Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of 951 Land Holdings, LLC

    By: GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

    By: GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

    By: _____
Aubrey J. Ferrao, as chief executive officer and not individually

**951 LAND HOLDINGS, LLC**

By:    Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of 951 Land Holdings, LLC

        By:    GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

        By:    _____
                 Aubrey J. Ferrao, as chief executive officer and not individually

**FC BEACH, LTD.**

By:    FC Beach, LLC, a Delaware limited liability company, as sole general partner of FC Beach, Ltd.

By:    Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Beach, LLC

        By:    GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

        By:    _____
                 Aubrey J. Ferrao, as chief executive officer and not individually

**FC BEACH, LLC**

By:    Fiddler's Creek, LLC, a Delaware limited liability company, as authorized manager and sole member of FC Beach, LLC

        By:    GBFC II, L.P., a Delaware limited partnership, as manager and member of Fiddler's Creek, LLC

        By:    GBFC II, LLC, a Delaware limited liability company, as sole general partner of GBFC II, L.P.

        By:    _____
                Aubrey J. Ferrao, as chief executive officer and not individually

**Annex I to Commitment Letter**

**Exit Term Sheet**

(Attached)

## SUMMARY OF TERMS AND CONDITIONS
## $30,000,000 Senior Secured Exit Credit Facilities

This term sheet (this "***Term Sheet***") is a summary of certain terms and conditions of senior secured exit credit facilities (the "***Exit Facilities***") to be provided in connection with the plans and/or joint plans of reorganization (each, as may be amended, modified or otherwise supplemented from time to time, and in form and substance acceptable to the Lender in its sole discretion, a "***Plan***," and collectively, the "***Plans***") in respect of Fiddler's Creek, LLC ("***FC***") and certain of its subsidiaries and affiliates, all as listed on <u>Appendix A</u> hereto (collectively, the "***Debtors***"). The Debtors are debtors-in-possession in cases jointly administered under Case No. 10-03846 in the United States Bankruptcy Court for the Middle District of Florida (the "***Bankruptcy Court***") under chapter 11 of the Bankruptcy Code (collectively, the "***Chapter 11 Cases***").

This Term Sheet is intended merely to be an outline of certain of the material terms of the Exit Facilities, and does not purport to be exhaustive as to all terms, conditions and other provisions that would govern any proposed financing hereunder. This Term Sheet is annexed to and forms a part of that certain commitment letter, dated December 3, 2010 (the "***Commitment Letter***") of Lender, and is subject to the terms and conditions herein and therein, including, without limitation, the execution and delivery of definitive documentation in respect of the Exit Facilities all in form and substance reasonably acceptable to Borrowers (as defined below) and Lender (as defined below) (the "***Exit Facilities Documentation***"). This Term Sheet is not intended to limit the scope of discussion and negotiation of any matters not inconsistent with the specific matters set forth herein and in the Commitment Letter.

For purposes of this Term Sheet, (i) "***Prepetition Mortgages***" means, collectively, those certain prepetition mortgages granted in favor of the Prepetition Secured Lenders (as defined in the Declaration of Anthony DiNardo in Support of Chapter 11 Petitions and First Day Pleadings, dated February 24, 2010, filed in the Chapter 11 Cases [Docket No. 29] (the "***DiNardo Declaration***")) over certain of the Debtors' real property and related assets (collectively, the "***Prepetition Collateral***"), all as more fully described in the DiNardo Declaration;[1] (ii) "***Undischarged Prepetition Collateral***" means any Prepetition Collateral that will not have the respective Prepetition Mortgage thereon terminated, released or discharged under the Plans, as more fully described in such Plans, which shall be in form and substance acceptable to the Lender in its sole discretion; and (iii) "***DIP Credit Facilities***" means, collectively, the post-petition credit facilities under (A) that certain Debtor-in-Possession Credit and Security Agreement, dated as of March 3, 2010, between Gulf Bay Capital, Inc., as lender, and FC and GB Peninsula Ltd., as borrowers, and the other Debtors, as guarantors (as may be amended, modified or supplemented from time to time, the "***DIP Credit Agreement***"), and (B) those certain agreements, documents and instruments executed and/or delivered with, to or in favor of Textron Financial Corporation ("***Textron***") pursuant to the terms and conditions set forth in that

---

[1] The Prepetition Collateral is comprised of the Regions Collateral, Fifth Third Collateral, KeyBank Collateral, Textron Collateral, Orion Collateral, FFI Collateral, Tomen 1 Collateral, Tomen 2 Collateral, and Mellon Collateral (each term as defined in the DiNardo Declaration).

certain term sheet dated June 1, 2010 by and between FC Golf, Ltd. and Textron [attached as Exhibit "A" to Docket No. 241].

## I.   Parties

*Borrowers*

Borrowers shall be all of the Debtors who are reorganized pursuant to the Plans (collectively, the "***Borrowers***").

*Guarantor*

Aubrey Ferrao, who shall provide a customary "bad boy" guarantee in form and substance satisfactory to Lender and Mr. Ferrao.

*Lender*

Mount Kellett Capital Management LP or one or more funds or accounts to be designated by it ("***Lender***").

## II.   Exit Facilities

*Amounts and Availability*

Term loan facilities in an aggregate principal amount of $30,000,000, comprised as follows:

(i)   Tranche A Credit Facility.  A term loan facility to be available in a single drawing on the Closing Date (as defined below) in an aggregate principal amount equal to an amount to be agreed by Borrower and Lender to be sufficient to fund distributions and other obligations under the Plan and provide working capital (as set forth in the Business Plan (as defined below), such amount not to be less that $15,000,000 and not more than $20,000,000   (the "***Tranche A Commitment***," and the loan thereunder, the "***Tranche A Loan***").

(ii)   Tranche B Credit Facility.  A delayed multiple-draw term loan credit facility in an aggregate principal amount equal to $30,000,000 minus the amount of the Tranche A Loan (such amount, the "***Tranche B Commitment***", together with the Tranche A Commitment, the "***Commitments***"), to be made available in two separate draws:  (A) an amount of not less than $5,000,000, in multiples of $5,000,000, on the first anniversary of the Closing Date (such amount drawn, the "***Tranche B1 Loan***"); and (B) subject to the Tranche B2 Bench Mark (as defined below), an amount up to the balance of the undrawn Commitments, on the second anniversary of the Closing Date (such amount   drawn, the

"***Tranche B2 Loan***"; together with the Tranche B1 Loan, the "***Tranche B Loans***"; and together with the Tranche A Loan, the "***Loans***"), each such draw to occur on not less than 30 days' prior written notice to Lender.

Amounts borrowed under the Exit Facilities that are repaid may not be reborrowed.

*Maturity*

All Loans shall be repaid four (4) years after the Closing Date (the "***Maturity Date***"), subject to an extension of the Maturity Date for a period of [one (1) year][2] in the event the Borrowers have net cash flows, on an aggregate basis, for the first three (3) years of the loan term, equal to at least 80% of the aggregate net cash flows projected in the Economic Model (as defined below) .

*Use of Proceeds*

The proceeds of the Loans shall be used: (i) to satisfy administrative expense and certain other claims in the Chapter 11 Cases, all as set forth in the Plans; (ii) to satisfy and repay, as provided in the Plans, some or all of the outstanding indebtedness under the DIP Credit Facilities as of the Closing Date; (iii) to finance the Company's working capital and for general corporate purposes, all consistent with the Business Plan (as defined below) which shall be subject to approval by Lender in its sole discretion; and (iv) for any other purpose approved by Lender in its sole discretion.

**III.  Lender Membership Interests**

Prior to the Closing, GBFC II, LP and GBFC II Two, LLC shall contribute their equity interest in the reorganized Fiddlers' Creek LLC to a newly formed limited liability company ("***Newco***"). Lender (or its affiliate) (the "***Mount Kellett Member***"), shall receive a grant of (i) a preferred membership interest entitling the Mount Kellett Member to receive distributions equal to a 15% per annum return on the principal amount of the Loans outstanding before any distributions (other than tax distributions) are made to the holders of the common membership interests in Newco, and (ii) a 50% common membership interest in Newco entitling the Mount Kellett Member to receive 50% of all distributions made to holders of the common membership

---

[2] [To be confirmed.]

interests. No distributions shall be made in respect of the membership interests in Newco (other than tax distributions) until the Loans are repaid in full.

The limited liability company agreement of Newco shall have the terms set forth below and shall otherwise be in form and substance satisfactory to the Lender in its sole discretion

The day to day matters of Newco shall be conducted by the asset manager in accordance with the approved business plan. [Gulf Bay] will be the asset manager for Newco and its subsidiaries, subject to and on terms of an asset management agreement in form and substance satisfactory to the Lender. Certain major decisions, including approval of annual budgets and business plans, bulk sales of properties, incurrence of indebtedness and other matters will require the approval of the Mount Kellett Member. Either Member shall have the right to cause the sale of portions of the project in accordance with minimum sale prices to be set forth in the approved business plan. The limited liability company will also provide for restrictions on transfers of membership interests and rights of first offer on transfers on terms satisfactory to the Lender in its sole discretion.

## IV. **Certain Payment Provisions**

*Interest Rates; Amortization*

All outstanding Loans shall bear interest at a rate of 10.0% per annum (the "***Non-Default Rate***"), and shall be paid monthly. Interest shall be due and payable on the last business day of each month, in arrears.

At any time when an event of default has occurred and is continuing, all amounts due shall bear interest at 2.0% above the Non-Default Rate.

Any outstanding Loan amount remaining unpaid as of the Maturity Date shall be due and payable in full on such Maturity Date.

*Mandatory Prepayments; Priority of Prepayments*

Subject to customary and appropriate exceptions to be agreed upon, the Loans shall be prepaid in an amount equal to 75% of the Net Cash Proceeds (as defined below) of any sale or other disposition (in each case, a "***Disposition***") of any Real Property Collateral (as defined below), with the remaining 25% to be used for approved expenses and capital

expenditures in accordance an agreed-upon budget. "***Net Cash Proceeds***" shall be proceeds of Disposition net of (i) reasonable closing costs, including past due real estate taxes and CDD obligations, if any, (ii) in the case of a Disposition of any assets comprising Undischarged Prepetition Collateral, amounts required to satisfy outstanding indebtedness (if any) to the relevant Prepetition Secured Lender(s), and (iii) reserves for tax distributions.

Each such prepayment shall be applied in order of maturity: <u>first</u>, to prepay principal outstanding under the Tranche A Loan, and <u>second and</u> <u>third</u>, to prepay the principal outstanding under each of the Tranche B1 Loan and Tranche B2 Loan, respectively, as may then be outstanding. All mandatory prepayments hereunder shall be payable without premium or penalty.

No portion of the Loans may be prepaid at any time prior to the second anniversary of the Closing Date without the consent of the Lender. Any portion of the Loans prepaid may not be reborrowed.

## V.  Security

*Collateral and Priority*

All of the Loans shall be secured by:

(i)    a perfected second mortgage, second priority interest and/or a subordinate assignment, as may be applicable, in the Undischarged Prepetition Collateral (if any), and all proceeds and products thereof;

(ii)   (1) a perfected first mortgage in all of Borrowers' other real property, including any improvements thereon, (2) an assignment of all related leases, rents, deposits, letters of credit, income and profits, (3) an assignment and/or a perfected security interest in all other related contracts, agreements and personal property, and (4) all proceeds and products of the foregoing (each of the collateral set forth in (i) and (ii) being, collectively, the "***Real Property Collateral***"); and

(iii)  except to the extent that it comprises Real Property Collateral, a perfected first priority security interest in all of the Borrowers' owned

or acquired personal property and assets, including, but not limited to, all machinery and equipment, inventory and other goods, accounts receivable, leaseholds, fixtures, bank accounts, general intangibles, financial assets, investment property, license rights, patents, trademarks, trade names, copyrights, chattel paper, insurance proceeds, contract rights, hedge agreements, documents, instruments, indemnification rights, tax refunds, cash and cash equivalents, and investment property (including interests in subsidiaries), and all proceeds and products thereof

(all of the foregoing set forth in (i), (ii) and (iii), collectively, the "*Collateral*").[3]

None of the Collateral shall be subject to any other pledge, security interest or mortgage, other than (x) in the case of the Undischarged Prepetition Collateral (if any), liens securing the Prepetition Mortgages (if any) in favor of the applicable Prepetition Secured Lenders as set forth in the applicable Plan, and (y) certain customary and appropriate permitted liens to be agreed upon in the Exit Facilities Documentation, including liens for real estate taxes and CDD obligations treated under the applicable Plans.

All liens and security interests securing the indebtedness under the DIP Credit Facility shall be terminated, released and discharged as of the effective date(s) of the Plans.[4]

| | |
|---|---|
| *Certain Releases upon Dispositions* | A Borrower shall be entitled to the release of the liens and security interests over its Real Property Collateral upon a Disposition of such Real Property Collateral; <u>provided</u> <u>that</u> (i) the Net Cash Proceeds of such Disposition (which shall be applied to prepay the Loans, as set forth above) meet certain minimum release prices to be specified, (ii) no event of default shall have occurred in respect of such Borrower (which event of default has not been waived in writing by Lender in its sole discretion), and (iii) such Borrower shall execute any loan documentation required by Lender in connection with such release and shall reimburse Lender for any costs and expenses incurred in respect of such release. |

---

[3] [TBD whether intercreditor agreement required.]
[4] [Subject to review of Plans.]

## VI.  Covenants[5]

| | |
|---|---|
| *Financial Covenants* | Usual and appropriate financial covenants for facilities of this type and size, and reasonably acceptable to Lender, including, without limitation, maximum capital expenditures, maximum operating expenditures and maintenance of minimum loan-to-value ratios (based on appraisal values). |
| *Financial Reporting* | Usual and appropriate reporting for facilities of this type and size, and reasonably acceptable to Lender, including, without limitation, unaudited monthly financial statements and annual audited financial statements and projections. |
| *Affirmative and Negative Covenants* | Usual and appropriate covenants for facilities of this type and size, and reasonably acceptable to Lender. |

## VII.  Events of Default

Usual and appropriate for facilities of this type and size, and reasonably acceptable to Lender (subject to certain exceptions, materiality standards and grace periods), including, without limitation:  failure to pay interest, principal, expenses or other amounts when due; any representation and warranty found to be incorrect in any material respect, breach of any affirmative, negative or financial covenant; any judgment in excess of an amount to be agreed upon; cross-default; and bankruptcy defaults.

## VIII. Conditions

*Conditions Precedent to Closing*

The Exit Facilities Documentation shall contain customary and appropriate conditions precedent to closing for facilities of this type and size, and those additional deemed appropriate by Lender for this transaction, which conditions shall in any case include, without limitation:

(i) the Exit Facilities Documentation shall have been executed in form and substance reasonably satisfactory to Lender;

(ii) an Operating Agreement for Newco shall have been executed having terms consistent with this Term Sheet and shall otherwise be in form and substance satisfactory to Lender;

(iii) Lender shall have received a copy of Borrowers' business plan (the "***Business Plan***"), which shall

---

[5] [Subject to review of Business Plan.]

not be amended, supplemented or otherwise modified without the express written consent of Lender, provided however, that in the event the Borrowers and the Lender cannot agree on the terms of any subsequent annual business plan provided by the Borrowers, then the Borrowers and the Lender agree to proceed under a business plan reflecting revenues and expenses at levels of 70% of those reflected in the prior approved Business Plan;

(iv)    confirmation by the Bankruptcy Court of each Plan and related documents (collectively, the "***Plan Documents***") in form and substance acceptable to Lender in its sole discretion, pursuant to a final, non-appealable order in form and substance acceptable to Lender in its sole discretion (the "***Confirmation Order***"), which Confirmation Order shall, among other things: (A) approve (1) entry into, and execution by, Debtors of the Exit Facilities Documentation, (2) the fee payment, expense reimbursement and indemnification provisions in the Exit Facilities Documentation, (3) the releases, injunctions and exculpations in favor of Lender provided in the Plans; (B) provide that, except as expressly consented to in writing by Lender, the Bankruptcy Court's retention of jurisdiction under such Plan and Confirmation Order shall not govern the enforcement of the Exit Facilities Documentation or any rights or remedies related thereto; and (C) such other matters as may be requested by Lender;

(v)    all other conditions to effectiveness of each Plan shall, in the reasonable judgment of Lender, have been satisfied or, with the prior written consent of Lender, waived; and

(vi)    none of the Exit Facilities Documentation (as executed and delivered), the Plans or Plan Documents shall have been amended, modified or supplemented without Lender's prior and express written approval.

*Conditions Precedent to Advances under the Tranche B*    Advances under the Tranche B Commitments shall be subject to conditions customary and appropriate for facilities

| | |
|---|---|
| *Commitments* | of this type and size, and those additional deemed appropriate by Lender for this transaction, including, without limitation the absence of any default under the Exit Facilities Documentation, and the following: |

<blockquote>

(i) <u>Tranche B1 Loan.</u>  On the first anniversary of the Closing Date, Borrowers shall be entitled to draw an amount up to the amount of the Tranche B Commitment, which amount drawn shall not be less than $5,000,000 and shall be in multiples of $5,000,000.

(ii) <u>Tranche B2 Loan.</u>  On the second anniversary of the Closing Date, Borrowers shall be entitled to draw an amount equal to the balance of the undrawn Commitments, provided that Borrowers' net cash flows for the 24-month period immediately following the Closing Date shall have equaled at least 80% of the economic model set forth in the Business Plan (the "***Economic Model***") (the "***Tranche B2 Bench Mark***").

</blockquote>

| | |
|---|---|
| **IX.  <u>Closing Date</u>** | The closing date ("***Closing Date***") for the transactions contemplated herein shall occur on the date on which all conditions to the closing have been satisfied or waived in accordance with terms and conditions of the Exit Facilities Documentation, including, without limitation, the occurrence of the effective date(s) of the Plans, but in no event later than [_____], 2011 (the "***Outside Date***"). |
| **X.  <u>Miscellaneous</u>** | |
| *Lender Fee* | The Exit Facilities Documentation shall provide for payment to Lender of a commitment fee in an amount equal to 2.0% of the aggregate Commitments, due and payable on the Closing Date. |
| *Lender Expense Reimbursement and Indemnification* | The Exit Facilities Documentation shall include usual and customary lender expense reimbursement and indemnification provisions, which shall, in any case, be no less favorable to Lender than those set forth in the DIP Credit Agreement. |
| *Assignments; Participations* | Lender shall be permitted to assign and sell participations in any of the Commitments and Loans in its sole discretion and without consent of Borrowers following the earliest of the second anniversary of the Closing Date, the draw down in |

full of the Tranche B Commitment or the occurrence of an Event of Default under the Exit Facilities Documentation.

| | |
|---|---|
| *Governing Law; Forum* | State of New York.  Exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan in the City of New York, NY. |

## Appendix A
## Debtors

Fiddler's Creek, LLC
951 Land Holdings, LLC
951 Land Holdings, Ltd.
DY Associates, LLC
DY Land Associates, Ltd.
FC Beach, LLC
FC Beach, Ltd.
FC Golf, LLC
FC Golf, Ltd.
FC Hotel, LLC
FC Hotel, Ltd.
FC Marina, LLC
FC Resort, LLC
FC Resort, Ltd.
Fiddler's Creek Management, Inc.
GBFC Development, LLC
GBFC Development, Ltd.
GBFC Marina, Ltd.
Gulf Bay Hospitality Company, LLC
Gulf Bay Hospitality, Ltd.
Gulf Bay Hotel Company, LLC
Gulf Bay Hotel Company, Ltd.
DY Land Holdings II, LLC
FC Commercial, LLC
FC Parcel 73, LLC
GB Peninsula, Ltd.
GBP Development, Ltd.
GBP Development, LLC

## EXHIBIT B

## Assumed Contracts

## EXHIBIT C

## Legal Description of the Colonnade Collateral