| | |
|---|---|
| **In re:** | **Chapter 11** |
| | |
| **FIDDLER'S CREEK, LLC** | **Case No. 9:10-bk-03846-ALP** |
| 951 LAND HOLDINGS, LLC | Case No. 9:10-bk-03852-ALP |
| DY ASSOCIATES, LLC | Case No. 9:10-bk-03856-ALP |
| GBFC DEVELOPMENT, LLC | Case No. 9:10-bk-03864-ALP |
| FC MARINA, LLC | Case No. 9:10-bk-03872-ALP |
| FC BEACH, LLC | Case No. 9:10-bk-03873-ALP |
| FC GOLF, LLC | Case No. 9:10-bk-03875-ALP |
| DY LAND HOLDINGS 11, LLC | Case No. 9:10-bk-03878-ALP |
| FC PARCEL 73, LLC | Case No. 9:10-bk-03881-ALP |
| FC COMMERCIAL, LLC | Case No. 9:10-bk-03888-ALP |
| FC HOTEL, LLC | Case No. 9:10-bk-03886-ALP |
| FC RESORT, LLC | Case No. 9:10-bk-03896-ALP |
| GULF BAY HOSPITALITY COMPANY, LLC | Case No. 9:10-bk-03898-ALP |
| GULF BAY HOTEL COMPANY, LLC | Case No. 9:10-bk-03905-ALP |
| GBP DEVELOPMENT, LLC | Case No. 9:10-bk-03908-ALP |
| GB PENINSULA, LTD. | Case No. 9:10-bk-03909-ALP |
| 951 LAND HOLDINGS, LTD. | Case No. 9:10-bk-03911-ALP |
| DY LAND ASSOCIATES, LTD. | Case No. 9:10-bk-03918-ALP |
| GBFC DEVELOPMENT, LTD. | Case No. 9:10-bk-03920-ALP |
| GBFC MARINA, LTD. | Case No. 9:10-bk-03928-ALP |
| FC BEACH, LTD. | Case No. 9:10-bk-03934-ALP |
| FC GOLF, LTD. | Case No. 9:10-bk-03937-ALP |
| FC HOTEL, LTD. | Case No. 9:10-bk-03938-ALP |
| FC RESORT, LTD. | Case No. 9:10-bk-03947-ALP |
| GULF BAY HOSPITALITY, LTD. | Case No. 9:10-bk-03949-ALP |
| GULF BAY HOTEL COMPANY, LTD. | Case No. 9:10-bk-03950-ALP |
| GBP DEVELOPMENT, LTD. | Case No. 9:10-bk-03952-ALP |
| FIDDLER'S CREEK MANAGEMENT, INC. | Case No. 9:10-bk-03954-ALP |
| | |
| | **(Jointly Administered under** |
| **Debtors.** | **Case No. 9:10-bk-03846-ALP)** |

_____/

i

# JOINT CONSOLIDATED DISCLOSURE STATEMENT FOR PLANS OF REORGANIZATION OF THE DEBTORS PURSUANT TO <u>CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE</u>

Respectfully Submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
Paul J. Battista, Esq.
Bart A. Houston, Esq.
Mariaelena Gayo-Guitian, Esq.
100 S.E. Second Street, 44TH Floor
Miami, Florida 33131
Telephone:    (305) 349-2300
Facsimile:    (305) 349-2310
Email:        pbattista@gjb-law.com
Email:        bhouston@gjb-law.com
Email:        mguitian@gjb-law.com

Counsel for Debtors and Debtors in Possession

Tampa, Florida
Dated as of December 3, 2010.

THIS JOINT DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE DEBTORS' PLANS OF REORGANIZATION UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE DATED AS OF DECEMBER 3, 2010 (AS AMENDED FROM TIME TO TIME, THE "PLANS"), AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR SECURITIES LAWS OR OTHER LEGAL EFFECTS OF THE PLANS ON HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS. ANY CREDITOR OR OTHER PARTY BUYING OR SELLING A CLAIM BASED ON THE INFORMATION CONTAINED HEREIN, INCLUDING ANY EXHIBIT ATTACHED HERETO DOES SO AT ITS OWN RISK.

ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLANS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE ENTIRE DISCLOSURE STATEMENT FURNISHED TO THEM AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, PRIOR TO SUBMITTING A BALLOT RESPECTIVELY, PURSUANT TO THIS SOLICITATION. THE DESCRIPTION OF THE PLANS CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLANS THEMSELVES. EACH CREDITOR AND HOLDER OF AN EQUITY INTEREST SHOULD READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLANS.

**THE PLANS PROPOSE EXCULPATION FROM LIABILITY AS TO THE DEBTORS AND VARIOUS NON-DEBTOR PARTIES FOR CERTAIN POSTPETITION ACTIONS IN CONNECTION WITH THE BANKRUPTCY CASES, WHICH PROVISIONS WOULD ENJOIN THE DEBTORS, HOLDERS OF CLAIMS, AND HOLDERS OF EQUITY INTERESTS FROM PURSUING CERTAIN ACTIONS AGAINST SUCH PARTIES EXCEPT AS OTHERWISE PROVIDED IN THE PLAN. ALL CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO READ CAREFULLY THOSE PROVISIONS OF THE PLANS ON EXCULPATION FROM LIABILITY WHICH ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT.**

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLANS OR THE SOLICITATION OF ACCEPTANCES OF THE PLANS TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. THIS DISCLOSURE STATEMENT IS DATED AS OF DECEMBER 3, 2010, AND CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE ENCOURAGED TO REVIEW THE DOCKET IN THE BANKRUPTCY

CASES IN ORDER TO APPRISE THEMSELVES OF EVENTS WHICH OCCUR BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THIS DISCLOSURE STATEMENT AND IN THE PLANS CONCERNING THE DEBTORS' BUSINESSES, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, THE PROJECTIONS FOR THE REORGANIZED DEBTORS' OPERATIONS, TRANSACTIONS TO WHICH THE DEBTORS WERE OR ARE PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLANS ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTORS AND NOT TO ANY OTHER PARTY. NONE OF THE ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS RETAINED BY THE DEBTORS OR THE COMMITTEE MAKES ANY REPRESENTATIONS CONCERNING SUCH INFORMATION.

THE DEBTORS HAVE ATTEMPTED TO PRESENT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ACCURATELY AND FAIRLY. THE ASSUMPTIONS UNDERLYING THE ANTICIPATION OF FUTURE EVENTS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT AN ESTIMATE BY THE DEBTORS, BUT BECAUSE THESE ARE ONLY ASSUMPTIONS OR PREDICTIONS OF FUTURE EVENTS (MOST OF WHICH ARE BEYOND THE DEBTORS' CONTROL), THERE CAN BE NO ASSURANCE THAT THE EVENTS WILL OCCUR.

IN THE EVENT THAT ANY IMPAIRED CLASS OF CLAIMS OR EQUITY INTERESTS VOTES TO REJECT THE PLANS, (1) THE DEBTORS MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLANS WITH RESPECT TO THAT CLASS UNDER THE BANKRUPTCY CODE'S "CRAMDOWN" PROVISIONS AND, IF REQUIRED, MAY AMEND THE PLANS TO CONFORM TO SUCH REQUIREMENTS, OR (2) THE PLANS MAY BE OTHERWISE MODIFIED OR WITHDRAWN.

THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS TO ACCEPT THE PLANS AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH IN THE SECTION OF THIS DISCLOSURE STATEMENT TITLED "VOTING ON AND CONFIRMATION OF THE PLAN."

# TABLE OF CONTENTS

I.        INTRODUCTION AND SUMMARY .................................................. 1
  A.    Overview .......................................................................................... 1
  B.    Rules of Interpretation ..................................................................... 1

II.       PURPOSE OF THIS DISCLOSURE STATEMENT ........................ 2
  A.    Summary of Treatment of Claims and Equity Interests under the Plans...................... 3
  B.    General Voting Procedures, Ballots, and Voting Deadline ............... 3
  C.    Confirmation Hearing and Deadline for Objections to Confirmation ................ 4

III.     BACKGROUND REGARDING THE DEBTORS.................................. 5
  A.    Corporate History ........................................................................... 5
  B.    Overview of Business Operations.................................................... 5
  C.    The Debtors' Prepetition Secured Lenders...................................... 9
  D.    Community Development District ("CDD") Special Assessments.......................... 15

IV.     EVENTS PRECIPITATING CHAPTER 11 FILINGS......................... 19
  A.    Adverse Market Conditions ........................................................... 19
  B.    The Debtors Cost Saving Initiatives and Efforts............................ 20
  C.    Significant Prepetition Litigation................................................... 21

V.      SIGNIFICANT EVENTS IN THE CHAPTER 11 CASES ................. 24
  A.    "First Day" Relief ......................................................................... 25
  B.    Developments During the Chapter 11 Cases ................................. 30

VI.     SUMMARY OF THE PLANS OF REORGANIZATION................... 38
  A.    Brief Explanation of Chapter 11 Reorganization .......................... 39
  B.    Classification of Claims and Equity Interests ............................... 39
  C.    Treatment of Unclassified Claims ................................................. 40
    1.    Administrative Claims. ............................................................. 40
    2.    United States Trustee's Fees ..................................................... 41
    3.    Priority Tax Claims ................................................................... 41
    4     DIP Lenders Allowed Claims. ................................................. 41
  D.    Request for Substantive Consolidation .......................................... 43
  E.    Treatment of Classified Claims and Equity Interests ..................... 43
  F.    Summary of Joint Plans of Reorganization .................................... 44

    1.    Joint Plan of Reorganization for GBFC Development, Ltd. and GBFC Development, LLC, as debtors and debtors in possession (collectively, the "GBFC Debtors")(the "GBFC Plan"). ……………………………………………………………………………………… …..44
    a)    Unclassified Claims. ................................................................. 44
    b)    Class 1:  Priority Claims. .......................................................... 44
    c)    Class 2: Secured Real Estate Tax Claims – GBFC Real Property. .............. 45
    d)    Class 3A:  Secured CDD Off Roll Bond Claims. ...................... 45
    e)    Class 3B:  Secured CDD Off Roll O&M Claims. ..................... 45
    f)    Class 4: Secured Claim of Regions Bank, N.A. ....................... 46
    g)    Class 5:  Unsecured Convenience Claims ................................ 47
    h)    Class 6:  Unsecured Claims (Unsecured Claims Not Otherwise Classified)............... 47

i)       Class 7: Equity Interests............................................................................ 48

2.      Joint Plan of Reorganization for FC Beach, Ltd. and FC Beach, LLC, as debtors and debtors in possession (collectively, the "FC Beach Debtors") (the "FC Beach Plan"). .......... 48
a)      Unclassified Claims. ................................................................................. 48
b)      Class 1: Priority Claims. .......................................................................... 48
c)      Class 2: Secured Real Estate Tax Claims.................................................. 49
d)      Class 3: Unsecured Convenience Claims .................................................. 49
e)      Class 4: Unsecured Claims (Unsecured Claims Not Otherwise Classified)................. 49
f)      Class 5: Equity Interests........................................................................... 50

3.      Joint Plan of Reorganization for DY Land Associates, Ltd. and DY Associates, LLC, as debtors and debtors in possession (collectively, the "DY Land Debtors")(the "DY Land Plan"). 50
a)      Unclassified Claims. ................................................................................. 50
b)      Class 1: Priority Claims. .......................................................................... 50
c)      Class 2: Secured Real Estate Tax Claims.................................................. 51
d)      Class 3A: Secured CDD Off Roll Bond Claims. ...................................... 51
e)      Class 3B: Secured CDD Off Roll O&M Claims. ..................................... 52
f)      Class 4: Secured Claim of Florida Financial Investments, Inc. ................. 52
g)      Class 5: Unsecured Convenience Claims .................................................. 52
h)      Class 6: Unsecured Claims (Unsecured Claims Not Otherwise Classified)................. 53
i)      Class 7: Equity Interests........................................................................... 53

4.      Joint Plan of Reorganization for 951 Land Holdings, Ltd. and 951 Land Holdings, LLC, as debtors and debtors in possession (collectively, the "951 Debtors")(the "951 Plan"). ........ 53
a)      Unclassified Claims. ................................................................................. 54
b)      Class 1: Priority Claims. .......................................................................... 54
c)      Class 2A: Secured Real Estate Tax Claims – KeyBank Collateral............................. 54
d)      Class 2B: Secured Real Estate Tax Claims – 951 Real Property (excluding the KeyBank Collateral). ................................................................................. 54
e)      Class 3A: Secured CDD Off Roll Bond Claims (KeyBank Collateral)....................... 55
f)      Class 3B: Secured CDD Off Roll Bond Claims- 951 Real Property (excluding the KeyBank Collateral) ................................................................ 55
g)      Class 3C: Secured CDD Off Roll O&M Claims – 951 Real Property (excluding the KeyBank Collateral). ................................................................ 55
h)      Class 4: Secured Claim of KeyBank, N.A. ............................................... 56
i)      Class 5: Secured Claim of Mellon United National Bank. ........................ 56
j)      Class 6: Secured Claim of Regions Bank, N.A. ........................................ 57
k)      Class 7: Unsecured Convenience Claims .................................................. 57
l)      Class 8: Unsecured Claims (Unsecured Claims Not Otherwise Classified)................. 57
m)      Class 9: Equity Interests. .......................................................................... 58

5.      Joint Plan of Reorganization for FC Golf, Ltd. and FC Golf, LLC, as debtors............. 58
and debtors in possession (collectively, the "FC Golf Debtors")(the "FC Golf Plan")............ 58
a)      Unclassified Claims. ................................................................................. 58
b)      Class 1: Priority Claims. .......................................................................... 58
c)      Class 2: Secured Real Estate Tax Claims.................................................. 59
d)      Class 3A: Secured CDD Off Roll Bond Claims. ...................................... 59
e)      Class 3B: Secured CDD Off Roll O&M Claims. ..................................... 60

f)     Class 4: Secured Claim of Textron Financial Corporation. ............................................. 60

g)     Class 5: Unsecured Convenience Claims ........................................................................ 60

h)     Class 6: Unsecured Claims (Unsecured Claims Not Otherwise Classified). ................. 61

i)     Class 7: Equity Interests.................................................................................................. 61

6.     Plan of Reorganization for Fiddler's Creek Management, Inc. (the "FCM Debtor")(the "FCM Plan"). ............................................................................................................................. 61

a)     Unclassified Claims. ....................................................................................................... 62

b)     Class 1: Priority Claims. ................................................................................................. 62

c)     Class 2: Unsecured Convenience Claims ....................................................................... 62

d)     Class 3: Unsecured Claims (Unsecured Claims Not Otherwise Classified). ................. 62

e)     Class 4: Equity Interests.................................................................................................. 63

7.     Joint Plan of Reorganization for GBP Development, Ltd, and GBP Development, LLC, as debtors and debtors in possession (collectively, the "GBP Debtors")(the "GBP Plan"). ...... 63

a)     Unclassified Claims. ....................................................................................................... 63

b)     Class 1: Priority Claims. ................................................................................................. 63

c)     Class 2: Secured Real Estate Tax Claims – Fifth Third Collateral). ................................ 64

d)     Class 3A: Secured CDD Off Roll Bond Claims – Fifth Third Collateral....................... 64

e)     Class 3B: Secured CDD Off Roll O&M Claims – Fifth Third Collateral. ..................... 64

f)     Class 4: Secured Claim of Fifth Third Bank, N.A. ......................................................... 64

g)     Class 5: Unsecured Convenience Claims ........................................................................ 65

h)     Class 6: Unsecured Claims (Unsecured Claims Not Otherwise Classified). ................. 65

i)     Class 7: Equity Interests.................................................................................................. 66

8.     Joint Plan of Reorganization for GB Peninsula, Ltd., as a debtor and debtor ................. 66 in possession (the "GB Debtor")(the "GB Plan")................................................................... 66

a)     Unclassified Claims. ....................................................................................................... 66

b)     Class 1: Priority Claims. ................................................................................................. 66

c)     Class 2: Secured Real Estate Tax Claims – GB Real Property. ...................................... 67

d)     Class 3A: Secured CDD Off Roll Bond Claims . ........................................................... 67

e)     Class 3B: Secured CDD Off Roll O&M Claims. ........................................................... 67

f)     Class 4: Unsecured Convenience Claims ........................................................................ 68

g)     Class 5: Unsecured Claims (Unsecured Claims Not Otherwise Classified). ................. 68

h)     Class 6: Equity Interests.................................................................................................. 69

9.     Joint Plan of Reorganization for DY Land Holdings II, LLC, FC .................................. 69 Commercial, LLC and FC Parcel 73, LLC, as debtors and debtors in possession (collectively, the "DY/FC Debtors")(the "DY/FC Plan"). ............................................................................. 69

a)     Unclassified Claims. ....................................................................................................... 69

b)     Class 1: Priority Claims. ................................................................................................. 69

c)     Class 2: Secured Real Estate Tax Claims – DY/FC Real Property. ................................ 70

d)     Class 3: Secured CDD Off Roll Bond Claims . ............................................................. 70

e)     Class 4: Secured Claims of Colonnade Naples Land, LLC. ........................................... 70

f)     Class 5: Unsecured Convenience Claims ........................................................................ 70

g)     Class 6: Unsecured Claims (Unsecured Claims Not Otherwise Classified). ................. 71

h)     Class 7: Equity Interests.................................................................................................. 71

10. Joint Plan of Reorganization for Gulf Bay Hospitality, Ltd. and Gulf Bay Hospitality Company, LLC (the "Gulf Bay Debtors"), FC Hotel, Ltd. and FC Hotel, LLC (the "FC Hotel Debtors"), Gulf Bay Hotel Company, Ltd. and Gulf Bay Hotel Company, LLC (the "GB Hotel Debtors"), FC Resort, Ltd. and FC Resort, LLC (the "FC Resort Debtors") and GBFC Marina, Ltd. and FC Marina, LLC (the "FC Marina Debtors"), as debtors and debtors in possession (collectively, the Gulf Bay Debtors, the FC Hotel Debtors, the GB Hotel Debtors, the FC Resort Debtors and the FC Marina Debtors are referred to herein as, the "Tarpon Club Debtors")(the "Tarpon Club Plan"). ..................................................................... 71

a) Unclassified Claims. ........................................................................ 72
b) Class 1: Priority Claims. .................................................................. 72
c) Class 2: Secured Real Estate Tax Claims........................................ 72
d) Class 3: Secured Claim of Iberia Bank. .......................................... 73
e) Class 4: Unsecured Convenience Claims ........................................ 73
f) Class 5: Unsecured Claims (Unsecured Claims Not Otherwise Classified).................. 73
g) Class 6: Equity Interests................................................................. 74
Possession (the "FC Debtor") (the "FC Plan"). ....................................... 74
a) Unclassified Claims. ........................................................................ 74
b) Class 1: Priority Claims. .................................................................. 74
c) Class 2: Unsecured Convenience Claims ........................................ 75
d) Class 3: Unsecured Claims (Unsecured Claims Not Otherwise Classified).................. 75
e) Class 4: Equity Interests.................................................................. 75

VII. IMPLEMENTATION OF THE PLANS OF REORGANIZATION .................. 76
A. General Overview of the Plans ........................................................ 76
B. Plan Funding - Exit Financing from Mount Kellett Capital Management LP........... 76
C. Vesting of Property of the Debtors' Estates in the Reorganized Debtors. ................. 77
D. No Corporate Action Required........................................................ 77
E. Managers and Members of the Reorganized Debtor....................... 77
F. Operation Pending Effective Date ................................................... 78
G. Exemption From Transfer Taxes ..................................................... 78

VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................ 78
A. Assumption or Rejection of Executory Contracts and Unexpired Leases. ............. 78
B. Approval of Assumption or Rejection ............................................. 79
C. Cure of Defaults............................................................................... 79
D. Rejection Claims Bar Date. ............................................................. 80
E. Inclusiveness. ................................................................................... 80

IX. DESCRIPTION OF OTHER PROVISIONS OF THE PLANS ...................... 81
A. Post-Effective Date Fees; Final Decree............................................ 81
B. Vesting of Assets. ............................................................................ 81
C. Discharge of Claims......................................................................... 81
D. Exculpations and Related Matters. ................................................ 82
E. Preserved Litigation Claims and Disputed Claims Resolution ...................... 84

X. PROVISIONS GOVERNING DISTRIBUTIONS ..................................... 86
A. Initial Distribution........................................................................... 86
B. Determination of Claims.................................................................. 86
C. Distributions.................................................................................... 88
D. Unclaimed Distributions. ................................................................ 88

E.      Transfer of Claim. ..................................................................................... 89
F.      One Distribution Per Holder. ................................................................... 89
G.      Effect of Pre-Confirmation Distributions. ............................................... 89
H.      No Interest on Claims. .............................................................................. 89
I.      Compliance with Tax Requirements. ........................................................ 89
J.      Preservation of Insurance .......................................................................... 90

XI.     Retention of Jurisdiction After the Effective Date. ....................................... 90
A.      Retention of Jurisdiction ........................................................................... 90
B.      Closing of the Bankruptcy Cases. ............................................................. 93
C.      Amendment and/or Modification of the Plans .......................................... 93
D.      Revocation or Withdrawal of the Plan(s) .................................................. 93
E.      Withholding and Reporting Requirements ................................................ 94

XII.    CONDITIONS PRECEDENT ........................................................................ 94
A.      Conditions to Confirmation and Effective Date of Plan. .......................... 94
B.      Conditions Precedent to the Effective Date. ............................................. 94
C.      Waiver of Conditions. ............................................................................... 95

XIII.   ACCEPTANCE AND CONFIRMATION OF PLANS ...................................... 95
A.      Acceptance of the Plan. ............................................................................. 95
B.      Feasibility of the Plans. ............................................................................. 95
C.      Best Interests Test ..................................................................................... 96
D.      Confirmation Without Acceptance of All Impaired Classes ...................... 97

XIV.    MATERIAL FEDERAL INCOME TAX CONSIDERATIONS ........................ 98
A.      U.S. Federal Income Tax Consequences to the Debtors. ........................... 99
B.      U. S. Federal Income Tax Consequences to a Investor Typical of the Holders of Claims
and Equity Interests ............................................................................................ 101
C.      Importance of Obtaining Professional Tax Assistance ............................. 102
D.      Circular 230 Disclaimer .......................................................................... 102

XV.     CERTAIN RISK FACTORS TO BE CONSIDERED ...................................... 102
Reorganization Factors ...................................................................................... 103

XVI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLANS ................................................................................................................... 104
A.      Continuation of the Chapter 11 Cases. .................................................... 104
B.      Alternative Plans of Reorganization. ....................................................... 104
C.      Liquidation .............................................................................................. 104

XVII.   SUMMARY, RECOMMENDATION AND CONCLUSION ........................... 105

# I. INTRODUCTION AND SUMMARY

## A.    Overview

Fiddler's Creek, LLC ("Fiddler's Creek") and twenty-seven (27) of its subsidiaries and affiliates (collectively, the "Debtors" and, on and after the Effective Date, the "Reorganized Debtors"), by and through their undersigned counsel, submit this Joint Consolidated Disclosure Statement  (the "Disclosure Statement") for use in the solicitation of votes on the Plans of Reorganization of the Debtors (collectively the "Plans")("List of Plans filed contemporaneously herewith are identified in Appendix "1") pursuant to Section 1125 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et al* (the "Bankruptcy Code").  Although the Debtors' Estates are presently being jointly administered for procedural purposes, the Debtors and their Estates have not been substantively consolidated.  Accordingly, references to the Plan means the eleven (11) separate and distinct Plans filed with the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), on December 3, 2010.    The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plans. All capitalized terms not defined in this Disclosure Statement have the meanings given to them in the Plans.

This Disclosure Statement sets forth certain information regarding the Debtors' pre-petition operating and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, and the anticipated organization and operations of the Reorganized Debtors. This Disclosure Statement also describes terms and provisions of the Plans, including certain alternatives to the Plans, certain effects of confirmation of the Plans, certain risk factors associated with securities to be issued under the Plans, and the manner in which distributions will be made under the Plans. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims in Impaired Classes must follow for their votes to be counted. Certain provisions of the Plans, and thus the descriptions and summaries contained herein, may be the subject of continuing negotiations among the Debtors and various parties, may not have been finally agreed upon, and may be modified. Such modifications, however, will not have a material effect on the distributions contemplated by the Plans.

Each of the Debtors is a proponent of its respective Plan within the meaning of Section 1129 of the Bankruptcy Code. The Plans contain separate Classes and propose recoveries for holders of Claims against and Equity Interests in the Debtors. After careful review of the Plans, current business operations, estimated recoveries in a liquidation scenario, and the prospects of ongoing business, the Debtors have concluded that their business and assets have significant value that would not be realized in a liquidation scenario and, as a result, the recovery to the Creditors will be maximized by a reorganization of the Debtors, as contemplated by the Plans. Therefore, the Debtors recommend that you vote in favor of the Plans.

## B.    Rules of Interpretation

The following rules for interpretation and construction shall apply to the Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, exhibit, statute, regulation, order, rule of the court, or the like, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented from time to time; (4) any reference to an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (5) unless otherwise specified, all references in the Disclosure Statement to Articles and Exhibits are references to Articles and Exhibits of the Disclosure Statement; (6) the words "herein," "hereof," and "hereto" shall refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (7) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (8) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply; (9) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (10) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## II.     <u>PURPOSE OF THIS DISCLOSURE STATEMENT</u>

The purpose of this Disclosure Statement is to provide the Holders of Claims and Equity Interests with adequate information to make an informed judgment about the Plans. This information includes, among other things, (a) the procedures for voting on the Plans, (b) a summary of each of the Plans filed and an explanation of how the Plans will function, including the means of implementing and funding the Plans (including the securities of the Debtors to be issued under the Plans), (c) the events leading to the filing of the Bankruptcy Cases, (d) general information about the businesses, properties, and operations of the Debtors, (e) projections for the Debtors' future operations, and (f) a summary of significant events which have occurred to date in the Bankruptcy Cases.

This Disclosure Statement contains important information about the Plans and considerations pertinent to a vote for or against the Confirmation of the Plans. All Holders of Claims and Equity Interests are encouraged to review carefully this Disclosure Statement.

Unless otherwise defined herein, all capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plans. Any term used in the Plans or herein that is not defined in the Plans or herein and that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be. If there is any conflict between the definitions contained in this Disclosure

Statement and the definitions contained in the Plans, the definitions contained in the Plans shall control.

## A.  Summary of Treatment of Claims and Equity Interests under the Plans

The obligations and distributions made under the Plans are in full and final settlement, release and compromise of any and all claims against and Equity Interests in the Debtors.

Except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.

The Plans contain separate classes for holders of Claims against, and Equity Interests in, the Debtors. As required by the Bankruptcy Code, Administrative Claims, Priority Tax Claims, United States Trustee fees and DIP Lender Allowed Claims are not classified. The classification and treatment for all Classes are described in more detail in the individual Plans.

For a description of the Plans and various risks and other factors pertaining to the Plans as it relates to holders of claims against, and interests in the Debtors, please see the "Description of the Reorganization Plan" and "Certain Factors To Be Considered," sections of this Disclosure Statement.

## B.  General Voting Procedures, Ballots, and Voting Deadline

Accompanying this Disclosure Statement are the following (1) the notice of, among other things, the time for submitting Ballots to accept or reject the Plans; the date, time and place of the hearing to consider the confirmation of the Plans and related matters, and the time for filing objections to the confirmation of the Plans (the "Confirmation Hearing Notice"); and (2) if you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan.

After carefully reviewing the Plans, this Disclosure Statement and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plans by checking the appropriate box on the enclosed Ballot. Please complete and sign your original Ballot (copies will not be accepted) and return it in the envelope provided. You must provide all of the information requested by the appropriate Ballot. Failure to do so may result in the disqualification of your vote on such Ballot. Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plans, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

The Bankruptcy Court has set _____2011, ("Voting Deadline") as the Voting Deadline. The Deadline is the date for the determination of record holders of Claims and/or Interests entitled to receive a copy of this Disclosure Statement and vote, using appropriate Ballots, to accept or reject the Plans.

**All Ballots must be returned either by regular mail, hand delivery or overnight delivery by the Voting Deadline to:**

> Clerk, United States Bankruptcy Court
> Sam M. Gibbons United States Courthouse
> 801 N. Florida Avenue, 5th Floor
> Tampa, Florida 33602-3826

Ballots returned by facsimile or email are not valid and will not be counted. Ballots received after the voting deadline will not be counted. Ballots should <u>not</u> be delivered directly to the Debtors, the Committee, or the Office of the United States Trustee.

<u>Questions About Voting Procedures</u>: (1) If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim holdings; or (2) you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents please contact:

> GENOVESE JOBLOVE & BATTISTA, P.A.
> Paul J. Battista, Esq.
> Mariaelena Gayo-Guitian, Esq.
> Attorneys for Debtors-in-Possession
> 100 Southeast Second Street, Suite 4400
> Miami, Florida 33131
> Telephone: (305) 349-2300 or (954) 453-8000
> E-mail: pbattista@gjb-law.com
> mguitian@gjb-law.com

<u>Convenience Class Opt-In Election.</u>  As further outlined in the Plans, each Holder of an Unsecured Claim (i) in an amount greater than $25,000 may have its Unsecured Claim treated as an Unsecured Convenience Claim under the Plan by making the Convenience Class Opt-In Election.  For treatment of this Class, please review Articles 3 and 5 of the respective Plans. <u>The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on the Ballot and filed with the Bankruptcy Court on or before the Voting Deadline.</u>

**C.      Confirmation Hearing and Deadline for Objections to Confirmation**

Pursuant to Section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Bankruptcy Court has scheduled an evidentiary hearing to consider final approval of this Disclosure Statement and confirmation of the Plans to begin on_____------2011 at 9:30 a.m. (Eastern Daylight Time) **before the Honorable K. Rodney May, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Middle District of Florida, 801 N. Florida Avenue, Courtroom 9B. Tampa,**

**Florida 33602**.

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan and final approval of this Disclosure Statement be filed with the Clerk of the Bankruptcy Court and served so that they are **ACTUALLY RECEIVED** on or before _____2011 (prevailing Eastern Standard Time) by: (i) Paul J. Battista, Esq., Genovese Joblove & Battista, P.A., 100 S.E. Second Street, 44th Floor, Miami, Florida 33131, (ii) Jordi Guso, Esq., Berger Singerman, P.A., 200 S. Biscayne Blvd., 10th Floor, Miami, Florida 33131, (iii) Lawrence V. Gelber, Esq., Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022 and (iv) J. Steven Wilkes, Trial Attorney, Region 21, 501 E. Polk Street, Suite 1200, Tampa, Florida.

## III. BACKGROUND REGARDING THE DEBTORS

The following sections of this Disclosure Statement provide a brief overview of the Debtors' corporate history, key aspects of the Debtors' business operations, a summary of the Debtors' current capital structure and the events precipitating the Chapter 11 Cases.

### A. Corporate History

The Debtors consist of two related parent companies and various levels of subsidiaries, including limited liability companies and other entities, which hold title to the various properties within the Fiddler's Creek community and which conduct a wide variety of business ventures that generate substantial income for the Debtors. Beginning in 1993, the Debtors, together with Tomen America, Inc., as its partner in certain of the Debtors, began assembling the various properties that today comprise Fiddler's Creek. The property underlying Fiddler's Creek was accumulated by the Debtors from 1993 through 1996. Specifically, the first acquisition consisted of approximately 1,300 acres that would become Fiddler's Creek, a master-planned community. The second acquisition increased the community's size to its current 3,931 acres. Fiddler's Creek as it sits today represents the culmination of years of planning, negotiations, settlements and assemblage efforts by the Debtors and the Debtors' team of professionals. In 1998, Fiddler's Creek sold its first home. Since then, Fiddler's Creek has developed, sold and constructed in excess of 1,650 homes in the development. As a result, Fiddler's Creek is home to over 4,300 full and part-time residents.

### B. Overview of Business Operations.

#### 1. Fiddler's Creek Community

Each of the Debtors in these Chapter 11 Cases owns, operates and/or is otherwise affiliated with the fully integrated, premier master-planned residential community known as "Fiddler's Creek" in southwestern Florida. Fiddler's Creek is located in Collier County, Florida,

approximately 12 miles southeast of the City of Naples and six miles north of Marco Island. The Fiddler's Creek development is comprised of nearly 4,000 zoned acres of prime land in Naples, Florida, and is planned for and capable of accommodating up to 6,000 residences upon projected build-out, which is estimated to be completed in 2020. Fiddler's Creek has been approved and vested by the State of Florida as a Development of Regional Impact.

Fiddler's Creek contains five distinctive neighborhoods known as: Fiddler's Creek, Veneta, Aviamar, Marsh Cove and Meadow Run. Within each of these neighborhoods are several unique villages of varying housing products offering a wide range of price points including, but not limited to, custom built luxury homes, single family homes, coach homes, villa homes and attached-villa residences. In total, there are 1,782 fully constructed and existing homes, including single family homes, coach homes and carriage homes in different communities within Fiddler's Creek. In addition, there is completed infrastructure for an additional platted 840 units of both single family home sites and multifamily units within a variety of villages. Presently, Fiddler's Creek contains approximately 2,100 acres of undeveloped land fully entitled for approximately 3,329 additional residential units and amenities. This includes approximately 1,300 acres of the undeveloped land approved for future amenity development, including two golf courses, clubhouses, expanded tennis facilities, lakes, preserves and more. Less than one-third of Fiddler's Creek will be developed for residential use, while the remainder of the land is dedicated primarily to nature preserves, lakes, parks, golf courses and recreational areas.

In addition to the home and lot inventory, there is over 33 acres of prime commercial property that is "infrastructure ready," with approximately 23 acres situated along State Road 951 (Collier Blvd.) and approximately 9 acres situated along US 41 (Tamiami Trail). The total commercial square footage for build-out is approximately 300,000 square feet.

**2.      Fiddler's Creek Amenities.**

(i)       **The Club & Spa at Fiddler's Creek**

Fiddler's Creek contains substantial operating amenities which are enjoyed by the homeowners. The Club & Spa at Fiddler's Creek, which is a 54,000 square-foot resort style clubhouse with a state-of-the-art fitness facility, lighted tennis courts, full menu spa services, resort-style multi-pool swimming complex, casual and formal dining venues and a meeting and activity center. The Club & Spa offers casual dining through its al fresco grille known as the *Gator Grille.* The Club & Spa also offers formal fine dining through its restaurant known as *Caxambas.*

(ii)      **The Golf Club at Fiddler's Creek**

Additionally, homeowners have the opportunity to join The Golf Club at Fiddler's Creek, with its first golf course named "The Creek Course," designed by the acclaimed golf course architect, Arthur Hills. The Creek Course has been nationally recognized by Golf Week magazine as one of the Top 100 Best Residential Golf Courses for each of years 2005 through 2010. Fiddler's Creek has also been recognized by Travel & Leisure magazine as one of

America's Top 100 Golf Communities for two consecutive years. The second course, The Preserve Course, is currently being designed by the award winning team of Hurdzan/Frye.

The Debtors offer Golf Club memberships to homeowners in Fiddler's Creek pursuant to the terms of The Golf Club Membership Plan, the Golf Club Rules and Regulations promulgated by the Golf Club, and other related documents as amended from time to time (collectively, the "Golf Club Membership Documents"). The Golf Club Membership Documents enable homeowners to become members of The Golf Club and enjoy, among other things, the privileges of an eighteen-hole premier golf course, driving range, practice putting green and temporary golf clubhouse facilities. The Golf Club facilities currently constructed are owned and operated by FC Golf, Ltd., doing business as The Golf Club (the "Golf Club"). Each person who acquires a membership in the Golf Club is entitled to use the Golf Club facilities in accordance with the terms and conditions of their respective Golf Club Membership Documents. The Golf Club owns and manages the operations of the Golf Club Facilities and has sole responsibility for the governance and administration of the Golf Club facilities and has exclusive authority to accept members, set dues and charges, establish rules and regulations and control the management and affairs of the Golf Club facilities and the Golf Club. The Golf Club has an advisory Board of Governors (the "Golf Club Advisory Board") composed of members who are appointed annually by the Golf Club and whose purpose includes fostering good relations between the Golf Club members and management of the Golf Club, providing members with input on programs, plans and activities of the Golf Club, and advising on the Golf Club policies, rules and regulations. The management of the Golf Club meets with the Golf Club Advisory Board on a periodic basis to discuss the operation of the Golf Club facilities.

(iii)   **The Tarpon Club**

During the early 1990's certain of the Debtors purchased one of the last parcels of undeveloped beachfront property on Marco Island and began construction of a condominium and beach front property known as the Marco Beach Ocean Resort (the "MBOR"), which opened in December 2001. The MBOR is comprised of 103 all suite luxury hotel/condominium units, a restaurant known as *Sale e Pepe,* which features northern Italian cuisine, a spa and fitness center, shops and other superb amenities, resulting in its being the recipient of AAA's Four-Diamond Award, as well as the Mobil Four-Star Award. Today, one of the Debtors, FC Beach, Ltd., continues to own 13 hotel condominium units at the MBOR. Another of the Debtors, Gulf Bay Hospitality, Ltd., operates the restaurant, *Sale* e *Pepe,* and manages the banquet facilities in the MBOR Beach Pavilion. Lastly, another of the Debtors, Gulf Bay Hotel Company, Ltd., manages the hotel operations at the MBOR for a management fee. The Beach Pavilion is a Tuscan styled building located at the MBOR that houses the *Sale e Pepe* restaurant, the lounge, banquet and ballroom facilities, the beach side bar, and changing facilities available to Tarpon Club members.

Fiddler's Creek homeowners also have the option to join The Tarpon Club, which offers members beach privileges, lockers and changing facilities located on the ground floor of the restaurant building, full service restaurant and beachside bar with food service, and spa services (as well as other resort amenities) at the MBOR (the "Resort Facilities"). Additionally, the Tarpon Club facilities currently consist of 14 marina wet slips and a dry boat storage facility and

additional outdoor storage designed to accommodate up to 180 boats ranging in size up to thirty-five (35feet). The Tarpon Club is currently finalizing permit rights for fifty-two (52) wet slips which will accommodate larger boats located on the Isles of Capri, Florida (collectively, the "Tarpon Club Facilities").

The Debtors offer Tarpon Club Memberships to homeowners in Fiddler's Creek pursuant to the terms of The Tarpon Club Membership Plan, the General Tarpon Club and Marina Rules, the Marco Beach Ocean Resort Rules and Regulations, and other related documents, as amended from time to time (collectively, the Tarpon Club Membership Documents"). The Tarpon Club Facilities are owned and managed by GBFC Marina, Ltd. ("GBFC Marina"). The Resort Facilities are owned and managed by FC Resort, Ltd. The Tarpon Club Facilities and Resort Facilities are operated by Gulf Bay Hospitality, Ltd. The Tarpon Club has an advisory Board of Governors (the "Tarpon Club Advisory Board") that serves as a liaison between management of the Tarpon Club and the members. The Tarpon Club Advisory Board is composed of members appointed annually by the Tarpon Club. The Tarpon Club membership offers an opportunity to enjoy beach and other social privileges at the Resort Facilities as well as enjoy the Tarpon Club Facilities. Each person who acquires a Social Membership is entitled to use the Tarpon Club Facilities and Resort Facilities in accordance with the terms and conditions of the Tarpon Club Membership Documents upon payment of the required dues and fees.

### 3. The Debtors' Senior Management.

The Debtors' senior management team and their professional experience are as follows:

a.  **Aubrey J. Ferrao**, President, Chief Executive Officer and founder of Fiddler's Creek. Mr. Ferrao came to the United States in 1973 from India at the age of nineteen after receiving a Bachelor of Arts degree from St. Stephens College at the University of Delhi. Mr. Ferrao arrived in Florida in 1976 and began his 26 year real estate development career. Prior to developing Fiddler's Creek, in 1986, Mr. Ferrao founded a group of companies known as the Gulf Bay Group of Companies ("Gulf Bay"). Gulf Bay is one of the largest privately owned development companies in Florida, with its headquarters in Naples, Florida. Mr. Ferrao has grown Gulf Bay into a vertically integrated, multi-faceted real estate development company with capabilities that include planning, development, real estate construction, marketing and sales, operations and management. Gulf Bay has accumulated vast knowledge and experience in successfully developing this large multi-faceted, highly amenitized community. Since its founding, Gulf Bay has enjoyed a stellar reputation for integrity, service and top-quality construction that has always delivered the very best to its customers. To that end, Gulf Bay has developed various successful luxury high-rise projects in the Pelican Bay and Park Shore areas of Naples, which include, among others, the development and construction of high rise towers and garden condominium developments consisting of St. Tropez, St. Maarten, St. Thomas, St. Lucia, St. Lucia Gardens, St. Simone, St. Nicole, St. Raphael, St. Marissa, St. Kitts, St. Vincents, Cap Farrat, Cannes, St. Pierre, St. Laurent, Crown Colony at Pelican Bay, Waterpark Place at Pelican Bay and The Brittany.

b.      **Anthony DiNardo**, Chief Financial Officer. Mr. Dinardo holds a Bachelor of Arts degree in Economics from New York University and a Masters in Business Administration and Accounting from the New York University Graduate School of Business. Additionally, Mr. DiNardo maintains a professional status as a Certified Public Accountant; state licensed Real Estate Broker and Mortgage Broker and a BOMI certified Real Property Administrator. Prior to working with the Debtors, he held a position as Vice-President of Finance with the Arvida Corporation of Florida, Real Estate Division as well as a position at Helmsley Spear, Inc., in New York, N.Y. Mr. DiNardo has over 30 years experience in real estate development.

c.      **Joseph Livio Parisi**, In-House Corporate Counsel. Mr. Parisi holds a Bachelor of Science in Engineering from the United States Merchant Marine Academy, a Masters of Technology degree in Construction Contract Administration from Arizona State University, and a Juris Doctor degree from Nova Southeastern University. Mr. Parisi was admitted to the Florida Bar in 1993 and prior to working with the Debtors, was a litigation attorney in the Ft. Lauderdale office of Ruden, McClosky, Smith, Schuster & Russell, P.A., where he practiced primarily in the areas of real estate and construction litigation for contractors and developers.

d.      **Mark. P. Strain**, Vice President of Planning. Mr. Strain holds a Bachelor of Science degree in Business Administration from International College with undergraduate courses at the University of California, Irvine. Mr. Strain maintains state general contractor licenses in both California and Florida. Mr. Strain is responsible for all planning functions as well as infrastructure and horizontal development for the Debtors with a specific area of responsibility on the Fiddler's Creek Development of Regional Impact ("DRI"). Prior to his involvement with the Debtors, Mr. Strain completed a 313 acre community in north Collier County and operated Excel Construction and Development Corporation, for which he held the position of President for 13 years. Mr. Strain's involvement in real estate development provides over 26 years of experience to the Debtors.

## C.      The Debtors' Prepetition Secured Lenders

The Debtors have the following eight (8) separate prepetition secured creditors: (i) AmSouth n/k/a Regions Bank (ii) Fifth Third Bank (iii) Textron Financial Corporation; (iv) Orion Bank n/k/a Iberia Bank; (v) KeyBank National Association; (vi) Mellon United National Bank; (vii) Colonnade Naples Land, LLC, as successor to Tomen America, Inc. and (viii) Florida Financial Investments, Inc. (collectively the "Prepetition Secured Lenders"). As set forth below, each of the Prepetition Secured Lenders asserts a mortgage lien on certain property included in Fiddler's Creek and owned by one or more of the Debtors.  The mortgage liens asserted by the Prepetition Secured Lenders do not overlap, as each Prepetition Secured Lender financed a separate parcel of land and improvements, if any, thereon contained within the overall Fiddler's

Creek development. As such, no one Prepetition Secured Lender asserts a lien on all of the assets and property comprising Fiddler's Creek.

### 1. Regions Bank, N.A. - GBFC Development, Ltd. and 951 Land Holdings, Ltd.

On November 2, 2001, GBFC Development, Ltd., ("GBFC Debtor") executed and delivered to Regions Bank ("Regions") a certain First Consolidated Revolving Construction Mortgage Note in the principal amount of Fifty Million Dollars ($50,000,000.00), which note was later consolidated and renewed by that certain Sixth Renewal Revolving Construction Mortgage Note, in the original principal amount of Thirty Million Dollars ($30,000,000.00) and that Future Advance Note Future Advance Revolving Construction Mortgage Note, dated March 14, 2006, in the original principal amount of Twenty Million Dollars ($20,000,000.00) (collectively referred to as the "Regions Note"). Contemporaneous with the execution of the Regions Note, the Debtor, 951 Land Holdings, Ltd., (the "Guarantor" or "951 Debtor") guaranteed the payment and performance of up to a total amount of Five Million Dollars ($5,000,000.00) pursuant to the terms of the Regions Note and secured by Region Lot Collateral. The outstanding balance owed to Regions on the Regions Note as of the Petition Date was $43,895,045.00. The GBFC Debtor and 951 Debtor assert that the Regions Collateral has a current aggregate market value equal to $60,700,000.00.

(a) **Terms of Regions Note:** (i) interest at 2.75% per annum + LIBOR; (ii) Regions Note matures on March 14, 2012.

(b) **Regions Collateral:** Regions Note is secured by a certain Mortgage, Security Agreement and Assignment of Rents, dated November 2, 2001, encompassing certain real property and improvements consisting of that portion of the 951 Real Property consisting of (i) three (3) developed lots located in the Cotton Green subdivision of the Debtors, (the "Regions Cotton Green Lots"); (ii) 530 developed residential lots (the "Regions Lot Collateral") which does not include the Regions Cotton Green Lots; and (iii) seventy-nine (79) fully constructed single-family and multi-family housing units owned by the GBFC Debtors (the "Regions Vertical Lots"). The Regions Cotton Green Lots, Regions Lot Collateral and Regions Vertical Lots are collectively the "Regions Collateral").

(c) **Guarantor(s):** Regions Note is guaranteed by Fiddler's Creek, LLC., and 951 Land Holdings, Ltd.

### 2. Fifth Third Bank - GBP Development, Ltd.

On May 4, 2006, GBP Development, Ltd. ("GBP Debtor") executed and delivered a certain revolving promissory note to Fifth Third Bank ("Fifth Third") in the principal amount of Twenty Three Million Dollars ($23,000,000.00) (the "Fifth Third Note"). The outstanding balance owed to Fifth Third on the Fifth Third Note as of the Petition Date was Fifteen Million Three Hundred Thirty-Nine Thousand Eight Hundred Twenty-One Dollars ($15,339,821.21). The Debtors assert that the Fifth Third Collateral has a current market value equal to $17,640,000.00.

(a)	**Terms of Fifth Third Note**: (i) interest at 30 day LIBOR + 2.5% per annum; and (ii) Fifth Third Note matured on May 4, 2009.

(b)	**Fifth Third Collateral:** The Fifth Third Note is secured by a Mortgage and Security Agreement, dated May 4, 2006, in the real property and improvements consisting of (i) twenty (20) fully constructed multifamily residential units located in the *Menaggio* subdivision of Veneta, (ii) thirty-two (32) vacant lots located in the *Menaggio* subdivision, and (iii) three (3) single family residential units and fifty-three (53) vacant lots located in the *Chiasso* subdivision of Veneta (the "Fifth Third Collateral").

(c)	**Guarantor(s):**  The Fifth Third Note is guaranteed by GB Peninsula, Ltd.

### 3.	KeyBank, National Association -951 Land Holdings, Ltd.

On October 31, 2007, 951 Land Holdings, Ltd. ("951 Debtor") executed and delivered to KeyBank, National Association ("Key Bank") a certain Development Loan Agreement and promissory note whereby KeyBank agreed to make a secured loan available to 951 Debtor in the maximum aggregate amount not to exceed the sum of Twenty-One Million Dollars ($21,000,000.00) in order to finance the development and construction of the initial phase of "Marsh Cove" in Fiddler's Creek Community (the "KeyBank Note"). The outstanding balance of the KeyBank Note as of the Petition Date was $6,610,330.00. The 951 Debtors assert that the KeyBank Collateral has a current aggregate market value equal to $10,770,000.00.

(a)	**Terms of KeyBank Note**: (i) interest at the adjusted LIBOR rate; (ii) the initial maturity date is October 31, 2010;

(b)	**KeyBank Collateral**: The KeyBank Note is secured by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated October 31, 2007, encompassing certain vacant land consisting of 4 non-contiguous parcels totaling 52.10 acres (the "KeyBank Collateral").

(c)	**Guarantor(s):**  The KeyBank Note is guaranteed by Fiddler's Creek, LLC.

### 4.	Textron Financial Corporation - FC Golf, Ltd.

On November 14, 2008, FC Golf, Ltd. ("FC Golf Debtor') executed and delivered to Textron Financial Corporation ("Textron") a certain Second Amended and Restated Promissory Note in the original principal amount of Eight Million Nine Hundred Fifty-Four Thousand Eight Hundred Seventy Dollars ($8,954,870.45) (the "Textron Note"). The outstanding balance owed to Textron on the Textron Note as of the Petition Date was $9,036,666.00. The FC Golf Debtors assert that the Textron Collateral has a current aggregate market value equal to $18,400,000.00.

(a)	**Terms of Textron Note**: The terms of the Amended and Restated Promissory Note dated August 4, 2006 are: (1) interest equal to the rate of interest announced, quoted or published by J.P. Morgan Chase & Co., or successor thereto, as its "prime rate" of interest (the "Chase Prime Rate") + 100 basis points; and (2) the Textron Note matures on December 31,

2012.

(b)     **Textron Collateral:** The Textron Note is secured by a Mortgage Security Agreement and Fixture Filing, dated as of December 11, 2002, as modified by that certain Note and Mortgage Modification Agreement, dated as of August 4, 2006, and that certain Notice of Future Advance, Note and Mortgage Modification Agreement, dated as of November 14, 2008, encompassing, among other things, (i) the golf course within Fiddler's Creek known as the "Creek Course," and 126.42 acres of vacant land presently being used as a temporary driving range for the Creek Course, and (ii) all of FC Golf's right, title, and interest, as lessee, in the leases entered into by and between FC Golf and the Fiddler's Creek Foundation, Inc. for space located at the Club & Spa related to the Creek Course (the "<u>Textron Collateral</u>").

(c)     **Guarantor(s):** The Textron Note is guaranteed by Fiddler's Creek, LLC.

**5.     Iberia Bank as successor to Orion Bank - GBFC Marina Ltd., FC Marina, LLC, (the "FC Marina Debtors") FC Hotel, Ltd, FC Hotel, LLC (the "FC Hotel Debtors") FC Resort Ltd., FC Resort, LLC, (the "FC Resort Debtors"), Gulf Bay Hotel Company, Ltd., and Gulf Bay Hotel Company, LLC (the "GB Hotel Debtors") and Gulf Bay Hospitality, Ltd., and Gulf Bay Company, LLC. (the "Gulf Bay Debtors")(collectively the "Tarpon Club Debtors").**

On or about March 31, 2004, each of GBFC Marina Ltd., FC Marina, LLC, FC Hotel, Ltd, FC Hotel, LLC, FC Resort Ltd., FC Resort, LLC, Gulf Bay Hotel Company, Ltd., and Gulf Bay Hotel Company, LLC., Gulf Bay Hospitality, Ltd., and Gulf Bay Company, LLC. (collectively, the "<u>Iberia Borrowers</u>") executed and delivered to Orion Bank a promissory note in the principal amount of Eighteen Million Dollars ($18,000,000.00) (the "<u>Iberia Note</u>"). On May 31, 2006, the Orion Borrowers executed and delivered a Notice of Future Advance and Extension of Payment Agreement and promissory note for an additional loan in the original principal amount of Eight Million Dollars ($8,000,000.00) for a total amount owing of Twenty Six Million Dollars ($26,000,000.00) (collectively with the First Orion Note, the "<u>Iberia Note</u>"). Orion Bank was taken over by the Federal Deposit Insurance Corporation, who in turn sold its assets to Iberia Bank. The outstanding balance owed to Iberia on the Orion Note as of the Petition Date was $18,124,462.00. The Tarpon Debtors assert that the Orion Collateral has a current aggregate market value equal to $20,640,000.00.

(a)     **Terms of Iberia Note**: (i) interest at a variable rate per annum of one percent (1%) per annum PLUS the Prime Rate (ii) the maturity date is August 3, 2013

(b)     **Iberia Collateral**:   The Orion Note is secured by that certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated March 31, 2004 encompassing certain (i) certain commercial condominium units located at the Marco Beach Ocean Resort, including, but not limited to, the banquet facilities, the *Sale e Pepe* restaurant facility, the gift shop and the spa located therein and (ii) Lots 455-496 and 567-576 of Isles of Capri consisting of the Tarpon Club Marina, 250 Isle of Capri Blvd., Naples. FL and related dry and wet boat slips (the "<u>Iberia Collateral</u>").

(c)     **Guarantor(s):**  The Iberia Note is guaranteed by Fiddler's Creek, LLC.

**6.     Florida Financial Investments, Inc**. **- DY Land Associates, Ltd.**

On December 15, 2008, DY Land Associates, Ltd. ("<u>DY Land Debtor</u>") executed and delivered a certain promissory note to Florida Financial Investments, Inc., ("<u>FFI</u>") in the principal amount of Five Million ($5,000,000.00) ("<u>FFI Note</u>"). Through several subsequent advances thereunder, DY Land Debtor borrowed up to a total of Nine Million Five Hundred Thousand ($9,500,000.00) in respect of the FFI Note. The outstanding principal balance owed to FFI on the FFI Note as of the Petition Date was $9,500,000.00. The DY Land Debtors assert that the FFI Collateral has a current aggregate market value equal to $49,100,000.00.

(a)     **Terms of FFI Note:** (i) interest at the Base Rate of nine (9%) per annum, unless the Default Rate applies (6% in excess of prime); (ii) the Maturity Date is December 5, 2013.

(b)     **FFI Collateral:**  The FFI Note is secured by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated December 15, 2008, and various spreader agreements encompassing certain undeveloped vacant land consisting of 717.87 acres of vacant land known as the DRI acreage designated for development of 1,134 residential units (the "<u>FFI Collateral</u>").

**7.     Colonnade Naples Land, LLC, as assignee of the Tomen America, Inc.** [1] **- DY Land Holdings II, LLC, FC Commercial, LLC and FC Parcel 73, LLC ("collectively the DY/FC Debtors")**

**Loan #1 - - FC Commercial, LLC and FC Parcel 73, LLC.**

On May 18, 2008, each of FC Commercial LLC and FC Parcel 73, LLC ("<u>FC Debtors</u>") executed and delivered that certain promissory note in the principal amount of Eighteen Million Six Hundred Thousand  Dollars ($18,600,000.00) ("<u>Tomen 1 Note</u>") to Tomen America, Inc. ("<u>Tomen</u>"). The outstanding balance owed on the Tomen 1 Note as of the Petition Date was $19,061,771.00. The DY/FC Debtors assert that the Collateral has a current aggregate market value equal to $26,040,000.00.

(a)     **Terms of Tomen 1 Note:**  (i) interest at the Prime Rate (published in the Wall Street Journal) unless the Default Rate (3% + Prime rate); (ii) the Tomen 1 Note matured on May 16, 2010.

(b)     **Colonnade Collateral:**    The Tomen 1 Note is secured by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of May 16, 2008, (ii) undeveloped real property owned by FC Commercial, LLC, which is zoned commercial and located at 8225 Fiddler's Creek Parkway, Naples FL and 14020 East Tamiami Trail, Naples, FL, and (iii) undeveloped real property owned by FC Parcel 73, LLC and indentified as Parcel 73

---

[1]  The Deeds transferring property from one debtor to another (primarily real estate held by 951 Land Holdings, Ltd., DY Land Associates, Ltd., and DY Land Holdings II, LLC) which was subsequently encumbered by a mortgage in favor  of Tomen  contain incorrect legal descriptions.

within the Fiddler's Creek PUD and located in the southeast quadrant of U.S. 41 and S.R. 951, Naples, Florida (the "Colonnade Collateral").

(c)     **Guarantor(s):**  The Tomen 1 Note is guaranteed by each of Fiddler's Creek, LLC, Fiddler's Creek Management, Inc., FC Beach, Ltd., GBFC Development, Ltd., DY Land Associates, Ltd, 951 Land Holdings, Ltd., GBFC Marina, Ltd., FC Hotel, Ltd., FC Resort, Ltd., Gulf Bay Hotel Debtors, Ltd., and Gulf Bay Hospitality, Ltd. (collectively, the "Tomen Guarantors").

### Loan #2  -  DY Land Holdings II, LLC.

On May 16, 2008, DY Land Holdings II, LLC ("DY Land Debtor") executed and delivered a certain promissory note in the principal amount of Thirty Million Dollars ($30,000,000). ("Tomen 2 Note") to Tomen.   The outstanding balance owed to Tomen on the Tomen 2 Note as of the Petition Date was $32,393,868.00. The Debtors assert that the Tomen 2 Collateral has a current aggregate market value equal to $64,000,000.00.

(a)     **Terms of Tomen 2 Note:** (i) interest at the Prime Rate (published in the Wall Street Journal) unless the Default Rate (3% + Prime rate); (ii) the Tomen 2 Note maturity date is May 16, 2013.

(b)     **Colonnade Collateral:**   The Tomen 2 Note is secured by a Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of May 16, 2008, encompassing certain vacant land consisting of 1,055.78 acres of undeveloped real property designated for development of 1,500 residential units known as Parcel 2 (the "Colonnade Collateral").

(c)     **Guarantor(s):**  The Tomen 2 Note is guaranteed by each of Fiddler's Creek, LLC, Fiddler's Creek Management, Inc., FC Beach, Ltd., GBFC Development, Ltd., DY Land Associates, Ltd, 951 Land Holdings, Ltd., GBFC Marina, Ltd., FC Hotel, Ltd., FC Resort, Ltd., Gulf Bay Hotel Debtors, Ltd., and Gulf Bay Hospitality, Ltd. (collectively, the "Tomen Guarantors").

### 8.     Mellon United National Bank – 951 Land Holdings, Ltd.

On December 22, 2004, 951 Land Holdings, Ltd., ("951 Debtor") executed and delivered a certain promissory note to Mellon United National Bank ("Mellon") in the principal amount of Six Million And No/100 Dollars ($6,000,000.00) (the "Mellon Note"). The outstanding balance owed to Mellon on the Mellon Note as of the Petition Date was $5,853,962.00. The Debtors assert that the Mellon Collateral has a current aggregate market value equal to $6,000,000.00.

(a)     **Terms of Mellon Note:** (i) interest at 2.5% per annum + LIBOR; (ii) the Mellon Note maturity date is one hundred twenty (120) months after closing (i.e., December 22, 2014).

(b)  **Mellon Collateral:**  The Mellon Note is secured by a certain Mortgage and Security Agreement of even date encompassing certain real property known as the "Fiddler's Creek Sales Center located at 8152 Fiddler's Creek Parkway, Naples, Florida and Fiddler's Creek Corporate Offices, 8156 Fiddler's Creek Parkway, Naples, Florida (the "Mellon Collateral").

(c)  **Guarantor(s):**  The Mellon Note is guaranteed by Fiddler's Creek, LLC.

## D.  Community Development District ("CDD") Special Assessments.

In addition to the secured bank loans referenced herein, certain of the Debtors (951 Land Holdings, Ltd.; DY Land Holdings II, LLC; DY Land Associates, Ltd.; FC Commercial, LLC; FC Parcel 73, LLC; GB Peninsula, Ltd.; GBP Development, Ltd.; GBFC Development, Ltd. and FC Golf, Ltd.) are responsible for Community Development District ("CDD") special assessments with respect to certain sections of Fiddler's Creek community.  There are two Community Development Districts encompassing Fiddler's Creek, which are commonly referred to as the "Fiddler's Creek CDD I ("CDD I") and "Fiddler's Creek CDD II ("CDD II")(collectively the "Districts").  The infrastructure of the Fiddler's Creek Community was financed in great part by bond indebtedness issued by the Community Development District ("CDD") with respect to certain sections of Fiddler's Creek community.

To finance such infrastructure, local units of special purpose government were created pursuant to Chapter 190 of the Florida Statutes, as amended, the "Uniform Community Development District Act" (the "Act"), and by, among other things, with respect to CDD I, Rule 42X-1.001- 1.003, Florida Administrative Code, as amended; and with respect to CDD II, Ordinance #02-61 of the Board of County Commissioners of Collier County, Florida.  The Act authorizes such community development districts to, among other things, (i) provide public improvements and community facilities to benefit real property, (ii) issue indebtedness, including bond indebtedness, secured by and paid from non-ad valorem special assessments, and (iii) impose and levy non-ad valorem special assessments on real property within the district in order to repay the bond indebtedness that financed the improvements and facilities benefiting the district's real property.

The Fiddler's Creek Community Development Districts were organized as local, special purpose government entities authorized by Chapter 190 of the Florida Statutes, as amended, provide an alternative method of planning, acquiring, operating, financing and maintaining community-wide improvements in planned communities.

The Fiddler's Creek Community Development Districts are organized similar to other local governments in Florida, in that their governing body is composed of a five-member board known as the Board of Supervisors (the "Board"). The Board establishes the policy of the CDD in accordance with Florida law. The Board, through review of advertised Requests for Qualifications, ranks and selects a District Engineer to perform the engineering needs of the CDD. The District Manager and the District Attorney administer the operations of the CDD and implement the Board's policies and contracts.

Each CDD is funded and is currently operating and maintaining community infrastructure in Fiddler's Creek, including water management, street lighting, landscaping, access control, roadway, irrigation, and park and recreation services. The CDD complements the responsibilities of the community homeowner's associations and the Debtors.

## 1.      Fiddler's Creek Community Development District I

The Fiddler's Creek CDD I was established August 13, 1996, and encompasses an area of approximately 1,389.77 acres within the Fiddler's Creek Development of Regional Impact ("DRI") to provide the necessary infrastructure for the community.  As provided for in the Act, CDD I's Board duly adopted Resolution 96-16 on August 20, 1996, which authorized and approved, among other things, the Master Trust Indenture dated as of December 1, 1996 between CDD I and the Indenture Trustee (as supplemented and amended from time to time in accordance with its terms, the "CDD I Master Indenture"), and the issuance of special assessment revenue bonds in one or more series under the CDD I Master Indenture.

CDD I issued and sold special assessment revenue bonds pursuant to its Resolution 96-16 and the CDD #1 Master Indenture, and related resolutions and documents.  CDD  I was developed in several phases as follows:

- Phase 1: Constructed during 1996-1999 included infrastructure elements such as general planning (soft costs), roadways, utilities, earthwork and clearing, street lighting, landscaping, security, wetland mitigation, off-site improvements and contingencies.

- Phase 2: Commenced in 1999, included earthwork and clearing regarding property adjoining the first golf course of the Project.

- Phase 3: Completed in 2002, included road and infrastructure systems to move the project both further to the east and north.

- Phase 4: Involved (i) site work associated with the large commercial parcel along Collier Boulevard (State Road 951); (ii) installation of the Marsh Cove Boulevard extension to connect with the future Golf Clubhouse; and (iii) site development of new residential parcels within Marsh Cove and the conversion of the temporary driving range parcel, known as Parcel 6, outside the Marsh Cove area.

## 2.      Fiddler's Creek Community Development District II

The Fiddler's Creek CDD II was established in November 19, 2002, and encompasses an area of approximately 998.79 acres within the Fiddler's Creek DRI.  Similarly, CDD II's Board of Supervisors duly adopted Resolution 2003-15 on December 2, 2002, which authorized and approved, among other things, the Master Trust Indenture dated as of June 1, 2003, between CDD II and the Indenture Trustee (as supplemented and amended from time to time in

accordance with its terms, the "CDD II Master Indenture"), and the issuance of special assessment revenue bonds in one or more series under the CDD II Master Indenture.

District II issued and sold special assessment revenue bonds pursuant to its Resolution 2003-15 and the CDD II Master Indenture, and related resolutions and documents. Bonds issued by CDD I and CDD II which remain outstanding are shown below.

CDD II added land to the north and northeast of the original project boundaries and was developed in several phases as follows:

- Phase I: Commenced in 2003, and now completed, created extensive new residential land, primarily for multi-family residences. The work includes typical soft costs, earthwork, water management, roadwork and utilities necessary to provide services within this new area.

- Phase 2: Commenced in 2005 and completed in 2007, followed Phase I work and completed the residential parcels within the Veneta community, including the water management and infrastructure.

- Phase 3: Included completion of remaining area of the Aviamar community and also created a portion of the necessary water management areas adjacent to the second golf course. This final phase will also include the creation of part of the community water management facilities, and developer related soft costs for each work and soil management.

- Phase 4: This final phase is expected to commence sometime in the future to coincide with the creation of the second golf course, and will include roadways and completion of water management areas.

### 3. Debtors Subject to Unpaid Bond Debt Assessments.

The following Debtors own real property subject to the liens of unpaid Bond Debt Assessments: 951 Land Holdings, Ltd.; DY Land Holdings II, LLC; DY Land Associates, Ltd.; FC Commercial, LLC; FC Parcel 73, LLC; GB Peninsula, Ltd.; GBP Development, Ltd.; GBFC Development, Ltd., and FC Golf, Ltd.

### 4. Claims of the Community Development Districts.

The Bonds issued by each of the Districts funded public improvements that benefit the residents and properties within the respective District, such as roadways, utilities, earthwork and clearing, water and storm water management, roadway lighting, landscaping, security, wetlands mitigation and monitoring, irrigation, and other infrastructure and improvements.

The Bonds are secured by, and paid from, special assessments (the "Bond Debt Assessments") levied by the issuing District on the real property within the District benefitted by

the Bond-financed infrastructure and improvements. Pursuant to Section 170.09 of the Florida Statutes, the Bond Debt Assessments constitute liens upon the assessed land coequal with the lien of all state, county, district, and municipal liens, superior in dignity to all other liens, titles, and claims, until paid.

Both pre- and post-petition, the Debtors failed to pay Bond Debt Assessments levied by the Districts upon their properties. Accordingly, such unpaid Bond Debt Assessments are due and outstanding to the Districts, which in turn are indebted to the Indenture Trustee on behalf of the Bondholders.

The properties of such Debtors are subject to the liens of the Bond Debt Assessments, levied by the Districts and pledged by the Districts to the Indenture Trustee, for the benefit of the Bondholders, to secure the payment of the principal of and interest on the Bonds.

The CDD Claims are comprised generally of the following claims:

(a)    **CDD Off Roll Bond Claims -** means the Claims of the applicable CDD against the Debtors related to *non ad valorem* special assessments imposed by the applicable CDD against the Real Property of the Debtors related to the payment of principal and interest/debt service owed by the CDD to the Indenture Trustee in connection with the Bonds issued by the applicable CDD for the benefit of the Real Property of the Debtors that is billed and collected directly by the applicable CDD from the Debtors, and is not subject to collection by and through the Collier County Tax Collector in connection with annual real estate tax bills issued by the Collier County Tax Collector.

(b)    **CDD Off Roll O&M Claims** - means the Claims of the applicable CDD against the Debtors related to *non ad valorem* special assessments imposed by the applicable CDD against the Real Property of the Debtors related to the payment of operational and maintenance obligations of the CDD for the benefit of the Real Property of the Debtors that are billed and collected directly by the applicable CDD from the Debtors, and are not subject to collection by and through the Collier County Tax Collector in connection with annual real estate tax bills issued by the Collier County Tax Collector.

**5.      Bonds allocable to land owned  by the Debtors as of the Petition Date**

In order to finance the construction of improvements to the property located in CDD I, the District issued a certain series of thirty (30) year bonds to various investors. Under Florida law, CDD I has the right to specially assess the real estate within its boundaries to generally enable it to repay the bond debt over a period of thirty (30) years and to generate funds necessary for the continued maintenance of such improvements. As of the Petition Date, the total outstanding amount of the bonds issued by CDD I equaled approximately <u>$34,395,988.13</u>.

| Bonds | Interest Rate (%) | Principal Outstanding as of Petition Date |
|---|---|---|

| | | | |
|---|---|---|---|
| Series 1999A Bonds (CDD I) | 5.875 | | $    570,054.82 |
| Series 1999B Bonds (CDD I) | 5.800 | | $    948,701.12 |
| Series 2002A Bonds (CDD I) | 6.875 | | $ 8,677,375.69 |
| Series 2002B Bonds (CDD I) | 6.625 | | $ 5,607,624.30 |
| Series 2005 Bonds (CDD I) | 6.000 | | $17,865,000.00 |
| Series 2006 Bonds (CDD I) | 4.200 | | $    727,232.20 |
| | | Total: | $34,395,988.13 |

In order to finance the construction of improvements to the property located in CDD II, the District issued a certain series of thirty (30) year bonds to various investors. Under Florida law, CDD II has the right to specially assess the real estate within its boundaries to generally enable it to repay the bond debt over a period of thirty (30) years and to generate funds necessary for the continued maintenance of such improvements. As of the Petition Date, the total outstanding amount of the bonds issued by CDD II equaled approximately $72,152,571.93.

| Bonds | Interest Rate (%) | | Principal Outstanding as of Petition Date |
|---|---|---|---|
| Series 2003A Bonds (CDD II) | 6.000 | | $ 2,482,876.09 |
| Series 2003A-1 Bonds (CDD II) | 6.375 | | $16,403,635.63 |
| Series 2003B Bonds (CDD II) | 5.750 | | $ 3,765,000.00 |
| Series 2004 Bonds (CDD II) | 6.750 | | $11,428,328.78 |
| Series 2005 Bonds (CDD II) | 6.000 | | $38,072,731.43 |
| | | Total | $72,152,571.93 |

## IV.    EVENTS PRECIPITATING CHAPTER 11 FILINGS.

### A.    Adverse Market Conditions

The homebuilding industry in the United States has experienced a significant downturn in the demand for new homes and an oversupply of new and existing homes available for sale. The negative impact of these events and trends was worsened by the turmoil in the mortgage and credit markets in late 2008 and continued through 2009, adversely impacting the Debtors' continued access to needed financing.

Developers and homebuilders throughout the United States have reported the negative impact of the current conditions in the industry. The downturn has been particularly steep in Florida where excess supply of new homes has led to downward pricing pressure for residential homes as well as improved and unimproved land and softening in the pace of home sales. The poor financial performance of the real estate industry during this past year has by no means been limited to the homebuilding sector but affected all financial areas of our national economy.

Unlike other homebuilders who purchased land at the peak of the economic boom, the

land comprising Fiddler's Creek community was acquired between 1992 and 1996. The Debtors' management team carefully developed and marketed the project successfully by requiring purchasers to pay thirty percent (30%) deposits on the purchases of new homes or lots. The Debtors' financial difficulties were not caused by mismanagement but by the failure of its financial partner, the failed agreements of future financing by its lenders, as well as the financial credit crunch that affected all sectors of the economy in 2008. These financial difficulties were highlighted when certain of the Debtors' lenders experienced financial difficulties themselves, which prevented them from providing additional loans to and/or restructuring existing loans with the Debtors.

In early February 2008, the Debtors, and other borrowing entities, negotiated the terms of a loan in the amount of Seventy-Five Million Dollars ($75,000,000.00) ("2008 Loan") with Textron Financial Corporation ("Textron"). On or about May 15, 2008, in reliance upon Textron's representations that it would fund the 2008 Loan, the Debtors executed a term sheet and caused a deposit to be paid. Thereafter, Textron began postponing finalizing the 2008 Loan for several months. Finally, in December 2008, despite its representations that all of the conditions for the 2008 Loan had been met or satisfied, Textron announced that it would not make the 2008 Loan.

The Debtors' management team also approached Regions Bank and Fifth Third Bank and requested an extension and renewal of the Construction Loan which matured in early 2009. Operating on parallel tracks, the Debtor's management team also retained the services of a mortgage broker to seek alternative sources of financing for the project. However, despite the valiant efforts made by the Debtors' management team to restructure or seek additional working capital from its various lenders (Textron, Regions and Fifth Third) and other financing sources, the downturn in the world financial markets locked up any ability to borrow monies from banks and/or other financial institutions.

In 2007, the real estate assets of Fiddler's Creek had a discounted value of Seven Hundred Million Dollars ($700,000,000.00). As of the Petition Date, Fiddler's Creek declared the total bulk sale discounted values of its real estate assets to be approximately Three Hundred and Twelve Million Dollars ($312,000,000) and mortgage debt of One Hundred and Sixty Million Dollars ($160,000,000.00), excluding CDD debt, which clearly illustrates how the real estate assets of Fiddler's Creek have been adversely impacted by the downturn in the real estate sector, the complete lack of liquidity in the financial markets and the overall economy.

A significant reason for the Debtors' bankruptcy filing was a need to seek additional sources of financing for the project as a result of the failure and refusal of purchasers under contract to close on units that were constructed pursuant to written agreements. In 2008, the Debtors were ready to close on homes sales of condominium units in the village of *"Callista"* community, however, as a result of the downturn in the economy and real estate markets, a majority of these purchasers failed and refused to close on their units, resulting in a loss of Forty-Two Million Dollars ($42,000,000.00) in expected revenue. Despite aggressively cutting costs and expenses, the Debtors expended the remainder of their cash reserves by December 2008.

**B.      The Debtors Cost Saving Initiatives and Efforts.**

In light of the sharp industry downturn, in late 2007 the Debtors began to take action to maximize revenues and minimize cash outflows. As part of these initiatives, the Debtors took steps to reduce general and administrative expenses and to streamline their operations and increase efficiencies. The cost reduction efforts included, among other things, (i) reducing the workforce at all levels, (ii) eliminating certain contracts and indirect costs, and (iii) revising the marketing and advertising budget.

As part of the cash savings measures, the Debtors analyzed each community based on profit and sales absorption goals that took into account current market factors such as the oversupply of homes available for sale, less demand, decreased consumer confidence, and tighter mortgage loan underwriting. The Debtors took steps to reduce inventory, limit development of new product and overall development activities, and reduced the number of homes under construction.

For accounting and tax purposes, the Debtors operate on a fiscal year that ends on December 31st of each year. For the fiscal year ended December 31, 2009, the Debtors, on a consolidated basis, generated sales of approximately Fifteen Million Seven Hundred Thirty-Eight Thousand Dollars ($15,738,000.00) and reported a net loss of approximately Forty-Three Million Nine Hundred Sixty-three Dollars ($43,963,000.00).

## C.    Significant Prepetition Litigation

### 1.    The Tomen Litigation.

Even before the downturn in the market conditions in 2007, the Debtors were negatively impacted by the protracted litigation with Tomen America, Inc., a subsidiary of Tomen Corporation (Japan's seventh largest trading company) ("Tomen America").

Tomen was a joint venture partner of Gulf Bay for over nineteen (19) years in various very successful luxury residential properties developed along a one and a half mile stretch of Gulf front property in the community of Pelican Bay in Naples, Florida. During this time, Tomen America on behalf of its Japanese parent, Tomen Corporation ("Tomen Japan"), had served as the funding partner, providing the principal source of equity and debt financing for these projects, as well as Fiddler's Creek.

In early 2000, however, the relationship between the parties began to change when Tomen America's parent corporation, Tomen Japan (Tomen America and Tomen Japan sometimes referred to as "Tomen"), experienced a financial crisis at home, in part, from bad investment decisions in the Japanese real estate market. To stave off bankruptcy, Tomen Japan reached an accommodation with its creditors that included billions of dollars in debt forgiveness and issuance of additional Tomen Japan shares to creditors. In return for that accommodation, Tomen Japan ceded *de facto* control over its operations to its largest shareholder, Tokai Bank, and Toyota Tsusho Corporation ("Toyota"), a large trading company affiliated with Toyota Motor Corporation. (Tokai Bank has now merged with The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU")). Toyota and BTMU forced Tomen Japan to embark on a major new plan calling for divestiture of all real estate investments throughout the world. Toyota assumed formal control

over Tomen Japan pursuant to a merger in April 2006.

On March 8, 2007, Gulf Bay and Parcel J Joint Venture filed an action against Tomen, BTMU, and Toyota styled: *Gulf Bay Land investments, inc., and Parcel J Joint Venture v. Toyota Tsusho Corporation, Tomen American, inc., Parcel JO 1 Development, inc., and The Bank of Tokyo-Mitsubishi UFJ, Ltd., Case No. 07-684-CA* in the Circuit Court of the 20th Judicial Circuit In and For Collier County, Florida ("<u>Tomen State Court Action</u>") for breach of contract, fiduciary duty, and express and implied covenants of good faith and fair dealing, promissory estoppel, tortious interference, and civil conspiracy.

After protracted litigation, Gulf Bay agreed to settle the Tomen State Court Action pursuant to a Binding Memorandum of Understanding ("<u>BMU</u>") dated January 26, 2008 which resulted in the severing of all existing financial relationships with between the Debtors and Tomen (as well as other affiliates) and the acquisition by one or more of the Gulf Bay entities of the equity interest in the various Joint Ventures with Tomen.

### 2. Textron Foreclosure Action

On November 10, 2009, Textron commenced an action against *FC Golf, Ltd., Fiddler's Creek, LLC., Fiddler's Creek Foundation, Inc et al. and John Does as Tenants-in-Possession* (collectively the "Debtor Defendants") Case No. 09-9775-CA pending in the Circuit Court of the Twentieth Judicial Circuit In and For Collier County, Florida ("<u>Textron State Court Action</u>"), and seeking to foreclose Textron's mortgage and security interest under Textron's Note and Mortgage.

On January 11, 2010, the Debtor Defendants filed their Verified Answer, Affirmative Defenses and Counterclaim to the Verified Complaint. Pursuant to the Counterclaim, the Debtor Defendants seek damages against Textron for negligent misrepresentations and promissory estoppel, for among other things, justifiable reliance on Textron's misrepresentations causing Twenty-five Thousand Dollars ($25,000.00) to be paid to Textron to obtain the 2008 Loan and forego alternative financing opportunities available to them.

On November 20, 2009, a *Motion for issuance of Order to Show Cause* ("OSC") was filed by Textron. By mutual agreement the parties continued the hearing on the OSC to February 22, 2010 at 1:30 pm. The Textron State Court Action and OSC hearing have been stayed by virtue of the bankruptcy filing.

### 3. Fifth Third Foreclosure Action

On December 9, 2009, Fifth Third commenced a foreclosure action against *GBP Development, Ltd., GB Peninsula, Ltd., Sunnymede Properties, LP; Menaggio Condominium Association, inc., Varenna Condominium Association, Inc., and Fiddler's Creek Foundation, Inc.* (collectively the "Debtor Defendants ") Case No. 09-1 0583-CA pending in the Circuit Court of the Twentieth Judicial Circuit In and For Collier County, Florida ("<u>Fifth Third State Court Action</u>") seeking to foreclose its security interests under the Fifth Third Note and Mortgage.

On or about February 15, 2010, the Debtor Defendants filed their Answer, Affirmative Defenses and Counterclaim to the Amended Complaint. Pursuant to the Counterclaim, the Debtor Defendants seek damages against Fifth Third for negligent misrepresentations and promissory estoppel, breach of an oral agreement and breach of contract for among other things, failure to renew the Loan, reimburse GBP for the *Menaggio* model furnishings, and failure to issue partial releases interfering with GBP's ability to sell units and, GBP's ability to meet their obligations under the Loan and Guaranty.

The Complaint and Debtor Defendants' Answer, Affirmative Defenses and Counterclaim are pending and stayed by the bankruptcy filing.

4. **Regions Bank Foreclosure Action.**

On or about January 28, 2010, Regions commenced a foreclosure action against GBFC Development, Ltd., 9541 Land Holdings, Ltd., Fiddler's Creek, LLC and Mark Woodward and Edward K. Cheffy as Trustees of The Aubrey Ferrao (Fiddler's Creek) 1999 Trust, (collectively the "Debtor Defendants") Case No.1 0-649-CA in the Circuit Court of the Twentieth Judicial Circuit In and For Collier County Florida seeking to foreclose its security interests under the Regions Note and Mortgage.

On February 11, 2010, the Debtor Defendants filed and served their Answer and Affirmative Defenses to the Complaint, and a Counterclaim. In the Counterclaim, the Debtor Defendants seek damages against Regions for fraudulent inducement, negligent misrepresentations, promissory estoppel, breach of oral agreement and breach of contract based on Regions oral and written representations that it would extend the Regions Loan pursuant to its original terms. As the maturity date approached, Regions attempted to modify the loan terms and requested that the Debtor Defendants' principal personally guarantee the loans, which had never been given (nor requested) in the past. The Debtor Defendants continued to make all loan payments through the maturity date in reliance on the loan extension. However, just prior to the loan's maturity date, Regions advised the Debtor Defendants that the loan would not be extended.

The Complaint and Debtor Defendants' Answer, Affirmative Defenses and Counterclaim are pending and stayed by the bankruptcy filing.

5. **Other Significant prepetition Litigation**

The Debtors are also a party to certain various other suits filed during the two (2) years prior to the Petition Date for contract rescission and/or specific performance which are detailed in the Schedules filed by GBFC Debtors.

As a result of the dramatic events in the real estate and financial markets that have transpired during course of the past year, the Debtors were not able to negotiate a restructuring of their debt with the existing mortgage lenders. This situation, coupled with national and local declines in pricing and sale of new homes caused Fiddler's Creek to seek protection in order to restructure its debt under the provisions of the Chapter 11 Bankruptcy Code.

6. **PEPI Capital, L.P. f/k/a Petrus Private Investments, L.P.**

Prior to the Petition Date, Fiddler's Creek, LLC and GB Peninsula, Ltd., negotiated with PEPI Capital, L.P. ("PEPI") the terms of a Debtor-In-Possession loan in the amount of Twenty-Five Million ($25,000,000.00). In connection with those negotiations, the Debtors transferred to PEPI during the four (4) months preceding the Petition Date, in excess of $955,000.00, pursuant to the terms of a Commitment Letter dated December 31, 2009 (the "Commitment Letter"). This amount is comprised of the payment of approximately $550,000 to PEPI to cover out-of-pocket due diligence expenses (presumably, legal fees) and a $405,000.00 payment representing one-half of a "Commitment Fee" under the Commitment Letter. The Debtors also paid expenses incurred by PEPI's professionals in connection with the PEPI negotiations. In exchange for these substantial payments, the Debtors received nothing more than the continued hope that PEPI would faithfully execute their responsibilities under the Commitment Letter. Instead of consummating the DIP loan, PEPI breached the terms of the Commitment Letter, forcing the Debtors to seek alternative DIP Financing from Gulf Bay Capital, Inc., an entity owned by Mr. Ferrao. Prior to the Petition Date, the Debtors served PEPI with a letter demanding the return of the Commitment Fee.

On March 2, 2010, PEPI filed its *Application by PEPI Capital, L.P. ("PEPI") for Payment of Administrative Expense Claim* [D.E. # 50] (the "Application"). On March 29, 2010, the Debtors filed *Debtors' Response And Objection To Application By PEPI Capital, L.P. For Payment Of Administrative Expense Claim* [D.E. # 110]. On that same day, the Official Creditor Committee of Homeowners filed its *Objection to Application by PEPI Capital, L.P. for Payment of Administrative Claim* [D.E. # 111]. On April 12, 2010, PEPI filed its *Notice of Withdrawing Application by PEPI Capital, L.P. For Payment of Administrative Expense Claim* without prejudice to PEPI filing a proof of claim for an unsecured non-administrative claim against the Estate [D.E. # 133].

On August 31, 2010, PEPI filed proofs of claim in each of the jointly administered cases for $1,405,000.00. This amount purportedly represents the remaining one-half of the Commitment Fee and $1,000,000 Break Up Fee.

7. **Debtor-In-Possession Loan from Gulf Bay Capital, Inc. ("DIP Lender")**

As set forth below in more detail, as a result of PEPI's breach of the Commitment Letter prior to the Petition Date, the Debtors negotiated and obtained a debtor-in-possession loan in the amount of Twenty-Five Million Dollars ($25,000,000.00) from Gulf Bay Capital, Inc., ("Gulf Bay" or "DIP Lender"), an affiliate of Mr. Ferrao, in order to finance these Chapter 11 Cases and enable the Debtors to operate in the ordinary course of business throughout these bankruptcy proceedings, including to cover all of the community's overhead expenses during the reorganization. The DIP Facility was necessary in order for the Debtors to continue through this reorganization process to deliver extraordinary lifestyle experiences, operating and maintaining the Golf Club, Tarpon Club and other facilities and amenities with consistent high standards of excellence and customer service.

## V. SIGNIFICANT EVENTS IN THE CHAPTER 11 CASES

As of the Petition Date, the Debtors declared assets with a value of Three Hundred and Twelve Million Dollars ($312,000,000.00) and mortgage debt of One Hundred Sixty Million Dollars ($160,000,000.00), not including CDD total assessments. Chapter 11 provides the most efficient and timely process for the Debtors to restructure their debt and bring their capital structure in line with today's market realities.

## A.    "First Day" Relief

In order to enable the Debtors to operate effectively and avoid the adverse effects of the Chapter 11 filings, the Debtors filed various types of "first-day" applications and motions (collectively, the "First Day Motions") with the Court seeking relief intended to allow the Debtors to effectively transition into Chapter 11 and minimize disruption of the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates.

On February 24, 2010, the Debtors filed an *Ex Parte* Motion to Hold First Day Hearings in Tampa Division [D.E. #21].  On February 25, 2010, the Court entered the Order Granting the First Day Hearing Motion [D.E. #32]. Following a hearing on March 3, 2010, and based upon the *Declaration of Anthony DiNardo In Support of Chapter 11 Petitions and First Day Motions* [D.E. #29], the Bankruptcy Court entered several orders (as described more fully in this section, collectively, the "First Day Orders") to help the Debtors stabilize day-to-day business operations. A brief summary of each of the First Day Orders is provided below.

### 1.    Procedural Orders

To facilitate a smooth and efficient administration of the Debtors' chapter 11 cases, the Bankruptcy Court entered several First Day Orders authorizing the Debtors to: (a) jointly administer the Chapter 11 Cases [D.E. #95]; (b) establish procedures for interim compensation and reimbursement of expenses to professionals, retained during the Chapter 11 cases [D.E. #172]; and (c) approving the Application of the Ordinary Course Professionals [D.E. #197].

### 2.    Employment and Retention of Professionals

On March 19, 2010, the Bankruptcy Court entered an Order authorizing the Debtors to retain the following professionals and advisors on an interim basis:  (a) Genovese Joblove & Battista, P.A. ("GJB"), as counsel to the Debtors [D.E. #91].

The Bankruptcy Court entered final orders authorizing the Debtors to retain the following professionals and advisors on a final basis:  (a) GJB, as counsel to the Debtors on April 23, 2010 [D.E. #156]; (b) Kapila & Company ("Kapila"), as Financial Consultants and Accountants on April 23, 2010 [D.E. #155]; (c) Moelis & Company, LLC ("Moelis"), as Financial Advisor and Investment Banker to the Debtors on June 17, 2010 [D.E. #262]; and (d) Woodward, Pires & Lombardo, P.A. ("Woodward"), as ordinary course professional to the Debtors on September 29, 2010 [D.E. #394]; (e) Berger Singerman, P.A., as counsel to Creditors Committee on April 27, 2010 [D.E. #167]; (f) Christopher Tierney & Hays Financial Consulting as Financial advisors to the Creditors Committee on June 17, 2010 [D.E.#265]; and (g) Trustee Services, Inc., as the Committee's Information Agent on June 1, 2010 [D.E. #233].

3. **Utility Providers**

The Debtors rely on utility services from various utility companies for water, sewer service, electricity, gas, telephone service, internet service, cable service and waste management. The Debtors were concerned that any interruption of utility services would threaten the Debtors' business operations. Accordingly, by an order dated April 23, 2010 [D.E. #152], the Bankruptcy Court prohibited utility providers from (a) altering or discontinuing services on account of the Debtors' commencement of their Chapter 11 cases or (b) requiring the payment of an additional deposit or other security on the Debtors' prepetition accounts.

4. **Chapter 11 Debtor-in-Possession Financing**

a. **Debtor-in-Possession Financing from Gulf Bay Capital, Inc.**

On February 24, 2010, the Debtors filed an *Emergency Motion for Entry of Interim and Final Orders Pursuant to Sections 361,363, 364(C) and (D) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure Authorizing (A) Debtors In Possession to Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating to the Foregoing, (D) Modifying the Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use of Cash Collateral and Granting Adequate Protection Thereof, (G) Scheduling a Final Hearing, and (H) Prescribing Form and Manner of Notice with Respect Thereto* seeking, among other things, authority to obtain (a) secured post-petition financing on a super-priority and priming basis from the DIP Lender, and (b) to use cash collateral of the Prepetition Secured Lenders (the "DIP Motion") [D.E.#10].

In connection with the DIP Motion the Court entered the following interim orders: (i) that certain *Interim Order Granting Motion Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto,* dated March 10, 2010 [D.E. #73] (the "<u>First Interim Order</u>"), (ii) that certain *Second Interim Order Granting Motion Pursuant To Sections 361, 363, 364(c) And (d) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto*, dated April 30, 2010 [D.E..# 184] (the "<u>Second Interim Order</u>"), (iii) that certain *Third Interim Order Granting Motion Pursuant To Sections 361, 363, 364(c) And (d) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-*

*Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto,* dated July 26, 2010 [D.E.# 310](the "Third Interim Order"), and (iv) that certain *Fourth Interim Order Granting Motion Pursuant To Sections 361, 363, 364(c) And (d) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto*, dated October 7, 2010 [D.E. # 416](the "Fourth Interim Order").

After conducting a fifth evidentiary hearing on November 30, 2010 (the "Fifth Interim Hearing") in respect of the Debtors' DIP Motion, the Debtors were authorized, among other things, to borrow from the DIP Lender one or more interim initial advances in an aggregate amount not to exceed the amounts set forth in the thirteen (13) weekly periods (the "Fifth Interim Period") contained in the budget admitted into evidence at the Fifth Interim Hearing up to a maximum borrowing of $7,300,422.00 when combined with the borrowings authorized by the Court pursuant to prior orders of the Court in respect of the DIP Motion.

As of the filing of this Disclosure Statement the aggregate outstanding Post-petition advances extended to the Debtors by the DIP Lender pursuant to the DIP Loan Documents and in accordance with and subject to the terms and conditions of the DIP Financing Orders, totaled $4,750,441 (excluding accrued and unpaid interest).

### b. DIP Financing and Use of Cash Collateral from Textron Financial Corporation and Iberia Bank as successor to Orion Bank

In connection with the DIP Motion, the Debtors filed on June 3, 2010, a Supplement to the DIP Motion relating to FC Golf, Ltd., seeking among other things authority to obtain (a) separate debtor-in-possession loan facility in the aggregate amount of up to $2,500,000 (with an initial advance of $900,000) from Textron (the "Textron DIP Loan") pursuant to the terms of the Textron Term Sheet dated June 4, 2010, to fund the operations of the Textron Collateral pursuant to the agreed upon budget and (b) use cash collateral from Textron and Iberia (the "DIP Motion Supplement") [D.E.#241]. The Textron DIP Loan included an intercreditor agreement between Textron and the DIP Lender wherein the DIP Lender agreed, among other things, not to prime Textron's Collateral.

In addition to the proceeds from the DIP Loan from the DIP Lender, certain of the Debtors (the FC Golf Debtors) also required the use of the cash generated from the operation of the Textron Collateral (namely the Creek Course at Fiddler's Creek and 126.42 acres of vacant land being utilized by the FC Gold Debtors as temporary driving range) and the cash generated from the operation of the Iberia Collateral (namely the Tarpon Club Marina and certain commercial units located at the MBOC, including, but not limited to, the banquet facilities, the *Sale e Pepe* restaurant facility, the gift shop and the spa located therein).

In connection with the proposed use of Cash Collateral each of FC Golf Debtors and the Tarpon Debtors were authorized to (i) use the Cash Collateral generated from the operations of the Textron Collateral and segregated from the proceeds of the DIP Loan and the cash generated by any other aspects of the Debtors' operations, and used solely to fund the operating expenses, in accordance with the Budget, related to the Textron Collateral; (ii) the Cash Collateral generated from the operations of the Iberia Collateral and segregated from the proceeds of the DIP Loan and the cash generated by any other aspects of the Debtors' operations, and used solely to fund the operating expenses, in accordance with the Budget, related to the Iberia Collateral; (iii) each of Textron and Iberia, received, *nunc pro tunc* as of the commencement of the Chapter 11 Cases, a replacement lien pursuant to Section §361(2) of the Bankruptcy Code on and in all property of FC Golf, with respect to Textron and the Tarpon Debtors, with respect to Orion, acquired or generated after the Petition Date, but solely to the same extent and priority, and of the same kind and nature, as the property of FC Golf and the Tarpon Debtors securing the prepetition obligations owed to Textron and Orion respectively (the "Cash Collateral Replacement Liens"), provided however, that in all events, such Cash Collateral Replacement Liens is junior and subordinate to the liens granted pursuant to the DIP Motion, in the Commitment Letter, and in the Interim Order to the DIP Lender in respect of the DIP Loan.

On September 28, 2010, the Court entered a *Final Order Granting Supplement Relating to FC Golf, Ltd. and Textron Financial Corporation (Textron) to Emergency Motion For Entry Of Interim And Final Orders Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor* [D.E. #393]("Textron DIP Order").

As of the filing of this Disclosure Statement the aggregate outstanding Post-petition advances extended to the Debtors by Textron pursuant to the Textron DIP Loan Documents and in accordance with and subject to the terms and conditions of the Textron DIP Financing Orders, totaled $1,399,000 (excluding accrued and unpaid interest).

## 5.    Iberia Bank as successor to Orion Bank – Forbearance Agreement

On or about April 29, 2004, Fiddler's Creek Foundation, Inc., ("FCF") a Florida corporation affiliated to the Debtors executed and delivered to 951 Debtor, a Promissory Note in the principal amount of $22,193,859, as assigned to Orion Bank, by virtue of an Allonge to Promissory Note dated August 3, 2006, and renewed by virtue of a Promissory Note executed and delivered by FCF in favor of Orion Bank, also dated August 3, 2006, in the then principal amount of $15,956,859.00, as subsequently renewed by virtue of a Promissory Note executed and delivered by Borrower in favor of Orion Bank,  also dated August 3, 2006, in the then principal amount of $15,956,859.00 (collectively, the "Note").    The Note is secured by a Mortgage, Assignment of Rents and Security Agreement dated April 29, 2004, given by FCF to 951 Debtor as collaterally assigned by 951 Debtor to Tomen by virtue of a Collateral Assignment of Security and Loan Documentation dated April 29, 2004, as reassigned by Tomen to 951 Debtor, by virtue of a Reassignment of Security and Loan Documentation dated July 21,

2006 as assigned to Orion Bank by virtue of an Assignment of Note, Mortgage and Loan Documents dated August 3, 2006, as modified by a Mortgage Modification and Extension of Payment Agreement dated August 3, 2006 encumbering the real property described as follows (the "Property"):

> Tract F-29, Fiddler's Creek, Phase 1B, Unit Three, according to the plat thereof, recorded in Plat Book 29, Pages 77 through 85, inclusive, of the Public Records of Collier County, Florida

together with an unrecorded Collateral Assignment of Foundation Capital Acquisition Assessments dated August 3, 2006 (collectively, the "Mortgage"). The Mortgage and the indebtedness secured thereby is further evidenced and secured by other documents including, but not limited to, various loan documents referenced in the Mortgage and is subject to the terms and conditions of a Loan Agreement dated August 3, 2006 (the "Loan Agreement").

Contemporaneously with the execution of the Mortgage and the Note, 951 Debtor and Fiddler's Creek, LLC, (collectively "Guarantors") executed and delivered to Orion Bank their respective Guaranty Agreements whereby Guarantors guaranteed full payment and performance of the Loan. The Note, Mortgage, Loan Agreement and Guaranty Agreements were all assigned by the Federal Deposit Insurance Corporation, as Receiver of Orion Bank, to Iberia by virtue of that Assignment of Note, Mortgage, Loan Documents and Collateral Documents dated effective November 13, 2009 (collectively the "Loan Documents").

Due to Guarantors' filing of Chapter 11 bankruptcy petitions on February 23, 2010, Iberia asserted a non-monetary default under the Loan Documents (the "Non-Monetary Default"). On or about March ___, 2010, FCF entered into a Forbearance and Restructure Agreement (the "Forbearance Agreement") with Iberia which modified the terms of the Loan Documents. Further, Iberia agreed to forbear from taking any legal action to enforce the Loan Documents from the date of the Agreement to and including September 30, 2011 (the "New Maturity Date").

The modified terms provide for FCF to pay interest from March 3, 2010, through the New Maturity Date as follows:

> From March 3, 2010 through April 14, 2010, interest shall accrue at the rate of 7.0% per annum but shall be paid at the rate of 4.25% per annum with such interest payable on April 14, 2010.
.
> From April 15, 2010 through the end of the Forbearance Period, interest shall be paid at the rate of 7% per annum and shall be due monthly beginning on May 15, 2010.

> The difference between the interest paid above, and the amount of interest accruing between March 3, 2010 and April 14, 2010 shall be payable on the New Maturity Date.

The Forbearance Agreement further provides that from and after the Effective Date through the New Maturity Date, the mandatory quarterly principal reduction payments to be

made by Borrower to Lender required under the Note shall be suspended provided, however, all Capital Acquisition Assessments payable per residential Unit pursuant to that Declaration of General Covenants, Conditions and Restrictions for Fiddler's Creek recorded in Official Records Book 2315, Pages 2050 through 2144, of the Public Records of Collier County, Florida and pursuant to the Collateral Assignment of Foundation Capital Acquisition Assessments given by Guarantors to Lender dated August 3, 2006 ("Capital Assessments") shall continue to be made to Lender as mandatory principal reduction payments under the Note, as and when the same are collected.

In consideration of the Iberia's agreement to forbear and to amend the terms of the Loan Documents, FCF agreed to pay to Iberia an amount equal to $647,980.00. The payment to Iberia was applied to the principal balance of the Note as of March 2, 2010, which resulted in a new principal balance of $9,287,879.00 as of the Petition Date.

## B.    Developments During the Chapter 11 Cases

### 1.    Filing of the Debtors' Schedules and Statement of Financial Affairs, Establishment of Deadlines to Submit Proof of Claim

#### a.    Debtors' Schedules and Statement of Financial Affairs

On April 9, 2010, each of the Debtors filed its schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and SOFA". The Schedules and SOFA provide information concerning each of the Debtors' assets, liabilities (including accounts payable), executory contracts and other financial information as of the Petition Date, all as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 of the Federal Rules of Bankruptcy Procedure.

#### b.    Bar Date(s)

On March 5, 2010, a Notice of Commencement was entered establishing the deadline for filing proofs of claim against the Debtors (the "Bar Date"). The deadline established by the Bankruptcy Court was originally May 10, 2010 for claims, excluding claims of governmental units as to which the bar date is 180 days from the date of the filing. On April 23, 2010, an order was entered extending the Bar Date to June 30, 2010 [D.E. #153]. A second Order was entered on June 14, 2010, extending the deadline to August 31, 2010 [D.E. #260]. The date established by Section 502(a)(9) of the Bankruptcy Code as the last day for a Governmental Unit to file a Proof of Claim against the Debtors in the Bankruptcy Cases was August 23, 2010 (the "Governmental Bar Date").

On September 28, 2010, the Court entered an Order extending the deadline for the filing of intercompany claims to December 3, 2010 [D.E. #390]. Given the size and complexity of these cases, the Debtors' need additional time to review and evaluate how to treat intercompany claims and will be seeking a second extension of the intercompany claims deadline for a period of 90 days to March 3, 2011.

### c. Claims Filed Against the Debtors

### (i) General Unsecured Claims

As of November 12, 2010, a total of approximately 6,689 claims have been filed against the Debtors on an aggregate basis. These claims are comprised of approximately $3,856,225 million in priority claims; $360,961,330.63 in secured claims, and $1,280,743,868.25 in unsecured claims. The Debtors believe that the total amount of unsecured claims is substantially overstated as a result of the Golf Club Members filing duplicate claims in each of the jointly administered cases.

### (ii) Golf Club Member Claims

As part of the unsecured claims filed in these cases, a number of claims have been filed by Golf Club Members. The Debtors believe that a very substantial number of the Golf Club claims are duplicative such that the total amount of claims asserted against the Debtors is significantly less when allowance is made for duplicate claims and unliquidated claims as to which an estimate was provided or can fairly be interpreted.

### 2. Appointment of the Creditors Committee

Section 1102 of the Bankruptcy Code requires that, absent an order of the Bankruptcy Court to the contrary, the U.S. Trustee must appoint a committee of unsecured creditors as soon as practicable (the "Creditors Committee"). On April 12, 2010, the U.S. Trustee appointed the Creditors' Committee [D.E. #132]. The Creditors' Committee is comprised of the following members:

Phillip Brougham
Committee Chairman
8587 Pepper Tree Way
Naples, Florida 34114

Al Love
Committee Vice Chairman
7685 Mulberry Lane
Naples, Florida 34114

Brian McGonagle
Lee County Port Authority
11000 Terminal Access Road
Suite 8671
Fort Myers, Florida 33913-8899

Raymond David
8579 Bellagio Drive
Naples, Florida 34114

Randy Long
Evans Oil Company
3170 Horseshoe Drive S.
Naples, Florida 34104

Glenn Vician
8605 Broadway
Merrillville, Indiana 46410

Dave Yates
7650 Mulberry Lane
Naples, Florida 34114

Sandy Carinci
9206 Museo Circle #101
Naples, Florida 34114

Torben Christensen
9270 Campanile Circle #204
Naples, Florida 34114

The Bankruptcy Court entered final orders authorizing the Official Committee of Unsecured Creditors (the "Committee") to retain the following professional and advisors on a final basis: (a) Berger Singerman, P.A., as counsel to the Committee on April 27, 2010; and, (b) Hays Financial Consulting, as Financial Advisors and Consultants for the Committee on June 17, 2010 [D.E.#265]; and (c) Trustee Services, Inc. as Information Agent for the Committee on June 1, 2010 [D.E. #233].

3.      Sale of Homes

To date, the Debtors have sought and obtained approval from the Court to sell twelve (12) homes and/or lots to third party retail purchasers as follows: (i) Callista Unit 103, Building 13, Phase 13 at Fiddler's Creek in the amount of $402,000.00, (ii) Majorca Lot 4 of Majorca Village at Fiddler's Creek in the amount of $990,000.00, (iii) Lot 31A of Mallard's Landing Village at Fiddler's Creek in the amount of $625,000.00, (iv) Lot 11 of Bellagio at Fiddler's Creek in the amount of $752,951.00. On April 28, 2010, the Court entered four (4) separate Agreed Orders Granting each of the First Sale Motion and Supplemental Sale Motion authorizing the Debtors to proceed with the sale and closing of the Callista, Majorca, Mallard and Bellagio Contracts pursuant to the agreed upon terms and conditions set forth in the Agreed Orders (collectively the "First Sale Orders") [D.E. #174, #175, #176, and #177].

On June 14, 2010, the Court entered the Order Granting the Second Sale Motion authorizing the Debtors to proceed with the sale and closing of the Majorca Contract pursuant to the agreed upon terms and conditions set forth in the Order (the "Majorca Sale Order") [D.E. #258] and approving that certain Purchase and Sale Agreement (the "Majorca Contract") between the Debtors and Ernest J. and Cynthia A Strack (the "Majorca Purchaser") for the purchase of Lot 5 of Majorca Village at Fiddler's Creek (the "Majorca Unit 5") in the amount of $1,140,000.00 [D.E. #258].

On July 9, 2010, the Debtors filed a Motion seeking the entry of an order pursuant to Sections 363(b), (f) and (m), 364, and 1108 of the Bankruptcy Code, and Rule 6004(c) of the Federal Rules of Bankruptcy Procedure (I) Approving that certain Purchase and Sale Agreement (the "Cranberry Contract") between GBFC Development, Ltd. (the "Selling Debtor") and Jeffrey and Cheryl Ningard (the "Cranberry Purchaser") for the purchase of Lot 36 of Cranberry Crossing Village at Fiddler's Creek (the "Cranberry Unit") in the amount of $542,450.00 (ii) Authorizing the Debtors to Consummate the Sale Free and Clear of All Liens, Claims and Encumbrances, with all such Liens, Claims and Encumbrances to Attach to the Net Proceeds Thereof, and (III) Authorizing the Debtors to Hold the Net Proceeds From the Sale in Escrow Pending Further Order of the Court (the "Cranberry Sale Motion") [D.E.# 291].

Additionally, on July 9, 2010, the Debtors filed a *Motion seeking the entry of an order pursuant to Sections 363, 364, 365 And 1108 Of The Bankruptcy Code (I) Approving And*

*Authorizing The Debtors To Assume Pre-Petition Contract For The Sale Of A Certain Condominium Unit In Callista At Fiddler's Creek (the "Callista Unit") in the amount of $750,000.00 to Mark E. Woolley and Kimberly S. Woolley (the "Callista Purchaser"), for the purchase of the condominium Unit 201, Building 17, Phase 17 of Callista at Fiddler's Creek (the "Callista Unit") (II) Authorizing The Debtors To Consummate The Sale Of Such Real Property Free And Clear Of All Liens, Claims And Encumbrances, With All Such Liens, Claims And Encumbrances To Attach To The Net Proceeds Thereof, And (III) Authorizing The Debtors To Hold The Net Proceeds From The Sale In Escrow Pending Further Order Of The Court And (B) Approving Settlement And Compromise Between GBFC Development, Ltd. And Mark E. Woolley And Kimberly S. Woolley Pursuant To Bankruptcy Rule 9019* [D.E. #292].

On July 21, 2010 the Court entered the *Order Granting (I) Motion for Approval of the Sale of a Lot 36 and Home in Cranberry Crossing Village, (II) Authorizing the Debtors to Consummate the Sale of such Real Property Free and Clear of Liens, Claims and Encumbrances, with all such Liens, Claims and Encumbrances to Attach to the Net Proceeds Thereof, and (III) Authorizing the Debtors to Hold The Net Proceeds from Sale in Escrow pending Further Order of Court* (the "Cranberry Sale Order") [D.E. #306] and the *Order Granting Expedited Motion for Approval and Authorization of the Debtors to Assume Pre-Petition Contract for the Sale of A Certain Condominium Unit in Callista at Fiddler's Creek, Motion to Sell Property Free and Clear of Liens, Claims and Encumbrances, With all Such Liens, Claims and Encumbrances to Attach to the Net Proceeds Thereof, and Authorizing the Debtors to Hold the Net Proceeds from the Sale in Escrow Pending Further Order of the Court., Motion Approving Settlement and Compromise between GBFC Development, LTD and Mark E. Woolley and Kimberly S. Woolley, Related Case Pursuant to Bankruptcy Rule 9019* (the "Callista Sale Order") [D.E. #307].

On September 16, 2010, the Court entered the *Order Granting (I) Motion for Approval of the Sale of a Lot 35 and Home in Bellagio, (II) Authorizing the Debtors to Consummate the Sale of such Real Property Free and Clear of Liens, Claims and Encumbrances, with all such Liens, Claims and Encumbrances to Attach to the Net Proceeds Thereof, and (III) Authorizing the Debtors to Hold The Net Proceeds from Sale in Escrow pending Further Order of Court* (the "Bellagio Sale Order") [D.E. #369] and  *Order Granting Expedited Motion for Approval and Authorization of the Debtors to Assume Pre-Petition Contract for the Sale of A Certain Condominium Unit 14-103 in Callista at Fiddler's Creek, Motion to Sell Property Free and Clear of Liens, Claims and Encumbrances, With all Such Liens, Claims and Encumbrances to Attach to the Net Proceeds Thereof, and Authorizing the Debtors to Hold the Net Proceeds from the Sale in Escrow Pending Further Order of the Court., Motion Approving Settlement and Compromise between GBFC Development, LTD and Michael and Susan Lofstedt Pursuant to Bankruptcy Rule 9019* [D.E. #370].

On October 20, 2010, the Court entered the *Agreed Order Granting (I) Motion for Approval of the Sale of a Lot 6 and Home in Bellagio, (II) Authorizing the Debtors to Consummate the Sale of such Real Property Free and Clear of Liens, Claims and Encumbrances, with all such Liens, Claims and Encumbrances to Attach to the Net Proceeds Thereof, and (III) Authorizing the Debtors to Disburse the Sale Proceeds in Accordance with the Order on Disbursement of Net Proceeds from the Sales of Real Property Securing Loan to*

*Regions Bank* (the "Bellagio Agreed Sale Order") [D.E. #435].

On November 12, 2010, the Court entered two *Agreed Orders on the Motions for Approval and Authorization of the Debtors to Assume Pre-Petition Contract for the Sale of A Certain Condominium Units 12-104 and 12-204 in Callista at Fiddler's Creek, Motion to Sell Property Free and Clear of Liens, Claims and Encumbrances, With all Such Liens, Claims and Encumbrances to Attach to the Net Proceeds Thereof, and Authorizing the Debtors to Disburse the Sale Proceeds in Accordance with the Order on Disbursement of Net Proceeds from the Sales of Real Property and Approving Settlement and Compromise between GBFC Development, LTD and Andrew Kearney and Michele Kearney respectively Pursuant to Bankruptcy Rule 9019* [D.E. #467 & #468].

As a result of such sales and closings, the Debtors have realized net proceeds from their standing real estate inventory in the amount of $6,151,893 since the Petition Date.

### 4. Exclusivity

On June 21, 2010, the Debtors filed a *Motion to Extend Exclusivity period pursuant to 11 U.S.C. §1121 through December 3, 2010 for filing a Chapter 11 Plan and February3, 2011 for solicitation of acceptance* [D.E. #273]. On October 5, 2010, the Court entered an Order Granting the Motion to Extend Exclusivity and extending the period through December 3, 2010 to file a Plan and February 3, 2010 for solicitation of acceptances [D.E. #411].

### 5. Violation of the Automatic Stay.

Prior to the Petition Date, 951 Land Holdings Ltd., operating as The Golf Club at Fiddler's Creek, entered into Golf Membership Agreements with home purchasers in the Fiddler's Creek community whereby such purchasers became members of the Golf Club at Fiddler's Creek, subject to the terms and conditions of the Golf Membership Agreements and a Golf Club Membership Plan. Upon the filing of the Debtors' petitions for relief under Chapter 11 of the Bankruptcy Code, the Debtors' legal and equitable interests in the Golf Membership Agreements became property of the Debtors' estates pursuant to Section 541(a) of the Bankruptcy Code. On April 22, 2010, Matthew Suffoletto, Raymond David, Steven Taub and Stephen Shulman (the "Plaintiffs"), all of whom are counter-parties to Golf Membership Agreements with one or more of the Debtors, through their counsel Robert Stochel, Glenn Vician and Eric Vasquez (the "Plaintiffs' Counsel"), filed a Class Action Complaint in the United States District Court for the Middle District of Florida, Case No. 2:10-CV-241-FTM-36-DNF (the "New Class Action Complaint"). The New Class Action Complaint identifies Debtor entities and asserts that the sole Defendant therein, Mr. Ferrao, has utilized these Debtor entities to cause harm to the Plaintiffs.

On May 10, 2010, the Debtors filed a *Motion to Impose Automatic Stay, Motion For Sanctions for Violation of the Automatic Stay under 11 U.S.C. Sec. 362(k), Motion For Contempt of Plaintiffs Matthew Suffoletto, Raymond David, Steven Taub and Stephen Shulman and Attorneys Robert Stochel, Glenn Vician and Eric Vasquez* [D.E. # 203] seeking a determination that the New Class Action Complaint constitutes (i) an act to exercise control over property of

the Debtors' estates, *i.e.*, the Golf Membership Agreements, in violation of Section 362(a)(3) of the Bankruptcy Code; and (ii) an act to assess claims against the Debtors that arose before the Petition Date, in violation of Section 362(a)(6) of the Bankruptcy Code.

On May 24, 2010, the Debtors filed their *Supplement to Debtors' Motion for an Order (I) Enforcing the Automatic Stay, (II) Awarding Sanctions for Intentional and Willful Violation of the Automatic Stay and (III) Holding Plaintiffs Matthew Suffoletto, Raymond David, Steven Taub and Stephen Shulman and Attorneys Robert Stochel, Glenn Vician and Eric Vasquez in Contempt of Court* [D.E. # 222]. On June 4, 2009, the Plaintiffs filed their *Response to Debtors' Motion for Enforcement of Automatic Stay, for Sanction, and for Contempt* [D.E. # 249] and *Supplemental Response to Debtors' Motion for Enforcement of Automatic Stay and for Sanctions* [D.E. # 250]. On June 11, 2010, the Debtors filed their Supplemental Response to *Authority in Support of Motion for Enforcement of Automatic Stay, and (ii) Reply to the Plaintiffs Response, each in connection with the Debtors Motion for an Order (I) Enforcing the Automatic Stay, (II) Awarding Sanctions for Intentional and Willful Violation of the Automatic Stay and (III) Holding Plaintiffs Matthew Suffoletto, Raymond David, Steven Taub and Stephen Shulman* [D.E. # 256].

On June 11, 2010, the Plaintiffs filed their *Supplemental Response to Motion to Enforce Automatic Stay, for Contempt and Sanctions and Supporting Memorandum of Law (Alter Ego Theory)* [D.E. # 257].

On September 15, 2010, the Court entered *its Order Granting Debtors' Motion To Impose Automatic Stay, And (B) Reserving Ruling on the Debtors' Request to Hold Plaintiffs Matthew Suffoletto, Raymond David, Steven Taub and Stephen Shulman and Attorneys Robert Stochel, Glenn Vician and Eric Vasquez in Contempt of Court for the Intentional and Willful Violation of the Automatic Stay and for the Award of Sanctions in Connection Therewith* [D.E. # 362] and on September 23, 2010 the Court entered its *Order Scheduling Final Evidentiary Hearing on Sanctions Issue related to Motion to impose automatic stay* for December 17, 2010 at 9:30 a.m. [D.E. # 386].

On September 29, 2010, Vician filed his Emergency Motion to Modify *Verified Motion For Entry Of Order Modifying The Automatic Stay To Allow Certain Settlement Agreement Litigation To Proceed To Trial In Federal Court* [DE # 395]. On November 16, 2010, Vician filed his *Motion for Protective Order and to Stay Pending Appeal Further Proceedings on the Bankruptcy Court's Order Granting Debtors' Motion for an Order Enforcing the Automatic Stay* [DE # 472]. On November 18, 2010 the Court entered its *Order Granting Motion To Modify the Automatic Stay as to Settlement Litigation filed by Glenn Vician* [DE # 475].

On November 29, 2010, Debtors filed *Motion for Protective Order Regarding Notice of Taking Deposition of Aubrey J. Ferrao Pursuant to Rule 7030, Federal Rules of Bankruptcy Procedure* [DE # 489]. On November 30, 2010, the Hearing regarding the *Motion for Protective Order Regarding Notice of Taking Deposition of Aubrey J. Ferrao Pursuant to Rule 7030, Federal Rules of Bankruptcy Procedure* was set for 12/3/2010 at 10:30 AM at Tampa, FL - Courtroom 9B, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue [DE # 494]. On December 2, 2010, Debtors filed *Motion to Compel Deposition Of Matthew Suffoletto, Stephen Shulman, Steven Taub, Robert E. Stochel, Eric John Vasquez and Raymond David* [DE # 499].

On November 30, 2010, and December 3, 2010, the Court heard arguments on the *Motion for Protective Order and to Stay Pending Appeal Further Proceedings on the Bankruptcy Court's Order Granting Debtors' Motion for an Order Enforcing the Automatic Stay* filed by Vician.

On December 3, 2010, the Hearing regarding *Motion to Compel Deposition Of Matthew Suffoletto, Stephen Shulman, Steven Taub, Robert E. Stochel, Eric John Vasquez and Raymond David. Filed by Bart A Houston on behalf of Debtor Fiddler's Creek, LLC* was set for 12/7/2010 at 03:00 PM at Tampa, FL - Courtroom 9B, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue [DE # 502].

### 6. SARE Motion by U. S. Bank National Association as Indenture Trustee

On June 3, 2010, Creditor U.S. Bank National Association ("U.S. Bank") filed its *Motion for Entry of an Order Determining that Certain Debtors Are Subject to the Single-Asset Real Estate Provisions of the Bankruptcy Code* [D.E. # 240] (the "SARE Motion"). By way of its Motion, U.S Bank sought entry of an Order determining that (i) the property of the SARE Debtors[2] is single-asset real estate, and (ii) that each of the SARE Debtors is subject to section 362(d)(3) of the Bankruptcy Code due to the fact that the infrastructure of the Fiddler's Creek Development was financed in great part by bond indebtedness and that to finance such infrastructure, local units of special purpose government districts were created pursuant to Chapter 190, Florida Statutes, the "Uniform Community Development District Act" (the "Act").

On August 10, 2010, Regions Bank filed its *Joinder in Motion for Entry of an Order Determining that Certain Debtors are Subject to the Single-Asset Real Estate Provisions of the Bankruptcy Code* [D.E. # 312]. On that same day, the Debtors filed its Opposition Response to *Motion for Entry of an Order Determining that Certain Debtors are Subject to the Single-Asset Real Estate Provisions of the Bankruptcy Code* [D.E. # 313]. On August 19, 2010, U.S. Bank filed its *Motion Supplement to Motion for Entry of an Order Determining that Certain Debtors Are Subject to the Single-Asset Real Estate Provisions of the Bankruptcy Code* [D.E. # 326]. On October 22, 2010, the Court entered its *Order Denying Motion for entry of an order determining that certain debtors are subject to the single-asset real estate provisions of the Bankruptcy Code* [D.E. # 438].

### 7. Pending Appeals

### a. Appeal by Glenn Vician

On October 19, 2010, the New Class Action Plaintiffs filed a *Motion for leave to appeal by Raymond David, Stephen Shulman, Robert Stochel, Matthew Suffoletto, Steven Taub, Eric Vasquez, Glenn S. Vician* [D.E. # 1] in the United States District Court for the Middle District of Florida, Case No. 8:10-cv-2342-VMC (the "Appeal"). On October 28, 2010, the Appellants

---

[2] The Debtors identified in the Motion as SARE Debtors are: DY Land Holdings II, LLC; DY Land Associates, Ltd.; FC Commercial, LLC; FC Parcel 73, LLC; GB Peninsula, Ltd.; GBP Development, Ltd.; and GBFC Development, Ltd.

filed *Appellants Brief by Robert Stochel, Eric Vasquez, Glenn S. Vician* [D.E. # 4]. On October 29, 2010, Appellees filed *Response In Opposition To Motion For Leave To Appeal* [D.E. # 5].

On November 8, 2010, Appellants filed *Motion For Protective Order and to Stay Pending Appeal Further Proceedings on the Bankruptcy Court's Order Granting Debtors' Motion for an Order Enforcing the Automatic Stay by Raymond David, Stephen Shulman, Robert Stochel, Matthew Suffoletto, Steven Taub, Eric Vasquez, Glenn S. Vician* [D.E.#9]. On November 11, 2010 Appellants filed *Motion To Strike Appellant's brief - bankrupty , or in the Alternative, Motion To Extend Appellee's Time to File Brief by Fiddler's Creek, LLC* [D.E. # 10]. On November 16, 2010 Appellants filed *Response In Opposition To Motion To Strike Appellant's brief - bankrupty , or in the Alternative, Motion To Extend Appellee's Time to File Brief by Fiddler's Creek, LLC* [D.E. # 12]. On November 17, 2010 Raymond David and Glenn S. Vician filed *Motion for miscellaneous relief, specifically to Terminate Jennis & Bowen, P.L. as Counsel of Record by Raymond David, Glenn S. Vician* [D.E. # 13].

On November 22, 2010 Appellees filed *Motion For Protective Order and to Stay Pending Appeal Further Proceedings on the Bankruptcy Court's Order Granting Debtors' Motion for an Order Enforcing the Automatic Stay by Raymond David, Stephen Shulman, Robert Stochel, Matthew Suffoletto, Steven Taub, Eric Vasquez, Glenn S. Vician* [D.E. # 14].

### b.	Appeal by U. S. Bank National Association as Indenture Trustee

On November 5, 2010, U.S. Bank filed its *Notice of Appeal* to the District Court pursuant to 28 U.S.C. §158(a) [D.E. # 461] appealing the *Order Denying Motion for entry of an order determining that certain debtors are subject to the single-asset real estate provisions of the Bankruptcy Code* [D.E. # 438].

### 8.	Pending Litigation Against Cushman & Wakefield, Inc., Sonnenblick-Goldman, LLC, John Doe # 1 and John Doe # 2 filed by Fiddler's Creek, LLC.

On January 13, 2010, Fiddler's Creek, LLC brought an action in the Circuit Court of the 20th Judicial Circuit In And For Collier County, Florida, seeking damages for breach of confidentiality agreement, breach of fiduciary duty, breach of covenant of good faith and fair dealing, misappropriation of confidential information and tortious interference with advantageous business relationships, all in furtherance of a conspiracy to implement an illegal, fraudulent and predatory "loan-to-own" scheme designed to steal the equity in, and control of, the Fiddler's Creek development. In order to counter the decline in the real estate market, Fiddler's Creek sought out lenders and investors willing to provide new credit facilities for the long term success of the Project. The Project retained the services of consultants specializing in real estate financing, debt restructuring and debt and equity placement. Cushman Wakefield, Inc. ("CWI") represented itself to be a global leader in real estate financial services, specializing in providing integrated capital solutions with access to global real estate capital markets.

In 2009, Fiddler's Creek retained CWI to assist in finding new credit facilities designed to protect the value and insure the success of the Project. CWI understood that it was extremely

important to Fiddler's Creek and a condition of a Confidentiality Agreement entered by the parties, not to disclose any confidential information it received from Fiddler's Creek; however, CWI intentionally and deliberately violated that trust. Without the written consent of Fiddler's Creek, CWI used confidential information it received to the detriment of Fiddler's Creek and the Project. The Debtor alleges that the Defendants disclosed and disseminated confidential information in violation of restrictive covenants and CWI's fiduciary duty, and improperly and unlawfully used the information to assist Tomen in a hostile and derogatory scheme to sell the Tomen Loans.

The Defendants advocated predatory lending practices to maximize the value of the Tomen Loans at the expense of Fiddler's Creek and to the detriment of the Project. The manner in which Defendants represented Tomen in the sale of the Tomen Loans was an inherent conflict of interest. The Defendants promoted the sale of the Tomen Loans, by disparaging the Project and disclosing confidential information about Fiddler's Creek's equity in the Project so as to accentuate Fiddler's Creek's guarantee obligation of the Tomen Loans. The Defendants also advocated a "loan-to-own" scheme suggesting to potential buyers of the Tomen Loans an opportunity for an illegal, fraudulent and predatory takeover of the Project, stripping Fiddler's Creek of its equity in, and control of, the Project. Upon information and belief, the Defendants have obtained prospective purchasers of the Tomen Loans, Doe 1 and Doe 2, who intend to assume Tomen's position and pursue an unlawful, predatory and hostile strategy to enforce the Fiddler's Creek guaranty and take over the Project. But for the improper use and dissemination of confidential information provided by the Defendants, such a "loan-to-own" scheme could not have been realized.

On March 5, 2010, CWI filed its Motion to Dismiss. On April 19, 2010, the Court entered its Order denying CWI's Motion to Dismiss. On May 6, 2010, CWI filed its Answer and Affirmative Defenses and Demand For Jury Trial. As of the present date, the litigation is in the discovery stages.


## VI.    SUMMARY OF THE PLANS OF REORGANIZATION

This section provides a summary of the structure, classification, treatment and implementation for each of the Plans filed in these jointly administered cases and is qualified in its entirety by reference to the each of the Plans filed contemporaneously hereto.

Although the statements contained in this Disclosure Statement include summaries of the provisions contained in each plan and in documents referred to therein, this Disclosure Statement does not purport to be a precise or complete statement of all the terms and provisions of the Plans filed or documents referred to therein, and reference is made to each plan and to such documents for the full and complete statements of such terms and provisions.

Each Plan filed and the documents referred therein will control the treatment of creditors and equity interest holders of each Debtor under that particular Plan and will, upon the effective date, be binding upon holders of claims against, and equity interests in, the Debtors, the Debtors' Estates, Reorganized Debtors, and other parties in interest.

## A.     Brief Explanation of Chapter 11 Reorganization

Chapter 11 of the Bankruptcy Code is the principal reorganization Chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and equity holders. Confirmation of a plan of reorganization is the principal objective of a Chapter 11 case.

In general, a Chapter 11 plan of reorganization (a) divides claims and interests into separate classes, (b) specifies the property that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization of the debtor. A Chapter 11 plan may specify that certain classes of claims or interests are either to be paid in full upon the effective date of the plan, reinstated, or their legal, equitable and contractual rights are to remain unchanged by the reorganization effectuated by the plan. Such classes are referred to under the Bankruptcy Code as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or interest in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property. Such classes are deemed to reject the plan.

All other classes of claims and interests contain "impaired" claims and interests entitled to vote on the plan. As a condition to confirmation, the Bankruptcy Code generally requires that each impaired class of claims or interests votes to accept a plan. Acceptances must be received (a) from the holders of claims constituting at least two-thirds in dollar amount and more than one-half in number of the allowed claims in each impaired class of claims that have voted to accept or reject the plan, and (b) from the holders of at least two-thirds in amount of the allowed interests in each impaired class of interest that have voted to accept or reject the plan. If any class or classes of claims or interests entitled to vote with respect to the plan rejects the plan, upon request of the plan proponents, the Bankruptcy Court may nevertheless confirm the plan if certain minimum treatment standards are met with respect to such class or classes.

Chapter 11 of the Bankruptcy Code does not require each holder of a claim or interest to vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan. However, the Bankruptcy Court must find that the plan of reorganization meets a number of statutory tests (other than the voting requirements described in this section) before it may confirm, or approve, the plan of reorganization. Many of these tests are designed to protect the interest of holders of claims or interest that do not vote to accept the plan of reorganization but who will nonetheless be bound by the plan's provisions if it is confirmed by the Bankruptcy Court.

## B.     Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires that a plan of reorganization classify the claims of a debtor's creditors and the interest of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if such claim or interest is substantially similar to the other claims of

such class. The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Plan consolidates the Debtors only for purposes of voting and distribution.

The Debtors believe that they have classified all Claims and Equity Interests in compliance with the requirements of the Bankruptcy Code. If a Creditor or holder of an Equity Interest challenges such classification of Claims or Equity Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors, to the extent permitted by the Bankruptcy Court, intend to make such reasonable modifications of the classifications of Claims or Equity Interests under the Plans to provide for whatever classification might be required by the Bankruptcy Court for confirmation, Except to the extent that such modification of classification adversely affects the treatment of a holder of a claim or equity interest and requires re-solicitation, acceptance of the Plans by any holder of a claim pursuant to this solicitation will be deemed to be a consent to that Plans treatment of such holder of a claim regardless of the class as to which such holder ultimately is deemed to be a member.

## C.    Treatment of Unclassified Claims

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, U.S. Trustee Fees, Priority Tax Claims, and the DIP Lender Allowed Claim have not been classified in the Plans.  The treatment accorded to Administrative Claims, U.S. Trustee Fees, Priority Tax Claims, and the DIP Lender Allowed Claim is set forth below.

Each of the Plans filed contemporaneously herewith provides for the treatment of unclassified claims as follows:

### 1.    Administrative Claims.

Each holder of an Allowed Administrative Claim (including Allowed Administrative Claims of Professionals) shall be paid (a) an amount, in Cash, by the Reorganized Debtor equal to the Allowed Amount of its Administrative Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, on the later of (i) the Effective Date, or as soon thereafter as reasonably practicable, or (ii) as soon as practicable after the date of a Final Order Allowing such Administrative Claim, (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as the case may be, with the consent of the Exit Financing Lender, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

All Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Bankruptcy Cases shall be paid by Reorganized Debtor (a) in the ordinary course of business in accordance with contract terms, (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Claim and the Debtors or Reorganized Debtors, as the case may be, with the consent of the Exit Financing Lender, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

**2.      United States Trustee's Fees**

All unpaid fees and charges assessed against the Debtors under Chapter 123 of title 28, United States Code, 28 U.S.C. §§1911-1930, for any calendar quarter ending prior to the Effective Date shall be paid to the United States Trustee by the Reorganized Debtors by no later than thirty (30) days following the Effective Date.  At the time of such payment, Reorganized Debtor shall provide to the United States Trustee an affidavit indicating the disbursements made by the Debtors for the relevant periods, if requested by the United States Trustee.  Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6), with respect to the Bankruptcy Cases shall be paid by the Reorganized Debtors, until the earlier of (i) the closing of the  Bankruptcy Cases by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Bankruptcy Cases or converting the Bankruptcy Cases to another chapter under the Bankruptcy Code.  Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6).  At the time of each such payment, the Reorganized Debtors shall provide to the United States Trustee an affidavit indicating the disbursements for the relevant period, if requested by the United States Trustee.

**3.      Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim shall receive from the Reorganized Debtors, on account of such Allowed Priority Tax Claim, regular installment payments in Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code commencing on the later of (i) the Effecitve Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Tax Claim.  Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Debtors, as the case may be, with the consent of the Exit Financing Lender.   The Reorganized Debtor shall have the right to prepay such Allowed Priority Tax Claims at any time, in whole or in part, without penalty or premium.

**4      DIP Lenders Allowed Claims.**

**a.      Gulf Bay Capital Inc. DIP Loan**

Pursuant to the DIP Financing Orders, the Bankruptcy Court has approved interim advances by the DIP Lender to the Debtors in an amount up to $7,300,422.00 which advances are secured, except as set forth in the DIP Financing Orders, by a first priority, priming Lien in favor of the DIP Lender on substantially all of the Property of the Debtors.

Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the DIP Lender is entitled to receive on the Effective Date, in full and final satisfaction, settlement, release, extinguishment, and discharge of the DIP Lender's Allowed Claim, Cash equal to the amount of the DIP Lender's

Allowed Claim. Notwithstanding, the Debtors propose that the treatment afforded the DIP Lender Allowed Claim in the Plans results in the DIP Lender Allowed Claim being deemed satisfied in full on the Effective Date in accordance with and pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code.

Accordingly, on the Effective Date, the DIP Lender shall receive, at the option of the DIP Lender to be exercised on or prior to the Confirmation Date, either one or a combination of the following: (i) Cash, when combined with the treatment of the DIP Lender Allowed Secured Claim under and pursuant to this Plans, of a value equal to the DIP Lender Allowed Claim; (ii) all right, title and interest of the Debtors in, to and under all of the Real Property securing the DIP Lender Allowed Claim owned by the Debtors (excluding the Regions' Vertical Collateral), which treatment shall be effected by the applicable Debtors transferring all such right, title and interest to the DIP Lender, or its assigns, on the Effective Date, subject in all events to any and all Liens for Allowed Claims (as restructured pursuant to the Plans) on such Real Property senior to the Liens of the DIP Lender, which Allowed Claims shall be assumed on a non-recourse basis by the DIP Lender or its successors and assigns; or (iii) such other treatment as may be agreed to between the DIP Lender and the Debtors on or before the Effective Date, with the consent of the Exit Financing Lender. Such treatment shall be in full and final satisfaction, settlement, release, extinguishment and discharge of the DIP Lender's Allowed Claim and all Liens granted in connection therewith. As of the Effective Date, without any further action by any party, the Liens on the Property of the Debtors that secure the DIP Loan shall be deemed to be extinguished, satisfied and released. To the extent that any Liens to secure the DIP Loan have been filed or recorded publicly, if requested by Reorganized Debtors, the DIP Lender shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens of record, but in all events subject to the treatment of such Liens as provided herein.

### b. Textron DIP Loan

Pursuant to the Textron DIP Financing Orders, the Bankruptcy Court has approved interim advances by Textron to the Debtors in an amount equal to $2,500,000.00 which advances are secured, except as set forth in the Textron DIP Financing Orders, by a post-petition lien in favor of Textron on substantially all of the Property of the FC Golf Debtors.

Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, Textron is entitled to receive on the Effective Date, in full and final satisfaction, settlement, release, extinguishment, and discharge of the Textron DIP Lender Allowed Claim, cash equal to the amount of the Textron DIP Lender's Allowed Claim. The Debtors propose that the treatment afforded Textron in respect of the Textron DIP Lender Allowed Claim in the Plans results in the Textron DIP Lender Allowed Claim being deemed satisfied in full on the Effective Date in accordance with and pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code.

On the Effective Date, Textron shall receive, in full and final satisfaction of the Textron DIP Loan, either (i) Cash of a value equal to the Allowed Claim of Textron in respect of the Textron DIP Loan, or (ii) such other treatment as may be agreed to between Textron and the FC Golf Debtors on or before the Effective Date, with the consent of the Exit Financing Lender. Such treatment shall be in full and final satisfaction, settlement, release, extinguishment and

discharge of Textron's DIP Loan and all Liens granted in connection therewith. As of the Effective Date, without any further action by any party, the Liens on the Property of the FC Golf Debtors that secure the Textron DIP Loan shall be deemed to be extinguished, satisfied and released. To the extent that any Liens to secure the Textron DIP Loan have been filed or recorded publicly, if requested by Reorganized Debtor, Textron shall take all commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens of record, but in all events subject to the treatment of such Liens as provided herein.

**D.       Request for Substantive Consolidation**

Since before the Chapter 11 Cases were filed, the Debtors have focused on the formulation of one or more plans of reorganization that would allow them to emerge quickly from Chapter 11 and preserve their value as a going concern. The Debtors recognize that in the market in which they operate, a lengthy and uncertain Chapter 11 process may detrimentally affect lender and buyer confidence in the Debtors, impair the Debtors' financial condition, and imperil the Debtors' prospects for a successful reorganization. The terms of the Plan are based on, among other things, the Debtors' assessment of their ability to successfully restructure their capitalization, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of Reorganized Debtors' business.

In summary, but subject to the more specific details provided herein, each of the Plans summarized below provide for the reorganization of the Debtors, the emergence of the Debtors from the Bankruptcy Cases as the Reorganized Debtor and the treatment of Allowed Claims against the Debtors and Allowed Equity Interests in the Debtors as provided in each of the Plans. Although the Debtors' Estates are presently being jointly administered for procedural purposes with Debtors and their respective Estates have not been substantively consolidated. Each of the Debtors intend to pursue confirmation of the Plans simultaneously.

The Plan will constitute a motion by the Debtors to substantively consolidate the Debtors with and into the corporate successor described in each Plan. If such motion is granted and the Plans are confirmed by the Bankruptcy Court, then, on the Effective Date of the Plans, the Properties of the Estates of the Debtors will be consolidated into one Estate as described therein, which Properties will then vest in the Reorganized Debtor on the Effective Date, subject to the terms of the Plan.

**E.       Treatment of Classified Claims and Equity Interests**

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Equity Interests in the Debtors. A Claim or Equity Interest is placed in a particular Class for the purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that Class and such Claim or Equity Interest has not been paid, released, or otherwise settled prior to the Effective Date. In accordance with Section 1123(a)(1)

of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in Sections 507(a)(2), 507(a)(3) and 507(a)(8) of the Bankruptcy Code have not been classified and their treatment is set forth above.

The Treatment of Classified Claims and Equity Interests for each of the Debtors is described in more detail below.

## F.      Summary of Joint Plans of Reorganization

**1.      Joint Plan of Reorganization for GBFC Development, Ltd. and GBFC Development, LLC, as debtors and debtors in possession (collectively, the "GBFC Debtors")(the "GBFC Plan").**

The GBFC Plan provides for the reorganization of the GBFC Debtors, the emergence of the GBFC Debtors from the Bankruptcy Cases as the Reorganized Debtor and the treatment of Allowed Claims against the GBFC Debtors and Allowed Equity Interests in the GBFC Debtors as provided in the Plan.  Although the GBFC Estates are presently being jointly administered for procedural purposes with the Other Debtors, the GBFC Debtors, the Other Debtors and their respective Estates have not been substantively consolidated.  Pursuant to the Plan, as of the Effective Date, GBFC Development, Ltd. will be converted under applicable law into a Florida limited liability company and re-named FCC Aviamar, LLC.  Immediately thereafter, GBFC Development, LLC will be substantively consolidated with and merged into FCC Aviamar, LLC pursuant to the terms of the Plan.

Except as otherwise specifically provided in the GBFC Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

### a)      **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth above.

### b)      **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim.  Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the GBFC Debtors or Reorganized Debtor, as the case may be, with the consent of the Exit Financing Lender. Class 1

is Unimpaired by the Plan. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c) **Class 2: Secured Real Estate Tax Claims – GBFC Real Property.**

Each Holder of an Allowed Secured Real Estate Tax Claim shall receive (i) the treatment provided for in Section 1129(a)(9)(D) of the Bankruptcy Code with interest on such Allowed Secured Real Estate Tax Claim at the rate provided for in Section 511 of the Bankruptcy Code, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the GBFC Debtors or the Reorganized Debtor and each such Holder prior to the Confirmation Date, with the consent of the Exit Financing Lender. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 2 Secured Real Estate Tax Claim is Allowed by a Final Order and shall be in full satisfaction, release and discharge of such Allowed Claim. Class 2 is Impaired. As a result, each Holder of an Allowed Class 2 Secured Claim is entitled to vote to accept or reject the Plan.

d) **Class 3A:  Secured CDD Off Roll Bond Claims.**

Class 3A consists of the Secured CDD Off Roll Bond Claims. As of the Effective Date, each Allowed Secured CDD Off Roll Bond Claim shall be reinstated and de-accelerated, and as a result thereof each Holder of an Allowed Secured CDD Off Roll Bond Claim shall (A) retain its respective first, priority Prepetition Lien on the GBFC Real Property securing such Allowed Claim *pari passu* with the Lien in favor of the Holder of the Allowed Secured Real Estate Tax Claim on such GBFC Real Property, and (B) receive (i) semi-annual payments of principal and interest on such Allowed Claim on November 1st and May 1st of each year commencing on May 1, 2014 (the "First Payment Date") and continuing thereafter through the existing respective Prepetition maturity date set forth in the applicable Bond Documents for each such Allowed Claim with interest on such Allowed Claim at the annual, non-default rate as provided for in the applicable Bond Documents for each such Allowed Claim, provided however, that interest accruing on each such Allowed Claim from the Petition Date through the Effective Date, together with interest accruing from and after the Effective Date through the First Payment Date shall be capitalized and added to the principal amount of each such Allowed Claim as of the First Payment Date, or (b) such other treatment as otherwise authorized by the Bankruptcy Code or agreed to by the GBFC Debtors or the Reorganized Debtor and each such Holder prior to the Confirmation Date, with the consent of the Exit Financing Lender. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 3A Secured CDD Off Roll Bond Claim is Allowed by a Final Order and shall be in full and final satisfaction, release and discharge of such Allowed Claim. Class 3A is Impaired. As a result, each Holder of an Allowed Class 3A Secured Claim is entitled to vote to accept or reject the Plan

e) **Class 3B:  Secured CDD Off Roll O&M Claims.**

Class 3B consists of the Secured CDD Off Roll O&M Claims.  As of the Petition Date, and since the Petition Date, the GBFC Debtors were current and have remained current on the payment of the CDD Off Roll O&M Claims. The GBFC Debtors will continue to pay such CDD

Off Roll O&M Claims through the Effective Date. As of the Effective Date, each Allowed Secured CDD Off Roll O&M Claim shall be reinstated and de-accelerated, and as a result thereof each Holder of an Allowed Secured CDD Off Roll O&M Claim shall (A) retain its respective first, priority Prepetition Lien on the GBFC Real Property securing such Allowed Claim *pari passu* with the Lien in favor of the Holder of the Allowed Secured Real Estate Tax Claim on such GBFC Real Property, and (B) shall receive payments in respect of such Allowed Secured CDD Off Roll O&M Claims from and after the Effective Date in such amounts and at such times as are required in accordance and consistent with resolutions and other directives of the applicable CDD or applicable non-bankruptcy law. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 3B Secured CDD Off Roll O&M Claim is Allowed by a Final Order and shall be in full and final satisfaction, release and discharge of such Allowed Claim. Class 3B is Impaired. As a result, each Holder of an Allowed Class 3B Secured Claim is entitled to vote to accept or reject the Plan.

    f)    **Class 4: Secured Claim of Regions Bank, N.A.**

Class 4 consists of the Secured Claim of Regions Bank, N.A. The Class 4 Secured Claim of Regions Bank, N.A. shall be fully and finally satisfied: (1) from and by (a) the treatment provided Regions Bank, N.A. under the Other Plan of 951 Land Holdings, Ltd. and (b) (i) the GBFC Debtors transferring all of their right, title and interest in, to and under the Regions Vertical Collateral securing such Allowed Class 4 Secured Claim to Regions Bank, N.A., or its assignee, free and clear of any and all Liens, Claims and encumbrances in accordance with Sections 363(b) and (f) and 1129(b)(2)(A)(iii) of the Bankruptcy Code, provided however, that such transfer shall occur immediately after and subject to the treatment afforded to the Class 2 Secured Real Estate Tax Claims in respect of the Regions Vertical Collateral, with Regions Bank, N.A. or its assignee assuming such Class 2 Secured Real Estate Tax Claims on a non-recourse basis, (ii) the DIP Lender agreeing to release and discharge any and all Liens on the Regions Vertical Collateral securing the DIP Lender Allowed Claim as of the Effective Date; and (iii) the GBFC Debtors and Regions Bank, N.A. entering into an agreement, in form and substance reasonably acceptable to each of them and the Exit Financing Lender, providing for the transition of the Regions Vertical Collateral to Regions Bank, N.A, or its assignee, and the marketing and sales process to be engaged in by Regions Bank, N.A. from and after the Effective Date with respect to the disposition of the Regions Vertical Collateral (the "Marketing Agreement"), or (2) as agreed to by the Holder of such Allowed Claim and the GBFC Debtors or Reorganized Debtor, with the consent of the Exit Financing Lender.

The transfer of the Regions Vertical Collateral as provided herein shall have the full benefit of the exemptions from documentary stamp and other taxes as provided in section 1146(a) of the Bankruptcy Code.

The Marketing Agreement shall, among other things, provide that (i) Regions Bank, N.A. shall have access to the Fiddler's Creek community for purposes of marketing and selling the Regions Vertical Collateral, subject to compliance with any and all applicable rules and regulations of the Fiddler's Creek community related thereto, (ii) the retail end user purchasers of the Regions Vertical Collateral from Regions Bank, N.A. shall have the same rights in regards to the amenities in the Fiddler's Creek community as if such purchasers purchased the Regions

Vertical Collateral directly from the Debtors, and (iii) the Debtors agree that they shall not impose or implement materially less restrictive design and development standards for housing units within the Fiddler's Creek community without providing notice of such standards to Regions Bank, N.A. Such satisfaction shall occur on the later of the Effective Date or the date each respective Class 4 Secured Claim of Regions Bank, N.A. is Allowed by a Final Order. In addition, as of the Effective Date, Regions Bank, N.A. shall release and discharge, or at the option of the GBFC Debtors assign to such Person or Entity as directed by the GBFC Debtors with the consent of the Exit Financing Lender, any and all Liens on any other Property of the GBFC Debtors. Regions Bank, N.A. and the Debtors shall exchange mutual general releases in a form reasonably acceptable to Regions Bank, N.A. and the Debtors except for the obligations of the parties contained in this Plan and the Other Plan for 951 Land Holdings, Ltd. Class 4 is Impaired. As a result, Regions Bank, N.A., as the Holder of an Allowed Class 4 Secured Claim is entitled to vote to accept or reject the Plan.

g) **Class 5: Unsecured Convenience Claims**

(i) Class 5 consists of all Unsecured Convenience Claims. Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 5. Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 6 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 5 under the Plan by making the Convenience Class Opt-In Election. The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii) Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii) Class 5 is Impaired by the Plan. Each Holder of an Allowed Unsecured Convenience Claim in Class 5 is entitled to vote to accept or reject the Plan.

h) **Class 6: Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

(i) Class 6 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii) Under the Plan, each Holder of an Allowed Unsecured Claim in Class 6 shall receive, an amount in Cash equal to five (5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date, and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter. Class 6 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 6 is entitled to vote to accept or reject the Plan.

i)      **Class 7:  Equity Interests.**

Class 7 consists of all Equity Interests.  On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered.  Class 7 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 7 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

**2.      Joint Plan of Reorganization for FC Beach, Ltd. and FC Beach, LLC, as debtors and debtors in possession (collectively, the "FC Beach Debtors") (the "FC Beach Plan").**

The FC Beach Plan provides for the reorganization of the FC Beach Debtors, the emergence of the FC Beach Debtors from the Bankruptcy Cases as the Reorganized Debtor and the treatment of Allowed Claims against the FC Beach Debtors and Allowed Equity Interests in the FC Beach Debtors as provided in the Plan.  Although the FC Beach Estates are presently being jointly administered for procedural purposes with the Other Debtors, the FC Beach Debtors, the Other Debtors and their respective Estates have not been substantively consolidated. Pursuant to the Plan, as of the Effective Date, FC Beach, Ltd. will be converted under applicable law into a Florida limited liability company and renamed FCC Beach Hotel, LLC.  Immediately thereafter, FC Beach, LLC will be substantively consolidated and merged with and into FCC Beach Hotel, LLC pursuant to the terms of the Plan.

Except as otherwise specifically provided in the FC Beach Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

a)      **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth above.

b)      **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim.  Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the FC Beach Debtors or Reorganized Debtor, as the case may be, with the consent of the Exit Financing Lender.  Class 1

is Unimpaired by the Plan. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c) **Class 2:  Secured Real Estate Tax Claims.**

Class 2 consists of the Secured Real Estate Tax Claims against the FC Beach Real Property. Each Holder of an Allowed Secured Real Estate Tax Claim in Class 2 shall receive (i) the treatment provided for in Section 1129(a)(9)(D) of the Bankruptcy Code with interest on such Allowed Secured Real Estate Tax Claim at the rate provided for in Section 511 of the Bankruptcy Code, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the FC Beach Debtors or the Reorganized Debtor and each such Holder prior to the Confirmation Date, with the consent of the Exit Financing Lender. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 2 Secured Real Estate Tax Claim is Allowed by a Final Order and shall be in full satisfaction, release and discharge of such Allowed Claim. Class 2 is Impaired by the Plan and each Holder of an Allowed Secured Claim in Class 2 is entitled to vote to accept or reject the Plan.

d) **Class 3:  Unsecured Convenience Claims**

(i) Class 3 consists of all Unsecured Convenience Claims. Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 3. Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 4 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 3 under the Plan by making the Convenience Class Opt-In Election. The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii) Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii) Class 3 is Impaired by the Plan. Each Holder of an Allowed Unsecured Convenience Claim in Class 3 is entitled to vote to accept or reject the Plan.

e) **Class 4:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

(i) Class 4 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii)     Under the Plan, each Holder of an Allowed Unsecured Claim in Class 7 shall receive, an amount in Cash equal to five (5%) percent of such Allowed Unsecured Claim in six (6)  semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter.  Class 4 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 4 is entitled to vote to accept or reject the Plan.

f)        **Class 5:  Equity Interests.**

Class 5 consists of all Equity Interests.  On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered.    Class 5 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 5 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan

**3.        Joint Plan of Reorganization for DY Land Associates, Ltd.  and DY Associates, LLC, as debtors and debtors in possession (collectively, the "DY Land Debtors")(the "DY Land Plan").**

The DY Land Plan provides for the reorganization of the DY Land Debtors, the emergence of the DY Land Debtors from the Bankruptcy Cases as the Reorganized Debtor and the treatment of Allowed Claims against the DY Land Debtors and Allowed Equity Interests in the DY Land Debtors as provided in the Plan.  Although the DY Land Estates are presently being jointly administered for procedural purposes with the Other Debtors, the DY Land Debtors, the Other Debtors and their respective Estates have not been substantively consolidated.  Pursuant to the Plan, as of the Effective Date, DY Land Associates, Ltd. will be converted under applicable law into a Florida limited liability company and re-named FCC Preserve, LLC.  Immediately thereafter, DY Associates, LLC will be substantively consolidated with and merged into FCC Preserve, LLC pursuant to the terms of the Plan.

Except as otherwise specifically provided in the DY Land Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

a)        **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth above.

b)        **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in

accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Codeon the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim. Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the DY Land Debtors or Reorganized Debtor, as the case may be with the consent of the Exit Financing Lender. Class 1 is Unimpaired by the Plan. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c) **Class 2: Secured Real Estate Tax Claims.**

Class 2 consists of the Secured Real Estate Tax Claims against the DY Land Real Property. Each Holder of an Allowed Secured Real Estate Tax Claim in Class 2 shall receive (i) the treatment provided for in Section 1129(a)(9)(D) of the Bankruptcy Code with interest on such Allowed Secured Real Estate Tax Claim at the rate provided for in Section 511 of the Bankruptcy Code, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the DY Land Debtors or the Reorganized Debtor and each such Holder prior to the Confirmation Date with the consent of the Exit Financing Lender. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 2 Secured Real Estate Tax Claim is Allowed by a Final Order and shall be in full satisfaction, release and discharge of such Allowed Claim. Class 2 is Impaired. As a result, each Holder of an Allowed Class 2 Secured Claim is entitled to vote to accept or reject the Plan.

d) **Class 3A: Secured CDD Off Roll Bond Claims.**

Class 3A consists of the Secured CDD Off Roll Bond Claims against the DY Land Real Property. As of the Effective Date, each Allowed Secured CDD Off Roll Bond Claim shall be reinstated and de-accelerated, and as a result thereof each Holder of an Allowed Secured CDD Off Roll Bond Claim shall (A) retain its respective first, priority Prepetition Lien on the DY Land Real Property securing such Allowed Claim *pari passu* with the Lien in favor of the Holder of the Allowed Secured Real Estate Tax Claim on such DY Land Real Property, and (i) receive semi-annual payments of principal and interest on such Allowed Claim on November 1st and May 1st of each year commencing on May 1, 2014 (the "First Payment Date") and continuing thereafter through the existing respective Prepetition maturity date set forth in the applicable Bond Documents for each such Allowed Claim with interest on such Allowed Claim at the annual, non-default rate as provided for in the applicable Bond Documents for each such Allowed Claim, provided however that interest accruing on each such Allowed Claim from the Petition Date through the Effective Date, together with interest accruing from and after the Effective Date through the First Payment Date shall be capitalized and added to the principal amount of each such Allowed Claim as of the First Payment Date, or (B) such other treatment as otherwise authorized by the Bankruptcy Code or agreed to by the DY Land Debtors or the Reorganized Debtor and each such Holder prior to the Confirmation Date, with the consent of the Exit Financing Lender. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 3A Secured CDD Off Roll Bond Claim is Allowed by a Final Order and shall be in full and final satisfaction, release and discharge of such Allowed Claim.

Class 3A is Impaired.  As a result, each Holder of an Allowed Class 3A Secured Claim is entitled to vote to accept or reject the Plan.

e) **Class 3B:  Secured CDD Off Roll O&M Claims.**

Class 3B consists of the Secured CDD Off Roll O&M Claims.   As of the Petition Date, and since the Petition Date, the DY Land Debtors were current and have remained current on the payment of the CDD Off Roll O&M Claims.  The DY Land Debtors will continue to pay such CDD Off Roll O&M Claims through the Effective Date.  As of the Effective Date, each Allowed Secured CDD Off Roll O&M Claim shall be reinstated and de-accelerated, and as a result thereof each Holder of an Allowed Secured CDD Off Roll O&M Claim shall (A) retain its respective first, priority Prepetition Lien on the DY Land Real Property securing such Allowed Claim *pari passu* with the Lien in favor of the Holder of the Allowed Secured Real Estate Tax Claim on such DY Land Real Property, and (B) shall receive payments in respect of such Allowed Secured CDD Off Roll O&M Claims from and after the Effective Date in such amounts and at such times as are required in accordance and consistent with resolutions and other directives of the applicable CDD or applicable non-bankruptcy law.  Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 3B Secured CDD Off Roll O&M Claim is Allowed by a Final Order and shall be in full and final satisfaction, release and discharge of such Allowed Claim.  Class 3B is Impaired.  As a result, each Holder of an Allowed Class 3B Secured Claim is entitled to vote to accept or reject the Plan.

f) **Class 4: Secured Claim of Florida Financial Investments, Inc.**

Class 4 consists of the Secured Claim of Florida Financial Investments, Inc.   The Allowed Class 4 Secured Claim of Florida Financial Investments, Inc. shall be satisfied by FFI: (A)(i) retaining its first, priority Prepetition Lien on the FFI Collateral, with the DIP Lender releasing its Lien securing the DIP Lender Allowed Claim from the FFI Collateral as of the Effective Date, and (ii) accruing, deferring and capitalizing interest on the Allowed Class 4 Secured Claim on a monthly basis, at the annual interest rate provided for in the FFI Loan Documents, with all unpaid principal, interest and other charges due and payable in full in one installment on December 31, 2016, or (B) such other treatment as otherwise authorized by the Bankruptcy Code or agreed to by the DY Land Debtors and FFI prior to the Confirmation Date, with the consent of the Exit Financing Lender.    Such satisfaction shall be in full and final satisfaction, release and discharge of such Allowed Claim.  Class 4 is Impaired. As a result, each Holder of an Allowed Class 4 Secured Claim is entitled to vote to accept or reject the Plan.

g) **Class 5:  Unsecured Convenience Claims**

(i)      Class 5 consists of all Unsecured Convenience Claims.  Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 5.  Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 6 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 5 under the Plan by making the Convenience Class Opt-In Election.  The Convenience Class Opt-

In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii)    Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii)   Class 5 is Impaired by the Plan.   Each Holder of an Allowed Unsecured Convenience Claim in Class 5 is entitled to vote to accept or reject the Plan.

h)      **Class 6:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

(i)   Class 6 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii)   Under the Plan, each Holder of an Allowed Unsecured Claim in Class 7 shall receive, an amount in Cash equal to five (5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter.  Class 6 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 6 is entitled to vote to accept or reject the Plan.

i)      **Class 7:  Equity Interests.**

Class 7 consists of all Equity Interests.  On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered.  Class 7 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 7 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

**4.     Joint Plan of Reorganization for 951 Land Holdings, Ltd. and 951 Land Holdings, LLC, as debtors and debtors in possession (collectively, the "951 Debtors")(the "951 Plan").**

The 951 Plan provides for the reorganization of the 951 Debtors, the emergence of the 951 Debtors from the Bankruptcy Cases as the Reorganized Debtor and the treatment of Allowed Claims against the 951 Debtors and Allowed Equity Interests in the 951 Debtors as provided in the Plan.  Although the 951 Estates are presently being jointly administered for procedural purposes with the Other Debtors, the 951 Debtors, the Other Debtors and their respective Estates have not been substantively consolidated.  Pursuant to the Plan, as of the Effective Date, 951 Land Holdings, Ltd. will be converted under applicable law to a Florida limited liability company and re-named FCC Marsh Cove, LLC.  Immediately thereafter, 951 Land Holdings, LLC will be substantively consolidated with and merged into FCC Marsh Cove, LLC pursuant to the terms of the Plan.

Except as otherwise specifically provided in the 951 Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

a)      **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth above.

b)      **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim.  Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the 951 Debtors or Reorganized Debtor, as the case may be with the consent of the Exit Financing Lender. Class 1 is Unimpaired by the Plan.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c)      **Class 2A:  Secured Real Estate Tax Claims – KeyBank Collateral.**

Class 2A consists of the Secured Real Estate Tax Claims against the KeyBank Collateral. On the Effective Date, the legal, equitable and contractual rights of each Holder of an Allowed Secured Real Estate Tax Claim encumbering the KeyBank Collateral shall be left unaltered. Class 2A is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Secured Claim in Class 2A is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

d)      **Class 2B: Secured Real Estate Tax Claims – 951 Real Property (excluding the KeyBank Collateral).**

Class 2B consists of the Secured Real Estate Tax Claims against the 951 Real Property (excluding the KeyBank Collateral).  Each Holder of an Allowed Secured Real Estate Tax Claim in Class 2B shall receive (i) the treatment provided for in Section 1129(a)(9)(D) of the Bankruptcy Code with interest on such Allowed Secured Real Estate Tax Claim at the rate provided for in Section 511 of the Bankruptcy Code, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the 951 Debtors or the Reorganized Debtor and each such Holder prior to the Confirmation Date with the consent of the Exit Financing Lender.  Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 2B

Secured Real Estate Tax Claim is Allowed by a Final Order and shall be in full satisfaction, release and discharge of such Allowed Claim. Class 2B is Impaired. As a result, each Holder of an Allowed Class 2B Secured Claim is entitled to vote to accept or reject the Plan.

e) **Class 3A: Secured CDD Off Roll Bond Claims (KeyBank Collateral).**

Class 3A consists of the Secured CDD Off Roll Bond Claims against the KeyBank Collateral. As of the Effective Date, the legal, equitable and contractual rights of each Holder of an Allowed Secured CDD Off Roll Bond Claim encumbering the KeyBank Collateral shall be left unaltered. Class 3A is Unimpaired. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Secured Claim in Class 3A is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan

f) **Class 3B: Secured CDD Off Roll Bond Claims- 951 Real Property (excluding the KeyBank Collateral)**

Class 3B consists of the Secured CDD Off Roll Bond Claims against the 951 Real Property excluding the KeyBank Collateral. As of the Effective Date, each Allowed Secured CDD Off Roll Bond Claim in this Class 3B shall be reinstated and de-accelerated, and as a result thereof each such Holder of an Allowed Secured CDD Off Roll Bond Claim shall (A) retain its respective first, priority Prepetition Lien on the 951 Real Property (excluding the KeyBank Collateral) securing such Allowed Claim *pari passu* with the Lien in favor of the Holder of the Allowed Secured Real Estate Tax Claim on such 951 Real Property (excluding the KeyBank Collateral), and (B) receive (i) semi-annual payments of principal and interest on such Allowed Claim on November 1st and May 1st of each year commencing on May 1, 2014 (the "First Payment Date") and continuing thereafter through the existing respective Prepetition maturity date set forth in the applicable Bond Documents for each such Allowed Claim with interest on such Allowed Claim at the annual, non-default rate as provided for in the applicable Bond Documents for each such Allowed Claim, provided however, that interest accruing on each such Allowed Claim from the Petition Date through the Effective Date, together with interest accruing from and after the Effective Date through the First Payment Date shall be capitalized and added to the principal amount of each such Allowed Claim as of the First Payment Date, or (b) such other treatment as otherwise authorized by the Bankruptcy Code or agreed to by the 951 Debtors or the Reorganized Debtor and each such Holder prior to the Confirmation Date, with the consent of the Exit Financing Lender. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 3B Secured CDD Off Roll Bond Claim is Allowed by a Final Order and shall be in full and final satisfaction, release and discharge of such Allowed Claim. Class 3B is Impaired. As a result, each Holder of an Allowed Class 3B Secured Claim is entitled to vote to accept or reject the Plan

g) **Class 3C: Secured CDD Off Roll O&M Claims – 951 Real Property (excluding the KeyBank Collateral).**

Class 3C consists of the Secured CDD Off Roll O&M Claims against the 951 Real Property excluding the KeyBank Collateral. As of the Petition Date, and since the Petition Date, the 951 Debtors were current and have remained current on the payment of the CDD Off Roll

O&M Claims.  The 951 Debtors will continue to pay such Class 3C CDD Off Roll O&M Claims through the Effective Date.  As of the Effective Date, each Allowed Secured CDD Off Roll O&M Claim in this Class 3C shall be reinstated and de-accelerated, and as a result thereof each such Holder of an Allowed Secured CDD Off Roll O&M Claim shall (A) retain its respective first, priority Prepetition Lien on the 951 Real Property (excluding the KeyBank Collateral) securing such Allowed Claim *pari passu* with the Lien in favor of the Holder of the Allowed Secured Real Estate Tax Claim thereon, and (B) shall receive payments in respect of such Allowed Secured CDD Off Roll O&M Claims from and after the Effective Date in such amounts and at such times as are required in accordance and consistent with resolutions and other directives of the applicable CDD or applicable non-bankruptcy law.  Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 3C Secured CDD Off Roll O&M Claim is Allowed by a Final Order and shall be in full and final satisfaction, release and discharge of such Allowed Claim.  Class 3C is Impaired.  As a result, each Holder of an Allowed Class 3C Secured Claim is entitled to vote to accept or reject the Plan.

h)      **Class 4: Secured Claim of KeyBank, N.A.**

Class 4 consists of the Secured Claim of KeyBank, N.A.   The Class 4 Secured Claim of KeyBank, N.A. shall be satisfied: (i) from and by the 951 Debtors transferring all of their right, title and interest in, to and under the KeyBank Collateral securing such Allowed Class 4 Secured Claim to KeyBank, N.A. in full and final satisfaction, release and discharge of the Allowed Claim of KeyBank, including the Allowed Class 4 Secured Claim in accordance with Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, subject in all events to the Lien securing the DIP Lender Allowed Claim and any other Liens senior in priority to the Liens in favor of KeyBank, N.A. on the KeyBank Collateral, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the Holder of such Allowed Claim and the 951 Debtors or Reorganized Debtor, with the consent of the Exit Financing Lender.  Such satisfaction shall occur on the later of the Effective Date or the date the Class 4 Secured Claim of KeyBank, N.A. is Allowed by a Final Order.  Class 4 is Impaired.  As a result, each Holder of an Allowed Class 4 Secured Claim is entitled to vote to accept or reject the Plan.

i)      **Class 5: Secured Claim of Mellon United National Bank.**

Class 5 consists of the Secured Claim of Mellon United National Bank.   The Allowed Class 5 Secured Claim of Mellon United National Bank shall be satisfied by Mellon United National Bank: (A)(i) retaining its first, priority Prepetition Lien on the Mellon Collateral, with the DIP Lender releasing its Lien securing the DIP Lender Allowed Claim from the Mellon Collateral as of the Effective Date, and (ii) receiving monthly payments of principal and interest based on an annual interest rate of prime plus 1% and a twenty (20) year amortization period, which payments shall commence on the date that is thirty (30) days after the later of the Effective Date or the date the Class 5 Secured Claim of Mellon United National Bank is Allowed by a Final Order, and continuing monthly thereafter through December 31, 2016, on which date all unpaid principal, interest and other charges shall be due and payable in full, provided however that interest accruing on such Allowed Claim from the Petition Date through the Effective Date shall be capitalized and added to the principal amount of such Allowed Claim as of the Effective Date, or (B) such other treatment as otherwise authorized by the Bankruptcy

Code or agreed to by the 951 Debtors or the Reorganized Debtor and Mellon United National Bank prior to the Confirmation Date with the consent of the Exit Financing Lender. Such satisfaction shall be in full and final satisfaction, release and discharge of such Allowed Claim. Class 5 is Impaired. As a result, each Holder of an Allowed Class 5 Secured Claim is entitled to vote to accept or reject the Plan.

j) **Class 6: Secured Claim of Regions Bank, N.A.**

Class 6 consists of the Secured Claim of Regions Bank, N.A. against the Regions Lot Collateral. Regions Bank, N.A., the 951 Debtors and GBFC Development, Ltd. (one of the Other Debtors) have reached an agreement as to the satisfaction of the Allowed Claims of Regions Bank, N.A. against the 951 Debtors and GBFC Development, Ltd., which agreement is contained in the Other Plan for GBFC Development, Ltd. and in this Plan. Specifically, as it relates to the 951 Debtors, as of the Effective Date, Regions Bank, N.A. shall release and discharge, or at the option of the 951 Debtors assign as directed by the 951 Debtors with the consent of the Exit Financing Lender, any and all Liens on the Regions Lot Collateral. Regions Bank, N.A. and the Debtors shall exchange mutual general releases in a form reasonably acceptable to Regions Bank, N.A. and the 951 Debtors consistent with the terms contained in this Plan. Class 6 is Impaired. As a result, each Holder of an Allowed Class 6 Secured Claim is entitled to vote to accept or reject the Plan.

k) **Class 7: Unsecured Convenience Claims**

(i) Class 7 consists of all Unsecured Convenience Claims. Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 7. Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 8 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 7 under the Plan by making the Convenience Class Opt-In Election. The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii) Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii) Class 7 is Impaired by the Plan. Each Holder of an Allowed Unsecured Convenience Claim in Class 7 is entitled to vote to accept or reject the Plan.

l) **Class 8: Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

(i) Class 8 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii)     Under the Plan, each Holder of an Allowed Unsecured Claim in Class 8 shall receive, an amount in Cash equal to five (5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter.  Class 8 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 8 is entitled to vote to accept or reject the Plan.

m)     **Class 9:  Equity Interests.**

Class 9 consists of all Equity Interests.  On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered.  Class 9 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 9 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

**5.     Joint Plan of Reorganization for FC Golf, Ltd. and FC Golf, LLC, as debtors and debtors in possession (collectively, the "FC Golf Debtors")(the "FC Golf Plan").**

The FC Golf Plan provides for the reorganization of the FC Golf Debtors, the emergence of the FC Golf Debtors from the Bankruptcy Cases as the Reorganized Debtor and the treatment of Allowed Claims against the FC Golf Debtors and Allowed Equity Interests in the FC Golf Debtors as provided in the Plan.  Although the FC Golf Estates are presently being jointly administered for procedural purposes with the Other Debtors, the FC Golf Debtors, the Other Debtors and their respective Estates have not been substantively consolidated.  Pursuant to the Plan, as of the Effective Date, FC Golf, Ltd. will be converted under applicable law into a Florida limited liability company and renamed FCC Golf Club, Ltd.  Immediately thereafter, FC Golf, LLC will be substantively consolidated with and merged into FCC Golf Club, LLC pursuant to the terms of the Plan.

Except as otherwise specifically provided in the FC Golf Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

a)     **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender and Textron with respect to the DIP Lender Allowed Claims shall receive the treatment set forth abpve.

b)     **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the

Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim. Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the FC Golf Debtors or Reorganized Debtor, as the case may be, with the consent of the Exit Financing Lender. Class 1 is Unimpaired by the Plan. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c) **Class 2: Secured Real Estate Tax Claims.**

Each Holder of an Allowed Secured Real Estate Tax Claim shall receive (i) the treatment provided for in Section 1129(a)(9)(D) of the Bankruptcy Code with interest on such Allowed Secured Real Estate Tax Claim at the rate provided for in Section 511 of the Bankruptcy Code, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the FC Golf Debtors or the Reorganized Debtor and each such Holder prior to the Confirmation Date with the consent of the Exit Financing Lender. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 2 Secured Real Estate Tax Claim is Allowed by a Final Order and shall be in full satisfaction, release and discharge of such Allowed Claim. Class 2 is Impaired. As a result, each Holder of an Allowed Class 2 Secured Claim is entitled to vote to accept or reject the Plan.

d) **Class 3A: Secured CDD Off Roll Bond Claims.**

Class 3A consists of the Secured CDD Off Roll Bond Claims. As of the Effective Date, each Allowed Secured CDD Off Roll Bond Claim shall be reinstated and de-accelerated, and as a result thereof each Holder of an Allowed Secured CDD Off Roll Bond Claim shall (A) retain its respective first, priority Prepetition Lien on the FC Golf Real Property securing such Allowed Claim *pari passu* with the Lien in favor of the Holder of the Allowed Secured Real Estate Tax Claim on such FC Golf Real Property, and (B) receive (i) semi-annual payments of principal and interest on such Allowed Claim on November 1st and May 1st of each year commencing on May 1, 2014 (the "First Payment Date") and continuing thereafter through the existing respective Prepetition maturity date set forth in the applicable Bond Documents for each such Allowed Claim with interest on such Allowed Claim at the annual, non-default rate as provided for in the applicable Bond Documents for each such Allowed Claim, provided however, that interest accruing on each such Allowed Claim from the Petition Date through the Effective Date, together with interest accruing from and after the Effective Date through the First Payment Date shall be capitalized and added to the principal amount of each such Allowed Claim as of the First Payment Date, or (b) such other treatment as otherwise authorized by the Bankruptcy Code or agreed to by the FC Golf Debtors or the Reorganized Debtor and each such Holder prior to the Confirmation Date, with the consent of the Exit Financing Lender. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 3A Secured CDD Off Roll Bond Claim is Allowed by a Final Order and shall be in full and final satisfaction, release and discharge of such Allowed Claim. Class 3A is Impaired. As a result, each Holder of an Allowed Class 3A Secured Claim is entitled to vote to accept or reject the Plan.

e)	**Class 3B:  Secured CDD Off Roll O&M Claims.**

Class 3B consists of the Secured CDD Off Roll O&M Claims.   As of the Petition Date, and since the Petition Date, the FC Golf Debtors were current and have remained current on the payment of the CDD Off Roll O&M Claims.  The FC Golf Debtors will continue to pay such CDD Off Roll O&M Claims through the Effective Date.  As of the Effective Date, each Allowed Secured CDD Off Roll O&M Claim shall be reinstated and de-accelerated, and as a result thereof each Holder of an Allowed Secured CDD Off Roll O&M Claim shall (A) retain its respective first, priority Prepetition Lien on the FC Golf Real Property securing such Allowed Claim *pari passu* with the Lien in favor of the Holder of the Allowed Secured Real Estate Tax Claim on such FC Golf Real Property, and (B) shall receive payments in respect of such Allowed Secured CDD Off Roll O&M Claims from and after the Effective Date in such amounts and at such times as are required in accordance and consistent with resolutions and other directives of the applicable CDD or applicable non-bankruptcy law.  Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 3B Secured CDD Off Roll O&M Claim is Allowed by a Final Order and shall be in full and final satisfaction, release and discharge of such Allowed Claim.  Class 3B is Impaired.  As a result, each Holder of an Allowed Class 3B Secured Claim is entitled to vote to accept or reject the Plan.

f)	**Class 4: Secured Claim of Textron Financial Corporation.**

Class 4 consists of the Secured Claim of Textron Financial Corporation.   The Allowed Class 4 Secured Claim of Textron Financial Corporation shall be satisfied by Textron: (A)(i) retaining its first priority Prepetition Lien on the Textron Collateral, and (ii) receiving monthly payments of principal and interest based on an annual interest rate of prime plus 1% and a twenty (20) year amortization period, which payments shall commence on the date that is thirty (30) days after the later of the Effective Date or the date the Class 4 Secured Claim of Textron is Allowed by a Final Order, and continuing monthly thereafter through December 31, 2016, on which date all unpaid principal, interest and other charges shall be due and payable in full, or (B) such other treatment as otherwise authorized by the Bankruptcy Code or agreed to by the FC Golf Debtors and Textron prior to the Confirmation Date with the consent of the Exit Financing Lender.   Such satisfaction shall be in full and final satisfaction, release and discharge of such Allowed Claim.  Class 4 is Impaired.  As a result, each Holder of an Allowed Class 4 Secured Claim is entitled to vote to accept or reject the Plan.

g)	**Class 5:  Unsecured Convenience Claims**

(i)	Class 5 consists of all Unsecured Convenience Claims.  Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 5.  Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 6 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 5 under the Plan by making the Convenience Class Opt-In Election.  The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii)    Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii)    Class 5 is Impaired by the Plan. Each Holder of an Allowed Unsecured Convenience Claim in Class 5 is entitled to vote to accept or reject the Plan.

h)    **<u>Class 6: Unsecured Claims (Unsecured Claims Not Otherwise Classified)</u>.**

(i)    Class 6 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii)    Under the Plan, each Holder of an Allowed Unsecured Claim in Class 6 shall receive, an amount in Cash equal to five (5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter. Class 6 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 6 is entitled to vote to accept or reject the Plan.

i)    **<u>Class 7: Equity Interests</u>.**

Class 7 consists of all Equity Interests. On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered. Class 7 is Unimpaired. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 7 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

**6.    Plan of Reorganization for Fiddler's Creek Management, Inc. (the "FCM Debtor")(the "FCM Plan").**

The FCM Plan provides for the reorganization of the FCM Debtor, the emergence of the FCM Debtor from the Bankruptcy Case as the Reorganized Debtor and the treatment of Allowed Claims against the FCM Debtor and Allowed Equity Interests in the FCM Debtor as provided in the Plan. Although the FCM Estate is presently being jointly administered for procedural purposes with the Other Debtors, the FCM Debtor, the Other Debtors and their respective Estates have not been substantively consolidated.

Except as otherwise specifically provided in the FCM Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

a)      **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth above.

b)      **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim.  Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the FCM Debtor or Reorganized Debtor, as the case may be with the consent of the Exit Financing Lender. Class 1 is Unimpaired by the Plan.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c)      **Class 2:  Unsecured Convenience Claims**

(i)      Class 2 consists of all Unsecured Convenience Claims.  Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 2.  Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 3 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 2 under the Plan by making the Convenience Class Opt-In Election.  The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii)      Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii)      Class 2 is Impaired by the Plan.  Each Holder of an Allowed Unsecured Convenience Claim in Class 2 is entitled to vote to accept or reject the Plan.

d)      **Class 3:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

(i)      Class 3 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii)     Under the Plan, each Holder of an Allowed Unsecured Claim in Class 7 shall receive, an amount in Cash equal to fiv (5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter.  Class 3 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 3 is entitled to vote to accept or reject the Plan.

e)      **Class 4:  Equity Interests**.

Class 4 consists of all Equity Interests.  On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered.  Class 4 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 4 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

**7.     Joint Plan of Reorganization for GBP Development, Ltd, and GBP Development, LLC, as debtors and debtors in possession (collectively, the "GBP Debtors")(the "GBP Plan").**

The GBP Plan provides for the reorganization of the GBP Debtors, the emergence of the GBP Debtors from the Bankruptcy Cases as the Reorganized Debtor and the treatment of Allowed Claims against the GBP Debtors and Allowed Equity Interests in the GBP Debtors as provided in the Plan.  Although the GBP Estates are presently being jointly administered for procedural purposes with the Other Debtors, the GBP Debtors, the Other Debtors and their respective Estates have not been substantively consolidated.  Pursuant to the Plan, as of the Effective Date, GBP Development, Ltd. will be converted under applicable law into a Florida limited liability company and re-named FCCP Development, LLC.  Immediately thereafter, GBP Development, LLC will be substantively consolidated with and merged into FCCP Development, LLC., pursuant to the terms of the Plan.

Except as otherwise specifically provided in the GBP Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

a)      **Unclassified Claims**.

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth above.

b)      **Class 1:  Priority Claims**.

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in

accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim. Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the GBP Debtors or Reorganized Debtor, as the case may be, with the consent of the Exit Financing Lender. Class 1 is Unimpaired by the Plan. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c) **Class 2: Secured Real Estate Tax Claims – Fifth Third Collateral).**

Class 2 consists of the Secured Real Estate Tax Claims against the Fifth Third Collateral. On the Effective Date, the legal, equitable and contractual rights of each Holder of an Allowed Secured Real Estate Tax Claim encumbering the Fifth Third Collateral shall be left unaltered. Class 2 is Unimpaired by the Plan. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of Class 2A Allowed Secured Claim is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

d) **Class 3A: Secured CDD Off Roll Bond Claims – Fifth Third Collateral.**

Class 3A consists of the Secured CDD Off Roll Bond Claims. As of the Effective Date, the legal, equitable and contractual rights of each Holder of an Allowed Secured CDD Off Roll Bond Claim encumbering the Fifth Third Collateral shall be left unaltered. Class 3A is Unimpaired. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Secured Claim in Class 3A is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

e) **Class 3B: Secured CDD Off Roll O&M Claims – Fifth Third Collateral.**

Class 3B consists of the Secured CDD Off Roll O&M Claims. As of the Effective Date, the legal, equitable and contractual rights of each Holder of an Allowed Secured CDD Off Roll O&M Claim encumbering the Fifth Third Collateral shall be left unaltered. Class 3B is Unimpaired. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Secured Claim in Class 3B is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

f) **Class 4: Secured Claim of Fifth Third Bank, N.A.**

Class 4 consists of the Secured Claim of Fifth Third Bank, N.A. The Class 4 Secured Claim of Fifth Third Bank, N.A. shall be satisfied: (i) from and by the GBP Debtors transferring all of their right, title and interest in, to and under the Fifth Third Collateral securing such Allowed Class 4 Secured Claim to Fifth Third Bank, N.A. subject in all events to any and all Liens for Allowed Claims senior to the Liens of Fifth Third Bank, N.A. thereon (including the DIP Lender Allowed Claim and the Allowed Secured Claim in Classes 2, 3A and 3B above), which transfer shall be in full and final satisfaction, release and discharge of such Allowed Class

4 Secured Claim in accordance with Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the Holder of such Allowed Claim and the GBP Debtors or Reorganized Debtor, with the consent of the Exit Financing Lender. Such satisfaction shall occur on the later of the Effective Date or the date each respective Class 4 Secured Claim of Fifth Third Bank, N.A. is Allowed by a Final Order. Class 4 is Impaired. As a result, each Holder of an Allowed Class 4 Secured Claim is entitled to vote to accept or reject the Plan.

g)      **Class 5:  Unsecured Convenience Claims**

(i)      Class 5 consists of all Unsecured Convenience Claims. Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 5. Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 6 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 5 under the Plan by making the Convenience Class Opt-In Election. The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii)      Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii)      Class 5 is Impaired by the Plan. Each Holder of an Allowed Unsecured Convenience Claim in Class 5 is entitled to vote to accept or reject the Plan.

h)      **Class 6:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

(i)      Class 6 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii)      Under the Plan, each Holder of an Allowed Unsecured Claim in Class 6 shall receive, an amount in Cash equal to five (5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter. Class 6 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 6 is entitled to vote to accept or reject the Plan.

i)      **Class 7:  Equity Interests.**

Class 7 consists of all Equity Interests.  On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered.  Class 7 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 7 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan

**8.      Joint Plan of Reorganization for GB Peninsula, Ltd., as a debtor and debtor in possession (the "GB Debtor")(the "GB Plan").**

The GB Plan provides for the reorganization of the GB Debtor, the emergence of the GB Debtor from the Bankruptcy Case as the Reorganized Debtor and the treatment of Allowed Claims against the GB Debtor and Allowed Equity Interests in the GB Debtor as provided in the Plan.  Although the GB Estate is presently being jointly administered for procedural purposes with the Other Debtors, the GB Debtor, the Other Debtors and their respective Estates have not been substantively consolidated.   Pursuant to the Plan, as of the Effective Date, the GB Debtor will be converted under applicable law into a Florida limited liability company and re-named FCC Veneta, LLC.

Except as otherwise specifically provided in the GB Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

a)      **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth above.

b)      **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim.  Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the GB Debtor or Reorganized Debtor, as the case may be with the consent of the Exit Financing Lender. Class 1 is Unimpaired by the Plan.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c) **Class 2: Secured Real Estate Tax Claims – GB Real Property.**

Class 2 consists of the Secured Real Estate Tax Claims against the GB Real Property. Each Holder of an Allowed Secured Real Estate Tax Claim in Class 2 shall receive (i) the treatment provided for in Section 1129(a)(9)(D) of the Bankruptcy Code with interest on such Allowed Secured Real Estate Tax Claim at the rate provided for in Section 511 of the Bankruptcy Code, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the GB Debtor or the Reorganized Debtor and each such Holder prior to the Confirmation Date with the consent of the Exit Financing Lender. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 2 Secured Real Estate Tax Claim is Allowed by a Final Order and shall be in full satisfaction, release and discharge of such Allowed Claim. Class 2 is Impaired. As a result, each Holder of an Allowed Class 2 Secured Claim is entitled to vote to accept or reject the Plan.

d) **Class 3A:  Secured CDD Off Roll Bond Claims .**

Class 3A consists of the Secured CDD Off Roll Bond Claims. As of the Effective Date, each Allowed Secured CDD Off Roll Bond Claim shall be reinstated and de-accelerated, and as a result thereof each Holder of an Allowed Secured CDD Off Roll Bond Claim shall (A) retain its respective first, priority Prepetition Lien on the GB Real Property securing such Allowed Claim *pari passu* with the Lien in favor of the Holder of the Allowed Secured Real Estate Tax Claim on such GB Real Property, and (B) receive (i) semi-annual payments of principal and interest on such Allowed Claim on November 1st and May 1st of each year commencing on May 1, 2014 (the "First Payment Date") and continuing thereafter through the existing respective Prepetition maturity date set forth in the applicable Bond Documents for each such Allowed Claim with interest on such Allowed Claim at the annual, non-default rate as provided for in the applicable Bond Documents for each such Allowed Claim, provided however, that interest accruing on each such Allowed Claim from the Petition Date through the Effective Date, together with interest accruing from and after the Effective Date through the First Payment Date shall be capitalized and added to the principal amount of each such Allowed Claim as of the First Payment Date, or (b) such other treatment as otherwise authorized by the Bankruptcy Code or agreed to by the GB Debtor or the Reorganized Debtor and each such Holder prior to the Confirmation Date, with the consent of the Exit Financing Lender. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 3A Secured CDD Off Roll Bond Claim is Allowed by a Final Order and shall be in full and final satisfaction, release and discharge of such Allowed Claim. Class 3A is Impaired. As a result, each Holder of an Allowed Class 3A Secured Claim is entitled to vote to accept or reject the Plan.

e) **Class 3B:  Secured CDD Off Roll O&M Claims.**

Class 3B consists of the Secured CDD Off Roll O&M Claims. As of the Petition Date, and since the Petition Date, the GB Debtor were current and have remained current on the payment of the CDD Off  Roll O&M Claims. The GB Debtor will continue to pay such CDD Off Roll O&M Claims through the Effective Date. As of the Effective Date, each Allowed Secured CDD Off Roll O&M Claim shall be reinstated and de-accelerated, and as a result thereof each Holder of an Allowed Secured CDD Off Roll O&M Claim shall (A) retain its respective

first, priority Prepetition Lien on the GB Real Property securing such Allowed Claim *pari passu* with the Lien in favor of the Holder of the Allowed Secured Real Estate Tax Claim on such GB Real Property, and (B) shall receive payments in respect of such Allowed Secured CDD Off Roll O&M Claims from and after the Effective Date in such amounts and at such times as are required in accordance and consistent with resolutions and other directives of the applicable CDD or applicable non-bankruptcy law. Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 3B Secured CDD Off Roll O&M Claim is Allowed by a Final Order and shall be in full and final satisfaction, release and discharge of such Allowed Claim. Class 3B is Impaired. As a result, each Holder of an Allowed Class 3B Secured Claim is entitled to vote to accept or reject the Plan.

f) **Class 4: Unsecured Convenience Claims**

(i) Class 4 consists of all Unsecured Convenience Claims. Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 4. Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 5 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 4 under the Plan by making the Convenience Class Opt-In Election. The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii) Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii) Class 4 is Impaired by the Plan. Each Holder of an Allowed Unsecured Convenience Claim in Class 4 is entitled to vote to accept or reject the Plan.

g) **Class 5: Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

(i) Class 5 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii) Under the Plan, each Holder of an Allowed Unsecured Claim in Class 5 shall receive, an amount in Cash equal to five (5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter. Class 5 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 5 is entitled to vote to accept or reject the Plan.

h) **Class 6:  Equity Interests.**

Class 6 consists of all Equity Interests.  On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered.  Class 6 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 6 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

9. **Joint Plan of Reorganization for DY Land Holdings II, LLC, FC Commercial, LLC and FC Parcel 73, LLC, as debtors and debtors in possession (collectively, the "DY/FC Debtors")(the "DY/FC Plan").**

The DY/FC Plan provides for the reorganization of the DY/FC Debtors, the emergence of the DY/FC Debtors from the Bankruptcy Cases as the Reorganized Debtor and the treatment of Allowed Claims against the DY/FC Debtors and Allowed Equity Interests in the DY/FC Debtors as provided in the Plan.  Although the DY/FC Estates are presently being jointly administered for procedural purposes with the Other Debtors, the DY/FC Debtors, the Other Debtors and their respective Estates have not been substantively consolidated.

Except as otherwise specifically provided in the DY/FC Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

a) **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth above.

b) **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim..  Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the DY/FC Debtors or Reorganized Debtor, as the case may be with the consent of the Exit Financing Lender. Class 1 is Unimpaired by the Plan.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c) **Class 2: Secured Real Estate Tax Claims – DY/FC Real Property.**

Class 2 consists of the Secured Real Estate Tax Claims against the DY/FC Real Property. On the Effective Date, the legal, equitable and contractual rights of each Holder of an Allowed Secured Real Estate Tax Claim encumbering the DY/FC Real Property shall be left unaltered. Class 2 is Unimpaired. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Secured Claim in Class 2 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

d) **Class 3: Secured CDD Off Roll Bond Claims .**

Class 3 consists of the Secured CDD Off Roll Bond Claims. As of the Effective Date, the legal, equitable and contractual rights of each Holder of an Allowed Secured CDD Off Roll Bond Claim encumbering the DY/FC Real Property shall be left unaltered. Class 3 is Unimpaired. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Allowed Secured Claim in Class 3 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

e) **Class 4: Secured Claims of Colonnade Naples Land, LLC.**

Class 4 consists of the Secured Claims of Colonnade Naples Land, LLC. The Class 4 Secured Claims of Colonnade Naples Land, LLC shall be satisfied: (i) from and by the DY/FC Debtors transferring all of their right, title and interest in, to and under the Colonnade Collateral securing the respective Allowed Class 4 Secured Claim to Colonnade Naples Land, LLC in full and final satisfaction, release and discharge of the Allowed Claims of Colonnade, including the Allowed Class 4 Secured Claim in accordance with Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, subject in all events to those Liens securing the DIP Lender Allowed Claim and any other Liens senior in priority to the Liens in favor of Colonnade on the Colonnade Collateral, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the Holder of such Allowed Claim and the DY/FC Debtors or Reorganized Debtor, with the consent of the Exit Financing Lender. Such satisfaction shall occur on the later of the Effective Date or the date the Class 4 Secured Claim of Colonnade is Allowed by a Final Order. Class 4 is Impaired. As a result, the Holder of an Allowed Class 4 Secured Claim is entitled to vote to accept or reject the Plan.

f) **Class 5: Unsecured Convenience Claims**

(i) Class 5 consists of all Unsecured Convenience Claims. Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 5. Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 6 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 5 under the Plan by making the Convenience Class Opt-In Election. The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii) Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii) Class 4 is Impaired by the Plan. Each Holder of an Allowed Unsecured Convenience Claim in Class 4 is entitled to vote to accept or reject the Plan.

g) **Class 6: Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

(i) Class 6 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii) Under the Plan, each Holder of an Allowed Unsecured Claim in Class 6 shall receive, an amount in Cash equal to five(5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter. Class 6 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 6 is entitled to vote to accept or reject the Plan.

h) **Class 7: Equity Interests.**

Class 7 consists of all Equity Interests. On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered. Class 7 is Unimpaired. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 7 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

**10. Joint Plan of Reorganization for Gulf Bay Hospitality, Ltd. and Gulf Bay Hospitality Company, LLC (the "Gulf Bay Debtors"), FC Hotel, Ltd. and FC Hotel, LLC (the "FC Hotel Debtors"), Gulf Bay Hotel Company, Ltd. and Gulf Bay Hotel Company, LLC (the "GB Hotel Debtors"), FC Resort, Ltd. and FC Resort, LLC (the "FC Resort Debtors") and GBFC Marina, Ltd. and FC Marina, LLC (the "FC Marina Debtors"), as debtors and debtors in possession (collectively, the Gulf Bay Debtors, the FC Hotel Debtors, the GB Hotel Debtors, the FC Resort Debtors and the FC Marina Debtors are referred to herein as, the "Tarpon Club Debtors")(the "Tarpon Club Plan").**

The Tarpon Club Plan provides for the reorganization of the Tarpon Club Debtors, the emergence of the Tarpon Club Debtors from the Bankruptcy Cases as the Reorganized Debtor and the treatment of Allowed Claims against the Tarpon Club Debtors and Allowed Equity Interests in the Tarpon Club Debtors as provided in the Plan. Although the Tarpon Club Estates are presently being jointly administered for procedural purposes with the Other Debtors, the Tarpon Club Debtors, the Other Debtors and their respective Estates have not been substantively consolidated.

Pursuant to the Tarpon Club Plan, as of the Effective Date, each of Gulf Bay Hospitality, Ltd., FC Hotel, Ltd., Gulf Bay Hotel Company, Ltd., FC Resort, Ltd. and GBFC Marina, Ltd. will be converted under applicable law into a separate Florida limited liability company and then immediately thereafter, each of Gulf Bay Hospitality, LLC., FC Hotel, LLC., Gulf Bay Hotel Company, LLC., FC Resort, LLC. and FC Marina, LLC, respectively, will be substantively consolidated with and merged into its respective limited partnership entity (after such conversion).

Except as otherwise specifically provided in the Tarpon Club Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

a)      **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth above.

b)      **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim.  Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the Tarpon Club Debtors or Reorganized Debtor, as the case may be with the consent of the Exit Financing Lender. Class 1 is Unimpaired by the Plan.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c)      **Class 2:  Secured Real Estate Tax Claims.**

Class 2- consists of the Secured Real Estate Tax Claims against the Tarpon Club Real Property.  Each Holder of an Allowed Secured Real Estate Tax Claim in Class 2 shall receive (i) the treatment provided for in Section 1129(a)(9)(D) of the Bankruptcy Code with interest on such Allowed Secured Real Estate Tax Claim at the rate provided for in Section 511 of the Bankruptcy Code, or (ii) as otherwise authorized by the Bankruptcy Code or agreed to by the Tarpon Club Debtors or the Reorganized Debtor and each such Holder prior to the Confirmation Date with the consent of the Exit Financing Lender.  Each such satisfaction shall occur on the later of the Effective Date or the date each respective Class 2 Secured Real Estate Tax Claim is Allowed by a Final Order and shall be in full satisfaction, release and discharge of such Allowed

Claim. Class 2 is Impaired. As a result, each Holder of an Allowed Class 2 Secured Claim is entitled to vote to accept or reject the Plan.

d) **Class 3: Secured Claim of Iberia Bank.**

Class 3 consists of the Secured Claim of Iberia Bank. The Allowed Class 3 Secured Claim of Iberia Bank shall be satisfied by Iberia Bank: (A)(i) retaining its first, priority Prepetition Lien on the Iberia Collateral, with the DIP Lender releasing its Lien securing the DIP Lender Allowed Claim from the Iberia Collateral as of the Effective Date, and (ii) receiving monthly payments of principal and interest based on an annual interest rate of prime plus 1% and a twenty (20) year amortization period, which payments shall commence on the date that is thirty (30) days after the later of the Effective Date or the date the Class 3 Secured Claim of Iberia Bank is Allowed by a Final Order, and continuing monthly thereafter through December 31, 2016, on which date all unpaid principal, interest and other charges shall be due and payable in full, provided however that interest accruing on such Allowed Claim from the Petition Date through the Effective Date shall be capitalized and added to the principal amount of such Allowed Claim as of the Effective Date, or (B) such other treatment as otherwise authorized by the Bankruptcy Code or agreed to by the Tarpon Club Debtors or the Reorganized Debtor and Iberia Bank prior to the Confirmation Date with the consent of the Exit Financing Lender. Such treatment shall be in full and final satisfaction, release and discharge of such Allowed Claim. Class 3 is Impaired. As a result, each Holder of an Allowed Class 3 Secured Claim is entitled to vote to accept or reject the Plan.

e) **Class 4: Unsecured Convenience Claims**

(i) Class 4 consists of all Unsecured Convenience Claims. Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 4. Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 5 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 4 under the Plan by making the Convenience Class Opt-In Election. The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii) Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii) Class 4 is Impaired by the Plan. Each Holder of an Allowed Unsecured Convenience Claim in Class 4 is entitled to vote to accept or reject the Plan.

f) **Class 5: Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

(i) Class 5 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii)     Under the Plan, each Holder of an Allowed Unsecured Claim in Class 7 shall receive, an amount in Cash equal to five (5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter.  Class 5 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 5 is entitled to vote to accept or reject the Plan.

g)     **Class 6:  Equity Interests.**

Class 6 consists of all Equity Interests.  On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered.   Class 6 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 6 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

**11.     Plan of Reorganization for Fiddler's Creek, LLC., as debtors and debtors in Possession (the "FC Debtor") (the "FC Plan").**

The FC Plan provides for the reorganization of the FC Debtor, the emergence of the FC Debtor from the Bankruptcy Case as the Reorganized Debtor and the treatment of Allowed Claims against the FC Debtor and Allowed Equity Interests in the FC Debtor as provided in the Plan.  Although the FC Estate is presently being jointly administered for procedural purposes with the Other Debtors, the FC Debtor, the Other Debtors and their respective Estates have not been substantively consolidated.

Except as otherwise specifically provided in the FC Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests, including any Liens securing such Allowed Claims.

a)     **Unclassified Claims.**

Holders of Allowed Administrative Claims, United States Trustee Fees, Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth above.

b)     **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Debtor Cash equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code on the later of (i) the Effective Date or as soon thereafter as reasonably practicable, or (ii) as soon as reasonably practicable after the date of a Final Order Allowing such Priority Claim.  Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may

be agreed upon by both the Holder of such Allowed Priority Claim and the FC Debtor or Reorganized Debtor, as the case may be with the consent of the Exit Financing Lender. Class 1 is Unimpaired by the Plan. As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of a Priority Claim in Class 1 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan.

c)    **Class 2:  Unsecured Convenience Claims**

(i)    Class 2 consists of all Unsecured Convenience Claims.  Each Allowed Unsecured Claim in an amount less than or equal to $25,000 shall be treated as an Unsecured Convenience Claim in this Class 2.  Notwithstanding anything to the contrary contained in the Plan, each Holder of an Allowed Class 3 Unsecured Claim in an amount greater than $25,000 may have its Allowed Unsecured Claim treated as an Allowed Unsecured Convenience Claim in this Class 2 under the Plan by making the Convenience Class Opt-In Election.  The Convenience Class Opt-In Election is irrevocable and must be made by such Holder on its Ballot on or before the Voting Deadline.

(ii)    Each Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Debtor in an amount equal to 100% of such Allowed Unsecured Convenience Claim in ten (10) equal monthly installments commencing thirty (30) days after the later of (i) the Effective Date, or (ii) the date of a Final Order Allowing such Unsecured Convenience Claim.

(iii)    Class 2 is Impaired by the Plan.  Each Holder of an Allowed Unsecured Convenience Claim in Class 2 is entitled to vote to accept or reject the Plan.

d)    **Class 3:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

(i)    Class 3 consists of all Unsecured Claims not otherwise classified in the Plan.

(ii)    Under the Plan, each Holder of an Allowed Unsecured Claim in Class 7 shall receive, an amount in Cash equal to five (5%) percent of such Allowed Unsecured Claim in six (6) semi-annual installments commencing on the date which is six (6) months after the later of (i) the Effective Date and (ii) the date of a Final Order Allowing such Unsecured Claim, and continuing each six (6) months thereafter.  Class 3 is Impaired by the Plan and each Holder of an Allowed Unsecured Claim in Class 3 is entitled to vote to accept or reject the Plan.

e)    **Class 4:  Equity Interests.**

Class 4 consists of all Equity Interests.  On the Effective Date, the legal, equitable and contractual rights of the Holders of the Equity Interests shall be unaltered.  Class 4 is Unimpaired.  As a result, pursuant to Section 1126(f) of the Bankruptcy Code, each Holder of an Equity Interest Class 4 is conclusively deemed to have accepted the Plan and therefore is not entitled to vote to accept or reject the Plan

# VII. IMPLEMENTATION OF THE PLANS OF REORGANIZATION

## A. General Overview of the Plans

Each of the Plans provide for the continued operation of the Property of the Debtors' Estates, other than the Regions' Vertical Property, the Fifth Third Collateral, Key Bank Collateral and Colonnade Collateral, by and through the Reorganized Debtors in accordance with the Plans. If the Substantive Consolidation Motion is granted and the Plans are confirmed by the Bankruptcy Court, then, on the Effective Date of the Plan and, except as expressly provided in the Plans, the Property of each of the Debtors' Estates will be consolidated and will vest in the Reorganized Debtors, and the Reorganized Debtors will thereafter manage such Property and implement the terms of the Plans, including making Distributions of Cash and Property to Holders of Allowed Claims, as applicable, all as set forth in each of the Plans.

Further, each of the Plans provide for Cash payments to Holders of Allowed Claims in certain instances and for the transfer of Property to certain Holders of Allowed Secured Claims as the indubitable equivalent of such Allowed Secured Claims, all as more particularly described in Articles 3 and 5 of the Plans.

The Plans shall be implemented on the Effective Date, and the primary source of the funds necessary to implement the Plan initially will be the Cash of Reorganized Debtor and the funds available to the Reorganized Debtor from the Exit Financing. At the present time, the Debtors believe that the Reorganized Debtors will have sufficient funds as of the Effective Date to pay in full the expected payments required under the Plan, including to the Holders of Allowed Administrative Claims (including Allowed Administrative Claims of Professionals), Allowed Priority Claims, and DIP Lender Allowed Claims. Cash payments to be made under the Plans after the Effective Date to the Holders of Allowed Unsecured Claims and Allowed Unsecured Convenience Claims will be derived from the operations of Reorganized Debtors and/or from the Exit Financing, including as shown in the Projections.

## B. Plan Funding - Exit Financing from Mount Kellett Capital Management LP or one or more funds or accounts to be designated by it.

On or as soon as reasonably practicable following the Effective Date, the Reorganized Debtors will consummate a new senior secured term loan credit facility with the Exit Financing Lender in the amount of $30,000,000 and in accordance with the terms of the Exit Financing Documents (the "Exit Financing"). The Reorganized Debtors shall be permitted to utilize the proceeds of the Exit Financing to (i) to fund the obligations of the Debtors and the Reorganized Debtors under the Plan and the Other Plans to confirm and consummate the Plan and the Other Plans, including the payment of all Allowed Administrative Claims and Priority Claims, and (ii) as additional working capital to conduct its operations following the Effective Date and to fund, to the extent necessary, the Distributions to Holders of Allowed Claims under the Plans on or after the Effective Date, all in accordance with the Exit Financing Documents. The material terms of the Exit Financing are set forth in the Exit Financing Commitment Letter, a copy of which is attached to the Plans as Exhibit A.

**C.       Vesting of Property of the Debtors' Estates in the Reorganized Debtors.**

On the Effective Date, after giving effect to substantive consolidation as provided in Article 10 of the Plans, and except as otherwise expressly provided in the Plan and the Exit Financing Documents, all Property of the Debtors' Estates (including the Litigation Claims) shall vest in the Reorganized Debtors free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature except the Permitted Liens, and the Confirmation Order shall so provide.   As of the Effective Date, the Reorganized Debtors may operate its businesses and use, acquire, and dispose of its Property, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plans and the Confirmation Order.   All privileges with respect to the Property of the Debtors' Estates, including the attorney/client privilege, to which the Debtors are entitled shall automatically vest in, and may be asserted by or waived on behalf of, the Reorganized Debtors.

**D.       No Corporate Action Required**

As of the Effective Date: (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements related to or contemplated by the Plan; and (b) the other matters provided for under, or in furtherance of, the Plan involving corporate action required of the Debtors, will be deemed to have occurred and become effective as provided in the Plan, and will be deemed authorized and approved in all respects without further order of the Bankruptcy Court or any further action by the stockholders or directors of the Debtors.

**E.       Managers and Members of the Reorganized Debtor.**

Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the managers, members, officers and directors of each Debtor immediately prior to the Effective Date shall be deemed to be the officers and directors of each Reorganized Debtor without any further action by any party.

Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the Debtors have disclosed hereinabove the identity and affiliation of any individuals proposed to serve as the initial managers, members, officers and directors of the Reorganized Debtor.

On and after the Effective Date, the operations of the Reorganized Debtors shall continue to be the responsibility of its managers, members, officers and directors.   Each manager, member, officer and director of each Reorganized Debtor shall serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the applicable articles or certificate of incorporation, operating agreement or other organizational documents of each Reorganized Debtor.

From and after the Confirmation Date, the managers, members, officers and directors, as applicable, of the Debtors and the Reorganized Debtors, as the case may be, shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order.

To the extent that, as of the Effective Date, the Debtors have in place employment, indemnification and other agreements with its directors, officers, managers, members and employees who will continue in such capacities after the Effective Date, such agreements shall remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements. Such agreements may include equity, bonus and other incentive plans in which directors, officers, managers, members and other employees of the Reorganized Debtors may be eligible to participate.

**F**.    **Operation Pending Effective Date**

Until the Effective Date, the Debtors will continue to operate their businesses, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.

**G.**    **Exemption From Transfer Taxes**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any security, or the making, delivery or recording of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or the vesting, re-vesting, transfer or sale of any Property of, by or in the Debtors or their Estates or Reorganized Debtors pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, by the Confirmation Order, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## VIII.   <u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

**A**.    **Assumption or Rejection of Executory Contracts and Unexpired Leases**.

The executory contracts and unexpired leases between a Debtor and any Person are dealt with as follows:

### 1.    **Assumption of Executory Contracts and Unexpired Leases.**

Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that currently exist between any of the Debtors and another Person or Entity listed on Exhibit B to the Plans shall be assumed by the applicable Debtor as of

the Effective Date (collectively, the "Assumed Contracts"); provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Exhibit B to the Plans to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be assumed (if added) or rejected (if deleted). The Debtors shall provide notice of any amendments to Exhibit B to the Plans to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Exhibit B shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder. Any executory contract or unexpired lease that exists between any of the Debtors and another Person or Entity and that is not listed on Exhibit B shall be deemed rejected by the applicable Debtor as of the Confirmation Date (collectively, the "Rejected Contracts"), unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume such executory contract or unexpired lease. For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of any of the Debtors shall be deemed to be executory contracts and Assumed Contracts (even if not listed on Exhibit B), and (ii) except as provided in Article 7 of the Plans, all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed by any of the Debtors for the benefit of a third party shall be deemed to be executory contracts and Rejected Contracts.

      **2.**      **Rejection of Executory Contracts and Unexpired Leases**. All executory contracts and unexpired leases either (i) set forth on Exhibit B- the schedule of rejected executory contracts and unexpired leases filed with the Bankruptcy Court as part of the Plans or (ii) existing but not listed on Exhibit B -the schedule of assumed executory contracts and unexpired leases filed with the Bankruptcy Court as part of the Plans, shall be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease that has been assumed or rejected in accordance with a Final Order entered on or before the Confirmation Date.

## B.      Approval of Assumption or Rejection

      Entry of the Confirmation Order constitutes: (a) the approval under Bankruptcy Code § 365 of the assumption or assumption and assignment of the executory contracts and unexpired leases assumed or assumed and assigned under the Plan or otherwise during the Chapter 11 Cases; and (b) the approval under Bankruptcy Code § 365 of the rejection of the executory contracts and unexpired leases rejected under the Plan or otherwise during the Chapter 11 Cases. Notwithstanding anything contained in this Section or Section 9.2 of the Plan to the contrary, the Debtors retain the right to add or change the treatment (assumed or rejected) of any executory contract or unexpired lease in the schedules filed with the Bankruptcy Court as part of the Plan Supplement, thus changing the treatment of the contract or lease under the Plan, at any time within 30 days after the Effective Date.

## C.      Cure of Defaults

      Any lessor or other party to an Assumed Contract (except those lessors or other parties

whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date. The Reorganized Debtors shall not, and need not as a condition to assuming or assuming and assigning any executory contract or unexpired lease under the Plan, Cure any default relating to a Debtor's failure to perform a nonmonetary obligation under any executory contract or unexpired lease.

Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtors or Reorganized Debtor or any Property of any of them. The Reorganized Debtors shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim. Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than the date which is six (6) months after the Effective Date, the Reorganized Debtors shall cure any and all undisputed Cure Claims. All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto or as may otherwise be agreed to by the parties with the consent of the Exit Financing Lender.

## D.     Rejection Claims Bar Date.

Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtors or Reorganized Debtor or the Property of any of them. With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date (the "Rejection Bar Date"). The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims. Any such Claims that become Disputed Claims shall be Disputed Claims in the Unsecured Claims Class for purposes of administration of Distributions under the Plan to Holders of Allowed Unsecured Claims.

## E.     Inclusiveness.

Unless otherwise specified on Exhibit B to the Plans, each executory contract and unexpired lease listed or to be listed on Exhibit B shall include all modifications, amendments,

supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Exhibit B.

## IX.    DESCRIPTION OF OTHER PROVISIONS OF THE PLANS

### A.    Post-Effective Date Fees; Final Decree

The Debtors shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) within ten (10) day of the entry of the order of confirmation for pre-confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the case disbursements for the relevant period. The reorganized Debtors shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) based upon all disbursement of the reorganized Debtors for post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), until the earlier of the closing of these cases by the issuance of a Final Decree by the Court, or upon the entry of an Order by this Court dismissing these cases or converting these cases to another Chapter under the United States Bankruptcy Code, and the parties responsible for paying the post-confirmation United States Trustee fees shall provide to the United States Trustee upon the payment of each post-confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period.

Notice of application for a final decree will only be provided to those holders of Claims and Equity Interests who specifically request such notice.

### B.    Vesting of Assets.

Except as provided in the Plan, the Confirmation Order, or the Plan Documents, on the Effective Date, after giving effect to substantive consolidation as provided for in the Plans, and except as otherwise expressly provided in the Plans and the Exit Financing Documents, all Property of the Debtors' Estates (including the Litigation Claims and any net operating losses) shall vest in the respective Reorganized Debtor free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature except the Permitted Liens, and the Confirmation Order shall so provide. The Reorganized Debtors intend to preserve net operating losses to the maximum extent permitted under applicable law. As of the Effective Date, each Reorganized Debtor may operate its businesses and use, acquire, and dispose of its Property, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. All privileges with respect to the Property of the Debtors' Estates, including the attorney/client privilege, to which each of the Debtors are entitled shall automatically vest in, and may be asserted by or waived on behalf of, the applicable Reorganized Debtors.

### C.    Discharge of Claims.

Except as otherwise expressly provided in the Plans or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtors and the Debtors' Estates and the Reorganized Debtors from any and all Debts, Liabilities or Claims of any nature whatsoever against the Debtors that arose at any time prior to the Confirmation Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date. Except as otherwise expressly provided in the Plans or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective Date, the Debtors and their Estates and the Reorganized Debtors, and their respective successors or assigns, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Confirmation Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan. As of the Effective Date, except as otherwise expressly provided in the Plans or in the Confirmation Order, all Persons and Entities, including all Holders of Claims or Equity Interests, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtors or the Debtors' Estates or the Reorganized Debtors, or any of their respective successors and assigns, or the assets or Properties of any of them, any other or further Claims, Debts, rights, causes of action, remedies, Liabilities or Equity Interests based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Confirmation Date or that occurs in connection with implementation of the Plan, and the Confirmation Order shall contain appropriate injunctive language to that effect. In accordance with the foregoing, except as otherwise expressly provided in the Plans or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities against the Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, to the fullest extent permitted by applicable law, and such discharge shall void any judgment obtained against the Debtors, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, Debt or Equity Interest. Notwithstanding the foregoing, Reorganized Debtors shall remain obligated to make payments and Distributions to Holders of Allowed Claims as required pursuant to the Plan.

## D.  Exculpations and Related Matters.

### 1.  Exculpation from Liability.

The Debtors and their respective members and managers, and other officers, the Professionals for the Debtors (acting in such capacity), the Committee and its members, the Professionals for the Committee (acting in such capacity), the DIP Lender, and the Exit Financing Lender (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, any Plan Document, the

Exit Financing, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Cases, in each case for the period on and after the Petition Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. The rights granted under the Plans are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. This exculpation from liability provision is an integral part of the Plans and is essential to their implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Exculpation from Liability shall not release any of the Litigation Claims.

## 2. General Injunction.

Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plans, as of the Effective Date, except as otherwise expressly provided in the Plans or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, Liability or Equity Interest that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, Liabilities, or Equity Interests, other than actions brought to enforce any rights or obligations under the Plans or the Plan Documents: (a) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtor or their respective Properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, or the Reorganized Debtor, or their respective Properties; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, or the Reorganized Debtor, or their respective Properties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtor; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plans or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtors or the Reorganized Debtors under the Plans and the Plan Documents and the other documents executed in connection therewith. The Debtors and the Reorganized Debtors shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plans and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the General Injunction Provisions shall not release any of the Litigation Claims.

## 3. Term of Certain Injunctions and Automatic Stay.

All injunctions or automatic stays for the benefit of the Debtors pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Cases, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtors' liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the Debtors affirmatively elect to have the Debtors' liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtors affirmatively elect to have the automatic stay lifted and to have the Debtors' liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtors as provided herein.

## E.     Preserved Litigation Claims and Disputed Claims Resolution

### 1.     Preserved Litigation Claims.

In accordance with Bankruptcy Code § 1123(b)(3), all Litigation Claims are retained and reserved for each of the Reorganized Debtors, which are designated as the respective Estate's representative under Bankruptcy Code § 1123(b)(3)(B) for purposes of the preserved Litigation Claims. In accordance with Bankruptcy Code § 1123(b)(3), all Litigation Claims are retained and reserved for the benefit of the Reorganized Debtors. The Reorganized Debtors shall have the authority to prosecute, defend, compromise, settle, and otherwise deal with any Litigation Claims, and each Reorganized Debtor shall do so in its capacity as a representative of the respective Estate in accordance with Bankruptcy Code § 1123(b)(3)(B). Each Reorganized Debtor shall have sole discretion to determine in its business judgment which Litigation Claims to pursue, which to settle, and the terms and conditions of those settlements.

### 2.     Pursuit of Litigation Claims.

On the Effective Date, the Litigation Claims shall be vested in the applicable Reorganized Debtor.  The Reorganized Debtor will have the right, in its sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Litigation Claims without seeking any approval from the Bankruptcy Court. The Debtors are currently not in a position to express an opinion on the merits of any of the Litigation Claims or on the recoverability of any amounts as a result of any such Litigation Claims.  For purposes of providing notice, the Debtors state that any party in interest that engaged in business or other transactions with any of the Debtors Prepetition or that received payments from any of the Debtors Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. The Reorganized Debtors will fund the costs and expenses (including legal fees) to pursue the Litigation Claims.

No Creditor or other party should vote for the Plans or otherwise rely on the Confirmation of the Plans or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Litigation Claim.  No Creditor or other party should

act or refrain from acting on the belief that it will obtain any defense to any Litigation Claim. ADDITIONALLY, THE PLANS DO NOT, AND ARE NOT INTENDED TO, RELEASE ANY LITIGATION CLAIM OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF REORGANIZED DEBTORS.  Creditors are advised that legal rights, claims and rights of action the Debtors may have against them, if they exist, are retained under the Plans for prosecution unless a specific order of the Bankruptcy Court authorizes the  Debtors to release such claims.  As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plans, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plans as any indication that the Debtors or Reorganized Debtors do not possess or do not intend to prosecute a particular claim or Litigation Claim if a particular creditor votes to accept the Plan.  It is the expressed intention under each of the Plans to preserve rights, objections to Claims, and rights of action of the Debtors, whether now known or unknown, for the benefit of Reorganized Debtors.  A Litigation Claim shall not, under any circumstances, be waived as a result of the failure of the Debtors to describe such Litigation Claim with specificity in the Plans or in this Disclosure Statement; nor shall the Reorganized Debtors, as a result of such failure, be estopped or precluded under any theory from pursuing any such Litigation Claim.  Nothing in the Plans operate as a release of any Litigation Claim.

### 3.      Summary of Litigation Claims

The Debtors do not presently know the full extent of the Litigation Claims and, for purposes of voting on the Plans, all Creditors are advised that Reorganized Debtors will have substantially the same rights that a Chapter 7 trustee would have with respect to the Litigation Claims.  Accordingly, neither a vote to accept a Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Litigation Claim against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party under that particular Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court.  Confirmation of the Plans and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Litigation Claim following Confirmation of the Plans.

At this time, the Debtors believe the Litigation Claims consist primarily of (i) avoidance actions relating to preferential transfers and possible fraudulent transfers under various provisions of the Bankruptcy Code against various trade Creditors and other Prepetition Creditors, including without limitation, claims against Tomen America, Inc., and its assignee, Colonnade Naples Land, LLC (collectively, "Tomen") to avoid as a fraudulent transfer under Section 548 of the Bankruptcy Code and applicable state law the obligations of one or more of the Debtors  to Tomen under (a) that certain Payment Guaranty, dated May 16, 2008 related to the mortgage debt of DY Land Holdings II, LLC to Tomen, and (b) that certain Payment Guaranty, dated May 16, 2008 related to the mortgage debt of FC Commercial, LLC and FC Parcel 73, LLC to Tomen, (ii) claims against Fifth Third related to the Pre-petition acts and omissions of Fifth Third Bank including those claims asserted by the GBP Debtors in Pre-petition foreclosure litigation commenced by Fifth Third Bank, against the GBP Debtors, (iii)

claims including avoidance actions and breach of contract claims against PEPI related to the pre-petition Commitment Letter to provide DIP Financing and payments made in connection therewith, and (iv) claims against Cushman and Wakefield and others as described Article V above.

Further, the Debtors and Reorganized Debtors reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

The Debtors' Estates shall remain open, even if the Bankruptcy Cases shall have been closed, as to any and all Litigation Claims until such time as the Litigation Claims have been fully administered and the recoveries therefrom have been received by each of the Reorganized Debtors.

### 4.     Prosecution and Settlement of Litigation Claims.

The Reorganized Debtors (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Litigation Claim which the Debtors had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Litigation Claim. From and after the Effective Date, Reorganized Debtors shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Litigation Claim or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Litigation Claim or objection to a Claim originally asserted in a face amount equal to or less than $100,000.00, then Reorganized Debtors may settle the Litigation Claim or objection to Claim and execute necessary documents, including a stipulation of settlement or release; and (ii) if the resulting settlement involves a Litigation Claim or objection to a Claim originally asserted in a face amount exceeding $100,000.00, then the Reorganized Debtors shall be authorized and empowered to settle such Litigation Claim or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019.

## X.     PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Initial Distribution

As soon as reasonably practicable (as determined by Reorganized Debtors with the consent of the Exit Financing Lender) after the Effective Date, the Reorganized Debtors shall make the Distributions required under the Plans to Holders of Allowed Administrative Claims (including Allowed Administrative Claims of Professionals), Allowed Priority Claims and DIP Lender Allowed Claims (collectively, the "Initial Distribution"). Thereafter, the Reorganized Debtors shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of each Plan.

### B.     Determination of Claims

From and after the Effective Date, the Reorganized Debtors shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims, all with the consent of the Exit Financing Lender. Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than ninety (90) days following the Effective Date (unless such period is extended by the Bankruptcy Court upon motion of the Tarpon Club Debtors or Reorganized Debtor), and the Confirmation Order shall contain appropriate language to that effect. Objections to Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) ninety (90) days following the Effective Date or (b) the date sixty (60) days after Reorganized Debtors receive actual notice of the filing of such Claim.

1. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or Reorganized Debtor, as the case may be, effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Cases on behalf of the Holder of a Claim.

2. Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Cases, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. The Debtors or Reorganized Debtor may, at any time, with the consent of the Exit Financing Lender, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

**C.     Distributions.**

Notwithstanding any provision herein to the contrary, no Distribution shall be made to the Holder of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim. At such time that such Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim shall receive the Distribution to which such Holder is then entitled under the Plan.

Notwithstanding any provision herein to the contrary, if, on any applicable Distribution Date, the Holder of a Claim is subject to a proceeding against it by Reorganized Debtors under Section 502(d) of the Bankruptcy Code, then each of the Reorganized Debtor (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding.

Distributions to a Holder of an Allowed Claim shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtors or Reorganized Debtors at the time of the Distribution, unless the Reorganized Debtors have been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules.  The Reorganized Debtors shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided herein.

**D.     Unclaimed Distributions.**

1.     If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then Reorganized Debtor shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

2.     If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to the Reorganized Debtors due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to the Reorganized Debtors as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

3.     Any unclaimed Distribution as described above sent by the Reorganized Debtors shall become the property of the Reorganized Debtors.

**E.     Transfer of Claim.**

In the event that the Holder of any Claim shall transfer such Claim on and after the Effective Date, such Holder shall immediately advise Reorganized Debtors in writing of such transfer and provide sufficient written evidence, in the Reorganized Debtors reasonable discretion, of such transfer.  The Reorganized Debtors shall be entitled to assume that no transfer of any Claim has been made by any Holder unless and until the Reorganized Debtors have received written notice to the contrary.  Each transferee of any Claim shall take such Claim subject to the provisions of the Plans and to any request made, waiver or consent given or other action taken hereunder and, except as otherwise expressly provided in such notice, Reorganized Debtors shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plans.

**F.     One Distribution Per Holder.**

If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distribution hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

**G.     Effect of Pre-Confirmation Distributions.**

Nothing in the Plans shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtors or Reorganized Debtors to such Holder under the Plans.

**H.     No Interest on Claims.**

Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition interest or the payment of Postpetition interest, penalties, or late charges on account of such Allowed Claim for any purpose.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Disputed Claim becomes an Allowed Claim.

**I.     Compliance with Tax Requirements.**

In connection with the Plans, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plans shall have the sole and exclusive responsibility for the satisfaction

and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

## J.    Preservation of Insurance

The discharge and release from Claims as provided in the Plans, except as necessary to be consistent with the Plans, do not diminish or impair the enforceability of any insurance policy that may cover Claims against a Debtor or any other Person.

## XI.    Retention of Jurisdiction After the Effective Date.

## A.    Retention of Jurisdiction

### 1.    General Retention.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, and except as expressly provided in the Confirmation Order as it shall have become a Final Order, or the Plan Documents (including, without limitation, the Exit Financing Documents), until the Bankruptcy Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of and over the Bankruptcy Cases that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

### 2.    Specific Purposes.

In addition to the general retention of jurisdiction set forth in Article 13.1, after Confirmation of the Plan and until the Bankruptcy Cases are closed, and except as expressly provided in the Confirmation Order as it shall have become a Final Order, or the Plan Documents (including, without limitation, the Exit Financing Documents), the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases for the following specific purposes:

i)    to allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any application for an Administrative Claim, and to determine any and all objections to the allowance or priority of Claims or Equity Interests;

ii)    to determine any and all cases, controversies, suits or disputes arising under or relating to the Bankruptcy Cases, the Plan or the Confirmation Order (including regarding the effect of any exculpation, discharge, limitation of liability, or injunction provisions provided for herein or affected hereby and regarding whether the conditions precedent to the consummation and/or Effective Date of the Plan have been satisfied);

iii)    to determine any and all applications for allowance of compensation of Professionals and reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code arising out of or relating to the Bankruptcy Cases; provided, however, that this retention of jurisdiction shall not require prior Bankruptcy Court approval of the payment of fees

and reimbursement of expenses of Professionals incurred after the Effective Date unless an objection to such fees and expenses has been made by the Reorganized Debtor;

iv) to determine any and all motions pending as of the date of the Confirmation Hearing (including pursuant to the Plans) for the rejection, assumption, or assignment of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to determine the allowance of any Claims resulting from the rejection thereof or any Cure Claims;

v) to determine any and all motions, applications, adversary proceedings, contested or litigated matters, Litigation Claims, and any other matters involving the Debtors or Reorganized Debtor commenced in connection with, or arising during, the Bankruptcy Cases and pending on the Effective Date, including approval of proposed settlements thereof;

vi) to enforce, interpret and administer the terms and provisions of the Plans and the Plan Documents; provided, however, the that Bankruptcy Court shall not retain jurisdiction to enforce, interpret or administer the terms and provisions of the Exit Financing Documents.

vii) to modify any provisions of the Plan to the fullest extent permitted by the Bankruptcy Code and the Bankruptcy Rules;

viii) to consider and act on the compromise and settlement of any Claim against or Equity Interest in the Debtors or the Estates;

ix) to assure the performance by the Reorganized Debtors of their obligations under the respective Plans;

x) to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Disclosure Statement, the Plans, the Plan Documents, the Confirmation Order, or any exhibits or schedules to the foregoing, as may be necessary or appropriate to carry out the purposes and intent of the Plans, including the adjustment of the date(s) of performance under the Plans in the event the Effective Date does not occur as provided herein so that the intended effect of the Plans may be substantially realized thereby;

xi) to resolve any disputes concerning any release or exculpation of, or limitation of liability as to, a non-debtor (including any Professional) hereunder or the injunction against acts, employment of process or actions against such non-debtor (including any Professional) arising hereunder;

xii) to enforce all orders, judgments, injunctions and rulings entered in connection with the Bankruptcy Cases;

xiii) to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plans and all contracts, instruments, releases, indentures and

other agreements or documents created in connection with the Plans, the Disclosure Statement or the Confirmation Order, including the Plan Documents (other than the Exit Financing Documents);

xiv)     to review and approve any sale or transfer of assets or Property by the Debtors or the Reorganized Debtors, including prior to or after the date of the Plans, and to determine all questions and disputes regarding such sales or transfers;

xv)     to determine all questions and disputes regarding title to the assets or Property of the Debtors, the Debtors Estates or the Reorganized Debtors;

xvi)     to determine any and all matters, disputes and proceedings relating to the Litigation Claims, whether arising before or after the Effective Date;

xvii)     to determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtors arising on or prior to the Effective Date or arising on account of transactions contemplated by the Plans;

xviii)     to resolve any determinations which may be requested by the Debtors or Reorganized Debtors of any unpaid or potential tax liability or any matters relating thereto under Sections 505 and 1146 of the Bankruptcy Code, including tax liability or such related matters for any taxable year or portion thereof ending on or before the Effective Date;

xix)     to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plans or the Confirmation Order;

xx)     to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

xxi)     to determine any other matters that may arise in connection with or relating to the Plans, the Disclosure Statement, the Confirmation Order or the Plan Documents;

xxii)     to enter such orders as are necessary to implement and enforce the injunctions described herein;

xxiii)     to enforce the obligations of any purchaser of any Property of the Debtors;

xxiv)     to enter an order on the Substantive Consolidation Motion;

xxv)     to determine such other matters and for such other purposes as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; and

xxvi)     to enter an order concluding and terminating the Bankruptcy Cases.

**B.     Closing of the Bankruptcy Cases.**

In addition to the retention of jurisdiction set forth in above, the Bankruptcy Court shall retain jurisdiction of the Bankruptcy Cases to enter an order reopening the Bankruptcy Cases after they have been closed.

**C.     Amendment and/or Modification of the Plans**

At any time before the Confirmation Date, the Debtors may alter, amend, or modify the Plan under Bankruptcy Code § 1127(a) as long as doing so does not materially and adversely affect the treatment and rights of the holders of Claims under the Plan. After the Confirmation Date but before substantial consummation of the Plan as defined in Bankruptcy Code § 1101 (2), the Debtors or Reorganized Debtors may, under Bankruptcy Code § 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, the Plan Documents, or the Confirmation Order, and any matters necessary to carry out the purposes and effects of the Plan as long as such proceedings do not materially and adversely affect the treatment of holders of Claims under the Plan. The Debtors and/or Reorganized Debtors must serve prior notice of such proceedings in accordance with the Bankruptcy Rules or applicable order of the Bankruptcy Court.

After the entry of the Confirmation Order and before the Effective Date the Plan, the Debtors (prior to the Effective Date) or the Reorganized Debtors (on the Effective Date) may, with the consent of the Exit Financing Lender, modify the Plans or the Plan Documents in a way that materially adversely affects the interests, rights, or treatment of a Class of Claims or Equity Interests, provided that (a) the Plan or such other Plan Documents, as modified, meets applicable Bankruptcy Code requirements, (b) the Debtors or Reorganized Debtors (as the case may be) obtain Bankruptcy Court approval for such modification, after notice, including to the Class of Claims or Equity Interests materially adversely affected and a hearing, (c) such modification is accepted by (i) at least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims actually voting in each Class of Claims adversely affected by such modification or (ii) at least two-thirds in amount of Allowed Equity Interests actually voting in each Class of Equity Interests adversely affected by such modification, and (d) the Debtors or Reorganized Debtors (as the case may be) comply with Section 1125 of the Bankruptcy Code with respect to the Plan or such other Plan Documents, as modified.

Notwithstanding anything to the contrary contained in the Plans, the Plans may not be altered, amended or modified without the written consent of the Debtors (prior to the Effective Date) or Reorganized Debtors (on and after the Effective Date).

**D.     Revocation or Withdrawal of the Plan(s)**

The Debtors reserve the right to revoke or withdraw the Plan(s) prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void in all respects and nothing contained in the Plan shall

be deemed to (a) constitute a waiver or release of any Claims against, or Equity Interests in, the Debtors or any other Person, or (b) prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

**E.      Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection with the Plan, the Debtors or Reorganized Debtors, as the case may be, must comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan remain subject to any such withholding and reporting requirements. The Debtors and Reorganized Debtors, as the case may be, may take all actions necessary to comply with such withholding and reporting requirements. Notwithstanding any other provision of the Plan, each holder of an Allowed Claim or Allowed Equity Interest that has received a distribution under the Plan has sale and exclusive responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding, and other tax obligation on account of such distribution.

## XII.  <u>CONDITIONS PRECEDENT</u>

**A.      Conditions to Confirmation and Effective Date of Plan.**

The following are conditions precedent to confirmation of the Plans that may be satisfied or waived in accordance with the terms of each Plan:

(i)      The Bankruptcy Court shall have entered the Disclosure Statement Approval Order.

(ii)      The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

(iii)      The Bankruptcy Court shall have entered a confirmation order confirming the Other Plans in the Other Debtors' Bankruptcy Cases in form and substance acceptable to the Debtors and the Exit Financing Lender.

(iv)      The Bankruptcy Court shall have entered an order (which may be part of the Confirmation Order) granting the Substantive Consolidation Motion and providing for the substantive consolidation of the Debtors' Estates as of the Effective Date which order shall be in form and substance acceptable to the Exit Financing Lender.

**B.      Conditions Precedent to the Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with the terms of each Plan:

Each of the Plans filed shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the Debtors with the consent of the Exit Financing Lender:

i)        The Confirmation Order shall be a Final Order.

ii)        The confirmation order(s) entered in the Other Debtors' Bankruptcy Cases in respect of the Other Plans shall, in form and substance acceptable to the Exit Financing Lender, be Final Order(s) and all of the conditions precedent to the effective date in the Other Plans shall have been satisfied or waived.

iii)        All conditions precedent to the closing of the Exit Financing shall have been satisfied or waived in accordance with the terms thereof.

iv)        Each Plan Document shall be in form and substance acceptable to the Debtors and the Exit Financing Lender.

## C.   Waiver of Conditions.

The Debtors may waive any condition to confirmation or the Effective Date, in whole or in part, upon order of the Bankruptcy Court for cause.

## XIII.   ACCEPTANCE AND CONFIRMATION OF PLANS

## A.   Acceptance of the Plan.

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims and Equity Interests accept the Plan, except under certain circumstances. Bankruptcy Code § 1126(c) defines acceptance of a plan by a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Under Bankruptcy Code § 1126(d), a Class of Equity Interests has accepted the Plan if holders of such Equity Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Bankruptcy Code § 1126(f) deems a Class of Claims or Equity Interests to have accepted the Plan without voting if that Class is unimpaired under the definition in Bankruptcy Code § 1124.

## B.   Feasibility of the Plans.

To confirm the Plans, the Bankruptcy Court must find that confirmation of the Plans are not likely to be followed by the need for further financial reorganization of the Debtors. This requirement is imposed by Bankruptcy Code §1129(a) and is referred to as the "feasibility" requirement. The Debtors believe that they will be able to perform timely all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Debtors are in the process of finalizing the financial projections for Fiscal Years 2011 through 2016 (the "Financial Projections") which will be filed with the Court no later than ten (10) days before the date set to consideration the adequacy of the Disclosure Statement. The Debtors' assumptions in the Financial Projections include the receipt of Exit Financing in the amount of $30,000,000.00 on or shortly after the Effective Date, a portion of which will be used to pay in full the expected payments required under the Plans to the Holders of Allowed Claims in accordance with the Plans, and the remainder of which will be used by the Reorganized Debtors for working capital.

The Financial Projections demonstrates that Reorganized Debtors will have sufficient Cash on hand as of the Effective Date to make, on the Effective Date, all payments to Creditors owing on the Effective Date, and sufficient Cash on hand to satisfy all remaining obligations under the Plan to all Creditors in all Classes. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of Bankruptcy Code § 1129(a). The Debtors caution that no representations can be made as to the accuracy of the Financial Projections. Certain of the assumptions on which the Financial Projections are based are subject to uncertainties outside the Debtors' control. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Financial Projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtors' financial results. Therefore, the actual results can be expected to vary from the Financial Projections and the variations may be material and adverse.

The Financial Projections were not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the Securities and Exchange Commission regarding projections. Furthermore, the Financial Projections have not been audited by the Debtors' independent accountants. Although presented with numerical specificity, the Financial Projections are based on a variety of assumptions, some of which in the past have not been achieved and which may not be realized in the future, and are subject to significant business, economic and competitive uncertainties and contingencies, and many of which are beyond the Debtors' control. Consequently, the Financial Projections should not be regarded as a representation or warranty by the Debtors or any other Person, that projections will be realized. Actual results may vary materially from those presented.

## C.     Best Interests Test

Even if a plan is accepted by each class of holders of claims, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Bankruptcy Code § 1129(a)(7), requires a bankruptcy court to find either that: (i) all members of an impaired class of claims or interests have accepted the plan; or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by: (i) the claims of any secured creditors to the extent of the value of their collateral; and (ii) the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If the probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then the plan is not in the best interests of creditors and equity security holders.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtors believe that the Plans will meet the "best interests" test of Bankruptcy Code § 1129(a)(7). The Debtors believe that each member of each Class will receive at least as much under the Plan as it would in a liquidation in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated under each of the Plans (rather than a forced liquidation) will allow the realization of more value for the Debtors' assets without the increased costs attending a Chapter 7 liquidation, including statutory Chapter 7 trustee fees and trustee's counsel fees, to name only a few additional expenses not present under the Plans.

## D.    Confirmation Without Acceptance of All Impaired Classes

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of Claims has accepted it. The Bankruptcy Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the

Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides: (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides: (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides: (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior claim or interest any property at all.

## XIV.  <u>MATERIAL FEDERAL INCOME TAX CONSIDERATIONS</u>

A summary description of certain United States ("U.S.") federal income tax consequences of the Plans is provided below.  The description of tax consequences below is for informational purposes only and, due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of the Plans as discussed herein.  Only the potential material U.S. federal income tax consequences of the Plans to the Debtors and to a typical holder of Claims and Equity Interests who are entitled to vote or to accept or reject the Plans are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plans, and no tax opinion is being given in this Disclosure Statement.  No rulings or determination of the Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained

with respect to any tax consequences of the Plans, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plans to the Debtors or to any holder of Claims or Equity Interests. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder, judicial authorities, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date of this document. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the holders of Claims and Equity Interests (the "Claimants"). Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THE PLANS, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLANS TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITES TRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLANS TO ANY HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLANS.**

### A. U.S. Federal Income Tax Consequences to the Debtors

#### 1. Cancellation of Indebtedness Income.

Generally, the discharge of a debt obligation owed by a debtor for an amount less than the "adjusted issue price" (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of indebtedness ("COD") income to the debtor, subject to certain rules and exceptions. However, when the discharge of indebtedness occurs pursuant to a Plans approved by the Bankruptcy Court in a case under Title 11 of the Bankruptcy Code (e.g., a Chapter 11 case), there is a special rule under the Tax Code that

specifically excludes from a debtor's income the amount of such discharged indebtedness (the so-called "bankruptcy exception"). Instead, certain of the debtor's tax attributes otherwise available generally must be reduced by the amount of the COD income that is excluded from the debtor's income. Such reduction of tax attributes generally occurs in the following order: (i) net operating losses and net operating loss carryovers (collectively, "NOLs"), (ii) general business credits, (iii) minimum tax credits, (iv) capital loss carryovers, (v) the tax basis of debtor's property (both depreciable and non-depreciable), (vi) passive activity loss and credit carryovers, and (v) foreign tax credit carryovers (although there is a special rule in the Tax Code which allows the debtor to elect to first reduce the tax basis of depreciable property before having to reduce NOLs and other attributes).

Under current Income Tax Regulations, the availability of the "bankruptcy exception" in the context of an affiliated group is made on a "separate entity" basis and not on an "affiliated group" basis. In addition, with regard to tax attribute reduction in the context of an affiliated group, recently adopted Income Tax Regulations (section 1.1502-28) suggest a "hybrid" method of attribute reduction. Under the current Tax Regulations only member corporations can file on a consolidated tax basis.

Under these regulations, the tax attributes of the separate corporate member having excluded COD income is first reduced, followed by a reduction of the tax attributes of the subsidiary members (to the extent of any stock basis reduction). Then, to the extent a corporate member's excluded COD income exceeds that corporate member's separate entity tax attributes, the consolidated tax attributes allocated to the other corporate members are proportionately reduced.

Substantially all of the Debtors are partnerships or single-member limited liability companies (collectively, "SMLLC") which are treated as disregarded entities for federal income tax purposes. Aubrey Ferrao is the ultimate owner of the Debtors and is the taxpayer. It is unclear whether the bankruptcy exception would apply to the Debtors that are SMLLC's or in the alternative whether the COD income be treated as having been realized to Mr. Ferrao.

### 2. Gain or Loss on Transfer/Sale of Debtors' Assets.

If there is a sale of the corporate Debtors' assets, or some portion thereof, the corporate Debtors will generally recognize gain or loss on the sale in an amount equal to the difference between the amount realized (generally, the amount of cash and the fair market value of any other property received plus liabilities of the Debtors' assumed by the Buyer, if any) and the corporate Debtors' tax basis in the assets sold. Such gain, if any, may be reduced (or eliminated) to the extent that the Debtors have sufficient NOL's. Any gain or loss recognized by a corporate member Debtor should be included in the consolidated tax return of the corporate affiliated member group so long as such corporate Debtor is a corporate member of the affiliated group at the time in which gain or loss was recognized If the SMLLC Debtor sells its assets, or some portion thereof, the SMLLC will not recognize gain on the sale in that the SMLLC Debtor in that the gain recognized on the sale will be passed through, unless such SMLLC Debtor has elected to check-the-box and be treated as an association taxable as a corporation under the Tax Code.

### B. U. S. Federal Income Tax Consequences to a Investor Typical of the Holders of Claims and Equity Interests

The U.S. federal income tax consequences of the implementation of the Plans to the Claimants, typical of the holders of Claims and Equity Interests who are entitled to vote to confirm or reject the Plans, will depend on a number of factors, including (i) whether the Claim constitutes a "security" for U.S. federal income tax purposes, (ii) the nature and origin of the Claim, (iii) the manner in which the holder acquired the Claim, (iv) the length of time the Claim has been held, (v) whether the Claim was acquired at a discount, (vi) whether the holder has taken a bad debt deduction or loss with respect to the Claim (or any portion thereof) in the current year or in any prior year, (vii) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (viii) the holder's method of tax accounting, (ix) whether the Claim is an installment obligation for U.S. federal income tax purposes, and (x) the timing of any distributions under the Plans.

### 1. Gain or Loss Recognition on the Satisfaction of Claims and Character of Gain or Loss.

Claimants will generally not recognize gain, but may recognize loss, with respect to the amount in which the Claimants receive on their Claims (generally, the amount of cash and the fair market value of any other property received in satisfaction of the Debtors' obligations) that either exceeds, on one hand, or is less than, on the other hand, the Claimant's basis in the Claim. Thus, it is possible that certain Claimants may recognize a gain or loss as a result of distributions under the Plans.

In general, gain or loss is recognized by any such Claimant is either capital or ordinary in character. The character is dependent upon the underlying nature of the Claim and whether such Claim, in the hands of the Claimant, constitutes a capital asset. To the extent that a debt instrument is acquired after its original issuance for less than the issue price of such instrument, it will have market discount. A holder of a Claim with market discount must treat any gain recognized on the satisfaction of such Claim as ordinary income to the extent that it does not exceed the market discount that has already been accrued with respect to such Claim. There may also be state, local or foreign tax considerations applicable to particular holders of Claims, none of which are discussed herein. **Claimants should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plans.**

### 2. Holders of Disputed Claims.

Although not free from doubt, holders of Disputed Claims should not recognize any gain or loss on the date that the assets are transferred to the Disputed Claims Reserve, but should only be required to report their gain or loss on the cash or other property that is distributed out to the Claimant free from any further restrictions. **Holders of Disputed Claims are urged to consult their own tax advisors regarding the taxation of their Disputed.**

### 3. Information Reporting and Backup Withholding.

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments may be subject to backup withholding. Under the Tax Code's backup withholding rules, a U.S. Claimant may be subject to backup withholding at the applicable rate

with respect to certain distributions or payments pursuant to the Plans, unless the Claimant: (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Payments made to Foreign Claimants may also be subject to withholding, which may be reduced under an applicable Treaty.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U. S. federal income tax liability, and a the Claimant may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

### C. Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U. S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLANS AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANSNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U. S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLANS, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.**

### D. Circular 230 Disclaimer

**THE IRS REQUIRES WRITTEN ADVICE REGARDING ONE OR MORE U.S. FEDERAL TAX ISSUES TO MEET CERTAIN STANDARDS. THOSE STANDARDS INVOLVE A DETAILED AND CAREFUL ANALYSIS OF THE FACTS AND APPLICABLE LAW WHICH WE EXPECT WOULD BE TIME CONSUMING AND COSTLY. WE HAVE NOT MADE AND HAVE NOT BEEN ASKED TO MAKE THAT TYPE OF ANALYSIS IN CONNECTION WITH ANY ADVICE GIVEN IN THE FOREGOING DISCUSSION. AS A RESULT, WE ARE REQUIRED TO ADVISE YOU THAT ANY U.S. FEDERAL TAX ADVICE RENDERED IN THE FOREGOING DISCUSSION IS NOT INTENDED OR WRITTEN TO BE USED AND CANNOT BE USED FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED BY THE IRS.**

## XV. <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

The restructuring of the Debtors involves a degree of risk, and this Disclosure Statement and the Plan and certain of their Exhibits contain forward-looking statements that involve risks and uncertainty. Reorganized Debtors' actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement. Holders of

Claims should consider carefully the following factors, in addition to the other information contained in this Disclosure Statement, before submitting a vote to accept or reject the Plan.

**Reorganization Factors**

### 1. Financial Considerations

As with any plan of reorganization or other financial transaction, there are certain risk factors that must be considered. All risk factors cannot be anticipated, some events will develop in ways that were not foreseen, and many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plans will not be realized exactly as assumed. Some or all of such variations may be material. While efforts have been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analyses set forth in this Disclosure Statement. Holders of Claims should be aware of some of the principal risks associated with the contemplated reorganization:

- There is a risk that one of more of the required conditions or obligations under the Plans or the Plan Documents will not occur, be satisfied or waived, as the case may be, resulting in the inability to confirm the Plan.

- The total amount of all Claims filed in the Chapter 11 Cases may materially exceed the estimated amounts of Allowed Claims assumed in the development of the Plans, in the valuation estimates provided above. The actual amount of all Allowed Claims in any Class may differ significantly from the estimates provided in this Disclosure Statement. Accordingly, the amount and timing of the distributions that will ultimately be received by any particular holder of an Allowed Claim in any Class may be materially and adversely affected if the estimates are exceeded as to any Class.

- A number of other uncertainties may adversely affect Reorganized Debtors' future operations including, without limitation, economic recession, residential housing market, adverse regulatory agency actions, acts of God, or similar circumstances. Many of these factors will be substantially beyond Reorganized Debtors' control, and a change in any factor or combination of factors could have a material adverse effect on Reorganized Debtors' financial condition, cash flows, and results of operations. There can be no assurance that Reorganized Debtors will be able to continue to generate sufficient funds to meet its obligations and necessary capital expenditures. Although Reorganized Debtors' financial projections assume that Reorganized Debtors will generate sufficient funds to meet its working capital needs for the foreseeable future on a stand-alone basis, its ability to gain access to additional capital, if needed, cannot be assured, particularly in view of possible competitive factors and industry conditions.

### 2. Risk of Non-Confirmation of the Plan.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will

reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for confirmation, that such negotiations would not adversely affect the holders of Allowed Claims and Equity Interests, or that such modifications would not necessitate the re-solicitation of votes.

## XVI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLANS

The Debtors believe that the Plan affords holders of Claims and Equity Interests the greatest realization on the Debtors' assets and, therefore, is in the best interests of those holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Cases; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

### A.    Continuation of the Chapter 11 Cases.

If the Debtors remain in Chapter 11, they could continue to operate their businesses and manage their properties as debtors-in-possession, but they would remain subject to the restrictions imposed by the Bankruptcy Code. The Debtors may have difficulty sustaining the high costs and the erosion of lender and homebuilder confidence that may be caused if the Debtors remain as Chapter 11 debtors-in-possession.

### B.    Alternative Plans of Reorganization.

If the Plan is not confirmed, the Debtors, or, after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization plan, any other party in interest in the Chapter 11 Cases, could propose a different plan or plans. Those plans might involve either a reorganization and continuation of the Debtors' businesses, or some other form of orderly liquidation of the Debtors' assets, or a combination of both.

### C.    Liquidation

If no plan is confirmed, the Debtors' Chapter 11 Cases may be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors. However, the Debtors believe that creditors would lose substantially higher going concern value if the Debtors were forced to liquidate. In addition, the Debtors believe that in liquidation under Chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Estates. The assets available for distribution to creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation

of operations and the failure to realize the greater going concern value of the Debtors' assets. The Debtors are in the process of finalizing a Liquidation Analysis (the "Liquidation Analysis") which will be filed with the Court no later than ten (10) days before the date set to consideration the adequacy of the Disclosure Statement which shows that Unsecured Creditors would receive no distribution in a Chapter 7 proceeding.

The Debtors may also be liquidated under a Chapter 11 plan. In a liquidation under Chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7. Thus, a Chapter 11 liquidation might result in larger recoveries than a Chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee is not required in a Chapter 11 case, expenses for professional fees could be lower than in a Chapter 7 case, in which a trustee must be appointed. However, any distribution to the Creditors under a Chapter 11 liquidation plan would likely be delayed substantially.

## XVII.    SUMMARY, RECOMMENDATION AND CONCLUSION

The Plans provides for an orderly and prompt distribution to Holders of Allowed Claims and Allowed Equity Interests against the Debtors.  The Debtors believe that their efforts to maximize the return for Creditors and Holders of Equity Interests have been full and complete. The Debtors further believe that the Plans are in the best interests of all Creditors and Holders of Equity Interests.  In the event of a liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code, the Debtors believe there would be no distribution to Unsecured Creditors and, in addition, Unsecured Creditors and the Holders of Equity Interests would not receive the value attributable to the Reorganized Debtors.  For these reasons, the Debtors urge that the Plans are in the best interests of all Creditors and Holders of Equity Interests and that the Plans be accepted.

Dated as of December 3, 2010.

Respectfully submitted,

*Paul J. Battista*
Paul J. Battista (Florida Bar No. 884162)
Bart A. Houston (Florida Bar No. 623636)
Mariaelena Gayo-Guitian (Florida Bar No. 813818)
GENOVESE JOBLOVE & BATTISTA, P.A.
100 S.E. Second Street, 44th Floor
Miami, Florida 33131
Telephone:     (305) 349-2300
Facsimile:     (305) 349-2310
Email: pbattista@gjb-law.com
Email: bhouston@gjb-law.com
Email: mguitian@gjb-law.com

Counsel for Debtors and Debtors in Possession

# Appendix 1

1.      Joint Plan of Reorganization for GBFC Development, Ltd. and GBFC Development, LLC, as debtors and debtors in possession (collectively, the "GBFC Debtors")(the "GBFC Plan").

2.      Joint Plan of Reorganization for FC Beach, Ltd. and FC Beach, LLC, as debtors and debtors in possession (collectively, the "FC Beach Debtors") (the "FC Beach Plan").

3.      Joint Plan of Reorganization for DY Land Associates, Ltd.  and DY Associates, LLC, as debtors and debtors in possession (collectively, the "DY Land Debtors")(the "DY Land Plan").

4.      Joint Plan of Reorganization for 951 Land Holdings, Ltd. and 951 Land Holdings, LLC, as debtors and debtors in possession (collectively, the "951 Debtors")(the "951 Plan").

5.      Joint Plan of Reorganization for FC Golf, Ltd. and FC Golf, LLC, as debtors and debtors in possession (collectively, the "FC Golf Debtors")(the "FC Golf Plan").

6.      Plan of Reorganization for Fiddler's Creek Management, Inc. (the "FCM Debtor")(the "FCM Plan").

7.      Joint Plan of Reorganization for GBP Development, Ltd, and GBP Development, LLC, as debtors and debtors in possession (collectively, the "GBP Debtors")(the "GBP Plan").

8.      Joint Plan of Reorganization for GB Peninsula, Ltd., as a debtor and debtor in possession (the "GB Debtor")(the "GB Plan").

9.      Joint Plan of Reorganization for DY Land Holdings II, LLC, FC Commercial, LLC and FC Parcel 73, LLC, as debtors and debtors in possession (collectively, the "DY/FC Debtors")(the "DY/FC Plan").

10.     Joint Plan of Reorganization for Gulf Bay Hospitality, Ltd. and Gulf Bay Hospitality Company, LLC (the "Gulf Bay Debtors"), FC Hotel, Ltd. and FC Hotel, LLC (the "FC Hotel Debtors"), Gulf Bay Hotel Company, Ltd. and Gulf Bay Hotel Company, LLC (the "GB Hotel Debtors"), FC Resort, Ltd. and FC Resort, LLC (the "FC Resort Debtors") and GBFC Marina, Ltd. and FC Marina, LLC (the "FC Marina Debtors"), as debtors and debtors in possession (collectively, the Gulf Bay Debtors, the FC Hotel Debtors, the GB Hotel Debtors, the FC Resort Debtors and the FC Marina Debtors are referred to herein as, the "Tarpon Club Debtors")(the "Tarpon Club Plan").

11.     Plan of Reorganization for Fiddler's Creek, LLC., as debtors and debtors in Possession (the "FC Debtor") (the "FC Plan").