**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| **FIDDLER'S CREEK, LLC** | **Case No. 9:10-bk-03846-ALP** |
| 951 LAND HOLDINGS, LLC | Case No. 9:10-bk-03852-ALP |
| DY ASSOCIATES, LLC | Case No. 9:10-bk-03856-ALP |
| GBFC DEVELOPMENT, LLC | Case No. 9:10-bk-03864-ALP |
| FC MARINA, LLC | Case No. 9:10-bk-03872-ALP |
| FC BEACH, LLC | Case No. 9:10-bk-03873-ALP |
| FC GOLF, LLC | Case No. 9:10-bk-03875-ALP |
| DY LAND HOLDINGS II, LLC | Case No. 9:10-bk-03878-ALP |
| FC PARCEL 73, LLC | Case No. 9:10-bk-03881-ALP |
| FC COMMERCIAL, LLC | Case No. 9:10-bk-03888-ALP |
| FC HOTEL, LLC | Case No. 9:10-bk-03886-ALP |
| FC RESORT, LLC | Case No. 9:10-bk-03896-ALP |
| GULF BAY HOSPITALITY COMPANY, LLC | Case No. 9:10-bk-03898-ALP |
| GULF BAY HOTEL COMPANY, LLC | Case No. 9:10-bk-03905-ALP |
| GBP DEVELOPMENT, LLC | Case No. 9:10-bk-03908-ALP |
| GB PENINSULA, LTD. | Case No. 9:10-bk-03909-ALP |
| 951 LAND HOLDINGS, LTD. | Case No. 9:10-bk-03911-ALP |
| DY LAND ASSOCIATES, LTD. | Case No. 9:10-bk-03918-ALP |
| GBFC DEVELOPMENT, LTD. | Case No. 9:10-bk-03920-ALP |
| GBFC MARINA, LTD. | Case No. 9:10-bk-03928-ALP |
| FC BEACH, LTD. | Case No. 9:10-bk-03934-ALP |
| FC GOLF, LTD. | Case No. 9:10-bk-03937-ALP |
| FC HOTEL, LTD. | Case No. 9:10-bk-03938-ALP |
| FC RESORT, LTD. | Case No. 9:10-bk-03947-ALP |
| GULF BAY HOSPITALITY, LTD. | Case No. 9:10-bk-03949-ALP |
| GULF BAY HOTEL COMPANY, LTD. | Case No. 9:10-bk-03950-ALP |
| GBP DEVELOPMENT, LTD. | Case No. 9:10-bk-03952-ALP |
| FIDDLER'S CREEK MANAGEMENT, INC. | Case No. 9:10-bk-03954-ALP |
| | **(Jointly Administered under** |
| **Debtors.** | **Case No. 9:10-bk-03846-ALP)** |

_____/

**AGREED MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 363, 364**
**AND 1108 OF THE BANKRUPTCY CODE: (I) APPROVING CONTRACT FOR THE**
**SALE OF A LOT 102 AND HOME IN SERENA AT FIDDLER'S CREEK, (II)**
**AUTHORIZING THE DEBTORS TO CONSUMMATE THE SALE OF SUCH REAL**
**PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES,**
**WITH ALL SUCH LIENS, CLAIMS AND ENCUMBRANCES TO ATTACH TO THE**

**NET PROCEEDS THEREOF, AND (III) AUTHORIZING THE DEBTORS TO DISBURSE THE SALE PROCEEDS IN ACCORDANCE WITH THE ORDER ON DISBURSEMENT OF NET PROCEEDS FROM THE SALES OF REAL PROPERTY SECURING LOAN TO REGIONS BANK, N.A.**

Fiddler's Creek, LLC ("Fiddler's Creek") and twenty-seven (27) of its subsidiaries and affiliates (collectively, the "Debtors" or "Company"), by and through their undersigned counsel, respectfully request the entry of an order, substantially in the form annexed hereto as ***Exhibit A***, pursuant to Sections 363(b), (f) and (m), 364 and 1108 of Title 11 of the United States Code (hereinafter the "Bankruptcy Code"), and Rule 6004(c) of the Federal Rules of Bankruptcy Procedure (A) approving that certain Purchase and Sale Agreement (the "Serena Contract") between the GBFC Development, Ltd. (the "Selling Debtor") and Zachary Casagrande (the "Serena Purchaser") for the purchase of Unit 102, Building 6, Phase 6 of Serena at Fiddler's Creek (the "Serena Unit") for the amount of $315,000.00, together with all related agreements, a copy of which Serena Contract is attached hereto as ***Exhibit B,*** (B) authorizing the Debtors to pay, and approving payment of, all costs of sale payable by the Debtors in connection therewith, including as more fully described herein: (i) normal and customary closing costs required by the Serena Contract, including without limitation, real estate broker commissions to Fiddler's Creek Realty, Inc., escrow fees, recording costs, title insurance premiums, (ii) due and past due real estate taxes and due and past due special assessments of Fiddler's Creek Community Development District I (the "CDD"), plus the CDD "buy down" on the Serena Unit; and (iii) ten (10%) of the gross proceeds (the "Sales Fee") to the Debtors; and (C) authorizing the Debtors to disburse the net sale proceeds (after payment of the amounts due in subclauses (B)(i), (ii) and (iii) from the sale of the Serena Unit to Regions Bank, N.A. pursuant to the terms of that certain *Order On Disbursement Of Net Proceeds From The Sales Of Real Property Securing Loan To*

*Regions Bank, N.A.* (the "Disbursement Order") [D.E. #428].  In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).  The statutory and legal predicates for the relief sought herein are sections 363(b), (f) and (m), 364 and 1108 of the Bankruptcy Code, and Rule 6004(c) of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

**A.     The Chapter 11 Filing**

2.     On February 23, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     On March 8, 2010, the Court entered an Order Granting Debtor's Emergency Motion for Order Directing Joint Administration of Chapter 11 Cases and jointly administering the cases under Case No. 9:10-bk-03846-ALP as the designated lead case.

4.     No trustee or examiner has been appointed.

5.     On March 9, 2010, the Office of the United States Trustee's Office filed a Notice of Appointment of Homeowners' Committee [D.E. #72].

6.     On April 12, 2010, the Office of the United States Trustee's Office filed an Amended Notice of Appointment of Homeowners' Committee and Notice of Change of Designation From Homeowners' Committee to Official Unsecured Creditors' Committee [D.E. #132].

**B.    Previous Sales of Homes.**

7.    To date, the Debtors have sought and obtained approval from the Court to sell twelve (12) homes to third party retail purchasers.  As a result of such sales, the Debtors have realized gross proceeds from their standing real estate inventory in the amount of approximately $8,486,401.00 since the Petition Date.

**C.    Background and Business Operations**

8.    Each of the Debtors in these Chapter 11 cases owns, operates and/or is otherwise affiliated with the premier, fully integrated, master planned residential community known as "Fiddler's Creek" in southwestern Florida.  Fiddler's Creek is located in Collier County, Florida, approximately 12 miles southeast of the City of Naples and six miles north of Marco Island. The Fiddler's Creek development is comprised of nearly 4,000 zoned acres of prime land in Naples, Florida, and is planned for and capable of accommodating up to 6,000 residences upon projected build-out, which is estimated to be in 2020.  Fiddler's Creek has been approved and vested by the State of Florida as a Development of Regional Impact.

9.    For further information on the Debtors' capital structure, business and operations, the Debtors refer to the Declaration of Anthony DiNardo in Support of Chapter 11 Petitions and First Day Motions [D.E. #29] ("First Day Declaration").

**D.    The Senior Secured Priming DIP Loan from Gulf Bay Capital, LLC**

10.    On February 23, 2010, the Debtors filed their *Emergency Motion for Entry of Interim and Final Orders pursuant to Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying*

*The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto* [D.E. #10] (the "DIP Motion").

11.     In connection with the DIP Motion, the Debtors filed on June 3, 2010, a *Supplement Relating to FC Golf, Ltd. and Textron Financial Corporation (Textron) to Emergency Motion For Entry Of Interim And Final Orders Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor* seeking among other things, authority to obtain (a) separate debtor-in-possession loan facility in the aggregate amount of up to $2,500,000 (with an initial advance of $900,000) from Textron (the "Textron DIP Loan") pursuant to the terms of the Textron Term Sheet dated June 4, 2010, to fund the operations of the Textron Collateral pursuant to the agreed upon budget and (b) use cash collateral from Textron and Iberia (the "DIP Motion Supplement") [D.E.#241].   The Textron DIP Loan included an intercreditor agreement between Textron and the DIP Lender wherein the DIP Lender agreed, among other things, not to prime Textron's Collateral.

12.     On September 28, 2010, the Court entered a *Final Order Granting Supplement Relating to FC Golf, Ltd. and Textron Financial Corporation (Textron) to Emergency Motion For Entry Of Interim And Final Orders Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing*

(A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor [D.E. #393].

13.     On October 7, 2010, the Court entered the *Fourth Interim Order Granting Motion Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto* (the "Fourth Interim Order") [D.E. #416].

14.     After conducting a fifth evidentiary hearing on November 30, 2010 (the "Fifth Interim Hearing") in respect of the Debtors' DIP Motion, the Debtors were authorized, among other things, to borrow from the DIP Lender one or more interim initial advances in an aggregate amount not to exceed the amounts set forth in the thirteen (13) weekly periods (the "Fifth Interim Period") contained in the budget admitted into evidence at the Fifth Interim Hearing up to a maximum borrowing of $7,300,422.00 when combined with the borrowings authorized by the Court pursuant to prior orders of the Court in respect of the DIP Motion.

15.     Specifically, as it relates to this Motion, and pursuant to the previous orders of the Court on the DIP Motion, the DIP Lender presently has and holds a first priming lien, mortgage and security interest on and against the Serena Unit, senior in all respects to the existing, pre-petition mortgage lien granted by the Debtors to Regions Bank in the Serena Unit subject to the

terms of the Disbursement Order discussed herein.

**E.** **The Disbursement of Net Proceeds from the Sales of Real Property Securing Loan to Regions Bank**

16.     Regions Bank asserts a mortgage lien on certain real property and improvements located within Fiddler's Creek, including constructed and existing housing units or fully developed and platted lots (the "Regions Collateral").

17.     The Serena Unit is part of the Regions Collateral securing the loan to Regions Bank.   Regions Bank asserts a secured claim in the principal amount of approximately $42,300,000.00.   At the hearing on the DIP Motion held on March 3, 2010, the Debtors presented uncontradicted expert appraisal testimony and evidence that the Regions Collateral has a current aggregate market value equal to $60,680,000.00.   Accordingly, there is a substantial equity cushion in the collateral securing Regions Bank pre-petition loan.   On April 9, 2010, Regions Bank filed a Supplemental Response in Objection to the DIP Motion wherein it asserted that the value of the Regions Collateral is approximately $50-53 million.   As a result, Regions Bank admits that there is between $7 million and $10 million of equity in the Regions Collateral. Moreover, as presented by the Debtors at the initial and continued DIP Hearings on the DIP Motion, the collateral "Waterfall" agreed to by the DIP Lender provides that there is approximately $17 million of net value (after taxes and CDD debt) in unencumbered collateral ahead of Regions Bank in respect of the DIP Loan, which "Waterfall" provides a substantial equity cushion in favor of Regions Bank and the other senior secured lenders.

18.     Based on the above, among other things, the Court found that the Prepetition Secured Lenders, including Regions Bank, were and are adequately protected in respect of their respective rights and claims in, to and against their respective collateral as required by section 361, 363 and 364 of the Bankruptcy Code, including by virtue of the package of protections

afforded such Prepetition Secured Lenders by the Debtors as set forth in the DIP Motion and in accordance with the terms of the DIP Loan and DIP Loan Documents.  Specifically, the Court found at the initial and continued DIP hearings that there is a substantial equity cushion in the collateral securing each of the Pre-Petition Liens of the Prepetition Secured Lenders, in particular because of the existence of the agreement of the DIP Lender to marshal the Collateral securing the DIP Loan in accordance with the "Waterfall" provisions set forth in the DIP Motion, the Commitment Letter and the DIP Loan Documents.  Moreover, the Court found that the use of the proceeds from the DIP Loan to principally benefit and support the collateral of the Prepetition Secured Lenders constitutes additional adequate protection of their interests.  The Court also found that maintaining and preserving the overall integrated operations of Fiddler's Creek through the DIP Loan provides additional and substantial adequate protection to the Prepetition Secured Lenders.

19.    At the Fourth Interim DIP Hearing, the Debtors, the DIP Lender and Regions Bank reached agreement on, and presented an *ore tenus* motion to approve, the disbursement of the net sale proceeds held in escrow by the Debtors from the previously approved sales of (i) a unit in Cranberry in the amount of $427,788.21 (the "Cranberry Escrow"), (ii) Callista Unit 17-201 in the amount of $417,899.08 (the "Callista Escrow"), (iii) Serena Unit 35 in the amount of $632,468.69 (the "Serena Escrow"), and (iv) Callista Unit 14-103 in the amount of $179,698.07 (the "Second Callista Escrow")(the Cranberry Escrow, the Callista Escrow, the Serena Escrow and the Second Callista Escrow are collectively referred to herein as the "Escrow").  Pursuant to such agreement, which is embodied in the Disbursement Order, the Debtors are authorized to disburse to the DIP Lender an amount equal to $600,000.00 from the Escrow, which monies are to be applied to the outstanding DIP Loan owed by the Debtors to the DIP Lender.  The Debtors

are further authorized to disburse an amount equal to $1,057,854.05 from the Escrow to Regions

Bank, which monies are to be applied to the outstanding pre-petition obligations owed by the

Debtors to Regions Bank.

20.    In addition, pursuant to the Disbursement Order, the Debtors are further

authorized to receive an amount equal to ten (10%) percent of the gross proceeds (the "Sale

Fee") from and upon the consummation of the sale of any of the Regions Collateral resulting

from any Applicable Contract.[1]

### RELIEF REQUESTED

**A.    Approval of the Sale of the Serena Unit Free and Clear.**

21.    As set forth above, the purchase price for the Serena Unit is $315,000.00

("Purchase Price").    Such Purchase Price includes a Capital Acquisition Assessment for

membership to The Club & Spa at Fiddler's Creek in the amount of $15,000.00, which $15,000

will be paid to the Fiddler's Creek Foundation upon closing.  Pursuant to the terms of the Serena

Contract, the Serena Purchaser has paid a $30,000 good faith deposit (the "Serena Deposit"). The

Serena Deposit will be applied to the Purchase Price, requiring the Serena Purchaser to fund the

remaining balance of the Purchase Price in cash at closing after the application of the Serena

Deposit. The Serena Contract is subject to mortgage financing.   The closing of the Serena Unit

is scheduled to take place within ten (10) days from the entry of an Order approving this Motion,

but in no event later than sixty (60) days after the date of the execution of the Serena Contract by

the Serena Purchaser and is contingent upon: (a) entry of an order of this Court authorizing such

sale free and clear of all liens, claim, and encumbrances; (b) issuance of a certificate of

---

[1]  The term "Applicable Contract" shall mean one or more purchase and sale contracts for the sale of the
Regions Collateral entered into by the Debtors on or before December 1, 2010 (which close within sixty (60) days
after December 1, 2010).

occupancy, and (c) mortgage financing by the Serena Purchaser.

22.    The Purchase Price for the Serena Unit significantly exceeds the minimum required gross sales price for the Serena Unit pursuant to the terms of the DIP Loan. Specifically, the DIP Loan requires that the minimum gross sales price for the Serena Unit be $123,492.00. The Purchase Price for the Serena Unit also significantly exceeds the release price set forth in the pre-petition mortgage to Regions Bank, which is $140,707.00.

23.    In connection with the closing of the Serena Unit, the Debtors also request the authority to pay, upon consummation of the sale of the Serena Unit, any and all expenses and obligations required to be paid by the Debtors in connection with the closing of the Serena Unit, including but not limited to (i) those items set forth in Paragraph 7 of the Serena Contract (ii) an amount equal to $15,000 for the Capital Acquisition Assessment related to the Fiddler's Creek Foundation; (iii) all amounts due for collection by the Uniform Method of collection set forth in Chapter 197 of the Florida Statutes (the "Uniform Method"), including without limitation, ad valorem taxes, real estate taxes, non-ad valorem taxes, and due and past due on roll assessment obligations due to the CDD for the period through the Closing, all solely with respect to the Serena Unit; (iv) accrued interest sufficient to redeem any and all tax certificates that have been issued if applicable to the Serena Unit (with any and all outstanding tax certificates related to the Serena Unit to be redeemed promptly upon the Closing); (v) any and all assessments that were billed in the ordinary course (without acceleration) as "off-roll" (or not by the Uniform Method) and have not been paid and all interest and penalties accrued thereon; (vi) to the extent due and payable, pro-rated *ad valorem* taxes, real estate taxes, *non-ad valorem* tax, special assessments, and any other taxes or assessments due, to Collier County for tax year 2010 through the Closing related to the Serena Unit; (vii) real estate brokers' commissions to Fiddler's Creek Realty, Inc.,

a non-debtor affiliate of the Debtors; (viii) title insurance; and (ix) the CDD buy down for the Serena Unit in the approximate amount of $11,398.10 (collectively the "Closing Expenses").

24.     Notwithstanding anything else in the Serena Contract, this Sale Motion, any order entered on this Sale Motion, or any document related to the Serena Contract, this Sale Motion, or any such order (all of the foregoing documents, collectively, the "Serena Documents"), (**A**) the Serena Unit remains subject to and the Serena Purchaser takes subject to all special assessments levied or to be levied by the CDD payable for tax years 2010 and beyond solely with respect to the Serena Unit, whether such special assessments are levied with regard to bonds issued by the CDD, with regard to operations and maintenance of the CDD, or otherwise (collectively, the "CDD Assessments For Tax Years 2010 And Beyond") and any and all liens of the CDD Assessments For Tax Years 2010 and Beyond, none of which are or will be affected by any of the Serena Documents, and (**B**) the Serena Unit remains subject to and the Serena Purchaser takes subject to all *ad valorem* taxes for tax year 2010 and beyond solely with respect to the Serena Unit (collectively, the "Ad Valorem Taxes For Tax Years 2010 And Beyond"), and any and all liens of the Ad Valorem Taxes For Tax Years 2010 And Beyond, none of which are affected by any of the Serena Documents.

25.     In addition to the above, the Debtors request the approval of the sale free and clear, liens, claims, encumbrances and interests with all valid liens, claims, encumbrances and interest to attach to the net proceeds of sale in the order of priority, including as a result of the liens granted to the DIP Lender in connection with the DIP Loan.

26.     Upon consummation of the closing of the sale of the Serena Unit, the Debtors propose that the net proceeds from the sale of the Serena Unit (after payment of Closing Expenses and the Sale Fee) be disbursed in accordance with the terms of the Disbursement Order

to Regions Bank to be applied to the pre-petition obligations owed by the Debtors to Regions Bank.

## BASIS FOR RELIEF REQUESTED

**A.    Sale of Property in the Ordinary Course of Business.**

27.    The Bankruptcy Code generally leaves undisturbed a debtor-in-possession's power to conduct normal business operations.  Section 1108 provides broadly that "[u]nless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee [or debtor-in-possession] may operate the debtor's business." *See*, 11 U.S.C. §1108.  Section 363 (c)(1) supplements the general power, stating that "[i]f the business  of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee [or the debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. §363(c). Courts usually defer to the business judgment of a debtor/trustee in deciding whether or not to authorize a debtor to sell property outside the ordinary course of business. *See, In re Continental Airlines, Inc*., 780 F.2d 1223 (5th Cir. 1986); *In re Lionel Corp*., 722 F.2d 1063, 1071 (2nd Cir. 1983); *In re Mason's Nursing Center, Inc*., 73 E.R. 360, 362 (Bankr. S.D. Fla. 1987).

28.    As set forth above, the Debtors are and have been in the business of selling homes and lots, with hundreds of homes sold over the past four (4) years.  As a result, the sale of the Serena Unit is clearly within the Debtors' ordinary course of business.  Moreover, the Debtors believe that the purchase price for the Serena Unit is fair and reasonable and higher than the

minimum gross sales prices set by the DIP Lender and the release price for Regions Bank. Additionally, the Debtors believe that the other terms of the Serena Contract are commercially reasonable and consistent with prior sales in Fiddler's Creek.

**B.    Sale of Property Free and Clear of all Liens, Claims and Encumbrances.**

29.    Although, the Debtors assert that selling homes and lots is within the ordinary course of its business, the Debtors further request, pursuant to section 363 of the Bankruptcy Code, authorization to implement and close on the Serena Contract, and to consummate the transactions contemplated therein by delivering title to the Serena Unit to the Serena Purchaser.

30.    Specifically, the Debtors request authority to sell, assign and transfer the Serena Unit to the Serena Purchaser, pursuant to Section 363(b) of the Bankruptcy Code, which Section provides that a debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate …." *See*, 11 U.S.C. §363(b).

31.    Courts interpreting Section 363(b) have approved non-ordinary course sales, even where substantially all of a debtor's assets were being sold prior to proposal of a plan of reorganization.  In the present case, the Debtors are not proposing to sell substantially all of their assets.  Rather, as set forth above, the sale of the Serena Unit is in the ordinary course of business.  However, the Debtors seek approval under Section 363(b) as well out of an abundance of caution.  *In re Parkstone Med. Info. Sys.*,2001 WL 36189822 at *1 (Bankr. S.D. Fla. Oct. 16, 2001) (Hyman, J.); *In re Lionel Corporation*, 722 F.2d 1063, 1070-71 (2nd Cir. 1983); *In re Baldwin United Corp.*, 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984); *In re Tower Automotive, Inc.*, 342 B.R. 158, 163-64 (Bankr. S.D.N.Y. 2006 (discussing legal standards governing asset sales outside the plan process).

32.    As a general rule, courts approve the sale of assets, including all or substantially

all of a debtor's assets, prior to confirmation of a plan and pursuant to Section 363(b), provided the debtor establishes "sound business judgment" for such a transaction. *Parkstone Med. Info. Sys.*, 2001 WL 36189822; *In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995) ("courts consistently have acknowledged that assets of an estate can be sold prior to the confirmation, or even filing, of a plan").; *In re Lorraine Brooke Associates, Inc.*, 2007 WL 2257608 at *4 (Bankr. S.D. Fla. Aug. 2, 2007) (Cristol, J.) (applying business judgment test in assessing 363(b) motion in chapter 7 proceedings) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 175-176 (D. Del. 1991)); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).  The "sound business judgment" test requires a debtor to establish: (a) that a sound business reason justifies the sale outside the ordinary course of business, (b) that accurate and reasonable notice has been provided to interested parties, (c) that the debtor has obtained a fair and reasonable price, and (d) good faith.  *Id.*; see also *In re Equity Management Systems*, 149 B.R. 120, 124 (applying same factors); *In re Phoenix Steel Corporation*, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (same); *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 136 (Bankr. W.D.N.Y. 2009) (same) (citing *In re Lionel Corp.*, 722 F.2d at 1071 and *Phoenix Steel*, 82 B.R. at 335).

33.    In the present case, there is no question that the sale of the Serena Unit represents sound business judgment on the part of the Debtors.  Among other things, the sale establishes a renewed confidence in Fiddler's Creek and the Debtors' ability to operate a premier master planned residential community.  Moreover, the sales price achieved by the Debtors for the Serena Unit significantly exceed the minimum sales prices required under the DIP Loan and the release price for Regions Bank.

34.    Still further, the proposed purchaser for the Serena Unit is a third party unrelated

to the Debtors and the negotiations with respect to the Serena Contract were done at arms' length and in good faith. The Serena Purchaser is not an insider of the Debtors within the meaning of Section 101(31) of the Bankruptcy Code, and does not control or act on behalf of any insider of the Debtors. Therefore, the sale has been proposed in good faith. *See In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) ("deference to a DIP's decision as to a successful bidder of its assets is appropriate, and that decision may be honored unless it is proven that the DIP abused that discretion"); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149, n.5 (3d Cir. 1986) (purpose of good faith requirement is to "prevent[] a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11."); see also *In re Lorraine Brooke Associates*, 2007 WL 2257608 at *4; *In re Grand Prix Associates, Inc.*, 2009 WL 1850966 at *4 (Bankr. D.N.J. June 26, 2009) ("A court may not find good faith if fraud, collusion, or unfair advantages are determined.") (citing *Abbotts Dairies*, 788 F.2d at 149-50).

35.    As a result, the Debtors assert that they have established the existence of sound business judgment in connection with the sale of the Serena Unit under Section 363(b) of the Bankruptcy Code. Moreover, the Serena Purchaser is entitled to the protections of Section 363(m) of the Bankruptcy Code and the Debtors request that the Court make such finding in connection herewith.

**C.    The Sale of the Serena Unit Free and Clear of all Liens, Claims and Encumbrances and the Existence of Adequate Protection to Regions Bank.**

36.    Pursuant to section 363(f) of the Bankruptcy Code, the Debtors are granted the statutory power to sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the five (5) enumerated conditions are satisfied (a) applicable non-bankruptcy law permits the sale of the property free and clear of such interest; (b) the entity holding the lien, claim or encumbrance consents to the sale; (c) the interest is a lien

15

and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.  *See*, 11 U.S.C. §363(f).  It is obvious that the Debtors must have the ability to give the Serena Purchaser good and marketable title free and clear of liens, claims, encumbrances and interests.  The sale of the Serena Unit satisfies one or more of the conditions enumerated in section 363(f) of the Bankruptcy Code because the Debtors understand and believe that Regions Bank will consent to such sale and/or the Debtors believe that the price at which the Serena Unit is to be sold, when considered in tandem with the substantial equity cushion that exists in respect of the Waterfall and in the Regions Collateral (Regions Bank has admitted at least $8.0 million in an equity cushion in the Regions Collateral), is greater than the aggregate value of the liens encumbering the property pursuant to Section 363(f)(3) above.  Therefore, Regions Bank is adequately protected as discussed above and below.

37.    Pursuant to the terms of the Serena Contract, the Debtors' estates expect to realize gross proceeds in the amount of $315,000.00 (the "Sale Proceeds").  The Debtors propose to sell the Serena Unit free and clear of all liens, claims, encumbrances and interests of any kind, with such liens, claims and encumbrances to attach to the net sale proceeds and disburse the proceeds from such sale to pay the Closing Expenses and the Sale Fee, with the balance to be paid to Regions Bank in accordance with the Disbursement Order.

38.    As set forth in more detail in the DIP Motion, the Bankruptcy Code does not explicitly define "adequate protection," but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property.  *See* 11 U.S.C. § 361.

16

Because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis. *In re Swedeland Dev. Group Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*citing In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. l987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1995) (same); *In re Senior Care Properties, Inc.*, 137 B.R. 527, 528 (Bankr. N.D. Fla. 1992) (same); *see also* S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978) and H.R. Rep. No. 595, 95th Cong., 2d Sess. 339 (1978) (acknowledging that the statute confers upon "the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved."). Preserving the value of collateral against the decline in value that would result from a precipitous liquidation is a crucial factor to consider in making an adequate protection determination. *See, e.g.*, *Snowshoe*, 789 F.2d at 1087 (section 364(d) order affirmed where the trustee reported that the collateral would lose from 50% to 90% of its fair market value if it ceased operating); *495 Central Park Ave.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (proceeds of priming financing utilized to improve collateral transfers into value that serves as adequate protection); *In re Relar Distribs., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994), *aff'd*, 182 B.R. 81 (D. Mass. 1995), *aff'd*, 69 F.3d 1200 (1st Cir. 1995) (the "[a]ctivities of a debtor can enhance collateral value and thereby provide adequate protection").

39.     The concept of adequate protection, however, does not mean that an equity cushion in the collateral must be preserved, whether the decline in the equity cushion is a result of a decline in the value of the collateral or an increase in the secured creditor's claim due to the accrual of interest or fees. *See In re Lane*, 108 B.R. 6 (Bankr. D. Mass. 1989) Moreover, adequate protection does not require the maintenance of a loan to collateral value ratio in the context of an oversecured creditor. *See In re Delta Resources, Inc.*, 54 F.3d 722, 730 (11th Cir.

17

1995).  Lastly, the Debtors are only required to provide adequate protection for the value of a

creditor's secured claim that exists as of the petition date.  *See In re Nice*, 355 B.R. 554, 561-562

(Bankr. N.D. W.Va. 2006) (citing *In re Farmer*, 257 B.R. 556, 561-62 (Bankr. D. Mont. 2000)

(valuing collateral as of the petition date for adequate protection purposes)).

40.     For all the reasons set forth above, the Debtors believe that the sale of the Serena

Unit is reasonable under the circumstances and in the best interest of the estates. The Debtors

believe that they have used reasonable efforts in seeking a buyer and that the sale of the Serena

Unit, pursuant to this Motion, is fair and reasonable, and is within the Debtors' best business

judgment. The Debtors have determined that the purchase price offered by the purchaser of the

Serena Unit is the highest and best offer received, is reasonable, represents fair market value, and

the proposed sales are in the best interest of the estate.

### Notice

41.     This Motion and all attachments hereto shall be served via CM/ECF, E-Mail

and/or U.S. Mail upon: (i) all parties listed on the Master Service List maintained by the Debtors,

to the extent such party is registered to receive Notices of Electronic Filings via CM/ECF, E-

Mail and/or U.S. Mail; (ii) all parties upon whom service is required pursuant to Rules 6004( c)

and 6006, to the extent not listed on the Master Service List; (iii) all parties who have filed

Notices of Appearance pursuant to Local Rule 9010-1 and who is registered to receive Notices of

Electronic Filings via CM/ECF; (iv) each Prepetition Secured Lender, and  all parties asserting

liens; and  (v) any other party which the Court directs.

**WHEREFORE**, the Debtors respectfully request that this Court enter an order on an

expedited basis (i) approving the Serena Contract (ii) authorizing the Debtors to consummate the

sale of the Serena Unit pursuant to the Serena Contract, free and clear of all liens, claims,

encumbrances and interests of any kind, with such liens, claims and encumbrances to attach to the net proceeds thereof, (iii) approving payment of the Closing Expenses, (iv) approving payment of the Sale Fee, (v) authorizing the Debtors to disburse the net sale proceeds (after payment of all Closing Expenses and Sale Fee) to Regions Bank in accordance with the Disbursement Order; and (vi) granting such other and further relief as is just.

Dated this 17<u>th</u> day of December, 2010.

Respectfully Submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for Debtors-in-Possession
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By:     /s/*Mariaelena Gayo-Guitian*
        Mariaelena Gayo-Guitian, Esq.
        Fla. Bar No.  0813818
        mguitian@gjb-law.com

        Paul J. Battista, Esq.
        Florida Bar No. 884162
        pbattista@gjb-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this **Motion** has been furnished by the Court's *CM/ECF* electronic mail system or by U.S. Mail to all parties on the attached service list on December 17th , 2010.

By:    /s/ Mariaelena Gayo-Guitian
              Mariaelena Gayo-Guitian, Esq.

## SERVICE LIST
## CASE NO.: 09-34791-BKC-RBR

Marianella Morales, Esquire
Authorized Agent For Joining Creditors
Avenida Francisco de Miranda
Torre Provincial "A"
Piso 8
Caracas, Venezuela
**(VIA EMAIL)**

John H. Genovese, Esq. **(VIA CM/ECF)**
Robert F. Elgidely, Esq.
Theresa M.B. Van Vliet, Esq.
Genovese Joblove & Battista, PA
Bank Of America Tower at International Place
100 S.E. 2nd Street
Suite 4400
Miami, Florida 33131
Phone: (305) 349-2300
Fax (305) 349-2310

Kendall Coffey, Esq. **(VIA EMAIL)**
Coffey Burlington,
Office in the Grove
Penthouse
2699 South Bayshore Drive
Miami, Florida 33133
kcoffey@coffeyburlington.com

The Honorable Herbert M. Stettin
One Biscayne Tower
Suite 3700
Two South Biscayne Boulevard
Miami, Florida 33131

John G. Bianco, Esq. **(VIA CM/ECF)**
John M. Mulli, Esquire
Tripp Scott
110 Southeast Sixth Street
Fifteenth Floor
Fort Lauderdale, Fl. 33301
jgb@trippscott.com

Alison W. Lehr **(VIA EMAIL)**
Assistant United States Attorney
99 N.E. 4th Street
7th Floor
Miami, Florida 33132
Phone: (305) 961-9176
Fax: (305) 536-7599
Alison.Lehr@usdoj.gov

Stuart A. Rosenfeldt, Esq. **(VIA EMAIL)**
Rothstein Rosenfeldt Adler, PA
401 East Las Olas Boulevard
Suite 1650
Fort Lauderdale, Florida 33301
srosenfeldt@rra-law.com

Jeffrey R. Sonn, Esq. **(VIA EMAIL)**
Sonn & Erez, PLC
Broward Financial Center
500 E. Broward Boulevard
Suite 1600
Fort Lauderdale, Florida  33394
Phone: (954) 763-4700
Fax (954) 763-1866
jsonn@sonnerez.com

Office of the US Trustee **(VIA CM/ECF)**
51 Southwest First Avenue
Suite 1204
Miami, Florida  33130

Thomas Tew, Esq. **(VIA EMAIL)**
Lynn Maynard Gollin, Esq.
Tew-Cardenas, LLP
Four Seasons Tower
15th Floor
1441 Brickell Avenue
Miami, Florida 33131-3407
tt@tewlaw.com
lmg@tewlaw.com

Conrad & Scherer, LLP **(VIA EMAIL)**
633 South Federal Highway
Fort Lauderdale, FL 33301
Tel: 954-462-5500
bs@conradscherer.com
JSilver@conradscherer.com

Michael D. Seese, Esq. **(VIA EMAIL)**
Hinshaw & Culbertson, LLP
1 E Broward Blvd Ste 1010
Ft Lauderdale, Florida 33301
Tel: 954.4677900
Fax:  954.4671024
mseese@hinshawlaw.com

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 21126
Philadelphia, PA 19114
**(Via U.S. Mail)**

Internal Revenue Service
Special Procedures - Insolvency
7850 SW 6th Court
Plantation, FL  33324
Tel.: (954) 423-7300
Fax.: (305) 982-5406
**(Via U.S. Mail)**

Special Asst. U.S. Attorney
P.O. Box 9, Stop 8000
51 SW 1st Avenue, #1114
Miami, Fl  33130
Fax: (305) 530-7139
**(Via U.S. Mail)**

Grant J. Smith, Esq. **(VIA EMAIL)**
Rothstein Rosenfeldt Adler, P.A.
401 East Las Olas Blvd
Suite 1650
Fort Lauderdale, FL 33301
gsmith@rra-law.com

United Healthcare
Dept. CH 10151
Palatine, IL 60055
**(Via US Mail)**

Special Asst. U.S. Attorney
IRS District Counsel
1000 S. Pine Island Rd., Ste 340
Plantation, FL 33324-3906
**(Via U.S. Mail)**

The Honorable Eric H. Holder, Jr.
Attorney General of the U.S.
950 Pennsylvania Avenue, NW Room 4400
Washington, DC  20530-0001
**(Via U.S. Mail)**

Honorable Jeffrey H. Sloman,
Acting U.S. Attorney
99 NE 4th Street
Miami, Fl  33132
**(Via U.S. Mail)**

Daniel Mink
Ovadia Levy
c/o Renato Watches, Inc
14051 NW 14th Street
Sunrise, Florida 33323
**((Via U.S. Mail)**

William George Salim, Jr. **(VIA CM/ECF)**
Moskowitz Mandell & Salim
800 Corporate Dr Ste 510
Fort Lauderdale, Florida 33334
wsalim@mmsslaw.com
Tel: 954.491-2000
Fax:  954.4912051

USI **(VIA EMAIL)**
Attn: Anthony Gruppo
200 West Cypress Creek Road
Suite 500
Fort Lauderdale, FL 33309
Tel: 954-607-4000
Anthony.gruppo@usi.biz

Marc Nurik, Esq. **(VIA EMAIL)**
1 East Broward Blvd
Suite 700
Fort Lauderdale, FL 33301
marc@nuriklaw.com

BAST AMRON LLP **(VIA CM/ECF)**
SunTrust International Center
One Southeast Third Avenue
Suite 1440
Miami, Florida 33131
Telephone: (305) 379-7904
Facsimile: (305) 379-7905
bamron@bastamron.com
jbast@bastamron.com

Mark Bloom, Esq. **(VIA EMAIL)**
Greenberg Traurig, LLP
1221 Brickell Avenue
Miami, FL 33131
T 305.579.0500
F 305.579.0717
bloomm@gtlaw.com

Robert D. Critton, Esq.  **(VIA EMAIL)**
Burman, Critton, Luttier & Coleman
303 Banyan Blvd., Suite 400
West Palm Beach, FL 33401
rcrit@bclclaw.com

Roth & Scholl **(VIA EMAIL)**
Attn: Jeffrey C. Roth, Esq.
Attorneys For Creditor Blue
Capital Us East Coast Properties, L.P.
866 South Dixie Highway
Coral Gables, Fl 33146
Telephone: (305) 662-4141
jeff@rothandscholl.com

Rogers, Morris & Ziegler, LLP **(VIA EMAIL)**
1401 East Broward Blvd
Suite 300
Fort Lauderdale, FL 33301
Tel: (954) 462-1431
Fax: (954) 763-2692
mfbooth@rmzlaw.com

Arthur C. Neiwirth, Esq. **(VIA CM/ECF)**
One E. Broward Blvd., Suite 1400
Ft. Lauderdale, FL 33301
Tel: (954) 523-7008
Fax: (954) 523-7009
aneiwirth@qpwblaw.com

The Florida Bar **(VIA EMAIL)**
Adria E. Quintela, Esq.
Alan Anthony Pascal, Esq.
Lake Shore Plaza II
1300 Concord Terrace, Suite 130
Sunrise, FL 33323
aquintel@flabar.org
apascal@flabar.org

Micheal w. Moskowitz, Esq. **(VIA E-MAIL)**
800 Corporate Drive, Suite 500
Ft. Lauderdale, FL 33234
mmoskowitz@mmsslaw.com

Francis L. Carter, Esq. **(VIA E-MAIL)**
Katz Barron Squitero Faust
2699 S. Bayshore Drive, 7th Floor
Miami, Florida 33133
Tel: 305-856-2444
Fax: 305-285-9227
flc@katzbarron.com

Bradley S. Shraiberg, Esq. **(VIA EMAIL)**
2385 NW Executive Drive
Suite 300
Boca Raton, Florida 33431
Tel: 561-443-0800
Fax: 561-998-0047
bshraiberg@sfl-pa.com

Henry S. Wulf, Esq. **(VIA EMAIL)**
CARLTON FIELDS, P.A.
525 Okeechobee Blvd., Suite 1200
West Palm Beach, Florida 33401
Telephone: (561) 659-7070
Facsimile: (561) 659-7368
E-Mail: hwulf@carltonfields.com

EMESS Capital, LLC  **(VIA EMAIL)**
c/o Bruce A. Katzen, Esq.
201 S. Biscayne Blvd., 17th Floor
Miami, Florida 33131
Telephone: (305) 379-9000
Facsimile: (305) 379-3428
E-Mail: bkatzen@klugerkaplan.com

Ira Sochet, Trustee  **(VIA EMAIL)**
Revocable Intervivos Trust of Ira Sochet
c/o Phil Hudson, Esq.
200 South Biscayne Blvd, Suite 3600
Miami, Florida 33130
Telephone: (305) 374-3330
Facsimile: (305) 374-4744
E-Mail: pmhudson@arnstein.com

Coquina Investments  **(VIA EMAIL)**
c/o Patricia A. Redmond, Esq.
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-3553
Facsimile: (305) 789-3395
E-Mail: predmond@stearnsweaver.com

Michael I. Goldberg, Esq.  **(VIA EMAIL)**
Las Olas Centre -  Suite 1600
350 East Las Olas Blvd
Fort Lauderdale, FL 33301
Telephone: (305) 463-2700
Facsimile: (305) 463-2224
E-Mail: Michael.goldberg@akerman.com

LMB Funding Group  **(VIA EMAIL)**
c/o Robert C. Furr, Esq.
2255 Glades Road, Suite 337W
Boca Raton, Florida 33431
Telephone: (561) 395-0500
Facsimile: (561) 338-7532
E-Mail: rfurr@furrcohen.com

Lawrence A. Gordich, Esq. **(VIA EMAIL)**
Melissa Alagna, Esq.
701 Brickell Ave
Suite 1900
Miami, Florida 33131
Telephone: (305) 789-2700
Facsimile: (305) 789-2727
Email: Lawrence.gordich@ruden.com
Email: Melissa.alagna@ruden.com

Broward County **(VIA EMAIL)**
Attn: Hollie N. Hawn, Esq.
Government Center
115 South Andrews Avenue
Fort Lauderdale, FL 33301
Telephone: (954) 357-7600
Facsimile: (954) 357-7641
E-Mail: hhawn@broward.org

Brian Tannebaum, Esq. **(VIA EMAIL)**
Tannebaum Weiss PL
150 W Flagler St Ste 2850
Miami, Florida 331301539
E-Mail: bt@tannebaumweiss.com

Paul David Lazarus, Esq.  **(VIA EMAIL)**
1 Financial Plaza, Suite 250
Fort Lauderdale, FL 33394
Telephone: (305) 712-1000
Facsimile: (305) 712-10001
E-Mail: pdlazarusesq@aol.com

Louis J. Terminello, Esq.  **(VIA EMAIL)**
Terminello & Terminello, P.A.
2700  SW 37th Avenue
Miami, Florida 33133
Telephone: (305) 444-5002
Facsimile: (305) 448-5566
E-Mail:  ljt@terminello.com

Daniel S. Mandel, Esq.  **(VIA EMAIL)**
Law Offices of Daniel S. Mandel, P.A.
2700 N. Military Trail, Ste. 355
Boca Raton, FL 33431
Phone: (561) 826-1740
Fax:    (561) 826-1741
E-mail:  dmandel@dsmandellaw.com

Howard M. Camerik, Esq. **(VIA EMAIL)**
GrayRobinson, P.A.
401 E. Las Olas Blvd., Suite 1850
Ft. Lauderdale, FL 33301-4236
Phone:  (954) 761-8111
Fax:  (954) 761-8112
E-mail:  howard.camerik@gray-robinson.com

**Updated 5-12-10**

James C. Moon, Esq. **(VIA EMAIL)**
Peter D. Russin, Esq.
Michael S. Budwick, Esq.
Meland Russin & Budwick
3000 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 358-6363
Facsimile: (305) 358-1221
E-Mail: jmoon@melandrussin.com
prussin@melandrussin.com
mbudwick@melandrussin.com

Vivian H. Fazio, Esq. **(VIA EMAIL)**
Biling Cochran
515 E. Las Olas Blvd., Fl 6
Ft. Lauderdale, FL 33301-4220
Phone:  (954) 767-7150
E-mail:  vhf@bclmr.com
         wtc@bclmr.com
         kellyr@bclmr.com

Michael J. Schlesinger, Esq. **(VIA EMAIL)**
Michael C. Cotzen, Esq.
Schlesinger & Cotzen, P.L.
799 Brickell Plaza
Ste 700
Miami, FL 33131
Phone:  (305) 373-8993
Fax:  (305) 373-8098
Email:  mc@scflalaw.com
        ms@scflalaw.com

Andrew R. Herron, Esq. **(VIA EMAIL)**
1401 Brickell Avenue, Suite 840
Miami, FL  33131
Phone: (305) 779-8106
F: (305) 779-8104
E-mail:  aherron@hjo-law.com

**Updated 5-12-10**

C. Thomas Tew, P.A. **(VIA EMAIL)**
Jeffrey Tew, Esq.
Joseph DeMaria, Esq.
Tew Cardenas LLP
1441 Brickel Avenue, 15th Floor
Miami, Florida 33131
Telephone: (305) 536-1112
Facsimilie: (305) 536-1116
E-Mail: tt@tewlaw.com
jt@tewlaw.com
jad@tewlaw.com

Gary S. Blake, Esq. **(VIA EMAIL)**
Gladstone Law Group, P.A.
1499 W. Palmetto Park Road
Suite 300
Boca Raton, FL 33486
Telephone: (561) 338-4101
Facsimilie: (561) 338-4077
gblake@lglaw.net

Michael R. Josephs, Esq. **(VIA EMAIL)**
Josephs Jack, P.A.
2699 S Bayshore Dr 7 Fl
Miami, FL 33133

Telephone: (305) 445-3800
Facsimile: (305) 448-5800
mrj@josephsjack.com

Rothstein Rosenfeldt Adler, P.A.
6600 NW 16th Street
Suite 11
Plantation, FL 33313

Eric N. Assouline, Esq. **(VIA EMAIL)**
Assouline & Berlowe, P.A.
213 East Sheridan Street, Ste. 3
Dania Beach, FL 33004
Telephone: (954) 929-1899
Facsimile: (954) 922-6662
ena@assoulineberlowe.com

Melinda S. Thorton **(VIA CM/ECF)**
Assistant County Attorney
County Attorney's Office
2810 Stephen P. Clark Center
111 N.W. First Street
Miami, FL 33128
Telephone: (305) 375-5151
Facsimile: (305) 375-5611
cao.bkc.miamidade.gov
mts4@miamidade.gov

# EXHIBIT "A"

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**
**www.flmb.uscourts.gov**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| | |
| **FIDDLER'S CREEK, LLC** | **Case No. 9:10-bk-03846-ALP** |
| 951 LAND HOLDINGS, LLC | Case No. 9:10-bk-03852-ALP |
| DY ASSOCIATES, LLC | Case No. 9:10-bk-03856-ALP |
| GBFC DEVELOPMENT, LLC | Case No. 9:10-bk-03864-ALP |
| FC MARINA, LLC | Case No. 9:10-bk-03872-ALP |
| FC BEACH, LLC | Case No. 9:10-bk-03873-ALP |
| FC GOLF, LLC | Case No. 9:10-bk-03875-ALP |
| DY LAND HOLDINGS II, LLC | Case No. 9:10-bk-03878-ALP |
| FC PARCEL 73, LLC | Case No. 9:10-bk-03881-ALP |
| FC COMMERCIAL, LLC | Case No. 9:10-bk-03888-ALP |
| FC HOTEL, LLC | Case No. 9:10-bk-03886-ALP |
| FC RESORT, LLC | Case No. 9:10-bk-03896-ALP |
| GULF BAY HOSPITALITY COMPANY, LLC | Case No. 9:10-bk-03898-ALP |
| GULF BAY HOTEL COMPANY, LLC | Case No. 9:10-bk-03905-ALP |
| GBP DEVELOPMENT, LLC | Case No. 9:10-bk-03908-ALP |
| GB PENINSULA, LTD. | Case No. 9:10-bk-03909-ALP |
| 951 LAND HOLDINGS, LTD. | Case No. 9:10-bk-03911-ALP |
| DY LAND ASSOCIATES, LTD. | Case No. 9:10-bk-03918-ALP |
| GBFC DEVELOPMENT, LTD. | Case No. 9:10-bk-03920-ALP |
| GBFC MARINA, LTD. | Case No. 9:10-bk-03928-ALP |
| FC BEACH, LTD. | Case No. 9:10-bk-03934-ALP |
| FC GOLF, LTD. | Case No. 9:10-bk-03937-ALP |
| FC HOTEL, LTD. | Case No. 9:10-bk-03938-ALP |
| FC RESORT, LTD. | Case No. 9:10-bk-03947-ALP |
| GULF BAY HOSPITALITY, LTD. | Case No. 9:10-bk-03949-ALP |
| GULF BAY HOTEL COMPANY, LTD. | Case No. 9:10-bk-03950-ALP |
| GBP DEVELOPMENT, LTD. | Case No. 9:10-bk-03952-ALP |
| FIDDLER'S CREEK MANAGEMENT, INC. | Case No. 9:10-bk-03954-ALP |
| | |
| | **(Jointly Administered under** |
| **Debtors.** | **Case No. 9:10-bk-03846-ALP)** |
| _____/ | |

**AGREED ORDER GRANTING MOTION PURSUANT TO SECTIONS 363, 364 AND**
**1108 OF THE BANKRUPTCY CODE (I) APPROVING CONTRACT FOR THE SALE**
**OF LOT 102 IN SERENA AT FIDDLER'S CREEK, (II) AUTHORIZING THE**
**DEBTORS TO CONSUMMATE THE SALE OF SUCH REAL PROPERTY FREE AND**
**CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, WITH ALL SUCH LIENS,**

**CLAIMS AND ENCUMBRANCES TO ATTACH TO THE NET PROCEEDS THEREOF,
AND (III) AUTHORIZING THE DEBTORS TO DISBURSE THE SALE PROCEEDS
IN ACCORDANCE WITH THE ORDER ON DISBURSEMENT OF
NET PROCEEDS FROM THE SALES OF REAL PROPERTY
SECURING LOAN TO REGIONS BANK, N.A.**

**THIS CASE** came before the Court upon the *Agreed Motion For Entry Of Order Pursuant To Sections 363, 364 And 1108 Of The Bankruptcy Code: (I) Approving Contract For The Sale Of A Lot And Home In Serena, (II) Authorizing The Debtors To Consummate The Sale Of Such Real Property Free And Clear Of Liens, Claims And Encumbrances, With All Such Liens, Claims And Encumbrances To Attach To The Net Proceeds Thereof, And (III) Authorizing The Debtors To Disburse the Sale Proceeds In Accordance with The Order On Disbursement of Net Proceeds From the Sale of Real Property Securing Loan to Regions Bank, N.A.* [D.E. # _____] (the "Sale Motion"). The Court, having found that good and sufficient cause exists in support of the relief granted herein; having found that such relief is in the best interest of the Debtors, their creditors and all other parties in interest; it is

**ORDERED** as follows:

1.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

2.      To the extent any findings of fact in this Order constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law in this Order constitute findings of fact, they are adopted as such.

3.      The Sale Motion is GRANTED as set forth in this Order.

4.      Subject to the terms of this Order, the Court approves that certain Purchase and Sale Agreement which is attached as ***Exhibit B*** to the Sale Motion (the "Serena Contract")

2

between the GBFC Development, Ltd. (the "Selling Debtor") and Zachary Casagrande (the "Serena Purchaser") for the purchase of Unit 102, Building 6, Phase 6 of Serena Village at Fiddler's Creek (the "Serena Unit") for the amount of $315,000.00, together with all related agreements.

5.    The Debtor, GBFC Development, Ltd., who is the record owner of the Serena Unit, and all other Debtors to the extent they have an interest in the Serena Unit are authorized to consummate the sale of the Serena Unit to the Serena Purchaser pursuant to the Serena Contract and to deliver title at Closing to the Serena Unit to the Serena Purchaser in the ordinary course of the Debtors' business in this instance pursuant to Section 363(c)(1) and Section 1108 of Title 11, United States Code (the "Bankruptcy Code").  The Court's approval of the sale of the Serena Unit is without prejudice to any determination as to whether any future sales of the Debtors' property constitute ordinary course sales.

6.    To the extent that the sale of the Serena Unit pursuant to the Serena Contract is not a transaction within the ordinary course of the Debtors' business, the Court finds that: (i) insofar as the sale of the Serena Unit is in the best interests of the Debtors, their creditors and all parties in interest, a sound business reason justifies the sale of the Serena Unit outside the ordinary course of the Debtors' business; (ii) under the facts and circumstances of the Sale Motion and the sale of the Serena Unit pursuant thereto, accurate and reasonable notice, as shortened by this Order, has been provided to all interested parties, including parties asserting liens on the Serena Unit, and no other or further notice is or shall be required except as otherwise set forth herein; (iii) the Debtors have obtained a fair and reasonable price for the sale of the Serena Unit; (iv) based on the Debtors' representations, such sale price exceeds the minimum release price required by the Debtors' pre-petition agreements with Regions Bank, N.A. and the

3

Debtors' post-petition agreements with Gulf Bay Capital, LLC, and (v) based on the Debtors' representations, the Debtors and the Serena Purchasers have conducted the sale transaction of the Serena Unit in good faith and for no improper purpose.  Accordingly, the Debtors have exercised sound business judgment in connection with the sale of the Serena Unit, and the Debtors are hereby authorized to consummate the sale of the Serena Unit to the Serena Purchaser pursuant to the Serena Contract pursuant to Section 363(b) of the Bankruptcy Code.

7.      The Debtors have represented that (a) the Serena Purchaser is not an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code and the decisions thereunder, and (b) the Serena Contract was negotiated and entered into in good faith, based upon arm's length bargaining and without collusion.  Upon those representations, the Court finds that the Serena Purchaser is a purchaser in good faith, as that term is used in the Bankruptcy Code and the decisions appurtenant thereto, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code with respect to the Serena Unit and the Serena Contract and that neither the Debtors nor the Serena Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of section 363(n) to the Serena Contract.

8.      The Serena Purchaser is hereby granted and is entitled to the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.  In the absence of a stay pending appeal, the Serena Purchaser will be acting in good faith pursuant to section 363(m) of the Bankruptcy Code in consummating the Serena Contract and this Order is not subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

9.      Subject to the delivery of the consideration in accordance with the Serena Contract and completing all other deliveries required under the Serena Contract, effective as of

the Closing, the sale of the Serena Unit by the Debtors to the Serena Purchaser shall constitute a legal, valid and effective transfer of the Serena Unit notwithstanding any requirement for approval or consent by any person and shall vest the Serena Purchaser with all right, title and interest in and to the Serena Unit free and clear of all liens, claims, encumbrances and interests whatsoever pursuant to section 363(f) of the Bankruptcy Code, insofar as Regions Bank, N.A. and any other creditors asserting a valid lien, claim, encumbrance and/or interest in and to the Serena Unit having consented to the relief granted herein pursuant to Section 363(f)(2) of the Bankruptcy Code.  Notwithstanding anything else in the Serena Contract, the Sale Motion, this Order, or any document related to the Serena Contract, the Sale Motion, or this Order (all of the foregoing documents, collectively, the "Serena Documents"), (**A**) the Serena Unit remains subject to and the Serena Purchaser takes subject to all special assessments levied or to be levied by Fiddler's Creek Community Development District I (the "CDD") payable for tax years 2010 and beyond solely with respect to the Serena Unit, whether such special assessments are levied with regard to bonds issued by the CDD, with regard to operations and maintenance of the CDD, or otherwise (collectively, the "CDD Assessments For Tax Years 2010 And Beyond") and any and all liens of the CDD Assessments For Tax Years 2010 And Beyond, none of which are or will be affected by any of the Serena Documents, and (**B**) the Serena Unit remains subject to and the Serena Purchaser takes subject to all *ad valorem* taxes for tax year 2010 and beyond solely with respect to the Serena Unit (collectively, the "Ad Valorem Taxes For Tax Years 2010 And Beyond"), and any and all liens of the Ad Valorem Taxes For Tax Years 2010 And Beyond, none of which are affected by any of the Serena Documents.

10.    Subsequent to the closing of such sale and except as provided in section 9 above, all entities which held a lien, claim, encumbrance or interest in and to the Serena Unit as of the

Closing shall have a lien, claim, encumbrance or interest in and to the proceeds from the sale of the Serena Unit with the same validity, priority and extent as such entities' lien, claim, encumbrance or interest in, to or upon the Serena Unit prior to the closing of such sale.

11.    Upon consummation of the sale of the Serena Unit with the Serena Purchaser (which the Debtors are hereby authorized to do), the Debtors shall be authorized and shall pay, promptly or as soon as reasonably practical after the Closing, all expenses and obligations required to be paid by the Debtors in connection with the closing of the Serena Unit, including but not limited to (i) those items set forth in Paragraph 7 of the Serena Contract, (ii) an amount equal to $15,000 for the Capital Acquisition Assessment related to the Fiddler's Creek Foundation, (iii) all amounts due for collection by the Uniform Method of collection set forth in Chapter 197 of the Florida Statutes (the "Uniform Method"), including, without limitation, *ad valorem* taxes, real estate taxes, *non-ad valorem* taxes, and due and past due on roll assessment obligations due to the CDD for the period through the Closing; (iv) accrued interest sufficient to redeem any and all tax certificates that have been issued if applicable to the Serena Unit (with any and all outstanding tax certificates related to the Serena Unit to be redeemed promptly upon Closing); (v) any and all assessments that were billed in the ordinary course (without acceleration) as "off-roll" (or not by the Uniform Method) and have not been paid and all interest and penalties accrued thereon; (vi) to the extent due and payable, pro-rated *ad valorem* taxes, real estate taxes, *non-ad valorem* taxes, special assessments, and any other taxes or assessments due, to Collier County for tax year 2010 through the Closing related to the Serena Unit, (vii) real estate brokers' commissions to Fiddler's Creek Realty, Inc., a non-debtor affiliate of the Debtors; (viii) title insurance; and (ix) the CDD buy down for the Serena Unit in the amount of $11,398.10 (collectively, the "Closing Expenses").  The determination of the Closing Expenses

is based upon the Debtors' representations that the Serena Unit is subject to the Uniform Method with respect to all special assessments due to the CDD; that such property is considered to be "on roll;" and that there were no defaults in payments due to the CDD prior to such property being placed "on roll." The determination of the nature and amount of obligations owed to the CDD, to Collier County, and to holder(s) of tax certificates is based upon the particular factual circumstances with respect to this Serena Unit, and does not constitute precedent with respect to any other unit or property sale, and does not bind any of the parties with respect to any other unit or property sale. The Debtors are authorized to and shall pay all Closing Expenses from the proceeds of the sale of the Serena Unit (the remaining sales proceeds after payment of the Closing Expenses shall be referred to herein as the "Net Sales Proceeds"). As set forth above and included in the Closing Expenses, the Debtors are further authorized to and shall promptly cause any and all outstanding tax certificates related to the Serena Unit to be redeemed from the proceeds of the sale of the Serena Unit.

12.    Upon consummation of the sale of the Serena Unit with the Serena Purchaser, the Debtors are authorized to disburse the Net Sale Proceeds from the sale of the Serena Unit (after payment of Closing Expenses, the CDD buy down and the Sale Fee) in accordance with the terms of the Disbursement Order to Regions Bank to be applied to the pre-petition obligations owed by the Debtors to Regions Bank.

13.    This Order and the Serena Contract shall be binding upon, and shall inure to the benefit of, the Debtors and the Serena Purchaser, and their respective successors and assigns, including without limitation, any Chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a Chapter 7 case if these cases are converted from Chapter 11.

14.     This Court shall retain exclusive jurisdiction to enforce the provisions of this Order and the Serena Contract and to resolve any dispute concerning this Order, the Serena Contract, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Serena Contract and this Order, including, but not limited to, the interpretation of the terms, conditions and provisions hereof and disputes arising in connection with the relief authorized herein.

15.     Nothing in this Order purports to excuse the Serena Purchaser or any other person or entity from compliance with any and all applicable state law and federal regulatory laws.  The terms of this Order shall be limited to the sale of the Serena Unit, and shall not be binding on or applicable to any other sale of property in these Chapter 11 cases.

16.     Pursuant to sections 105 and 363 of the Bankruptcy Code, any and all creditors of the Debtors shall be barred, estopped and enjoined from taking any action of any kind against the Serena Purchaser or the Serena Unit on account of any claim against the Debtors or the Serena Unit, except under applicable law in connection with the payment of the CDD Assessments For Tax Years 2010 And Beyond and Ad Valorem Taxes For Tax Years 2010 And Beyond.

17.     The failure specifically to include any particular provisions of the Serena Contract or any related agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors, and the Serena Purchaser that the Serena Contract and any related agreements are authorized and approved in their entirety subject in all events to the terms of this Order.

18.     Based on the record at the hearing on the Sale Motion, including the facts and circumstances of the Sale Motion, the Court finds that good cause exists to shorten and modify the notice and hearing requirements established by Sections 102(1) and 363(b) of the Bankruptcy

Code, Bankruptcy Rules 2002, 6004, 9006, 9007, 9008 and 9014, and the local rules of this Court, and as a result hereby modifies and shortens such requirements to the extent necessary to facilitate the relief granted in this Order.

19.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall become effective immediately upon its entry by the Court.  In the absence of any entity obtaining a stay of this Order pending appeal, the Debtors and the Serena Purchaser are free to close under the Serena Contract in accordance herewith.

**DONE** and **ORDERED** in Chambers at Tampa, Florida, on _____.


_____
K. Rodney May
United States Bankruptcy Judge


Copy to: Paul J. Battista, Esq.
(Attorney Battista is directed to serve a conformed copy of this Order on the Master Service List maintained by the Debtors)

# EXHIBIT "B"

## SERENA AT FIDDLER'S CREEK, A CONDOMINIUM

### COMPLETED UNIT/DEVELOPER SALE
### PURCHASE CONTRACT AND DEPOSIT RECEIPT

THIS CONTRACT, entered into by and between GBFC DEVELOPMENT, LTD., or assigns, hereinafter referred to as "Seller" or "Developer, and **Zachary Casagrande**.

(title to be taken as specified above) hereinafter referred to as "Buyer, whose address is: ███████████

___

### WITNESSETH:

Seller will sell and Buyer will purchase the following property situated in Collier County, Florida, in accordance with the terms of this contract. Buyer acknowledges that no representation has been made by Seller or any of its agents of any income, income tax, or economic benefit to be derived by virtue of the purchase or ownership of the unit purchased:

Unit No. **102**, Building **6**, Phase **6**, SERENA AT FIDDLER'S CREEK, a Condominium, together with pro rata interest in the Common Elements and Common Property of the Condominium and Limited Common Elements appurtenant thereto, more particularly delineated and identified in the Declaration of Condominium of SERENA AT FIDDLER'S CREEK, a Condominium, as recorded in Official Record Book 4178, at Page 1571, et seq., of the Public Records of Collier County, Florida, as amended, subject to the terms and conditions of such Declaration of Condominium.

upon the following terms and conditions:

1. **PURCHASE PRICE.** The unit purchase price is:                                   **$315,000.00**
   and consists of the following:

   Base Price ........................................................................................ $ 300,000.00
   Options & Extras (per Options & Extras Schedule
   Attached hereto and made a part hereof) .......................................... $ included
   Capital Acquisition Assessment (The Club & Spa Fiddler's Creek) ............................. $ 15,000.00

   Total Purchase Price................................................................................ $**315,000.00**

   Buyer agrees to make the following payments:

   $   **25,000.00**    Initial deposit at this time.

   $   **69,500.00**    Balance of 30% to make up total deposits due.

   $__**220,500.00**    At Closing (together with additional closing expenses set forth in paragraph 7 below).

   Make all deposit checks payable to WOODWARD, PIRES & LOMBARDO, P.A., TRUST ACCOUNT, but mail or deliver them to Fiddler's Creek Realty, Inc., at 8152 Fiddler's Creek Parkway, Naples, FL 34114. Deposit checks are accepted subject to collection.

2. **ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER.**

3. **BUYER'S RIGHT TO INSPECT DOCUMENTS.** As required in Section 718.503, Florida Statutes, the Seller will furnish to the Buyer, on or before fifteen (15) days prior to closing, the following documents:

   A. Declaration of Condominium;
   B. Articles of Incorporation of the Condominium Association;
   C. Bylaws of the Condominium Association;
   D. Copy of proposed Operating Budget;
   E. Copy of site plan and floor plans of unit;
   F. Prospectus and Question and Answer Sheet as required by Section 718.504, Florida Statutes; and
   G. Amended and Restated Declaration of General Covenants, Conditions and Restrictions for Fiddler's Creek.

Seller has exhibited and delivered to Buyer and Buyer has read and agreed to be bound by the Prospectus and all Schedules, Plans and Exhibits attached thereto, all of which are incorporated by reference and made a part of this Contract with the same force and effect as if set forth in full herein. Seller reserves the right to make changes in the above documents and will provide the Buyer with copies of all amendments. Buyer acknowledges that Buyer has read and signed, prior to execution of this Contract, a Real Property Sales Disclosure form; Fiddler's Creek Disclosure Summary; and a Receipt for Condominium Documents.

Buyer _____
Buyer_____
Seller_____

THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF EXECUTION OF THIS CONTRACT BY THE BUYER, AND RECEIPT BY BUYER OF ALL THE ITEMS REQUIRED TO BE DELIVERED TO HIM BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES. THIS CONTRACT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN FIFTEEN (15) DAYS AFTER THE BUYER HAS RECEIVED ALL THE ITEMS REQUIRED. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING. FIGURES CONTAINED IN ANY BUDGET DELIVERED TO THE BUYER PREPARED IN ACCORDANCE WITH THE CONDOMINIUM ACT ARE ESTIMATES ONLY AND REPRESENT AN APPROXIMATION OF FUTURE EXPENSES BASED ON FACTS AND CIRCUMSTANCES EXISTING AT THE TIME OF THE PREPARATION OF THE BUDGET BY THE DEVELOPER. ACTUAL COSTS OF SUCH ITEMS MAY EXCEED THE ESTIMATED COSTS. SUCH CHANGES IN COST DO NOT CONSTITUTE MATERIAL ADVERSE CHANGES IN THE OFFERING.

4.      **CLOSING.** Time shall be of the essence of this contract. Closing shall take place at a location to be determined by Seller in Collier County, Florida, and closing shall occur within thirty (30) days from notice from Seller or Seller's Agent that the Certificate of Occupancy has been issued, or thirty (30) days from the Buyer's execution of this Contract, whichever is later. At closing, Seller will deliver to Buyer a general warranty deed conveying to the Buyer a fee simple title to said condominium unit, subject to those items as set forth in Paragraph 5 below. Buyer acknowledges and agrees that his rights, title and interest in and to this Property are subordinate to the lien and operation of any mortgage heretofore or hereafter placed upon the property prior to the closing of this transaction, and to any advances or modifications thereof provided, however, said mortgages shall be released at or prior to closing. *Closing no later than Jan, 12, 2011.*

5.      **CONVEYANCE BY WARRANTY DEED.** Seller will convey, by general warranty deed, the marketable or insurable fee simple title to the Unit, subject to the following exceptions:

A.      The provisions of the Amended and Restated Declaration of General Covenants, Conditions and Restrictions for FIDDLER'S CREEK, as supplemented and amended, Articles of Incorporation of FIDDLER'S CREEK FOUNDATION, INC. (the "Foundation"), and its Bylaws (collectively, the "Master Homeowners' Documents");

B.      Real estate and tangible personal property taxes for the current year (which shall be prorated based upon the current year's taxes, if available, with due allowance made for the maximum discount and, if not available, then the actual paid real estate tax bill for the year preceding closing) and for all taxes for subsequent years;

C.      Restrictions and reservations of record and such zoning or other restrictions and regulations including subdivision ordinances, development orders, development permits and other regulations and conditions upon the use of the Property as may be imposed by governmental authorities having jurisdiction or which are common to the area;

D.      The Fiddler's Creek Planned Unit Development Ordinance (Collier County Ordinance Nos. 96-74 and 98-13) as amended;

E.      Marco Shores DRI Development Order 96-1 and 98-1 Collier County Resolution No. 96-530 dated November 26, 1996 and No. 98-49 dated February 24, 1998 ("Marco Shores DRI Development Order") as amended;

F.      Liens and assessments imposed by the Fiddler's Creek Community Development District 2 (the "District" or the "CDD"); and

G.      All documents listed in paragraph 3 above, together with such factual matters as might be revealed by a personal inspection of the Property.

6.      **EXPENSES OF CLOSING.** Seller shall furnish and pay for: Preparation of Warranty Deed, No Lien and FIRPTA withholding affidavits, Owners' title insurance policy to be supplied to Buyer (which shall contain permitted exceptions as set forth in paragraph 5), recording a partial release of lien (if necessary), and real estate commission.

Buyer shall pay: (a) recording costs for the warranty deed; (b) documentary stamps on the deed; (c) a capital reserve assessment to the Fiddler's Creek Foundation, Inc. (which as of December 2009 is $1,500.00), (d) a start-up fee equal to one month's assessment to the Serena at Fiddler's Creek Condominium Association, Inc., (e) a $4,480.00 charge for water/sewer, roads, library and other impact fees, and (f) a closing fee, title search fee, title exam fee and courier/express mail (if necessary), the total of which shall not exceed $525.00. Should Buyer obtain a mortgage, all costs incident to such mortgage shall be at the expense of the Buyer. Real estate taxes, the Serena at Fiddler's Creek Condominium Association, Inc. and Fiddler's Creek Foundation, Inc. assessments, utility deposits, CDD debt and maintenance assessments, insurance and any other proratable items shall be prorated as of the specific date of closing as set forth above.

7.      **WARRANTIES/CONSTRUCTION SPECIFICATIONS.** As part of the consideration of this Contract, Buyer acknowledges that Seller and Builder (retained by Seller for construction) have made no warranties or representations other than those expressly provided herein or by statute in connection with either the Condominium property or the Unit. Buyer waives all rights to any other warranties, express or implied, including but not limited to warranties for workmanship, fitness, merchantability, and materials other than those expressly provided by F.S. 718.203 or set forth herein. Buyer additionally agrees to waive any liability on the part of the Seller or Builder for consequential damages, including by not limited to, damages for loss of use, moving expenses, loss of market value, or lost income unless prohibited by F.S. 718.203. This waiver is made as to all potential causes of action, including but not limited to whether under tort or contract. All representation and warranties, if any, must be written into this Contract; otherwise, there are none. This paragraph shall survive the closing contemplated hereunder and the delivery of the Warranty Deed to the Buyer. Seller shall have the right to substitute materials, appliances, fixtures and equipment whenever necessary because of the unavailability of intended items, or construction requirements in the

Buyer _____

Buyer _____

Seller _____

R. 12/09

field, so long as the substitutes are of equivalent or better quality. Construction will be substantially in accordance with the plans and specifications on file with Seller. Buyer acknowledges and agrees, due to "in the field" construction factors, it is the construction industry practice for plans and specifications to be changed and adjusted from time to time, and Buyer acknowledges that it is reasonable and for Buyer's benefit to allow Seller the flexibility to make such changes. Buyer understands the Seller's standard materials, appliances, interior colors, and other selections for the unit are delineated in the Seller's Standard Features List and in the Option and Extras Scheduled attached, if any, which Buyer acknowledges Buyer has received upon the execution of this Contract. Seller shall have the right, in Seller's sole discretion, to extend or provide a subsequent time period for selections, by serving written notice to Buyer via certified mail, return receipt requested. If notice is served by certified mail to Buyer's address listed in this Contract and is not received, but returned by the United States Postal Service as being "refused," "moved, not forwardable," or "unclaimed," or is otherwise not delivered or deliverable through no fault of the Seller, then notice is effective as of the date of mailing. Buyer acknowledges and agrees that if Buyer does not make the selection of options, extras, colors, etc. within the time period set forth herein, or in any subsequent notice provided by Seller, Buyer will receive and shall be deemed to have accepted the standard features and colors selected by Seller. The provisions of this section will survive closing.

8.    **BUYER SELECTION.** Buyer shall have fourteen (14) days from Buyer's execution of this Contract to make flooring, interior color and optional upgrade selections from those offered by Seller. If Buyer fails to make the foregoing selections on a timely basis then the standard flooring and standard interior color selections shall be made by Seller. Seller shall use its best efforts to complete the installation of standard and/or upgraded flooring and interior colors prior to closing, but the closing date shall not be delayed or extended if Seller does not complete these items prior to closing. Additionally, if Buyer executes a subsequent Addendum to this Contract for additional millwork to be installed within the Unit, the closing date as set forth in Paragraph 4 above shall not be extended but rather Seller shall have the obligation to complete all millwork contracted for within one hundred twenty (120) days of the date of closing. Buyer agrees to provide access to Seller or its contractor and subcontractors during business hours on an as needed basis to complete the flooring installation and interior colors which were not completed prior to closing, and for the installation of any millwork to be installed in the Unit after closing. During this construction, Buyer acknowledges that Buyer's use of the Unit may be impaired. Seller's and its agents liability for the completion of any flooring installation, interior color and the installation of any millwork shall be limited to that imposed by statute and any gross negligence or intentional damage caused. This Paragraph 8 shall survive the closing contemplated herein.

9.    **DISCLOSURE OF REALTOR.** Buyer warrants and acknowledges that FIDDLER'S CREEK REALTY, INC., is the listing real estate broker. The listing real estate broker is an agent of the Seller and is being paid by the Seller. The procuring real estate broker, N/A (unless the same as the listing real estate broker), is not a subagent of Seller and is acting in this transaction as a Buyer's broker or Buyer's agent. Other than those real estate brokers listed herein, Buyer covenants to defend and indemnify Seller against the claims of any other broker. Buyer's decision to buy was based upon Buyer's own investigation of the property and upon this contract and the documents required by Section 718.503, Florida Statutes supplied by Seller to Buyer and not upon any representation, warranty, statement or conduct of the Seller or the listing real estate broker.

10.    **SELLER'S RIGHT TO APPROVE BUYER.** Buyer understands that the Association, in order to maintain a community of financially responsible and congenial residents, requires application and approval of Buyers. As a part of the consideration of this Contract, Buyer consents that the Association may make such investigation of Buyer as may be deemed desirable and the Buyer covenants to hold the Seller harmless and release the Association from liability on account of such investigation. Seller's obligations hereunder are contingent upon approval of Buyer by the Association. Buyer agrees to timely complete any application for membership in the Association.

11.    **SELLER'S RISK OF LOSS UNTIL CLOSING.** Seller assumes risk of loss from fire or otherwise until closing.

12.    **BUYER TO RECEIVE POSSESSION OF UNIT AT CLOSING.** No Buyer can take possession of or enter either a unit or the condominium building or make improvements to the property until all amounts due Seller have been paid and title to the property has been conveyed to Buyer. Buyer indemnifies and holds Seller harmless for any damage or injury which may result should Buyer violate this provision. At the time of, or prior to, title being conveyed to the Buyer, the Buyer, accompanied by an agent of Seller, shall inspect the property being conveyed and provide the Seller with a list of any items requiring corrections. With the exception of items requiring corrections upon the list provided by Buyer to Seller, upon conveyance of title to the Buyer, the Buyer shall be deemed to have accepted the unit in its then condition. Defects noted on this list shall not be grounds for escrowing closing proceeds or delaying the closing.

13.    **TRANSFER OR ASSIGNMENT, MARKETING , RECORDING.** Buyer shall have no right to assign, sell or transfer his interest under this Contract without Seller's prior written consent, which can be withheld with or without reason, except to Buyer's spouse, individually or jointly with Buyer, Buyer's family trust, existing or to be created and of which the Buyer or Buyer's spouse is the primary beneficiary, or to any business entity organized under the laws of the State of Florida or any other state and authorized to do business in Florida, in which the Buyer's or Buyer's spouse owns a minimum of a fifty percent (50%) controlling interest. Buyer shall have no right to advertise, list or market the Unit prior to closing, in any manner whatsoever, and any such action by Buyer or any of Buyer's agents shall be deemed a breach of this Contract, and Seller shall be entitled to exercise all remedies provided under this Contract for Buyer's default, including but not limited to, terminating the Contract and retaining all deposits made by Buyer as agreed upon liquidated damages. This Contract shall not be recorded in the office of the Clerk of any Circuit Court of the State of Florida and any recording of same by the Buyer shall be considered a breach of the Contract.

14.    **DEFAULT.** Time is of the essence. Seller's acceptance of this Offer shall constitute a binding contract for the purchase and sale of the above-described Unit. Should the Buyer fail to perform any obligation within the prescribed time period set forth above, then Seller shall have the right to cancel this purchase Contract for such default and to retain deposits made or agreed to be made by Buyer as full and liquidated damages for such default by Buyer or to initiate an action for specific performance. Should the Seller grant an extension of time for the closing, the Seller shall have the right to demand an additional five percent (5%) deposit on or before the closing date as set forth above and require the Buyer pay late charges equal to one and one-half percent (1 1/2%) of the purchase price per month. If Buyer does thereafter close, Buyer agrees that all prorations and all expenses of the Buyer shall be as of the final date for closing as set forth above, and Buyer agrees to reimburse the Seller an amount equal to the additional common expenses of the condominium unit incurred by Seller due to

Copyright (2005) (2009) GBFC Development, Ltd. All Rights Reserved.

Buyer_____

Buyer_____

Seller_____

Buyer's delay in closing on the date set forth above. In the event of Seller's default, Buyer shall have all remedies available in law or equity. In the event of Buyer's default, the escrow agent shall, upon receipt of notice of default, deliver to the Seller the funds held in escrow and the escrow agent shall not be obligated to conduct any independent investigation or determination of the alleged default.

15.    Seller warrants that the unit that is the subject of this contract has never been occupied and is being sold new.

16.    **DEPOSIT.** The deposit made by the Buyer under this Contract shall be placed in an escrow account by the Escrow Agent, WOODWARD, PIRES & LOMBARDO, P.A., 3200 Tamiami Trail North, Suite 200, Naples, Florida 34103, in Chartered Lending Institutions guaranteed and insured by a governmental agency. The Buyer may, upon request, receive a receipt for his deposit funds from the Escrow Agent. Escrow Agent agrees to hold said funds in said bank on the following conditions:

A. If the Buyer properly terminates the contract pursuant to its terms, pursuant to Chapter 718 of the Florida Statutes, all deposits shall be returned to the Buyer with interest.

B. If the Buyer defaults in the performance of his obligation under the PURCHASE CONTRACT AND DEPOSIT RECEIPT, the deposits, in accordance with paragraph 13 above, shall be paid to Seller.

C. If the funds of the Buyer have not previously been disbursed as set forth in Paragraphs A or B above, the principal will be disbursed to Seller at closing as a credit against the purchase price, unless prior to the disbursement, the Escrow Agent receives written notice from the Buyer of a dispute between the parties. At closing, all interest on the deposit shall be paid to Seller.

17.    **ABSTRACTS.** The Seller does not provide abstracts of title for condominium units. Should the Buyer or his lending institution desire one, the obtaining of said abstract shall be at the Buyer's responsibility and expense.

18.    **NOTICES.** Whenever a notice is required to be sent, the same shall be delivered by regular mail (unless specifically stated otherwise), addressed to the Buyer at the address set forth in this Contract and addressed to the Seller at **8156 Fiddler's Creek Parkway, Naples, Florida 34114-0816, Facsimile No. (239) 732-9402.** All notices shall be deemed and considered given upon mailing.

19.    **OTHERS BOUND BY THIS CONTRACT/APPLICABLE LAW.** This Contract is binding upon Buyer's heirs, personal representatives and/or successors. This contract shall be construed, applied, and enforced in accordance with the laws of the State of Florida. Any action to enforce a provision of this Contract shall be in the appropriate court located in Collier County, Florida.

20.    **WAIVER MUST BE IN WRITING.** Except as may otherwise be expressly provided herein, no waiver of any rights or obligations hereunder shall be deemed to have occurred unless in writing signed by the party against whom such waiver is asserted and no waiver shall be deemed a waiver of any subsequent or other right or obligation.

21.    **COUNTERPARTS/GENDER/FACSIMILE.** This contract may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The use of the singular includes the plural; the use of the male, female, or neuter includes all or any of them. A facsimile (FAX) signature shall be deemed an original. Offer and acceptance by facsimile is binding.

22.    **GOVERNING LAW AND VENUE.** This Contract and all documents executed pursuant to it shall be construed and enforced according to the laws of the State of Florida. Venue for any disputes hereunder shall be exclusively in Collier County, Florida.

23.    **SEVERABILITY OF PROVISIONS.** Should any part, clause, provision or condition of this Contract be held to be void, invalid or inoperative, the parties agree that such invalidity shall not affect any other part, clause, provision or condition hereof, but that the remainder of this Contract shall be effective as though such void part, clause, provision or condition had not been contained herein. Should any part, clause, provision, or condition of this contract be held to be void, invalid, or inoperative by a court of competent jurisdiction, the parties agree to supplement and modify this contract by replacing the stricken provisions with language from applicable Florida case law which is most advantageous to the Seller.

24.    **INSULATION DISCLOSURE.** Seller has advised Buyer, as required by the rules of the Federal Trade Commission that it currently intends to install in the Unit as follows:

Exterior masonry walls will be insulated with thermal reflective insulation which, according to the manufacturer, will yield an R value of 4.1. Masonry party walls will be insulated with batt or blown insulation to a nominal thickness of two inches (2") which, according to the manufacturer, will yield an R value of 8 and interior frame garage walls will be insulated with batt insulation to a nominal thickness of three and one-half inches (3 ½") which, according to the manufacturer, will yield an R value of 11. Interior walls will not be insulated. Roof areas shall be insulated with batt or blown insulation to an average thickness of ten inches (10") which, according to the manufacturer, will yield an R value of 30. The R value and other information shown above is based solely on the information given by the appropriate manufacturers (based on the thickness listed) and Buyer agrees that Seller is not responsible for the manufacturers' errors or omissions.

25.    **INCORPORATION OF RIDERS.** Any Rider or Addendum to this Contract will be deemed to be incorporated into this Contract as fully as if it were set forth at length. The terms and provisions of any such Rider or Addendum will control those of this Contract, but only to the extent necessary to give them full effect. This Contract may be modified only in writing signed by the parties.

26.    **DISCLOSURE OF DEVELOPER'S RIGHT TO RECEIVE NOTICE OF, AND AN OPPORTUNITY TO REMEDY, ALLEGED CONSTRUCTION DEFECTS.** Pursuant to Florida law, we are required to provide you, the undersigned Buyer, with the following disclosure which advises you that you must notify the Developer of any alleged construction defects prior to

Buyer _____

Buyer _____

Seller _____

commencing litigation so that the Developer has an opportunity to offer to repair or pay to settle alleged construction defects before a lawsuit is filed.

## CHAPTER 558 NOTICE OF CLAIM

CHAPTER 558, FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION YOU MUST DELIVER TO THE OTHER PARTY TO THIS CONTRACT A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER, WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

27.    DISCLOSURE OF FLORIDA CONSTRUCTION RECOVERY FUND.

PAYMENT MAY BE AVILABLE FROM THE FLORIDA HOMEOWNERS' CONSTRUCTION RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS: 850-487-1395, Construction Industry Licensing Board, 1940 North Monroe Street, Tallahassee, FL 32399-1039.

28.    **RADON GAS.** Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Seller does not conduct any radon testing in any of the condominium units and Seller makes no representation to Buyer concerning the presence or absence of radon gas in the Unit at any time or in any quantity. Buyer hereby expressly releases Seller from any loss, claim, liability or damage now or hereinafter arising from or related to the presence at any time of radon gas in the Unit. This provision shall survive closing.

29.    **ENERGY EFFICIENCY.** Buyer acknowledges, prior to or at the time of signing of this Contract, having received the Energy Efficiency information brochure described in Section 553.996, Florida Statutes prepared by the Department of Community Affairs.

30.    **ENERGY PERFORMANCE LEVEL DISPLAY CARD.** In accordance with Section 553.9085, Florida Statues, an Energy Performance Level Display Card will be completed and provided to Buyer, at Buyer's request.

31.    **PROPERTY TAX DISCLOSURE SUMMARY.**   BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

32.    **COMMUNITY DEVELOPMENT DISTRICT.** Buyer acknowledges that 951 Land Holdings Ltd., the Developer of Fiddler's Creek has caused to be established a Community Development District, as defined in Chapter 190, Florida Statutes, known as the Fiddler's Creek Community Development District 2 which may include all or a portion of Fiddler's Creek, and may also include property in addition to Fiddler's Creek. The District will provide certain urban community development services and will have the authority to levy and collect fees, rates, charges, taxes and assessments to pay for, finance, and provide such services. The District is empowered to plan, establish, acquire, construct or reconstruct, enlarge or extend, equip, operate, and maintain systems and facilities for basic infrastructures which may include, without limitation: (1) water management and control of lands within the District and the connection of some or any such facilities with roads and bridges; (2) roads and bridges; (3) potable water distribution; (4) sewage collection; and (5) waste water management. The District will impose taxes and/or assessments on Fiddler's Creek through a special taxing district.  These fees, rates, charges and taxes pay the construction, operation, and/or maintenance costs of certain public facilities within the District and are set annually by the governing board of the District.  These fees, rates, charges, taxes and/or assessments are in addition to county and all other fees, rates, charges, taxes and/or assessments provided for by law. These fees, rates, charges, taxes, and assessments will likely appear on the annual real estate tax bill for each Owner (as defined in the Master Homeowner's Documents) as a separate and distinct tax and will be payable directly to the Collier County Tax Collector. All taxes and/or assessments of the District shall constitute a lien upon those portions of Fiddler's Creek owned by any Owner. The District shall have the power to issue any types of bonds permitted by Chapter 190, Florida Statutes, payable amongst other sources through ad valorem taxes and/or assessments.

Seller presently anticipates that the District (or Collier County) will be responsible for potable water distribution, waste water collection, irrigation, effluent, landscaping, gatehouse personnel, storm water collection, storm water management (drainage control), boulevard maintenance and street lighting. Other services may be added to the District's responsibilities.

Buyer agrees, by acceptance of a deed conveying title to the Property, for itself, its successors or assigns, to pay any and all fees, rates, charges, taxes and assessments imposed by the District with respect to the Property, and to abide by all the regulations of the District, as they may be amended from time to time.

Buyer acknowledges and understands that Seller and or its affiliated companies may be applying for governmental approvals to include additional property into the Fiddler's Creek Community Development District 2 in accordance with Florida law.

Buyer_____

Buyer_____

Seller_____

33.    **INCLUSION OF PROPERTY IN DEVELOPMENT OF REGIONAL IMPACT (DRI).** Buyer does hereby authorize and give his/her consent to Seller or its duly authorized agent, to include the property being purchased by Buyer hereunder or other property within Fiddler's Creek and to apply for and obtain any governmental approvals of this development of regional impact in accordance with Section 380.06, Florida Statutes, without further authorization, consent or participation by Buyer. Buyer authorizes Seller to execute all documents necessary to implement the District and the PUD, as attorney in fact on behalf of Buyer, without any further participation, notice, joinder, or consent by Buyer. All District materials are available for inspection by Buyer and all property owners at Fiddler's Creek at Seller's business office during normal business hours.

34.    **USE OF THE REMAINING PROPERTY.** As long as Seller or other builders own property in the Community, Seller or such other builders may keep offices and model homes in the Community. This may include advertising signs and other promotional devices necessary or helpful for sales, leasing or management.

Seller or its affiliates will be conducting blasting, excavation, construction and other activities within or around the community, both before and after buyer closes under this Contract. Buyer recognizes their rights to do so and will not (i) deem any of these activities to be nuisances or noxious or offensive activities, (ii) enter, or allow any others under buyer's control to enter, any areas where such activities are being conducted (even when they have temporarily ceased, such as during non-working hours) and (iii) hold seller or its affiliates liable or sue seller or its affiliates for any damage, injury or death arising from or connected with any of the activities described above. Buyer understands that the lot may be located adjacent to or near golf courses and other resort-related facilities and that resort-related activities, including without limitation, golfing, tournaments, concerts, and other events, may be held at any such golf course or resort-related facilities. Buyer will not deem any of these resort-related activities to be nuisances or noxious or offensive activities. Buyer shall assume all risks associated with such locations, including, but not limited to, the risk of property damage, personal injury or death arising from errant golf balls and other actions incidental to the use and operation of any golf course and other resort-related facilities and shall release, indemnify, defend and hold harmless the seller, its affiliates and the owner and operator of any golf course or resort-related facilities from any liability claims, or expenses, including attorney's fees, arising from any property damage personal injury or death suffered by buyer or buyer's family members, guests or invitees as a result of any resort-related activity. The provisions of this section will survive closing.

35.    **RECREATIONAL FACILITIES; CLUBS.** Buyer, as a condition of purchase of his/her residential unit in Serena at Fiddler's Creek, automatically becomes a Social Member of The Club and Spa at Fiddler's Creek (the "Club"). Buyer is required to pay, upon closing on the residential unit, both the refundable Capital Acquisition Assessment and the Capital Reserve Assessment for use of the recreational property known as the Club (the "Recreational Property"). Buyer shall also be requested to pay the assessments, fees and charges established from time to time for use of the Recreational Property. Social membership and other categories of membership entitling use of the tennis, fitness, swimming and social facilities at Fiddler's Creek are offered in accordance with the terms and conditions of the Master Homeowners' Documents governing Fiddler's Creek and the membership plan documents governing the Recreational Property, as amended from time to time.

Buyer acknowledges for itself, its successors and assigns, and understands that ownership of the Property and/or membership in any Association shall not confer rights of membership in, or any rights, easements (whether prescriptive or otherwise) or privileges with respect to the use and enjoyment of, any Recreational Property or recreational facilities, including without limitation, any golf courses, tennis courts, golf clubhouse, tennis clubhouse, beach facilities, parks, swimming pools, locker rooms, baseball, football or soccer fields, basketball courts, equestrian facilities or dining facilities, unless such properties are owned by the Foundation and are specifically designated for the use of the members, and the Buyer has paid the Foundation the assessments related to the use of the Recreational Property. Membership in any club or the right and privilege to use and enjoy properties and facilities owned or operated as a club or limited access organization, shall be conferred only by and within the sole and absolute discretion of, the operator of such clubs, properties or facilities from time to time pursuant to separate application and payment for membership or use, including the payment of fees and assessments. Seller, and its affiliates have not made, do not make and have disclaimed any warranty or representation to Buyer, that either Buyer or its successors will be approved for or otherwise be eligible for membership in any such club or organization upon making any application therefor. Buyer acknowledges and agrees that Buyer has no expectation of any right to use any of the aforesaid clubs, properties or facilities. The owner of any such recreational facilities may also, at any time, in its sole and absolute discretion, make use privileges available to persons who are not owners of property in Fiddler's Creek, and may sell, alter, eliminate or cease operating all or part of the recreational facilities.

Buyer acknowledges that the Club is, or shall be, owned and operated by Fiddler's Creek Foundation, Inc. (the "Foundation") and Buyer further acknowledges that ownership of a residential unit in Fiddler's Creek does not grant Buyer any ownership interest in the Recreational Property which may be made available to owners of residential units in Fiddler's Creek now or in the future. Buyer acknowledges that Seller may, but is not obligated to, modify, expand or add additional facilities to the Recreational Property, in its sole and absolute discretion. In the event such facilities are added to the Recreational Property, the Foundation shall determine the terms and conditions such facilities will be available to members of the Club, if at all. Buyer agrees to execute, at or before closing, the acknowledgment attached hereto as Exhibit "A."

36.    **ADDITIONAL ACKNOWLEDGMENTS BY BUYER.**

A.  Buyer understands and acknowledges that any lakes or wetlands are designed as water management areas and are not designed as aesthetic features. Due to fluctuations in ground water elevations within the immediate area, the water level of lakes will rise and fall. Buyer further understands and acknowledges that seller and its affiliates have no control over such elevations. Therefore buyer agrees to release seller and every affiliate of seller from and against any and all losses, claims, demands, damages, costs, expenses of whatever nature or kind, including attorneys fees and costs and appellate fees and costs, related to or arising out of any claim against seller or its affiliates as a result of the water elevations, including without limitation, the absence of any water in the lakes. Buyer shall not alter, modify, expand or fill any lakes or wetlands located on or in the vicinity of the Property, without the prior written approval of the local permitting authority, Seller, the U.S. Army Corps of Engineers, the District, and such other local, state and federal authorities as may have relevant jurisdiction over such matters.

B.  Buyer acknowledges and agrees that Seller and it successors and assigns, have the absolute right to add, modify or eliminate lots, dwelling units and common areas (and any facilities thereon) to, on or from Fiddler's Creek generally, and that no representation, warranty or assurance has been given to Buyer by any person or entity (i) that any such lots, dwelling units or

Buyer

Buyer_____

Seller 

R. 12/09

common areas of facilities will or will not be added, modified or eliminated or (ii) as to the financial or other impact on any Association or other entity which may assess charges against the Property, or on Buyer or the residents of Fiddler's Creek.

C. Each Buyer acknowledges that the subject property is in proximity to the Marco Island Executive Airport. Seller has disclosed that the Property is subject to a navigation easement in favor of Collier County, which provides for unobstructed aircraft flight within and through all the air space above Fiddler's Creek. See the Amended and Restated Declaration of General Covenants, Conditions and Restrictions for Fiddler's Creek, Section 2.10, for more information.

D. No person, including any sales agent of Fiddler's Creek Realty, Inc., or other real estate brokerage firm, is authorized to make any representations or to provide any information with regard to any of the matters contained in this contract which are contrary or in addition to the information contained in this contract or in the master homeowners' documents, condominium association documents or rules, as amended. Purchaser acknowledges that no such representations have been made to (or, if made, have not been relied upon by) purchaser by any person or entity.

E. EXCEPT TO THE EXTENT COVERED BY THE WARRANTY PROVISIONS OF F.S. 718.203, BUYER AGREES THAT SELLER IS NOT RESPONSIBLE OR LIABLE FOR ANY CLAIMS FOR DAMAGES TO THE RESIDENCE, PERSONAL PROPERTY OR THE HEALTH OF THE BUYER OR ANY PERSONS CAUSED BY MOLD, MILDEW, FUNGUS, SPORES OR CHEMICALS. BUYER ASSUMES ALL RISKS OF HARM RELATED TO SUCH ITEMS AND SHOULD SEEK INSURANCE OR TAKE OTHER ACTION, INCLUDING FOLLOWING THE RECOMMENDATIONS OF THE EPA AND STATE HEALTH AND ENVIRONMENTAL AGENCIES TO PROTECT BUYER AND BUYER'S GUESTS FROM SUCH ITEMS.

F. BUYER AND SELLER HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WAIVE THE RIGHT EITHER MAY HAVE TO TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED UPON THIS CONTRACT, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS CONTRACT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR OTHER ACTIONS OF EITHER PARTY.

G. Buyer acknowledges and understands that this Contract supersedes all prior forms of purchase contracts that may be a part of any association documents supplied to Buyer.

H. The Buyer acknowledges that Seller has advised Buyer to obtain an attorney to review this Contract and all related documents on Buyer's behalf prior to Buyer signing this Contract. Buyer acknowledges that he has had the opportunity to obtain an attorney to represent his interests prior to signing this Contract.

I. The provisions of Paragraphs 32 through 36 shall survive closing and delivery of the deed.

Note:  Before Buyer signs this Contract, Buyer should read it and the master homeowners' documents carefully and is free to consult an attorney of Buyer's choice.

37.     **PUBLIC RECORDS.** Buyer authorizes Seller to record the documents necessary to establish and operate Fiddler's Creek and the portion of it in which the Property is located, and all other documents Seller deems necessary or appropriate, and all amendments and supplements to them in the public records of Collier County

38.     **INCORPORATION.** The following exhibits and addenda are attached hereto and incorporated herein. Any reference to "Contract" shall be deemed to include reference to same:

- Exhibit "A"  Buyer's Acknowledgement
- Exhibit "B"  Real Property Sales Disclosure
- Exhibit "C"  Fiddler's Creek Disclosure Summary
- Exhibit "D"  Frequently Asked Questions and Answers
- Exhibit "E"  Receipt for Condominium Documents
- Exhibit "F"  Fiddler's Creek Acknowledgement of Receipt of Documents
- Exhibit 'G'  Affiliated Business Arrangement Disclosure Statement

[The Remainder Of this Page is Intentionally Left Blank]

Buyer

Buyer

Seller

R. 12/09

PURSUANT TO FLORIDA STATUTE 190, THE FIDDLER'S CREEK COMMUNITY DEVELOPMENT DISTRICT 2 MAY IMPOSE AND LEVY TAXES OR ASSESSMENTS, OR BOTH TAXES AND ASSESSMENTS, ON THIS PROPERTY. THESE TAXES AND ASSESSMENTS PAY THE CONSTRUCTION, OPERATION AND MAINTENANCE COSTS OF CERTAIN PUBLIC FACILITIES AND SERVICES OF THE DISTRICT AND ARE SET ANNUALLY BY THE GOVERNING BOARD OF THE DISTRICT. THESE TAXES AND ASSESSMENTS ARE IN ADDITION TO COUNTY AND OTHER LOCAL GOVERNMENTAL TAXES AND ASSESSMENTS AND ALL OTHER TAXES AND ASSESSMENTS PROVIDED FOR BY LAW.

IN WITNESS WHEREOF, the parties hereunto have set their hands on the day and year set forth below.

Signed, sealed and delivered
in the presence of:

_____        Buyer ZACHARY CASTAGRANA
Witness

_____        ██████████████████████
Witness                                 Date:_____

_____        Buyer_____
Witness                                 Social Security No.
                                        Home Telephone No.
_____        Office Telephone No.
Witness                                 Date:_____


                                        GBFC DEVELOPMENT, LTD., a Florida Limited
                                        Partnership

                                        By:_____
_____        Print Name: Joseph L Davis
Witness                                 Title: Attorney-in-Fact and not Individually
                                        Date: 12/1/10
_____
Witness


## DEPOSIT RECEIPT

Receipt of the above-stated deposit is hereby acknowledged by:

Cash ☐    Check #_____ ☐    Wire transfer

and will be held in escrow as per the above-stated terms and conditions.

                                        WOODWARD, PIRES & LOMBARDO, P.A.,
                                        ESCROW AGENT

Date:_____            By:_____



Buyer _____
Buyer _____
Seller _____

R. 12/09

## EXHIBIT "A"
## BUYER'S ACKNOWLEDGMENT

The undersigned Buyer of property located in the Fiddler's Creek Planned Unit Development, Collier County, Florida, more particularly described as Unit No. <u>102</u>, Building <u>6</u>, Phase <u>6</u>, SERENA AT FIDDLER'S CREEK, A CONDOMINIUM (the "Property") hereby acknowledges and agrees as follows:

1.    Affiliate companies of 951 Land Holdings, Ltd. (the "Master Developer") of Fiddler's Creek own Property which they intend to develop and construct improvements thereon both in the Isle of Capri and Marco Island, Florida. The Property on Isle of Capri is privately owned and it is the present intent to develop a yacht club facility thereon in the future. Likewise, an affiliate company of the Master Developer privately owns the Marco Island Property and it is the present intent to provide a beach resort facility thereon in the future. Development and construction of these facilities is contingent upon receipt of all applicable governmental permits and approvals.

2.    Neither the purchase of Property within the Fiddler's Creek Planned Unit Development, nor a membership in the Fiddler's Creek Foundation, Inc., entitles Buyer to any right, title, interest or otherwise to use either the planned yacht club facility or beach resort facility nor any other future club facility which may be established. Ownership of Property within Fiddler's Creek entitles Buyer only to a social membership in The Club and Spa at Fiddler's Creek, subject to payment of assessments, fees and charges established from time to time, as more fully described in the Amended and Restated Declaration of General Covenants, Conditions and Restrictions for Fiddler's Creek ("Master Homeowners' Documents").

3.    Eligibility requirements, approval standards, use rights and membership fees and charges have not, nor will be, established for either the planned yacht club facility or beach access facility until all necessary governmental permits and approvals are obtained and facilities constructed. At that time, it is the intent of the Master Developer <u>but not the obligation</u> to supply each Owner and buyer of Property within Fiddler's Creek with full details regarding membership opportunities, which will be subject to terms, condition and limitations outlined therein.

4.    An eighteen hole golf course and related facilities which are operated as part of Marriott's Marco Island Resort and Golf Club (the "Marriott Golf Course") are located within the Fiddler's Creek community. Use of the Marriott Golf Course is governed by that certain Contract of Covenants and Restrictions dated November 9, 1989, and recorded in the Public Records of Collier County, Florida, in Official Records Book 1484, page 1814, as modified by that certain unrecorded Contract dated August 20, 1996, by and between Gulf Bay 100, Ltd., doing business as 951 Land Holdings Joint Venture. (now known as 951 Land Holdings, Ltd., successor by conversion of 951 Land Holdings Joint Venture), and City National Bank of Florida, as Trustee under that certain Land Trust Contract dated April 27, 1979, known as Trust No. 5003950 for the benefit of Massachusetts Mutual Life Insurance Company (collectively, the "Marriott Contract"). Pursuant to the Marriott Contract, the Master Developer is entitled to two hundred (200) memberships for use of the Marriott Golf Course (the "Marriott Golf Memberships"). The Master Developer plans to offer the Marriott Golf Memberships to purchasers of Property in Fiddler's Creek. Buyer acknowledges and agrees that Master Developer, in its sole discretion, has the right to offer the two hundred (200) Marriott Golf Memberships and to determine to whom the two hundred (200) Marriott Golf Memberships will be offered and the terms and conditions for acquiring a Marriott Golf Membership from the Master Developer.

5.    The Master Developer has reserved the right to develop private golf and country club(s) at Fiddler's Creek, which is separate and unrelated to The Club and Spa at Fiddler's Creek. If developed, these facilities may include golf course, practice facilities, tennis courts, swimming pools and related social facilities. The Master Developer and its successors and assigns shall have the right to determine the terms and conditions related to the use of these facilities. The Master Developer has reserved the right to sell or transfer these facilities, including to an equity member-owned club. If constructed, the Master Developer will determine the amounts of fees and charges including the terms of any required initiation fee, membership deposit or membership contribution. Ownership of a residential unit or lot in Fiddler's Creek does not provide any right, title, interest or use of these facilities nor any ownership or membership interest in these facilities.

6.    Buyer shall not be entitled to any monetary damages or rescission of the Purchase and Sale Contract in the event the yacht club facility, beach resort facility, private golf and country club, and/or access to the Marriott Golf Course are not constructed or provided.

7.    By signing below, Buyer represents and warrants to both the Master Developer and the Seller of the Property that Buyer's purchase of the Property was based solely upon Buyer's examination of the Purchase Contract, Master Homeowners Documents, and other written material supplied by Master Developer and Seller and the purchase was <u>not</u> based upon any future obligation or opportunity to be a member or join either a yacht club or beach resort facility or a private golf and country club. Seller's pricing of the Property purchased by Buyer does not include the value, if any, of a possible potential for membership in either a yacht club facility or beach resort facility or a private golf and country club.

8.    Buyer acknowledges that no representations have been made to Buyer (or, if made, have not been relied upon) by any person or entity including, but not limited to, the Master Developer, Seller, sales personnel including Fiddler's Creek Realty, Inc., or employees thereof, which is contrary to the provisions of this Contract and documents received or made available to Buyer. This Buyer's Acknowledgment shall survive the closing contemplated herein and is a part of the consideration for Seller's acceptance of Buyer's offer to purchase the Property.

IN WITNESS WHEREOF, the undersigned has set his hand on the date set forth below.

Signed, sealed and delivered
in the presence of:

_____           Buyer
                                       Print Name: _ZACHARY CATAGIUNSE_
Print Name: _____

_____           Buyer
                                       Print Name:_____
Print Name _____

Initial

Initial

R. 12/09

## EXHIBIT "B"
## SERENA AT FIDDLER'S CREEK, A CONDOMINIUM
## REAL PROPERTY SALES DISCLOSURE

To:    The undersigned Buyer of Unit <u>102</u>, Bldg. <u>6</u>, Phase <u>6</u>, Serena at Fiddler's Creek, a condominium, located in Collier County, Florida, purchased from GBFC Development, Ltd.

Pursuant to law, we wish to advise you that there are certain charges related to the closing of the purchase of your residence. Listed below are the major closing cost items ordinarily found in a transaction and those items are indicated which may be payable by you pursuant to the contract which you are about to sign. Where known to the undersigned REALTOR, the dollar amounts to be paid by you have been added.

I.    Expenses to be paid by Seller:

  (a)    Preparation of warranty deed
  (b)    Owners' title insurance policy
  (c)    Real estate commission
  (d)    Proration of real property taxes
  (e)    Proration of Condominium Association maintenance fees, if any
  (f)    Proration of the Fiddler's Creek Community Development District 2 (CDD) Debt and Maintenance Assessments
  (g)    Attorney's fees
  (h)    Partial release of existing mortgage (if applicable)

II.    Expenses to be paid by Buyer:

  (a)    Costs of recording the deed
  (b)    Start-up fee to Condominium Association, Inc. (equal to one month's assessment)
  (c)    Attorney's fees (if Buyer elects to have an attorney)
  (d)    Escrow account balance
  (e)    Documentary stamps on deed (.0070 x purchase price)
  (f)    Proration of real property taxes
  (g)    Proration of Condominium Association maintenance fees
  (h)    Proration of the Fiddler's Creek Community Development District 2 (CDD) Debt and Maintenance Assessments
  (i)    Capital reserve assessment to the Fiddler's Creek Foundation, Inc. ($1,500.00)
  (j)    Telecommunications assessment
  (k)    A $4,480.00 charge for water/sewer, roads, library and other impact fees
  (l)    A closing fee, title search fee, title exam fee and courier/express mail (if necessary), the total of which shall not exceed $525.00

III.    Additional expenses of Buyer if mortgage is obtained:

  (a)    Origination fee (points)
  (b)    Intangible tax on mortgage (.0020 x mortgage amount) on new mortgage
  (c)    Documentary stamps on note (.0035 x mortgage amount)
  (d)    Record mortgage
  (e)    Credit report and appraisal fees
  (f)    Lender's attorney's fees
  (g)    Mortgagee title insurance policy

The undersigned Buyer acknowledges that Fiddler's Creek Realty, Inc., is the listing real estate broker and is an agent of the Seller and will be paid by Seller upon the successful closing of the sale. The undersigned REALTOR (if other than Fiddler's Creek Realty, Inc.) is not a subagent of Seller and is acting in this transaction as a Buyer's broker or Buyer's agent. The procuring real estate broker, although not an agent or subagent of Seller or listing real estate broker, will be paid by Seller upon the successful closing of the sale.

The undersigned represents to the Seller, and acknowledges that Seller may rely upon said representation, that Buyer's purchase of a Unit at Serena at Fiddler's Creek, a Condominium is based solely upon advertisements and promotion of Serena at Fiddler's Creek, a Condominium, and written presentation material at the sales offices of the developer. Buyer is not aware of, nor has made a decision to purchase a Unit at Serena at Fiddler's Creek, a Condominium, based upon advertisements, marketing, or promotional efforts of other developments, other developers, or their sales personnel, in the Naples area although there may be a common thread of ownership between certain other developers and the principals of GBFC Development, Ltd.

The undersigned Buyer acknowledges this instrument has been read and signed before any contract to purchase real estate has been signed.

Date __11/26/10__

Date _____

Date _____

Buyer
Print Name: __ZACHARY CATAPANE__

Buyer
Print Name: _____

Realtor
Print Name: _____

Initial _____

Initial _____

R. 12/09

# EXHIBIT "C"
## FIDDLER'S CREEK
### DISCLOSURE SUMMARY

1.  AS A PURCHASER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF FIDDLER'S CREEK FOUNDATION, INC.

2.  THERE HAVE BEEN, OR WILL BE, RECORDED RESTRICTIVE COVENANTS GOVERNING THE USE AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.

3.  YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE FOUNDATION. ASSESSMENTS MAY BE SUBJECT TO PERIODIC CHANGE. THE AMOUNTS OF THE CAPITAL ACQUISITION ASSESSMENT, CAPITAL RESERVE ASSESSMENT, ANNUAL ASSESSMENT AND TELECOMMUNICATIONS SERVICE ASSESSMENT CURRENTLY ARE:

| | |
|---|---|
| CAPITAL ACQUISITION ASSESSMENT | $15,000.00 (ONE TIME) |
| CAPITAL RESERVE ASSESSMENT | $ 1,500.00 (ONE TIME) |
| ANNUAL ASSESSMENT | (SEE NOTE 6 BELOW) |
| TELECOMMUNICATIONS SERVICES ASSESSMENTS (includes basic/standard cable, digital variety/music and high speed internet connection, not including sales tax and franchise fees) | $ 82.66 PER MONTH |

YOU WILL ALSO BE OBLIGATED TO PAY SPECIAL ASSESSMENTS IMPOSED BY THE FOUNDATION. SUCH SPECIAL ASSESSMENTS MAY BE SUBJECT TO CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $N/A PER N/A.

4.  YOU MAY BE OBLIGATED TO PAY SPECIAL ASSESSMENTS TO THE RESPECTIVE MUNICIPALITY, COUNTY OR SPECIAL DISTRICT. ALL ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.

5.  YOUR FAILURE TO PAY SPECIAL ASSESSMENTS OR ASSESSMENTS LEVIED BY A MANDATORY HOMEOWNER'S ASSOCIATION COULD RESULT IN A LIEN ON YOUR PROPERTY.

6.  THERE MAY BE AN OBLIGATION TO PAY RENT OR USE FEES FOR RECREATIONAL OR OTHER COMMONLY USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE FOUNDATION. EACH MEMBER OF THE FOUNDATION MUST PAY SOCIAL MEMBERSHIP ASSESSMENTS AS A SOCIAL MEMBER OF THE FOUNDATION, AND MUST ALSO PAY ADDITIONAL ASSESSMENTS IF A MEMBER ELECTS TO ACQUIRE TENNIS OR FITNESS PRIVILEGES. THE AMOUNTS OF THE SOCIAL MEMBERSHIP ASSESSMENT, AND ASSESSMENTS FOR PRIORITY TENNIS PRIVILEGES AND FITNESS PROGRAM / AEROBIC PRIVILEGES CURRENTLY ARE:

| | | |
|---|---|---|
| SOCIAL MEMBERSHIP ASSESSMENT | $ 235.00 | PER MONTH |
| PRIORITY TENNIS PRIVILEGES (01/01/09) | $ 735.00 | PER YEAR |

MEMBERS OF THE FOUNDATION WILL ALSO PAY CERTAIN USE FEES AND CHARGES FOR USE OF THE RECREATIONAL PROPERTY, INCLUDING (WITHOUT LIMITATION) COURT FEES (FOR SOCIAL MEMBERS), USE FEES FOR FITNESS PROGRAM / AEROBIC PRIVILEGES, AND FOOD AND BEVERAGE CHARGES. THE CURRENT AMOUNTS OF THESE USE FEES AND CHARGES ARE SET FORTH ON A SEPARATE SCHEDULE OF ASSESSMENTS AND CHARGES, THE RECEIPT OF WHICH IS ACKNOWLEDGED BY THE UNDERSIGNED PURCHASER.

7.  THE RESTRICTIVE COVENANTS CAN BE AMENDED WITHOUT THE APPROVAL OF THE FOUNDATION MEMBERSHIP OR THE APPROVAL OF THE PARCEL OWNERS WHILE THE DEVELOPER/DECLARANT IS THE OWNER OF THE PROPERTY IN THIS COMMUNITY.

8.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE FORM ARE ONLY SUMMARY IN NATURE AND, AS A PROSPECTIVE PURCHASER, YOU SHOULD REFER TO THE COVENANTS AND THE FOUNDATION GOVERNING DOCUMENTS BEFORE PURCHASING THIS PROPERTY.

9.  THESE DOCUMENTS ARE MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD OFFICE IN COLLIER COUNTY, FLORIDA OR ARE NOT RECORDED AND CAN BE OBTAINED FROM THE DEVELOPER.

DATE: 11/26/10

PURCHASER
Print Name: ZACHARY CASAGRANDE

DATE:_____

PURCHASER
Print Name:_____

Initial 

Initial

R. 12/09

## EXHIBIT "D"

## FREQUENTLY ASKED QUESTIONS AND ANSWERS

*Serena at Fiddler's Creek Condominium Association, Inc.*

*As of December 2009*

### I.
### Voting Rights

Q:    What are my voting rights in the Condominium Association?

A:    Each Unit Owner shall be a member of the Serena at Fiddler's Creek Condominium Association, Inc., and shall be entitled to one (1) vote for each Unit owned by him (refer to Section 4.8 of the Bylaws).

### II.
### Use Restrictions

Q:    What restrictions exist in the Condominium Documents on my right to use my Unit?

A:    Condominium Units shall not be used for commercial purposes and the Unit Owners must abide by the Rules and Regulations of the Association (a complete set of which is attached as Exhibit 6 to the Prospectus for Serena at Fiddler's Creek, a Condominium). These rules restrict, among other things, pets, number of occupants per Unit, and types of vehicles on Condominium Property.

### III.
### Lease Restrictions

Q:    What restrictions exist in the Condominium Documents on the leasing of my Unit?

A:    No Unit may be leased, sublet, or assigned more than three times per year maximum for a minimum of thirty (30) consecutive days each time. The use or sale of any Unit on a "time-share" basis is prohibited (refer to Section 12.3A of the Declaration of Condominium).

### IV.
### Condominium Assessments

Q:    How much are my Assessments to the Condominium Association for my Unit type and when are they due?

A:    Assessments are levied quarterly by the Serena at Fiddler's Creek Condominium Association, Inc., the quarterly amount per Unit with reserves is $1,475.00, and if reserves are waived is $1,267.32, in accordance with the Estimated Operating Budget (a copy of which is attached as Exhibit 2 to the Prospectus), exclusive of any special Assessments.

### V.
### Membership in Recreational Facilities Association

Q:    Do I have to be a member in any other association? If so, what is the name of the association and what are my voting rights in this association? Also, how much are my Assessments?

A:    Membership is mandatory for all Unit Owners in the Fiddler's Creek Foundation, Inc., which is a nonprofit Association for all Unit and lot owners in Fiddler's Creek, Collier County, Florida and each member shall be entitled to one (1) vote for each Unit owned by him. (Refer to Exhibit 10 of the Declaration of Condominium (Section 2.03 of the Fiddler's Creek Foundation, Inc. By-Laws). Fees due to the Fiddler's Creek Foundation, Inc. are not a part of the Estimated Operating Budget for Serena at Fiddler's Creek Condominium Association, Inc. (Exhibit 2 to the Prospectus) and are assessed separately against any Unit Owner. The monthly Assessments per Unit for 2010 are $82.66 for basic cable services as part of the Telecommunications Service Assessment.

### VI.
### Rent/Land Use Fees

Q:    Am I required to pay rent or land use fees for recreational or other commonly used facilities? If so, how much am I obligated to pay annually?

A:    There are annual Assessments for the recreational and commonly used facilities of The Club and Spa at Fiddler's Creek, which the Unit Owners are obligated to pay to the Fiddler's Creek Foundation, Inc. The basic Annual Assessment is currently $2,820.00 to be billed $235.00 on the first of each month.

### VII.
### Court Cases

Q:    Is the Condominium Association or other mandatory membership Association involved in any court cases in which it may face liability in excess of $100,000? If so, identify each such case.

A:    Serena at Fiddler's Creek Condominium Association, Inc., is currently not a party to any court cases for which the Association may face liability.

**NOTE:**    **THE STATEMENTS CONTAINED HEREIN ARE ONLY SUMMARY IN NATURE. A PROSPECTIVE PURCHASER SHOULD REFER TO ALL REFERENCES, EXHIBITS HERETO, THE SALES CONTRACT, AND THE CONDOMINIUM DOCUMENTS.**



Initial

Initial

R. 12/09

## EXHIBIT "E"
## RECEIPT FOR CONDOMINIUM DOCUMENTS

The undersigned acknowledges that the documents checked below have been received or, as to plans and specifications, made available for inspection.

Name of Condominium:          Serena at Fiddler's Creek, a Condominium

Address of Condominium:       Aviamar Circle, Naples, Florida

| DOCUMENT | RECEIVED | BY ALTERNATIVE MEDIA |
|---|---|---|
| Frequently Asked Questions and Answer Sheet | X | |
| Prospectus Text | X | |
| Declaration of Condominium | X | |
| Articles of Incorporation | X | |
| Bylaws | X | |
| Estimated Operating Budget | X | |
| Form of Contract for Sale or Lease | X | |
| Rules and Regulations | X | |
| Covenants and Restrictions | X | |
| Ground Lease | N/A | |
| Management and Maintenance Contracts for More Than One Year | N/A | |
| Renewable Management Contracts | N/A | |
| Lease of Recreational and Other Facilities to be used Exclusively by Unit Owners of Subject Condominiums  (See S. 718.503(1)(b) 7  &  S. 718.504, F.S. | N/A | |
| Form of Unit Lease if a Leasehold | N/A | |
| Declaration of Servitude | N/A | |
| Sales Brochure | X | |
| Phase Development Description | X | |
| Lease of Recreational and Other Facilities used by Unit Owners with other Condominiums | N/A | |
| Description of Management for Single Management of Multiple Condominiums | N/A | |
| Conversion Inspection Report | N/A | |
| Conversion Termite Inspection Report | N/A | |
| Plot Plan | X | |
| Floor Plan | X | |
| Survey of Land and Graphic Description of Improvements | X | |
| Executed Escrow Agreement | X | |
| Copy of Deed Evidencing Developer's Ownership Interest | X | |
| Energy Efficiency Information  Brochure | X | |
| Alternative Media Disclosure Statement (See Rule 61B-17.011) | N/A | |

| DOCUMENT | RECEIVED    OR | MADE AVAILABLE | BY ALTERNATIVE MEDIA |
|---|---|---|---|
| Plans and Specifications | | X | |

THE PURCHASE CONTRACT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF EXECUTION OF THE PURCHASE CONTRACT BY THE BUYER AND RECEIPT BY THE BUYER OF ALL OF THE DOCUMENTS REQUIRED TO BE DELIVERED TO HIM BY THE DEVELOPER. THIS CONTRACT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN FIFTEEN (15) DAYS AFTER THE BUYER HAS RECEIVED ALL THE DOCUMENTS REQUIRED.  BUYER'S RIGHT TO VOID THE PURCHASE CONTRACT SHALL TERMINATE AT CLOSING.

Executed this _26_ day of _November_, 2010.

Purchaser or Lessee
Print Name: _ZACHARY CATACENAC_

Purchaser or Lessee
Print Name:_____

**SERENA AT FIDDLER'S CREEK CONDOMINIUM ASSOCIATION, INC.**
**2010 APPROVED OPERATING BUDGET**

Total Number of Units in Association = 76

19  of 30 Buildings Contributing

|  | 2010 Approved |
|---|---|
| **INCOME** | |
| REGULAR ASSESSMENTS | 385,267 |
| RESERVE ASSESSMENT (REPLACEMENT) | 63,134 |
| **TOTAL INCOME** | **448,401** |
| **EXPENSES** | |
| **ADMINISTRATIVE** | |
| POSTAGE | 1,000 |
| OFFICE EXPENSE | 3,300 |
| FEES, LICENSES & REPORTS | 500 |
| CONSULTING FEES (Insurance Appraisals/Reserve Study) | 1,500 |
| ANNUAL FEES - CORP | 70 |
| ANNUAL FEES - CONDO DIVISION | 304 |
| LEGAL FEES | 5,600 |
| MANAGEMENT FEES | 13,500 |
| **TOTAL ADMINISTRATIVE** | **25,774** |
| **MAINTENANCE** | |
| CLEANING CONTRACT (POOL & COMMON AREA) | 3,600 |
| ELEC./STREET LIGHT REPAIRS (MONUMENT LIGHTING) | 2,100 |
| MAINTENANCE SUPPLIES (BUILDING SUPPLIES) | 500 |
| POOL UTILITIES (ELECTRIC) | 5,600 |
| POOL REPAIR & MAINTENANCE | 7,000 |
| POOL TELEPHONE | 600 |
| POOL HEAT | 11,000 |
| GROUNDS CONTRACT | 58,140 |
| MULCHING | 6,815 |
| TREE PRUNING | 5,500 |
| PROPERTY REPAIRS | 4,000 |
| FIRE SPRINKLER INSPECTION | 5,985 |
| FIRE EXTINGUISHER MAINTENANCE | 500 |
| EXTERMINATING/PEST CONTROL | 2,280 |
| FIRE SPRINKLER SYSTEM REPAIRS & MAINTENANCE | 2,000 |
| CONTRACT LABOR | 4,000 |
| PRESSURE WASHING | 6,000 |
| FIRE ALARM INSPECTIONS | 1,520 |
| LANDSCAPE REPL. & IMPROV. | 3,000 |
| FIRE ALARM MONITORING | 7,258 |
| FIRE ALARM REPAIR & MAINTENANCE | 5,000 |
| FIRE MONITORING TELEPHONE | 22,800 |
| DRYER VENT CLEANING | 1,710 |
| IRRIGATION REPAIRS | 1,000 |
| GROUNDS PEST CONTROL | 8,100 |
| **TOTAL MAINTENANCE** | **176,008** |
| **UTILITIES/OTHER** | |
| WATER & SEWER | 54,485 |
| ELECTRIC | 5,000 |
| INSURANCE | 105,000 |
| FLOOD INSURANCE | 19,000 |
| **TOTAL UTILITIES/OTHER** | **183,485** |

| | | | |
|---|---|---|---|
| **TOTAL EXPENSES** | 385,267 | 5,069.30 | 1,267.33 |
| REPLACEMENT RESERVE TRANSFER | 63,134 | | |
| LOSS PREVIOS YEAR | 6,465 | | |
| **TOTAL EXPENSES & RESERVES** | 448,401 | 5,900.01 | 1,475.00 |

| | 2010 |
|---|---|
| QUARTERLY ASSESSMENT | $1,475.00 |

| RESERVES Item | Replacement Cost | Useful Life | Remaining Life | Fund Balance | Amount To Be Funded | Annual Contribution |
|---|---|---|---|---|---|---|
| Paving | $35,467 | 20 | 18 | $1,876 | $33,591 | $1,866 |
| Roofs | $760,000 | 35 | 33 | $22,353 | $737,647 | $22,353 |
| Exterior Paint | $190,000 | 7 | 4 | $38,000 | $152,000 | $38,000 |
| Pool | $8,233 | 10 | 8 | $915 | $7,318 | $915 |
| Unallocated Reserve Interest | $0 | 0 | 0 | $0 | $0 | $0 |
| Total | $993,700 | | | $63,144 | $930,556 | $63,134 |

R. 12/09

# EXHIBIT "F"
## FIDDLER'S CREEK
## ACKNOWLEDGMENT OF RECEIPT OF DOCUMENTS

The undersigned hereby acknowledges receipt of (i) the Recreational Property Documents regarding the membership opportunities available in The Club and Spa at Fiddler's Creek (the "Club") and (ii) the homeowner document as set forth below.

A.   RECREATIONAL PROPERTY DOCUMENTS
     (For use of the Recreational Property at the Club)

1. Fiddler's Creek Community Summary
2. Rules and Regulations For Recreational Property
3. Frequently Asked Questions
4. Purchase and Sale Contract
5. Management Agreement
6. Membership Information Statement
7. Schedule of Assessments, Fees and Charges for the Club

All property owners in Fiddler's Creek are required to be at least a Social Member of the Club. The acquisition of a higher category of membership is optional. In order to acquire a Social Membership, the undersigned acknowledges that he/she must submit a completed and executed Membership Information Statement along with a check in U.S. funds, which shall include the amounts for the refundable Capital Acquisition Assessment, and the Capital Reserve Assessment. The amount for the Capital Acquisition Assessment and Capital Reserve Assessment is set forth in the Membership Information Statement. The undersigned agrees to be bound by the terms and conditions of the Club and Community Documents, as may be amended from time to time.

B. HOMEOWNER'S DOCUMENTS

Fiddler's Creek Foundation

1.   Copy of Purchase and Sale Contract
2.   Disclosure Summary
3.   Amended and Restated Declaration of General Covenants, Conditions and Restrictions for Fiddler's Creek
4.   Articles of Incorporation of Fiddler's Creek Foundation, Inc.
5.   Bylaws of Fiddler's Creek Foundation, Inc.
6.   Foundation Budget
7.   Materials relating to Fiddler's Creek Community Development District 2

The undersigned further acknowledges that complete copies of all of the documents described in this Acknowledgment are available at the sales office at Fiddler's Creek (the "Governing Documents"). In the event of any error or omission in the copies of documents provided to the undersigned, the undersigned acknowledge and agrees that the terms and provisions of the Governing Documents contained in the sales office shall prevail and shall be binding upon the undersigned.

The undersigned acknowledges and understands that the Recreational Property (as defined in the Amended and Restated Declaration) is not common area of Fiddler's Creek Foundation, Inc. (the "Foundation"), but rather are private property which have been transferred to the Foundation. The undersigned acknowledges that use of the Recreational Property may only be obtained by acquiring a Social Membership in the Club. Accordingly, the undersigned hereby releases and discharges forever any claims against the Developer, the Club and their affiliates that the undersigned may use the Recreational Property without acquiring a membership and paying the applicable capital acquisition assessment, capital reserve assessment, membership assessments, fees and charges.

If the undersigned is married, or there are co-owners, the signatures of both spouses and co-owners are required.
Dated ____11 / 2C____, 20010.

Signature
Print Name: _ZACHARY CHATYPHAL_

Signature
Pint Name:_____

R. 12/09

# EXHIBIT "G"
## AFFILIATED BUSINESS ARRANGEMENT
## DISCLOSURE STATEMENT
## REAL ESTATE SETTLEMENT PROCEDURE ACT
## 24 CFR PART 3500

To:        Undersigned Buyer(s)

From:      GBFC Development, Ltd. and Woodward, Pires & Lombardo, P.A.

Property:   Serena at Fiddler's Creek, a Condominium, Naples, Florida

This is to give you notice that GBFC Development, Ltd. and Woodward, Pires & Lombardo, P.A. (Referring Parties) have a business relationship with Union Title Insurance Company, Inc.  The nature of the relationship is that a partner or shareholder in both GBFC Development, Ltd. and Woodward, Pires & Lombardo, P.A. own 100% of the ownership interest in Union Title Insurance Company, Inc.  Because of this relationship, this referral may provide Referring Parties a financial or other benefit.

   A.    Set forth below is the estimated charge or range of charges for the settlement services listed.  You are NOT required to use the listed provider(s) as a condition for settlement or as a condition to close on any loan in connection with purchase of the subject property.  THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES.  YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

| Provider and Settlement Services | Charge or range of charges |
|---|---|
| Union Title Insurance Co., Inc. | |
| Owner's Title Insurance policy | Provided by Seller |
| Mortgage Title Insurance policy | $300.00 if issued with Owner's policy |
| Mortgage Loan Closing fee | $200.00 |
| Mortgage Title Endorsements | Rates set by Florida Department of Insurance but no less than $50 each |

   B.    Set forth below is the estimated charge or range of charges for the settlement of services of an attorney, credit reporting agency, or real estate appraiser that we, as your lender, will require you to use, as a condition of your loan on this property, to represent our interests in the transaction.

| Provider and Settlement Services | Charge or range of charges |
|---|---|
| N/A | N/A |

Acknowledgment

I/We have read this disclosure form, and understand that Referring Parties are referring me/us to purchase the above-described settlement service(s) and may receive a financial or other benefit as the result of this referral.

Signature _____        Signature _____
Print Name: _ZACHARY CASAGRANDE_              Print Name: _____
Date: _11/26/09_                              Date: _____

[The Remainder of This Page Is Intentionally Left Blank]

FIDDLER'S CREEK
STANDARD FEATURES LIST
SERENA 4-PLEX
COACH HOMES

03/29/08

| DESCRIPTION | BRAND/STYLE | SIZE/MATERIAL | COLOR, FINISH, LOCATION | NOTES |
|---|---|---|---|---|
| **EXTERIOR** | | | | |
| 1st FLOOR | Concrete | | | |
| WALLS-1st FL | CBS | | | |
| 2nd FLOOR | Concrete | | | |
| WALLS-2nd FL | CBS | | | |
| ELEVATION | Per Plan | | | |
| EXT. PAINT | Flex-Bon | See Paint Spec's | | |
| WINDOWS | Milestone 2000 Series | Per Plan Aluminum | White w/Tinted Glass | |
| SGD | Milestone | Per Plan Aluminum | White w/Clear Glass | |
| FRONT DOOR | Therma-Tru Fiber Classic | 3'x8', 6-Panel | Per Plan | |
| SOFFIT VENTS | Stucco | | | |
| FASCIA | | 2x8 RS Cedar | Roughsawn - Painted | |
| STORM PROTECTION | Bolt-on Panels | 24 Gauge Steel | White/Painted | N/A |
| DRIVEWAY/ENTRY WALKS | Brick Pavers | | | |
| REAR PATIO / TERRACE | | Concrete | Broom Finished | |
| EXT COACH LIGHTS | Progress or equal | | | Per Plan |
| LANDSCAPING | | | | Per Plan |
| IRRIGATION | | | | Per Plan |
| GARAGE DOOR | Amarr-Weatherguard Series | 27 Gauge | Painted | 1 3/8" Thick Metal Clad |
| GARAGE DOOR OPENER | Lift Master | 1.5 HP | (2) Transmitters | |
| GARAGE FLOOR | | Concrete | Stained | |
| GUTTERS | | 6"Aluminum | Location - Per Plan | |
| ROOF COVERING | HonierLife Tile | TBD | TBD | |
| HARDWARE | Baldwin | | Kensington (entry) | |
| **INTERIOR** | | | | |
| INSULATION | 8" CMU Walls | R-4.1 | Walls | |
| | Ceilings | R-30 Blown | Ceilings | |
| INT. PARTITIONS | | Wood - Bearing | | |
| | | Metal Non-Bearing | | |
| WALL FINISH | 1/2" Drywall | | Knock Down (excluding Kitchen, Laundry & Baths) | |
| CEILING FINISH | 5/8" Drywall | | Knock Down | |
| **INTERIOR TRIM** | | | | |
| DOORS | 8' Colonist(Solid Core) | 6-Panel Pre-Hung | Painted | Painted Hinges |
| HARDWARE | Valli & Valli | H4717 | Polished Brass | |
| CASING | #366 F.J. or equal | 3 1/2" LDF | Painted | |
| BASE | #623 F.J. or equal | 6" LDF | Painted | |
| INT. PAINT | Flex-Bon | Floral White | CW0330 | 1 Year Washable Warranty |
| SHELVING | | Ventilated Wood | Master Bedroom Closet | |
| | | Ventilated Wire Coated | Secondary Bedroom Closets | |
| WINDOW SILLS | | Corian | Glacier White | |
| WATER HEATER | State Select | 75 Gallon | NATURAL GAS | |
| HOSE BIBBS | Per Plan | | | |
| CABINETS - KITCHEN | | | | All within the same level |
| BATHS & LAUNDRY | Raffinati | Level 3 | Brittania Cream | No Upper Cabinets In Laundry |
| CABINET HARDWARE | Cosmo | | Brush Chrome | |
| STAIRS | New Attaction II - Style BP450 | Carpet | Color: 721 Oyster Shell | 2nd  Floor Units Only |
| **KITCHEN** | | | | |
| SINK | Kohler Lakefield | Cast Iron | White | K5877-4U, Double Bowl |
| FAUCET | Grohe Europlus II | | White | G33-939 |
| CABINET TOPS | Corian | As Per Drawings | Glacier White | Edge detail #1 |
| FLOORING | Portico | 16"x16" | Pescara White | Installed Straight |
| **MASTER BATH** | | | | |
| VANITY TOP | | Cultured Marble | White on White | Laguna (Oval W/Rim) |
| MIRROR | | 42" High | Vanity Width | |
| LAV. FAUCETS | Brasstech | | Satin Nickel | B7200155 |
| WATER CLOSET | Kohler Wellworth / K-4274 | Elongated | White | Seat & Cover C800THWH |
| TUB | | Cultured Marble | White on White | Deck and Skirt |
| TUB FIXTURE | Brasstech | 7000 Series | Satin Nickel | B7206155 |
| MEDICINE CABINET | | 14x24 | Mirror | Beveled Edge, Per Plan |
| BATH ACCESSORIES | | Ceramic | White | |
| SHOWER FIXTURE | Brasstech | 7000 Series | Satin Nickel | B7004155 |
| SHOWER WALLS | Portico | 8 x 10 w/Listello | Pescara White | Installed Straight |
| SHOWER FLOOR | Portico | 6x6 Ceramic (Matte) | Pescara White | Installed on Diagonal |
| BATH FLOOR | Portico | 16"x16" | Pescara White | Installed Straight |
| **SECOND BATH** | | | | |
| VANITY TOP | | Cultured Marble | White on White | Laguna (Oval W/Rim) |
| LAV. FAUCET | Brasstech | 7000 Series | Satin Nickel | B7000155 |
| MIRROR | | 42" High | Vanity Width | |
| WATER CLOSET | Kohler 4276-0 | Elongated | White | Seat & Cover C800THWH |
| MEDICINE CABINET | | 14x24 | Mirror | Beveled Edge, Per Plan |
| BATH ACCESSORIES | | Ceramic | White | |
| TUB or SHOWER | Kohler or  equal (tub) | Cast Iron | White(Tub) | K715-0 |
| TUB or SHOWER FIXTURE | Brasstech | 7000 Series | Satin Nickel | B7002155 or B7004155 |
| SHOWER WALLS | Portico | 8 x 10 w/Listello | Pescara White | Installed Straight |
| SHOWER FLOOR | Portico | 6x6 Ceramic (Matte) | Pescara White | Installed on Diagonal |
| FLOORING | Portico | 16"x16" | Pescara White | Installed Straight |
| **THIRD BATH** | | | | |
| VANITY TOP | | Cultured Marble | White on White | Laguna (Oval W/Rim) |
| LAV. FAUCET | Brasstech | 7000 Series | Satin Nickel | B7000155 |
| MIRROR | | 42" High | Vanity Width | |
| WATER CLOSET | Kohler 4276-0 | Elongated | White | Seat & Cover C800THWH |
| MEDICINE CABINET | | 14x24 | Mirror | Beveled Edge, Per Plan |
| BATH ACCESSORIES | | Ceramic | White | |
| SHOWER FIXTURE | Brasstech | 7000 Series | Satin Nickel | B7004155 |
| SHOWER WALLS | Portico | 8 x 10 w/Listello | Pescara White | Installed Straight |
| SHOWER FLOOR | Portico | 6x6 Ceramic (Matte) | Pescara White | Installed on Diagonal |
| FLOORING | Portico | 16"x16" | Pescara White | Installed Straight |
| **POWDER ROOM (Girasole floorplan only)** | | | | |
| PEDESTAL LAVATORY | Kohler | | White | TBD |
| LAV. FAUCET | Brasstech | 7000 Series | Satin Nickel | B7000155 |
| MIRROR | | N/A | N/A | N/A |
| WATER CLOSET | Kohler 4276-0 | Elongated | White | Seat & Cover C800THWH |
| FLOORING | Portico | 16"x16" | Pescara White | Installed Straight |
| **LAUNDRY ROOM** | | | | |
| CABINET TOP(S) | Corian | | Glacier White | |
| LAUNDRY TUB | Mustee or equal | | | M10K |
| LAUNDRY TUB FAUCET | Kohler | | Chrome | K15160-0 |
| **ELECTRIC** | | | | |
| SMOKE DETECTORS | Fire-X or Equal | | | Battery Back-Up |
| GFI | | 15/20 Ampere | 120 Volt | Grounding Type |
| CEILING FANS | | | Pre-wired in living, family, bedrooms and lanai | |
| BATH FANS | Nutone or equal | 50 CFM | | |
| FIXTURE PACKAGE | | | | As Per Plans |
| SWITCHES | Decora | 15 /20 Ampere | | As Per Plans |
| RECEPTACLES | Duplex | 15 /20 Ampere | 120 Volt | As Per Plans |
| W.P. OUTLETS | | | | As Per Plans |
| SWITCHED OUTLETS | | | Secondary Bedrooms | As Per Plans |
| SECURITY SYSTEM | Prewire | | | |
| TV PREWIRE | Structured Wiring | RG-6 Shielded | | As Per Plans |
| PHONE PREWIRE | Structured Wiring | Cat 5-e | | As Per Plans |
| A/C COMPRESSOR | Trane or equal | Per Energy Code | Per Plan | |
| **APPLIANCES - White Finish** | | | | |
| DISHWASHER | GE | PDW7300JWW | Profile "QuietPower" Series | |
| DISPOSAL | Insinkerator or Equal | Badger V | | |
| RANGE | GE | JGB905WEH | Profile 30" Free-Standing Gas Range w/ Warming Drawer | NATURAL GAS |
| MICROWAVE | GE | JVH1670W | Profile "Spacemaker" Sensor Oven (1.6 cu.ft. oven cavity) | |
| REFRIGERATOR | GE | PSS26MGP | Profile (25.5 cu.ft. capacity) "Arctica" Side -By-Side | |
| WASHER | GE | WCSR4170D | Super Capacity Plus (3.2 cu.ft.) | |
| DRYER | GE | DBXR463GD | Extra-Large Capacity (6.0cu ft.) | NATURAL GAS |
| **FLOORING** | | | | |
| CARPET PAD | | Quadrex or equal | | |
| CARPET | New Attaction II - Style BP450 | Carpet | Color: 721 Oyster Shell | |
| FLOOR TILE | Portico | 16"x16" | Pescara White | |

The standard features listed above may vary from home to home, and from unit to unit. The Seller reserves the right to eliminate or substitute equipment, materials, appliances, manufacturers, and model numbers with items of equal or higher, in our sole opinion, value. Color and size variations may occur.

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING REPRESENTATIONS OF THE SELLER. FOR CORRECT REPRESENTATIONS, MAKE REFERENCE TO THIS STANDARD FEATURES LIST AND TO DOCUMENTS TO BE FURNISHED TO BUYER BY SELLER PURSUANT TO THE PURCHASE AGREEMEN

Buyer(s): _____    Date: 1 / 26 / 0

Buyer(s): _____    Date: _____

PURCHASER _____
PURCHASER _____

1 | P a g e



*A Fiddler's Creek Community*

# Serena Village
# Options Package

Buyer's Name(s):   *ZACHARY CASAGRANDE*
Bldg/Unit:         Serena 6-102

## A. CABINETS & COUNTERTOPS
- *Your kitchen cabinets will include cabinet moldings, a wooden silverware tray, a sponge tray, trash bin, decorative columns and one (1) Magic Corner;*
- *Your kitchen cabinets will also include Hide-A-Lite under cabinet lighting with its own separate wall switch;*
- *Refrigerator and dishwasher "wooden-cabinet-panels" are __NOT__ included in this package; and*
- *Your Laundry Room cabinets will include upper cabinets, in addition to lower cabinets.*

Style/Finish of Cabinet Doors:...............................**Style:  Rocca Fiorita / Finish:  Cream**
*This cabinet door style and finish will be used __throughout your entire home__ – in the Kitchen, Laundry Room and Bathrooms.  However, pursuant to the Standard Features List, a pedestal lavatory is supplied within the Girasole Floor Plan Bath #2, therefore no cabinet will be supplied.*

Kitchen Cabinet **Countertops**:........................................**Giallo Fiorito**
*You will have **granite countertops (3cm thick)** for your Kitchen Cabinets, with ogee bullnose edge **and the Kitchen Backsplash will be 4".***

**NOTE:**  Laundry Room Cabinet **Countertops**
*This package includes **granite** countertops (2 cm thick with bevel edge") for your laundry room cabinets, with a 4" tall granite backsplash, which will be the same type of granite you have chosen for your kitchen countertops.  Your Laundry Room will also have an **undermount stainless steel sink** with **chrome faucet (with pull-out head).***

All Bathroom Cabinet **Countertops & Master Bath Tub**:...........................**Cultured Marble - Cafe Latte**
*You will have cultured marble countertops, with integrated sinks, for all of your bathroom cabinets and for your master bathtub.  However, pursuant to the Standard Features List, a pedestal lavatory is supplied within the Girasole Floor Plan's Bath #2, therefore no cabinet will be supplied.*

[The remainder of this page is intentionally left blank]

Buyer's Initials:  ___Z___ // Buyer's Initials: _____
Buyer's Initials:  _____ // Buyer's Initials: _____

## B. KITCHEN/LAUNDRY APPLIANCES // KITCHEN SINK & FAUCET
- *GE Profile Series dishwasher, range, combination microwave/vent hood and refrigerator.*

Color of **Kitchen Appliances**: .................................**Stainless Steel**

Color of **Laundry Room Washer & Dryer**:.............**Bisque**

Color of **Kitchen Undermount Sink & Faucet**:.........................**Stainless Steel Sink // Satin Nickle Faucet**

## C. SECURITY SYSTEM

- *One (1) master-control-panel;*
- *Two (2) liquid-crystal display key-pads (one at garage-to-house entry door and one in your master suite) - with panic-buttons;*
- *One (1) pet immune motion detector;*
- *One (1) interior siren;*
- *One (1) battery back-up;*
- *One (1) transformer; and*
- *One (1) keyless entry.*

## D. ENHANCED ROOM OPENING

- *One (1) arched, walk through opening; and*
- *Two (2) arched, pass through openings.*

NOTE TO BUYERS: Due to the nature of building products, including, but not limited to tile, rock, stone and wood, Buyers understand and agree that the materials listed on these sheets may display variations in (among others) shade, color, pattern mineral assemblage, crystallization, calcification, composition, pores, density, hardness, sedimentation, cut, split, texture and veining, as applicable (as much as 25%) between sample materials and actual application and installation, which is beyond the control of the Seller. All dimensions, sizes, configurations provided to Buyer are subject to change due to field requirements and are meant to be illustrative only. Seller can, in its sole discretion, defer completion of all Millwork (for example, wall units, built-in furnishings, and wall paneling), if any, to a date after the Certificate of Occupancy ("CO") is obtained, but in no event later than one hundred twenty (120) days after CO. Seller's deferral of completion of Millwork will not be an event-enabling Buyer to delay closing with Seller.

[The remainder of this page is intentionally left blank]

Buyer's Initials: _____ // Buyer's Initials: _____
Buyer's Initials: _____ // Buyer's Initials: _____

SUPPLEMENT
TO
FIDDLER'S CREEK
CONDOMINIUM AND HOMEOWNER'S DOCUMENTS

By his signature below, Purchaser acknowledges that Purchaser has received, read and signed, prior to the execution of a Purchase Contract, this Supplement to the Fiddler's Creek Condominium and Homeowner's Documents (including but not limited to the Prospectus, if a condominium; Budget; Village and Fiddler's Creek Disclosure Summaries and Purchase Contract and Deposit Receipt) disclosing the current CDD Debt Service and Maintenance Assessments for each village below for the fiscal year 10/01/10 – 9/30/11, which are:

| | CDD Debt Service | CDD Maintenance |
|---|---|---|
| **Condominium Villages** | | |
| Callista | $2500 | $1502 |
| Mennagio | $2600 | $1502 |
| Marengo | $2400 | $1502 |
| Serena | $2500 | $1502 |
| Varenna | $2000 | $1502 |
| | | |
| **Single Family Villages** | | |
| Bellagio | $3390 | $1221.48 |
| Chiasso | $5100 | $1502 |
| Cotton Green | $1540 | $1221.48 |
| Cranberry Crossing | $4500 | $1221.48 |
| Majorca | $4500 | $1221.48 |
| Millbrook | $5100 | $1502 |
| Sauvignon | $4700 | $1221.48 |
| | | |
| **Custom Estate Villages** | | |
| Isla del Sol | $4950 | $1221.48 |
| Mahogany Bend | $4750 | $1221.48 |
| Mulberry Row | $1500 | $1221.48 |

Date:

Purchaser
Print Name: Zachary Casagrande

Date:

11/26/10

Purchaser
Print Name:

Effective Date: October 12, 2010

**SUPPLEMENT**
**TO**
**FIDDLER'S CREEK**
**CONDOMINIUM AND HOMEOWNER'S DOCUMENTS**

By his signature below, Purchaser acknowledges that Purchaser has received, read and signed, prior to the execution of a Purchase Contract, this Supplement to the Fiddler's Creek Condominium and Homeowner's Documents (including but not limited to the Purchase Contract and Deposit Receipt; Frequently Asked Questions and Answers Sheet, if a condominium; Budget (and the Budget Notes); and Fiddler's Creek Disclosure Summary) disclosing the current Telecommunications Services Assessment ($82.66 per month) and the current Social Membership Fee ($235.00 per month) and current fee for Priority Tennis Privileges ($735.00 per year) payable to the Fiddler's Creek Foundation, Inc.

Date:    11/20/10

_____
Purchaser
Print Name: Zachary Casagrande

Date:

_____
Purchaser
Print Name:

Effective Date: December, 2008

# SUPPLEMENT
# TO
# FIDDLER'S CREEK
# CONDOMINIUM AND HOMEOWNER'S DOCUMENTS

By his signature below, Purchaser acknowledges that Purchaser has received, read and signed, prior to the execution of a Purchase Contract, this Supplement to the Fiddler's Creek Condominium and Homeowner's Documents (including, but not limited to, the revised Budget Notes (Rev. 12-08) attached hereto and made a part hereof). Purchaser acknowledges and understands that the Purchase Contract executed by Purchaser supersedes all prior forms of purchase contracts that may be a part of any association documents supplied to Purchaser. The Village and Fiddler's Creek Disclosures, and Frequently Asked Questions attached to and made of the Purchase Contact executed by Purchaser supersede all prior forms of such disclosures supplied to Purchaser.

Date: _____

_____
Purchaser
Print Name: Zachary Casagrande

Date: _____

_____
Purchaser
Print Name:

**ADDENDUM #1**
**TO PURCHASE CONTRACT and DEPOSIT RECEIPT**

This Addendum ("Addendum") is made a part of and amends that certain Purchase Contract and Deposit Receipt dated the 26 day of November, 2010 for the purchase of Unit No. 102, Building 6, Phase 6 of Serena at Fiddler's Creek, a condominium (the "Unit") by **GBFC DEVELOPMENT LTD**, as Seller, and **Zachary Casagrande**, as Buyer ("Contract").

The Contract is hereby amended and modified in the manner set forth below.

1.       The following is hereby added as new paragraph 38:

**38. BANKRUPTCY COURT APPROVAL.** This Contract for sale of the Unit is subject to and contingent upon the entry of an order of the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), approving this Contract for the sale of the Unit free and clear of all liens claims and encumbrances, with such liens, claims and encumbrances to attach only to the proceeds of such sale pursuant to Section 363 of the Bankruptcy Code (the "Approval Order"). Once this Contract is executed and the Initial Deposit has been received, the Seller will file the appropriate pleadings with the Bankruptcy Court to seek approval of this Contract in the Seller's Bankruptcy Case No. 10-bk-03846-ALP. The Seller shall use its best efforts to obtain such Approval Order. The Sellers obtaining of an Approval Order is a condition precedent to Seller's obligations as set forth in this Contract. If Seller has not received the Approval Order within sixty (60) days of Buyer(s) execution of this Contract, then Buyer or Seller may terminate this Contract and Buyer's Deposits actually paid shall be refunded to Buyer, unless extended by mutual agreement of the parties.

2.       Delete paragraph 4 in its entirety and substitute the following:

**4. CLOSING.** Time shall be of the essence of this contract. Closing shall take place at a location to be determined by Seller in Collier County, Florida, and closing shall occur at the later of: (a) within thirty (30) days from the Buyer's execution of this Contract, or (b) ten (10) days after the date of the Approval Order, but in no event later than sixty (60) days after the date of Buyer's execution hereof, unless extended by mutual agreement of the parties. At closing, Seller will deliver to Buyer a general warranty deed conveying to the Buyer a fee simple title to said condominium unit, subject to those items as set forth in Paragraph 5 below. Buyer acknowledges and agrees that his rights, title and interest in and to this Property are subordinate to the lien and operation of any mortgage heretofore or hereafter placed upon the property prior to the closing of this transaction, and to any advances or modifications thereof provided, however, said mortgages shall be released at or prior to closing.

3.       Delete paragraph 9 in its entirety and substitute the following:

**9. SELLER'S RIGHT TO APPROVE BUYER.** Buyer understands that the Association, in order to maintain a community of financially responsible and congenial residents, requires application and approval of Buyers. As a part of the consideration of this Contract, Buyer consents that the Association may make such investigation of Buyer as may be deemed desirable and the Buyer covenants to hold the Seller harmless and release the Association from liability on account of such investigation. Seller's obligations hereunder are contingent upon approval of Buyer by the Association, if the Board of Directors of the Association is not controlled by the Seller. In such event, Buyer agrees to timely complete any application for membership in the Association.

4.       Delete paragraph 13 in its entirety and substitute the following:

13.    **DEFAULT.** Time is of the essence. Seller's acceptance of this Offer shall constitute a binding contract for the purchase and sale of the Unit, subject in all events to the approval of the Bankruptcy Court as set forth in paragraph 38. Should the Buyer fail to perform any obligation within the prescribed time period set forth in this Contract, then if Seller shall have obtained the Approval Order then Seller shall have the right to cancel this purchase Contract for such default and to retain deposits made or agreed to be made by the Buyer as full and liquidated damages for such default or to initiate an action for specific performance. Should the Seller grant an extension of time for the closing, the Seller shall have the right to demand an additional five percent (5%) deposit on or before the closing date as set forth above and require the Buyer pay late charges equal to one and one-half percent (1 1/2%) of the purchase price per month. If Buyer does thereafter close, Buyer agrees that all prorations and all expenses of the Buyer shall be as of the final date for closing as set forth above, and Buyer agrees to reimburse the Seller an amount equal to the additional common expenses of the condominium unit incurred by Seller due to Buyer's delay in closing on the date set forth above. In the event of Seller's default, other than Seller's failure to obtain the Approval Order within sixty (60) days of this Contract's execution by Buyer, Buyer shall have all remedies available in law or equity. In the event Seller is unable to obtain the Approval Order within sixty (60) days of Buyer's execution of this Contract, Buyer or Seller may terminate this Agreement and Buyer specifically waives the right to seek actual damages, consequential damages, punitive damages or any other damages whatsoever from the Seller and/or its

Buyer 
Buyer
Seller

legal counsel or retained professionals, and acknowledges and agrees that Seller's sole remedy shall be the refund of the Buyer's Deposit(s) actually paid. In the event of Buyer's default, the escrow agent shall, upon receipt of notice of default, deliver to the Seller the funds held in escrow and the escrow agent shall not be obligated to conduct any independent investigation or determination of the alleged default.

5.    Delete paragraph 21 in its entirety and substitute the following:

21. **GOVERNING LAW AND VENUE.** This Contract and all documents executed pursuant to it shall be construed and enforced according to the laws of the State of Florida. Venue for disputes hereunder shall be in Collier County, Florida, subject to the jurisdiction of the Bankruptcy Court.

6.    Except as amended, added or modified above, all terms and conditions of the Contract remain in full force and effect. Where paragraphs of the Contract are amended, added or modified herein, such amendments, additions or modifications shall control.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the date first written above.

Witness to Buyer:                              **BUYER:**

Print: _____    Zachary Casagrande
                                               Date: ___11/26/10___

                                               **BUYER:**

Print: _____    Date: _____


                                               **SELLER:**

Witness to Seller:                             GBFC DEVELOPMENT, LTD
                                               A Florida Limited Partnership
                                               By: _____ Joseph L Parisi
Print: _____        Attorney in Fact and not individually

                                               Date: ___12/1/10___
Print: _____

[The Remainder of this Page is Intentionally Left Blank]