UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| **FIDDLER'S CREEK, LLC** | **Case No. 8:10-bk-03846-ALP** |
| 951 LAND HOLDINGS, LLC | Case No. 8:10-bk-03852-ALP |
| DY ASSOCIATES, LLC | Case No. 8:10-bk-03856-ALP |
| GBFC DEVELOPMENT, LLC | Case No. 8:10-bk-03864-ALP |
| FC MARINA, LLC | Case No. 8:10-bk-03872-ALP |
| FC BEACH, LLC | Case No. 8:10-bk-03873-ALP |
| FC GOLF, LLC | Case No. 8:10-bk-03875-ALP |
| DY LAND HOLDINGS II, LLC | Case No. 8:10-bk-03878-ALP |
| FC PARCEL 73, LLC | Case No. 8:10-bk-03881-ALP |
| FC COMMERCIAL, LLC | Case No. 8:10-bk-03886-ALP |
| FC HOTEL, LLC | Case No. 8:10-bk-03888-ALP |
| FC RESORT, LLC | Case No. 8:10-bk-03896-ALP |
| GULF BAY HOSPITALITY COMPANY, LLC | Case No. 8:10-bk-03898-ALP |
| GULF BAY HOTEL COMPANY, LLC | Case No. 8:10-bk-03905-ALP |
| GBP DEVELOPMENT, LLC | Case No. 8:10-bk-03908-ALP |
| GB PENINSULA, LTD. | Case No. 8:10-bk-03909-ALP |
| 951 LAND HOLDINGS, LTD. | Case No. 8:10-bk-03911-ALP |
| DY LAND ASSOCIATES, LTD. | Case No. 8:10-bk-03918-ALP |
| GBFC DEVELOPMENT, LTD. | Case No. 8:10-bk-03920-ALP |
| GBFC MARINA, LTD. | Case No. 8:10-bk-03928-ALP |
| FC BEACH, LTD. | Case No. 8:10-bk-03934-ALP |
| FC GOLF, LTD. | Case No. 8:10-bk-03937-ALP |
| FC HOTEL, LTD. | Case No. 8:10-bk-03938-ALP |
| FC RESORT, LTD. | Case No. 8:10-bk-03947-ALP |
| GULF BAY HOSPITALITY, LTD. | Case No. 8:10-bk-03949-ALP |
| GULF BAY HOTEL COMPANY, LTD. | Case No. 8:10-bk-03950-ALP |
| GBP DEVELOPMENT, LTD. | Case No. 8:10-bk-03952-ALP |
| FIDDLER'S CREEK MANAGEMENT, INC., | Case No. 8:10-bk-03954-ALP |

**(Jointly Administered under**
**Case No. 8:10-bk-03846-ALP)**

    **Debtors.**

_____/

## INDENTURE TRUSTEE'S OBJECTION TO CONFIRMATION
## OF THE SECOND AMENDED PLANS OF REORGANIZATION

U.S. Bank National Association, as Indenture Trustee (the "Indenture Trustee"), with

regard to the Bonds and under their respective Indentures as are shown on the attached

Exhibit A, objects to confirmation of the *Second Amended Plans of Reorganization* identified on the attached Exhibit B (the "Plans"). In support of this objection (the "Confirmation Objection"), the Indenture Trustee respectfully states:

## Preliminary Statement

1.  The Plans propose to negatively amortize the Bond Debt Special Assessments[1] and to favorably treat the claims of insiders and related entities without providing the Debtors' primary constituency, the Bondholders, a vote or the protections of a cram down hearing under Section 1129(b). These Plans cannot be confirmed because they are not proposed in good faith and are not feasible.

2.  The Plans are not proposed in good faith. The Plans are the consummation of the Debtors' strategy to in effect restructure the Bonds over the objections of the Bondholders—the Debtors' most senior secured debt and the source of financing that made the Development possible—and to do so while denying the Bondholders the key protections of the Bankruptcy Code—a vote or a cram down hearing—and while engaging in favorable self-dealing with insiders and related entities. The benefits the Debtors' insiders or related entities stand to reap from this strategy are significant, including more than 18% interest on approximately $1 million in tax certificates. The Debtors' lack of good faith is further shown in that the Plans purport to "restructure" certain of the Bond Debt Special Assessments on property that the Debtors will surrender to junior secured creditors. To secure these benefits, the Debtors have improperly solicited the homeowners of the Districts to cause the Districts to accept the Plans with respect to the treatment of the Bond Debt Special Assessments. Indeed, the proposed treatment of the O&M Assessments, *i.e.*, that those assessments are made current on the effective date and paid

---

[1]  Capitalized terms used but not defined in this Preliminary Statement have the meaning ascribed to them in the body of this Objection.

current thereafter, shows the Debtors' effort to curry favor with the Districts to cause the Districts to accept the Plans over the objections of the Bondholders and to avoid giving the Bondholders the protections of Section 1129(b).

3. The Plans are not feasible. The Plans contemplate repayment of the restructured Bonds with funds derived out of the sale of certain lots located within Fiddler's Creek. However, in order for sufficient funds to be raised to satisfy the Bonds, even as restructured pursuant to the Plans, sales would have to exceed (by a significant margin) all sales metrics previously achieved by Fiddler's Creek including those of the 2004-2007 Florida housing boom. The Indenture Trustee does not believe that such sales goals are achievable. As such, the Debtors are likely to default on the proposed Plan payments and will likely re-file for bankruptcy.

4. Moreover, the Plans are not "fair and equitable" and do "unfairly discriminate." The Plans are not fair and equitable because they do not propose to pay the appropriate amount of interest under Section 1129(b)(2)(A)(i)(II). The Plans are also not fair and equitable because this case, and the terms upon which the negative amortization is proposed, is not one of the rare cases where such treatment is appropriate. The Plans unfairly discriminate against the Off Roll Bond Debt Special Assessments because two other assessments claims—the On Roll Bond Debt Special Assessments and the O&M Assessments—have the same priority on the same collateral but receive radically superior treatment—they are brought current on the effective date and paid currently thereafter—to the Off Roll Bond Debt Special Assessments. This notwithstanding the fact that all of the Assessments have the same priority of lien; a lien which is on parity with *ad valorem* taxes under Section 170.09, Florida Statutes.

3

5. For all these reasons, as more fully set forth below, the Plans cannot be confirmed.

## Background

**A. Procedural Background**

6. On February 23, 2010 (the "Petition Date"), the Debtors commenced the above-captioned cases by the filing of voluntary petitions for relief by each of the Debtors under Chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. According to the Debtors, each of them owns, operates and/or is otherwise affiliated with the "Fiddler's Creek" development located in Collier County, Florida (the "Development"). (*Second Amended Joint Consolidated Disclosure Statement for Plans of Reorganization of the Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code* [D.E. 752] (the "Disclosure Statement") at 5-6.) The Court has approved the Debtors' Disclosure Statement, and the Debtors are seeking confirmation of the Plans.

7. Following approval of the Disclosure Statement, the Court set a hearing to consider confirmation of each of the Second Amended Joint Plans of Reorganization filed by the Debtors for May 26, 2011 and May 27, 2011 (the "Confirmation Hearing"), and fixed deadlines for objections to confirmation on May 12, 2011 and for replies in support of confirmation on May 19, 2011. (*Order Granting Debtors' Motion for Entry of Order (I) Approving Second Amended Disclosure Statement; (II) Approving Solicitation Procedures; (III) Approving Forms of Ballots and Establishing Procedures for Voting on the Second Amended Plans of Reorganization; and (IV) Establishing Notice and Objection Procedures in respect of Confirmation of the Second Amended Plans of Reorganization* [D.E. 770].) The Court also fixed

May 16, 2011 as the deadline for acceptances or rejections of the Plans to be filed (the "Balloting Deadline").

8.     After the setting of the Confirmation Hearing and the fixing of the Balloting Deadline, the Debtor distributed the Plans, Disclosure Statement, and ballots.   The Debtors solicited the Districts to vote on, *inter alia*, the Bond Debt Special Assessments (defined below), and to cast acceptances in favor of the Debtors' proposed treatment under the Plans of the Bond Debt Special Assessments.

**B.     Bonds and Bond Debt Special Assessments**

9.     The infrastructure of the Development was financed in great part by bond indebtedness.

10.     To finance such infrastructure, local units of special purpose government were created pursuant to Chapter 190, Florida Statutes, the "Uniform Community Development District Act" (the "Act"), and, among other things, with respect to Fiddler's Creek Community Development District 1 ("District #1"), Rule 42X-1.001-1.003, Florida Administrative Code, as amended; and with respect to Fiddler's Creek Community Development District #2 ("District #2"; each, a "District" or a "CDD;" and together, the "Districts" or the "CDDs"), Ordinance #02-61 of the Board of County Commissioners of Collier County, Florida.

11.     The Act authorizes such community development districts to, among other things, (i)  provide public improvements and community facilities to benefit real property, (ii)  issue indebtedness, including bond indebtedness, secured by and paid from non-ad valorem special assessments, and (iii)  impose and levy non-ad valorem special assessments on real property within the district in order to repay the bond indebtedness that financed the improvements and facilities benefiting the district's real property.

12.    As provided for in the Act, District #1's Board of Supervisors duly adopted Resolution 96-16 on August 20, 1996, which authorized and approved, among other things, the Master Trust Indenture dated as of December 1, 1996 between District #1 and the Indenture Trustee (as supplemented and amended from time to time in accordance with its terms, the "District #1 Master Indenture"), and the issuance of special assessment revenue bonds in one or more series under the District #1 Master Indenture.

13.    District #1 issued and sold special assessment revenue bonds pursuant to its Resolution 96-16 and the District #1 Master Indenture, and related resolutions and documents. Bonds issued by District #1 and remaining outstanding are shown on Exhibit A (the "District #1 Bonds").

14.    Similarly, District #2's Board of Supervisors duly adopted Resolution 2003-15 on December 2, 2002, which authorized and approved, among other things, the Master Trust Indenture dated as of June 1, 2003 between District #2 and the Indenture Trustee (as supplemented and amended from time to time in accordance with its terms, the "District #2 Master Indenture"), and the issuance of special assessment revenue bonds in one or more series under the District #2 Master Indenture.

15.    District #2 issued and sold special assessment revenue bonds pursuant to its Resolution 2003-15 and the District #2 Master Indenture, and related resolutions and documents. Bonds issued by District #2 and remaining outstanding are shown on Exhibit A (the "District #2 Bonds" and collectively with the District #1 Bonds, the "Bonds").

16.    The Bonds issued by each of the Districts funded public improvements that benefit the residents and properties within the respective District, such as roadways, utilities, earthwork and clearing, water and storm water management, roadway lighting, landscaping,

security, wetlands mitigation and monitoring, irrigation, and other infrastructure and improvements.

17.     The Bonds are secured by, and paid from, special assessments (the "Bond Debt Special Assessments") levied by the issuing District on the real property within the District benefitted by the Bond-financed infrastructure and improvements. Pursuant to Section 170.09 of the Florida Statutes, the Bond Debt Special Assessments constitute liens upon the assessed land coequal with the lien of all state, county, district, and municipal liens, superior in dignity to all other liens, titles, and claims, until paid.

18.     Both pre- and post-petition, the Debtors failed to pay Bond Debt Special Assessments levied by the Districts upon their properties. Accordingly, such unpaid Bond Debt Special Assessments are due and outstanding to the Districts, which in turn are indebted to the Indenture Trustee on behalf of the holders of the Bonds (the "Bondholders"). The properties of such Debtors are subject to the liens of the Bond Debt Special Assessments, levied by the Districts and pledged by the Districts to the Indenture Trustee, for the benefit of the Bondholders, to secure the payment of the principal of and interest on the Bonds.

**C.      Districts' Proofs of Claims**

19.     The Districts filed proofs of claim against the nine Debtors that own real property subject to the liens of unpaid Bond Debt Special Assessments: 951 Land Holdings, Ltd.; DY Land Holdings II, LLC; DY Land Associates, Ltd.; FC Commercial, LLC; FC Golf, Ltd.; FC Parcel 73, LLC; GB Peninsula, Ltd.; GBP Development, Ltd.; and GBFC Development, Ltd.

20.     All specific information in this objection as to the Bond Debt Special Assessments owed by the Debtors to the Districts as of the Petition Date, including without limitation the series of Bonds, the amounts of principal and interest, etc., is based upon information provided by the Districts' consultant in connection with the Districts' proofs of

claim, and the Indenture Trustee's rights are reserved accordingly. Although some of the Districts' proofs of claims included special assessments other than the Bond Debt Special Assessments, only the Bond Debt Special Assessments are considered by the Indenture Trustee herein.

**D.     "Off Roll" versus "On Roll"**

21.     The Districts may collect Bond Debt Special Assessments directly from landowners, in which case such assessments are considered "off roll." As an alternative, the Districts may arrange for Collier County to collect the Bond Debt Special Assessments in conjunction with the County's collection of real estate taxes, in which case such assessments are considered "on roll." The difference between "off roll" Bond Debt Special Assessments and "on roll" Bond Debt Special Assessments is solely as to the collection procedure and not as to lien priority or statutory rights. The Debtors have not disclosed any reason to provide different treatment of their unpaid Bond Debt Special Assessments based upon whether such Bond Debt Special Assessments are collected "off roll" or "on roll" other than the mere procedural inability to delay payment to the county tax collector for Collier County for the "on roll" assessments.

22.     Whether Bond Debt Special Assessments are "off roll" or "on roll" <u>does not affect</u> either the Debtors' obligations to pay the Bond Debt Special Assessments to the Districts, or the Districts obligations to pay the amounts due with regard to the Bonds to the Indenture Trustee. Debtors' Plans regarding the "off roll" Bond Debt Special Assessments is simply a ruse using the complicit Districts o put off payment as long as possible.

**E.     The Districts' Meeting and the Improper Solicitations**

23.     Following the Debtors' solicitation of the Districts' acceptances with respect to the Bond Debt Special Assessments, the Districts conducted a "joint public meeting" on April 18, 2011 (the "<u>District Meeting</u>"). The ostensible purpose of the District Meeting was to allow

"the Debtors, the Indenture Trustees, the Official Unsecured Creditors Committee and members of the Fiddler's Creek community and/or their counsel or representatives to appear before the [Districts] to provide information, ask questions, and express their opinions, concerns, perspectives, and positions regarding the [Plans]." (*See Notice to Interested Parties of a Joint Public Meeting of the Boards of Supervisors of Fiddler's Creek Community Development District Numbers 1 and 2 on April 18, 2011 at 8:00 a.m.* [D.E. 784] at 2.)

24.     However, as is more fully discussed in the *Indenture Trustee's Motion for Entry of an Order (A) Determining that the Debtors have Improperly Solicited the Homeowners of Fiddler's Creek and (B) Granting Related Relief* [D.E. 1184] (the "Improper Solicitation Motion"), the Debtors made multiple improper solicitations of the homeowners of Fiddler's Creek for the transparent purpose of influencing the homeowners to cause the Districts to vote in favor of the Plans with respect to the treatment of the Bond Debt Special Assessments, against the wishes of the Bondholders who are negatively impacted by such impaired treatment. The Improper Solicitation achieved its intended effect, in that hundreds of homeowners attended the District Meeting and urged the Districts to vote in favor of the Plans, not just on the O&M Claims, but on the Bond Debt Special Assessments as well.

**F.     The Districts' Vote and the Injunction Proceeding**

25.     After the District Meeting, the Districts scheduled further meetings to determine how to vote on the Plans. District #2 scheduled (and conducted) an executive session for May 5, 2011, and a public hearing for May 12. On information and belief, at the May 12th meeting, District #2 directed its counsel to cast acceptance ballots on the Bond Debt Special Assessments. District #1 has scheduled a public hearing for May 11 (no executive session has been scheduled). On information and belief, at the May 11th meeting, District #1 also directed its counsel to cast acceptance ballots on the Bond Debt Special Assessments (by a 3-2 vote).

26. In advance of these public meetings, on May 3, 2011, the Indenture Trustee directed the Districts to reject the Plans with respect to the Bond Debt Special Assessments. The Districts have not responded to this demand, but counsel for District #2 advised his board that District #2 is not required to vote as the Bondholders direct.

27. Accordingly, on May 9, 2011, the Indenture Trustee commenced an adversary proceeding to, *inter alia*, enjoin the Districts from voting to accept the Plans with respect to the Bond Debt Special Assessments (the "Injunction Proceeding"). In connection with the Injunction Proceeding, the Indenture Trustee has sought a temporary restraining order ("TRO") and a preliminary injunction to prevent the Districts from filing acceptances during the pendency of the Injunction Proceeding so as to preserve the *status quo* and prevent irreparable harm to the Bondholders. At the hearing on May 11, 2011, the Court denied the request for a TRO, based in part on the finding that the Indenture Trustee has other adequate remedies, including the ability to seek to designate the vote of the Districts under Section 1126(e), which the Indenture Trustee intends to do.

## Objection

### I. The Plans cannot be confirmed because not all of the requirements of Section 1129(a) are met.

28. A chapter 11 plan of reorganization can be confirmed only if the requirements of each of the subsections of Section 1129(a) of the Bankruptcy Code are met. To confirm the plan, moreover, the debtor must prove each of these requirements by clear and convincing evidence. *See In re D & G Investments of West Florida, Inc.*, 342 B.R. 882, 885-886 (Bankr. M.D. Fla. 2006); *In re New Midland Plaza Assocs.*, 247 B.R. 877, 883 (Bankr. S.D. Fla. 2000); *In re Miami Center Assocs. Ltd.*, 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992). Here, the Plans cannot be

confirmed because the Debtors cannot prove by clear and convincing evidence that the Plans

meet the good faith, "not forbidden by law," and feasibility requirements of Section 1129(a).

## A.    The Plans are not proposed in good faith.

29.     Section 1129(a)(3) provides that "the court shall confirm a plan only if . . . (3)

[t]he plan has been proposed in good faith[.]" 11 U.S.C. § 1129(a)(3); *In re McCormick*, 49 F.3d

1524, 1526 (11th Cir. 1995) (holding good faith requirement not violated solely because debtor

exercises his Fifth Amendment right not to testify). "Good faith" is not defined in the

Bankruptcy Code, but the Eleventh Circuit has construed "good faith" under Section 1129(a)(3)

to require:

> that there is a reasonable likelihood that the plan will achieve a
> result consistent with the objectives and purposes of the
> [Bankruptcy] Code.   Where the plan is proposed with the
> legitimate and honest purpose to reorganize and has a reasonable
> hope of success, the good faith requirements of section 1129(a)(3)
> are satisfied. The focus of a court's inquiry is the plan itself, and
> courts must look to the totality of the circumstances surrounding
> the plan, keeping in mind the purpose of the Bankruptcy Code is to
> give debtors a reasonable opportunity to make a fresh start.

*Id.* (internal citations omitted).   Additionally, in the Eleventh Circuit, pre-petition conduct may

be considered in connection with Section 1129(a)(3)'s good faith requirement because a debtor

that files a petition with a lack of good faith cannot propose a plan in good faith. *See In re*

*Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir. 1987). ("It seems unquestionable to us that the

taint of a petition filed in bad faith must naturally extend to any subsequent reorganization

proposal; thus, any proposal submitted by a debtor who filed his petition in bad faith would fail

to meet section 1129's good faith requirement.")   Accordingly, the Court may consider in its

good faith analysis any fact showing "'an intent to abuse the judicial process and the purposes of

the reorganization provisions.'"  *See id.* (quoting *Albany Partners, Ltd. v. Westbrook ( In re*

*Albany Partners, Ltd.)*, 749 F.2d 670, 674 (11th Cir.1984)).

30.     The Debtors' lack of good faith is manifest in their stated intention to "restructure" the Bond Debt Special Assessments while leaving the Bonds in default and not giving the Bondholders, who hold the **sole** economic interest in the Bond Debt Special Assessments, either a vote on the treatment of the Bond Debt Special Assessments or a cram down hearing.[2]   In effect, the Debtors intend to restructure the Bonds without giving the Bondholders any of the protections—again, a vote or a cram down hearing—of the Bankruptcy Code.   This intention is antithetical to the purposes of the reorganization provisions of the Bankruptcy Code.

31.     There can be no question that the Debtors are in effect and substance restructuing and reissuing the Bonds contrary to the Master Trust Indentures, state law, and federal tax law. The Bondholders financed the construction of infrastructure improvements upon the Debtors' property at below market interest rates in exchange for tax-free treatment of the interest on the Bonds.  As the Debtors admit in the Disclosure Statement, the purpose of the Act, in general, and the purpose of the Districts, in particular, is to facilitate this deal between a developer and bondholders.   The Districts are in substance a governmental conduit inserted between the developer and bondholders so as to comply with federal tax laws for tax exempt securities.

32.     The conduit nature of the Districts is explicit in the Act, the Indentures, and the Debtors' pre-petition actions.  Under the Act the Bondholders and Districts may covenant so as to enable the Bondholders to ensure that the proceeds of the Bonds flow through the District to the Development and that the revenues from the Development flow through the District to the Bondholders.  For example, the Act provides the following:

---

[2]     The Debtors have indicated their intention not to put on a case under Section 1129(b) of the Bankruptcy Code because they have obtained ostensible acceptances from the Districts.  This indication is buttressed by the fact that the Debtors even at this late stage have yet to identity an expert to offer evidence as to, among other things, the appropriate discount rate under Section 1129(b)(2)(A)(i)(II).

Covenants. . . . all such covenants shall constitute valid and legally binding enforceable contracts between the District and the Bondholders, regardless of the time of issuance thereof. Such covenants may include, without limitation, covenants concerning the disposition of the bond proceeds; the use and disposition of the project revenues; the pledging of revenues, taxes and assessments; . . . restrictions on the sale or disposal of the assets and property of the District; the priority of assessment liens; the priority of claims by Bondholders on the taxing power of the District; . . . acceleration upon default; . . . and such other covenants as may be deemed necessary and desirable for the security of the Bondholders.

Fla. Stat. § 190.016(11).

Trust Agreements. The resolution authorizing the issuance of the bonds or such trust agreement may pledge the revenues to be received from any projects of the District and may contain such provisions for protecting and enforcing the rights and revenues of the Bondholders as a board may approve, including, without limitation, covenants setting forth the duties of the district in relation to: acquisition, construction, reconstruction, improvement, maintenance, repair, operation, and issuance of any projects; the fixing and revising of the rates, fees, and charges; and the custody, safeguarding, and application of all monies and for the employment of consulting engineers in connection with such acquisition, construction, reconstruction, improvement, maintenance, repair, or operation.

Fla. Stat. § 190.017.

Issuance of Certificates of Indebtedness Based on Assessment for Assessable Improvements; Assessment Bonds. . . . In the event of the creation of the special fund and the issuance of such assessment bonds or other obligations, the proceeds of such certificates of indebtedness or assessments liens deposited therein shall be used only for the payment of the assessment bonds or other obligations issued as provided in this Section. The District is authorized to covenant with the Bondholders for such assessment bonds or other obligations that it will diligently and faithfully enforce and collect all the special assessments and interest and penalties thereon for which such certificates of indebtedness or assessment liens have been deposited in or assigned to such fund; . . . to make any other covenants deemed necessary or advisable in order to properly secure the holders' assessment bonds or other obligations.

Fla. Stat. § 190.023(2). As these examples show, the Act allows the Bondholders to control the use of the proceeds of the Bonds, the use of the revenues of the Development, and the use of the assets and property of the District. The conduit nature of the Districts is confirmed by the Indentures. For example, the District #2 Master Indenture provides:

> [T]he District, in order to secure the payment of the principal of, premium, if any, and interest on the Bonds of a Series . . . the District, does hereby assign, pledge and grant a security interest in the following (herein called the "Series Trust Estate") to the Trustee, and its successors in trust, and their successors and assigns forever:

> All of right, title and interest of the District in, to and under all of the Series Pledge Revenues (as hereinafter defined), the Series Pledged Funds (as herein after defined) . . . .

> [I]t being expressly understood and agreed that, unless otherwise provided in the Supplemental Indenture relating to a Series the Series Trust Estate established and held hereunder for Bonds of such Series shall secure solely such Bonds and shall be held separate and in trust solely for the benefit of the Holders (as hereinafter defined) of the Bonds of such Series, additional Bonds of such Series and other obligations issued expressly on parity therewith and shall not secure Bonds of any other Series.

District #2 Master Indenture at 1-2 (emphasis added). Thus, the revenues from the Debtors' Development flow through the Districts, in trust, to the Bondholders.

33.     Accordingly, the treatment proposed under the Plans for the Bond Debt Special Assessments will simply flow through the Districts to the Bondholders. Under the Plans, the Bondholders will in effect lose the right to cause the foreclosure for the Debtors' defaults on the Bonds and be forced to receive deferred cash payments on the Bonds without ever having cast a vote on such treatment or having the propriety of such treatment tested by a cram down hearing under Section 1129(b).

34.     Moreover, the Debtors' improper solicitation of the homeowners of the Fiddlers' Creek community shows that the Debtors' lack of good faith arises not merely from Plans that

are antithetical to the reorganization provisions of the Bankruptcy Code but also an intent to abuse the judicial process. Not content with denying the Bondholders' ballots in this case, the Debtors have actively frustrated the Bondholders' efforts to cause the Districts to comply with Florida and federal law and the Indentures, and have violated the disclosure and solicitation provisions of the Bankruptcy Code, by improperly soliciting the homeowners.

35.     As is shown more fully in the Improper Solicitation Motion, the Debtors' improper solicitations are misleading in three material respects. First, the treatment of the Off Roll Bond Debt Special Assessments is mischaracterized as "in full with interest." In fact, the Bond Debt Special Assessments are not being paid in full. Worse, this statement seriously mischaracterizes the consequences of the Debtors' proposed treatment of the Bond Debt Special Assessments. Contrary to the ordinary meaning of "paid in full," the Districts will remain in default to the Bondholders following any confirmation of the Plans, and the Bondholders will retain their rights against the Districts. Second, the improper solicitations misleadingly omit material facts, such as the facts that the Off Roll Bond Debt Special Assessments will be negatively amortized under the Plans and the committed exit financing will not furnish sufficient liquidity for the Debtors post-confirmation. Third, the improper solicitations ignore the carefully drawn distinctions in the Disclosure Statement among the Debtors' 11 separate Plans and engage in scaremongering, creating the false impression that absent confirmation of the Plans, the Fiddler's Creek community will not survive.[3]

36.     In addition to misleading the homeowners, the purpose underlying the improper solicitations goes to the heart of the Debtor's lack of good faith. The purpose of the improper

---

[3]     In addition to showing the Debtors' lack of good faith, these improper solicitations conclusively establish that the Debtors failed to comply with Section 1125, as is shown in the Improper Solicitation Motion. Accordingly, the Court must deny confirmation because the plan proponents, the Debtors, cannot show that they complied with all applicable provisions of title 11. *See* 11 U.S.C. § 1129(a)(2).

solicitations is to cause the Districts to accept the Plans with respect to the treatment of the Bond Debt Special Assessments. This purpose is a key part of the Debtors stratagem to engineer an acceptance by the Districts with respect to the Bond Debt Special Assessments—notwithstanding the opposition of the Bondholders who have the true financial stake in the proposed restructuring of the Bond Debt Special Assessments—so as to deprive the Bondholders the opportunity to put the Debtors to prove their case under Section 1129(b). The support of the homeowners is essential for this strategy because the Districts have asserted that they are conflicted with alleged duties the Districts claim to owe to the homeowners, and such conflicted loyalties to the homeowners would furnish the sole basis for the Districts voting on the Plans in a manner contrary to Bondholder direction. The Debtors desperately seek to avoid a cramdown hearing under Section 1129(b) because as is shown below the Plans are not "fair and equitable" and do "unfairly discriminate." The intent to strip the Bondholders of the protections afforded them under Section 1129(b) shows the Debtors' lack of good faith.

37. The proposed treatment of the O&M Assessments, which is that those assessments are made current on the effective date and paid current thereafter, shows the Debtors' effort to curry favor with the Districts to cause the Districts to accept the Plans over the objections of the Bondholders and to avoid giving the Bondholders the protections of Section 1129(b).

38. The Debtors' desperation, and lack of good faith, is further illustrated by their conduct—which one board member for District #1 described as "blackmail"[4]—in connection

---

[4] Minutes of Meeting, District #1 & District #2, at 5 (Aug. 25, 2010), a copy of which is attached hereto as Exhibit "C" ("Aug. 25 Minutes").

with District #2 and the Indenture Trustee's Single Asset Real Estate Motion.[5]  Before the

Debtors' "blackmail," in a duly organized and properly conducted public meeting, District #2

voted to take no action on the Single Asset Real Estate Motion.[6]  Indeed, at that meeting District

#2's counsel "confirmed his belief that this is a single asset bankruptcy."[7]  The Debtors, not

satisfied with "no action" and desirous of District #2's "joinder" in the Debtors' opposition to the

Single Asset Real Estate Motion, threatened a funding shortfall.[8]  This threat was the act one

board member called "blackmail."[9]  This threat worked.  The District Manager, in what appears

to be a unilateral act, directed District #2's bankruptcy counsel to join the Debtors' opposition

and only after the fact, was this act ratified by District #2.[10]

      39.    Furthermore, the lack of good faith is shown by the Debtors' favorable treatment

of insiders and related entities.  The most egregious example of this favorable treatment and

sharp practice is the consummation under the Plans of the tax certificate scheme engaged in by

Mr. Ferrao, the President of the Debtors, through a non-debtor affiliate, Gulf Bay 400, LP.

Rather than providing DIP funding for the Debtors to pay past due taxes and, therefore, eliminate

accruing 18% interest on those tax certificates, Mr. Ferrao, through Gulf Bay 400, LP, purchased

hundreds of tax certificates, totaling nearly $1 million in debt, on which the Debtors and their

property are obligated.  As a result, the Debtors are continuing to suffer 18% interest on debt

owed to its own equity and its own DIP lender.  The Debtors' Plans contemplate that exit

---

[5]   "Single Asset Real Estate Motion" means the *Motion for Entry of an Order Determining that Certain Debtors are Subject to the Single-Asset Real Estate Provisions of the Bankruptcy Code* filed by the Indenture Trustee.

[6]   Minutes of Meeting, District #1 & District #2, at 5 (Jul. 28, 2010), a copy of which is attached hereto as Exhibit "D" ("Jul. 28 Minutes") at 4.

[7]   Jul. 28 Minutes at 3.

[8]   Aug. 25 Minutes at 4-5.

[9]   Aug. 25 Minutes at 5.

[10]   Aug. 25 Minutes at 5 & 8

financing will be used to pay these tax certificates, including the accrued interest. Rather than provide DIP financing at a lower interest rate, Debtors' equity took personal advantage of the Debtors to obtain this inflated return when funds were obviously available for the Debtors to have paid the taxes.

40.     In addition to the tax certificate scheme, the Plans provide favorable treatment to insiders or related entities as follows:

(i.)     Debtors exit financing pays a non-debtor affiliate—Gulf Bay Capital, Inc. —prior to its most senior secured debt. Debtors are making this preferred payment despite previously indicating that the DIP financing would not prime or otherwise adversely affect the holders of the CDD bond debt.

(ii.)    Moelis & Co. only sought capital that was advantageous to Debtors' equity, Mr. Ferrao, without regard to more appropriate alternatives available to Debtors.

(iii.)   The homeowners association at the Fiddler's Creek development is a nondebtor affiliate, the Foundation, which generates substantial profits by significantly burdening the Debtors' properties. For example, upon any sale of property within Fiddler's Creek, whether directly from the Debtor or on the secondary market, there is a mandatory capital assessment upon the sold lot of $16,000 that must be paid to the Foundation. This sum is in addition to yearly assessments. This $16,000 per lot assessment acts as a significant deterrent to outside developers that might provide a more advantageous exit strategy for the Debtors. Additionally, this $16,000 per lot assessment has been utilized as a threat to secured creditors that would seek to assert their rights and foreclose. Not surprisingly, several other non-debtor affiliates have contracts with the Foundation, including a management contract which permitted significant returns to Debtors' equity and non-debtor affiliate. This arrangement has been referred to in open court, by a party other than the Indenture Trustee, as a "profit sweep" of the significant funds acquired by the Foundation.

(iv.)    A non-debtor affiliate, GB 31, Ltd., which appears to be the only declarant to the Foundation that did not file a petition for bankruptcy relief with this Court, owns certain of the most attractive property for immediate construction and sale within Fiddler's Creek. This property, which is not subject to secured bank debt, was transferred to GB 31 by a Debtor entity.

This favorable treatment of insiders, particularly where the Debtors fail to use the full reach of their resources to repay creditors, shows the Debtors' lack of good faith. *In re Walker*, 165 B.R.

994, 1001 (E.D. Va. 1994) ("the failure of a debtor to use the full reach of its disposable resources to repay creditors is evidence that a plan is not proposed in good faith because such conduct frustrates this objective").

41.     Finally, the Debtors' lack of good faith is further evidenced by the proposal in certain of the Plans[11] to "restructure" the Bond Debt Special Assessments for the benefit of junior secured creditors, Regions Bank, N.A. and Fifth Third Bank, N.A.   The Debtors are attempting to restructure certain of the Bond Debt Special Assessments for the benefit of a third party junior secured creditor.   The Debtors are transferring value from their most senior secured creditors to their junior creditors so as to have the Bondholders pay the cost of the purported consensual resolution of the claims of Regions Bank and Fifth Third Bank.   This unsanctioned transfer of value has the effect of increasing the value retained by the Debtors' insiders and shows further favorable treatment for the Debtors' insiders at the expense of the Bondholders.

42.     Taking account of the totality of the circumstances, the Plans are the consummation of the Debtors' strategy to deny the Bondholders—the Debtors' most senior secured debt and the source of financing that made the Development possible—a vote or a cram down hearing, while engaging in favorable self-dealing with insiders and related entities.   Such plans cannot possibly be, and are not, proposed in good faith.

**B.     The Plans are forbidden by law.**

43.     In addition to requiring that a chapter 11 plan is proposed in good faith, Section 1129(a) of the Bankruptcy Code also provides that "the court shall confirm a plan only if . . . (3) [t]he plan has been proposed . . . not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

---

[11]   Specifically, the following three Plans: the Second Amended Joint Plan of Reorganization for GBFC Development, Ltd. and GBFC Development, LLC; Second Amended Joint Plan of Reorganization for 951 Land Holdings, Ltd. and 951 Land Holdings, LLC; and Second Amended Joint Plan of Reorganization for GBP Development, Ltd. and GBP Development, LLC.

This prohibition against chapter 11 plans "forbidden by law" is "expansive" and includes state law. *In re Dapontes*, 364 B.R. 866, 867-68 (Bankr. D. Conn. 2007) (holding that Section 1129(a)(3) incorporates state law prohibiting assignment of future wages); *see also In re Zenith Electronics Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999) (finding that Section 1129(a)(3) incorporate Delaware corporations law). Where a plan provision violates state law, confirmation must be denied. *In re American Capital Equipment, Inc.*, 405 B.R. 415, (Bankr. W.D.Pa. 2009) (denying confirmation because plan proposed assignment of personal injury tort claims in violation of state law); *Zenith Electronics Corp.*, 241 B.R. at 108 (individual chapter 11 plan could not be confirmed because plan proposed an assignment of debtor's future wages in violation of state law). Because the proposed treatment of the Bond Debt Special Assessments without regard for the effect that treatment has on the Bonds violates the Act and other provisions of Florida law, the Plans cannot be confirmed.

44.     The proposed treatment of the Bond Debt Special Assessments violates the Act and other provisions of Florida law because the Debtors propose to increase the outstanding principal amount of the Bond Debt Special Assessments without a commensurate increase in the benefit to the burdened property. Under Florida law, a special assessment requires a special benefit to property. The amount of special assessment debt burdening a specific piece of real property must be commensurate with the amount of benefit that such property has received from assessable, capital improvements. If no benefit correlates to the special assessments, the special assessments are at risk of being deemed invalid thereby leaving the Bondholders with no security.

45.     A special benefit to assessed property requires evidence to support findings of special benefit, such as studies, testimony, or expert opinion indicating how an assessment

specially benefits the particular real property. Moreover, a legislative body "cannot by its fiat make a local improvement of that which in its essence is not such an improvement, and it cannot by its fiat make a special benefit to sustain a special assessment where there is no special benefit." *City of North Lauderdale v. SMM Properties, Inc.*, 825 So.2d 343, 348 (Fla. 2002) (citing *South Trail Fire Control Dist. v. State*, 273 So.2d 380, 383 (Fla.1973) (quoting 48 Am.Jur., Special or Local Assessments, § 29, at 589 (1943)).

46.     With respect to off-roll Bond Debt Special Assessments, the Debtors propose to add "unpaid and accrued interest" to the outstanding principal amount of the respective special assessments. Debtors should provide evidence to support their implied conclusion that the addition of "unpaid and accrued interest" to the respective special assessment tied to a particular series of Bonds (creating a larger assessment, and by the same token, a larger par amount of "New Bonds"), is supported by adequate benefit to the subject property. Absent such a showing, the Plans cannot and do not comply with Florida law.

47.     Moreover, it is questionable whether creating a larger, par amount of bonds is consistent with federal tax law governing tax exempt securities. Debtors, through the Districts, and without the consent of the Bondholders or guidance from tax and bond counsel, are essentially attempting to do a wholesale restructuring of the Bonds. Allowing confirmation of the Plans to ostensibly achieve these goals will have disastrous effects across the state of Florida with respect to municipal financing generally and CDD financing in particular.

48.     Furthermore, the Plans misstate and are inaccurate as to the Bond Debt Assessments and the Bonds, including without limitation the following:

(a)     failure to account for the necessary replenishment of the reserve funds held under the Indentures.

(b)    deducting from outstanding principal the draws from the construction funds held under the Indentures, when the outstanding principal amounts of the Bonds already reflect such reductions as applicable.

(c)    Inconsistencies, such as under the "Claims Analysis," GBP Development, Ltd. Is said to be obligated only with regard to the CDD 2 Series 2004 Bonds; although under the actual Disclosure Statement and Plans, GBP Development Ltd. Is said to be obligated as to the CDD 2 Series 2003, 2004 and 2005 Bonds.

(d)    The maturity date of the CDD 2 2003 Bonds is stated to be 2035; in fact, the subseries each have different maturity dates: Series A-1 is 2016; Series A-2 is 2035; and Series B is 2013.

Because the Plans fail to accurately state these and other matters[12] they do not comply with the Act and other provisions of Florida law.[13]

49.    In sum, Debtors' Plans violate Florida law, and the District's contractual obligations, by providing for: (i) disparate treatment for "on roll" and "off roll" assessments, (ii) providing for increased burden on land they do not expect to sell while not increasing any benefit for such land (thereby putting the Assessments in question as to enforceability), (iii) changing the treatment of Bonds without amending the Indentures (which would require 100% Bondholder consent) which control the Bonds. Furthermore, Debtor's plans effectively restructure the Bonds such that under the Federal Tax Code of 1986 the Bonds are being reissued, but without the requisite federal law requirements, such that the interest on the Bonds may become taxable in the hands of the Bondholders, many of whom are legally prohibited from holding taxable debt instruments. Many of the Bondholders investors are retirees who depend upon tax exempt interest to survive and the inclusion of taxable interest will complicate financial matters for them, not to mention substantially lessen their return on their investment.

---

[12]    The Indenture Trustee objects to these and all other errors and inconsistencies; and reserves all rights as review of the Plans reveals additional errors.

[13]    For this reason, the Debtors and the Plans fail to accurately determine the amount of the Bond Debt Special Assessments as "claims" under Sections 502 and 506 of the Bankruptcy Code. Accordingly, they violate the provisions of title 11, do not comply with Sections 1129(a)(1) & (2), and therefore cannot be confirmed.

50.     The *de facto* restructuring of the Bonds, the tax issues related to such *de facto* restructuring, the failure to allow the Bondholders to have any effective say in the restructuring of their debt (let alone the 100% approval rights promised to them the Master Indentures), and the disparate treatment of "on roll" versus "off roll" regarding priority essentially take away most of the primary reasons Bondholders purchased these Bonds in the first place. Confirmation of these plans will create confusion in the multi $100 Billion land secured municipal debt sector on the order experienced in the variable rate demand bond sector of the bond market following the "*Twistcap*" decision. In addition to the effect the Debtors' confirmed plans would have Bondholders generally, the market for any future financings of this type (which remains an inexpensive and attractive manner in which to finance development or redevelopment in States such as Florida) will be seriously challenged give the prospective lack of purchasers for these securities due to the possibility of the interruption or abrogation of their legal and contractual rights.

**C.     The Plans are not feasible.**

51.     Section 1129(a)(11) of the Bankruptcy Code requires the Debtors to prove that confirmation of the Plans is not likely to be followed by the need to liquidate or otherwise engage in further financial reorganization. *See* 11 U.S.C. § 1129(a)(11). The Plans must be workable and stand a reasonable likelihood of success. *See In re Bravo Enterprises USA, LLC,* 331 B.R. 459, 474 (Bankr. M.D. Fla. 2005). "To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations." *In re Leslie Fay Companies, Inc.,* 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997); *accord In re Repurchase Corp.,* 332 B.R. 336, 343 (Bankr.N.D.Ill.2005) ("Confirmation should neither be based on speculation

nor the visionary projections of a debtor's champion."). The Plans do not and cannot satisfy the feasibility requirement.

52.     Factors the courts in Florida have considered in determining whether confirmation of a plan is likely to be followed by another bankruptcy filing include: (i) the adequacy of a debtor's capital structure; (ii) the debtor's earning power; (iii) economic conditions; (iv) the ability of management; (v) the probability of continuity in management; and (vi) any other factor that could influence whether the reorganization will be successful or not. *See In re Immenhausen Corp.*, 172 B.R. 343, 348 (Bankr. M.D. Fla. 1994); *In re Thurmon*, 87 B.R. 190, 191 (Bankr. .D. Fla. 1988). The Debtors' feasibility projections are unrealistically optimistic especially given current economic conditions. In particular, the Debtors have not properly taken into account the price declines in the market, and the lower absorption rates resulting from fewer high income individuals purchasing second homes. The Debtors' financial projections do not contain reasonable expectations for what builders will pay for raw lots. Also, the Debtors do not properly factor in increased competition from other distressed properties in the market, which will result in reduced home and land prices. *See In re SM 104 Ltd.*, 160 B.R. 202, 234 (Bankr. S.D. Fla. 1993) ("Section 1129(a)(11) requires the plan proponent to show concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the plan."). The fact that the Debtors are barely able to service their debts today, coupled with adverse market conditions, and the fact that the reorganized Debtors are thinly capitalized and are relying on overly aggressive financial projections, results in the Plan not being feasible. *See In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985) (a determination of feasibility must be "firmly rooted in predictions based on objective fact"); *In re Sovereign Oil Co.*, 128 B.R. 585, 587

(Bankr. M.D. Fla. 1991) (plans that involve "pipe dreams" or "visionary schemes" are not confirmable).]

## II. The Plans cannot be confirmed over the objection of the Bondholders because the requirement of Section 1129(b) is not met.

53.     A plan may be confirmed over the objection of a dissenting class of impaired claims only if (i) all other confirmation objections are satisfied under section 1129(a); (ii) the plan does not discriminate unfairly; and (iii) the plan is fair and equitable with respect to each rejecting class of impaired claims. 11 U.S.C. § 1129(b)(1). This is the so-called "cramdown" of the plan. Here, the Plans are not fair and equitable because the minimum requirements of Section 1129(b)(2)(A) are not met. The Plans proposed negative amortization does not provide market rate interest, unreasonably shifts risk of failure to Bondholders, and is not appropriate in this case. Moreover, the Plans do discriminate unfairly against the Off-Roll Bond Debt Special Assessments. Accordingly, the Plans cannot be confirmed over the objections of the Bondholders.[14]

## A. The Plans are not fair and equitable because the minimum requirements of Section 1129(b)(2)(A) are not met and the Plans' proposed negative amortization does not provide market rate interest, unreasonably shifts risk of failure to Bondholders, and is not appropriate in this case.

### i.     *The Plans do not meet the requirements of Section 1129(b)(2)(A)(i).*

54.     A plan may be crammed down on a class of secured claims under Section 1129(b)(2)(A)(i) if it provides that the holders of the secured claims retain the liens securing their claims (whether the property is retained by the debtor or transferred to another entity) to the extent of the allowed amount of those claims and that each holder receives deferred cash

---

[14]   Although the Districts have voted to submit acceptances of the Plans with respect to the Bond Debt Special Assessments, those acceptances are contrary to law for the reasons set forth in Injunction Proceeding filed by the Indenture Trustee and should be treated as a rejection. Moreover, the Indenture Trustee anticipates filing a motion to designate those acceptances as improper for the reasons set forth in the Injunction Proceeding, the Improper Solicitation Motion, and additional reasons.

payments having a value "as of the effective date of the plan" equal to the value of the secured

creditor's collateral. *See* 11 U.S.C. § 1129(b)(2)(A)(i). Although the phrase "as of the effective

date of the plan" is not defined in the Bankruptcy Code, the legislative history and the case law

make clear that this phrase means "present value." H.R. Rep. No. 95-595, 95th Cong., 1st Sess.

304, 468 (1977) (The phrase "as of the effective date" "contemplates a present value analysis

that will discount value to be received in the future"); *see also Matter of Southern States Motor*

*Inns, Inc.*, 709 F,.2d 647, 650 (11th Cir. 1983) ("as of the effective date" under section

1129(a)(9) means "present value"). *In re Fisher*, 29 B.R. 542, 543 (Bankr.D.Kan.1983) defined

present value in the following manner:

> [present value is not] a legal concept, but rather it is a term of art in
> the financial community. It simply means that a dollar received
> today is worth more than a dollar to be received in the future. To
> compensate the creditor for not receiving its money today, the
> debtor is charged an additional amount of money. The charge is
> based on a rate of interest called a "discount rate." The discount
> rate is used to calculate how much the creditor should be paid so it
> will have the same amount of money in the future as it would have
> had if it did not have to wait to be paid.

Thus, to pass the test of Section 1129(b)(2)(A)(i)(II), the Plans must propose an appropriate

discount rate.

55.     The Bankruptcy Code does not specify how bankruptcy courts are to calculate the

appropriate discount rate. The most widely-accepted standard has been that the discount rate

paid by the debtor "should correspond to the rate of interest which would be charged or obtained

by a creditor making the loan to a third party with similar terms, duration, collateral and risk." *In*

*re Landmark at Plaza Park, Ltd.*, 7 B.R. 653, 657 (Bankr. D.N.J. 1980). The Eleventh Circuit

has adopted this standard in construing the same statutory language under Section 1129(a)(9)(C),

and has held that the discount rate should be determined by looking to the prevailing market rate

for comparable loans. *See Southern States Motor Inns, Inc.*, 709 F.2d at 652 (11th Cir. 1983).

More specifically, the Eleventh Circuit stated that the discount rate should be determined as follows:

> The appropriate discount [interest] rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount [interest] rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

*Id.* (alterations in original; citation omitted). Accordingly, the Plans must provide for a discount rate equal to the prevailing market rate of interest determined by analyzing the market rate of interest for a comparable loan. *See id.*; *see also In re New Midland Plaza Assocs.*, 247 B.R. 877, 889 (Bankr. S.D.Fla. 2000).[15]

56.     As will be demonstrated at confirmation, the Debtors' proposal to use the same interest rate uased when the Bonds were issued, up to nine years ago, is not appropriate, given the higher rate in the current market, and the changed risk profile for Fiddler's Creek.   The testimony at confirmation will establish that the current market rate for comparable bonds is significantly higher than what the Debtors have proposed.   Moreover, the deferral of interest payments for an additional one or two years is not consistent with market terms.

> ii.     *The Plans' proposed negative amortization does not provide market rate interest, unreasonably shifts risk of failure to Bondholders, and is not appropriate in this case.*

57.     Negative amortization means a plan "provision wherein part or all of the interest on a secured claim is not paid currently but instead is deferred and allowed to accrue," and the

---

[15]   In *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), a plurality of the Supreme Court held that the proper method for determining the discount rate in a Chapter 13 cramdown case is the "formula method," which requires the adjustment of the prime national rate of interest (or some other appropriate riskless interest rate) based on the risk of non-payment.   However, that same plurality suggested that in a Chapter 11 case where an efficient market exists, the discount rate should be equal to the market rate. *Id.* at 476 n.14.   Because an efficient market exists in this case, there can be no question that the Plans must propose a discount rate equal to the market interest rate.

accrued interest is added to principal and paid at a later time when, the debtor hopes, income is higher. *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1176 (9th Cir. 1992). Whether a plan that provides for negative amortization is fair and equitable must be determined on a case-by-case basis. *Id.* at 1176. Negative amortization is disfavored and is rarely approved. *See id.* at 1177. In the rare case that negative amortization is approved, a "necessary, but not sufficient factor" is that the plan must provide for a market rate of interest. *Id.*

58.     Thus, as a threshold matter, the negative amortization provided for in the Plans is not fair and equitable because, as explained above, the Plans do not provide a market rate of interest. Even if the interest rate provided for in the Plans was increased to a market rate, the negative amortization provided for in the Plans would not be fair and equitable.

59.     In addition to market interest, courts analyze the following factors as relevant to whether negative amortization is fair and equitable:

- Is the amount and length of the proposed deferral reasonable?
- Is the ratio of debt to value satisfactory throughout the plan?
- Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible?
- What is the nature of the collateral, and is the value of the collateral appreciating, depreciating or stable?
- Are the risks unduly shifted to the creditor?
- Are the risks borne by one secured creditor or class of secured creditors?
- Does the plan preclude the secured creditor's foreclosure?
- Did the original loan terms provide for negative amortization? and
- Are there adequate safeguards to protect the secured creditor against plan failure?

*Great Western Bank*, 953 F.2d at 1178. All nine of these factors weigh against concluding that the negative amortization proposed in the Plans is fair and equitable, even if the Plans are amended to provide for the "necessary, but not sufficient, factor" of market rate interest.

60. Moreover, the negative amortization provision shifts all of the risk of failure of the Plans to **only** the Bond Debt Special Assessments, because they are the only claims not brought current or otherwise treated in a consensual manner under the Plans. This treatment is not provided for under the original loan terms, and there are no safeguards to protect the Districts or the Bondholders from the failure of the Plans. Thus, the last five of the factors also all weigh against approving negative amortization here.

61. In addition, the inclusion of a negative amortization provision in the three Plans that propose to transfer certain property of the Debtors to Regions Bank and Fifth Third Bank subject to the "restructure" Bond Debt Special Assessments is wholly inappropriate. The cornerstone of the negative amortization analysis is fairness. *See Great Western Bank*, 953 F.2d at 1177-78. Outside of bankruptcy, upon default, a senior secured creditor is entitled to apply the value of the property in which it has a lien to the payment of the full amount of the secured debt before any value from the property flows down to junior secured creditors. Here, where the Debtors are surrendering certain of their estates' property to junior secured creditors, there is nothing fair in altering this non-bankruptcy outcome and allowing the value of that property to inure to the junior secured creditors before the senior creditor.

## B. The Plans unfairly discriminate against the Off-Roll Bond Debt Special Assessments.

62. The "unfair discrimination" test requires that similarly situated creditors, even those separately classified, must be treated equally. Although this test does not apply to secured claims with liens on different collateral with different priorities, it does apply to secured claims with liens on the same collateral and with equal priority. Although "unfair discrimination" is not defined in the Bankruptcy Code, the modern test holds that

> a rebuttable presumption that a plan is unfairly discriminatory will arise when there is: (1) a dissenting class; (2) another class of the

> same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a material lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of the percentage recovery, an allocation under the plan of material greater risks than the dissenting class in connection with its proposed distribution.

*In re Dow Corning Corp.*, 244 B.R. 705, 710-11 (Bankr. E.D. Mich. 1999).

63.     Applying this test to the On-Roll Bond Debt Special Assessments, it is clear that the Plans unfairly discriminate. The first and second elements of the test above are met: the Off-Roll Bond Debt Special Assessments are the "dissenting class," and the On-Roll Bond Debt Special Assessments and the O&M Assessments are each "another class of the same priority." The third element is also met: the Plans allocate materially greater risks to the Off-Roll Bond Debt Special Assessments because with respect to the Off-Roll Bond Debt Special Assessments, the Plans propose to "capitalize" the Debtors' defaulted interest payments and additional post-confirmation "deferred" interest payment, but, by contrast, the Debtors propose to bring the On-Roll and O&M assessments current at confirmation and to continue to make payments currently. This proposed treatment is particularly unfair with respect to the O&M assessments because the transparent purpose of this treatment is to curry favor with the homeowners and the Districts.

## Conclusion

WHEREFORE, the Indenture Trustee respectfully requests entry of an order denying confirmation of the Plans.

Dated May 12, 2011.

Warren S. Bloom, Esq.
Florida Bar #: 838616
Email: bloomw@gtlaw.com
Amy E. Lowen, Esq.
Florida Bar #: 0492248
Email: lowena@gtlaw.com
GREENBERG TRAURIG, P.A.
450 South Orange Avenue, Suite 650
Orlando, FL 32801
Phone: (407) 420-1000
Facsimile: (407) 420-5909

John B. Hutton
Florida Bar # 902160
GREENBERG TRAURIG, P.A.
333 Avenue of the Americas
Miami, FL 33131
Phone (305) 579-0500
Facsimile: (305) 579-0717
Email: huttonj@gtlaw.com

BY: _____
       JOHN B. HUTTON

Thomas M. Messana, Esq.
Florida Bar No. 991422
MESSANA, P.A.
401 East Olas Boulevard
Suite 1400
Ft. Lauderdale, FL 33301
Phone: (954) 712-7400
Facsimile: (954) 712-7401
Email: tmessana@messana-law.com

W. Keith Fendrick
Florida Bar # 612154
HOLLAND & KNIGHT LLP
P.O. Box 1288
Tampa, FL 33601-1288
Phone (813) 227-6707
Facsimile: (813) 229-0134
Email: keith.fendrick@hklaw.com

BY: _/s/ Thomas M. Messana_____
       THOMAS M. MESSANA

BY: _____/s/ W. Keith Fendrick____
       W. KEITH FENDRICK

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2011, I electronically filed the foregoing with the Clerk

of the Court using CM/ECF. I also certify that the foregoing document is being served this day

on all counsel of record or pro se parties identified on the Service List below, either via

transmission of Notices of Electronic Filing generated by CM/ECF or by first class U.S. Mail,

postage prepaid, for those counsel or parties who are not authorized to receive electronically

Notices of Electronic Filing.

_____
JOHN B. HUTTON

## Electronic Mail Notice List

The following is the list of parties who are currently on the list to receive e-mail notice/service
for this case:

Amanda L Barton on behalf of Creditor The ITG Tax Free Income & Capital Appreciation Fund,
LTD abarton@itgholdings.com, asanford@itgholdings.com

Paul J Battista on behalf of Accountant Soneet Kapila and Kapila & Company pbattista@gjb-
law.com, gjbecf@gjb-law.com

Jules S Cohen on behalf of Creditor COLONNADE PROPERTIES LLC jcohen@akerman.com

Roberta A Colton on behalf of Financial Advisor Moelis & Company, LLC
racolton@trenam.com, jjcarminati@trenam.com

Robert A DeMarco on behalf of Creditor Fiddler's Creek Community Development District #2
rdemarco@swflalaw.com, fdemarco@swflalaw.com

Kathleen L. DiSanto on behalf of Creditor Glenn Vician ecf@jennisbowen.com,
jandb.ecf@gmail.com;kkearney@jennisbowen.com

W Keith Fendrick on behalf of Creditor U.S. Bank National Association, as Trustee to Fiddler's
Creek Community Development District #2's Special Assessment Revenue Bonds Series 2003 A
and Series 2003B keith.fendrick@hklaw.com, andrea.olson@hklaw.com

Debi Evans Galler on behalf of Accountant Christopher Tierney dgaller@bergersingerman.com,
efile@bergersingerman.com;jalvarez@bergersingerman.com

Mariaelena Gayo-Guitian on behalf of Accountant Soneet Kapila and Kapila & Company
mguitian@gjb-law.com, chopkins@gjb-law.com;ktoland@gjb-law.com;ablye@gjb-law.com

Alberto F Gomez on behalf of Creditor Alexander Love algomez@morsegomez.com,
awestcott@morsegomez.com;agomez@morsegomez.com

Douglas R Gonzales on behalf of Creditor Fiddler's Creek Community Development District I
dgonzales@wsh-law.com

Rachel S Green on behalf of Defendant Naples Landing Group, L.C. rgreen@forizs-dogali.com,
rbrown@forizs-dogali.com;jewusiak@forizs-dogali.com

Laura Fortney Gross on behalf of Creditor Regions Bank lgross@gunster.com,
jhoppel@gunster.com

Jordi Guso on behalf of Creditor Committee The Official Unsecured Creditors' Committee
jguso@bergersingerman.com, fsellers@bergersingerman.com;efile@bergersingerman.com

Jennifer Hayes on behalf of Creditor c/o Mark J. Wolfson Fifth Third Bank jhayes@foley.com,
btanner@foley.com

Mark D. Hildreth on behalf of Creditor Iberiabank mhildreth@slk-law.com, dcooper@slk-law.com

Bart A Houston on behalf of Debtor Fiddler's Creek, LLC bhouston@gjb-law.com,
cbucolo@gjb-law.com;vlambdin@gjb-law.com

John B Hutton on behalf of Creditor U.S. Bank National Association huttonj@gtlaw.com,
thompsonc@gtlaw.com;MiaLitDock@gtlaw.com;miaecfbky@gtlaw.com

Diane L. Jensen on behalf of Creditor Regions Bank bankruptcy@paveselaw.com

A. Christopher Kasten on behalf of Creditor Steve Taub ckasten@bushross.com,
sgraham@bushross.com

Donald R Kirk on behalf of Creditor Florida Financial Investments, Inc.
dkirk@fowlerwhite.com,
kthompson@fowlerwhite.com;anita.flowers@fowlerwhite.com;Hema.Persad@fowlerwhite.com

David M Landis on behalf of Creditor Tomen America, Inc. dlandis@mateerharbert.com,
rpinkston@mateerharbert.com;skrause@zeklaw.com;nschwed@zeklaw.com

Hywel Leonard on behalf of Creditor MUNB Loan Holdings LLC hleon@carltonfields.com,
lrodriguez@carltonfields.com;tpaecf@cfdom.net

Stephen R Leslie on behalf of Creditor Gulf Bay Capital, Inc. sleslie.ecf@srbp.com,
srbpecf@srbp.com;mclift@srbp.com

Angelina E Lim on behalf of Plaintiff MMA Financial CDD Sponsor, LLC
angelinal@jpfirm.com, barbarab@jpfirm.com;minervag@jpfirm.com

Amy E Lowen on behalf of Creditor U.S. Bank National Association lowena@gtlaw.com,
tjong@gtlaw.com;farnumj@gtlaw.com;rifkenl@gtlaw.com

Michael C Markham on behalf of Plaintiff MMA Financial CDD Sponsor, LLC
mikem@jpfirm.com, barbarab@jpfirm.com;minervag@jpfirm.com;angelinal@jpfirm.com

Aleida Martinez-Molina on behalf of Creditor Fiddler's Creek Community Development District
I amartinez@wsh-law.com, maracher@wsh-law.com

Thomas M Messana on behalf of Creditor U.S. Bank National Association as Trustee for
Fiddler's Creek Community Development District #1 Special Assessment Revenue Bonds Series
2005 and District #2 Special Assess. Rev. Bonds S tmessana@mws-law.com,
sunderwood@mws-law.com;blieberman@mws-law.com;emair@mws-law.com;nbarrus@mws-
law.com;thurley@mws-law.com

Raymond V Miller on behalf of Creditor Regions Bank rmiller@gunster.com,
vyon@gunster.com

Alan J Perlman on behalf of Creditor PEPI Capital, L.P. aperlman@ralaw.com,
msaez@ralaw.com;aalu@adorno.com

Patricia Redmond on behalf of Creditor Stearns Weaver Miller Weissler Alhadeff & Sitterson,
P.A. predmond@stearnsweaver.com, rross@stearnsweaver.com;mmesones-
mori@stearnsweaver.com;jrivera@stearnsweaver.com

Ricardo A Reyes on behalf of Defendant GB 31, Inc. rar@tobinreyes.com,
april@tobinreyes.com

Michael L Schuster on behalf of Debtor Fiddler's Creek, LLC mschuster@gjb-law.com,
gjbecf@gjb-law.com

William J Simonitsch on behalf of Creditor PEPI Capital, L.P. bill.simonitsch@klgates.com,
joyce.lieberman@klgates.com;marc.pifko@klgates.com

Paul S Singerman on behalf of Creditor Committee The Official Unsecured Creditors'
Committee singerman@bergersingerman.com,
efile@bergersingerman.com;ctarrant@bergersingerman.com

Robert A. Soriano on behalf of Creditor Textron Financial Corporation SorianoR@gtlaw.com,
DevlinD@gtlaw.com

Trustee Services Inc (SM) sm@trusteeservices.biz

Scott A Underwood on behalf of Creditor U.S. Bank National Association, solely in its
capacities as trustee with regard to Fiddlers Creek Community Development District #1 Special

Assessment Revenue Bonds, Series 2005 and Fiddlers Creek sunderwood@mws-law.com, emair@mws-law.com;lcoffy@mws-law.com;tmessana@mws-law.com;thurley@mws-law.com;blieberman@mws-law.com;nbarrus@mws-law.com;dstern@mws-law.com;tmessana@bellsouth.net

United States Trustee - FTM USTPRegion21.TP.ECF@USDOJ.GOV

Glenn S Vician on behalf of Creditor Glenn Vician glennsvician2@bhbvonline.com

Jeffrey W. Warren on behalf of Creditor Banc of America Leasing & Capital, LLC jwarren@bushross.com, mlinares@bushross.com;bnkecf@bushross.com

J Steven Wilkes on behalf of U.S. Trustee United States Trustee - FTM steven.wilkes@usdoj.gov

Mark J. Wolfson on behalf of Creditor c/o Mark J. Wolfson Fifth Third Bank mwolfson@foley.com, btanner@foley.com;jhayes@foley.com

Heather L Yonke on behalf of Debtor 951 Land Holdings, LLC hyonke@gjb-law.com, gjbecf@gjb-law.com;hburke@gjb-law.com;gjbecf@gjb-law.com

## **Manual Notice List**

The following is the list of parties who are not on the list to receive e-mail notice/service for this case, and are therefore being served by first class U.S. Mail, postage prepaid, :

Paul S. Singerman, Esq.
Unsecured Creditors Committee
Berger Singerman
200 South Biscayne Boulevard
Miami, FL 33131-5308
Fiddler's Creek, LLC *et al.*
8156 Fiddler's Creek Parkway
Naples, Florida 34114

Fiddler's Creek, LLC *et al.*
3200 Tamiami Trail N.
Suite 200
Naples, Florida 34103

Avalon Risk Associates, Inc.
240 Cedar Knolls Road, Ste. 308
Cedar Knolls, NJ 07927

J. Steven Wilkes, Esq.
Office of the U.S. Trustee
501 East Polk Street
Tampa, Florida 33602

John and Val Enghauser
3792 Mahogany Bend Drive
Naples, Florida  34114-623

Fiddler's Debt Investor LLC
623 Fifth Avenue
18th Floor
New York, NY 10022

Fishkind & Assocs., Inc.
Henry H. Fishkind, Ph.D.
12051 Corporate Blvd.
Orlando, FL 32817

KeyBank National Association
c/o Michael P. Shuster
Porter, Wright, Morris & Arthur LLP
9132 Strada Place, 3rd Floor
Naples, FL 34108-2683

Glen and Kathleen Metelmann
9026 Cascada Way #201
Naples, Florida  34114-6458

Kimberly A Potter on behalf of Creditor Varenna Condominium Association, Inc.
McCumber Daniels Buntz Hartig Puig, PA
One Urban Centre
4830 West Kennedy Blvd, Ste 300
Tampa, FL 33609

Douglas J. Rillstone, Esq.
Broad and Cassel
215 South Monroe Street
Suite 400
Tallahassee, Florida  32301

Daniel Sussman
307 Saddlebrook Lane
Naples, FL 34110

Mark Woodward on behalf of Debtor Fiddler's Creek, LLC
Woodward,Pires & Lombardo PA
3200 Tamiami Trail N.
Suite 200
Naples, FL 34103

**Exhibit A**

**The Bonds and the Indentures**

U.S. Bank National Association serves as the ultimate successor trustee (the "Indenture Trustee"), with regard to each of the following bond issuances (collectively, the "Bonds") and under their respective indentures (collectively, the "Indentures;" all Indentures are as they may have been supplemented and/or amended from time to time in accordance with their terms):

- **Fiddler's Creek Community Development District Special Assessment Revenue Bonds, Series 1999A** and **Fiddler's Creek Community Development District Special Assessment Revenue Bonds, Series 1999B,** issued pursuant to that Master Trust Indenture, dated as of December 1, 1996, by and between Fiddler's Creek Community Development District and the Indenture Trustee (the "CDD #1 Master Indenture"), as supplemented by that Second Supplemental Indenture, dated as of May 1, 1999, by and between Fiddler's Creek Community Development District and the Indenture Trustee;

- **Fiddler's Creek Community Development District Special Assessment Revenue Bonds, Series 2002A** and **Fiddler's Creek Community Development District Special Assessment Revenue Bonds, Series 2002B,** issued pursuant to the CDD #1 Master Indenture, as supplemented by that Fourth Supplemental Indenture, dated as of March 1, 2002, by and between Fiddler's Creek Community Development District and the Indenture Trustee;

- **Fiddler's Creek Community Development District 1 Special Assessment Revenue Bonds, Series 2005,** issued pursuant to the CDD #1 Master Indenture, as supplemented by that Fifth Supplemental Indenture, dated as of December 1, 2005, by and between Fiddler's Creek Community Development District 1 and the Indenture Trustee;

- **Fiddler's Creek Community Development District 1 Special Assessment Revenue Refunding Bonds, Series 2006,** issued pursuant to the CDD #1 Master Indenture, as supplemented by that Fifth Supplemental Trust Indenture, dated as of November 1, 2006, by and between Fiddler's Creek Community Development District 1 and the Indenture Trustee;

- **Fiddler's Creek Community Development District #2 Special Assessment Revenue Bonds, Series 2003A** and those **Fiddler's Creek Community Development District #2 Special Assessment Revenue Bonds, Series 2003B,** issued pursuant to that Master Trust Indenture, dated as of June 1, 2003, by and between Fiddler's Creek Community Development District #2 and the Indenture Trustee (the "<u>CDD #2 Master Indenture</u>"), as supplemented by that First Supplemental Indenture, dated as of June 1, 2003, by and between Fiddler's Creek Community Development District #2 and the Indenture Trustee;

- **Fiddler's Creek Community Development District #2 Special Assessment Revenue Bonds, Series 2004,** issued pursuant to the CDD #2 Master Indenture, as supplemented by that Second Supplemental Indenture, dated as of November 1, 2004, by and between Fiddler's Creek Community Development District #2 and the Indenture Trustee;

- **Fiddler's Creek Community Development District #2 Special Assessment Revenue Bonds, Series 2005,** issued pursuant to the CDD #2 Master Indenture, as supplemented by that Third Supplemental Indenture, dated as of December 1, 2005, by and between Fiddler's Creek Community Development District #2 and the Indenture Trustee.

**Exhibit B**

**The Plans Proposing to Restructure the Bond Debt Special Assessments**

- Second Amended Joint Plan of Reorganization for 951 Land Holdings, Ltd. and 951 Land Holdings, LLC Pursuant to Chapter 11 of the United States Bankruptcy Code [D.E. 762].

- Second Amended Joint Plan of Reorganization for DY Land Holdings II, LLC, FC Commercial, LLC and FC Parcel 73, LLC Pursuant to Chapter 11 of the United States Bankruptcy Code [D.E. 754].

- Second Amended Joint Plan of Reorganization for DY Land Associates, Ltd. and DY Land Associates, LLC Pursuant to Chapter 11 of the United States Bankruptcy Code [D.E. 755].

- Second Amended Joint Plan of Reorganization for FC Gold, Ltd. and FC Golf, LLC Pursuant to Chapter 11 of the United States Bankruptcy Code [D.E. 764].

- Second Amended Joint Plan of Reorganization for GB Peninsula, Ltd. Pursuant to Chapter 11 of the United States Bankruptcy Code [D.E. 756].

- Second Amended Joint Plan of Reorganization for GBP Development, Ltd. and GBP Development, LLC Pursuant to Chapter 11 of the United States Bankruptcy Code [D.E. 763].