In re:                                                                      **Chapter 11**

| | |
|---|---|
| **FIDDLER'S CREEK, LLC** | **Case No. 8:10-bk-03846-KRM** |
| 951 LAND HOLDINGS, LLC | Case No. 8:10-bk-03852-KRM |
| DY ASSOCIATES, LLC | Case No. 8:10-bk-03856-KRM |
| GBFC DEVELOPMENT, LLC | Case No. 8:10-bk-03864-KRM |
| FC MARINA, LLC | Case No. 8:10-bk-03872-KRM |
| FC BEACH, LLC | Case No. 8:10-bk-03873-KRM |
| FC GOLF, LLC | Case No. 8:10-bk-03875-KRM |
| DY LAND HOLDINGS II, LLC | Case No. 8:10-bk-03878-KRM |
| FC PARCEL 73, LLC | Case No. 8:10-bk-03881-KRM |
| FC COMMERCIAL, LLC | Case No. 8:10-bk-03888-KRM |
| FC HOTEL, LLC | Case No. 8:10-bk-03886-KRM |
| FC RESORT, LLC | Case No. 8:10-bk-03896-KRM |
| GULF BAY HOSPITALITY COMPANY, LLC | Case No. 8:10-bk-03898-KRM |
| GULF BAY HOTEL COMPANY, LLC | Case No. 8:10-bk-03905-KRM |
| GBP DEVELOPMENT, LLC | Case No. 8:10-bk-03908-KRM |
| GB PENINSULA, LTD. | Case No. 8:10-bk-03909-KRM |
| 951 LAND HOLDINGS, LTD. | Case No. 8:10-bk-03911-KRM |
| DY LAND ASSOCIATES, LTD. | Case No. 8:10-bk-03918-KRM |
| GBFC DEVELOPMENT, LTD. | Case No. 8:10-bk-03920-KRM |
| GBFC MARINA, LTD. | Case No. 8:10-bk-03928-KRM |
| FC BEACH, LTD. | Case No. 8:10-bk-03934-KRM |
| FC GOLF, LTD. | Case No. 8:10-bk-03937-KRM |
| FC HOTEL, LTD. | Case No. 8:10-bk-03938-KRM |
| FC RESORT, LTD. | Case No. 8:10-bk-03947-KRM |
| GULF BAY HOSPITALITY, LTD. | Case No. 8:10-bk-03949-KRM |
| GULF BAY HOTEL COMPANY, LTD. | Case No. 8:10-bk-03950-KRM |
| GBP DEVELOPMENT, LTD. | Case No. 8:10-bk-03952-KRM |
| FIDDLER'S CREEK MANAGEMENT, INC. | Case No. 8:10-bk-03954-KRM |

**(Jointly Administered under**
**Debtors.**                                          **Case No. 8:10-bk-03846-KRM)**
_____/

**MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 363, 364 AND 1108**
**OF THE BANKRUPTCY CODE: (I) APPROVING THE SALE OF 91 FINISHED LOTS**
**IN VENETA VILLAGE AT FIDDLER'S CREEK (INCLUDING CHIASSO) TO D.R.**
**HORTON PURSUANT TO THE TERMS OF THE LOT PURCHASE AGREEMENT**
**RATIFIED ON MAY 26, 2011, (II) AUTHORIZING THE DEBTORS TO**
**CONSUMMATE THE SALE OF SUCH REAL PROPERTY FREE AND CLEAR OF**

**ALL LIENS, CLAIMS AND ENCUMBRANCES, WITH ALL SUCH LIENS, CLAIMS AND ENCUMBRANCES TO ATTACH TO
THE NET PROCEEDS THEREOF, AND (III) AUTHORIZING THE DEBTORS TO DISBURSE THE SALE PROCEEDS IN ACCORDANCE WITH THE TERMS OF THE SEVENTH INTERIM DIP ORDER AND ORDER APPROVING SETTLEMENT AND PLAN SUPPORT AGREEMENT WITH FIFTH THIRD BANK**

**Hearing Requested on or before June 30, 2011**

Fiddler's Creek, LLC ("Fiddler's Creek") and twenty-seven (27) of its subsidiaries and affiliates (collectively, the "Debtors" or "Company"), by and through their undersigned counsel, respectfully request the entry of an order pursuant to Sections 363(b), (f) and (m), 364 and 1108 of Title 11 of the United States Code (hereinafter the "Bankruptcy Code"), and Rule 6004(c) of the Federal Rules of Bankruptcy Procedure (i) approving that certain Lot Purchase Agreement (the "Agreement") between GBP Development, Ltd. (the "Selling Debtor") and DR Horton, Inc. (the "D.R. Horton" or "Purchaser"), ratified as of May 26, 2011 (the "Effective Date"), for the purchase of ninety-one (91) single-family finished lots in the Veneta subdivision within Fiddler's Creek (the "Veneta Lots"), which Veneta Lots include fifty-three (53) 65' lots in the village of Chiasso  (the "Chiasso Lots") and thirty-eight (38) 50' lots in the village of Amador, together with all related agreements, a copy of the Agreement is attached hereto as ***Exhibit A,*** (ii) authorizing the Debtors to pay, and approving payment of, all costs of sale payable by the Debtors in connection therewith, including real estate commissions, escrow fees, recording costs, real estate taxes, special assessments, including CDD "buy downs" to the extent applicable, and title insurance premiums, and (iii) authorizing the Debtors to disburse the sale proceeds in accordance with the terms of that *Seventh Interim Order Granting Motion Pursuant To Sections 361, 363, 364(C) And (D) Of The Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-*

*Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto* (the "Seventh Interim Order")[D.E. #N.A.] and that *Order (A) Granting Debtors' Motion Seeking Shortened Notice and Objection Periods on Motion for Entry of Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and (B) Authorizing and Approving Settlement and Plan Support Agreement between GBP Development, Ltd., and Fifth Third Bank* (the "Fifth Third Agreement")[D.E. #702]. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2). The statutory and legal predicates for the relief sought herein are sections 363(b), (f) and (m), 364 and 1108 of the Bankruptcy Code, and Rule 6004(c) of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

**A.      The Chapter 11 Filing**

2.      On February 23, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      On March 8, 2010, the Court entered an Order Granting Debtor's Emergency Motion for Order Directing Joint Administration of Chapter 11 Cases and jointly administering

the cases under Case No. 8:10-bk-03846-KRM as the designated lead case.

4.     No trustee or examiner has been appointed.

5.     On March 9, 2010, the Office of the United States Trustee's Office filed a Notice of Appointment of Homeowners' Committee [D.E. #72].

6.     On April 12, 2010, the Office of the United States Trustee's Office filed an Amended Notice of Appointment of Homeowners' Committee and Notice of Change of Designation From Homeowners' Committee to Official Unsecured Creditors' Committee [D.E. #132].

**B.     Background and Business Operations**

7.     Each of the Debtors in these Chapter 11 cases owns, operates and/or is otherwise affiliated with the premier, fully integrated, master planned residential community known as "Fiddler's Creek" in southwestern Florida.  Fiddler's Creek is located in Collier County, Florida, approximately 12 miles southeast of the City of Naples and six miles north of Marco Island. The Fiddler's Creek development is comprised of nearly 4,000 zoned acres of prime land in Naples, Florida, and is planned for and capable of accommodating up to 6,000 residences upon projected build-out, which is estimated to be in 2020.  Fiddler's Creek has been approved and vested by the State of Florida as a Development of Regional Impact.

8.     The property underlying Fiddler's Creek was accumulated by the Debtors from 1993 through 1996.  In 1998, Fiddler's Creek developed, constructed and sold its first home. Since then, Fiddler's Creek has constructed and sold in excess of 1,650 homes in the development.  As a result, Fiddler's Creek is home to over 4,300 full and part time residents.

9.     Fiddler's Creek contains five distinctive neighborhoods known as: Fiddler's Creek, Veneta, Aviamar, Marsh Cove and Meadow Run.   Within each of these

neighborhoods/subdivisions are several unique villages of varying housing products offering a wide range of price points. In total, there are 1,782 fully constructed and existing homes, including single family homes, coach homes and carriage homes in different communities within Fiddler's Creek. In addition, there is completed infrastructure for an additional platted 840 Lots of both single family homesites and multifamily lots within a variety of villages.

10.    In addition to the above saleable inventory of homes and developed lots, Fiddler's Creek contains approximately 2,100 acres of undeveloped land fully entitled for approximately 3,329 additional residential lots and amenities. This includes approximately 1,300 acres of the undeveloped land approved for future amenity development, including two golf courses, clubhouses, expanded tennis facilities, lakes, preserves and more. Less than one-third of Fiddler's Creek will be developed for residential use, while the remainder of the land is dedicated primarily to nature preserves, lakes, parks, golf courses and recreational areas.

11.    Still further, Fiddler's Creek contains substantial and fully completed operating amenities which are enjoyed by the homeowners, including: The Club & Spa at Fiddler's Creek, which is a 54,000 square-foot resort style clubhouse with state-of- the-art fitness facility, lighted tennis courts, full menu spa services, resort style multi-pool swimming complex, casual and formal dining venues and a meeting and activity center.

12.    For further information on the Debtors' capital structure, business and operations, the Debtors refer to the Declaration of Anthony DiNardo in Support of Chapter 11 Petitions and First Day Motions [D.E. #29] ("First Day Declaration").

C.    <u>The Senior Secured Priming DIP Loan from Gulf Bay Capital, LLC</u>

13.    On February 23, 2010, the Debtors filed their *Emergency Motion for Entry of Interim and Final Orders pursuant to Pursuant To Sections 361, 363, 364(C) And (D) Of The*

*Bankruptcy Code And Rule 4001 Of The Federal Rules Of Bankruptcy Procedure Authorizing (A) Debtors In Possession To Obtain Senior Secured Post-Petition Financing, (B) Granting Certain Priming Liens, (C) Approving Agreements Relating To The Foregoing, (D) Modifying The Automatic Stay, (E) Granting Super-Priority Administrative Claim Status, (F) Authorizing Use Of Cash Collateral And Granting Adequate Protection Therefor, (G) Scheduling A Final Hearing, And (H) Prescribing Form And Manner Of Notice With Respect Thereto* [D.E. #10] (the "DIP Motion"). In connection with the DIP Motion, the Court has authorized borrowings pursuant to that certain Interim Order, dated March 10, 2010 [D.E. #73] (the First Interim Order"), that certain Second Interim Order dated April 30, 2010 [D.E. #184] (the "Second Interim Order"), that certain Third Interim Order, dated July 26, 2010, [D.E. #310](the "Third Interim Order") that certain Fourth Interim Order, dated October 7, 2010 [D.E.#416] (the "Fourth Interim Order"), that certain Fifth Interim Order, dated December 28, 2010 [D.E. #576] and Sixth Interim Order, dated April 1, 2011 [D.E. #788].

14.     On May 27, 2011, the Court approved entry of a Seventh Interim Order which authorized the Debtors, among other things, to borrow from the DIP Lender one or more interim initial advances in an aggregate amount not to exceed the amounts set forth in the four (4) week period (the "Seventh Interim Period") contained in the budget admitted into evidence at the Seventh Interim Hearing up to a maximum borrowing of $5,330,899.00 when combined with the borrowings authorized by the Court pursuant to prior orders of the Court in respect of the DIP Motion.

15.     Specifically, as it relates to this Motion, and pursuant to the previous orders of the Court on the DIP Motion, the DIP Lender presently has and holds a first priming lien, mortgage and security interest on and against the Veneta Lots, senior in all respects to the existing, pre-

petition mortgage liens granted by the Debtors to all other secured creditors, provided however, that the Debtors reached a settlement with Fifth Third Bank that provides for the payment of certain of the proceeds from the sale of the Chiasso Lots to Fifth Third Bank as more fully set forth below.  Accordingly, all net proceeds from the sale of the Veneta Lots (including the Chiasso Lots) shall be paid to the DIP Lender and Fifth Third Bank after payment of Closing Expenses (as defined herein) in accordance with the Fifth Third Agreement.

D.    **The Settlement and Plan Support Agreement with Fifth Third Bank**

16.    Pre-petition, the Chiasso Lots were collateral to Fifth Third Bank pursuant to that certain Revolving Promissory Note executed by GBP Development, Ltd. to Fifth Third Bank ("Fifth Third") in the principal amount $23,000,000.00 (the "Fifth Third Note") and related mortgage and security documents.

17.    On February 25, 2011, the Court approved the Fifth Third Agreement which provides, among other things, that the GBP Debtors shall retain ownership of the Chiasso Lots and shall have control over the marketing, sale and/or development of the Chiasso Lots.  In connection therewith, Fifth Third agreed to amend and restate the loan documents evidencing and securing the Class 4 Secured Claim of Fifth Third with respect to the Chiasso Lots in the GBP Plan, in a form reasonably acceptable to Fifth Third, to provide that (i) the outstanding principal balance of the Class 4 Secured Claim of Fifth Third will equal $662,500 and be evidenced by a promissory note to Fifth Third (the "Split Fifth Third Note"), (ii) the Split Fifth Third Note shall be secured by the Mortgage originally securing the Class 4 Secured Claim of Fifth Third, as amended and restated (the "Split Mortgage") and shall encumber solely the Fifth Third Lots, (iii) the Split Mortgage shall contain a release provision that provides for the partial release of the lien of the Split Mortgage and any and all other claims and liens of Fifth Third, on

a Lot by Lot basis, on and in respect of each Chiasso Lot in exchange for the payment to Fifth Third of an amount equal to $12,500 per Chiasso Lot (the "Lot Release Price"), (iv) the Split Fifth Third Note shall have a maturity date of three (3) years from the effective date of this Plan (the "Maturity Date"), (v) the guaranty of GB Peninsula, Ltd. of the Class 4 Secured Claim of Fifth Third shall be deemed satisfied in full and GB Peninsula, Ltd. shall not guaranty the Split Fifth Third Note, (vi) no other payments shall be due under the Split Fifth Third Note, Split Mortgage and all related documents other than the Lot Release Price, and (vii) the Split Fifth Third Note and the Split Mortgage shall be non-recourse to the GBP Debtors and their successors, including under this Plan. If the Split Fifth Third Note has not been fully satisfied by the Maturity Date, interest at the rate of 18% per annum on the unpaid principal balance of the Split Fifth Third Note from and after the date of execution thereof shall be due and owing on a non-recourse basis, and Fifth Third shall be permitted to file an amended complaint for the aforesaid amounts plus reasonable fees and costs of foreclosure without effectuating new service of process and the GBP Debtors consent to the entry of a foreclosure judgment of the Split Mortgage in respect of the remaining Chiasso Lots.

## **RELIEF REQUESTED**

### **A.     Approval of the Sale of the Veneta Lots Free and Clear.**

18.     By this Motion, the Debtors request entry of an order, pursuant to sections 363(b), 363(f) and 363(m) of the Bankruptcy Code, authorizing the Selling Debtor to sell the Veneta Lots in the Veneta Subdivision of Fiddler's Creek (as more specifically identified in Exhibit A to the Agreement) and currently known as the 50' lots in Parcels 24 116 (collectively the "Amador Lots") and the 65' Chiasso Lots in Parcels 112A and 112B pursuant to the terms of the Agreement, free and clear of all liens, claims, encumbrances and interests to Purchaser. Of the

91 Veneta Lots proposed to be sold to Purchaser, there are fifty-three (53) Chiasso Lots which are collateral to Fifth Third Bank and the balance (38 lots) are unencumbered Amador Lots.

19.     As set forth above, the purchase price for each of the 65' Chiasso Lot is $130,000 (the "65' Lot Base Purchase Price") for a total consideration of $6,890,000.  The Purchase Price for each of the Amador Lots is $100,000 (the "50' Lot Base Purchase Price") for a total consideration of $3,800,000 (collectively the 65' Lot Base Purchase Price and the 50' Lot Purchase Price are referred to as the "Base Purchase Price").

20.     In addition to the Base Purchase Price, the Purchaser shall pay the Selling Debtor additional consideration for each Lot sold by Purchaser to a third party (the "Retail Purchaser"), an amount by which: (1) twenty (20%) of the total, final contract sales price of the Lot (containing a single-family residence constructed thereon) paid by the Retail Purchaser, as shown on the final HUD-1 Settlement Statement for closing of such sale (which shall include all charges for options, upgrades, premiums, extras and change orders) exceeds (2) the 50' Base Lot Purchase Price or the 65' Base Lot Purchase Price, as applicable (the "Additional Consideration").  The Base Purchase Price for the Lots plus the Additional Consideration set forth herein is referred to as the Purchase Price.

21.     The parties have also executed an Escrow Agreement attached hereto as ***Exhibit B*** (the "Escrow Agreement") which provides that the Purchaser shall deposit the sum of $50,000 (the "Earnest Money") with Woodward, Pires & Lombardo (the "Escrow Agent").   The Earnest Money shall be held and applied by the Escrow Agent against the Purchase Price at the closing on the last lot to be purchased pursuant to the terms of the Agreement.

22.     The Purchaser shall have a period of thirty (30) calendar days from the Effective Date to conduct its inspection (the "Inspection Period").  Prior to the expiration of the Inspection

Period, Purchaser will notify Seller that the Property suitable and it will issue a Notice of Suitability ("NOS") at which time the Deposit will become non-refundable except upon the Selling Debtors' default. In the event that Purchaser does not provide a NOS to the Selling Debtor by the end of the Inspection Period, and such failure continues for a period of ten (10) days after written notice from Seller, then the Agreement shall terminate automatically, and the Purchaser shall receive a refund of the Deposit paid.

23.     The purchase terms provide for the rolling purchase of the Veneta Lots with an initial purchase of 11 Amador Lots, and an additional 11 Amador Lots and 6 Chiasso Lots no later than 6 months following the initial closing.   The initial closing of the Veneta Lots (Lots 12 – 22 of the Fiddler's Creek Phase Four Unit Two, Block A ("Initial Closing lots") shall take place within fifteen (15) days after issuance of the NOS and is contingent only upon entry of an order of this Court (i) authorizing the Selling Debtor to execute the Agreement and (ii) approving the sale of the Veneta Lots free and clear of all liens, claims, and encumbrances.  Thereafter, the Purchaser shall close on the remaining 50' Lots and 65' Lots in accordance with the Closing schedule set forth in Exhibit C of the Agreement (the "Closing Schedule").

24.     The Purchaser has further agreed to pay Seller and/or Fiddler's Creek Realty, Inc. ("FCRI"), and affiliate of the Debtors, with respect to each Improved Lot sold a marketing fee in the amount of one (1%) percent for the sales and marketing efforts conducted by the Seller.  The Purchaser and FCRI will also enter into an Exclusive Listing Agreement regarding the sale of the Improved Lots.

25.     The Purchaser acknowledges that the Property to be conveyed is subject to (i) the Fiddler's Creek Community District #2 ("CDD") fees, taxes and/or assessment for the CDD debt service and maintenance; (ii) applicable homeowners' association annual assessments; and (iii)

the Amended and Restated Declaration of General Covenants, Conditions and Restrictions for Fiddler's Creek as supplemented and amended, together with Articles of Incorporation and Bylaws, as supplemented and amended, and the Design Review Criteria of the Fiddler's Creek Foundation, Inc., and the neighborhood covenants. The Purchaser further acknowledges that Fiddler's Creek Community offers certain recreational amenities, including: The Club & Spa at Fiddler's Creek, The Golf Club at Fiddler's Creek, and Tarpon Club (the "Amenities"). The Amenities shall be made available to Purchaser's Retail Purchasers and each such purchaser shall be required to pay upon the purchase of a home the applicable Assessments, including the Capital Acquisition Assessment (for membership to The Club & Spa at Fiddler's Creek), a Capital Reserve Assessment, a Telecommunication Services Assessment and an Annual Assessment. Membership in the Golf Club and the Tarpon Club is optional and shall be governed by the respective Membership Documents.

26. In connection with the closing of the Veneta Lots, the Debtors also request the authority to pay, upon consummation of the sale (i) any and all expenses and obligations required to be paid by the Debtors in connection with the closing of the Veneta Lots, (ii) real estate brokers' commissions to Fiddler's Creek Realty, Inc., a non-debtor affiliate of the Debtors and; (iii) title insurance (collectively the "Closing Expenses").

27. Notwithstanding the foregoing, the Veneta Lots shall remain subject to and the Purchaser takes subject to all special assessments levied or to be levied by the CDD for tax years 2010 and beyond solely with respect to the Veneta Lots, whether such special assessments are levied with regard to bonds issued by the CDD, with regard to operations and maintenance of the CDD, or otherwise (collectively, the "CDD Assessments For Tax Years 2010 And Beyond") and any and all liens of the CDD Assessments For Tax Years 2010 and beyond, none of which are or

will be affected by the Agreement, this Sale Motion, or order approving sale. Additionally, the Veneta Lots remain subject to and the Purchaser takes subject to all *ad valorem* taxes for tax year 2010 and beyond (collectively, the "Ad Valorem Taxes For Tax Years 2010 And Beyond") solely with respect to the Veneta Lots, and any and all liens of the Ad Valorem Taxes For Tax Years 2010 And Beyond, none of which are affected by the Agreement, this Sale Motion, or order approving sale.

28.     In addition to the above, the Debtors request the authority to disburse the net proceeds from the sale (after Closing Expenses) to Fifth Third Bank in an amount equal to the Lot Released Price with respect to each Chiasso Lot sold, with the balance of the net proceeds from the Chiasso Lots and the Unencumbered Lots being paid to the DIP Lender to reduce the DIP Loan.

## BASIS FOR RELIEF REQUESTED

### A.    Sale of Property in the Ordinary Course of Business.

29.     The Bankruptcy Code generally leaves undisturbed a debtor-in-possession's power to conduct normal business operations. Section 1108 provides broadly that "[u]nless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee [or debtor-in-possession] may operate the debtor's business." *See*, 11 U.S.C. §1108. Section 363 (c)(1) supplements the general power, stating that "[i[f the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee [or the debtor-in-possession] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. §363(c). Courts usually defer to the business judgment of a debtor/trustee in

deciding whether or not to authorize a debtor to sell property outside the ordinary course of business. *See, In re Continental Airlines, Inc*., 780 F.2d 1223 (5th Cir. 1986); *In re Lionel Corp*., 722 F.2d 1063, 1071 (2nd Cir. 1983); *In re Mason's Nursing Center, Inc*., 73 E.R. 360, 362 (Bankr. S.D. Fla. 1987).

30. As set forth above, the Debtors are and have been in the business of selling homes and lots, with hundreds of homes sold over the past four (4) years. As a result, the sale of the Veneta Lots is clearly within the Debtors' ordinary course of business. Moreover, the Debtors believe that the purchase price for the Veneta Lots is fair and reasonable. Additionally, the Debtors believe that the other terms of the Agreement are commercially reasonable and consistent with going market rate for sale of lots.

**B.**     **Sale of Property Free and Clear of all Liens, Claims and Encumbrances.**

31. Although, the Debtors assert that selling homes and lots is within the ordinary course of its business, the Debtors further request, pursuant to section 363 of the Bankruptcy Code, authorization to implement and close on the Veneta Lots, and to consummate the transactions contemplated therein by delivering title to the Veneta Lots to the Purchaser in accordance with the Agreement.

32. Specifically, the Debtors request authority to sell, assign and transfer the Veneta Lots to the Purchaser, pursuant to Section 363(b) of the Bankruptcy Code, which Section provides that a debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate …." *See*, 11 U.S.C. §363(b).

33. Courts interpreting Section 363(b) have approved non-ordinary course sales, even where substantially all of a debtor's assets were being sold prior to proposal of a plan of reorganization. In the present case, the Debtors are not proposing to sell substantially all of their

assets. Rather, as set forth above, the sale of the Veneta Lots is in the ordinary course of business. However, the Debtors seek approval under Section 363(b) as well out of an abundance of caution. *In re Parkstone Med. Info. Sys.*,2001 WL 36189822 at *1 (Bankr. S.D. Fla. Oct. 16, 2001) (Hyman, J.); *In re Lionel Corporation*, 722 F.2d 1063, 1070-71 (2nd Cir. 1983); *In re Baldwin Lotsed Corp.*, 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984); *In re Tower Automotive, Inc.*, 342 B.R. 158, 163-64 (Bankr. S.D.N.Y. 2006 (discussing legal standards governing asset sales outside the plan process).

34. As a general rule, courts approve the sale of assets, including all or substantially all of a debtor's assets, prior to confirmation of a plan and pursuant to Section 363(b), provided the debtor establishes "sound business judgment" for such a transaction. *Parkstone Med. Info. Sys.*, 2001 WL 36189822; *In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995) ("courts consistently have acknowledged that assets of an estate can be sold prior to the confirmation, or even filing, of a plan").; *In re Lorraine Brooke Associates, Inc.*, 2007 WL 2257608 at *4 (Bankr. S.D. Fla. Aug. 2, 2007) (Cristol, J.) (applying business judgment test in assessing 363(b) motion in chapter 7 proceedings) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 175-176 (D. Del. 1991)); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991). The "sound business judgment" test requires a debtor to establish: (a) that a sound business reason justifies the sale outside the ordinary course of business, (b) that accurate and reasonable notice has been provided to interested parties, (c) that the debtor has obtained a fair and reasonable price, and (d) good faith. *Id.*; see also *In re Equity Management Systems*, 149 B.R. 120, 124 (applying same factors); *In re Phoenix Steel Corporation*, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (same); *In re Jon J. Peterson, Inc.*, 411 B.R. 131, 136 (Bankr. W.D.N.Y. 2009) (same) (citing *In re Lionel Corp.*, 722 F.2d at 1071 and *Phoenix Steel*, 82 B.R.

at 335).

35.     In the present case, there is no question that the sale of the Veneta Lots represents sound business judgment on the part of the Debtors.  Among other things, the sale establishes a renewed confidence in Fiddler's Creek and the Debtors' ability to operate a premier master planned residential community.

36.     Still further, the Purchaser is a third party national builder unrelated to the Debtors and the negotiations over the Agreement for the Veneta Lots were done at arms length and in good faith.  The Purchaser is not an insider of the Debtors within the meaning of Section 101(31) of the Bankruptcy Code, and does not control or act on behalf of any insider of the Debtors.  Therefore, the sale has been proposed in good faith.  *See In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) ("deference to a DIP's decision as to a successful bidder of its assets is appropriate, and that decision may be honored unless it is proven that the DIP abused that discretion"); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149, n.5 (3d Cir. 1986) (purpose of good faith requirement is to "prevent[] a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11."); see also *In re Lorraine Brooke Associates*, 2007 WL 2257608 at *4; *In re Grand Prix Associates, Inc.*, 2009 WL 1850966 at *4 (Bankr. D.N.J. June 26, 2009) ("A court may not find good faith if fraud, collusion, or unfair advantages are determined.") (citing *Abbotts Dairies*, 788 F.2d at 149-50).

37.     As a result, the Debtors assert that they have established the existence of sound business judgment in connection with the sale of the Veneta Lots under Section 363(b) of the Bankruptcy Code.  Moreover, the Purchaser is entitled to the protections of Section 363(m) of the Bankruptcy Code and the Debtors request that the Court make such finding in connection herewith.

**C.** **The Sale of the Veneta Lots Free and Clear of all Liens, Claims and Encumbrances pursuant to Section 363(f).**

38.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors are granted the statutory power to sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the five (5) enumerated conditions are satisfied (a) applicable non-bankruptcy law permits the sale of the property free and clear of such interest; (b) the entity holding the lien, claim or encumbrance consents to the sale; (c) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.   *See*, 11 U.S.C. §363(f).  It is obvious that the Debtors must have the ability to give the Purchaser good and marketable title free and clear of liens, claims, encumbrances and interests.  The sale of the Veneta Lots satisfies one or more of the conditions enumerated in section 363(f) of the Bankruptcy Code because the Debtors have the consent of the DIP Lender and Fifth Third Bank (including pursuant to the Fifth Third Agreement) to such sale.

### Notice

39.     This Motion and all attachments hereto shall be served via CM/ECF, E-Mail and/or U.S. Mail upon: (i) all parties listed on the Master Service List maintained by the Debtors, to the extent such party is registered to receive Notices of Electronic Filings via CM/ECF, E-Mail and/or U.S. Mail; (ii) all parties upon whom service is required pursuant to Rules 6004( c) and 6006, to the extent not listed on the Master Service List; (iii) all parties who have filed Notices of Appearance pursuant to Local Rule 9010-1 and who is registered to receive Notices of Electronic Filings via CM/ECF; (iv) each Prepetition Secured Lender, and  all parties asserting

16

liens; and (v) any other party which the Court directs.

      **WHEREFORE**, the Debtors respectfully request that this Court enter an order (i) approving the terms and conditions of the Agreement, (iii) authorizing the Debtors to consummate the sale of the Veneta Lots pursuant to the terms of the Agreement, free and clear of all liens, claims, encumbrances and interests of any kind, with such liens, claims and encumbrances to attach to the net proceeds thereof, (iv) authorizing the Debtors to disburse the net proceeds (after payment of Closing Expenses) from the sale of the Veneta Lots to Fifth Third Bank in an amount equal to the Lot Release Price for each Chiasso Lot sold and to the DIP Lender for the balance of the net proceeds from the sale of the Chiasso Lots and all of the net proceeds from the sale of the Unencumbered Lots, (v) approving payment of all Closing Expenses payable by the Debtors in connection therewith, and (vi) granting such other and further relief as is just.

      Dated: June 16th, 2011.

                     Respectfully Submitted,

                     GENOVESE JOBLOVE & BATTISTA, P.A.
                     Attorneys for Debtors-in-Possession
                     100 Southeast Second Street, Suite 4400
                     Miami, Florida 33131
                     Telephone: (305) 349-2300
                     Facsimile : (305) 349-2310

                     By:    */s/Mariaelena Gayo-Guitian*
                           Mariaelena Gayo-Guitian, Esq.
                           Fla. Bar No. 0813818
                           mguitian@gjb-law.com

                           Paul J. Battista, Esq.
                           Florida Bar No. 884162
                           pbattista@gjb-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of this **Motion** has been furnished by the Court's *CM/ECF* electronic mail system or by U.S. Mail to all parties on the attached service list on June 16th, 2011.

By:    /s/ Mariaelena Gayo-Guitian

        Mariaelena Gayo-Guitian, Esq.

<u>**SERVED VIA CM/ECF and/or**</u>
<u>**Electronic Mail**</u>

Regions Bank
c/o Lara Fortney Gross, Esq.
c/o Raymond Miller, Esq.
Gunster Yoakley & Stewart, P.A.
2 South Biscayne Boulevard, Ste 3400
Miami, FL 33131-1897
rmiller@gunster.com
lgross@gunster.com

Fifth Third Bank
c/o Mark J. Wolfson, Esq.
c/o Jennifer Hayes, Esq.
Foley & Lardner LLP
100 N. Tampa Street, Ste. 2700
Tampa, Florida 33602
mwolfson@foley.com
jhayes@foley.com

Florida Financial Investments, Inc.
c/o Donald Kirk, Esq.
501 E. Kennedy Boulevard
Suite 1700
Tampa, Florida 33602
dkirk@fowlerwhite.com

Gulf Bay Capital, Inc.
c/o Stephen R. Leslie, Esq.
Stichter, Riedel, Blain & Prosser
110 East Madison Street
Suite 200
Tampa, Florida 33602-47
Sleslie.ecf@srbp.com

William J. Simonitsch, Esq.
K&L Gates
Wachovia Financial Center
200 S. Biscayne Blvd
Ste 3900
Miami, FL 33131
Bill.simonitsch@klgates.com

Aleida Martinez-Molina, Esq.
Weiss Serota Helfman
2525 Ponce de Leon Blvd.
Coral Gables, FL 33134
amartinez@wsh-law.com

Roberta A. Colton, Esq.
POB 1102
Tampa, FL 33601
racolton@trenam.com

Alberto F. Gomez, Jr., Esq.
Morse & Gomez, PA
119 S. Dakota Ave
Tampa, FL 33606
algomez@morsegomez.com

Hywel Leonard, Esq.
Carlton Fields, PA
POB 3239
Tampa, FL 33601
hleon@carltonfields.com

Ricardo Alberto Reyes, Esq.
Tobin & Reyes, P.A.
5355 Town Center Rd.
Boca Raton, Florida 33486-1005
rar@tobinreyes.com

William Grady Morris, Esq.
P.O. Box 2056
Marco Island, Florida 34146-2056
wgmorrislaw@embarqmail.com

Douglas Gonzales, Esq.
Weiss Serota Helfman
200 E. Broward Blvd.
Ste 1900
Fort Lauderdale, FL 33301
dgonzales@wsh-law.com

Phillip Brougham, Chairman of
Homeowners Committee
8587 Pepper Tree Way
Naples, FL 34114
pbrougham@earthlink.net

Raymond David
8579 Bellagio Drive
Naples, FL 34114
rdavid1@comcast.net

Glenn Vician
8605 Broadway
Merrillville, IN 46410
glennvician@gmail.com

Torben Christensen
9270 Campanile Circle # 204
Naples, FL 34114
flyfan@aol.com

Al Love, Committee Vice chairman
7685 Mulberry Lane
Naples, FL 34114
alove41@comcast.net

G. Weber Gaskin
9279 Menaggio Court., # 102
Naples, FL 34114
gwgaskin@comcast.com

Bob Baldocchi
7730n Mulberry Lane
Naples, FL 34114
Bobkat7730@comcast.net

Paul S. Singerman, Esq.
Jordi Guso, Esq.
Debi Evans Galler, Esq.
Counsel for Ad Hoc Homeowners
Committee
200 South Biscayne Boulevard
Suite 1000
Miami, FL  33131
JGuso@bergersingerman.com
dgaller@bergersingerman.com
singerman@bergersingerman.com

Amanda L. Barton, Esq.
Counsel for the ITG Tax Free Income &
Capital Appreciation Fund, LTD.
13490 Old Livingston Road
Naples, Florida 34109
abarton@itgholdings.com

Christopher Kasten, Esq.
Bush Ross
P.O. Box 3913
Tampa, FL 33601-3913
ckasten@bushross.com

Thomas M. Messana, Esq.
Scott A. Underwood, Esq.
Attorneys for U.S. Bank National Assoc.
401 East Las Olas Boulevard, Suite 1400
Ft. Lauderdale, FL 33301
tmessana@mws-law.com
sunderwood@mws-law.com

Jeffrey W. Warren, Esq.
Bush Ross, P.A.
POB 3913
Tampa, FL 33601-3913
jwarren@bushross.com

J. Steven Wilkes
Office of the United States Trustee
501 E. Polk Street
Tampa, FL 33602
Steven.wilkes@usdoj.gov

W. Keith Fendrick, Esq.
Holland & Knight, LLP
100 North Tampa Street, Suite 4100
Tampa, FL 33602
keith.fendrick@hklaw.com

Edmund Whitson, Esq.
Counsel for Colonnade Naples Land LLC
Akerman Senterfitt
SunTrust Financial Center
401 E. Jackson St.
Suite 1700
Tampa, FL 33602-5250
Edmund.whitson@akerman.com

Robert E. Stochel, Esq.
Hoffman & Stochel
One Professional Center, Suite 306
Crown Point, IN 46307
res@reslaw.org

Eric John Vasquez, Esq.
Suite 201
900-6th Ave S
Naples, FL 34102
evasquez@ejvlawoffice.com

Laura Fortney Gross, Esq.
Counsel for Regions Bank
Gunster, Yoakley& Stewart, P.A.
777 South Flagler Drive, Suite 500E
West Palm Beach, FL 33401
lgross@gunster.com

David M. Landis, Esq.
Jon E. Kane, Esq.
Counsel for Tomen America, Inc
Mateer & Harbert, P.A. &
225 E. Robinson Street, Suite 600
Post Office Box 2854
Orlando, Florida 32802-2854
dlandis@mateerharbert.com
jkane@mateerharbert.com

Patricia A. Redmond, Esq.
Counsel for Aubrey Ferrao
Stearns Weaver Miller Weissler
Alhadeff & Sitterson, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
predmond@stearnsweaver.com

Glenn S. Vician, Esq.
8605 Broadway
Merrilville, Indiana 46410
Glennsvician2@bbbvonline.com

Robert A DeMarco, Esq.
Treiser, Collins & Vernon
3080 Tamiami Trail East
Naples, FL 34112
(239) 649-4900
rdemarco@swflalaw.com

John B. Hutton, Esq.
Counsel for US Bank National Asoc.
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, FL 33131
huttonj@gtlaw.com

Robert A. Soriano, Esq.
Greenberg Traurig, P.A.
625 East Twiggs Street, Suite 100
Tampa, Florida 33602
soriano@gtlaw.com

Mark David Bloom, Esq.
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131
bloomm@gtlaw.com

Aaron P. Honaker, Esq.
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131
honakera@gtlaw.com

Jeffrey Gilbert, Esq.
Greenberg Traurig, P.A.
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
gilbergj@gtlaw.com

Andrew L. Much, Esq.
Textron Financial Corporation
11575 Great Oaks Way, Suite 210
Alpharetta, GA 30022
amuch@textronfinancial.com

Stephen R. Leslie, Esq
Stichter, Riedel, Blain & Prosser, P.A.
Attorneys for Gulf Bay Capital, Inc.
110 Madison Street - Suite 200
Tampa, Florida 33602
sleslie@srbp.com

Mark D. Hildreth, Esq.
Attorney for Iberia Bank
Shumaker, Loop & Kendrick, LLP
PO Box 49948
Sarasota, FL 34230-6948
mhildreth@slk-law.com

Warren S. Bloom, Esq.
Amy E. Lowen, Esq.
Greenberg Traurig, P.A.
450 S. Orange Avenue, Suite 650
Orlando, FL 32801
bloomw@gtlaw.com
lowena@gtlaw.com

Trial Attorney
Office of the U.S. Trustee, Region 21
501 E. Polk Street, Suite 1200
Tampa, Florida 33602
steven.wilkes@usdoj.gov

**SERVED VIA FIRST CLASS U.S. MAIL**

Fiddler's Creek, LLC, *Et Al*
Attn: Tony DiNardo
8156 Fiddler's Creek Pkwy
Naples, FL 34114

Regions Bank
Attn: Gloria Sloop
1900 5th Ave N, 12th FL
Birmingham, AL 35203

Regions Bank
4851 N Tamiami Trail
Naples, FL 34103

Tomen America, Inc.
Stuart A. Krause, Esq.
Zeichner Ellman & Krause
575 Lexington Ave
New York, NY 10022

Tomen America, Inc.
805 Third Avenue
New York, NY 10022

IberiaBank
2150 Goodlette Rd.
Naples, FL 34102

Textron Financial Corporation
c/o Mark Bloom, Esq.
Greenberg Traurig
1221 Brickell Ave
Miami, FL 33131

Fifth Third Bank
c/o Brian Giles, Esq.
Statman, Harris & Eyrich, LLC
3700 Carew Tower
441 Vine Street
Cincinnati, Ohio 45202

Fifth Third Bank
999 Vanderbilt Beach Rd
Naples, FL 34108

Mellon United, N.A.
Commercial Loan Division
1111 Brickell Ave, 30th Floor
Miami, FL 33131

Florida Financial Investments, Inc.
8156 Fiddler's Creek Pkwy
Naples, FL 34114

Aon Risk Services Inc Of NY
Po Box 7247-7376
Philadelphia, PA
19170-7376

Ash City USA
PMB 816 60 Industrial Pkwy
Buffalo, NY 14227

Avalon Risk Inc.
240 Cedar Knolls Rd
Suite 308
Cedar Knolls, NJ 07927

Bellagio Village Association
5067 Tamiami Trail East
Naples, FL 34113

Carriage Limousine LLC
678 Bald Eagle Dr Ste #4
Marco Island, FL 34115

Century Link
Po Box 96064
Charlotte, NC 28296-0064

Colonnade Properties, LLC
c/o Chris Glinski
380 Lexington Ave., Suite 710
New York, NY 10168

Cranberry Crossing
5067 Tamiami Trail East
Naples, FL 34114

Evans Oil Company
3170 S Horseshoe Dr
Po Box 856
Naples, FL 34106

FBS Property Tax Abatement LLC
200 S Biscayne Boulevard
Suite 2300
Miami, FL 33131

Grand Western Brands Inc.
Po Box 21046
Ft Lauderdale, FL 33335-1046

Guymann Construction Of FL
305 SW 3rd St
Cape Coral, FL 33991-1961

Jenner & Block LLP
330 N Wabash Avenue
Chicago, IL 60611

John Deere Landscapes
One John Deere Place
Moline, Illinois 61265

Lee County Port Authority
11000 Term. Access Rd
#8671
Ft Myers, FL 33913-8899

Sysco West Coast FL
Po Box 1839
Palmetto, FL 34220

Tampa Bay Trane
902 N Himes
Tampa, FL 33609

Textron Business Services Inc
Dept At 40219
Atlanta, GA 31192-0219

The Advocacy Group At
Tew Cardenas LLC
215 South Monroe St Ste
702
Tallahassee, FL 32301

Titleist/Acushnet Company
Po Box 532402
Charlotte, NC 28290-2402

United Capital Funding Corp.
Po Box 31246
Tampa, FL 33631-3246

Collier County Tax Collector
2800 N. Horseshoe Drive
Naples, FL 34104

The City of Naples
City Attorney
735 Eighth Street South, 2nd Floor
Naples, FL 34102

Internal Revenue Service
PO Box 21126
Philadelphia, PA 19114

Internal Revenue Service
Special Procedures – Insolvency
7850 SW 6th Court
Plantation, FL 33324

Special Asst. U.S. Attorney
2110 First Street, Suite 3-137
Ft Myers, FL 33901

The Honorable Eric H. Holden, Jr.
Attorney General of the U.S.
950 Pennsylvania Avenue, NW Room 4400
Washington, DC 20530-0001

State of Florida
Department of Revenue
c/o Frederick F. Rudzik
PO Box 6668
Tallahassee, FL 32314

Securities and Exchange Commission
Branch of Reorganization
3475 Lenox Road, N.E., #1000
Atlanta, GA 30326-1232

Diane L. Jensen, Esq.
Local Counsel for Regions Bank
Pavese Law Firm
Post Office Drawer 1507
Ft. Myers, FL 33902

Glenn & Dawn Vician
467 Scarborough Rd.
Valparaiso, IN 46385

Glenn & Dawn Vician
9225 Museo Cir.
Unit 201
Naples, FL 34114-9522

Stephen & Shelia Shulman
5807 Fox Hollow Court
Ann Arbor, MI 48105

Stephen & Shelia Shulman
8589 Bellagio Dr.
Naples, FL 34114

Matthew & Christine Suffoletto
205 Whetherburn Dr
Wexford, PA 15090-8869

Matthew & Christine Suffoletto
189 Richmond Ct
Marco Island, FL 34145

Steven & Ellen Taub
POB 18547
Tampa, FL 33679-8547

Steven & Ellen Taub
107 Wisteria Lane
Media, PA 19063-1668

Steven & Ellen Taub
9283 Menaggio Ct
Naples, Florida 34114

Raymond & Carole David
8579 Bellagio Drive
Naples, FL 34114

Kimberly A. Potter, Esq.
McCumber Daniels Buntz Hartig Puig, P.A.
One Urban Centre
4830 W. Kennedy Blvd, Ste 300
Tampa, FL 33609

Mark J. Woodward, Esq.
Woodward Pires & Lombardo, P.A.
3200 N. Tamiami Trail N.
Ste 200
Naples, FL 34103

# EXHIBIT A

### Lot Purchase Agreement

THIS LOT PURCHASE AGREEMENT (the "Agreement") is made among **D.R. Horton, Inc.,** a Delaware corporation ("Buyer"), and **GBP Development, Ltd.,** a Florida limited partnership and **GB Peninsula, Ltd.,** a Florida limited partnership (collectively, the "Seller").

### WITNESSETH:

WHEREAS, Seller has developed and desires to sell certain property it owns in the Fiddler's Creek development in Collier County, Florida (the "Community"), and Buyer desires to purchase that property, all upon the terms and conditions contained in this Agreement,

NOW THEREFORE, for and in consideration of the reciprocal covenants stated herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Property.** This is an agreement to purchase and sell fully developed (or to be fully developed on or before the Closing on a Lot), single-family residential Lots (as defined in Section 12 below), together with all rights, privileges, easements and interests appurtenant thereto (collectively, the "Property" or "Lots"). Seller shall sell and Buyer shall purchase a total of ninety-one (91) Lots in the Villages currently known as Parcel 24 and Parcel 116 (collectively, the "50' Lots"), and Parcels 112A and 112B (collectively, the "65' Lots") (collectively, the "Villages"), within the subdivision known as Veneta ("Subdivision"), within the Community. The Lots were developed by Seller in the Community, and are legally described in **Exhibit A** attached hereto and incorporated herein. All of the plats of survey referenced in Exhibit A are hereinafter collectively referred to as the "Plats."

2. **Effective Date.** The "Effective Date" means the date this Agreement is executed by Buyer and Seller and this Agreement is ratified as required by Section 35 below.

3. **Purchase Price.**

a.   Buyer shall purchase the Property in multiple takedowns in accordance with the Closing Schedule, and the purchase price for the Property shall be paid on a per Lot basis in immediately available funds, subject to adjustments, prorations and credits as herein provided. The base purchase price for 50' Lot shall be One Hundred Thousand and No/100 Dollars ($100,000.00) (the "50' Lot Base Purchase Price"), and the base purchase price per 65' Lot shall be One Hundred and Thirty Thousand and no/100 Dollars ($130,000.00) (the "65' Lot Base Purchase Price") (both the 50' Lot Base Purchase Price and 65' Lot Base Purchase Price sometimes referred to as the "Base Purchase Price").

b.   In addition to the Base Purchase Price, Buyer shall pay Seller additional consideration for each Lot sold by Buyer to a third party ("Retail Purchaser"), in the amount by which: (1) twenty percent (20.00%) of the total, final contract sales price of the Lot (containing a single-family residence constructed thereon) ("Improved Lot") to the Retail Purchaser, as shown on the final HUD-1 Settlement Statement for closing on that sale (which shall include all charges for options, upgrades, premiums, extras and change orders), exceeds (2) (a) the 50' Base Lot Purchase Price when the Improved Lot is a 50' Lot, or (b) the 65' Base Lot Purchase Price when the Improved Lot is a 65' Lot. That excess amount, if any, is

Buyer
Seller

hereinafter referred to as the "Additional Consideration". The Base Purchase Price for the Lot plus the Additional Consideration set forth herein, if any, is hereinafter referred to as the Purchase Price. The price at which Buyer may sell a Lot and the improvements constructed thereon to a Retail Purchaser shall be determined by Buyer in its sole discretion. Buyer has not made and does not make any warranty or representation as to when Buyer may sell any Improved Lot to a Retail Purchaser or as to what the price for the sale of any Improved Lot to a Retail Purchaser may be. Buyer shall direct the settlement agent who closes on the sale of an Improved Lot by Buyer to a Retailer Purchaser to deduct any Additional Consideration due to Seller from that sale from Buyer's proceeds of the closing, and pay the Additional Consideration directly to Seller. Seller shall not be entitled to a copy of the HUD-1 settlement statement from the sale of the Improved Lot to a Retail Purchaser or to any other information that Buyer or the settlement agent are not permitted by law to disclose. Notwithstanding the foregoing, prior to the closing of each Improved Lot to a Retail Purchaser, Buyer will deliver to Seller a certificate signed by Buyer, setting forth the total sum paid and/or payable by or on behalf of the Retail Purchaser to Buyer, identifying the Improved Lot, the date of closing on the sale of the Improved Lot to a Retail Purchaser and the final contract sales price as shown on the HUD-1 settlement statement, solely for the purpose of verifying the amount of Additional Consideration due from the sale, if any. Buyer's obligation to pay the Additional Consideration shall survive termination of this Agreement.

c.     Notwithstanding any other provision herein, if at any time during the term of this Agreement Seller offers lots in the Subdivision that are substantially similar to any of the Lots that are the subject of this Agreement for sale at a price (including the reasonable value of all compensation paid or to be paid to Seller at or following closing) less than the Purchase Price or upon better terms than set forth herein, then the Purchase Price recited herein shall automatically and immediately reduce to the lowest price at which Seller is offering to sell lots in the Subdivision, and/or the other applicable terms of this Agreement shall automatically change to match the terms of the other contract, and this Agreement shall be deemed to be amended accordingly. Upon the request of either party, the parties shall execute a written amendment to this Agreement to state the reduction in price and/or change in terms in accordance with this Section 3(c). Should Seller offer lots in the Subdivision to third parties at a price higher than the Purchase Price stated herein or upon less favorable terms, there shall be no corresponding adjustment or amendment to this Agreement.

4.     **Earnest Money.**

a.     Within ten (10) business days of the Effective Date, the parties shall execute an escrow agreement in form substantially as shown by **Exhibit B** attached hereto and incorporated herein (the "Escrow Agreement"), whereupon Buyer shall deposit the sum of Fifty Thousand and No/100 Dollars ($50,000.00) (the "Earnest Money") with Woodward, Pires & Lombardo, P.A. ("Escrow Agent"). If Buyer fails to deliver the Earnest Money as required herein, and such failure continues for a period of ten (10) days after written notice from Seller, then either party may terminate this Agreement by written notice to the other at any time prior to the deposit of the Earnest Money. If this Agreement is so terminated, this Agreement shall be deemed to have terminated as of the date that the Earnest Money was originally to have been delivered by Buyer, and there shall be no remedy hereunder to either Seller or Buyer other than the termination of this Agreement.

b.     If this Agreement is not sooner terminated, the Earnest Money shall be applied against the Purchase Price at the Closing on the last Lot to be purchased hereunder, or as otherwise provided herein.

c.     Upon receipt by Seller of a Notice of Suitability from Buyer, the Earnest Money will become non-refundable to Buyer, except as otherwise provided herein.



Buyer

Seller

5. **Contingencies.**

a. <u>Preliminary Conditions to Buyer's Performance</u>. Buyer's performance of any of its obligations hereunder is contingent upon satisfaction of both of the following conditions (collectively, the "Preliminary Conditions"):

    (1) Seller shall have delivered to Buyer a copy of Seller's owner's policy of title insurance, insuring Seller's ownership interest in the Property and the Lots as marketable, fee simple title, and copies of all recorded Plats of the Property and the Lots, subject to no exceptions or conditions other than the Permitted Exceptions.

    (2) The Seller shall have obtained final approval of the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"), approving this Agreement and the sale of the Property free and clear of all liens claims and encumbrances, with such liens, claims and encumbrances to attach only to the proceeds of such sale pursuant to Section 363 of the Bankruptcy Code, except for the Permitted Exceptions (the "Approval Order"). Once this Agreement is fully executed, the Seller will file the appropriate pleadings with the Bankruptcy Court to seek approval of this Agreement and the sale of the Property in the Seller's Bankruptcy Case No. 10-bk-03846-ALP (the "Bankruptcy Case"). The Seller shall use its best efforts to obtain such Approval Order. The Seller's obtaining of an Approval Order is a condition precedent to Seller's obligations as set forth in this Agreement. If Seller has not received the Approval Order within sixty (60) days of the Effective Date of this Agreement, then either party may terminate this Agreement upon written notice to the other, in which event the Earnest Money actually paid by Buyer shall be refunded to Buyer.

b. <u>Conditions to Buyer's Obligation to Close</u>. Buyer's obligation to close on the purchase of a Lot under this Agreement is contingent upon satisfaction of all of the following conditions (collectively, the "Conditions to Closing"): (1) all of Seller's warranties, representations and covenants contained in this Agreement shall be and remain true, correct and complete and fully performed as provided herein and through the date of Closing on the respective Lot or Lots; (2) a final plat showing the Lots as separately existing parcels of land shall have been approved by Collier County and recorded in the Public Records of Collier County, Florida; (3) there shall have occurred no material adverse change in the physical, financial or legal conditions of the Property from the conditions existing as of the Effective Date; (4) Seller shall deliver good and marketable title to the Property to Buyer as provided in Section 8 below, and the Title Company shall be unconditionally prepared to issue a standard ALTA owner's form title insurance policy insuring good and marketable fee simple title to the Property with a liability limit in the amount of the Purchase Price at standard premium rates; (5) the Lots to be Closed must meet all of the Development Specifications, except as otherwise provided herein (as defined in Section 12 below); (6) there shall be no development preconditions to the issuance of a building permits for the construction of single-family residences on the Lots to be Closed, except as otherwise provided herein; (7) there shall be no preconditions to the issuance of certificates of occupancy for single-family residences on the Lots to be Closed other than construction of such residences in accordance with applicable building permits and codes, except as otherwise provided herein; and (8) any approvals from homeowners' associations or architectural review boards necessary for Buyer to construct Buyer's intended products on the Lots shall have been received.

6. **Takedown of Lots; Permitted Closing Days.**

a. <u>Takedown of Lots</u>. Closings on the purchase and sale of Lots (each, a "Closing", and collectively, the "Closings") shall take place according to the schedule set forth on **Exhibit C** (the "Closing Schedule"). The first such Closing is referred to herein as the "Initial Closing." Buyer shall

Buyer

Seller

purchase at the Initial Closing Lots 12 through 22 of Fiddler's Creek Phase Four Unit Two, Block "A". Thereafter, Buyer shall close on the remaining 50' Lots and 65' Lots in accordance with the Closing Schedule attached hereto as Exhibit C. All Closings shall take place at the office of Seller's attorney. Seller shall deliver possession of the applicable Lots at Closing. Buyer may purchase Lots ahead of the schedule set forth on Exhibit C, and Seller shall deliver Lots to Buyer subject to the provisions contained herein. Buyer acknowledges and accepts that Lot 4 of Fiddler's Creek Phase Four Unit One, Block "A" is currently crossed by a temporary construction access road, as shown on Fiddler's Creek, Phase Four Unit 1, Construction Plan, prepared by Q. Grady Minor & Assoc., P.A. dated April 2007, revision #1 (Construction Access) dated April 25, 2007. If Buyer desires to takedown Lots in advance of the Closing Schedule or this Section, Buyer acknowledges and understandings that Lots other than Lots 1 through 22 of Fiddler's Creek Phase Four Unit Two, Block "A" and Lots 1 through 7 of Fiddler's Creek Phase Four Unit One, Block "A", may not meet all Development Specifications and Seller's Warranties on or before the Closing date. In the event Buyer purchases Lots in advance of the schedule set forth in Exhibit C, Buyer shall be entitled to apply any Lots purchased in excess of the required minimums against any subsequent minimum takedown requirements. Buyer may close on the purchase of Lots regardless of whether the Conditions to Closing have been satisfied, and unless Buyer waives its rights in writing, any such Closing shall not be deemed a waiver of any requirement regarding the Lots under this Agreement, except as otherwise provided herein. Seller shall continue to have full responsibility to perform its obligations under this Agreement with respect to all of the Lots, closed or not closed, as provided in this Agreement.

b. <u>Permitted Closing Days.</u> Notwithstanding any other provision herein, any Closing under this Agreement must occur on a Tuesday, Wednesday or Thursday that is a business day as defined in Section 30 below (a "Permitted Closing Day"), and if a scheduled Closing would otherwise occur on a day that is not a Permitted Closing Day, then the Closing shall automatically be extended to the next day that is a Permitted Closing Day. Furthermore, if any Closing is scheduled to occur on any date from September 15 through September 30, it shall automatically be extended to the next Permitted Closing Day in October, and if any Closing is scheduled to occur on any date from December 18 through January 5, it shall automatically be extended to the next Permitted Closing Day in January.

7.    **Closing Documents, Closing Costs and Prorations.**

a.    <u>Closing Documents.</u> At the Closing, Seller shall deliver to the settlement agent the Special Warranty Deed conveying fee simple title to the Lots being conveyed and a Lien Affidavit regarding all of the Lots being conveyed in a form acceptable to Chicago Title Insurance Company (the "Title Company"), an assignment of all prepaid impact fees, and such other reasonable documentation as may be required to fulfill the intent of this Agreement. At Closing, Seller shall also execute and deliver to Buyer, with regard to the Lots being conveyed, a general assignment of rights against third parties in the form of Exhibit D attached hereto and incorporated herein.

b.    <u>Closing Costs and Prorations.</u> Buyer shall pay the documentary stamps to be affixed to the Deed. Recording fees will be split 50/50 between Buyer and Seller. Seller shall pay the cost for preparation and issuance of an owner's policy of title insurance, the cost of satisfaction of any liens on the Lots being conveyed, Seller's attorneys' fees and all expenses incurred by Seller related to the Closing. Buyer shall pay Buyer's attorneys' fees and all expenses incurred by Buyer related to the Closing. Ad valorem taxes on the Lots being conveyed for the tax year of the Closing, together with District assessments and District buydowns provided in Section 21.a below, shall be prorated between Seller and Buyer as of Closing based on the latest assessment available. All past due ad valorem taxes and homeowners' association assessments shall be paid by Seller at Closing. Should such proration be inaccurate based on the actual ad valorem tax bill when received, either party may demand, and shall receive, a payment from the other correcting such apportionment. Seller shall be responsible for and shall pay any roll-back taxes or other taxes attributable to the Lots' having been assessed or exempted for agricultural or other special uses prior



Buyer
Seller

to Closing, whether such taxes become due before, at or after Closing. The provisions of this Section shall survive the Closing and any termination of this Agreement.

8.    Conveyance of Title.

a.    Review of Title. At the Closing, Seller shall convey good and marketable fee simple title to the Lots being purchased pursuant to a recordable Special Warranty Deed. "Good and marketable title" shall mean title that is insurable by the Title Company under a standard ALTA owner's form at standard rates, free and clear of all liens, encumbrances and other exceptions to title and rights of others except those Permitted Exceptions listed on Exhibit E attached hereto and incorporated herein. Buyer shall have until the Closing to examine title to the Property and to give written notice to Seller of any objections that Buyer may have, other than the Permitted Exceptions. Seller shall have thirty (30) days from the date of the notice to cure all such objections, at Seller's sole cost. The Closing shall be delayed during and extended for any such cure period. If Seller fails for any reason to cure the objections within 30 days, the Buyer, at Buyer's option, may: (1) waive the unsatisfied objections and complete the purchase of all of the Lots scheduled for Closing, including those subject to the unsatisfied objections, or (2) terminate this Agreement in its entirety and receive an immediate refund of the Earnest Money, or (3) reject and refuse to purchase the Lot or Lots affected by the unsatisfied objections, delete those Lots from the description and schedule of Lots to be purchased hereunder and proceed to purchase the remaining Lots that are unaffected by the unsatisfied objections, if any, according to the terms hereof.

b.    Subsequent Reviews of Title. After the Initial Closing, Buyer shall have until the date scheduled for each subsequent takedown to re-examine title to the applicable Lots and to give written notice to Seller of any objections to title that did not exist or were not of public record as of the Effective Date. Seller shall have thirty (30) days from the date of notice to cure all such objections, at Seller's sole cost. The entire Closing Schedule shall be delayed during and extended for any such cure period. If Seller fails for any reason to cure the objections within 30 days, the Buyer, at Buyer's option, may: (1) waive the unsatisfied objections and complete the purchase of all of the Lots scheduled for Closing, including those subject to the unsatisfied objections, or (2) terminate this Agreement in its entirety and receive an immediate refund of the Earnest Money, or (3) reject and refuse to purchase the Lot or Lots affected by the unsatisfied objections, delete those Lots from the description and schedule of Lots to be purchased hereunder and proceed to purchase the remaining Lots that are unaffected by the unsatisfied objections, if any, according to the terms hereof.

9.    Inspection Period. Buyer and its agents, consultants and contractors shall have from the Effective Date until 11:59 p.m. eastern time on the thirtieth (30th) day thereafter (the "Inspection Period") in which to enter upon all common areas and all real property owned by Seller within the Subdivision (collectively, the "Land") to inspect and perform such tests and studies deemed necessary or appropriate by Buyer. Forty-eight (48) hours prior to entering the Community, Buyer shall provide Seller with the name of persons entering the Community so that name can be provided to the Main Gate attendant for access by Buyer's representatives, consultants or agents. Seller hereby grants to Buyer a nonexclusive license to enter upon the Land and any portion thereof for the purpose of making such inspections, and Seller shall cooperate with all parties performing such inspections. The results of all inspections, tests, examinations and studies of any portion of the Land performed during the Inspection Period must be suitable to Buyer, in its sole discretion. Prior to the expiration of the Inspection Period, Buyer may notify Seller that such results are suitable to Buyer by delivering to Seller a written Notice of Suitability signed by one of the corporate officers of Buyer listed in Section 35 below. No such Notice of Suitability shall be valid and effective unless signed by one of the specified officers. If Buyer fails for any reason to send Seller the Notice of Suitability by the end of the Inspection Period, and such failure continues for a period of ten (10) days after written notice from Seller, this Agreement shall automatically terminate. Also, if Buyer notifies Seller in writing at any time prior to issuance of a Notice of Suitability

DR Horton Lot Purchase Agreement -- Veneta
Page 5 of 42
4121-7061-3513.2
37485 0029

Buyer 
Seller

that the results of its inspections, tests, examinations or studies are not suitable to Buyer, then this Agreement shall automatically terminate. Upon termination, Buyer shall be entitled to an immediate refund of the Earnest Money, and thereafter neither party shall have any further obligation to the other hereunder, except that Buyer shall promptly restore any physical damage caused to the Land by the aforesaid inspections, tests and other activities, and Buyer shall indemnify Seller for any and all claims of bodily injury or damage to property (including the Land itself) arising out of Buyer's inspections of the Land. Buyer shall also indemnify Seller for liens which may be filed against the Property or any portion thereof by persons or entities employed or contracted by Buyer to perform inspections of the Land. Buyer's repair and indemnification obligations under this Section 9 shall survive termination of this Agreement for a period of one (1) year.

10.     **Delivery of Information.** Seller shall deliver to Buyer copies of all of the documents and materials listed below, to the extent they are in the possession or control of Seller, within seven (7) days of the Effective Date. Failure of Seller to deliver the identified items (or notice that Seller does not have same) within seven (7) days shall automatically extend the Inspection Period one day for each day delivery of such items or Notice is delayed. Seller shall deliver copies of: (a) all Plats; (b) all title reports, commitments and policies regarding the Property and/or the Lots; (c) any reports, documents and surveys regarding soil conditions affecting the Property and/or the Lots; (d) all environmental studies or reports regarding the Property and/or the Lots; (e) any wetland delineation studies regarding the Property and/or the Lots (none that we are aware of); (f) any proposed or existing leases, licenses, easements and agreements affecting the Property and/or the Lots; (g) construction drawings (including a complete set of the "Construction Plans," as defined in Section 11 below) for the development of the Property, including two (2) CAD diskettes providing all information shown on the approved Construction Plans; and (h) all constituent documents.

11.     **Subdivision Plans.** Seller represents and warrants that:

a.      Seller has submitted to the Collier County a complete set of construction plans for the Subdivision, including but not limited to, the Fiddler's Creek, Phase Four Unit One, Construction Plan, prepared by Q. Grady Minor & Assoc., P.A. dated April 2003, through revision #7 dated June 1, 2005; Fiddler's Creek, Phase Four Units Two and Three, Construction Plan, prepared by Q. Grady Minor & Assoc., P.A. dated January 2005, through revision #R (Record Drawings Phase 2) dated February 27, 2007; and, Fiddler's Creek, Phase Four Unit One, Construction Plan, prepared by Q. Grady Minor & Assoc., P.A. dated April 2007, through revision #1 (Construction Access) dated April 25, 2007 (collectively, the "Construction Plans"). The Seller has submitted plans to Collier County, the applicable Florida Water Management District and any and all other governmental agencies having jurisdiction over the development of the Subdivision (collectively, the "Governing Jurisdictions"), to the extent those Governing Jurisdictions have required the submission of plans, which plans have been approved. Seller shall not modify the Construction Plans with regard to the Property, without Buyer's prior consent, which shall not be unreasonably withheld, conditioned or delayed.

b.      Seller shall not modify the Plats with regard to the Property, without Buyer's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed. The Plats and the Construction Plans are hereinafter collectively referred to as the "Subdivision Plans."

12.     **Development Specifications.** Seller warrants that it has developed the Subdivision and the Property so that each meets all applicable laws, regulations, ordinances, restrictions, orders permitting requirements and zoning conditions, the Subdivision Plans and all specifications and qualifications stated in this Section 12 (collectively, the "Development Specifications"). For purposes of this Agreement, a "Lot" is a discrete parcel of developed and legally existing land that meets or will meet all the Development Specifications and all requirements for construction of a single family residence thereon on



Buyer
Seller

or before Closing of an individual Lot. Without limiting the generality of the foregoing, Seller warrants that:

a.     The following Subdivision improvements with regard to the Property have been or will be completed by Seller prior to the Closing of an individual Lot: (1) clearing of substantial vegetation (no additional clearing or grubbing is intended to be performed by Seller); (2) grading done to existing elevation, except for grading to finish Lot elevations (no additional grading is intended to be performed by Seller); (3) curbing (no additional curbing is intended to be performed by Seller); (4) paving, including paving of all roads, whether public or private, except the final lift of asphalt on a portion of Campanile Circle (adjacent to Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B") (no additional paving, except the referenced final lift, which is intended to be performed by Community Development District #2 ("District")); (5) storm drainage, retention and detention facilities and other storm drainage systems for Subdivision and capacity for the individual Lots, Swales at the rear of the Lots divert runoff to either catch basins or the adjacent lake; (6) sanitary sewer (accepted by Collier County with regard to the 50' Lots, except Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B", which will be accepted prior to the Closing of these Lots); (7) public water source and distribution system with adequate capacity to serve a single-family dwelling unit on each Lot (accepted by Collier County with regard to the 50' Lots, except Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B", which will be accepted prior to the Closing of these Lots); and (8) sidewalks along the front of the Lots where required by the Construction Plans of the Subdivision.

b.     The Subdivision and each Lot is or will be served by underground utilities on or before the Closing of an individual Lot, including: (1) underground electric lines sufficient to service each Lot, installed in a utility easement referenced in the Site Plan, Utility Exhibit and/or Construction Plans, with all applicable fees and installation paid for the underground electric main service and transformers; (2) natural gas for heating, water heaters, cooking and fireplaces, (3) telephone service to service the Lot and lines installed as referenced in the Utility Exhibit and/or Construction Plans, and (4) cable television and internet service. The underground utilities (and specific components thereof) have been or will be installed prior to the Closing on an individual Lot in accordance with the Utility Exhibit attached hereto as Exhibit "F."      *The plans and drawings identified on* ~~JW~~

~~P.R.~~

c.     All roads, except the final lift of asphalt on a portion of Campanile Circle (adjacent to the Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B"), sanitary and storm sewer facilities, water lines and drainage easements in the Villages are substantially completed and are paid for in full (subject to the District assessments and buydowns provided in Section 21.a below), as further provided herein.

d.     Buyer, upon the Closing of an individual Lot or Lots, shall have the right to connect to existing and readily available water and sewer systems upon Buyer's payment of tap fees and other required fees by the Governing Jurisdictions.

e.     Seller has installed with regard to 50' Lots, to the Governing Jurisdictions' requirements, all water lines and sewer mains, including laterals and water meter boxes (except Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B", which will have similar utility service installed on or before Buyer's Closing of these Lots). The 65' Lots will have the similar utility services installed on or before Buyer's Closing of these Lots. See the Site Plan and the Construction Plans attached hereto.

f.     All debris has been burned or hauled off in accordance with all applicable laws, regulations, ordinances, restrictions and orders. Seller has not and shall not bury any materials or substances of any nature or create berms on the Lots or any rights-of-way.

Buyer
Seller

g.    The Lots shall have full and free access to District roads within the Subdivision, and all District roads to and from the Subdivision within the Community.

h.    All utilities servicing the 50' Lots, including water and sewer lines are operable and have received the appropriate certifications and clearances form the applicable utilities and agencies (except Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B", which will have similar utility services installed on or before Buyer's Closing of these Lots).    The 65' Lots will have the similar utility services installed on or before Buyer's Closing of these Lots.

i.    All Subdivision improvements within the Villages needed to support the 50' Lots (except Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B", see below), except for the entry monument and the common area landscaping (which shall be the responsibility of the Seller (Buyer and Seller to execute documentation necessary to provide an easement(s) for the installation of an entry monument(s)), have been completed in accordance with the Subdivision Plans and have utility and preliminary Subdivision acceptance, subject to minor punch list item(s) (the only current punch list item in Phase I is the Construction Access, the removal of which shall be the responsibility of the Buyer.  With regard to Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B" , Subdivision improvements within the Village needed to support the these Lots are incomplete, including without limitation items (1) the entry monument and the common area landscaping (which shall be the responsibility of the Seller (Buyer and Seller to execute documentation necessary to provide an easement(s) for the installation of an entry monument), (2) the final lift of asphalt on a portion of Campanile Circle (adjacent to the Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B", and (3) private utilities).  Subject to Section 6 above, Subdivision improvements needed to support Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B" will be completed on or before the Closing on those lots so that building permits and certificates of occupancies will be obtainable.

j.    All Lots are or will be serviced by providers of telephone, cable and high-speed internet services prior to the Buyer's Closing on a Lot.

k.    The Seller has received applicable permits to be issued by the South Florida Water Management District ("SFWMD") to allow for development of the Property pursuant to the Development Specifications, and the SFWMD has approved all stormwater improvements for the Subdivision and Property required pursuant to said permit.

l.    All recreational amenities, if any, required by the Governing Jurisdiction, shall have been constructed, installed and paid for in full prior to the Initial Closing.

13.    **Pre-Closing Lot Inspection.** Prior to each Closing, Buyer may perform a visual inspection of the Lots to be purchased at that Closing and prepare a list of all items not in compliance with the Development Specifications stated in Section 12.  Seller shall correct all items as described on the list within fifteen (15) days after the inspection and prior to the Closing, unless agreed to otherwise, in writing, by the parties.  In such event, Buyer may, at its option: (a) complete the Closing and allow Seller to complete the items after the Closing; or (b) complete the Closing on the non-defective Lot(s) and Buyer shall proceed to select and simultaneously close on alternative Lots that meet all of the Development Specifications.  In the event that Buyer elects to exercise option (b) above, and delete defective Lots, and Buyer deletes from the Closing nine (9) or more defective Lots, then Buyer shall have the right, but not obligation, to terminate this Agreement, and upon notification thereof, the Earnest Money shall be refunded to Buyer and the parties shall be relieved of any further obligations hereunder, other than obligations which are intended to survive the Closing or termination of this Agreement.  Notwithstanding anything to the contrary herein, there is no obligation for Seller to correct defective Lots, however, once corrected, Lots shall be available for Buyer's selection.

Buyer
Seller

14. **Moratoriums or Governmental Delays.** In the event any local, state or federal regulatory authority having authority over the Subdivision or the Lots imposes a moratorium on the issuance of building permits, septic system permits, sewer taps, water taps, public school attendance rights or certificates of occupancy, then the Closing shall, at Buyer's election, be suspended and extended by the time period that such conditions exist, and the escalator to the Purchase Price, if any, shall be abated. If such moratorium or delay is in effect for a period greater than one hundred eighty (180) days, then Buyer, at Buyer's option, shall have the right to terminate this Agreement upon written notice to Seller. In the event of such termination, the Earnest Money shall be refunded to Buyer.

15. **Intentionally Deleted.**

16. **Sales and Marketing; Marketing Fee.** Seller warrants that it will, throughout the term of this Agreement, conduct community-wide sales and marketing efforts and campaigns for the mutual benefit of all builders selling within the Community, on a nondiscriminatory basis. Seller and/or Seller's affiliate, Fiddler's Creek Realty, Inc. ("FCRI"), will advance the necessary monies for such purposes and Buyer will contribute marketing funds to offset the expenses of the Community Information Center (staffing and costs associated with the facility, maintenance, insurance, utilities, etc.) by paying to Seller, with respect to each Improved Lot sold by Buyer, a fee (the "Marketing Fee") in the amount of one percent (1%) of the total consideration actually received by Buyer, Buyer's affiliates and/or any person or entity engaged (directly or indirectly) by Buyer for the sale of an Improved Lot. Buyer shall direct the settlement agent who closes on the sale of an Improved Lot sold by Buyer to deduct the Marketing Fee due Seller from that sale from Buyer's proceeds of the closing, and pay the Marketing Fee directly to Seller. Buyer and FCRI will enter into an Exclusive Listing Agreement regarding the sale of the Improved Lots.

Seller will provide Buyer adequate wall space within the Community Information Center to display product and Buyer's information specific to the Villages. The Seller will collaborate with Buyer's marketing team for artwork. Seller will pay for the cost of display materials to be provided in accordance with the Seller's display standards and of all brochures and other collateral materials for the sale of the Improved Lots. The Buyer shall have the right to approval, which approval shall not be unreasonably withheld, conditioned or delayed, of all final renderings of the displays and other sales and marketing materials to be disseminated to the public, which materials shall be provided by Buyer within thirty (30) days of the Initial Closing, or as otherwise agreed to by the parties. Buyer will not (directly or indirectly), without the prior written consent of Seller (which consent may not be unreasonably withheld, conditioned or delayed): (a) issue any brochures or other sales materials, or place any advertising or signage in the Community concerning Improved Lots; or (b) use any of Seller's trademarks, service marks or trade names (including, without limitation, "Fiddler's Creek" or any variation thereof). Seller's approval does not constitute a legal or technical review or approval of the contents of these materials, but is intended solely for Seller's purposes in maintaining and ensuring a high quality marketing and promotional campaign of the Community.

17. **Intentionally Deleted.**

18. **Entrance Feature and Recreational Amenities.** Seller warrants that subject to Section 12 above, all entrance features, recreational amenities and other common area improvements for the Subdivision required by the Governing Jurisdiction pursuant to the Subdivision Plans have been completed and are paid for in full.

19. **Use of the Community Property.** As long as Seller, its successors and assigns, as Community developer, owns property in the Community, Seller and such successors and assignee(s) may maintain offices and model homes in, and sponsor promotional events and conduct similar sales activities at, the



Buyer
Seller

Community, which include the use of advertising signs and other promotional devices necessary for or conducive to sales, leasing or management.

SELLER OR ITS AFFILIATES MAY BE CONDUCTING BLASTING, EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR AROUND PORTIONS OF THE COMMUNITY OUTSIDE OF THE SUBDIVISION, BOTH BEFORE AND AFTER THE CLOSINGS PURSUANT TO THIS AGREEMENT. BUYER AFFIRMS SELLER'S RIGHT TO CONDUCT SUCH ACTIVITIES AND WILL NOT (A) CLAIM THAT SUCH ACTIVITIES ARE NOXIOUS, OFFENSIVE NUISANCES, (B) ENTER, OR ALLOW ANY OTHERS UNDER BUYER'S CONTROL TO ENTER, ANY AREAS WHERE SUCH ACTIVITIES ARE BEING CONDUCTED (EVEN WHEN THEY HAVE TEMPORARILY CEASED, SUCH AS DURING NON-WORKING HOURS) AND (C) HOLD SELLER OR ITS AFFILIATES LIABLE OR SUE SELLER OR ITS AFFILIATES FOR ANY DAMAGE, INJURY OR DEATH ARISING FROM OR CONNECTED WITH ANY BLASTING, EXCAVATION OR CONSTRUCTION ACTIVITIES, UNLESS RESULTING FROM NEGLIGENCE ON THE PART OF SELLER, ITS AFFILIATES OR CONTRACTORS.

THE FIDDLER'S CREEK LAKES AND WETLAND AREAS ARE DESIGNED AS WATER MANAGEMENT AREAS AND NOT AS AESTHETIC FEATURES. BUYER ACKNOWLEDGES THAT DUE TO FLUCTUATIONS IN GROUND WATER ELEVATIONS WITHIN THE IMMEDIATE AREA, THE WATER LEVEL OF LAKES WILL RISE AND FALL, AND SELLER AND ITS AFFILIATES HAVE NO CONTROL OVER SUCH WATER ELEVATIONS, INCLUDING THE ABSENCE OF ANY WATER IN THE LAKES.

Buyer will not alter, modify, expand or fill any lakes or wetlands located on or in the vicinity of the Property without the prior written approval of the local permitting authority, Seller, the U.S. Army Corps of Engineers, the District, and all other local, state and federal authorities having jurisdiction over such matters.

20.    **Intentionally Deleted.**

21.    **DISTRICT/VILLAGE ASSOCIATION.**    Buyer acknowledges that the Property to be conveyed at the time of each Closing is part of the Fiddler's Creek Community Development District #2 (the "District"), as defined in Chapter 190, Florida Statutes. The governing board of the District (the "Board") has the authority to levy and collect fees, rates, charges, taxes and assessments (the "District Charges") on the Property through a special taxing district to pay the construction, operation, and/or maintenance costs of certain public facilities within the District. The District is empowered to plan, establish, acquire, construct or reconstruct, enlarge or extend, equip, operate, and maintain systems and facilities for basic infrastructures which may include, without limitation, (a) water management and control of lands within the District and the connection of some or any such facilities with roads and bridges; (b) roads and bridges; (c) potable water distribution; (d) sewage collection; and (e) waste water management. The District Charges are set annually by the Board and are in addition to county and all other fees, rates, charges, taxes and/or assessments provided for by law. The District Charges will likely appear on the annual real estate tax bill for each owner (as defined in the Governing Documents) as a separate and distinct tax and will be payable directly to the Collier County Tax Collector. All such District Charges will constitute a lien upon the Property.

a.    The current annual Debt and Maintenance assessments for the District are as follows: At the Closing of the 50'Lots: (1) Lots 1 through 22 of Fiddler's Creek Phase Four Unit Two, Block "A", Buyer will pay $3,122.22 per Lot, and Seller will pay $4,115.78 per Lot; (2) Lots 1 through 7 of Fiddler's Creek Phase Four Unit One, Block "A", Buyer will pay $3,299.50 per Lot, and Seller will pay $3,938.50 per Lot; and   (3) Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B", Buyer will pay

Buyer 
Seller

$3,906.64 per Lot, and Seller will pay $3,331.36 per Lot, resulting in a District Debt Service payment per Lot of approximately $5,100 annually, and a District Maintenance Assessment payment of $1,501.82, annually. At the Closing of the 65' Lots: (1) Lots 4 through 6, 8, 10 through 13, 15 through 20, and 23 through 59 of Fiddler's Creek Phase Four Unit Two, Block "B", Buyer will pay $3,122.22 per Lot, and Seller will pay $4,115.78 per Lot, and (2) Lots 21 and 22 of Fiddler's Creek Phase Four Unit Two, Block "B", Buyer will pay $7,858.52 per Lot, and Seller will pay $0.00 per Lot, resulting in a District Debt Service payment of approximately $5,100 annually and a District Maintenance Assessment payment of $1,502.82, annually, per Lot. Seller warrants that the District is in GOOD STANDING.

b.    Foundation Covenants, Village Covenants and Village Associations.

(i)    The Property will be conveyed subject to the Amended and Restated Declaration of General Covenants, Conditions and Restrictions for Fiddler's Creek (the "Community Declaration"), as supplemented and amended, together with the Articles of Incorporation and Bylaws, as supplemented and amended, and the Design Review Criteria of the Fiddler's Creek Foundation, Inc (the "Foundation"; the Community Declaration, the Articles of Incorporation, Bylaws and Design Review Criteria of the Foundation collectively, the "Foundation Documents"); and, the neighborhood covenants (including the Declaration of Restrictions and Protective Covenants for Parcel 24 at Fiddler's Creek, the Declaration of Restrictions and Protective Covenants for Parcel 116 at Fiddler's Creek, and the Declaration of Restrictions and Protective Covenants for Parcels 112B and 112A at Fiddler's Creek) (the "Neighborhood Covenants") (the Foundation Documents and the Neighborhood Covenants are collectively referred to herein as the "Governing Documents"). Buyer acknowledges receipt of a copy of the Governing Documents and amendments and Buyer is on notice of the contents thereof.

(ii)    Buyer understands and agrees that Section 7 of the Community Declaration requires the payment of assessments to the Foundation upon the sale of each Improved Lot to a Retail Purchaser, including without limitation, a Capital Acquisition Assessment, Annual Assessments, Telecommunications Services Assessments, Capital Reserve Assessments; and Resale Capital Reserve Assessments, which amounts are subject to change (see current amounts in Section 22.a. below). Within seven (7) days of the Effective Date, Seller shall submit to Buyer the Village Association (homeowner's associations) documents (including the Declarations of Restrictions and Protective Covenants, the Declarations of Covenants, Conditions and Restrictions, the Articles of Incorporation, and Bylaws for the Villages) together with the information delivered to Buyer pursuant to Section 10 hereof. Buyer shall review such documents during the Inspection Period.

22.    Club/Fees. Recreational opportunities available to social members of the Foundation will also be available to Buyer's Retail Purchasers. Buyer understands the following with regard to Recreational Property within the Community, which is based upon the attached current "disclosure summaries":

a.    The Club and Spa at Fiddler's Creek ("Club and Spa"). Retail Purchasers, as a condition of purchase of Property within the Community, are obligated to be members of the Foundation. Buyer acknowledges that there are recorded restrictive covenants governing the use and occupancies of properties in the Community, including the Governing Documents. Retail Purchasers of property are obligated to pay assessments, fees and charges to the Foundation, upon closing on the Lot, in accordance with the Foundation Documents, which assessments, fees and charges are subject to periodic change. The current assessment amounts include a Capital Acquisition Assessment of $15,000, a Capital Reserve Assessment of $1,500, a Telecommunication Services Assessment of $247.62 per quarter, and an Annual Assessment (paid quarterly) of $705 per quarter.    The statements contained herein are only summary in nature, and prospective purchasers should refer to the Foundation Documents. Social membership and other categories of membership entitling use of the tennis, fitness, swimming and social facilities at the

Buyer
Seller

Community are offered in accordance with the terms and conditions of the Foundation Documents governing the Community.

Buyer acknowledges and understands that ownership of the Property and/or membership in the Village Association or any other association will not confer rights of membership in, or any rights, easements (whether prescriptive or otherwise) or privileges with respect to the use and enjoyment of, any Recreational Property (see Subsection 1.32 of the Community Declaration) or recreational facilities, including without limitation, any golf courses, tennis courts, golf clubhouse, tennis clubhouse, beach facilities, swimming pools, locker rooms, baseball, football or soccer fields, basketball courts, equestrian facilities or dining facilities, unless such properties are owned by the Foundation and are specifically designated for the use of the members, and the Buyer or Retail Purchaser has paid to the Foundation the assessments related to the use of the Recreational Property. Membership in any club or the right and privilege to use and enjoy properties and facilities owned or operated as a club or limited access organization, will be conferred only by and within the sole and absolute discretion of the operator of such club, property or facility from time to time pursuant to separate application and payment for membership or use, including the payment of dues and assessments.

Buyer acknowledges that the Club and Spa is, or will be, owned and operated by the Foundation and Buyer further acknowledges that ownership of a Lot in the Community does not grant Buyer (or its successors or assigns, including the Retail Purchaser) any ownership interest in the Recreational Property, the use of which may be made available to owners of the lots in the Community now or in the future.

Buyer acknowledges that Seller may, but is not obligated to, modify, expand or add additional facilities to the Recreational Property in its sole and absolute discretion. In the event such facilities are added to the Recreational Property, the Foundation will determine the terms and conditions such facilities will be available to members of the Foundation, if at all. In addition, in the event additional recreational facilities are added to the Recreational Property, the amount of the Capital Acquisition Assessment and/or Resale Capital Acquisition Assessment may be increased after such date.

b. Buyer also understands that there is Country Club Property (see Subsection 1.11 of the Community Declaration) within the Community which is not Recreational Property or Common Area (see Subsection 1.8 of the Community Declaration), and which is privately owned and operated according to respective membership plans and rules and regulations adopted from time to time (collectively, "Membership Documents"). The Country Club Property includes the Golf Club at Fiddler's Creek (the "Golf Club") and the Tarpon Club (the "Tarpon Club"). Ownership of a unit, residence or any other portion of property, or membership in the Foundation does not give any vested right or easement, prescriptive or otherwise, to use of the Country Club Property, and does not grant any ownership or membership interest in either of these clubs. Membership in the Golf Club and the Tarpon Club is optional and any right or privilege to use those facilities is governed by the respective Membership Documents, pursuant to a separate application and the payment for membership and/or use privileges, including the payment of an initiation deposit, dues and other charges. The Golf Club and Tarpon Club shall determine the amounts of such initiation deposit, dues and other charges, in their sole discretion. The current amounts applicable to the Golf Club and Tarpon Club include the following:

(i)     The Tarpon Club. Currently, the initiation deposit is $15,000, payable in 2 installments. The current dues are $2,100 (plus sales tax) per year, payable to the Tarpon Club. These amounts and the terms and conditions of membership are subject to change by The Tarpon Club, in its sole discretion.

(ii)     The Golf Club. Currently, the initiation deposit is $50,000, payable in 4 installments. The current dues are $7,500 (plus sales tax) per year, payable to the Golf Club. These amounts and the

Buyer
Seller

terms and conditions of membership are subject to change by The Golf Club of Fiddler's Creek, in its sole discretion.

The Seller will make available staff of the Golf Club so that Buyer's prospective purchasers can be made familiar with the Golf Club operations after the prospective purchaser has signed a purchase contract with the Buyer. Access to the Golf Club facilities will be made pursuant to the Membership Documents of the Golf Club.

23.     **Architectural Approval.** Buyer understands that Seller has created a quality community within Fiddler's Creek and that it is the Foundation Design Review Committee's ("FDRC") intent to maintain high standards for aesthetic values consistent with the Design Review Criteria and the Governing Documents when considering any plans, specifications or applications, whether or not defined herein, submitted by Buyer for approval.

a.     Within five (5) days of the Effective Date, Buyer shall submit plans and specifications for each product it intends to build in the Subdivision to the FDRC. Within ten days of receipt of the plans and specifications for each product, the FDRC shall notify Buyer of its approval or disapproval of the particular product. The FDRC may approve or disapprove a product in its sole discretion, for any reason or no reason. Once the FDRC has approved a product, no further approval from Seller or the FDRC shall be required at any time, unless Buyer proposes alterations to the design of the product requiring approval by the FDRC as provided in Governing Documents.

b.     Buyer understands that the approval of any plans and specifications (regardless of type and whether defined hereunder) is to assure satisfaction of Seller's aesthetic design purposes and compliance with the Foundation Documents. Further, Seller's and the FDRC's approval do not address or constitute a guarantee of the engineering or technical merits of the plans or specifications, nor does it certify compliance with applicable building codes, fire safety requirements, or other governmental regulations, but is intended solely for Seller's and FDRC's purposes.

c.     Signage. No temporary project identification signage shall be installed or placed on the Property during the construction period by anyone other than the Buyer. Buyer shall ensure that Buyer's builder, contractor, and/or agents comply with these provisions. Temporary project identification signage during construction shall be limited to one sign, and such sign shall be submitted within ten (10) days of the Effective Date to the FDRC for approval, and such sign shall be consistent with all relevant Collier County sign ordinances. The temporary project identification signage to be used during construction must be removed upon the earlier of installation of the permanent approved signage or upon issuance of certificate of occupancy for the first residence constructed by Buyer.

All permanent signage shall be approved in writing by Seller and the FDRC prior to being installed and comply with all signage standards and relevant Collier County sign ordinances. Permanent signage shall contain only that information approved by Seller and the FDRC, in writing.

d.     Construction Deposit. Buyer agrees to provide a $2,500 Construction and Village Improvements Deposit ("Construction Deposit") for each Lot under construction to the Escrow Agent on or before Buyer's filing of a Notice of Commencement for construction on the Lot. The Construction Deposit will secure the prompt and full payment of all costs and expenses incurred or advanced by Seller for clean up, repairs or replacement required of damage or maintenance necessitated by Buyer, its builder, contractor, and/or agents to existing Village Common Areas (see Subsection 1.47 of the Community Declaration), District Property (see Subsection 1.15 of the Community Declaration), and Common Areas (see Subsection 1.8 of the Community Declaration) (for example, sidewalks, streets, curbs, paving, drainage facilities, and other improvements, etc.) and/or deficiencies listed by the FDRC. The Construction

Buyer
Seller

Deposit will be held by the Escrow Agent and refunded to the Buyer within ten (10) days after Buyer notifies Escrow Agent, Seller and the FDRC of its receipt of a Certificate of Occupancy for each residence, unless the FDRC objects, in writing, to the release of such Construction Deposit and specifies, in writing, the exact deficiencies in Buyer's performance or damage listed by the FDRC. Buyer shall have a period of thirty (30) days from receipt of such written notice from the FDRC to cure such deficiency and upon such cure, the Escrow Agent shall deliver the Construction Deposit to Buyer. If Buyer does not cure such deficiency within such thirty (30) day time period, FDRC shall have the right to apply all or any portion of the Construction Deposit toward the correction of any referenced deficiencies.

24.     **Buyer Requirements.** Buyer acknowledges that the Property is and will be subject to the following special requirements, with which Buyer agrees to comply:

a.      <u>Landscaping.</u> Buyer will install on the Property landscaping in accordance with the Design Review Criteria and equal to the minimum amount of the Landscape Requirement. Seller may correct any deficiencies or damages which arise from Buyer's breach of this Section at Buyer's expense, after providing notice and fifteen (15) days to cure such breach.

b.      <u>Design Review Criteria.</u> Ownership and use of the Property, and any construction thereon, will comply with the Design Review Criteria, as may be amended from time to time. Buyer acknowledges having received on or before the Effective Date a recent copy of the Design Review Criteria.

c.      <u>Sewer and Water Fees.</u> Buyer will be responsible for the payment of all impact fees, hook-up fees and similar charges imposed in connection with sewer and water service for the Property. Buyer acknowledges and understands that potable water will not be provided by Seller or an affiliate of Seller, but by an entity unrelated to Seller which imposes a fee for initial hook-up to the water system; and which fee, as increased or decreased from time to time, will be the obligation of Buyer, its successors and assignees.

d.      <u>Swale Areas.</u> Buyer will not permit obstructions of any kind (including, but not by way of limitation, any building materials, vehicles or debris) to accumulate, exist or remain within any swale areas, right-of-way or easement area, common area or any property not owned exclusively by Buyer. Upon completion of construction, Buyer at its sole expense will cause all swale areas located on the Lot to be brought to the engineering grade plan elevations required by Governing Jurisdictions.

e.      <u>Corrective Measures.</u> If any swale elevations do not conform to the requirements set forth in this Section Buyer immediately, at its expense, will cause the necessary filling, grading and other work to be performed.

f.      <u>Construction Activities.</u> Buyer agrees that at all times during construction on the Property, Buyer will comply with the Governing Documents, including, but not limited to, the following: (1) the Property will be maintained in a neat and orderly manner free from unnecessary construction debris as required by the Governing Documents, and (2) construction activities upon and around the Property will comply with the Governing Documents (including restrictions on the hours during which construction activities may be performed).

g.      <u>Drainage Plan.</u> Seller has established an overall drainage system plan for the area in which the Lots are located, which may be amended from time to time. Buyer will design and install a drainage system on the Lots owned by Buyer at Buyer's expense, in compliance with the overall drainage system plan of Seller, and prior to issuance of the certificate of occupancy or approval of final inspection for each Lot by the applicable government agency.

Buyer 
Seller

h.   Governmental Requirements.   Buyer will at its expense comply with all governmental requirements applicable to the Property, and will not seek to change the zoning, land use provisions, permitted uses, planned unit development provisions, development of regional impact provisions, platting, water management district or waste water disposal provisions or any other governmental provisions affecting the Property without obtaining the prior written consent of Seller.

i.   Impact Fees.   Except as otherwise specifically provided in this Agreement, all other fees, costs, and charges incurred in connection with acquisition of the Property and construction of improvements on the Property (including impact fees, if any, imposed by any government agency) will be the sole responsibility of Buyer.   Seller shall assign at closing (1) for Lots 1 through 22 of Fiddler's Creek Phase Four Unit Two, Block "A" (County Reference # - AR7090), Seller shall assign its prior payment of $3,122.22 (per Lot) of transportation impact fees allocable to said Lots being purchased, (2) for Lots 1 through 7 of Fiddler's Creek Phase Four Unit One, Block "A" (County Reference # - AR4082), Seller shall assign its prior payment of $3,299.50 (per Lot) of transportation impact fees allocable to said Lots being purchased, (3) for Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B" (County Reference # - AR8149), Seller shall assign its prior payment of $3,906.64 (per Lot) of transportation impact fees allocable to said Lots being purchased, (4) for Lots 4 through 6, 8, 10 through 13, 15 through 20, and 23 through 59 of Fiddler's Creek Phase Four Unit Two, Block "B", of Fiddler's Creek Phase Four Unit Two, Block "B") (County Reference # - AR7090), Seller shall assign its prior payment of $$3,122.22 (per Lot) of transportation impact fees allocable to these Lots being purchased, and (5) Lots 21 and 22 of Fiddler's Creek Phase Four Unit Two, Block "B" (County Reference # - AR7090), Seller shall assign its prior payment of $7,858.52 (per Lot) of transportation impact fees allocable to these Lots being purchased.

j.   Facilities and Assessments.   Buyer acknowledges and understands that the streets and roads, surface water management systems and certain other common facilities and properties within the Villages are public as well as private, and will be maintained with funds derived from fees, rates, charges, taxes and assessments made by the District and assessments made against all lots within the Villages (including the Lots), as more particularly set forth in the respective documents.   Buyer agrees that, subsequent to closing hereunder, Buyer will pay all such fees, rates, charges, taxes and assessments required by the Governing Documents with respect to any Lots owned by Buyer.

k.   Cable Television.   Buyer agrees, at its own cost and expense, to pre-wire the residence on the Property for cable telecommunications services so that the residence may take full advantage of such cable telecommunications services as may be available within the Community, and required by the Foundation (see Subsection 11.3 of the Community Declaration).   Buyer will grant such easements as may be required by the cable television provider to install and maintain a central cable telecommunications system serving the Property, Village and Community.

l.   Gas Agreement.   Buyer acknowledges that Seller or its affiliates have entered into an agreement with Peoples Gas Company with regard to the installation and maintenance of a Gas Distribution System at Fiddler's Creek (the "Gas Agreement"), and that during the term of the Gas Agreement, Buyer shall comply with the Seller's obligations there under with regard to each home built by Buyer.   As such, Buyer acknowledges that all homes built by Buyer shall be gas compliant as that term is defined in the Gas Agreement, or Buyer agrees to pay Seller Three hundred Dollars ($300.00) for each home constructed by Buyer that is not gas compliant.   Seller acknowledges that to the extent the energy conservation allowance program continues, Buyer will be entitled to an energy conservation allowance from Peoples Gas Company for each gas compliant home built based on the allowance schedule provided in the Gas Agreement, or as otherwise provided by Peoples Gas Company.

Buyer 
Seller

25. **Disclosures and Acknowledgments.** Buyer hereby acknowledges and agrees that:

a.     Seller will have the right, but not the obligation, in its sole discretion and by its sole act, to add additional real property to the Foundation Property (as defined in the Community Declaration), whether such real property is currently within the Community, by recording in the Public Records of the County an instrument subjecting such additional land to the Community Declaration.  Buyer acknowledges that the effects of the addition of such additional land could include a substantial increase in the acreage of the Foundation Property, the number of residential units within the Community, the size of the Foundation common areas, the amount of assessments, the number of members, the number of persons using Foundation common areas, the size of the Foundation's budget and the total number of votes which could be cast by the members of the Foundation.

b.     The Community is classified as a "development of regional impact" ("DRI") in accordance with Florida law and pursuant to Marco Shores/Fiddler's Creek DRI Development Order.  Buyer agrees that Buyer will disclose in writing to any Retail Purchaser of the Lot, prior to any such sale, that the Lot is within the Marco Shores/Fiddler's Creek DRI Development Order and will be developed in accordance with the Marco Shores/Fiddler's Creek DRI Development Order.

c.     NO PERSON, INCLUDING ANY SALES AGENT OF SELLER OR OTHER REAL ESTATE BROKERAGE FIRM, IS AUTHORIZED TO MAKE ANY REPRESENTATIONS OR TO PROVIDE ANY INFORMATION WITH REGARD TO ANY OF THE MATTERS CONTAINED IN THIS AGREEMENT WHICH ARE CONTRARY OR IN ADDITION TO THE INFORMATION CONTAINED IN THIS AGREEMENT OR IN THE GOVERNING DOCUMENTS, AS AMENDED. BUYER ACKNOWLEDGES THAT NO SUCH REPRESENTATIONS HAVE BEEN MADE TO (OR, IF MADE, HAVE NOT BEEN RELIED UPON BY) BUYER BY ANY PERSON OR ENTITY.

d.     The Property is in proximity to the Marco Island Executive Airport, and is subject to an avigation easement in favor of Collier County which provides for unobstructed aircraft flight within and through a portion of the air space above the Community.  See Section 2.10 of the Community Declaration.

26.    **Condemnation and Casualty.**  If prior to Closing, all or any portion of the Property is condemned or taken, or threatened to be condemned or taken, by any authority, or any portion of the Property suffers a casualty loss, Seller shall give Buyer immediate Notice thereof with a complete description of all relevant information and complete copies of all relevant documentation.  Within thirty (30) days of such Notice, Buyer may elect:  (a) to terminate this Agreement with respect to the affected Lot or Lots and receive a refund of the Earnest Money applicable to the affected Lot or Lots, with neither party thereafter having any further obligation to the other hereunder with respect to the affected Lots, or (b) to close on the purchase of the affected Lots without reduction in the Purchase Price, but with the right to receive all monies payable as a result of any such taking, in which case Seller shall promptly execute all documents required by Buyer to assign Seller's rights therein to Buyer.

27.    **Seller's Warranties.**  Seller shall represent, warrant and covenant to Buyer that, on or before the Closing of a Lot, that:

a.     Subject to the Bankruptcy Court's Approval Order, Seller has or shall have good and marketable fee simple title to the Property, free and clear of all liens, encumbrances and other matters (other than the Permitted Exceptions attached hereto as **Exhibit E**).  There are no parties other than Seller and Seller's lender with any interest in the Property (marital, homestead, option, right of first refusal, leasehold or otherwise).  Subject to the Bankruptcy Court's Approval Order, no other signatures are required to make this Agreement fully enforceable by Buyer.  Seller is in sole and exclusive possession of the Property (as

Buyer
Seller

debtors-in-possession), and no person or entity claims any right of possession to all or any portion thereof, conditioned upon receipt of the Bankruptcy Court's Approval Order.

b.     Subject to the Bankruptcy Court's Approval Order, Seller has full authority to execute this Agreement and convey the Property to Buyer and execute and deliver the deed and such other documents, instruments, affidavits and certificates as are necessary or desirable to effectuate this transaction.

c.     There are no taxes, levies, assessments or special fees of any kind (other than normal fees and assessments, including without limitation, ad valorem property taxes, District Levies, etc.) imposed by any governmental authority or other third party that would be payable by Buyer in connection with its use of the Property.

d.     No commitments have been made to any governmental authority, utility company, school board, church, religious body, homeowner's association, or other organization, group, or individual that would impose an obligation upon Buyer to construct any improvements, to make any contribution of money, to dedicate any land or to maintain any land or improvements, unless otherwise provided herein.

e.     To the best of Seller's knowledge, all assessments against the Property are shown in the official records of Collier County, Florida; no site or area improvements have been constructed or installed by any public authority, the cost of which may be assessed in whole or in part against any part of the Property, except assessments imposed by the District; and Seller has not been notified of any possible future improvements that might create an assessment against any part of the Property.

f.     There is no pending, and Seller has no notice or knowledge of any threatened, taking or condemnation of the Property by governmental authorities.

g.     Seller has no notice or knowledge of any violation of law, order, ruling, ordinance, rule or regulation with respect to Seller or the Property.

h.     To the best of Seller's knowledge, during the time Seller has owned the Property: (1) none of the Property has been excavated (other than for the installation of utilities and other services provided to the Village (i.e., cable television, utilities and drainage)); (2) no landfill was deposited on or taken from the Property; (3) no construction or other debris (including, without limitation, livestock, other organic materials, strippings, rocks, stumps or concrete) has been buried upon the Property; and (4) the Property has not contained a bury or borrow pit.

i.     To the best of Seller's knowledge, the Property has not been, and is not being, assessed or taxed under any agricultural, special use, open space, "Conservation Use", "Current Use", "Green Acres" or similar valuation or program, and if the Property has been or is now being so assessed or taxed, then Seller shall pay all applicable taxes associated with the change in use contemplated by Buyer as and when such taxes are assessed.

j.     Seller has filed all federal, state and local tax returns as required by law with respect to Seller and the Property.

k.     The Lots have full and free access to District streets within the Subdivision, and District streets to and from the Subdivision within the Community, and Seller has no knowledge of any pending or threatened governmental proceeding or other fact or condition that would limit such access.

l.     Subject to the approval of the Bankruptcy Court, the execution and delivery of this Agreement and the consummation of this transaction will not result in a breach of any of the terms of, or constitute a

Buyer
Seller

default under, any (1) indenture, contract or instrument to which Seller is a party or by which Seller or the Property is bound, or (2) law, order, ruling, ordinance, rule, order or regulation with respect to Seller or the Property or the use or construction thereof.

m.     To the best of Seller's knowledge, the Property contains no threatened or endangered species or endangered or protected habitats or items of archaeological significance as defined by applicable state and federal laws.

n.     To the best of Seller's knowledge, there are no cemeteries, grave sites or burial sites or archaeological or historic artifacts or sites located on or immediately adjacent to the Property.

o.     The Lots will be usable as Lots upon which a single-family residence can be constructed and used for residential purposes.

p.     There are no wetlands or state jurisdictional waters located upon any Lot.

q.     Seller is not a "foreign person" as defined by the Internal Revenue Code or Regulations, and, prior to Closing contemplated under this Agreement, agrees to provide Buyer an affidavit to that effect.

r.     As provided herein and to the best of Seller's knowledge, the Lots have been or will be developed in accordance with the Development Specifications on or before Buyer's Closing on a Lot.

s.     To the best of Seller's knowledge, the information and materials furnished and to be furnished by Seller to Buyer, and Seller's representations and warranties made herein or in connection herewith, are true, complete and accurate.

t.     Seller shall not knowingly and intentionally take, or cause any action that would cause any of the foregoing representations or warranties to be untrue or incorrect at the Closing. This Section shall survive the Closing or any termination of this Agreement for a period of one (1) year.

28.    **No Broker.** Except as to Fiddler's Creek Realty, Inc., as to whose commission Seller is solely responsible, Seller represents to Buyer that Seller has not discussed this Agreement or the subject matter thereof with any real estate broker, agent, or salesperson, so as to create any legal right in any such broker, agent or salesperson to claim a real estate commission, finder's fee, or similar compensation from Buyer with respect to the sale and/or conveyance of the Property contemplated in this Agreement. Seller hereby indemnifies and holds Buyer harmless from and against any and all liabilities, losses, costs, damages and expenses, including reasonable attorneys' fees and costs of litigation, Buyer shall ever suffer or incur because of any claim by any broker, agent or salesperson, whether or not meritorious, for any fee, commission or other compensation with regard to this Agreement or the sale and purchase of the Property contemplated hereby, and arising out of any acts or agreements of Seller. Except as to Fiddler's Creek Realty, Inc., as to whose commission Seller is solely responsible (and as to whose commission Buyer shall have no responsibility), Buyer represents to Seller that Buyer has not discussed this Agreement or the subject matter thereof with any real estate broker, agent, or salesperson, so as to create any legal right in any such broker, agent or salesperson to claim a real estate commission, finder's fee, or similar compensation from Seller with respect to the sale and/or conveyance of the Property contemplated in this Agreement. Buyer hereby indemnifies and holds Seller harmless from and against any and all liabilities, losses, costs, damages and expenses, including reasonable attorneys' fees and costs of litigation, Seller shall ever suffer or incur because of any claim by any broker, agent or salesperson, whether or not meritorious, for any fee, commission or other compensation with regard to this Agreement or the sale and purchase of the Property contemplated hereby, and arising out of any acts or agreements of Buyer. This Section shall survive the Closing or any termination of this Agreement.

Buyer 
Seller

29.  Default.  *(except as provided in subsection d. below),*

a.  **Buyer's Default.** In the event that Buyer fails to close on the purchase of the Lots as required hereunder, or if prior to or after Closing Buyer otherwise defaults under this Agreement for any reason not caused by Seller, Seller will be entitled, as Seller's sole and exclusive remedy, to terminate this Agreement and receive and retain the Earnest Money as agreed and liquidated damages for withholding the Property from the market and for expenses incurred in connection with this transaction, and Seller, Buyer and any brokers or agents thereupon will be relieved of any further rights, obligations or liabilities hereunder, in which event, Buyer acknowledges that Seller's damages for Buyer's failure to close would be difficult to ascertain and that Seller's retention of the deposit(s) constitutes a fair and reasonable measure of damages, All other rights and remedies of Seller, including without limitation, any right to monetary damages, are hereby waived.

b.  **Seller's Default.** In the event of Seller's default in the performance of any covenant or obligation hereunder for any reason not caused by Buyer, or if any of Seller's representations or warranties prove to be false, inaccurate, incomplete or misleading in any material adverse respect, then Buyer's sole remedy will be either to (1) demand refund of the Earnest Money paid hereunder, without interest, upon which refund, Seller, Buyer and any brokers or agents will have no further rights, obligations or liabilities hereunder; or, in the alternative, or (2) seek specific performance of the terms of this Agreement. All other rights and remedies of Buyer, including without limitation, any right to monetary damages, are hereby waived.

c.  **Notice and Cure Rights.** In the event of a default under any covenant contained in this Agreement, the non-defaulting party shall give the defaulting party notice of such default, specifying in reasonable detail the nature of the default. Thereafter the defaulting party shall have thirty (30) days from the date notice of default is given to cure the default, unless specifically provided otherwise. If the defaulting party cures the default within the 30-day period, or as otherwise provided, it shall not incur any liability to the other party for the default. Each party shall reasonably cooperate with any and all attempts by the other to cure any default within the applicable cure-period;

d.  **Limited License Agreement.** In the event that Buyer fails to close on the purchase of all of the Lots as required hereunder, then within ninety (90) days following a required Closing whereby Buyer has not purchased such required Lots, Seller shall have the right, at its option, to deliver written notice to Buyer that Seller has elected to utilize the limited license agreement which is attached hereto as Exhibit H (the "License Agreement") to permit Seller to utilize Buyer's architectural building elevations (the "Elevations") on the Lots which are not purchased by Buyer. Upon receipt of such written notice from Seller, Buyer shall execute the License Agreement in the form attached hereto as Exhibit H, shall attach the Elevations utilized by Buyer within the Community and shall attach the list of Lots that have not been purchased by Buyer as required under this Agreement. Buyer shall deliver two (2) executed copies of the License Agreement to Seller and upon execution thereof by Seller, Seller shall return to Buyer one (1) fully executed copy of the License Agreement. When both Seller and Buyer have executed the License Agreement, the License Agreement shall be in full force and effect. If Seller does not deliver written notice to Buyer of its election to utilize the License Agreement within thirty (30) days of Buyer's failure to close on the required purchase of any takedown of the Lots or if Seller does not execute the License Agreement within thirty (30) days after receipt of the executed License Agreement from Buyer, the License Agreement and all obligations of Buyer with respect thereto shall cease and terminate. Further, Buyer shall have no obligation to execute and deliver the License Agreement to Seller if Buyer's failure to close on the purchase of all of the Lots is caused by Seller's default or as a result of a failure of a condition to Closing which excused Buyer's performance hereunder. *In the event of breach of the provisions of this subsection by either party, the other party may seek specific performance of such provisions. Neither party shall be entitled to monetary damages for breach of the provisions of this Subsection.*

/ DR Horton Lot Purchase Agreement — Veneta

Buyer ____

Seller ____

30.    Notices. All notices required or permitted to be given hereunder shall be in writing and shall be deemed given: (a) when hand delivered, receipt required (b) the next business day after deposit with Federal Express, UPS or other nationally recognized overnight courier service, with overnight delivery charge prepaid, receipt required, or (c) when transmitted via facsimile, provided a copy is sent the next day by method (a), or (b), Notices will be delivered subject to the right of either party to change the address/facsimile number at which it is to be received by written notice to the other party. All Notices shall be addressed as follows:

| | |
|---|---|
| If to Buyer: | Paul Romanowski, Division President<br>D. R. Horton, Inc. – Southwest Florida Division<br>13880 Treeline Ave., Ste. 3<br>Fort Myers, FL 33913<br>Phone: (239) 225-2600<br>Fax: (817) 928-6178 |
| With a copy to: | O. Kenneth Bagwell, Jr., Corporate Counsel<br>D. R. Horton, Inc.<br>5850 T.G. Lee Blvd., Ste. 600<br>Orlando, FL 32822<br>Phone: (407) 850-5257<br>Fax: (800) 248-5996 |
| With a copy to: | Richard MacFarland, Esq.<br>Broad and Cassel<br>7777 Glades Road, Ste. 300<br>Boca Raton, FL 33434<br>Phone: (561) 883-8959<br>Fax: (561) 218-8959 |
| If to Seller: | GBP Development, Ltd./GB Peninsula, Ltd.<br>Attn: Aubrey J. Ferrao, as Attorney in Fact<br>8156 Fiddler's Creek Pkwy<br>Naples, FL 34114<br>Phone: (239) 732-9400<br>Fax: (239) 732-9402 |
| With a copy to: | GBP Development, Ltd. /GB Peninsula, Ltd.<br>Attn: Anthony DiNardo, as Attorney in Fact<br>and Joseph L. Parisi, Esq.<br>8156 Fiddler's Creek Pkwy<br>Naples, FL 34114<br>Phone: (239) 732-9400<br>Fax: (239) 732-9402 |
| With a copy to: | Mark J. Woodward, Esq.<br>Woodward, Pires & Lombardo, P.A.<br>3200 Tamiami Trail N., Suite 200<br>Naples, FL 34103<br>Phone: (239) 649-6555<br>Fax: (239) 649-7342 |

Buyer
Seller

31. **Seller's Covenants Pending Closing.** From and after the Effective Date through Closing, Seller shall (a) not voluntarily convey or encumber any portion of the Property or any rights therein, nor enter into any conveyance, security document, option, right of first refusal, easement, lease or other agreement granting to any person or entity any rights with respect to the Property, or any interest therein, (b) operate and maintain the Property in a good and workmanlike manner at least as well as Seller has operated and maintained it prior to the Effective Date, (c) within 3 business days after Seller's becoming aware thereof, give notice to Buyer of any litigation, arbitration or administrative proceeding concerning or affecting the Property, together with copies of all relevant documents, and (d) comply with all requirements of all laws, orders, rulings, ordinances, rules, orders and regulations of any governmental authority having jurisdiction over Seller or the Property or the use or construction thereof.

32. **Standard Provisions.**

a. Seller acknowledges the importance to Buyer of protecting its brand, including trademarks, service marks and other images. All printed and electronic materials, advertising copy, scripts, billboards and monument and other signage (collectively, "Marketing Materials") developed and/or used by Buyer may (but shall not be required to) utilize Buyer's then-standard or specially-designed trademarks, service marks and designs, including colors, fonts and other design characteristics, or such other design characteristics as Buyer shall desire. Seller agrees that any Declaration or amendments thereto recorded after the Effective Date shall not conflict with the agreements set forth in this paragraph.

b. This Agreement shall be interpreted in accordance with the laws of the State of Florida, and the venue for litigation of any dispute arising out of this Agreement, whether in law or equity, shall lie exclusively in the state courts of Collier County, Florida.

c. Time is of the essence in the occurrence of all events, the satisfaction of all conditions and the performance of all obligations hereunder.

d. This Agreement constitutes the sole and entire agreement between the parties with regard to its subject matter. All prior discussions, negotiations and agreements regarding the subject matter of this Agreement are merged herein and shall have no further force or effect. No representations or warranties have been made by either party except as stated herein.

e. All covenants, representations and warranties contained in this Agreement or given in connection herewith shall survive Closing and delivery of the deed and other documents delivered at Closing and shall not be merged with delivery thereof.

f. The term "business day" shall mean Monday through Friday, excluding days on which federally-chartered or banks chartered by the state in which the Property is located are closed for business. If the day for any action under this Agreement falls on a day other than a business day, the day for the action shall automatically be extended until the next business day.

g. If any provision of this Agreement shall be declared invalid or unenforceable by laws applicable thereto, or unenforceable as to certain parties, then the performance of such provision shall be excused by the parties hereto and the remaining provisions of this Agreement shall remain in full force and effect.

h. The titles, captions and paragraph headings herein are inserted for convenience only and are in no way intended to interpret, define or limit the scope or content of this Agreement or any provision hereof. Both parties have been represented by counsel in the drafting and negotiation of this Agreement, and this Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

Buyer ___

Seller ___

i.     BUYER AND SELLER EACH AGREE TO WAIVE A TRIAL BY JURY IN ANY DISPUTE ARISING OUT OF THIS AGREEMENT.

j.     Any failure or delay of Buyer or Seller to enforce any term of this Agreement shall not constitute a waiver of such term, it being explicitly agreed that such a waiver must be specifically stated in a writing delivered to the other party in compliance with Section 28 above. Any such waiver by Buyer or Seller shall not be deemed to be a waiver of any other breach or of a subsequent breach of the same or any other term.

k.     This Agreement shall be binding upon and shall inure to the benefit of Seller and Buyer, their respective heirs, successors, legal representatives and permitted assigns. Buyer will not assign this Agreement or any interest herein without obtaining the prior written consent of Seller, which consent may be withheld in Seller's sole and absolute discretion. If Buyer is a corporation, the transfer of any corporate shares therein will be deemed a prohibited assignment of this Agreement; if Buyer is a partnership, the transfer of any partnership interest resulting in a change of control therein will be deemed a prohibited assignment of this Agreement; and if Buyer is any other form of entity, the transfer of any ownership interest therein will be deemed a prohibited assignment of this Agreement. Seller may assign any of its rights hereunder to any person or entity to whom Seller contemporaneously assigns Seller's rights as "developer" of the Property. Notwithstanding the foregoing, Seller's consent will not be required in connection with the assignment by Buyer to a person or entity wholly owned and/or controlled by Buyer, so long as Buyer remains obligated hereunder following any such assignment.

l.     This Agreement may be executed in multiple, separate counterparts, and such counterparts shall constitute one and the same document. This Agreement may not be modified or amended except by a writing signed by both Buyer and Seller.

m.     In the event of any litigation between Buyer and Seller regarding this Agreement, the losing party shall promptly pay the substantially prevailing party's attorneys' fees and expenses and costs of litigation.

n.     This Agreement may be executed by facsimile or email signatures, which for all purposes shall be deemed to constitute originals. In addition, if either party uses facsimile-transmitted executed documents, or executed documents which have been electronically scanned and transmitted by email, then the other party and the Escrow Agent may rely upon such documents as if they were executed originals.

o.     Neither Seller nor any affiliate thereof is a co-venturer or partner of Buyer in connection with the construction and sale of any improvements upon any Lot, nor is Buyer an agent or representative of Seller or of any of Seller's affiliates. Neither Seller nor any of its affiliates will have liability of any nature whatsoever in connection with construction upon, ownership, use or sale of a Lot and improvements thereon, and Buyer agrees to indemnify and hold harmless Seller, and its affiliates ("Indemnitees") from and against any and all claims, damages, expenses (including reasonable attorneys' fees and court costs in all trial and appellate proceedings) and liabilities of any nature whatsoever asserted against or incurred by Indemnitees in connection with construction upon, use, ownership or sale of any Lot (and improvements thereon) by Buyer or its successors or assigns, including Retail Purchasers.

33.     Environmental Matters/Hazardous Substances.

a.     Definition of Hazardous Substances.  "Hazardous Substances" shall mean and include all hazardous or toxic substances, wastes or materials, and all pollutants and contaminants, including but not limited to those elements or compounds which are contained in the list of hazardous substances adopted by the Unites States Environmental Protection Agency ("EPA") and the list of toxic pollutants designated

Buyer
Seller

by Congress or the EPA or defined by any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to or imposing liability (including strict liability) or standards of conduct concerning, any hazardous, toxic or dangerous waste, substance or material, as now or any time hereinafter in effect.

b.    Clean-up.  If Buyer's environmental inspections of the Land reveal the existence of any Hazardous Substance on, in, at, about or under the Land, then Seller may at Seller's option elect, at Seller's sole expense, to complete the clean-up of the same prior to Closing and in accordance with all applicable governmental standards and Buyer's reasonable standards. If such clean-up is not completed, and written certification thereof by all applicable governmental authorities is not received by Buyer, prior to Closing, then Buyer may either terminate this Agreement and receive refund of the Earnest Money or proceed to close on such Lots as Buyer deems, in its sole discretion, to be in acceptable environmental and ecological condition.

c.    Representations, Warranties and Covenants.  Seller hereby represents, warrants and covenants to Buyer as follows (all of which shall survive Closing, termination of this Agreement and any investigation or knowledge of Buyer prior to Closing):

(1)    Neither Seller nor, to the best of Seller's knowledge and belief, any third party, has used, generated, manufactured, stored or disposed of any Hazardous Substance in, at, on, under or about the Property or transported any Hazardous Substance to or from the Property. Furthermore: (a) the Property is not in violation, nor has been or is currently under investigation for violation of any federal, state or local law, ordinance, permit or regulation relating to industrial hygiene, worker health and safety, or to the environmental conditions in, at, on, under or about the Property including, but not limited to, soil and groundwater conditions; (b) the Property has not been subject to, and is not within 2,000 feet of, a deposit of any Hazardous Substance; (c) there has been no discharge, migration or release of any Hazardous Substance from, into, on, under or about the Property; and (d) there is not now, nor has there ever been on or in the Property underground storage tanks or surface or below-grade impoundments, any asbestos-containing materials or any polychlorinated biphenyls used in hydraulic oils, electrical transformers or other equipment. Seller hereby assigns to Buyer as of Closing all claims, counterclaims, defenses or actions, whether at common law or pursuant to any other applicable federal or state or other laws which Seller may have against any third parties relating to the existence of any Hazardous Substance in, at, on, under or about the Property.

(2)    Seller shall defend (using counsel acceptable to Buyer), indemnify and hold harmless Buyer and Buyer's officers, directors, employees, agents, shareholders, members, managers, attorneys and their respective representatives and successors in interest (collectively, the "Indemnitee") from any fine, penalty, liability, loss, cost, damage or expense, including, without limitation, court costs, expert witness fees and attorneys' fees, that Indemnitee may suffer or incur as a result of any claim, demand, action, cost or judgment made or obtained by any individual, partnership, corporation, entity, governmental agency or person which arises out of or results from the presence or existence of Hazardous Substances in, at, on, under or about the Property to the extent that such Hazardous Substances are or were located in such locations prior to any Closing. The foregoing indemnity shall include all foreseeable and unforeseeable damages and shall include consequential, speculative and punitive damages.

34.    **Intentionally Deleted.**

35.    **Corporate Ratification.**  NOTWITHSTANDING ANY OTHER PROVISION HEREIN, NEITHER THIS AGREEMENT NOR ANY AMENDMENT HERETO SHALL BE A VALID,

DR Horton Lot Purchase Agreement – Veneta
Page 23 of 42
4821-7081-3511.2
374859/0029

Buyer
Seller

BINDING AND ENFORCEABLE OBLIGATION OF BUYER UNLESS AND UNTIL SUCH DOCUMENT IS RATIFIED IN WRITING BY ONE OF THE FOLLOWING EXECUTIVE OFFICERS OF BUYER: DONALD R. HORTON, DONALD J. TOMNITZ, BILL W. WHEAT OR STACEY H. DWYER.

36.     **Intentionally Deleted.**

37.     **FASB Interpretation No. 46 Compliance.** In order to assist Buyer in complying with FASB Interpretation No. 46 (Consolidation of Variable Interest Entities) ("FIN 46"), Seller shall complete an information letter in the form attached hereto as **Exhibit G** and deliver it to Buyer concurrently with Seller's execution of this Agreement. Further, Seller shall provide Buyer with such additional information, documentation or certification as may be reasonably requested by Buyer in order to comply with FIN 46, as amended from time to time.

-EXECUTIONS ON FOLLOWING PAGE-

DR Horton Lot Purchase Agreement – Veneta
Page 24 of 42
4823-7061-3513.2
37435/0029

Buyer
Seller

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized officers/agents on the dates stated below.

**Seller:**

**GBP Development, Ltd., a Florida limited partnership**

By: _____

Name: ___Aubrey J. Ferrao___

Title: ___Attorney in Fact and not individually___

Date: ___4/28/2011___

**GB Peninsula, Ltd., a Florida limited partnership**

By: _____

Name: ___Aubrey J. Ferrao___

Title: ___As Attorney in Fact and not individually___

Date: ___4/28/2011___

**Buyer:**

**D.R. Horton, Inc.**

By: _____
    Paul Romanowski
    Division President

Date: ___5/4/11___

Pursuant to Section 35 above, the undersigned hereby ratifies this Agreement on behalf of D.R. Horton, Inc.

_____

Print Name:    Stacey H. Dwyer

Title: ___Executive Vice President___

Date: ___5-26-11___

DR Horton Lot Purchase Agreement -- Veneta
Page 25 of 42
4823-7651-5513.2
37485\0029

Buyer _____
Seller _____

## Exhibit A

### Description of the Lots

Lots 1-22, inclusive, Block "A", of Fiddler's Creek, Phase Four, Unit Two, according to the Plat thereof, as recorded in Plat Book 45, Pages 40 through 47; AND Lots 1 through 7, inclusive, Block "A", of Fiddler's Creek, Phase Four, Unit One, according to the Plat there of, as recorded in Plat Book 43, Pages 55 through 61; AND Lots 1 through 9, inclusive, Block "B", of Fiddler's Creek, Phase Four, Unit Three, according to the Plat there of, as recorded in Plat Book 46, Pages 57 through 61 (collectively, the 50' Lots); AND Lots 4 through 6, 8, 10 through 13, 15 through 59, inclusive, Block "B" (collectively, the 65' Lots), together with Tracts "A-1", "A-2", "A-3", "E" and "F" (to be deeded to the Village Association on or before the Closing of the last 65' Lot), of Fiddler's Creek, Phase Four, Unit Two, according to the Plat thereof, as recorded in Plat Book 45, Pages 40 through 47, in the Public Records of Collier County, Florida.

Buyer
Seller

## EXHIBIT B

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (hereinafter referred to as this "Agreement"), is made and entered into this ____ day of _____, 2011, by and among: GBP DEVELOPMENT, LTD., a Florida limited partnership, and GB PENINSULA, LTD., a Florida limited partnership, each having as a mailing address: 8156 Fiddler's Creek Pkwy., Naples, FL 34114 (hereinafter collectively referred to as "Seller"); D.R. HORTON, INC., Inc. having as a mailing address: 13880 Treeline Avenue, Suite 3, Fort Myers, FL 33913 (hereinafter referred to as "Buyer"); and WOODWARD, PIRES & LOMBARDO, P.A., having as a mailing address: 3200 Tamiami Trail N., Ste. 200, Naples, FL 34103 (hereinafter referred to as "Escrow Agent").

## WITNESSETH

WHEREAS, Seller and Buyer have entered into that Lot Purchase Agreement having an Effective Date of _____, (hereinafter referred to as the "Contract") as to certain real property situated in Collier County, Florida (hereinafter referred to as the "Property"); and

WHEREAS, Buyer and Seller have appointed WOODWARD, PIRES & LOMBARDO, P.A. to hold all earnest money under the Contract in accordance with the terms of the Contract and this Agreement.

NOW, THEREFORE, in furtherance of the transaction contemplated hereby and for and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.     Seller and Buyer hereby designate, constitute and appoint WOODWARD, PIRES & LOMBARDO, P.A. as the "Escrow Agent" under this Agreement to hold all earnest money under the Contract, and WOODWARD, PIRES & LOMBARDO, P.A. accepts such designation and appointment and agrees to act in accordance with the terms of the Contract and this Agreement. In the event or a conflict between the terms of this Agreement and those of the Contract, the terms of the Contract shall control. Seller and Buyer agree (a) that Escrow Agent shall be a stakeholder only and not liable for any losses, costs or damages it may incur in performing its responsibilities hereunder unless such losses, costs or damages shall arise out of the willful default or negligence of Escrow Agent or its agents, (b) that no releases or disbursements shall be made hereunder except upon consistent written instructions from both Seller and Buyer or their successors or assigns; and (c) that in the event of a dispute hereunder between Seller and Buyer (or their successors or assigns), Escrow Agent shall have the right, exercisable in its sole discretion, to be discharged by tendering unto the registry or custody of any court of competent jurisdiction, the Initial Closing documents and funds held by Escrow Agent, together with any such legal pleadings as it deems appropriate. Escrow Agent shall be indemnified, saved and held harmless by the Seller and Buyer for all of its expenses, costs and reasonable attorney's fees incurred in connection with such interpleader action. Seller shall be responsible for any fees for the retention of Escrow Agent for acting in the capacity as Escrow Agent.

2.     Upon receipt of consistent written instructions from both Seller and Buyer, or their respective counsel, then Escrow Agent shall disburse the funds held in escrow in accordance with the written instructions signed by both Buyer and Seller, or their respective counsel. Said written instructions may be given in duplicate counterparts and by facsimile. Escrow Agent shall have the right to deduct any costs Escrow Agent has incurred for overnight delivery charges or wire transfer fees from the funds held prior to disbursement.

Buyer
Seller

3.   All checks, money orders or drafts deposited with Escrow Agent under this Agreement will be processed for collection in the normal course of business. Escrow Agent will not commingle funds received by it in escrow with funds of others and shall deposit such funds in a separate escrow account with a federally insured Bank. Escrow Agent shall not be liable for any loss caused by the failure, suspension, bankruptcy or dissolution of any such investment vehicle or fund.

4.   Escrow Agent shall not be liable for any loss or damage resulting from the following:
(a)   Any default, error, action or omission of any other party;
(b)   The expiration of any time limit unless such time limit was known to Escrow Agent and such loss is solely caused by failure of Escrow Agent to proceed in its ordinary course of business;
(c)   Any loss or impairment of funds while on deposit with a federally insured Bank resulting from failure, insolvency or suspension of such institution; or
(d)   Escrow Agent's complying with any and all legal process, writs, orders, judgments and decrees of any court whether issued with or without jurisdiction and whether or not subsequently vacated, modified, set aside or reversed.

5.   Escrow Agent shall be entitled to rely upon the instructions and other matters covered thereby, and shall not be required to investigate the authority of the person executing and delivering such instructions, or otherwise verify the accuracy of the statements of information presented therein.

6.   The terms and provisions of this Agreement are for the benefit of Seller, Buyer and Escrow Agent and their respective successors and assigns only. Nothing contained herein shall be deemed or construed to inure to the benefit of any other person or party, it being the express intent of Seller, Buyer and Escrow Agent that no such person party shall be entitled to any of the benefits hereof, except as herein expressly provided.

7.   Time is of the essence of this Agreement.

8.   This Agreement is intended as a contract under the laws of the State of Florida and shall be governed thereby and construed in accordance therewith.

9.   This Agreement may be executed by facsimile signatures, which for all purposes shall be deemed to constitute originals. This Agreement may be executed in counterparts, all of which when taken together shall be deemed one original.

10.   Any interest earned on the funds held in escrow shall accrue to the benefit of Buyer, whose tax identification number is 75-2386963.

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the day, month and year first above written.

**NOTE: THIS IS AN EXHIBIT, INITIAL ONLY – DO NOT EXECUTE.**

Buyer
Seller

# EXHIBIT C

## CLOSING SCHEDULE

The Initial Closing Date shall be fifteen (15) days after issuance of the Notice of Suitability. Buyer shall purchase at the Initial Closing Lots 12 through 22 of Fiddler's Creek Phase Four Unit Two, Block "A" ("Initial Closing Lots"). Buyer may purchase some or all of the Initial Closing Lots prior to the Initial Closing Date; however, such early closing shall not change the Initial Closing Date.

Second Closing: No later than six (6) months after the Initial Closing Date, Buyer shall close on Lots 1 through 11 of Fiddler's Creek Phase Four Unit Two, Block "A", and Lots 4 through 6, 8 and 10 of Fiddler's Creek Phase Four Unit Two, Block "B" (the "Second Closing").

Third Closing: No later than nine (9) months after the Initial Closing Date, Buyer shall close on Lots 11 through 13 and 15 through 16 of Fiddler's Creek Phase Four Unit Two, Block "B" ("Third Closing").

Subsequent Closings: Commencing on the first day of the first full calendar quarter after twelve (12) months from the Initial Closing Date, Buyer shall close on no less than five (5) numerically consecutive 65' Lots per quarter, beginning with Lot 17 of Fiddler's Creek Phase Four Unit Two, Block "B" and ending with Buyer's purchase of Lot 59 of Fiddler's Creek Phase Four Unit Two, Block "B". If Buyer has a contract or contracts with a Retail Buyer to construct a residence, Buyer shall have the right to purchase the Lot(s) upon which such residence(s) will be constructed and such Lot(s) shall count towards the five (5) Lots to be purchased but such Lots do not need to be consecutive; provided, however, Buyer shall not be permitted to skip more than five (5) numerically consecutive Lots to purchase a Lot where Buyer has a contract with a Retail Buyer.

Additionally, Buyer shall close on Lots 1 through 7 of Fiddler's Creek Phase Four Unit One, Block "A" and Lots 1 through 9 of Fiddler's Creek Phase Four Unit Three, Block "B" no later than one (1) year from the Initial Closing Date.

Buyer 
Seller

## EXHIBIT D

## GENERAL ASSIGNMENT

THIS GENERAL ASSIGNMENT (this "**Assignment**") is made as of the ____ day of _____, 2011, by GBP DEVELOPMENT, LTD., a Florida limited partnership, and GB PENINSULA, LTD., a Florida limited partnership (collectively, the "**Seller**"), to D.R. HORTON, INC., a Delaware limited liability company ("**Buyer**").

WHEREAS, of even date herewith, Seller has conveyed to Buyer the lots described in Exhibit "**A**" attached hereto ("**Lots**"), together with all improvements (the "**Improvements**") located thereon (the Lots and Improvements are referred to herein collectively as the "**Property**"); and

WHEREAS, Seller and Buyer intend that Seller also convey to Buyer all of the Conveyed Property Rights (as hereinafter defined).

NOW, THEREFORE, Seller, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, hereby agrees as follows:

1.     Seller has GRANTED, BARGAINED, SOLD, CONVEYED and ASSIGNED, and by these present does hereby GRANT, BARGAIN, SELL, CONVEY and ASSIGN to Buyer all of Seller's right, title and interest in and to the following, but only to the extent same pertain to the Property ("**Conveyed Property Rights**"):

(a)     all surveys, engineering, soils, seismic, geological, environmental, reports, studies and certificates and other technical descriptions;

(b)     all warranties, guaranties and indemnities received from third parties, and all claims, demands and causes of action against third parties, but only to the extent they are for the benefit of, and applicable to, the Property or the owner thereof, including, without limitation, any warranties, guaranties, indemnities, contractual rights, claims, demands and causes of action pertaining to the development, construction, design or completion of the Property and/or the common areas, streets, utilities or other subdivision infrastructure;

(c)     all licenses, permits, governmental approvals, utility commitments, utility rights (including rights to capacity or service), drainage and detention rights, development rights or other similar rights, inclusive of any prepaid impact fees, impact fee credits or other similar development credits, other than reimbursement rights (i) accruing to Buyer by reason of funds expended by Buyer, or on behalf of Buyer, after the date hereof, or (ii) otherwise expressly agreed to by Seller in writing pursuant to the contract of sale for the Lots by and between Seller and Buyer (the "Lot Purchase Agreement"), or (iii) as otherwise provided in the Lot Purchase Agreement;

(d)     all rights under any plats (preliminary or final) of any portion of the Property or any rights-of-way abutting the Property or any portion thereof, including any boundary plats and any right-of-way plats, submitted, approved or recorded;

(e)     all unpaid awards or proceeds, including awards in connection with insurance and any eminent domain taking; and

(f)     all other rights, powers, privileges, options, or other benefits associated with, that pertain to, are attributable to, are appurtenant to, apply to, or which otherwise benefit the Property.

Buyer
Seller

TO HAVE AND TO HOLD the Conveyed Property Rights unto Buyer and Buyer's successors and assigns forever.

2.     This Assignment shall be binding on Seller, its successors and assigns, and shall inure to the benefit of Buyer, its successors and assigns.

3.     This Assignment does not constitute an assumption of any liability or obligation by Buyer, nor shall it be deemed to impose on Buyer any liability or obligation. This Assignment is made WITHOUT RECOURSE. Furthermore, Seller assigns the Conveyed Property Rights only to the extent they may exist and in fact be assignable, and without any representation or warranty whatsoever.

4.     Seller and Buyer will each cooperate with each other, their employees, and agents to facilitate the purpose and intent of this Assignment including, without limitation, the providing of information and documentation that may be reasonably required for the enforcement of the rights and interests assigned hereby.

5.     This Assignment may be executed in several counterparts, each of which shall be fully effective as an original and all of which together shall constitute one and the same instrument.

EXECUTED as of the date first above written.

**NOTE: EXHIBIT ONLY – DO NOT EXECUTE.**

Buyer
Seller



## EXHIBIT "E"

## PERMITTED EXCEPTIONS

SCHEDULE B - Section 2

Commitment Number:

Exceptions:

Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company:

1. Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2. Standard Exceptions:
(a) Rights or claims of parties in possession not shown by the public records.
(b) Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the premises.
(c) Easements, or claims of easements, not shown by the public records.
(d) Any lien, or right to a lien, for service, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.
(e) Taxes or special assessments which are not shown as existing liens by the public records.
(f) Any claim that any portion of said lands are sovereignty lands of the State of Florida, including submerged, filled or artificially exposed lands and lands accreted to such lands.
(g) Taxes and assessments for the year 2011 and subsequent years, although not yet due and payable until on or on/or after November 1, 2011.

3. Standard exceptions (b) and (c) may be removed from the policy when a satisfactory survey and surveyor's report and inspection of the premises is made.

4. Standard exceptions (a), (d) and (e) may be removed upon receipt of a satisfactory affidavit-indemnity from the party shown in title and in possession stating who is in possession of the lands and whether there are improvements being made at date of commitment or contemplated to commence prior to the date of closing which will not have been paid for in full prior to the closing.

5. Declaration of Restrictions and Protective Covenants for Parcel 24 at Fiddler's Creek; Declaration of Restrictions and Protective Covenants for Parcel 116 at Fiddler's Creek or the Declaration of Restrictions and Protective Covenants for Parcel 112 at Fiddler's Creek [as may be applicable to the lots conveyed] to be recorded in the Public Records of Collier County, Florida.

Standard Exception: 2(g) Taxes and assessments for the year 2011 and subsequent years, although not yet due and payable until on or after November 1, 2011.



6. Hotel Restriction Agreement dated November 9, 1989 between The Deltona Corporation and City National Bank of Florida, as Trustee, as recorded November 16, 1989 in O.R. Book 1484, Pages 1724 through 1745, of the Public Records of Collier County, Florida.

7. Memorandum of Agreement dated February 6, 1996 by and between GB 100, Inc., a Florida Corporation and Parcel Z, Inc., a Florida Corporation jointly doing business as a Florida general partnership known as 951 Land Holdings Joint Venture and the Board of County Commissioners of Collier County, Florida, as recorded February 29, 1996 in O.R. Book 2153, page 812-818, Public Records of Collier County, Florida.

8. Conditions, restrictions and limitations together with easements reserved for public utility purposes as shown on the plat of Fiddler's Creek, Phase Four, Unit One, as recorded in Plat Book 43, Pages 55 through 61; all of the Public Records of Collier County, Florida. [If applicable to the lots conveyed]

9. Conditions, restrictions and limitations together with easements reserved for public utility purposes as shown on the plat of Fiddler's Creek, Phase Four, Unit Two, as recorded in Plat Book 45, Pages 40 of the Public Records of Collier County, Florida. [If applicable to the lots conveyed]

10. Conditions, restrictions and limitations together with easements reserved for public utility purposes as shown on the plat of Fiddler's Creek, Phase Four, Unit Three, as recorded in Plat Book 46, Page 57, of the Public Records of Collier County, Florida. [If applicable to the lots conveyed]

11. Resolution No. 09-91 by the Board of County Commissioners relating to drainage easement located in Phase Four, Unit Two, as recorded in O. R. Book 4444, Page 3338, Public Records of Collier County, Florida. [If applicable to the lots conveyed]

12. Drainage Easement in favor of Collier County over the West 60 feet of the East ½ of the Northeast 1/4 of the Northwest 1/4 and the East 60 feet of the Northwest 1/4 of the Northeast ½ as recorded December 20, 1995, in O. R. Book 2130, Page 1078, Public Records of Collier County, Florida.

13. Easement reserved over the West 30 feet of the East ½ of the Northeast 1/4 of the Northwest 1/4 Section 14, Township 51 South, Range 26 East, for roadway in favor of Carl Gran, Joanna Wood and current owners of abutting land in Deed recorded December 27, 1972 in O.R. Book 495, Page 109, Public Records of Collier County, Florida.

14. Reservation for roads contained in Deed recorded in O.R. Book 182, Page 519 and Deed recorded in O.R. Book 182, Page 900, reserving unto JIB Corporation, and others an easement over and across the following: A strip of land 60 feet in width lying 30 feet on each side of the line common to the North ½ of the Northeast ¼ and the South ½ of the Northeast ¼ of Section 14, Township 51 South, Range 26 East.

15. Amended and Restated Temporary Construction Access and Drainage Easement recorded in O.R. Book 3287, Page 2464, and re-recorded in O.R. Book 3494, Page 2053, all of the Public Records of Collier County, Florida.

16. Reservation for roads contained in Deed dated October 20, 1964, recorded in *Official Records Book 178, Page 452*, such Deed reserving unto the grantor named in the Deed, JIB Corporation, and others, an easement over and across a strip of land 60 feet in width lying 30 feet on each side of the line common to the North ½ of the Northwest 1/4 and the South ½ and the Northwest 1/4 in Section 14, Township 51 South, Range 26 East.

17. Vacation of Easements by instrument recorded in O. R. Book 2783, Page 2615 and re-recorded in O.R. Book 4389, Page 3664, Public Records of Collier County, Florida.

18. Utility Facilities Warranty Deed and Bill of Sale by and between GB Peninsula, Ltd, a Florida Limited Partnership and Fiddler's Creek Community Development District 2, as recorded in O.R. Book 4256, Page 3932, of the Public Records of Collier County, Florida.

19. Assignment of Reservations by and between GB Peninsula Ltd., a Florida Limited partnership and GBP Development, Ltd., a Florida limited partnership and Fiddler's Creek Community Development District 2, as recorded in O.R. Book 3859, Page 148, of the Public Records of Collier County, Florida.

20. Utility Facilities Warranty Deed and Bill of Sale by and between GB Peninsula, Ltd., a Florida Limited Partnership and Fiddler's Creek Community Development District 2, as recorded in O. R. Book 4103, Page 3112, having been re-recorded in O.R. Book 4113, Page 3538, all of the Public Records of Collier County, Florida.

21. Easement by and between GB Peninsula, Ltd., a Florida limited liability company, and Florida Power & Light Company and Sprint as recorded in O.R. Book 3813, Page 1383, Public Records of Collier County, Florida.

22. Utilities Facilities Warranty Deed and Bill of Sale between GB Peninsula, Ltd., a Florida limited partnership and the Fiddler's Creek Community Development District 2, by instrument recorded in O.R. Book 3870, Page 0904, Public Records of Collier County, Florida.

23. Resolution by the Board of County Commissioners of the Collier County Water-Sewer District No. CWS 85-4 as recorded in O.R. Book 1143, Page 2367, Public Records of Collier County, Florida.

24. Resolution by the Board of County Commissioners as recorded in O.R. Book 4423, Page 1737, Public Records of Collier County, Florida.

25.     Avigation Easement by and between GB 100, Inc., a Florida Corporation and Parcel Z, Inc., a Florida Corporation d/b/a 951 Land Holdings Joint Venture as Grantor to Collier County and the Collier County Airport Authority as Grantee, as recorded in O.R. Book 2242, page 2307, Public Records of Collier County, Florida.

26.     Department of Army Permit issued under Application Number 78B-0683 having an effective dated of September 29, 1983, and recorded in O.R. Book 1360, pages 1238 through 1252, recorded September 24, 1991 in O.R. Book 1650, Pages 160 through 174, of the Public Records of Collier County, Florida.

27.     That certain Planned Unit Development (P.U.D.) issued by Collier County under Ordinance No. 84-41 (84-42) on June 12, 1984, as amended by Ordinance Nos. 88-48 and 89-34, as issued on May 24, 1988 and June 13, 1989, as amended by Ordinance No. 96-74, as issued on November 26, 1996, respectively, Collier County, Florida, and as amended.

28.     Polling Place Agreement by and between Supervisor of Elections and 951 Land Holdings Joint Venture, a Florida General Partnership, dated March 27, 1996, recorded April 10, 1996 in O.R. Book 2169, Page 1177, of the Public Records of Collier County, Florida.

29.     Final Judgment filed in Case No. 02-5293 Fiddler's Creek Community Development District 2 vs. The State of Florida, et al, for District Special Assessment Revenue Bonds, recorded February 19, 2003 in O.R. Book 3222, Page 458, of the Public Records of Collier County, Florida. (Assessments for the Community Development District are assessed as non ad valorem items.)

30.     Amended and Restated Declaration of General Covenants, Conditions and Restrictions for Fiddler's Creek as recorded in O.R. Book 3685, Page 319, et seq., Supplemental Declaration and First Amendment recorded in O.R. Book 3695, Page 1853; Supplemental Declaration and Second Amendment recorded in O.R. Book 3765, Page 2548; Supplemental Declaration and Third Amendment recorded in O.R. Book 3939, Page 918; Articles of Incorporation and Bylaws of the Fiddler's Creek Foundation, Inc., recorded in O.R. Book 2315, Page 2114; and O.R. Book 2315, Page 2119; Supplemental Declaration and Fourth Amendment recorded in O.R. Book 3984, Page 1519; Supplemental Declaration and Fifth Amendment recorded in O.R. Book 3984, Page 1522; Supplemental Declaration and Sixth Amendment recorded in O.R. Book 4002, Page 133; Supplemental Declaration and Seventh Amendment recorded in O.R. Book 4023, Page 3272; Supplemental Declaration and Eight Amendment recorded in O.R. Book 4178, Page 1559, Supplemental Declaration and Ninth Amendment recorded in O.R. Book 4180, Page 2755, amended Supplemental Declaration and Ninth Amendment recorded in O.R. Book 4194, Page 410; Supplemental Declaration and Tenth Amendment as recorded in O.R. Book 4208, Page 2788; Supplemental Declaration and Eleventh Amendment as recorded in O.R. Book 4256, Page 1872; as amended in O.R. Book 4426, Page 2150; all of the Public Records of Collier County, Florida, and as amended. These

documents contain provisions creating easements, assessments for various purposes and lien rights. [To be amended to include the lots conveyed]

31. Notice of Adoption of Development Order by the Board of County Commissioners for Unit 30, Isle of Capri Commercial and Key Marco (Horr's Island) and *part of Marco Shores Planned Unit Development* located in Sections 11, 14, 22, 23, 24 and 33, Township 51 South, Range 26 East, and Sections 14, 15, 21, 22, 23, 26 and 28, Township 52 South, Range 26 East, Collier County, Florida, as recorded in O.R. Book 1505, at Pages 1728,-1782, and Amendment in Collier County Resolution 89-149, recorded in O.R. Book 1505, at Pages 1795-1803; and Resolution 88-117 recorded in O.R. Book 1505, at Pages 2348-2351; Notice recorded March 21, 1990 in O.R. Book 1514, at Pages 746-760 executed by Robert L. Weintraub, Esq., which states as follows: "that the development orders constitute land development regulations applicable to the subject property, but the recordation of the notices and of the development orders shall not constitute a lien, cloud, or encumbrance on any real property, or actual constructive notice of any of the same", Resolution No. 96-333 adopted July 23, 1996; Resolution No. 96-530, adopted November 26, 1996; Resolution No. 98-49 adopted February 24, 1998; and Resolution No. 00-458 adopted December 12, 2000, all of the Public Records of Collier County, Florida and as amended.

32. Grant of Temporary Construction and Access Easement in favor of the Fiddler's Creek Community Development District #2, as recorded in O.R. Book 3323, Page 875, Public Records of Collier County, Florida.

33. Order of Taking in favor of Florida Power and Light Company for a perpetual easement as recorded in O.R. Book 1324, Page 2293, of the Public Records of Collier County, Florida.

34. Ordinance No. 75-20, filed May 19, 1975 in O.R. Book 619, Page 1177 of the Public Records of Collier County, Florida, regulating the installation of any water distribution system and waste water collection system within a public right-of-way or easement.

35. Ordinance No. 75-21, filed May 19, 1975 in O.R. Book 619, Page 1182 of the Public Records of Collier County, Florida, protecting certain trees within Collier County.

36. Ordinance No. 75-24, filed May 19, 1975 in O.R. Book 619, Page 1191 of the Public Records of Collier County, Florida, regulating and restricting the creation, construction, alteration, etc. of buildings, locations, etc.

37. Resolution by the Board of County Commissioners Establishing the Immokalee Area Planning District and the Coastal Area Planning District as recorded in O.R. Book 649, Page 1239, Public Records of Collier County, Florida.

38. Collier County Ordinance No. 90-30 referred to as the "Collier County Mandatory Solid Waste Collection and Disposal Ordinance", as amended.



39.  Riparian and Littoral Rights are not insured.

40.  Title to the beds or bottoms of lakes, rivers or other bodies of water located on or within the property.

41.  The nature, extent, or existence of riparian rights, if any, appurtenant to the insured land are neither guaranteed nor insured, and the riparian rights of others as the same may affect the said land, are hereby excepted.

42.  Any lien provided for Chapter 159.17, Florida Statutes, In favor of any city, village, town, or port authority for unpaid service charges for service by any water system, sewer system or gas system serving the lands herein described. Not yet due or payable.

43.  Agreement to Assign Reservations and Dedicate and/or convey as recorded June 13, 2003 in O.R. Book 3315, Page 2999, Public Records of Collier County, Florida.

**EXHIBIT F**



## FIDDLER'S CREEK UTILITY PLANS AND DRAWINGS

Fiddler's Creek Phase 4, Unit 1 Record Drawings. 28 pages. Dated 06/01/05. Prepared by Q.Grady Minor and Associates, P.A.

Fiddler's Creek Phase 4, Unit 2 Record Drawings. 36 pages. Dated 02/27/07. Prepared by Q. Grady Minor and Associates, P.A.

Fiddler's Creek Phase 4, Unit 1 Construction Access Plans. 2 pages. Dated 04/25/07. Prepared by Q. Grady Minor and Associates, P.A.

Fiddler's Creek Phase 4, Unit 1 Plat. Recorded 06/09/05 in plat book 43, pages 55-61.

Fiddler's Creek Phase 4, Unit 2 Plat. Recorded 03/13/06 in plat book 45, pages 40-47.

Fiddler's Creek Phase 4, Unit 3 Plat. Recorded 06/23/06 in plat book 46, pages 57-61.

**EXHIBIT G**

[DATE]

Paul Romanowski, Division President
D.R. Horton, Inc. – Southwest FL Division
13880 Treeline Ave., Ste. 3
Fort Myers, FL 33913

> Re: Lot Purchase Agreement ("the Agreement") between GBP Development, Ltd., a Florida limited partnership, and GB Peninsula, Ltd., a Florida limited partnership (collectively, the "Seller") and D.R. Horton, Inc. ("Buyer") regarding approximately _____ acres of land located in Collier County, Florida (the "Land")

Dear Mr. Romanowski:

Pursuant to Section 37 of the Agreement, I am writing on behalf of Seller to certify to Buyer the following:

1. Seller is a Florida limited partnership, organized and existing under the laws of Florida;

2. Seller does owns significant assets other than the Land; and
   [OR ALTERNATIVE PARAGRAPH (2)]

3. The value of the Land constitutes _____ % or less of the total value of all assets owned by Seller; and

4. The above certifications are made to the best of the undersigned's knowledge.

**NOTE: THIS IS AN EXHIBIT. INITIAL ONLY – DO NOT EXECUTE**

Buyer
Seller

## LIMITED LICENSE AGREEMENT
## (ELEVATIONS)

This **LIMITED LICENSE AGREEMENT** (the "License") is executed and delivered this _____ day of _____, _____, by and between **D.R. Horton, Inc.**, a Delaware corporation ("**Licensor**") and **GBP Development, Ltd.**, a Florida limited partnership and **GB Peninsula, Ltd.**, a Florida limited partnership, and their affiliates (collectively, the "**Licensee**").

A.    Licensor is the Buyer pursuant to that certain Lot Purchase Agreement dated as of April _____, 2011 (the "Agreement"), by and between Licensor, as Buyer and Licensee, as Seller.

B.    Pursuant to the Agreement, Licensor desires to grant, transfer and convey a limited license to Licensee, as hereinafter provided, for the right to use those certain architectural building elevations which are attached hereto as **Exhibit A** (the "**Elevations**") and which Licensor has utilized for the construction of residential homes in that certain residential community know as Fiddler's Creek in Collier County, Florida (the "**Community**") which Seller is developing. The License granted herein shall apply solely to the use of the Elevations by Licensee for the construction of residential homes on any lots which are not purchased by Licensor from Licensee pursuant to the terms of the Agreement, which are described on **Exhibit B** attached hereto and made a part hereof (the "**Lots**").

C.    Licensee desires to accept the limited license as described herein, in connection with and for use exclusively for the Lots, without recourse, representation or warranty of Licensor, from and after the date hereof in accordance with the terms hereof.

**NOW, THEREFORE,** in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee hereby agree as follows:

1.    RECITALS, DEFINITIONS.  The above stated recitals are true and correct and incorporated herein by this reference. All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

2.    LICENSE.  Licensor hereby grants to Licensee a non-exclusive, non-transferable license to use the Elevations, without recourse, representation or warranty, solely in connection with and for use exclusively in connection with the Lots. Licensee shall not use nor have the right to use the Elevations in connection with any other development or construction project, other than the limited license to use the Elevations in respect to the Lots. Licensee shall use the Elevations solely for the purpose of developing architectural plans to be prepared by a Florida

**NOTE: THIS IS AN EXHIBIT. INITIAL ONLY – DO NOT EXECUTE**

Buyer _____
Seller _____

licensed architect retained by Licensee to prepare architectural plans and drawings as required by Collier County, Florida, for the issuance of a building permit on each of the Lots. The License granted herein shall permit the Elevations to be utilized in connection with the preparation of such architectural plans. All references to D.R. Horton, Inc., and the fact that the Elevations are owned by D.R. Horton, Inc. shall be deleted from any of the Elevations utilized by Licensee and Licensee is specifically prohibited from using, advertising or marketing the fact that the Elevations are owned by or are the product of D.R. Horton, Inc. The use of the Elevations is solely to permit a common architectural scheme to be utilized by Licensee on the Lots to the extent that they have not been purchased by Licensor pursuant to the Agreement.

3.     ACCEPTANCE. Licensee hereby accepts this License without recourse, representation or warranty. The License granted herein shall apply solely to the Licensee and shall not be utilized by any other party. Licensee shall not have the right to assign or transfer any license or interest in or to the Elevations to any other person or entity whatsoever.

4.     RESERVATION OF LICENSOR'S RIGHTS. Licensor, for itself and its affiliated and related companies, hereby reserves any and all rights not expressly and explicitly granted in this License, including, but not limited to, Licensor's right to use and/or authorize or license the use of the Elevations to any third party. Licensor specifically reserves any trademark, copyright or other rights it owns with respect to the Elevations.

5.     TERM. This License shall commence on the execution hereof by the Licensor and Licensee and shall terminate two (2) years from the date of the last lot purchased by Licensor within the Community, pursuant to the Agreement. Upon the termination hereof, the License herein granted shall cease and terminate and Licensee shall have no further right to use the Elevations.

6.     EVENT OF DEFAULT BY LICENSEE. Each of the following events after written notice by Licensor and an opportunity to cure as provided in Section 7 below shall be deemed a default hereunder by Licensee (each an "Event of Default by Licensee"):

(a)     except for the existing Bankruptcy Case, if Licensee becomes the subject of a voluntary petition in bankruptcy or any voluntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors, or an involuntary petition in bankruptcy or any involuntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors, if such involuntary petition or proceeding is not dismissed within sixty (60) days of filing, or

(b)     if Licensee is using the Elevations in support of, or in connection with, any unlawful activity; or

(c)     upon a breach of this License by Licensee.

7.     LICENSEE'S RIGHT TO CURE. Upon Licensee's receipt of written notice from Licensor of an event of default by Licensee, Licensee shall have a period of fifteen (15) days to cure such breach and if Licensee fails to cure such breach by Licensee within such period,

**NOTE: THIS IS AN EXHIBIT. INITIAL ONLY – DO NOT EXECUTE**

DR Horton Lot Purchase Agreement – Veneta
Page 36 of 42
4821-7061-3513.2
371185/0029

Buyer
Seller

Licensor shall have the right to terminate this License and, upon such termination, the License herein granted shall cease and terminate and Licensee shall have no further rights under this License.

8. **REMEDIES.** Licensee agrees that upon an Event of Default by Licensee, Licensor will suffer irreparable damage, money damages may be inadequate, and Licensor shall be entitled to preliminary injunctive relief and other injunctive relief, which shall be in addition to, and not in limitation of, any and all other remedies Licensor may have in law or equity for the enforcement of this License or for damages suffered as a result of such breach. Upon the expiration or termination of this License, all rights granted to Licensee hereunder shall terminate and revert to Licensor.

9. **MODIFICATION OF AGREEMENT.** This License represents the entire understanding and agreement between the parties with respect to the subject matter hereof, and supersedes all of the negotiations, understanding and representations (if any) made by and between such parties. None of the terms or provisions hereof may be amended, supplemented, waived or changed orally, except by a writing signed by Licensor and Licensee. Any such amendment, supplement, waiver or modification shall make specific reference to this License.

10. **NOTICES.** Any notices which may be permitted or required hereunder shall be in writing and shall be deemed to have been duly given as of the date and time the same are (i) delivered by hand, or (ii) received by the addressee, if sent by Express Mail, Federal Express or other reputable express delivery service (receipt requested) and shall be sent in each case to the appropriate addresses set forth below (or to such other addresses as a party may from time to time designate as to itself by notice similarly given to the other parties in accordance herewith, which shall not be deemed given until received by the addressee):

| | |
|---|---|
| To Licensor: | Paul Romanowski, Division President |
| | D.R. Horton, Inc. – Southwest Florida Division |
| | 13880 Treeline Ave., Ste. 3 |
| | Fort Myers, FL 33913 |
| | Telephone: (239) 225-2600 |
| | Facsimile: (817) 928-6178 |
| | |
| With a copy to: | O. Kenneth Bagwell, Jr., Corporate Counsel |
| | D.R. Horton, Inc. |
| | 5850 T.G. Lee Blvd., Ste. 600 |
| | Orlando, FL 32822 |
| | Telephone: (407) 850-5257 |
| | Facsimile: (800) 248-5996 |
| | |
| With a copy to: | Richard MacFarland, Esq. |
| | Broad and Cassel |
| | 7777 Glades Rd., Ste. 300 |
| | Boca Raton, FL 33434 |
| | Telephone: (561) 883-8959 |
| | Facsimile: (561) 218-8959 |

**NOTE: THIS IS AN EXHIBIT. INITIAL ONLY – DO NOT EXECUTE**

DR Horton Lot Purchase Agreement – Veneta
Page 37 of 42
4823-7061-1513.2
37485/0029

Buyer
Seller

To Licensee:

GBP Development, Ltd./GB Peninsula, Ltd
Attn: Anthony DiNardo, as Attorney in Fact
and Joseph L. Parisi, Esq.
8156 Fiddler's Creek Pkwy.
Naples, FL 34114
Telephone: (239) 732-9400
Facsimile: (239) 732-9402

With a copy to:

Mark J. Woodward, Esq.
Woodward, Pires & Lombardo, P.A.
3200 Tamiami Trail N., Ste. 200
Naples, FL 34103
Telephone: (239) 649-6555
Facsimile: (239) 649-7342

11.    BINDING EFFECT AND ASSIGNMENT. This License shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto; provided, however, that Licensee shall not assign any of its rights or delegate any of its duties under this License, or otherwise transfer this License (by merger, operation or law or otherwise) without the prior written consent of Licensor, which consent may be withheld in the sole and absolute discretion of Licensor. Licensor may assign or transfer any or all rights granted herein to any third party without the consent of Licensee.

12.    NO PARTNERSHIP, JOINT VENTURE, OR AGENCY. Nothing herein contained shall be construed to constitute the parties hereto as partners or as joint venturers, or one as agent of the other. Neither party has the right to bind the other party or its subsidiaries or affiliates.

13.    WAIVER. No waiver of any breach or failure to perform the terms, covenants and conditions of this License shall be binding upon the parties hereto unless the same shall be in writing. Any such waiver shall be for one time only and shall not be for any future breach or failure to perform under the terms of this License.

14.    APPLICABLE LAW AND BINDING EFFECT. This License shall be construed and enforced in accordance with the laws of the State of Florida applicable to agreements to be executed and performed wholly within said state, and shall inure to the benefit of and be binding upon the parties hereto and their heirs, personal representatives, successors and assigns. The parties hereby agree that venue for any legal action authorized hereunder shall be in Collier County, Florida, and that jurisdiction shall be vested in the Civil Division of the Circuit Court for the Twentieth Judicial Circuit in and for Collier County, Florida, and if appropriate, in the Business Court Division thereof, and any objections as to jurisdiction or venue of such court is expressly waived.

15.    ATTORNEY'S FEES. If either party to this License shall bring suit in connection with the enforcement or interpretation of any provisions hereof, the predominately

NOTE: THIS IS AN EXHIBIT. INITIAL ONLY – DO NOT EXECUTE

Buyer _____
Seller _____

prevailing party on any issue in any such litigation and any appeals therefrom shall be entitled to recover from the other party, in addition to any other relief granted as a result of such litigation, all costs and expenses of such litigation and reasonable attorneys' fees and paralegals' fees incurred prior to trial, at trial and on appeal.

16. TAXES. Licensee is solely responsible for reporting and paying any taxes (including sales or use taxes and intangible taxes) resulting from Licensee's acceptance of the license granted pursuant to this License. Licensor reserves the right to have Licensee pay any such taxes to Licensor as they fall due for remittance to the appropriate authority. Licensee agrees to hold Licensor harmless from all liability arising from Licensee's failure to report or pay such taxes.

17. SECTION AND PARAGRAPH HEADINGS. Section and paragraph headings used throughout this License are for reference and convenience and in no way define, limit or describe the scope or intent of this License or affect its provisions.

18. USAGE. Whenever used herein, the singular number shall include the plural and the plural the singular and the use of any gender shall include all genders.

19. INVALID PROVISION. The invalidity or unenforceability of any term or provision of this License or the non-applicability of any such term or provision to any person or circumstances shall not impair or affect the remainder of this License, and the remaining terms and provisions hereof shall not be invalidated, but shall remain in full force and effect and shall be construed as if such invalid, enforceable or non-applicable provisions were omitted.

20. COUNTERPARTS. This License may be executed in counterparts, each of which shall be deemed to be an original, but which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this License as of the date specified above.

LICENSOR:

D.R. HORTON, INC., a Delaware corporation

By:_____
Name:_____
Title:_____
Date:_____

**NOTE: THIS IS AN EXHIBIT. INITIAL ONLY – DO NOT EXECUTE**

Buyer
Seller

**LICENSEE:**

**GBP DEVELOPMENT, LTD.,** a Florida
limited partnership

By:_____
Name:_____
Title:_____
Date:_____


**GB PENINSULA, LTD.,** a Florida
Limited partnership

By:_____
Name:_____
Title:_____
Date:_____

**NOTE: THIS IS AN EXHIBIT. INITIAL ONLY – DO NOT EXECUTE**

Buyer
Seller

# EXHIBIT A

## ELEVATIONS

### [To be attached by Licensor upon execution based upon the Elevations used in the Community]

NOTE: THIS IS AN EXHIBIT. INITIAL ONLY – DO NOT EXECUTE

Buyer
Seller

**EXHIBIT B**

**LOTS**

**[To be completed by Licensor upon execution based upon the Lots listed in Exhibit A to the Agreement which are not purchased by Licensor]**

**NOTE: THIS IS AN EXHIBIT. INITIAL ONLY – DO NOT EXECUTE**

Buyer
Seller

# EXHIBIT B

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (hereinafter referred to as this "Agreement"), is made and entered into this ____ day of _____, 2011, by and among: GBP DEVELOPMENT, LTD., a Florida limited partnership, and GB PENINSULA, LTD., a Florida limited partnership, each having as a mailing address: 8156 Fiddler's Creek Pkwy., Naples, FL 34114 (hereinafter collectively referred to as "Seller"); D.R. HORTON, INC., Inc., a Delaware corporation, having as a mailing address: 13880 Treeline Avenue, Suite 3, Fort Myers, FL 33913 (hereinafter referred to as "Buyer"; and WOODWARD, PIRES & LOMBARDO, P.A., having as a mailing address: 3200 Tamiami Trail N., Ste. 200, Naples, FL 34103 (hereinafter referred to as "Escrow Agent").

## W I T N E S S E T H

WHEREAS, Seller and Buyer have entered into that Lot Purchase Agreement having an Effective Date of June 2, 2011 (hereinafter referred to as the "Contract") as to certain real property situated in Collier County, Florida (hereinafter referred to as the "Property"); and

WHEREAS, Buyer and Seller have appointed WOODWARD, PIRES & LOMBARDO, P.A. to hold all earnest money under the Contract in accordance with the terms of the Contract and this Agreement.

NOW, THEREFORE, in furtherance of the transaction contemplated hereby and for and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.     Seller and Buyer hereby designate, constitute and appoint WOODWARD, PIRES & LOMBARDO, P.A. as the "Escrow Agent" under this Agreement to hold all earnest money under the Contract, and WOODWARD, PIRES & LOMBARDO, P.A. accepts such designation and appointment and agrees to act in accordance with the terms of the Contract and this Agreement. In the event or a conflict between the terms of this Agreement and those of the Contract, the terms of the Contract shall control. Seller and Buyer agree (a) that Escrow Agent shall be a stakeholder only and not liable for any losses, costs or damages it may incur in performing its responsibilities hereunder unless such losses, costs or damages shall arise out of the willful default or negligence of Escrow Agent or its agents, (b) that no releases or disbursements shall be made hereunder except upon consistent written instructions from both Seller and Buyer or their successors or assigns; and (c) that in the event of a dispute hereunder between Seller and Buyer (or their successors or assigns), Escrow Agent shall have the right, exercisable in its sole discretion, to be discharged by tendering unto the registry or custody of any court of competent jurisdiction, the Initial Closing documents and funds held by Escrow Agent, together with any such legal pleadings as it deems appropriate. Escrow Agent shall be indemnified, saved and held harmless by the Seller and Buyer for all of its expenses, costs and reasonable attorney's fees incurred in connection with such interpleader action. Seller shall be responsible for any fees for the retention of Escrow Agent for acting in the capacity as Escrow Agent.

2.     Upon receipt of consistent written instructions from both Seller and Buyer, or their respective counsel, then Escrow Agent shall disburse the funds held in escrow in accordance with the written instructions signed by both Buyer and Seller, or their respective counsel. Said written instructions may be given in duplicate counterparts and by facsimile. Escrow Agent shall have the right to deduct any costs Escrow Agent has incurred for overnight delivery charges or wire transfer fees from the funds held prior to disbursement.

3. All checks, money orders or drafts deposited with Escrow Agent under this Agreement will be processed for collection in the normal course of business. Escrow Agent will not commingle funds received by it in escrow with funds of others and shall deposit such funds in a separate escrow account with a federally insured Bank. Escrow Agent shall not be liable for any loss caused by the failure, suspension, bankruptcy or dissolution of any such investment vehicle or fund.

4. Escrow Agent shall not be liable for any loss or damage resulting from the following:

      (a)     Any default, error, action or omission of any other party;

      (b)     The expiration of any time limit unless such time limit was known to Escrow Agent and such loss is solely caused by failure of Escrow Agent to proceed in its ordinary course of business;

      (c)     Any loss or impairment of funds while on deposit with a federally insured Bank resulting from failure, insolvency or suspension of such institution; or

      (d)     Escrow Agent's complying with any and all legal process, writs, orders, judgments and decrees of any court whether issued with or without jurisdiction and whether or not subsequently vacated, modified, set aside or reversed.

5. Escrow Agent shall be entitled to rely upon the instructions and other matters covered thereby, and shall not be required to investigate the authority of the person executing and delivering such instructions, or otherwise verify the accuracy of the statements of information presented therein.

6. The terms and provisions of this Agreement are for the benefit of Seller, Buyer and Escrow Agent and their respective successors and assigns only. Nothing contained herein shall be deemed or construed to inure to the benefit of any other person or party, it being the express intent of Seller, Buyer and Escrow Agent that no such person party shall be entitled to any of the benefits hereof, except as herein expressly provided.

7. Time is of the essence of this Agreement.

8. This Agreement is intended as a contract under the laws of the State of Florida and shall be governed thereby and construed in accordance therewith.

9. This Agreement may be executed by facsimile signatures, which for all purposes shall be deemed to constitute originals. This Agreement may be executed in counterparts, all of which when taken together shall be deemed one original.

10. Any interest earned on the funds held in escrow shall accrue to the benefit of Buyer, whose tax identification number is 75-2386963.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the day, month and year first above written.

**Seller:**

**GBP Development, Ltd.**, a Florida limited partnership

By: _Amy J. Ferrao_

Name: Aubrey J. Ferrao

Title: Attorney in Fact and not individually

Date: June 8, 2011

**GB Peninsula, Ltd.**, a Florida limited partnership

By: _Amy J. Ferrao_

Name: Aubrey J. Ferrao

Title: As Attorney in Fact and not individually

Date: June 8, 2011

**Escrow Agent:**

WOODWARD, PIRES & LOMBARDO, P.A.

By: _Carrie E. Laorman_

Name: Carrie E. Laorman

Title: Vice President

Date: 6/8/11

**Buyer:**

**D.R. Horton, Inc.**, a Delaware corporation

By: _Paul Romanowski_

Paul Romanowski

Division President

Date: 6-9-11